# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ALLAN TEH, <br><br>   On a derivative basis as a partner of, <br><br> KS LAW GROUP, a District of Columbia Limited Liability Partnership, <br><br>     Plaintiff, <br><br>       v. <br><br> LEE MELCHIONNI, individually, SYLVIA BENITO, individually, PERSIST COMMUNICATIONS, INC., a Florida Corporation, THE LAKE LAW FIRM, a New York Limited Liability Company, <br><br>     Defendants, <br><br> and <br><br> KS LAW GROUP, a District of Columbia Limited Liability Partnership, <br><br>     Nominal Defendant. | Case No.: 25- |

## DOCKET INDEX

| State Court Docket Sheet |
|---|
| 001 - 2023-04-25 Civil Cover Sheet |
| 002 - 2023.04.25 Derivative Complaint |
| 005 - 2023-05-01 Summons. Defendants L. Melchionni, S. Benito, Persist Com Inc, Lake Law Firm, KS Law Group |
| 006 - 2023-05-01 Summons Defendant's L. Melchionni, S. Benito, Persist Comm Inc, Lake Law Firm, and KS Law Group |
| 007 - 2023-05-01 Summons. Defendant Lake Law Firm |
| 008 - 2023-05-01 Summons. Defendant Persist Comm Inc |
| 009 - 2023-05-01 Summons. Defendant L. Melchionni, S. Benito, Persist Com Inc, Lake Law Firm, KS Law Group |
| 010 - 2023-05-01 Summons. Defendant Lake Law Firm |
| 011 - 2023-05-01 Summons. Defendants L. Melchionni, S. Benito, Persist Com Inc, Lake Law Firm and Nom Def. KS Law Group |

| |
|---|
| 012 - 2023-05-01 Summons. Defendant Persist Comm Inc |
| 014 - 2023-05-02 Summons. Defendant KS Law Group |
| 016 - 2023-05-02 Summons. Defendant KS Law Group |
| 021 - Order Requiring Compliance with Complex Business Litigation Section Procedures and Order on Case Management Conferences |
| 022 - 2023-06-02 Order on Motion's and Memo Requirements and Mandatory Order to Confer and Certification Requirements |
| 025 - 2023-06-15 Defendant's L. Melchionni, S. Benito and KS Law Group's MTC Arbitration and Dismiss |
| 026 - 2023-06-15 Defendant's Lake Law Firm and Persist Com Motion to Compel Arbitration and Dismiss |
| 027 - 2023-06-20 Defendant's Joint Motion to Transfer |
| 029 - 2023-06-23 Agreed Order Extending Plaintiff's Time to Respond to Defendant's Motion to Compel Arbitration and Dismiss |
| 031 - 2023-06-28 Plaintiff's Response in Opposition to Defendant's Motion to Compel Arbitration and Dismiss |
| 032 - 2023-06-28 Plaintiff's Response in Opposition to Defendant's Motion to Compel Arbitration and Dismiss |
| 033 - 2023-06-30 Plaintiff's Response to Defendant's Joint Motion to Transfer |
| 034 - 2023-07-03 Defendant's Lake Law Firm and Persist Com Reply in Support of Motion to Compel Arbitration and Dismiss |
| 035 - 2023-07-05 Defendant's L. Melchionni, S. Benitos, and KS Law Groups Reply in further Support of Its Motion to Compel Arbitration and Dismiss |
| 036 - 2023-07-05 Defendant's Lake Law Firm and Persist Com et al Motion to Stay Proc. Except for Motion to Compel Arbitration and to Dismiss |
| 037 - 2023-07-06 Defendant's L. Melchionni, S. Benito, and KS Law Groups Motion for Sanctions |
| 038 - 2023-07-07 Defendant's L. Melchionni, S. Benito and KS Law Groups Mtn to Stay Proc. Except for Motion to Compel Arbitration and to Dismiss |
| 039 - 2023-07-07 Defendant's Amended Motion to Stay Proc. Except for Motion to Compel Arbitration and to Dismiss |
| 040 - 2023-07-07 Order Granting Motion to Transfer |
| 042 - 2023-07-17 Agreed Order Extending Plaintiff's Time to Respond to Defendant's Motion for Sanctions |
| 043 - 2023-07-19 P's Response in Opp to Def's Lake Law Firm and Persist Comm Motion to Stay Proc. Except for Motion to Compel Arbitration and to Dismiss |
| 045 - 2023-07-20 Order Setting Case Management Conference and to Prepare a Mandatory Case Management Report |
| 046 - 2023-07-20 Notice and Order of Adherence to Complex Business Litigation Section Procedures |
| 047 - 2023-07-20 Notice and Order of Motion and Memorandum Requirements |
| 048 - 2023-07-20 Mandatory Order to Confer and Certification Requirement |
| 049 - 2023-07-21 Defendant's Reply in Support of Motion to Stay |
| 050 - 2023-07-21 Plaintiff's Response in Opposition to Defendant's Motion for Sanctions (DE.37) |
| 051 - 2023-07-26 Defendant's Reply in Support of Motion to Stay Proceedings Except for Motion to Compel Arbitration and to Dismiss |
| 052 - 2023-07-26 NOH. Defendant's Amended Motion to Stay Proceedings except for Motion to Compel Arbitration and to Dismiss |
| 054 - 2023-08-12 Order Staying Proceedings Pending Disposition of Motions to Compel Arbitration |

| |
|---|
| 058 - 2023-10-12 Order Setting Initial Case Management Conference and to Prepare a Mandatory Case Management Report |
| 062 - 2023-10-19 Order Requiring Parties Joint Case Management Preliminary Order |
| 067 - 2023-12-22 Defendant's L. Melchionni, S. Benito and KS Law Groups Joinder to the Lake Law Firm and Persist Com Motion for Sanctions |
| 068 - 2024-01-04 Plaintiff's Response in Opposition to Defendant's Motion for Sanctions, Compel Arbitration and Dismiss (DE.48) |
| 071 - 2024-01-30 Agreed Order Staying the Case Pending Arbitration (DE.64) |
| 072 - 2024.05.25 Order Denying Plaintiff's Motion to Enforce Settlement. |
| 072 - 2024-05-25 Order Denying P's Mtn to Enforce Settlement (DE.59) |
| 078 -2025.07.02 Order Scheduling Case Management Conference on 11.10.25 |
| 079 - 2025.07.29 Notice of Claim of Attorney's Charging Lien |
| 080 - 2025-10-22 Plaintiff's Motion to Confirm Final Arbitration Award and for Entry of Final Judgment |
| 085 - 025-11-03 LLF and Persist's Motion to Confirm Final Arbitration Award |
| 087 - 2025-11-05 Agreed Order Granting Melchionni's Motion EOT |
| 089 - 2025-11-05 Agreed Order Granting Benito's Motion EOT |
| 091 - 2025-11-07 Benito's Response to Plaintiff's Motion to Confirm Final Arbitration Award |
| 092 - 2025-11-07 Teh's Notice of Filing |
| 093 - 2025-11-07 Defendant Benito's Opp to Plaintiff's Motion to Confirm Final Arbitration Award |
| 094 - 2025-11-10 Teh's Emergency Motion to Appoint Receiver |

# Case Information

**Local Case Number:**
2023-015702-CA-01

**State Case Number:**
132023CA015702000001

**Case Style:**
Allan Teh vs KS Law Group, LLP et al

**Filing Date:**
04/25/2023

**Judicial Section:**
CA44 - Downtown Miami - Judge Walsh, Lisa S

**Case Status:**
OPEN

**Case Type:**
Shareholder Derivative

**Consolidated Case No.:**

# Related Cases

**Case Number:**
2023-004474-CA-01

**Filing Date:**
03/15/2023

**Case Type:**
Business Transactions

**Case Number:**
2024-020751-CA-01

**Filing Date:**
10/25/2024

**Case Type:**
Business Torts

# Hearing Details

**Hearing Date:**
07/31/2024

**Hearing Time:**
9:00AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
04/15/2024

**Hearing Time:**
9:30AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
03/18/2024

**Hearing Time:**
9:30AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
02/21/2024

**Hearing Time:**
9:00AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
01/22/2024

**Hearing Time:**
9:30AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
12/18/2023

**Hearing Time:**
9:00AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
11/16/2023

**Hearing Time:**
9:00AM

**Hearing Code:**
MOTCAL

**Description:**

**Hearing Location:**

Motion Calendar

**Hearing Date:**
10/19/2023

**Hearing Time:**
10:00AM

**Hearing Code:**
SPECSETS

**Description:**
Special Sets

**Hearing Location:**

**Hearing Date:**
10/19/2023

**Hearing Time:**
10:00AM

**Hearing Code:**
SPECSETS

**Description:**
Special Sets

**Hearing Location:**

**Hearing Date:**
10/19/2023

**Hearing Time:**
10:00AM

**Hearing Code:**
SPECSETS

**Description:**
Special Sets

**Hearing Location:**

**Hearing Date:**
10/19/2023

**Hearing Time:**
10:00AM

**Hearing Code:**
SPECSETS

**Description:**
Special Sets

**Hearing Location:**

**Hearing Date:**
10/19/2023

**Hearing Time:**
9:00AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
10/19/2023

**Hearing Time:**
10:00AM

**Hearing Code:**
SPECSETS

**Description:**
Special Sets

**Hearing Location:**

**Hearing Date:**
10/09/2023

**Hearing Time:**
9:30AM

**Hearing Code:**
CMC

**Description:**
Case Management Conference

**Hearing Location:**

**Hearing Date:**
08/09/2023

**Hearing Time:**
9:00AM

**Hearing Code:**
MOTCAL

**Description:**
Motion Calendar

**Hearing Location:**

**Hearing Date:**
07/21/2023

**Hearing Time:**
2:00PM

**Hearing Code:**
SPECSETS

**Description:**
Special Sets

**Hearing Location:**

**Hearing Date:**
07/05/2023

**Hearing Time:**
8:45AM

**Hearing Code:**
TRAN

**Description:**
Transfer Calendar

**Hearing Location:**

**Hearing Date:**
07/05/2023

**Hearing Time:**
8:45AM

**Hearing Code:**
TRAN

**Description:**
Transfer Calendar

**Hearing Location:**

# Parties

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | Teh, Allan | | |
| Defendant | KS Law Group, LLP | **B#:** 348538<br>Isaac J Mitrani | |
| Defendant | Melchionni, Lee | **B#:** 348538<br>Isaac J Mitrani | |
| Defendant | Benito, Sylvia | **B#:** 348538<br>Isaac J Mitrani | |
| Defendant | Persist Communications, Inc. | **B#:** 115465<br>Gelber, Matthew R., ESQ | |
| Defendant | The Lake Law Firm, LLC | **B#:** 115465<br>Gelber, Matthew R., ESQ | |

# Dockets

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|
| 93 | 11/07/2025 | | Response to Motion | Event | |
| 92 | 11/07/2025 | | Notice of Filing: | Event | Complaint |
| 91 | 11/07/2025 | | Response to Motion | Event | |
| 90 | 11/07/2025 | | Notice of Appearance | Event | |
| 89 | 11/05/2025 | | Agreed Order | Event | Extending Time For Sylvia Benito To File A Response To Motion To Confirm Final Arbitration Award, Etc. |
| 88 | 11/05/2025 | | Motion for Extension of Time | Event | |
| 87 | 11/05/2025 | | Agreed Order | Event | On Defendant Lee Melchionni's Request For Extension Of Time, Etc. |
| 86 | 11/04/2025 | | Motion for Extension of Time | Event | |
| 85 | 11/03/2025 | | Motion: | Event | TO CONFIRM FINAL ARBITRATION AWARD AND FOR ENTRY OF FINAL JUDGMENT |
| 84 | 11/03/2025 | | Notice of Appearance | Event | |
| 83 | 10/31/2025 | | Agreed Order | Event | Verified Motion For Admission To Appear Pro Hac Vice, Etc. |
| 82 | 10/25/2025 | | Receipt: | Event | Receipt#:3300051 Amt Paid:$100.00 Name:ISAAC J MITRANI 26 BROADWAY, 19TH FLOOR NEW YORK NY 10004 Comment: Allocation Code Quantity Unit Amount 3176-Non-Fla Attorney F 1 $100.00 $100.00 Tender Type:eFilings Tender Amt:$100.00 Receipt Date:10/25/2025 Register#:330 Cashier:EFilingUser EFiling #:234354183 |
| 81 | 10/23/2025 | | Motion for Pro Hac Vice | Event | |
| 80 | 10/22/2025 | | Motion: | Event | TO CONFIRM FINAL ARBITRATION AWARD |
| 79 | 07/29/2025 | | Notice: | Event | CLAIM OF ATTORNEY'S CHARGING LIEN |
| 78 | 07/02/2025 | | Order: | Event | Scheduling Case Management Conference On November 10, 2025 At 9:00AM Via Zoom |
| 77 | 06/13/2025 | | Order: | Event | Scheduling Status Conference On June 26, 2025 At 9:00AM Via Zoom |
| 76 | 01/29/2025 | | Order: | Event | Setting Status Conference On February 10, 2025 At 9:00AM Via Zoom |
| | 07/31/2024 | | Case Management Conference | Hearing | Case Management Conference |
| 75 | 07/29/2024 | | Order Setting Management Conference | Event | July 31, 2024 At 9:00AM Via Zoom |

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|-----|------|-----------|--------------|------------|----------|
| 74 | 07/07/2024 | | Stipulation and Order Substituting Counsel | Event | |
| 73 | 06/28/2024 | | Stipulation for Substitution of Counsel | Event | |
| 72 | 05/25/2024 | | Order: | Event | Denying Plaintiff's Motion To Enforce Settlement (DE 59) |
| | 04/15/2024 | | Case Management Conference | Hearing | Interim |
| | 03/18/2024 | | Case Management Conference | Hearing | Interim |
| | 02/21/2024 | | Case Management Conference | Hearing | Interim |
| 71 | 01/30/2024 | | Order Placing Case Inactive Status: Motion Stay or Abate | Event | |
| 70 | 01/23/2024 | | Notice of Unavailability/absence | Event | |
| | 01/22/2024 | | Case Management Conference | Hearing | Interim |
| 69 | 01/10/2024 | | Response: | Event | |
| 68 | 01/04/2024 | | Response to Motion | Event | |
| 67 | 12/22/2023 | | Motion for Sanctions | Event | |
| | 12/18/2023 | | Case Management Conference | Hearing | Interim |
| 66 | 11/19/2023 | | Order Setting CM Deadline | Event | |
| | 11/16/2023 | | Motion Calendar | Hearing | Motion to Enforce Settlement Request for Status Conference DE#57 |
| 65 | 10/27/2023 | | Notice: | Event | PLAINTIFFS REPLY IN FURTHER SUPPORT OF MOTION TO ENFORCE SETTLEMENT AND REQUEST FOR STATUS CONFERENCE |
| 64 | 10/27/2023 | | Order Granting Motion to Compel | Event | |
| 63 | 10/20/2023 | | Response to Motion | Event | to Enforce for Settlement |
| 62 | 10/19/2023 | | Order: | Event | Requiring Parties' Joint Case Management Preliminary Order |
| | 10/19/2023 | | Special Sets | Hearing | Defendants Motion to Compel Arbitration and Dismiss D.E. 25 |
| | 10/19/2023 | | Special Sets | Hearing | Defendants Motion to Compel Arbitration and Dismiss D.E. 25 |
| | 10/19/2023 | | Case Management Conference | Hearing | Initial Case Management |
| | 10/19/2023 | | Special Sets | Hearing | Defendants Motion to Compel Arbitration and Dismiss D.E. 25 |
| | 10/19/2023 | | Special Sets | Hearing | Defendants Motion to Compel Arbitration and Dismiss |
| | 10/19/2023 | | Special Sets | Hearing | Defendants Motion to Compel Arbitration and Dismiss |
| 61 | 10/17/2023 | | Motion for Continuance | Event | |
| 60 | 10/17/2023 | | Notice of Hearing- | Event | 11/16/2023 at 9:00AM |
| 58 | 10/12/2023 | | Order: | Event | Setting Initial Case Management Conference And To Prepare A Mandatory Case Management Report |
| 59 | 10/10/2023 | | Motion/petit for Enforcement | Event | |
| | 10/09/2023 | | Case Management Conference | Hearing | initial cmc |
| 57 | 10/05/2023 | | Motion: | Event | TO RESCHEDULE |
| 56 | 10/05/2023 | | Agreed Order | Event | Rescheduling Initial Case Management Conference (DE 56) |

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|
| 55 | 09/11/2023 | | Notice of Hrg Special Appt | Event | OCTOBER 19, 2023 @ 10:00 AM |
| 54 | 08/12/2023 | | Order: | Event | STAYING PROCEEDINGS PENDING DISPOSITION OF MOTIONS TO COMPEL ARBITRATION |
| | 08/09/2023 | | Motion Calendar | Hearing | Defendants Lake Law and Persist Communications Amended Motion to Stay Proceedings Except for Motion to Compel Arbitration and to Dismiss DE39\|\|Defendants Lee Melchionni, Sylvia Benito, and KS Law Groups Motion to Stay Proceedings Except for Motion to Compel Arbitration and Dismiss DE38 |
| 53 | 07/28/2023 | | Response: | Event | IN FURTHER SUPPORT OF THEIR MOTION FOR SANCTIONS |
| 52 | 07/26/2023 | | Notice of Hearing- | Event | 08/09/2023 at 9:00 am |
| 51 | 07/26/2023 | | Response: | Event | in Support. |
| 50 | 07/21/2023 | | Response to Motion | Event | |
| 49 | 07/21/2023 | | Response: | Event | in Support. |
| | 07/21/2023 | | Special Sets | Hearing | INITIAL CASE MANAGEMENT CONFERENCE |
| 48 | 07/20/2023 | | Order Setting CM Deadline | Event | |
| 47 | 07/20/2023 | | Order Setting CM Deadline | Event | |
| 46 | 07/20/2023 | | Order Setting CM Deadline | Event | |
| 45 | 07/20/2023 | | Order Setting CM Deadline | Event | |
| 44 | 07/19/2023 | | Response to Motion | Event | |
| 43 | 07/19/2023 | | Response to Motion | Event | |
| 42 | 07/17/2023 | | Agreed Order | Event | Extending Plaintiff's Time To Respond To Defendants' Motion For Sanctions (DE 37) |
| 40 | 07/10/2023 | | Order of Transfer (jud Sect Chg) Section: | Event | GRANTED CA 44 |
| 39 | 07/07/2023 | | Motion to Stay | Event | AMENDED |
| 38 | 07/07/2023 | | Motion to Stay | Event | PROCEEDINGS EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS |
| 37 | 07/06/2023 | | Motion for Sanctions | Event | |
| 36 | 07/05/2023 | | Motion to Stay | Event | |
| 35 | 07/05/2023 | | Response to Motion | Event | |
| | 07/05/2023 | | Transfer Calendar | Hearing | DEFENDANTS' JOINT MOTION TO TRANSFER |
| | 07/05/2023 | | Transfer Calendar | Hearing | DEFENDANTS' JOINT MOTION TO TRANSFER |
| 34 | 07/03/2023 | | Motion to Compel | Event | |
| 33 | 06/30/2023 | | Response to Motion | Event | |
| 32 | 06/28/2023 | | Response: | Event | in opposition to motion to compel |
| 31 | 06/28/2023 | | Response: | Event | in opposition to motion to compel |
| 30 | 06/28/2023 | | Notice of Appearance | Event | |
| 29 | 06/23/2023 | | Order Extending Time for | Event | TO RESPOND TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DISMISS |
| 28 | 06/21/2023 | | Notice of Hearing- | Event | 7/5/2023 @8:45AM |
| 27 | 06/20/2023 | | Motion to Transfer | Event | |
| 26 | 06/15/2023 | | Motion to Compel | Event | |
| 25 | 06/15/2023 | | Motion to Compel | Event | |
| 24 | 06/05/2023 | | Notice of Unavailability/absence | Event | |

| DIN | Date | Book/Page | Docket Entry | Event Type | Comments |
|-----|------|-----------|--------------|------------|----------|
| 23 | 06/02/2023 | | Notice of Unavailability/absence | Event | |
| 22 | 06/02/2023 | | Order Setting CM Deadline | Event | |
| 21 | 06/02/2023 | | Order Setting CM Deadline | Event | |
| 20 | 05/30/2023 | | Agreed Order | Event | Granting Verified Motion for Admission to Appear Pro Hac Vice |
| 19 | 05/15/2023 | | Notice of Appearance | Event | |
| 18 | 05/12/2023 | | Receipt: | Event | Receipt#:3130015 Amt Paid:$100.00 Name:GERVAIS, MICHELLE M BLANK ROME LLP 100 S. ASHLEY DRIVE SUITE 600 TAMPA FL 33602 Comment: Allocation Code Quantity Unit Amount 3176-Non-Fla Attorney F 1 $100.00 $100.00 Tender Type:eFilings Tender Amt:$100.00 Receipt Date:05/12/2023 Register#:313 Cashier:EFilingUser |
| 17 | 05/10/2023 | | Motion for Pro Hac Vice | Event | |
| | 05/04/2023 | | 20 Day Summons Issued | Service | |
| 16 | 05/04/2023 | | ESummons 20 Day Issued | Event | Re: Index # 14. |
| 15 | 05/04/2023 | | Receipt: | Event | Receipt#:3090038 Amt Paid:$10.00 Comment: Allocation Code Quantity Unit Amount 3139-Summons Issue Fee 1 $10.00 $10.00 Tender Type:eFilings Tender Amt:$10.00 Receipt Date:05/04/2023 Register#:309 Cashier:EFilingUser |
| 13 | 05/03/2023 | | Receipt: | Event | Receipt#:3140142 Amt Paid:$40.00 Comment: Allocation Code Quantity Unit Amount 3139-Summons Issue Fee 1 $10.00 $10.00 3139-Summons Issue Fee 1 $10.00 $10.00 3139-Summons Issue Fee 1 $10.00 $10.00 3139-Summons Issue Fee 1 $10.00 $10.00 Tender Type:eFilings Tender Amt:$40.00 Receipt Date:05/03/2023 Register#:314 Cashier:EFilingUser |
| 14 | 05/02/2023 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| | 05/02/2023 | | 20 Day Summons Issued | Service | |
| 12 | 05/02/2023 | | ESummons 20 Day Issued | Event | Re: Index # 8. |
| | 05/02/2023 | | 20 Day Summons Issued | Service | |
| 11 | 05/02/2023 | | ESummons 20 Day Issued | Event | Re: Index # 6. |
| | 05/02/2023 | | 20 Day Summons Issued | Service | |
| 10 | 05/02/2023 | | ESummons 20 Day Issued | Event | Re: Index # 7. |
| | 05/02/2023 | | 20 Day Summons Issued | Service | |
| 9 | 05/02/2023 | | ESummons 20 Day Issued | Event | Re: Index # 5. |
| 8 | 05/01/2023 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 7 | 05/01/2023 | | (M) 20 Day (C) Summons (Sub) Received | Event | |
| 6 | 05/01/2023 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| 5 | 05/01/2023 | | (M) 20 Day (P) Summons (Sub) Received | Event | |
| 4 | 04/26/2023 | | Receipt: | Event | Receipt#:3090174 Amt Paid:$401.00 Comment: Allocation Code Quantity Unit Amount 3100-Circuit Filing Fee 1 $401.00 $401.00 Tender Type:eFilings Tender Amt:$401.00 Receipt Date:04/26/2023 Register#:309 Cashier:EFilingUser |
| 2 | 04/25/2023 | | Complaint | Event | |
| 1 | 04/25/2023 | | Civil Cover Sheet - Claim Amount | Event | |

Filing # 171724175 E-Filed 04/25/2023 10:40:40 AM

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.      CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>  JUDICIAL CIRCUIT, IN AND FOR <u>MIAMI-DADE</u>  COUNTY, FLORIDA

<u>Allan Teh</u>
Plaintiff                                         Case # _____

                                                  Judge  _____

vs.

<u>KS Law Group, LLP, Lee Melchionni, Sylvia Benito, Persist Communications, Inc., The Lake Law Firm, LLC</u>
 Defendant

**II.      AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.      TYPE OF CASE**      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

- 2 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☒ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
     ☐ Residential Evictions
     ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

  9

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☐ no
    ☒ yes If "yes," list all related cases by name, case number, and court.
    2023-004474-CA-01; and 2022-022470-CA-01

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Cheyenne Moghadam        Fla. Bar # 1040660
        Attorney or party             (Bar # if attorney)

Cheyenne Moghadam         04/25/2023
 (type or print name)         Date

- 3 -

Filing # 171724175 E-Filed 04/25/2023 10:40:40 AM

IN THE CIRCUIT COURT OF THE 11ᵀᴴ JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH,

      On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

      Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

      Nominal Defendant.

_____/

## DERIVATIVE COMPLAINT

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership") files this derivative suit on behalf of KS Law against Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), PERSIST COMMUNICATIONS, INC ("Persist"), THE LAKE LAW FIRM, LLC ("Lake Law Firm")

(hereinafter, collectively "Defendants"), and Nominal Defendant KS Law Group, LLP, and in support thereof alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.    This action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2.    Plaintiff, Allan Teh, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County, Florida.

3.    Nominal Defendant, KS Law Group, LLP is a District of Columbia Limited Liability Partnership which operates in the State of Florida, maintains bank accounts in the State of Florida, and whose principals all reside in the State of Florida.

4.    Defendant, Lee Melchionni, is a citizen and resident of the State of Florida and is currently a managing partner of KS Law with a twenty-five percent (25%) ownership interest in KS Law. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5.    Defendant, Sylvia Benito, is a citizen and resident of the State of Florida and is currently a Managing Partner of KS Law with a twenty-five percent (25%) ownership interest. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

6.    Persist Communications, Inc. is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of

operation is located in Broward County Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

7. Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoice dated 9/1/2021 as **Exhibit 2.***

8. Lake Law Firm, LLC, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law firm has an office located in Broward County Florida and issues invoices regarding alleged services with the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See **Exhibit 2**.*

9. As more fully set forth herein, Lake Law Firm has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to F.S. §48.193 et seq., Lake Law Firm is subject to specific personal jurisdiction because Lake committed multiple acts and breaches enumerated in F.S. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law Firm has an office in Florida, has committed a tortious act within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

10. This venue and forum are appropriate based upon F.S. § 47.011 and F.S. § 47.051 and also because virtually every act, breach and transaction set out in this Complaint occurred in Miami-Dade County Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

## GENERAL ALLEGATIONS

11. KS Law was formed on August 24th, 2021, upon the execution of the Partnership Agreement. *See Partnership Agreement attached as **Exhibit 3***.

12. At all times material hereto, KS Law had three "Managing Partners" each owning a certain equity interest, as set forth below:

   a. Lee Melchionni, Esq. (25% Ownership Interest)

   b. Sylvia Benito (25% Ownership Interest)

   c. Allan Teh (50% Ownership Interest)

13. Pursuant to Section 4 of the Partnership Agreement KS Law's "sole purpose is to engage in the practice of law."

14. KS Law was to partner with co-counsel and trial-counsel in order to obtain, work-up, and handle various mass tort injury cases which were represented to include:

   a. Hernia Mesh Injury Cases;

   b. Round Up Toxicity Cases;

   c. 3M Ear Plug Injury Cases; and

   d. Talcum Powder Toxicity Cases.

15. Further, pursuant to Section 12 of the Partnership Agreement "[i]t is expressly understood" that Teh would underwrite and fund the activities of KS Law.

16. On September 3rd, 2021, Teh, in compliance with his duties to the Partnership, wired $4 million as a capital contribution into the KS Law Account at Chase Bank (Acct. Ending in ***6138) at the direction of his fellow Partners, Melchionni and Benito.

17. Teh's $4 million capital contribution constitutes KS Law's entire working capital.

18. Despite Teh funding the entirety of KS Law's operations his fellow partners, Melchionni and Benito, have continuously left Teh in the dark on substantive management decisions of KS Law.

19. Melchionni and Benito, each unilaterally and amongst themselves and with absolutely no authority, have hijacked the management of KS Law and have treated Teh as mere investor rather than a 50% owner and partner of KS Law.

20. Managing Partners, Melchionni and Benito, for their own pecuniary gain, and acting in concert with Defendants Persist and Lake Law, have misappropriated the entirety of KS Law's working capital and breached their fiduciary duties to the Partnership through fraudulent conduct which has led to the unjust enrichment of Persist and Lake Law.

21. Melchionni and Benito are both partners in at least five (5) other D.C. law firms that handle similar cases.

22. Upon information and belief, Melchionni, Benito, and Lake Law have been siphoning "good" cases from KS Law and transferring the cases to Defendant,

Lake Law, and other law firms in which Melchionni and Benito are partners or have a financial interest.

23. Lee Melchionni is the "Legal Managing Partner" of KS Law. In Melchionni's capacity as the "Legal Managing Partner" his duties include:

   a. Providing "legal support to work up, qualify, process, manage, and settle cases";

   b. Being "responsible for case related expenses, including the use of third party vendors to accomplish these tasks"; and

   c. Payment of the "cost of acquiring and maintaining malpractice and general liability insurance . . . for KS Law Group, LLP";

24. There is no evidence that Melchionni fulfilled or understood any of these duties.

25. Sylvia Benito is a "non-lawyer" partner of KS Law with "the authority over marketing Partnership Activities, and provide other professional management services" which "include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership," and "obtaining new clients and cases."

26. There is no evidence that Benito fulfilled or understood any of these duties.

27. Despite Melchionni and Benito's representations that Teh's $4 million contribution would be utilized for the acquisition and management of these mass-tort cases, the truth of the matter is that a mere **thirteen days after the funds were deposited into** KS Law's bank account it was transferred out to an entity with whom KS Law has no written agreement.

28. Specifically, on September 16th, 2021, $3,880,000 was transferred from KS Law's Chase bank account to Defendant, Persist's, TD Bank account ending in ***2721. *See **Exhibit 2***.

29. Defendants, Melchionni and Benito, with absolutely no authority or legitimate reason transferred essentially all of KS Law's working capital to a third-party (Defendant Persist) with no known contract or agreement in place.

30. Further, Teh, as the 50% owner of KS Law was not informed of the transfer at that time or any appropriate time thereafter.

31. It was only until the Fall of 2022, approximately one (1) year following those transfers, that Teh finally received documents obliquely referencing said transfer. To wit: a one-and-a-half-page invoice from Lake Law "to" KS Law for $3,880,000.00. *See **Exhibit 2***.

32. The transfer of $3,880,000 of KS Law's funds to Persist was made at the direction of Melchionni, Benito, and Lake Law.

33. The purpose of this transfer is not yet known since Persist appears to be a communications or marketing company. Again, there is no known contract between KS Law and Persist.

34. Persist has failed to account or provide any benefit to KS Law in exchange for the $3,880,000 payment.

35. On October 18th, 2021, approximately two (2) months after KS Law was formed, Melchionni represented that KS Law had:

   a. 155 Round Up Cases;

     b.  200 Talcum Powder Cases;

     c.  212 Hernia Mesh Cases; and

     d.  212 3M Earplug Cases. *See October 18th Email as **Exhibit 4**.*

36. Benito represented that KS Law's Talcum Powder cases alone would bring in a total of $2,978,000.00 in revenue to KS Law. *See redacted July 11th, 2022, Excel Spreadsheet attached as **Exhibit 5**.*

37. A mere three (3) months later, the represented number of Talcum Powder Cases KS Law had was whittled down to only 59. *See October 14th, 2022 Email attached as **Exhibit 6**.*

38. This represents a 70% drop-off from the original 200 Talcum Powder cases Melchionni and Benito represented KS Law to have.

39. The representations made by both Melchionni and Benito regarding the cases KS Law had and KS Law's entitlement to any settlement fees were false and fraudulent and Melchionni and Benito knew these were false representations at the time they made them.

40. Melchionni himself has admitted that **KS Law does not have a single retainer agreement in place**. Nor does KS Law have any agreements as co-counsel, referring counsel, or trial counsel.

41. It is important to note that Rules 1.5(c) and 1.5(e) of Rules of Professional Conduct governing D.C. law firms explicitly state:

**1.5(c)** A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or

percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

**1.5(e)** A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; **_and_**

(4) The total fee is reasonable.

42. As stated above, KS Law is not party to any known fee agreement and upon information and belief no "client" has ever been informed of KS Law's involvement in their case.

43. On December 18th, 2022, Melchionni on behalf of the Partnership executed a "Case Replacement Agreement" with Lake Law. *See Case Replacement Agreement attached as **Exhibit 7**.*

44. Although $3,880,000 was deposited into Persist's TD bank account and Persist and Lake Law are separate and distinct entities, the Case Replacement Agreement claims that the $3,880,000 was actually paid to Lake Law rather than Persist. *See **Exhibit 7**.*

45.  The agreement contains several admissions that Melchionni and Benito's representation of the number of cases KS Law had were false.

46.  Specifically, the Case Replacement Agreement appears to be Defendant's attempt to backtrack their representations and "replace" cases that KS Law never had in the first place.

47.  The agreement itself admits that "Lake has not delivered equivalent value in cases."

48.  For example the Case Replacement Agreement states that "Lake agrees that KS is owed 200 Talcum Powder cases."

49.  To date, KS Law has not been provided evidence of these "replacement cases" nor received any return on the benefits provided to Lake Law and Persist.

50.  On March 3rd, 2023, despite the multiple previous representations made by Melchionni and Benito, the "drop-off" in KS Law cases was astounding and was now represented that KS Law had:

   a.  152 3M Ear Plug Cases;

   b.  142 Hernia Mesh Cases;

   c.  75 Round Up Cases; and

   d.  **9 Talcum Powder Cases**. *See March 3, 2023 email attached as **Exhibit 8**.*

51.  This represents a 51% drop-off in cases previously represented by Melchionni and Benito and a 96% drop-off from KS Law's original amount of Talcum Powder cases.

52. On April 13th, 2023, Johnson & Johnson announced an 8.9 Billion Dollar settlement offer to claimants in Talcum Powder Cases. *See attached press release as **Exhibit 9.***

53. Melchionni, as the Legal Managing Partner of KS Law, provided no update on this settlement nor any clarity on the amount of Talcum Power Cases KS Law currently has.

54. Melchionni has breached his fiduciary duties to KS Law not only by misappropriating the working capital of KS Law but openly admitting that KS Law does not hold general or professional liability insurance required under the Partnership Agreement.

55. Nor does KS Law have a "Interest on Lawyer Trust Account" ("IOLTA") required by the D.C. Rules of Professional Conduct

56. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, a single contingent fee agreement, and having no general or professional liability insurance is shocking and clearly demonstrates the breaches alleged herein.

### DEMAND ON KS LAW GROUP, LLP'S MANAGING PARTNERS IS EXCUSED AS FUTILE

57. Plaintiff has not made a formal demand on the general partners of KS Law to investigate or initiate the claims asserted herein because such demand is excused as futile.

58. As detailed herein, the actions that have directly damaged KS Law arise out of the conduct of general partners Melchionni and Benito.

59. Pursuant to Section 26 of the Partnership Agreement "all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized **only by the affirmative vote of 66 2/3% of the total, combined ownership interests.**"

60. Together, Defendants, Melchionni and Benito, hold a 50% ownership interest in KS Law and based on their breaches of fiduciary duty and fraudulent conduct to request they investigate their own wrongdoings would be inappropriate and futile.

## COUNT 1
## DERIVATIVE CLAIM FOR THE EQUITABLE APPOINTMENT OF A RECEIVER

61. Plaintiff re-alleges and incorporated by reference paragraphs 1 through 60 as if fully set forth herein.

62. This is an action for the appointment of a receiver for KS Law pursuant to the inherent equitable powers of this Court.

63. The basis for the appointment of a receiver over KS Law is predicated upon the various wrongful acts and conduct of Defendants, Melchionni and Benito, in breaching the Partnership Agreement and their fiduciary duties, including but not limited to:

   a. Misrepresentation of the number of cases KS Law had;

   b. Misappropriation of Partnership Funds in the form of transferring $3,880,000 to Defendant, Persist;

   c. Failure to maintain general or professional liability insurance;

   d. Failure to maintain and IOLTA account; and

e. Failure to have a single retainer, co-counsel, or referring counsel agreement in place.

64. Further, given the gravity and extent of misconduct by Melchionni and Benito, they should be permanently removed as partners in KS Law.

65. Based on the foregoing, KS Law is entitled to the appointment of a receiver to manage the affairs of KS Law and who shall have all the powers and duties required to effectuate that management.

66. Accordingly, in order to preserve KS Law and protect it from further waste and damage, the Plaintiff seeks the appointment of a receiver over KS Law, and for an order conferring upon such receiver all powers and authority by law

**WHEREFORE**, Plaintiff respectfully requests this Court enter an Order appointing a receiver to manage the affairs of KS Law Group, LLP, permanently expel Melchionni and Benito from the Partnership, award attorneys' fees and costs, and any such further relief this Court deems just and proper.

**COUNT 2**
**DERIVATIVE CLAIM FOR CONSTRUCTIVE FRAUD**
**(AS TO LEE MELCHIONNI)**

67. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

68. Melchionni holds a 25% ownership interest in KS Law.

69. At all times material hereto, there has been a relationship of trust and confidence between Melchionni, on the one hand, and KS Law on the other hand.

70.    At all times material hereto, Melchionni has served as the Legal Managing Partner of KS Law.

71.    As alleged herein, Melchionni has committed constructive fraud by, among other things, participating in self-dealing, fraudulent transactions whereby transferring essentially all of KS Law's working capital to Defendant, Persist, without any known agreement in place. Further, Melchionni has siphoned "good" cases away from KS Law for his own pecuniary gain damaging and continuing to damage KS Law.

72.    By virtue of Melchionni's fiduciary relationship, Melchionni had the continuing duty of care, honesty, and loyalty to KS Law and his fellow Partners which he has blatantly ignored and breached.

73.    Melchionni's knew or should have known that his conduct and inaction would necessarily damage KS Law.

74.    Melchionni's material breaches of his duties have proximately caused serious damage to KS Law. All such damages proximately result from Melchionni's breaches of his duties

WHEREFORE, Plaintiff, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Lee Melchionni for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 3
## DERIVATIVE CLAIM FOR CONSTRUCTIVE FRAUD
### (AS TO SYLVIA BENITO)

75.	Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

76.	Benito holds a 25% ownership interest in KS Law.

77.	At all times material hereto, there has been a relationship of trust and confidence between Benito, on the one hand, and KS Law on the other hand.

78.	At all times material hereto, Benito has served as a Non-Lawyer Partner of KS Law.

79.	As alleged herein, Benito has committed constructive fraud by, among other things, participating in self-dealing, fraudulent transaction whereby transferring essentially all of KS Law's working capital to Defendant, Persist, without any known agreement in place. Further, Benito has siphoned "good" cases away from KS Law for her own pecuniary gain damaging and continuing to damage KS Law.

80.	By virtue of Benito's fiduciary relationship, Benito had the continuing duty of care, honesty, and loyalty to KS Law and his fellow Partners which she has blatantly ignored and breached.

81.	Benito knew or should have known that her conduct and inaction would necessarily damage KS Law.

82.	Benito's material breaches of her duties have proximately caused serious damage to KS Law. All such damages proximately result from Benito's breaches of his duties

**WHEREFORE**, Plaintiff, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Sylvia Benito

for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

**COUNT 4**
**DERIVATIVE CLAIM BREACH OF FIDUICARY DUTY**
**(AS TO LEE MELCHIONNI)**

83. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

84. Melchionni holds a 25% ownership interest in KS Law.

85. At all times material times hereto, Melchionni served as the "Legal Managing Partner" of KS Law, and, as a result, owed KS Law and its Partners a fiduciary duty.

86. As alleged herein, Melchionni committed constructive fraud and breached his fiduciary duties by misappropriating KS Law's funds, wasting partnership assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of KS Law.

87. For example, Plaintiff has discovered that Melchionni without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred essentially all of KS Law's working capital, amounting to $3,880,000, to Defendant, Persist's TD Bank account.

88. Further, Melchionni has admitted that KS Law, as a law firm, does not have a single retainer agreement in place, as co-counsel, or referring counsel, or any other capacity.

89. Melchionni has also failed to acquire or maintain any general or professional liability insurance for KS Law as is his duty and obligation under the Partnership

Agreement nor has he maintained an IOLTA as required by the D.C. Rules of Professional Conduct.

90. Finally, upon information and belief, Melchionni has siphoned "good" cases from KS Law to Lake Law and the other law firms in which Melchionni is a partner in.

91. The misconduct of Melchionni has materially harmed KS Law.

**WHEREFORE,** Plaintiff, Allan Teh, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Lee Melchionni for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 5
## <u>DERIVATIVE CLAIM BREACH OF FIDUICARY DUTY</u>
### (AS TO SYLVIA BENITO)

92. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

93. Benito holds a 25% ownership interest in KS Law.

94. At all times material times hereto, Benito served as a "Non-Lawyer" Partner of KS Law, and, as a result, owed KS Law and its Partners a fiduciary duty.

95. As alleged herein, Benito committed constructive fraud and breached her fiduciary duties by misappropriating KS Law's funds, wasting partnership assets, and fraudulently concealing and failing to disclose the same, for her own personal pecuniary gain and to the detriment of KS Law.

96. For example, Plaintiff has discovered that Benito without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred

essentially all of KS Law's working capital, amounting to $3,880,000, to Defendant, Persist's TD Bank account.

97.    Upon information and belief, Benito has siphoned "good" cases from KS Law to Lake Law and the other law firms in which Benito is a partner in.

98.    The misconduct of Benito has materially harmed KS Law.

**WHEREFORE,** Plaintiff, Allan Teh, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Sylvia Benito for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 6
## DERIVATIVE CLAIM FOR UNJUST ENRICHMENT
### (AS TO LAKE LAW FIRM)

99.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

100.    As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Lake Law unjustly receiving the millions of dollars, arose from acts and omissions by Lake Law and those other named Defendants.

101.    Specifically, Lake Law has not provided anything of value to KS Law in exchange for the $3,880,000 it received.

102.    Lake Law was individually enriched by the receipt of funds as specifically set forth herein.

103.    As referenced herein, KS Law has conferred a benefit on Lake Law by paying such funds.

104. Lake Law had and has knowledge of the significant benefit conferred upon it.

105. Defendant voluntarily accepted and retained the benefit conferred, i.e., Lake Law, to this day, has continued to retain those funds.

106. As specifically set out herein, circumstances are such that it would be inequitable for the Defendant to retain the benefit conferred upon it without first providing the appropriate exchange of value and consideration to KS Law.

107. KS Law was legally impoverished as that term is used in the context of this claim.  Specifically, $3,880,000 of KS Law's funds was wrongfully transferred to, and is being held by Lake Law.

108. As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

109. There is no justification regarding the enrichment realized by Lake Law.

110. There is no adequate remedy available at law regarding that which has occasioned upon KS Law.

**WHEREFORE,** Plaintiff, on behalf of KS Law demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

**COUNT 7**
**<u>DERIVATIVE CLAIM FOR UNJUST ENRICHMENT</u>**
**(AS TO PERSIST COMMUNICATIONS)**

111. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

112. As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Persist unjustly receiving the millions of dollars, arose from acts and omissions by Persist and those other named Defendants.

113. Specifically Persist has not provided anything of value to the KS Law in exchange for the $3,880,000 it received.

114. Persist was individually enriched by the receipt of funds as specifically set forth herein.

115. As referenced herein, KS Law has conferred a benefit on the Persist individually by paying such funds.

116. Persist had and has knowledge of the significant benefit conferred upon it.

117. Defendant voluntarily accepted and retained the benefit conferred, i.e., Persist, to this day, has continued to retain those funds.

118. As specifically set out herein, circumstances are such that it would be inequitable for the Defendant to retain the benefit conferred upon it without first providing the appropriate exchange of value and consideration to KS Law.

119. KS Law was legally impoverished as that term is used in the context of this claim.  Specifically, $3,880,000 of KS Law's funds was wrongfully transferred to, and is being held by Persist.

120. As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

121. There is no justification regarding the enrichment realized by Persist.

122.   There is no adequate remedy available at law regarding that which has occasioned upon KS Law.

**WHEREFORE,** Plaintiff, on behalf of KS Law demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

**COUNT 8**
**DERIVATIVE CLAIM FOR EQUITABLE ACCOUNTING**
**(AS TO LAKE LAW)**

123.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

124.   As is clear from the allegations set out herein, the events that led to the cascade of events leading to Lake Law unjustly receiving the subject funds arose from acts and omissions by Lake Law and they have been unjustly enriched thereby.

125.   Specifically, Lake Law has not provided anything of value to KS Law in exchange for the $3,880,000 they received.

126.   Defendants Lake Law and Persist were individually enriched by the receipt of funds as alleged herein.

127.   As referenced herein, KS Law has conferred a benefit on the Defendant Lake Law.

128.   Lake Law had and have knowledge of the significant benefit conferred upon it.

129.   Lake Law voluntarily accepted and retained the benefits conferred.

130.   Lake Law, to this day, has continued to retain those funds.

131.  KS Law's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

132.  According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

133.  Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Lake Law's knowledge and direction, transferred essentially all of KS Law's working capital to Defendant, Lake Law, with no cognizable contract or agreement in place.

134.  In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

135.  The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

136.  Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff, on behalf of KS Law, demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

**COUNT 9**
**DERIVATIVE CLAIM FOR EQUITABLE ACCOUNTING**
**(AS TO PERSIST COMMUNICATIONS)**

Page **22** of **24**

137. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

138. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Persist unjustly receiving the subject funds arose from acts and omissions by Persist and it has been unjustly enriched thereby.

139. Specifically, Persist has not provided anything of value to KS Law in exchange for the $3,880,000 it received.

140. Defendant Persist was enriched by the receipt of funds as alleged herein.

141. As referenced herein, KS Law has conferred a benefit on the Defendant Persist.

142. Persist had and have knowledge of the significant benefit conferred upon it.

143. Persist voluntarily accepted and retained the benefits conferred.

144. Persist, to this day, has continued to retain those funds.

145. KS Law's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

146. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

147. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Persist's knowledge and direction, transferred essentially all of KS Law's working capital to Defendant, Persist, with no cognizable contract or agreement in place.

148. In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

149. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

150. Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff, on behalf of KS Law, demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

The Plaintiff hereby demands trial by jury on all issues and claims so triable as of right.

Dated: April 25, 2023

Respectfully submitted,

**JONES & ADAMS, P.A.**
*Attorney for Plaintiff*
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

**2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT**

DOCUMENT# P15000085963

**Entity Name:** PERSIST COMMUNICATIONS, CORPORATION

**FILED**
**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

**Current Principal  Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316



**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316  US

**FEI Number: 81-0851001**

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL  33316  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   EDWARD LAKE                                                                01/20/2023

_____                                        _____
          Electronic Signature of Registered Agent                                               Date

**Officer/Director Detail :**

Title            PRESIDENT

Name          LAKE, EDWARD J

Address       1815 CORDOVA RD

City-State-Zip:   FT. LAUDERDALE  FL  33316

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered*.

SIGNATURE: EDWARD J LAKE                                   PRESIDENT                   01/20/2023

_____                                        _____
          Electronic Signature of Signing Officer/Director Detail                                    Date

# Exhibit 2

## THE LAKE LAW FIRM™

## Invoice

| BILL TO: KS Law Group | CAMPAIGN: HM/TALC/3M/RU |
|---|---|
| | DATE: 9/1/2021 |
| | DUE DATE: |
| Phone: | TERMS: See Below |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 220 | Hernia Mesh | $5,600 | $1,232,000 |
| 200 | Talc | $6,000 | $1,200,000 |
| 155 | Round Up | $5,048.39 | $782,500 |
| 220 | 3M | $3,025 | $665,500 |
| | | Total | $3,880,000.00 |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000050

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Print Name: Lee Melchionni

Signature: _____ Date: 9/1/21

**REMITTANCE BY WIRE:**
*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000051

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

# Exhibit 3

**KS LAW GROUP, LLP**
**LIMITED LIABILITY PARTNERSHIP AGREEMENT**
**EFFECTIVE AS OF July 26, 2021**

This Limited Liability Partnership Agreement ("Agreement") is entered into by Attorney Lee Melchionni and Non-Attorneys Allan Teh[1] and Sylvia Benito (collectively, the Managing "Partners"), pursuant to the provisions of the Business Organizations Title in the District of Columbia Code (specifically, D.C, Code § 29-101.01, *et seq.,* the "Act").

**1.        Formation.**

Pursuant to this Agreement, the limited liability partnership was formed (the "Partnership"), and the Managing Partners elected to become a registered, Limited Liability Partnership, in accordance with the provisions of the Code. The Managing Partners shall be:

1. Lee Melchionni, Esq.; (Melchionni as the "Attorney") and

2. Allan Teh,

3. Sylvia Benito

The Managing Partners agree that no person shall be added or admitted to the Partnership as either a Partner or Managing Partner without the unanimous, affirmative vote of the Managing Partners, with the sole exception of the provisions set forth in Section 16.

**2.        Name.**

The name of the Partnership shall be KS Law Group, LLP, and all business of the Partnership shall be conducted under and in such name. There shall be no change to the Partnership name without the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

**3.        Primary Place of Business.**

The Partnership shall be established and have the place of business in the District of Columbia, located at 1100 H Street NW, Suite 840, Washington, D.C. 20005 or at an address or location to be determined by the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

---

[1] All references to Allan Teh are to him in his capacity as Partner and nominee for Kamunting Street Capital Management, L.P. shall have the right to designate a replacement Partner for Allan Teh, who shall then become a Managing Partner, in the event that Allan Teh is unwilling to serve, becomes incapacitated or dies.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

### 4.     Sole Purpose.

The Partnership's sole purpose is to engage in the practice of law, in order to provide the Partners with the opportunity for pecuniary gain, professional growth and service to the bar and the state and communities which the Partnership serves.

The Partnership shall be a partnership only for the purpose specified in this Section. Except as otherwise provided in this Agreement, the Partnership shall not engage in any other activity or business that is not reasonably necessary or appropriate to the accomplishment of its purpose, and no Partner shall have any authority to hold himself out as the agent of another Partner in regard to any other business or activity.

### 5.     Statutory Compliance.

The Partnership shall exist under and be governed by, and this Agreement shall be construed in accordance with, all the applicable laws of the District of Columbia and the District of Columbia Rules of Professional Conduct. The Managing Partners agree to and shall make all filings and disclosures required by, and shall otherwise comply with, all such laws. The Managing Partners agree to and shall execute and file any assumed or fictitious name certificates and other documents and instruments as may necessary or appropriate with respect to the formation of and conduct of business by the Partnership.

Further, each Managing Partner and Partner, other than the designated Legal Managing Partner (identified in Section 14 of this Agreement), hereby agrees not to hold himself or herself out to the general public, nor publicize in any media or forum their or any other Members' ownership, membership or affiliation with the Partnership.

### 6.     Indemnification.

Melchionni (an "Indemnifying Partner") hereby agrees to indemnify Allan Teh from time to time, and hold them harmless from and against all liability, loss, cost, damage and expense (including attorneys' fees and costs incurred in the investigation, defense and settlement of the matter) which the Partnership or any of such other Partners shall ever sustain, suffer or incur which relate or arise out of or in connection with the operation of the Partnership or a breach by the Indemnifying Partner of any representation, warranty or covenant made by the Indemnifying Partner in this Agreement. If the Partnership, Allan Teh from time to time are made a party to any litigation or otherwise incurs any loss or expense as a result of or in connection with any Indemnifying Partner's personal or professional obligations or liabilities unrelated to Partnership business, such Indemnifying Partner shall indemnify and reimburse the Partnership, Allan Teh from time to time, for all such loss and expense incurred, including reasonable attorneys' fees.

### 7.     Title to Property.

The Partnership shall hold all real and personal property interests in the name of the Partnership, and not in the name of any Partner.

### 8.     No Payments of Individual Obligations.

The Partners agree to and shall use the Partnership's credit and assets solely for the benefit of

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

the Partnership.

Melchionni in his capacity as agent and nominee for KS Law Group, LLP, shall pay the costs of acquiring and maintaining malpractice and general liability insurance (to the extent these coverages are available) for KS Law Group, LLP. The policy shall be at least $5 million per claim/ $5 million in the aggregate and cover all Managing Partners for acts undertaken in their official capacity as Managing Partners.

### 9. Limitation of Duties

Each Partner hereby agrees that he/she owes duties of care, honesty and loyalty to the other Partners and to the Partnership itself, subject only to the following limitations:

(a) Subject to their Non-Circumvention obligations, the Partners are not restricted from competing with the Partnership. Each Partner and the Partnership itself waives any breach of duty arising from a Partner engaging in any business, enterprise or transaction, which may directly or indirectly compete with the partnership, or that otherwise would constitute a business opportunity for the Partnership.

(b) Each Partner who is an Attorney shall have no limitation regarding the ethical practice of law, and any duty under this Agreement or implied in law shall be waived to the extent it would interfere with a lawyer's ability to represent any client as required by the rules of ethics and professional responsibility.

### 10. Non-Circumvention.

Notwithstanding any other provision in this Agreement, if an attorney Partner withdraws from the Partnership, the withdrawing attorney Partner shall pay to the Partnership a share of the fees received for legal services provided to any client of the Partnership who subsequently engages the withdrawing attorney Partner. The allocation of the fees received shall be in proportion to the work done before and after the withdrawal. Recoverable costs shall be reimbursed upon receipt. The Partners irrevocably agree that they shall not, directly or indirectly, interfere with, circumvent or attempt to circumvent, avoid, by-pass or obviate the Partnership's interest in and relationship with pre-established sellers, buyers, brokers, dealers, distributors, technology providers, intermediaries, entrepreneurs, consultants, employees, legal counsel, professional relationships, individuals, or any other pre-established or un-contracted relationships revealed or introduced by one Partner to another in connection with any present and future transactions related to this Partnership.

### 11. Ownership Interests.

The Managing Partners' Ownership Interest in the Partnership shall be:

| | |
|---|---|
| 1. Lee Melchionni, Esq. | 25% |
| 2. Allan Teh, | 50% |
| 3. Sylvia Benito, | 25% |

The Managing Partners agree that, other than the percentages and adjustments set forth in this Section, the Ownership Interest of the Partners shall not be amended or changed without the unanimous, affirmative vote of the Managing Partners.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

## 12.    Capital Contributions.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm. The Partners agree that Capital Contributions, will be made from time to time over a six (6) month period, for a total minimum amount of $4,000,000. The Capital Contributions will be made by Allan Teh in the amount of $4,000,000.

## 13.    Rights, Powers and Responsibilities of the Managing Partners.

The Managing Partners shall divide the responsibility for certain areas of Partnership operations as set forth herein:

A) Lee Melchionni shall be the Legal Managing Partner. The Legal Managing Partner shall provide the legal support to work up, qualify, process, manage and settle cases. He shall also be responsible for case related expenses, including the use of third party vendors to accomplish these tasks. In fulling these roles the Legal Managing Partner shall have complete and unequivocal control and veto power over any and all decisions relating to the practice of law, the prosecution of each of the Partnership's client's legal claims, the outward conduct of the law firm, the handling of funds in any IOLTA or client trust accounts, the public statements and representations of the law firm (including any and all marketing, branding and website design), conflicts of interest, whether actual or potential, co-counsel relationships, referrals to counsel, fee disputes, and client confidentiality, as well as any activities by or on behalf of the law firm, including the activities of any Partners, employees, agents, and independent contractors, which are regulated, limited or otherwise addressed in any way by the District of Columbia Rules of Professional Conduct.

Per District of Columbia Rule of Professional Conduct 5.4, the Legal Managing Partner hereby agrees to be responsible for and to supervise the managerial and other activities of the nonlawyer Partner, Allan Teh, and other Partners as they may be added, as if these non-lawyer Partners were lawyers admitted to practice in the District of Columbia, and to supervise the ethical conduct of same under the standards set forth in District of Columbia Rule of Professional Conduct 5.1. It is hereby agreed that this provision will require the Partnership and Legal Managing Partner to make reasonable efforts to ensure that the Partnership has in effect measures giving reasonable assurance that all the participants in the Partnership conform to the D.C. Rules of Professional Conduct.

Allan Teh and Sylvia Benito, as a Non-Lawyers participant in the Partnership per D.C. Rule of Professional Conduct 5.4, shall have the authority over marketing Partnership Activities, and provide other professional management services, all in order to assist the Partnership in providing legal services to the Partnership's clients. These managerial activities will include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership, obtaining new clients and cases, joint venturing, firm infrastructure management, and advising the Managing Partners regarding the same.

A)    In the event that the Managing Partners disagree regarding a Partnership operation or activity which is directly addressed within the District of Columbia Rules of Professional Conduct and also relates to marketing, branding, marketing campaigns, internet marketing or internet design, or regarding any proposed, contemplated or actual activity for or on behalf of the Partnership which is

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

regulated and/or limited by the District of Columbia Rules of Professional Conduct, the Legal Managing Partners shall have complete and unequivocal control of and veto power over, any such activity, as set forth in Section 14(A) above.

Per District of Columbia Rule of Professional Conduct 5.4, the Non-Lawyer Managing Partner, hereby agrees and undertakes to abide by the D.C. Rules of Professional Conduct as if she was a lawyer admitted in the District of Columbia.

## 14. Partner Compensation.

No Partner shall receive any interest or salary with respect to his/her Capital Contributions or his/her Ownership Interest, or for services rendered to or on behalf of the Partnership, or otherwise in his/her capacity as Partner, except as otherwise provided in this Agreement or by unanimous written consent of all Partners.

## 15. Withdrawal, Divorce or Death of a Partner.

Any Partner may withdraw from the Partnership upon sixty (60) calendar days' written notice to the other Partners and Managing Partners. Upon withdrawal, the withdrawing Partner shall cease to have any rights to further participation in the management or operations of the Partnership. Such withdrawing Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on claims that were retained by the Partnership prior to the day the Partner gave his/her notice of withdrawal to the Partnership. For purposes of this Section, the retainer date shall be deemed to be the first date on which the client executed a retainer agreement with the Partnership.

Furthermore, a Partner's death or permanent disability shall be deemed a "withdrawal" as of the date of the death or permanent disability. A deceased or permanently disabled Partner and/or his/her estate and heirs shall continue to have the right to payment of his/her share of the fees paid to the Partnership in accordance with the Partner's Partnership Interest as of the date of death or permanent disability on cases that were retained by the Partnership on or before such date. Payments under this provision shall be made in the normal course of business pursuant to the rules for distribution set forth in Section 22 of this Agreement.

The Partners hereby agree that, if by operation of law or by judgment or judicial decree in a bankruptcy or divorce case, any portion of a Partner's Ownership Interest in the Partnership is assigned to a third party, said assigned or transferred interest, to the extent it is assigned or transferred to a third party, shall be treated as if, on the date of the assignment or transfer order, the Partner in question became deceased, and any such Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on cases that were retained by the Partnership prior to the date of withdrawal.

## 16.   Expulsion for Cause.

(a)   For Cause Only.

Any Partner may be expelled" for cause", upon the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership, For purposes of this provision, "cause" for expulsion will include but not be limited to any of the following:

(i)   Disbarment, suspension, or other major disciplinary action determined

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

adversely to any Attorney Partner by any duly constituted authority;

(ii)     Professional misconduct or violation of the canons of professional ethics, if such misconduct continues after its cessation bas been requested by the Managing Partners;

(iii)     Any action or inaction that injures or threatens the professional standing or business operations of the Partnership, if such action or inaction continues after its cessation is requested by the Managing Partners, as set forth below;

(iv)     Any Partner takes a position that adversely effects the continuation of the Partnership, if such continues after its cessation is requested by the Managing Partners.

(b)     Notice of Expulsion for Cause.

If majority of the combined ownership interests held by the Managing Partners in the Partnership determines that "cause" exists for expulsion of a Partner, then the Partnership shall provide notice of this decision to the Partner who is subject to expulsion, and the Partner shall have ten (10) business days after notice is given to cure or remedy the reason for expulsion, if a cure or remedy is possible.

(c)     Entitlement to Profits After Expulsion.

Upon any expulsion, the expelled Partner shall be treated as a "withdrawn" Partner pursuant to Section 15, above, as of the date on which the expelled Partner failed to cure the reason for his expulsion, or five (5) business days from the Notice of Expulsion, whichever is later. The expelled Partner will have no other entitlement to any compensation. Furthermore, the Managing Partners may withhold future payments to any Partner who has been expelled for cause and apply those payments as a setoff against any damages to the Partnership caused by the expelled Partner or any liabilities due from the expelled Partner to the Partnership.

## 18. Liquidating Events.

The Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)     The affirmative vote of the majority of the total, combined ownership interests held by the Managing Partners in the Partnership, to dissolve, wind up, and/or liquidate the Partnership; or

(b)     The happening of any other event that makes it unlawful or impossible to carry on the business of the Partnership.

The Partnership shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined by a court of competent jurisdiction, that the Partnership has dissolved prior to or without the occurrence of a Liquidating Event, the Managing Partners hereby agree to continue the business of the Partnership without a winding up or liquidation.

## 19. Winding Up.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

(a)     Upon the occurrence of a Liquidating Event, the Partnership shall continue for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for this winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Agreement and the Partnership has terminated all operations.

(b)     The Managing Partners (or any Person elected for this purpose by the Managing Partners) shall be responsible for overseeing the winding up and liquidation of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds there from, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)     First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors other than the Partners;

(ii)     Second, to the payment and discharge of the Underwriting Contribution (defined in Section 20);

(iii)     to the payment and discharge of all other Partnership's debts and liabilities to Partners; and

(iii)     The balance, if any, to the Partners in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)     Except with respect to the Underwriting Contribution (defined in Section 20), each Partner hereby expressly waives any right which the Partner individually, as a creditor of the Partnership, might otherwise have under the Code, to receive distributions of Partnership assets *pari passu* with the other creditors of the Partnership, in connection with a distribution of assets of the Partnership or in satisfaction of any liability of the Partnership, and hereby subordinates any such right to said creditors.

### 20. Preferred Return.

Fifteen percent (15%) per annum simple interest multiplied by the invested capital, which shall accrue from the date of the Firm's acceptance of Allan Teh's Underwriting Contributions, until the Firm receives its first mass tort settlement proceeds via a Qualified Settlement Fund.

### 21. Profits and Losses.

After the Partnership repays the Underwriting Contribution (defined in this Section), the profit/loss allocation shall be calculated on a net basis as a percentage of the resulting fee, net of expenses, which shall not include legal fees and expenses of any kind. Expenses which pertain to a particular case should be deducted from the fees received for that case before allocating profits/losses to the extent that they cannot be charged to the client. Partnership Expenses which do not pertain to a particular case shall be amortized over all pending cases at the time the expense was incurred, in an

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

equal amount for each case.

Profits

Net Profits after full and complete reimbursement of funding by Allan Teh for a particular mass tort campaign shall be allocated as follows after the holdback of reserves as unanimously agreed to and approved by the Managing Partners:

(a)    Return of Capital: First, one hundred percent (100%) to Allan Teh until Distributions to such equal the amount of Allan Teh's Capital Contributions.

(b)    Preferred Return: Second, one hundred percent (100%) to Allan Teh until Distributions to such of Distributable Cash on a cumulative basis pursuant to this clause equal the Preferred Return.

(c)    Catch up: Second, one hundred percent (100%) to Lee Melchionni and Sylvia Benito until Distributions to Lee Melchionni and Sylvia Benito on a cumulative basis as carried interest Distributions equal twenty percent (20%) of all Distributions,

(d)    Split: Any balance, (i) eighty percent (80%) to Allan Teh and (ii) twenty percent (20%) to Lee Melchionni and Sylvia Benito.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Law Firm. Allan Teh is committing to fund a total of $4,000,000 ("Underwriting Contributions") to be paid to the firm as needed and determined by the Managing Partners to run a campaign related to any case/litigation as determined by the Managing Partners. The Managing Partners agree and understand that all such costs incurred by Allan Teh on behalf of the Company, including the Underwriting Contribution, shall be treated as an interest-free loan and paid back in full prior to any Partnership distributions.

Losses

It is understood that Lee Melchionni, Esq. shall not be responsible to pay back Allan Teh in the event that a particular mass tort campaign, case or litigation effort fails to generate profits. In the event that either party wants to recoup losses from a particular Mass Tort campaign that did not generate a profit from the profit(s) of other Mass Tort campaign(s) that do generate profits, then all Parties shall have the right to recoup their losses. In the case of Allan Teh, the amount of the loan referenced above and all Capital Contribution made by them used to acquire such cases which are not paid back or recovered shall be subject to such offset.

## 22. Management Fee.

KS Law Group will charge a management fee of one percent (1%) on invested Capital Contributions.

## 23. Entire Agreement.

This Agreement constitutes and shall be considered the entire agreement between the parties with respect to the subject matter of this document, and supersedes all previous arrangements, understandings, representations or agreements between the parties, whether written or oral. As set forth

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

in Section 12, the Partners may, from time to time, by unanimous, affirmative vote, agree to alter certain portions of this Agreement for Special Allocations. However, the Partners hereby agree that any such secondary agreement shall apply only to the special circumstances considered therein and will not alter the terms or conditions of this Agreement beyond the limited time and scope set forth in said secondary, written agreement.

### 24. Distributions to Partners.

Distribution to the Managing Partners shall occur at the conclusion of any singular case pursuant to Section 21.

### 25. Amounts Withheld.

All amounts withheld pursuant to the Tax Codes or any other state or local tax law, with respect to any payment, compensation or distribution to the Partnership or the Partners, shall be treated as amounts distributed to the Partners, for all purposes under this Agreement. The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partner and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate such amounts to the Partners with respect to which such amount was withheld.

### 26. Decisions

Except as otherwise provided in this Agreement, all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized only by the affirmative vote of 66 2/3% of the total, combined ownership interests held by the Managing Partners in the Partnership. It is further acknowledged and agreed, however, that any decision falling under the matters set forth in Section 14 of this Agreement shall be within the professional discretion of the Legal Managing Partner.

### 27. Vote Required for Certain Actions.

Notwithstanding Section 24 hereof:

(d)     no decision or action regarding the incurrence by the Partnership of any debt, contract or obligation for which the Partners are individually liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership; and

(e)     no decision or action regarding the incurrence by the Partnership of any debt for which the Partnership is liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership.

### 28. Partners Authorized to Take Certain Actions on Behalf of the Partnership.

Except as otherwise provided elsewhere in this Agreement, each Managing Partner is authorized to take the following actions and make the following decisions to the extent that such actions and decisions are necessary to permit such Managing Partner to carry on the Partnership's routine, day-to-day practice of law:

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

a. Accept clients on behalf of the Partnership based on criteria set forth by Legal Managing Partners, and agree to undertake specific matters for any Partnership client based on criteria set forth by Legal Managing Partners provided that a Managing Partner accepting such client or undertaking such matter is responsible for assuring that such action will not create a conflict with the interests of any other client and is otherwise consistent with the types of clients and matters normally handled by the Partnership, and provided further that such Managing Partner obtains the concurrence of any other Managing Partner or Managing Partners whose services may reasonably be expected to be required to service such client or matter.

b. Take any other action and make any other decision that is clearly routine and incidental to the day-to-day conduct of the Partnership and/or its practice.

## 29. Banking.

All funds of the Partnership shall be deposited in the Partnership's name, in such account or accounts with member banks of the FDIC as may be approved by an affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership; provided, however that the Managing Partners may elect to deposit all or a portion of the funds standing in the Partnership reserves in interest-bearing accounts with, or apply such funds to purchase short-term interest-bearing investments issued or guaranteed as to payment by, such banks or other financial institutions that are members of the FDIC or the United States (or its agencies or instrumentalities).

## 30. Restrictions on Transfers.

Except as provided in footnote 1, no Partner shall transfer all or any portion of his Partnership interest or any rights therein without the unanimous consent of the Managing Partners. The Partners not seeking to transfer their interests shall have the right of first refusal to purchase any such interest in equal shares. Any transfer or attempted transfer by any Partner in violation of the preceding sentence shall be null and void and of no force or effect whatsoever. Each Partner hereby acknowledges the reasonableness of the restrictions on transfer imposed by this Agreement in of the Partnership purposes and the relationship of the Partners. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable. Each Partner hereby further agrees to hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes or costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a transfer or an attempted transfer in violation of this Agreement.

## 31. Waiver of Partition.

No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and his legal representatives, successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his Partnership interest, or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

### 32. Rights of Partners.

Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership. No Partner shall have priority over any other Partner as to the return of his Capital Contributions, distributions, or allocations unless otherwise provided in this Agreement.

### 33. Notice of Dissolution.

In the event a Liquidating Event occurs, or any other event occurs that would result in a dissolution of the Partnership, the Partnership shall, within thirty (30) calendar days thereafter: (a) provide written notice thereof to each of the Partners and to all other parties with whom the Partnership regularly conducts business, and (b) publish notice of such dissolution in a newspaper of general circulation in each place in which the Partnership regularly conducts business.

### 34. No Liability for Partnership Debts.

Except as provided in Section 7, no Partner shall be personally liable or accountable, directly or indirectly, including by way of indemnification, contribution, assessment, or otherwise, for debts, obligations or liabilities of or chargeable to the Partnership or other Partner, whether arising in tort, contract, or otherwise that are incurred, created or assumed by the Partnership, except with respect to an obligation as to which all of the Partners have unanimously agreed in writing that the Partners would be personally liable.

### 35. Indemnification of Managing Partners/Partners by Partnership.

The Partnership shall, to the extent of its assets, indemnify, defend and hold each Partner in the Partnership free and harmless from any and all claims, demands, liabilities, obligations, damages, losses, costs and expenses, including attorneys' fees (individually, a "Liability" and collectively, the "Liabilities") incurred in connection with the business of the Partnership, provided the acts or omissions from which the Liabilities arise were performed by the Partner in good faith and with a reasonable belief that the Partner was acting within the scope of the Partner's authority under this Agreement and the Partner was not grossly negligent or guilty of intentional misconduct. Neither the Partnership nor any Partner shall have any claim against any other Partner by reason of any act or omission for which such Partner is entitled to indemnification under the Agreement.

### 36. Partnership Representative and Indemnification Thereof.

Partner Lee Melchionni, Esq. is specifically authorized to act as the "Partnership Representative" (hereafter the "PR") under the applicable tax Code, and in any similar capacity under state or local law. The Partnership and the other Partners agree to defend, indemnify and hold harmless the PR, from all costs and expenses, including fees of outside attorneys, accountants and experts, incurred in acting as PR during or after the termination or expiration of the term of the Partnership. The Partnership and the other Partners further agree to execute such powers of attorney and other forms and authorizations as may be required by the IRS for a Partner to act as PR.

### 37. Professional Liability Insurance.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

The Partnership shall maintain policies of professional liability, errors and omissions, general liability, in the amount of $5 million per occurrence/$5 million aggregate. As stated above, this shall be paid annually by the Partnership.

**38. Notices.**

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing, and sent by overnight courier to recipient's hands, or U.S. certified mail with return receipt requested, to the following addresses:

> Lee Melchionni, Esq.
> 20900 NE 30th Ave
> Suite 510
> Miami, FL 33180

> Sylvia Benito
> 20900 NE 30th Ave
> Suite 510
> Miami, FL 33180

> Allan Teh
> 119 Washington Ave
> Suite 600
> Miami Beach, FL 33139

Such addresses may be changed from time to time by any party by providing written notice in the manner set forth above. The date the party receiving notice will be considered to have been noticed will be the date of the delivery, as shown on the courier confirmation or return receipt from the U.S. postal service.

**39. Resolution of Disputes.**

Any controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and shall be resolved via arbitration under the American Arbitration Action, 9 U.S.C. § 2, in the District of Columbia, in accordance with the rules of the American Arbitration Association, and judgment entered upon the award rendered may be enforced or appealed by appropriate judicial action pursuant to the District of Columbia Code of Civil Procedure. The arbitration shall be heard by a single arbitrator, which shall be a person unanimously agreed to by the Managing Partners, and the dispute shall be heard within thirty (30) days following notice by one party that he/she desires that a matter be arbitrated.

If the parties are unable, within such 30-day period to agree upon an arbitrator, then the issue shall be heard by an arbitrator selected by the District of Columbia office of the American Arbitration Association, which arbitrator shall be experienced in the area of legal partnerships and who shall be knowledgeable with respect to the subject matter area of the dispute.

The arbitrator shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal.  The parties shall agree within thirty (30) days following

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery; provided, in any event each Partner shall be entitled to discovery in accordance with the District of Columbia Code of Civil Procedure. The arbitrator shall determine a prevailing party in the proceeding, and award the prevailing party his costs and expenses, including but not limited to reasonable attorneys' fees and arbitration costs, from the non-prevailing party in such proceeding.

**40. Counterparts.**

This Agreement may be executed by facsimile and/or in two or more counterparts, each of which shall constitute an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties have entered into this Agreement of Partnership as of the dates set forth below.


*Lee Melchionni*
_____
Lee Melchionni, Esq.

Aug 24, 2021
Date


_____
Allan Teh,

Date: August 24th, 2021


Sylvia Benito (Aug 24, 2021 16:33 EDT)
_____
Sylvia Benito,

Aug 24, 2021
Date

# KS Law Group Operating Agreement.docx

Final Audit Report                                                      2021-08-24

| | |
|---|---|
| Created: | 2021-08-24 |
| By: | Lee Melchionni (lee@capital4justice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_4MpQdjxaqLAEo3BNLfP3BscoK90ghu0 |

## "KS Law Group Operating Agreement.docx" History

🔏 Document digitally presigned by DocuSign\, Inc. (enterprisesupport@docusign.com)
2021-08-24 - 2:40:53 PM GMT- IP address: 71.77.192.124

📄 Document created by Lee Melchionni (lee@capital4justice.com)
2021-08-24 - 6:10:55 PM GMT- IP address: 71.77.192.124

📧 Document emailed to Lee Melchionni (lee@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

📧 Document emailed to Sylvia Benito (sylvia@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

📄 Email viewed by Sylvia Benito (sylvia@capital4justice.com)
2021-08-24 - 6:12:22 PM GMT- IP address: 74.125.150.38

🔏 Document e-signed by Lee Melchionni (lee@capital4justice.com)
Signature Date: 2021-08-24 - 6:12:32 PM GMT - Time Source: server- IP address: 71.77.192.124

🔏 Document e-signed by Sylvia Benito (sylvia@capital4justice.com)
Signature Date: 2021-08-24 - 8:33:37 PM GMT - Time Source: server- IP address: 172.58.175.96

✅ Agreement completed.
2021-08-24 - 8:33:37 PM GMT

 Adobe Sign

# Exhibit 4

Subject: Re: Data request / update

---

 **Lee Melchionni** <lee@capital4justice.com>                                    Mon, Oct 18, 2021, 5:37 PM
to Sohail Shahrasebi, Sylvia Benito

Sohail,

We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.

- Could we be given the following

  ○ A final copy of the legal documents suppor  ng the suppor  ng the Denovo US law firm?
    ○ We have a  ached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
  ○ Of the $8mln we've commi  ed to the US cases, an update on how much has been invested and what the distribu  on is per case type
    ○ We have invested all of the $8mln commi  ed. I have broken down the number of cases and case type, for Jus  ce Partners and then KS Law Group below.
    ○ Jus  ce Partners
    ○ 200 Firefighter Foam
    ○ 208 Talc
    ○ 380 Hernia Mesh
    ○ 350 3M
    ○ 150 RoundUp
    ○ 200 Zantac
      - KS Law Group
      - 155 RoundUp
      - 200 Talc
      - 212 Hernia Mesh
      - 212 3M
  ○ Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    ○ The a  ached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.
  ○ Update on the status of the various cases in the US and   ming on each case
    ○ Hernia Mesh - We con  nue to march towards se  lement with mul  ple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cau  ously op  mis  c that the majority of our docket will be se  led by Q2 of 2022.
    ○ Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering informa  on.

- 3M - There have been four trials with mostly posi ve results. The first trial resulted in a $7.1M verdict for three plain ffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M a er finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and nnitus. There are mul ple trials scheduled over the next few months, but it is possible that a se lement is reached in the next few months.

- RoundUp - in 2020, a global se lement agreement was proposed, where $10 billion was allocated to resolve exis ng claims and a controversial scien fic panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's mo on for approval of the proposed se lement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.

- Firefighter Foam - There is no substan ve update since our last investor communica on.

- Zantac - There is no substan ve update since our last investor communica on.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the li ga ng counterpar es when the documenta on is completed?
  - Yes, our a orneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following
  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - Update on the status of the various cases in the US and timing on each case
- On the Diesel stuff
  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi


Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139

O: 786-484-0771
M: 646-707-4484

**2 Attachments** • Scanned by Gmail



| X | **KS Case List 10.1…** | PDF | **Non-Lawyer Part…** |

# Redacted Exhibit 5

| Full Name | Last Name | Estimated Case Value | Net KS Law Firm |
|---|---|---|---|
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |

1

| | %% | ,-.---/ | --% | %% | 01.,23/--% |
|---|---|---|---|---|---|
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | %% | ,-.---/ | --% | %% | 01.,23/--% |

| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
|---|---|---|---|---|---|---|
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | %% | ,-.---/ | --% | %% | 01.,23/--% |

3

| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
|---|---|---|---|---|---|---|---|
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |
| | | | %% | ,-.---/ | --% | %% | 01.,23/--% |

4

| | | %% | ,-.---/  --% | %% | 01.,23/--% |
|---|---|---|---|---|---|
| | | | | | |
| | | **Hypo Value of Docket** | | **$** | **2,978,400.00** |

Subject: KS Law Group Weekly Case Update **Exhibit 6**

 **Lee Melchionni** <lee@capital4justice.com>                                         Fri, Oct 14, 2022,
to Sohail Shahrasebi, Allan Teh, Sylvia Benito ■

Sohail,

As requested, here is the weekly update on KS Law Group's Active cases.

- Talc - 59 Active Cases
- Hernia Mesh - 62 Active Cases
- 3M - 156 Active Cases
- Roundup - 34 Active Cases

--
**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**



# Exhibit 7

**CASE REPLACEMENT AGREEMENT**

This CASE REPLACEMENT AGREEMENT (this "Agreement") is made and entered into as of December 1, 2022 by and among KS Law Group LLP, a District of Columbia limited liability partnership ("KS"), and Lake Law Firm, LLC, a New York limited liability company ("Lake") (each a "Party" and collectively the "Parties").

RECITALS

WHEREAS, Lake is a professional law firm engaged in the practice of law, with its principal offices in the State of New York;

WHEREAS, Lake is engaged in the acquisition of clients and case workup across multiple types of mass tort litigations, including talcum powder litigation ("Talcum Powder"), hernia mesh litigation ("Hernia Mesh"), Roundup litigation ("Roundup"), and 3M litigation ("3M", and combined with Talcum Powder, Hernia Mesh, Roundup, 3M, Firefighter Foam and Zantac, the "Cases", and each individual case within the Cases, a "Case");

WHEREAS, KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount");

WHEREAS, Lake has not delivered equivalent value in cases to the Funded Amount and owes KS Cases and replacement Cases, the quantity and identity of which are set forth below; and

WHEREAS, the Parties seek to memorialize the terms of their agreement.

NOW, THEREFORE, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      Replacement of Cases.  KS has previously paid Lake the Funded Amount for certain Cases as described below which Lake has yet to provide.  The Parties agree that notwithstanding any earlier agreement for Cases that existed between the Parties, Cases shall be provided by Lake to KS as set forth below.

    a.  Talcum Powder.

        i.      Lake agrees that KS is owed 200 Talcum Powder cases, guaranteed for medical records, which were purchased for $1,200,000, or $6,000 a Case (the "Talcum Power Purchase Price). The criteria for the medical record guarantee of the Talcum Powder cases are set forth in Exhibit A to this Agreement.

        ii.     Lake agrees that the maximum non-medical record drop off of KS' Talcum Powder cases will be 25%.

        iii.    Lake agrees that KS' is owed 60% of the total attorney contingency fee.

        iv.     Lake hereby agrees to allow KS to convert any shortfall in Talcum Powder cases owed into 6 filed employees per converted Talcum Powder case, with the Internal

Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

v.   Lake agrees that if the owed filed employees are filed with the IRS by a law firm or company other than Lake, KS will receive 95% of the ERC fee received by Lake.

vi.   Lake agrees that if the owed filed employees are filed with the IRS by Lake, KS will receive 50% of the ERC fee received by Lake.

vii.   If Lake is unable to provide the filed employees before the statute of limitations expires on ERTC under the CARES Act, Lake agrees that within 90 days of the statute of limitations expiring, Lake will reimburse KS for the costs paid for each un-converted Talcum Powder case ($6,000 per case), plus 8% interest, per year, per case, from the purchase date of September 1, 2021.

b.   Hernia Mesh.

i.   Lake agrees that KS is owed 220 Hernia Mesh cases, guaranteed for medical records, which were purchased for $1,232,000, or $5,000 a Case (the "Hernia Mesh Purchase Price). The criteria for the medical record guarantee of the Hernia Mesh cases are set forth in Exhibit A to this Agreement.

ii.   Lake agrees that the maximum non-medical record drop off of KS' Hernia Mesh cases will be 30%.

iii.   Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv.   Lake agrees to continue to replace Hernia Mesh cases for KS with additional Hernia Mesh cases

v.   For Hernia Mesh cases that are replaced past October 15, 2022, Lake shall pay KS 79% of the attorney fee, which shall be identified by KS to Lake in writing.

vi.   Solely as an example, if 100 Hernia Mesh cases are owed to KS where 79% of the attorney fee is paid to KS, the number of owed cases to KS shall be reduced to 91

vii.   If the Hernia Mesh litigation were to reach a global settlement and cases are still owed to KS, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Hernia Mesh cases ($5,000 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

viii.   The Hernia Mesh litigations include, but are not limited to, the litigations related to Johnson and Johnson Proceed and Prolene Hernia System, Ethicon Physio Mesh, Covidien, W.L. Gore & Associates, Atrium C-Qur, and Davol, Inc/C.R. Bard, Inc.

c.   Roundup.

i.   Lake agrees that KS is owed 155 Roundup cases, guaranteed for medical records, which were purchased for $782,500, or $5,048.39 a Case (the "Roundup Purchase Price). The criteria for the medical record guarantee of the Roundup cases are set

2

forth in Exhibit A to this Agreement.

    ii.    Lake agrees that the maximum non-medical record drop off of KS' Roundup cases will be 25%.

    iii.    Lake agrees that KS' is owed 60% of the total attorney contingency fee.

    iv.    Lake agrees to allow KS to convert any shortfall of Roundup cases into Camp Lejeune cases on a one-for-one conversion basis upon request from KS. Solely as an example, KS would have the ability to convert 50 Roundup cases into 50 Camp Lejeune cases. To avoid any confusion, this example does not take into account non-medical record drop off.

    v.    If the Roundup litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Roundup cases ($5,048.39 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

  d.  3M.

    i.    Lake agrees that KS is owed 220 3M cases, guaranteed for medical records, which were purchased for $665,500, or $3,025 a Case (the "3M Purchase Price). The criteria for the medical record guarantee of the 3M cases are outlined in Exhibit A to this Agreement.

    ii.    Lake agrees that the maximum non-medical record drop off of KS' 3M cases will be 25%.

    iii.    Lake agrees that KS' is owed 60% of the total attorney contingency fee.

    iv.    Lake agrees to continue to replace 3M cases.

    v.    If the 3M litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered 3M cases ($3,025 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

2.    Written Notice of Modifications. In the event that a case should be replaced, converted, or modified, KS will provide written notice to Lake informing them of the need for such replacement, conversion, or modification pursuant to Section 5(b) below. Lake shall then use its best efforts to effect such replacement, conversion, or modification within a commercially reasonable timeframe.

3.    Guarantee of Medical Records. Subject to the agreed upon non-medical drop off for each of the Cases described above, if a client is disqualified based on the phases below, Lake agrees that the case will be replaced one-to-one, but subject to replacement provisions set forth above,

  a.  Phase 1 – Verbal Confirmation. The intake details are reconfirmed verbally, and additional information is added, based on the specific case type. Secondary outreach from Lake reconfirms the information provided over the phone with additional details such as injury,

3

length of use, diagnosis, and doctor information to be provided.

b.  Phase 2 – Medical Record Retrieval Phase.  Medical records are obtained, proving injury, diagnosis, and/or surgery where applicable.

c.  Phase 3 – Nurse Review.  The medical records are reviewed by a nurse or medical professional to determine if the injury, diagnosis, and/or surgery criteria are met, based on the specific case type.

d.  Phase 4 – Filing.  The plaintiff fact sheet, census form, and/or [PPF] are filed with the courts. They contain details of the case, including diagnosis, medical history, etc. and is based on the specific case type.

4.  Responsibilities of Lake.  Lake agrees to the following:

a.  Lake will market, intake, and sign-up potential clients.

b.  Lake will gather medical records, a medical summary, a plaintiff fact sheet, and/or court complaint as necessary.

c.  Lake will act as liaison between the undesigned and trial firms.

d.  Lake will handle any client inquiries. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.

5.  Miscellaneous.

a.  Expenses. Except as otherwise provided herein, KS, on the one hand, and Lake, on the other, shall each pay their own expenses incident to the negotiation, preparation, and carrying out of this Agreement, including all fees and expenses of its counsel and accountants for all activities of such counsel and accountants undertaken pursuant to this Agreement, irrespective of whether or not the transactions contemplated hereby are consummated.

b.  Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made if and when delivered personally or by overnight courier to the Parties at the following addresses or sent by electronic transmission, with confirmation received (or at such other address for a Party as shall be specified by like notice):

To KS:

KS Law Group LLP
20900 NE 30th Ave, Suite 510, Miami, FL 33180
Attention: Lee Melchionni
Email: lee@capital4justice.com

To Lake:

Lake Law Firm, LLC
One Rockefeller Center, 11th Floor, New York, NY 10020
Attention: Jeffrey Dubin

4

Email: elake@forpersist.com

Any such notice shall, when sent in accordance with the preceding sentence, be deemed to have been given and received on the earliest of (i) the day delivered to such address, (ii) the fifth (5th) business day following the date deposited with the United States Postal Service, or (iii) twenty-four (24) hours after shipment by such courier service.

c.  Assignment; Third Party Beneficiaries.  Neither this Agreement nor any rights or obligations under it are assignable, except that KS may assign its rights hereunder.  Except for any indemnified parties, there shall be no third party beneficiaries of this Agreement.

d.  Governing Law; Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of New York applicable to contracts executed in and to be performed in New York.  Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of New York and of the United States, in each case located in New York, for any litigation arising out of or relating to this Agreement (and agrees not to commence any litigation relating thereto except in such courts).

e.  Counterparts.  This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  It is the express intent of the Parties to be bound by the exchange of signatures on this Agreement via DocuSign (or similar electronic means) or emailed PDF copies.

f.  No Implied Waiver; Remedies.  No failure or delay on the part of the Parties to exercise any right, power, or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  All rights, powers, and privileges granted herein shall be in addition to other rights and remedies to which the Parties may be entitled at law or in equity.

g.  Entire Agreement.  This Agreement, including the Exhibit attached hereto, sets forth the entire understandings of the Parties with respect to the subject matter hereof and thereof, and it incorporates and merges any and all previous communications, understandings, oral or written as to the subject matter hereof and thereof.

h.  Amendments; Actual Waivers.  This Agreement may not be amended except by an instrument in writing signed on behalf of KS and Lake.  Any agreement on the part of KS or Lake to any such extension or waiver shall be valid if set forth in an instrument in writing signed on behalf of KS or Lake.

i.  Headings.  The headings of the Sections of this Agreement, where employed, are for convenience only and do not form a part hereof and in no way modify, interpret or construe the meanings of the Parties.

5

j.  Severability.  Any provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions of this Agreement; provided, however, in the event the provision which is invalid or unenforceable pertains to a material element of the transaction such that the principal objectives of the transaction provided for herein are materially impaired or are invalid or unenforceable, this Agreement shall be terminated.

k.  Specific Performance.  Each Party acknowledges that, in view of the uniqueness of the transactions contemplated by this Agreement, each Party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore each Party agrees that the other Parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

l.  No Presumption Regarding Drafter.  The Parties acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between them, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, it would not be appropriate to deem any Party to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

* * * * *

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Parties hereto have executed this Case Replacement Agreement as of the date first set forth above.

**KS**:

KS Law Group LLP

By: *Lee Melchionni*
Lee Melchionni (Dec 27, 2022 20:59 EST)
Name: Lee Melchionni
Title:

**LAKE**:

Lake Law Firm, LLC

By: 
Edward Lake (Dec 27, 2022 20:47 EST)
Name: Edward Lake
Title:

[Signature Page to Case Replacement Agreement]

## Exhibit A

**Talcum Powder:** Cases provided with the following criteria below and guaranteed by medical records:
- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer).
- Seventy-five (75) years old or younger.
- Four (4) years plus of exposure.
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer with chemotherapy or treatment.
- Death within eighteen (18) months and original diagnosis within four (4) years of death.

**Hernia Mesh**: Cases provided with the following criteria below and guaranteed by medical records:
- Records showing revision, removal, or replacement surgery, or scheduled within ninety (90) days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery in 2011 or afterward.

**Roundup**: Cases provided with the following criteria below and guaranteed by medical records:
- Diagnosed with Non-Hodgkin lymphoma or subtype within the last ten (10) years, [unless medical records access then 2007 forward].
- Direct exposure only to Roundup for more than one (1) year.
- No existing attorney.

**3M**: Cases provided with the following criteria below and guaranteed by medical records:
- Used 3M Combat Arms CAEv2 Earplugs between 2003 and 2015.
- Diagnosed with tinnitus or documented loss of hearing of ten percent (10%) or more in at least one (1) ear.
- No existing attorney.

**Camp Lejeune:** Cases provided with the following criteria below and guaranteed by medical records:
- -PC must have resided, worked, or was otherwise exposed at Camp Lejeune, NC not less than 30 days from 8/1/1953 through 12/31/1987
- -PC must have been diagnosed with one of the following injuries after exposure at Camp Lejeune: Bladder Cancer, Brain Cancer, Brain Tumor, Cervical Cancer, Ovarian Cancer, Prostate Cancer, Rectal Cancer, Breast Cancer, Esophageal Cancer, Kidney Cancer, Liver Cancer, Lung Cancer, Leukemia, Hodgkin's Disease, Lymphoma, Multiple Myeloma, Hepatic Steatosis (Fatty Liver Disease), Parkinson's Disease, Renal Toxicity, Scleroderma, Non-Hodgkin's Lymphoma, Soft Tissue Cancer, Basal Cell Carcinoma, Melanoma, Merkel Cell Carcinoma, Squamous Cell Carcinoma, Colon (Colorectal) Cancer, Intestinal Cancer, Appendix Cancer, Aplastic Anemia and other Myelodysplastic syndromes, Cirrhosis of the Liver, Renal/Kidney Failure, Birth Defects (non-Cardiac), Cardiac Birth Defects, Miscarriage (19 weeks or earlier), Fetal Death (20 weeks gestation), Fertility Issues, Tremors (musculoskeletal), Pre-Parkinson's Disease, Neurobehavioral Effects - must have all symptoms: delayed reaction times, memory problems, attention/concentration problems, and motor function problems (e.g. hand tremor, postural sway)
- -PC must not currently be represented by an attorney

[Exhibit A]

# KS Law Group - Case Replacement Agreement

Final Audit Report                                    2022-12-28

| | |
|---|---|
| Created: | 2022-12-28 |
| By: | Lee Melchionni (lee@redwoodlg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4IPGrt0ky7Gi-3IFKgGAkBJ5kv2IPsl0 |

## "KS Law Group - Case Replacement Agreement" History

📄 Document created by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:44:56 AM GMT- IP address: 99.110.180.129

📧 Document emailed to elake@forpersist.com for signature
2022-12-28 - 1:45:53 AM GMT

📄 Email viewed by elake@forpersist.com
2022-12-28 - 1:46:43 AM GMT- IP address: 73.205.234.141

✍ Signer elake@forpersist.com entered name at signing as Edward Lake
2022-12-28 - 1:47:04 AM GMT- IP address: 73.205.234.141

✍ Document e-signed by Edward Lake (elake@forpersist.com)
Signature Date: 2022-12-28 - 1:47:06 AM GMT - Time Source: server- IP address: 73.205.234.141

📧 Document emailed to Lee Melchionni (lee@redwoodlg.com) for signature
2022-12-28 - 1:47:07 AM GMT

📄 Email viewed by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:53:47 AM GMT- IP address: 99.110.180.129

✍ Document e-signed by Lee Melchionni (lee@redwoodlg.com)
Signature Date: 2022-12-28 - 1:53:57 AM GMT - Time Source: server- IP address: 99.110.180.129

✅ Agreement completed.
2022-12-28 - 1:53:57 AM GMT

**Adobe Acrobat Sign**



# Exhibit 8

**From:** Lee Melchionni <lee@capital4jus_ce.com>
**Sent:** Friday, March 3, 2023 3:17:48 PM
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>; ALLAN TEH <allan.teh@icloud.com>
**Cc:** Sylvia Benito <sylvia@capital4jus_ce.com>
**Subject:** KS Law Group Update

Sohail,

Attached are the case lists for KS Law Group ("KS"). To provide some context, KS is owed 200 Talcum Powder cases, with a maximum non-medical record drop off of 25%. Any shortfall in Talcu employees per converted Talcum Powder case, with the Internal Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Ec Hernia Mesh cases, with a maximum non-medical record drop off of 30%. KS is owed 155 Roundup Cases, with a maximum non-medical record drop off of 25%. Any shortfall in Roundup cases one conversion basis. KS is owed 220 3M cases, with a maximum non-medical record drop off of 25%.

We are also sharing the executed case replacement agreement with the Lake Law Firm.

- **3M Earplugs**
  - 11 - Attempting to Contact
  - 3 - Filed
  - 54 - Pending
  - 79 - Retained and Sent to Firm
  - 5 - Unable to Reach/Unresponsive
- **Hernia Mesh**
  - 3 - Attempting to Contact
  - 8 - Filed
  - 82 - Pending
  - 2 - Ready to Submit
  - 43 - Retained and Sent to Firm
  - 4 - Unable to Reach/Unresponsive
- **Round Up**
  - 2 - Attempting to Contact
  - 27 - Pending
  - 14 - Ready to Submit
  - 18 - Retained - Sent to Firm
  - 14 - Unable to Reach/Unresponsive
- **Talcum Powder**
  - 1 - Attempting to Contact
  - 5 - Pending
  - 2 - Retained and Sent to Firm
  - 1 - Unable to Reach/Unresponsive

--
**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**



**5 Attachments** • Scanned by Gmail



| X  KS_Talcum_Pow… | X  KS_3M_Earplugs… | X  KS_Round_Up_R… | X  KS_Hernia_Mesh… | PDF  KS Law Group - C… |

# Exhibit 9

**The New York Times**

## Johnson & Johnson Reaches Deal for $8.9 Billion Talc Settlement

The company faces a flood of lawsuits claiming its talc products caused cancer. The proposed settlement requires approval by a bankruptcy court, but has the backing of plaintiffs' lawyers.

 Give this article



The talc in Johnson & Johnson's baby powder may have been contaminated with asbestos, plaintiffs claim.  Lucas Jackson/Reuters

 **By Tiffany Hsu**

Tiffany Hsu has followed the Johnson & Johnson talc litigation closely for more than five years.

April 4, 2023

Johnson & Johnson said on Tuesday that it had agreed to pay $8.9 billion to tens of thousands of people who claimed the company's talcum powder products caused cancer, a proposal that lawyers for the plaintiffs called a "significant victory" in a legal fight that has

**Special offer:** Subscribe for $4.25 $1 a week for the first year.                    EXPAND

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |

| **DIVISION**<br>☒CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **CIVIL ACTION SUMMONS (b)**<br>**Form for Personal Service on a Natural Person** | **CASE NUMBER**<br>2023-015702-CA-01 |
|---|---|---|
| **PLAINTIFF(S)**<br><br>Allan Teh, individually<br>On a Derivative Basis<br>as a Partner of<br>KS, Law Group, LLP | **VS.   DEFENDANT(S)**<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and<br>THE LAKE LAW FIRM, a New York Limited Liability Company.<br>and Nominal Defendant, KS Law Group, a District of Columbia LLP | **CLOCK IN** |

**THE STATE OF FLORIDA:**TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s):<br><br>Lee Melchionni | Address:<br><br>1537 Tryon Road NE Brookhaven, GA 30319 |
|---|---|

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

### MIAMI-DADE COUNTY COURT LOCATIONS

| ☒ **Dade County Courthouse** (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ **Joseph Caleb Center Court** (20)<br>Suite 103<br>5400 N.W. 22nd Avenue<br>Miami, FL 33142 | ☐ **Hialeah District Court** (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ **North Dade Justice Center** (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ **Miami Beach District Court** (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ **Coral Gables District Court** (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ **South Dade Justice Center** (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | **SERVICE** |

| Plaintiff/Plaintiff Attorney<br><br>Florida Bar No. | Address: | |
|---|---|---|
| **LUIS G. MONTALDO<br>CLERK AD INTERIM<br>CIRCUIT AND COUNTY COURTS** | <br><br><br><br>DEPUTY CLERK | **DATE ON:** |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| [X] IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |
|---|
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |

| DIVISION<br>[X] CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **CIVIL ACTION SUMMONS (b)**<br>**Form for Personal Service on a Natural Person** | **CASE NUMBER**<br>2023-015702-CA-01 |
|---|---|---|
| **PLAINTIFF(S)**<br><br>Allan Teh, individually<br>On a Derivative Basis as a<br>Partner of<br>KS, Law Group, LLP | **VS.  DEFENDANT(S)**<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and<br>THE LAKE LAW FIRM, a New York Limited Liability Company.<br>and Nominal Defendant, KS Law Group, a District of Columbia LLP | **CLOCK IN** |

| **THE STATE OF FLORIDA:** TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant: |
|---|

| To Defendant(s):<br><br>Sylvia Benito | Address:<br><br>5954 NE 5th Avenue, Miami, FL 33137 |
|---|---|

<u>IMPORTANT</u>

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at <u>www.dadecountyprobono.org</u>."**

MIAMI-DADE COUNTY COURT LOCATIONS

| [X] **Dade County Courthouse** (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ **Joseph Caleb Center Court** (20)<br>Suite 103<br>5400 N.W. 22nd Avenue<br>Miami, FL 33142 | ☐ **Hialeah District Court** (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ **North Dade Justice Center** (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ **Miami Beach District Court** (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ **Coral Gables District Court** (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ **South Dade Justice Center** (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | **SERVICE** |

| Plaintiff/Plaintiff Attorney<br><br>Florida Bar No. | Address: | |
|---|---|---|
| **LUIS G. MONTALDO**<br>**CLERK AD INTERIM**<br>**CIRCUIT AND COUNTY COURTS** | <br><br><br>DEPUTY CLERK | **DATE ON:** |

# AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email <u>ADA@jud11.flcourts.org</u>; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| | | |
|---|---|---|
| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
| **DIVISION**<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | **CASE NUMBER**<br>2023-015702-CA-01 |

| **PLAINTIFF(S)**<br><br>ALLAN TEH, individually<br>On a Derivative Basis as a Partner of<br>KS, Law Group, LLP | **VS.  DEFENDANT(S)**<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited<br>Liability Company, and   THE LAKE LAW FIRM, a New<br>York Limited Liability Company.<br> and Nominal Defendant, KS Law Group, a District of<br>Columbia LLP | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): __The Lake Law Firm, LLC_____

__1815 Cordova Road, Ft Lauderdale, FL 33316_____

_____

_____

_____

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: __Matthew L. Jones, Esq._____

whose address is: __Jones & Adams, P.A._____

__999 Ponce de Leon Blvd., Suite 925, Coral Gables, FL 33134_____

_____

**CLOCK IN**

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **LUIS G. MONTALDO**<br>**CLERK AD INTERIM** | | DATE |
| | DEPUTY CLERK | |

# AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314  Rev. 01/23

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION** ☒ CIVIL ☐ DISTRICTS ☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE** **(a) GENERAL FORMS** | **CASE NUMBER** 2023-015702-CA-01 |
| **PLAINTIFF(S)** Allan Teh, individually On a Derivative Basis as a Partner of KS, Law Group, LLP | **VS.   DEFENDANT(S)** LEE MELCHIONNI, individually, SYLVIA BENITO, individually, PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and   THE LAKE LAW FIRM, a New York Limited Liability Company. and Nominal Defendant, KS Law Group, a District of Columbia LLP | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): Persist Communications, Inc.

Edward J. LAke

1815 Cordova Road, Ft. Lauderdale, FL 33316

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: Matthew L. Jones, Esq.

whose address is: Jones & Adams, P.A.

999 Ponce de Leon Blvd., Suite 925

Coral Gables, FL 33134

**CLOCK IN**

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **LUIS G. MONTALDO** **CLERK AD INTERIM** | DEPUTY CLERK | DATE |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314  Rev. 01/23

Clerk's web address: www.miami-dadeclerk.com

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION** ☒ CIVIL ☐ DISTRICTS ☐ OTHER | **CIVIL ACTION SUMMONS (b)** **Form for Personal Service on a Natural Person** | **CASE NUMBER** 2023-015702-CA-01 |
| **PLAINTIFF(S)** Allan Teh, individually On a Derivative Basis as a Partner of KS, Law Group, LLP | **VS. DEFENDANT(S)** LEE MELCHIONNI, individually, SYLVIA BENITO, individually, PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and THE LAKE LAW FIRM, a New York Limited Liability Company. and Nominal Defendant, KS Law Group, a District of Columbia LLP | **CLOCK IN** |

**THE STATE OF FLORIDA:** TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s): Lee Melchionni | Address: 1537 Tryon Road NE Brookhaven, GA 30319 |
|---|---|

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

### MIAMI-DADE COUNTY COURT LOCATIONS

| ☒ **Dade County Courthouse** (05) Room 133 73 West Flagler Street Miami, FL 33130 | ☐ **Joseph Caleb Center Court** (20) Suite 103 5400 N.W. 22nd Avenue Miami, FL 33142 | ☐ **Hialeah District Court** (21) Room 100 11 East 6th Street Hialeah, FL 33010 | ☐ **North Dade Justice Center** (23) Room 100 15555 Biscayne Blvd. North Miami Beach, FL 33160 |
|---|---|---|---|
| ☐ **Miami Beach District Court** (24) Room 200 1130 Washington Avenue Miami Beach, FL 33139 | ☐ **Coral Gables District Court** (25) Room 100 3100 Ponce De Leon Blvd. Coral Gables, FL 33134 | ☐ **South Dade Justice Center** (26) Room 1200 10710 SW 211 Street Miami, FL 33189 | **SERVICE** |

| Plaintiff/Plaintiff Attorney Florida Bar No. | Address: | |
|---|---|---|
| **LUIS G. MONTALDO** **CLERK AD INTERIM** **CIRCUIT AND COUNTY COURTS** | 38084 DEPUTY CLERK | **DATE ON:** 5/2/2023 |

## AMERICANS WITH DISABILITIES ACT OF 1990 ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |
| --- |
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. |

| DIVISION | SUMMONS 20 DAY CORPORATE SERVICE | CASE NUMBER |
| --- | --- | --- |
| ☒ CIVIL | | 2023-015702-CA-01 |
| ☐ DISTRICTS | (a) GENERAL FORMS | |
| ☐ OTHER | | |

| PLAINTIFF(S) | VS.  DEFENDANT(S) | SERVICE |
| --- | --- | --- |
| ALLAN TEH, individually On a Derivative Basis as a Partner of KS, Law Group, LLP | LEE MELCHIONNI, individually, SYLVIA BENITO, individually, PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and   THE LAKE LAW FIRM, a New York Limited Liability Company.  and Nominal Defendant, KS Law Group, a District of Columbia LLP | |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): _The Lake Law Firm, LLC_

1815 Cordova Road, Ft Lauderdale, FL 33316

_____

_____

_____

Each defendant is required to serve written defense to the complaint or petition on Plaintiff's Attorney: _Matthew L. Jones, Esq._

whose address is: _Jones & Adams, P.A._

999 Ponce de Leon Blvd., Suite 925, Coral Gables, FL 33134

_____

**CLOCK IN**

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **LUIS G. MONTALDO CLERK AD INTERIM** | Braty  CA #30987 DEPUTY CLERK | DATE 5/2/2023 |
| --- | --- | --- |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

|  |  |  |
|---|---|---|
| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |

| **DIVISION**<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **CIVIL ACTION SUMMONS (b)**<br>**Form for Personal Service on a Natural Person** | **CASE NUMBER**<br>2023-015702-CA-01 |
|---|---|---|
| **PLAINTIFF(S)**<br><br>Allan Teh, individually<br>On a Derivative Basis as a<br>Partner of<br>KS, Law Group, LLP | **VS.   DEFENDANT(S)**<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and<br>THE LAKE LAW FIRM, a New York Limited Liability Company.<br>and Nominal Defendant, KS Law Group, a District of Columbia LLP | **CLOCK IN** |

**THE STATE OF FLORIDA:** TO EACH SHERIFF OF THE STATE, YOU ARE COMMANDED to serve this Summons and a copy of the Complaint in this lawsuit on defendant:

| To Defendant(s):<br><br>   Sylvia Benito | Address:<br><br>   5954 NE 5th Avenue, Miami, FL 33137 |
|---|---|

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse. The address for the courthouse, and branch locations are listed below for your convenience:

**"For those unable to pay for an attorney, information on how to seek free legal assistance can be found at www.dadecountyprobono.org."**

### MIAMI-DADE COUNTY COURT LOCATIONS

| | | | | SERVICE |
|---|---|---|---|---|
| ☒ **Dade County Courthouse** (05)<br>Room 133<br>73 West Flagler Street<br>Miami, FL 33130 | ☐ **Joseph Caleb Center Court** (20)<br>Suite 103<br>5400 N.W. 22nd Avenue<br>Miami, FL 33142 | ☐ **Hialeah District Court** (21)<br>Room 100<br>11 East 6th Street<br>Hialeah, FL 33010 | ☐ **North Dade Justice Center** (23)<br>Room 100<br>15555 Biscayne Blvd.<br>North Miami Beach, FL 33160 | |
| ☐ **Miami Beach District Court** (24)<br>Room 200<br>1130 Washington Avenue<br>Miami Beach, FL 33139 | ☐ **Coral Gables District Court** (25)<br>Room 100<br>3100 Ponce De Leon Blvd.<br>Coral Gables, FL 33134 | ☐ **South Dade Justice Center** (26)<br>Room 1200<br>10710 SW 211 Street<br>Miami, FL 33189 | | |

| Plaintiff/Plaintiff Attorney<br><br>Florida Bar No. | Address: | |
|---|---|---|
| **LUIS G. MONTALDO**<br>**CLERK AD INTERIM**<br>**CIRCUIT AND COUNTY COURTS** | *[signature]* 219401<br>DEPUTY CLERK | **DATE ON:**<br><br>5/2/2023 |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 172107591 E-Filed 05/01/2023 08:47:31 AM

| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| ☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |

| DIVISION<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2023-015702-CA-01 |
|---|---|---|
| **PLAINTIFF(S)**<br><br>Allan Teh, individually<br>On a Derivative Basis as a Partner of<br>KS, Law Group, LLP | **VS.  DEFENDANT(S)**<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited Liability Company, and   THE LAKE LAW FIRM, a New York Limited Liability Company.<br>and Nominal Defendant, KS Law Group, a District of Columbia LLP | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): _Persist Communications, Inc._____

 Edward J. LAke _____

 1815 Cordova Road, Ft. Lauderdale, FL 33316 _____

 _____

Each defendant is required to serve written defense to the complaint or petition on
Plaintiff's Attorney: __Matthew L. Jones, Esq._____

whose address is: __Jones & Adams, P.A._____

 999 Ponce de Leon Blvd., Suite 925 _____

 Coral Gables, FL 33134 _____

**CLOCK IN**

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **LUIS G. MONTALDO<br>CLERK AD INTERIM** | DEPUTY CLERK | DATE<br><br>5/2/2023 |
|---|---|---|

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1ˢᵗ Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314  Rev. 01/23                                                        Clerk's web address: www.miami-dadeclerk.com

Filing # 172231577 E-Filed 05/02/2023 10:52:05 AM

| | CASE NUMBER |
|---|---|
| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | |

| DIVISION<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | SUMMONS 20 DAY CORPORATE SERVICE<br>(a) GENERAL FORMS | CASE NUMBER<br>2023-015702-CA-01 |
|---|---|---|

| PLAINTIFF(S)<br><br>ALLAN TEH, individually<br>On a Derivative Basis as a Partner of<br>KS, Law Group, LLP | VS. DEFENDANT(S)<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited<br>Liability Company, and THE LAKE LAW FIRM, a New<br>York Limited Liability Company.<br>and Nominal Defendant, KS Law Group, a District of<br>Columbia LLP | SERVICE |
|---|---|---|

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on defendant(s): ___KS Law Group, LLP___
_____20900 NE 30th Avenue, Miami, Florida 33180_____
_____
_____

Each defendant is required to serve written defense to the complaint or petition on

Plaintiff's Attorney: _____Matthew L. Jones, Esq._____

whose address is: __Jones & Adams, P.A._____
_999 Ponce de Leon Blvd., Suite 925, Coral Gables, FL 33134_____
_____

**CLOCK IN**

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| **LUIS G. MONTALDO**<br>**CLERK AD INTERIM** | | DATE |
|---|---|---|
| | DEPUTY CLERK | |

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314 Rev. 01/23                                                    Clerk's web address: www.miami-dadeclerk.com

Filing # 172231577 E-Filed 05/02/2023 10:52:05 AM

| | | |
|---|---|---|
| ☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
| **DIVISION**<br>☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | **SUMMONS 20 DAY CORPORATE SERVICE**<br>**(a) GENERAL FORMS** | **CASE NUMBER**<br>2023-015702-CA-01 |
| **PLAINTIFF(S)**<br><br>ALLAN TEH, individually<br>On a Derivative Basis as a Partner of<br>KS, Law Group, LLP | **VS.  DEFENDANT(S)**<br>LEE MELCHIONNI, individually,<br>SYLVIA BENITO, individually,<br>PERSIST COMMUNICATIONS, INC, a Florida Limited<br>Liability Company, and   THE LAKE LAW FIRM, a New<br>York Limited Liability Company.<br> and Nominal Defendant, KS Law Group, a District of<br>Columbia LLP | **SERVICE** |

**THE STATE OF FLORIDA:**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this summons and copy of the complaint or petition in this action on

defendant(s): ___KS Law Group, LLP___

_____20900 NE 30th Avenue, Miami, Florida 33180_____

_____

_____

Each defendant is required to serve written defense to the complaint or petition on

Plaintiff's Attorney: ___Matthew L. Jones, Esq._____

whose address is: ___Jones & Adams, P.A._____

_999 Ponce de Leon Blvd., Suite 925, Coral Gables, FL 33134_____

_____

**CLOCK IN**

within 20 days " **Except when suit is brought pursuant to s. 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to respond shall be 40 days. When suit is brought pursuant to. 768.28, Florida Statutes, the time to respond shall be 30 days."** after service of this summons on that defendant , exclusive of the day of service, and to file the original of the defenses with the Clerk of this Clerk Court either before service on Plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

| | | |
|---|---|---|
| **LUIS G. MONTALDO**<br>**CLERK AD INTERIM** | /36565<br>DEPUTY CLERK | DATE<br>5/4/2023 |

### AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Avenue, Suite 2400, Miami, FL 33128; Telephone (305) 349-7175; TDD (305) 349-7174, Email ADA@jud11.flcourts.org; or via Fax at (305) 349-7355,  at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

CLK/CT. 314  Rev. 01/23

Filing # 174491163 E-Filed 06/02/2023 01:23:39 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA43
JUDGE: Thomas J. Rebull

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## ORDER REQUIRING COMPLIANCE WITH COMPLEX BUSINESS LITIGATION SECTION PROCEDURES AND ORDER ON CASE MANAGEMENT CONFERENCES

The Complex Business Litigation Rules shall apply to all actions in the Complex Business Litigation Section except to the extent that they are superseded by court Order. The rules are located on the circuit website at: http://www.jud11.flcourts.org/About-the-Court/Ourt-Courts/Civil-Court/Complex-Business-Litigation and on the Judge's webpage.

These Procedures shall be construed and enforced to avoid technical delay, encourage civility, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

All motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Rules.

### INITIAL CASE MANAGEMENT CONFERENCE

**NOTICE IS HEREBY GIVEN** that on **July 21, 2023 at 2:00 p.m.**, undersigned shall convene an Initial Case Management Conference ("ICMC") in this cause.

> *Lead Trial Counsel, each individual party, and a representative of any entity party shall appear for the ICMC unless other arrangements are approved in advance by the Judge.*

Failure of any party to attend, including the insurance carrier representative, shall subject that party to sanctions. **Lead Counsel shall meet no less than 20 days in advance of the ICMC to discuss the matters identified in Rule 1.201(b) and shall, no less than fourteen (14) days before the scheduled Case Management Conference, file the Joint Case Management Report in compliance with Rule 1.201(b)(1).**

**THE DEADLINES FOR SUBMISSIONS PRIOR TO THE INITIAL CMC MAY NOT BE ALTERED OR WAIVED BY COUNSEL PLEASE MAKE APPROPRIATE ARRANGEMENTS TO COMPLY**

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court. Counsel shall file the report and note any parties' nonparticipation. Failure to provide the required case management report may subject the violating party(ies) to sanctions.

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, the Court will set the case management plan and trial date at the ICMC. Because this ICMC occurs near the outset of the case, the trial date will be confirmed at the subsequent Scheduling Case Management Conference to assure reasonable case management progress. Once set at the Scheduling Case Management Conference, the trial date will be a firm date. THE COURT ANTICIPATES REAL TRIAL SETTINGS, AND COUNSEL SHOULD MAKE APPROPRIATE SCHEDULING DECISIONS AT THE TIME OF THE CMC, including blocking necessary time with expert witnesses and mediators. **As provided in the rule, continuance of the trial of a complex action, once scheduled at the Scheduling Conference, will rarely be granted, and then only upon good cause shown. Failure to complete discovery, dispositive motions, or mediation in violation of the case management plan is not good cause.** Parties may not continue a case by agreement.

Plaintiff is required to provide a full set of all materials regarding pending motion(s), including all responses and replies, and all memoranda no later than three (3) days prior to the initial case management conference. COURTESY COPIES, HEARING BINDERS, AND HEARING REQUEST PROCEDURES FOR ALL HEARINGS

The Judge requires a paper copy/complete hearing binder with all materials, from each involved party (motions, memos, opposition, replies, case law, record and document excerpts) that any party requests to be included, delivered to chambers at least 3 days prior to the scheduled hearing. *(Due to pandemic all materials shall also be uploaded through courtMap on the hearing date scheduled.)* It shall be the responsibility of the movant to provide a single comprehensive binder. Parties shall not submit competing binders. The binder shall **first** include **only** the motion and supporting memorandum of law, the opposition, and any reply. These initial materials shall **not** include any attached exhibits or other materials. These primary first materials (motion/memo, opposition, and reply) are analogous to appellate briefs, and the attachments and exhibits, etc., are the appendix/record and must come **after** the primary materials.

Parties are hereby noticed that the Court may consider any non-dispositive pending motion at any Case Management Conference and should prepare accordingly, and that the Court may engage in any of the actions authorized under Fla. R. Civ. P. 1.200 and 1.201. The Court will also review the parties' periodic progress and completion of case management milestones under the case management plan in order to assure timely progress towards trial. Parties should not agree to extensions of milestone deadlines anticipating that the trial will be delayed. It is the parties'

responsibility to complete case preparation in sufficient time in advance of the trial date to allow for pretrial hearing on Daubert Motions, Dispositive Motions, and for the completion of mediation, etc.

### PROPOSED ORDERS

Proposed Orders, ex-parte, agreed and otherwise, shall be submitted by courtMAP in Word format as indicated on the Judge's webpage. Parties shall promptly review and propose any edits to a proposed order. If the parties are unable to agree to the language of an order, the movant shall gather all versions of the order with proposed changes red-lined (or Track Changes) and email them in Word to the Court at cbl43@jud11.flcourts.org for its review and execution. **Disputed orders shall not be uploaded to CourtMap.** Delivery of the order shall be prompt in accord with the CBL Rules.

Counsel for Plaintiff(s) and Third-Party Plaintiff(s) is/are ORDERED: to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order. If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third-Party Plaintiff shall provide the party with a copy of this Notice.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 2nd day of June, 2023.

2023-015702-CA-01 06-02-2023 1:16 PM
Hon. Thomas J. Rebull

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Heather.Bunner@blankrome.com

**Physically Served:**

Filing # 174491171 E-Filed 06/02/2023 01:23:42 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA43
JUDGE: Thomas J. Rebull

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## ORDER ON MOTIONS AND MEMO REQUIREMENTS AND MANDATORY ORDER TO CONFER AND CERTIFICATION REQUIREMENT

This case is pending in the Complex Business Litigation Division and must follow the Complex Business Litigation rules.  In addition, it is **ORDERED** and **ADJUDGED**:

### MOTION CALENDAR

The Court conducts an open motion calendar (3 business days' notice required) on Mondays and Tuesdays at 9:00 a.m.  Motion Calendar hearings will continue to be heard via zoom.  As a general rule, ten-minute Motion Calendar hearings do not require memoranda of law. Copies of motions and any response shall be uploaded on courtMAP in accordance with the Court's motion calendar procedures posted on its website.

### MOTIONS REQUIRING A SPECIAL SET HEARING

Hearings must be set using the Court's special set through courtMAP.  Motions may be scheduled or ruled upon without a hearing, in the Court's discretion, anytime more than twenty days after the motion is filed, by which time briefing should be completed under this order.  Special set hearings are limited to one hour absent leave of court.  In the event a movant (or responding party) believes more than one hour is needed, the case shall be set on the motion calendar so the Court may be advised of the nature of the motion and determine whether additional time will be allotted.

**Content of motions** shall state with particularity the grounds therefore, cite any statute or rule of procedure relied upon, shall set forth the relief sought and shall include the required certification of conferral.  The Court will not consider issues at a hearing that were not specifically addressed in the motion and memoranda in support of and in opposition to the motion.  Nor will the Court entertain any matter not set for hearing.  *See Miami-Dade County Bd. of County Com'rs v. An Accountable Miami-Dade*, 208 So. 3d 724 (Fla. 3d DCA 2016) ("[i]t is well established that "the

granting of relief, which is not sought by the notice of hearing or which expands the scope of a hearing and decides matters not noticed for hearing, violates due process").

## MEMORANDA REQUIREMENTS

*These requirements and deadlines may not be waived or altered except by court order.*

**Failure to File and Serve Motion Materials:**

A motion or opposition not supported by a memorandum of law (which may be incorporated into the motion) may be summarily rejected or denied.  Failure to timely file a memorandum in opposition to a motion may result in the pending motion being considered uncontested.

**Motion briefing deadlines are court orders.**

| Motion | Memoranda of law | Page limit | Time deadline | |
|---|---|---|---|---|
| Motion filed by movant | As required by CBL rules | 30 | At time of filing the motion | Memos which are not filed with the motion will be disregarded. |
| Opposition to motion | At time of filing opposition, if needed | 30 | 10 days after service of motion as computed in the Fla. R. Civ. P. 1.090 | If no response is timely filed, the Court will proceed and may grant the motion as unopposed. |
| Reply | If needed, limited to matters raised in the opposition | 10 | 5 days after service of opposition as computed in the Fla. R. Civ. P. 1.090 | If no reply is timely filed, the Court will proceed |
| Sur-reply | With Court permission only | | | |

**Motions Decided on Papers and Memoranda:**

Motions may be considered and decided by the Court without a hearing. **A hearing is at the discretion of the Court unless a hearing is required by the Rules of Civil Procedure.**

## SEALED AND CONFIDENTIAL DOCUMENTS

Sealed or confidential documents should be efiled pursuant to the instructions on the Clerk's efiling portal.  In Camera inspections shall be conducted as instructed by the Court.

## MANDATORY ORDER TO CONFER AND CERTIFICATION REQUIREMENT

This case is subject to the Complex Business Litigation Rules.  The rules require that parties meet and confer prior to filing any motion to determine if issues can be narrowed, the appropriate amount of time required for hearing if hearing is requested, and any other issues such as the completion of related discovery.  Meet and Confer under these rules requires **an actual effort** between attorneys, not staff.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 2nd day of June, 2023.

2023-015702-CA-01 06-02-2023 1:16 PM
Hon. Thomas J. Rebull

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Heather.Bunner@blankrome.com

**Physically Served:**

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

      Nominal Defendant.

                                           /

**DEFENDANTS LEE MELCHIONNI'S, SYLVIA BONITO'S, AND KS LAW GROUP'S
MOTION TO COMPEL ARBITRATION AND DISMISS**

      Defendants Sylvia Benito, Lee Melchionni, and Nominal Defendant KS Law Group, LLP

(collectively the "KS Law Defendants"), pursuant to Fla. R. Civ. P. 1.110, the parties' Limited

Liability Partnership Agreement, the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 3, and the

Florida Arbitration Code (the "FAC"), Fla. Stat. § 682.03, hereby move to compel arbitration and

dismiss Plaintiff Allen Teh's derivative action and state:

## I.      INTRODUCTION

On August 24, 2021, Teh, Benito, and Melchionni joined as partners in the formation of KS Law Group LLP, a District of Columbia partnership.  (Complaint at ¶ 11).  In accordance with KS Law's Limited Liability Partnership Agreement, Teh provided KS Law with a capital contribution of $4 million.  (Complaint at ¶ 16).  Pursuant to the Partnership Agreement, any dispute or concern arising out of or related to a breach of the Partnership Agreement must be submitted to arbitration. (Complaint, Ex. 3 at ¶ 39). In violation of this mandatory arbitration provision, Teh commenced this suit. It should be dismissed and Teh compelled to comply with his agreement to arbitrate.

## II.      FACTUAL BACKGROUND

Teh, Melchionni, and Benito are partners in KS Law, a law firm formed under the laws of the District of Columbia.  (Complaint Ex. 3, p. 1).  Melchionni, a D.C. admitted lawyer is the Managing Partner while Teh and Benito are permitted non-lawyer participants.  *See id.*  KS Law, governed by the Partnership Agreement, was formed for the purposes of funding mass tort cases, with Teh providing the financing for the firm.  (Complaint at ¶¶ 11, 14; Ex. 3, p. 1).

Pursuant to the Partnership Agreement, "…any controversy arising out of or related to [the Partnership Agreement] or the breach thereof shall be settled under the law of the District of Columbia . . . and shall be resolved via arbitration under the American Arbitration Association, 9 U.S.C. § 2, in the District of Columbia[.]" (Complaint Ex 3 at ¶ 39).  All of Teh's fives causes of action against the KS Law Defendants arise out of and/or relate to the Partnership Agreement requiring arbitration in the District of Columbia.

In conformance with the mandatory Arbitration Clause, in November of 2022, Teh initiated a books and records action (the "First Action") against KS Law in front of the American Arbitration Association. (KS Law Demand for Arbitration at ¶ 26, attached hereto as Exhibit A).

2

But despite knowing that the Partnership Agreement requires that disputes be submitted to arbitration, on March 15, 2023 the same attorney who filed the Demand for Arbitration then filed an action (the "Second Action") by Teh in his individual capacity against Melchionni, and Benito, The Lake Law Firm, LLC, and Persist Communications, Inc. On April 25, 2023, before Melchionni and Benito had responded to the Second Action (with a motion to compel the mandatory arbitration), Teh's counsel filed this Third Action.

This Third Action is nearly identical to the Second Action. (*See Teh v. Melchionni et al.*, Case No. 2023-004474-CA-01, Complaint, attached hereto as Exhibit B). In this Third Action, Teh alleges five derivative causes of action against the KS Law Defendants: (1) equitable appointment of a receiver, (2) constructive fraud (against Melchionni), (3) constructive fraud (against Benito), (4) breach of fiduciary duty (against Melchionni), and (5) breach of fiduciary duty (against Benito). (Complaint at ¶¶ 61-98).

Each and every count Teh raises against the KS Law Defendants arises from or relates to the Partnership Agreement requiring arbitration.  Pursuant to the Partnership Agreement, the FAA and FAC, Teh's Complaint must be arbitrated in the District of Columbia, and this action dismissed.

## III.    ARGUMENT

### A.    Legal Standard

#### 1.    This Court has the authority to order these claims to be arbitrated in the District of Columbia.

"When underlying contracts involve interstate commerce, agreements to arbitrate under the law of another state are enforceable in Florida under the FAA." *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008). The FAA is applicable "where an agreement evidences 'a transaction involving commerce.'" *Mintz & Fraade, P.C. v. Beta Drywall*

*Acquisition, LLC*, 59 So. 3d 1173, 1175 (Fla. 4th DCA 2011) (citing 9 U.S.C. § 2). Florida courts recognize that the term "involving commerce" "means 'a transaction that, in fact, involves interstate commerce[.]'" *Id*. (quoting *Default Proof Credit Card Sys., Inc.*, 992 So. 2d at 445). And "the term 'interstate commerce' is to be interpreted broadly." *Id*. (citing *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So.2d 658, 660 (Fla. 4th DCA 2008).

The FAA is applicable to the Arbitration Clause. First, the Arbitration Clause specifically mentions 9 U.S.C. § 2, recognizing that the FAA would govern an arbitration under its terms. (Complaint, Ex. 3 at ¶ 39). Second, the Partnership Agreement explicitly provided for Teh, a Florida resident, to transfer of $4 million to KS Law, a D.C. partnership created and organized under the Business Organization Title of the District of Columbia Code. (Complaint at ¶¶ 11, 16; Complaint, Ex. 3, p. 1). This interstate transaction is specifically described in the Partnership Agreement: "It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm . . . . The Capital Contributions will be made by Allan Teh in the amount of $4,000,000." (Complaint, Ex. 3 at ¶ 12). Indeed, Teh admits in his Complaint that, as a resident of Florida, he initiated the $4 million transaction wire transaction on September 3, 2021, and that the funds were sent **directly** "into the KS Law Account[.]" (Complaint at ¶ 16). Third, the entire Partnership, taken together, plainly evidences an agreement by which Teh invests in, expects profits from, and becomes a partner of, a D.C. partnership – one that does business across state lines and with Florida entities. (*See* Complaint, Ex. 3, ¶ 21; Complaint, Ex. 2; Complaint, Ex. 7). This transaction plainly involves "interstate commerce" and thereby the Arbitration Clause falls within the scope of the FAA and is enforceable in Florida courts. *See Catastrophe Servs., Inc. v. Fouche*, 145 So. 3d 151, 154 (Fla. 5th DCA 2014) (holding that a contract between a Florida resident and a foreign entity evidences interstate commerce.).

### 2.      Arbitration clauses are favored in both federal and Florida courts.

"Where a contract falls within the scope of the [FAA], federal law applies in state courts as well as federal courts in construing and enforcing an arbitration agreement." *Donald & Co. Sec. v. Mid-Fla. Cmty. Servs., Inc.*, 620 So. 2d 192, 193 (Fla. 2d DCA 1993) (stating that "Florida courts are bound only by the United States Supreme Court in interpreting acts of Congress.").

The U.S. Supreme Court has held that "Congress declared a national policy favoring arbitration" in enacting the FAA. *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858 (1984). Likewise, the Supreme Court of Florida has held that "arbitration provisions are common, and their use generally favored by the courts." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999). And federal courts in Florida have held that the FAA "creates a presumption in favor of arbitrability." *Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1325 (S.D. Fla. 2004) (citing *Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309 (11th Cir.2002)).

### B.      Under the FAA and the Florida Arbitration Code, the Partnership Agreement satisfies all the elements required to compel arbitration.

In Florida, "an arbitration clause in a contract involving interstate commerce is subject to the Florida Arbitration Code (FAC)[.]" *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 463–64 (Fla. 2011). The Supreme Court of Florida has held that, when ruling on a motion to compel arbitration, "the inquiry follows the same three-step process regardless whether the inquiry is conducted under the FAC or the FAA," stating:

> Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived.

*Id.* at 465 (quoting *Seifert v. U.S. Home Corp.*, 750 So.2d 633 (Fla.1999).

5

### 1.    A valid agreement to arbitrate exists.

"The issue of 'whether a valid written agreement to arbitrate exists' is controlled by principles of state contract law." *Shotts*, 86 So. 3d at 464. Here, District of Columbia state law applies to all questions of contract as KS Law is a Limited Liability Partnership created "pursuant to the Business Organizations Title in the District of Columbia Code" and the Partnership Agreement contains a choice of law provision designating that "[a]ny claim or controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia[.]" (Complaint at Ex. 3, p. 1.; ¶ 39). "Florida courts are required to enforce choice of law provisions in contracts unless the law of the foreign state contravenes the strong public policy of Florida or is unjust or unreasonable." *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008) (citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000)). Since there is no public policy exception this Court must apply District of Columbia law in determining whether a valid written agreement to arbitrate exists.

Under District of Columbia law, for an enforceable contract to exist the parties must "express[ ] an intent to be bound, agree[ ] to all material terms, and assume[ ] mutual obligations sufficient to create an enforceable contract." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A. 2d 996, 1004 (D.C. 2008). There "must be mutual assent of each party to all the essential terms of the contract." *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A. 2d 725, 729 (D.C. 2000).

It is beyond dispute that Teh, Benito, and Melchionni all assumed mutual obligations throughout the Partnership Agreement, financial obligations, ownership interests, and other rights and powers in the partnership. (Complaint, Ex. 3 at ¶¶ 9, 11-13). This is evidenced by the parties' signatures and further supported by Teh's own admissions in his Complaint regarding the formation of KS Law. (Complaint, ¶¶ 11-16; Ex. 3, p. 13). In fact, Teh has attached the Partnership Agreement as an exhibit to his own Complaint. (Complaint, Ex. 3).

6

That Teh added KS Law as a nominal defendant in this derivative action does not change the result.  While KS Law did not sign the Partnership Agreement, it is bound by its terms, including the Arbitration Provision. Under District of Columbia law, KS Law is bound by and may enforce this arbitration provision as if it were a signatory to its own Partnership Agreement. Section 29-701.08 of the Code of the District of Columbia plainly states, "A limited partnership is bound by and may enforce the partnership agreement, *whether or not the partnership has itself manifested assent to the partnership agreement*." DC ST § 29-701.08 (emphasis added).

### 2.     All of the claims asserted are arbitrable under the broad Arbitration Clause in the Partnership Agreement.

The Partnership Agreement contains an unambiguous and broad Arbitration Clause:

**Any controversy arising out of or related to this Agreement** or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and **shall be resolved via arbitration** under the American Arbitration Association[.]

(Complaint Ex. 3 at ¶ 39) (emphasis added).

Both state and federal courts analyzing FAA arbitration clauses have found that an arbitration "provision which is broad in scope allows for arbitration of all claims 'arising out of or related to' the contract, including tort claims." *Cooper v. Rehab. Ctr. at Hollywood Hills LLC*, 305 So. 3d 3, 4 (Fla. 4th DCA 2020) (quoting *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 639 (Fla. 1999)); *see also Herrera*, 154 F. Supp. 3d at 1327 ("The presumption of arbitrability is particularly applicable where the arbitration clause is broad.") (citing *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 650 (1986)).

As the U.S. Supreme Court has held:

[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

7

*AT&T Technologies*, 475 U.S. at 650.

Where an unambiguous arbitration clause broadly covers "all claims or controversies" that arises out an agreement, any claim is covered thereunder barring **only** "the most forceful evidence of a purpose to exclude" a specific claim. *Herrera Cedeno v. Morgan Stanley Smith Barney*, LLC, 154 F. Supp. 3d 1318, 1327 (S.D. Fla. 2016).

The arbitration provision in *Herrera* is similar to the one here:

| *Herrera* | KS Law |
|---|---|
| **[A]ll claims or controversies** . . . concerning or **arising from [the agreement] . . . or breach of** this or any other agreement between us . . . shall be determined by arbitration[.] | **Any controversy arising out of or related to this Agreement or the breach thereof** … shall be resolved via arbitration[.] |

*Herrera,* 154 F. Supp. 3d at 1322.

As the court in *Herrera* held, for a claim to be outside the scope of such a broad arbitration clause, the parties must "clearly express their intent to exclude categories of claims from their arbitration agreement." *Id*. (citing *Paladino v. Avnet Comp. Techs., Inc.*, 134 F.3d 1057, 1057 (11th Cir.1998).

And like in *Herrera*, the Arbitration Clause here does not narrow or limit the types of claims that are subject to arbitration. Instead, it broadly covers "any controversy" and explicitly includes any claims arising out of or relating to alleged breaches of the Partnership Agreement. The Arbitration Clause does not exclude any categories of claims, and no evidence has been put forth to the contrary. Teh's claims are covered within the scope of the broad Arbitration Clause, which afforded no exclusions. As such, all of Teh's claims against the KS Law Defendants must be arbitrated.

8

**3.       The right to arbitration has not been waived.**

Finally, the KS Law Defendants have not waived their right to arbitration. The right to arbitration is considered waived when a party acts inconsistently with that right, such as by actively participating in a lawsuit without asserting their right or filing an answer without claiming that the matter should be arbitrated. *See Bland v. Green Acres Grp., L.L.C.*, 12 So. 3d 822, 824 (Fla. 4th DCA 2009); *see also Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004) (waiving right to arbitrate involves "taking actions inconsistent with that right."). This Motion is the KS Law Defendants' first action in this matter, and therefore their right to arbitrate has been maintained.

## IV.    CONCLUSION

The KS Law Defendants respectfully request this Court dismiss Counts 1-5 of Plaintiff Teh's Complaint and order that they be submitted to arbitration pursuant to the Partnership Agreement, grant the KS Law Defendants their attorney's fees and costs for having to file this Motion and grant any further relief deemed just under the circumstances.

Dated:  June 15, 2023

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Kenneth Bressler*
Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

9

_Attorneys for Defendants Benito,_
_Melchionni, and KS Law Group, LLP_

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed

on this 15th day of June 2023, with the Clerk of the Circuit Court using the Florida Courts e-filing

e-portal and served by an automatic email generated by the Florida Courts e-filing portal to::

Matthew Jones, Esq.
matthew@jones-adams.com
Cheyenne Moghadam, Esq.
c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

_Counsel for Plaintiff, Allan Teh_

Andrew Berman, Esq.
Email: aberman@ybklaw.com
YOUNG, BERMAN, KARPF & KARPF, P.A.
825 Brickell Bay Drive, Tower III, Suite 1748
Miami, Florida 33131
Telephone: (305) 945-1851
Facsimile: (786) 219-1981

_Counsel for Defendants Persist Communications, Inc. and Lake Law Firm, LLC_

_/s/ Kenneth Bressler_
Kenneth Bressler
Admitted _Pro Hac Vice_

10

# Exhibit A

## AMERICAN ARBITRATION ASSOCIATION
## DEMAND FOR ARBITRATION

In The Matter of the Arbitration

RE:    ALLAN TEH, Claimant

    vs.                                    AAA Case No.: _____

    KS LAW GROUP, LLP, Respondent.

Date: November 19, 2022

_____/

The Claimant, Allan Teh, and Respondent, KS Law Group, LLP, (hereinafter collectively, the "Parties") executed a Partnership Agreement (the "Agreement") which provided Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP, in exchange for a $4,000,000 capital contribution. This Demand for Arbitration arises from Respondent's failure to comply with Claimant's Demand for Inspection of Records, as required by Section 29-604.06(b) of the Code of District Colombia (the "Code").

### Background

1. On August 24, 2021, the Claimant, Allan Teh, and Respondent, KS Law Group, LLP, executed a Partnership Agreement providing Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP. (*See Partnership Agreement attached as Exhibit "A"*).

2. From the execution of the Agreement to the present date, the Respondent has failed to provide Claimant with any substantive correspondence, information or documentation allowing Claimant to assess the value, status and quality of his **$4,000,000 equity interest** in the Respondent.

3. On November 5, 2022, Claimant emailed, and mailed via certified mail on November 7th, 2022, a Demand for Inspection of Records to the Respondent (the "Demand"). (*See Demand attached as Exhibit "B"*)

4. The Demand was made pursuant to Section 29-604.06(b) of the Code of District Colombia, which sets forth a partner's rights and duties with respect to information of the partnership:

> A partnership shall provide partners and their agents and attorneys **access to its books and records**. It shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to **inspect and copy books and records** during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished.

D.C. Code § 29-604.06(b)

5. After providing the Respondent ten (10) days in which to comply with Claimant's statutory demand, the Respondent failed to provide the records sought.

6. On November 16, 2022, counsel for Respondent submitted a letter to Claimant's counsel. (*See Respondent's letter attached as Exhibit "C", including enclosure*)

7. Respondent's letter did not contain any documents demanded by the Claimant, but instead contained a list of proposed items that would be provided to Claimant upon the execution of a Confidentiality Agreement by Claimant along with Claimant's counsel, Jones & Adams, P.A. (*See Exhibit "C", including enclosure*).

8. Interestingly, the proposed Confidentiality Agreement requests Claimant's counsel, Jones & Adams, P.A., be a signatory of the Confidentiality Agreement but it makes no such request of Respondent's counsel, Blank Rome, LLP.

9. It is important to note that the Partnership Agreement between the Parties is devoid of any reference to the requirement of executing a confidentiality agreement in connection with a statutory demand for books and records.

10. Further, Claimant cannot locate any reference to the requirement of a confidentiality agreement in the D.C. Code.

11. Nevertheless, the Claimant recognizes that all the matters pertaining to the Partnership involve various confidential and proprietary matters and will continue to protect and preserve that information.

12. As is quite clear, Claimant's Demand sets forth ten (10) reasonable requests so that Claimant may adequately assess the value, status and quality of his $4,000,000 equity interest.

13. Respondent's letter only provided proposed inadequate documentation to nine out of the ten requests in Claimant's Demand.

14. In many instances, Respondent's proposed documents did not correlate to Claimant's demands or severely minimized the scope of Claimant's requests.

15. Just by way of example, Claimant requested access to "[c]opies of the financial statements of the Partnership, which include, profit and loss statements, balance sheets, and cash flow statements." (*See ¶ 2 of Exhibit "B"*)

16. To which, Respondent stated in its letter that it would provide "[a] spreadsheet reflecting KS Law's Chase banking activity as of November 10, 2022 and KS Law's monthly bank statements." (*See ¶ 2 of Exhibit "C"*)

17. Not only did Respondent fail to produce the required documents but the proposed documents do not remotely correspond to the Claimant's requests.

18. Regarding Claimant's request for "[a]ll documents relating to Mr. Teh's equity interest in the Partnership", Respondent oddly proposed that it will provide "a letter regarding Mr. Teh's investment, dated May 19, 2022."

19. This oblique reference to a "letter" is clearly an insufficient response to Claimant's request.

20. Claimant also requested the "[u]sernames and passwords to all bank accounts in the name of the Partnership." (*See ¶ 8 of Exhibit "B"*)

21. Respondents did not even acknowledge or address that request.

22. Nor did Respondent address Claimant's request for all "communications regarding the equity interest of Mr. Teh in the Partnership." (*See ¶ 9 of Exhibit "B"*)

23. To date, Claimant has not received the requested books or records, nor has the Claimant been offered or been provided access to inspect the Respondent's books and records as required by the Code. (*See D.C. Code § 29-604.06(b)*).

24. The Agreement between the Parties requires that any dispute arising out of the Agreement shall be settled under the laws of the District of Colombia. (*See Exhibit "A" Section 39*).

25. The Agreement between the Parties further contains an arbitration clause set forth in Section 39.

26. Section 39 requires that a dispute between the Parties will be submitted to the American Arbitration Association and be arbitrated by a single arbitrator in the District of Colombia. (*See Exhibit "A" Section 39*).

27. Due to Respondent's failure to comply with Section 29-604.06(b) Claimant demands this matter proceed to the American Arbitration Association.

## The Claim

Claimant seeks an award and order from the American Arbitration Association requiring Respondent to comply with Claimant's statutory right to inspect the Respondents books and records. Further, as set out in the Agreement, Claimant requests an award of his attorneys' fees, costs and expenses pursuant to Section 39 of the Partnership Agreement.

DATED this 19th day of November, 2022.

**JONES & ADAMS, P.A.**
*Attorneys for Claimant*
Coral Gables Centre
999 Ponce de Leon Boulevard
Suite 925
Coral Gables, FL 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     */s/ Matthew L. Jones_____*
       Matthew L. Jones, Esq.
       Florida Bar No.: 909335

# Exhibit B

Filing # 168815642 E-Filed 03/15/2023 04:58:39 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH, individually,

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation, and
THE LAKE LAW FIRM, a New York Limited
Liability Company

      Defendants.

_____/

## COMPLAINT

Plaintiff, ALLAN TEH ("Teh"), sues Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), PERSIST COMMUNICATIONS, INC ("Persist"), and THE LAKE LAW FIRM, LLC ("Lake Law Firm") (collectively referred to as "Defendants") and in support thereof alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.    This action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2.    Plaintiff, Allan Teh, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County, Florida.

Page **1** of **26**

3.    Defendant, Lee Melchionni, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

4.    Defendant, Sylvia Benito, is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5.    Persist Communications, Inc. is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of operation is located in Broward County Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

6.    Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as* **Exhibit 1** *and Lake Law invoice dated 9/1/2021 as* **Exhibit 2.**

7.    Lake Law Firm, LLC, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law firm has an office located in Broward County Florida and issues invoices regarding alleged services with the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See* **Exhibit 2.**

8.    As more fully set forth herein, Lake Law Firm has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to F.S. §48.193 et seq., Lake Law

Firm is subject to specific personal jurisdiction because Lake committed multiple acts and breaches enumerated in F.S. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law Firm has an office in Florida, has committed a tortious act within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

9.      This venue and forum are appropriate based upon F.S. § 47.011 and F.S. § 47.051 and also because virtually every act, breach and transaction set out in this Complaint occurred in Miami-Dade County Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

## GENERAL ALLEGATIONS

10.     During the spring and summer of 2021, Melchionni and Benito approached Teh regarding various business opportunities involving "litigation funding" for mass tort cases.

11.     One such business opportunity was for Teh to provide capital to a limited liability company which would then invest (via loan or capital contributions) into a law firm which would then utilize the "investment" to obtain and handle various mass tort cases.

12.     Melchionni and Benito subsequently represented to Teh that there would be significant advantages if he also formed his own law firm. *See June 24th, 2021 email as Exhibit 3.*

13.     These represented advantages of Teh having his own law firm included Teh having: 1) veto power over what litigation was pursued; 2) control over dollar amounts in specific litigations; 3) the ability to add partners to "his firm"; and 4) simplified governing documents. *See Exhibit 3.*

14.     According to Melchionni and Benito this proposed law firm would handle different types of mass tort injury cases, including claims and lawsuits involving Hernia Mesh injuries, Talc toxicity, Round Up toxicity, and 3M Ear Plugs injuries.

15.     During that time frame, multiple meetings, conversations and emails took place wherein various specific representations were made to Teh by Melchionni and Benito regarding the viability of the proposed law firm, the cost of acquiring cases, and the number of cases that the firm would have. *See June 21st, 2021 and August 3rd, 2021 Emails as Composite Exhibit 4.*

16.     As set out herein, Teh has learned that these direct and specific representations were false.

17.     On June 23rd, 2021, during a conference call with the Plaintiff, and others present, Melchionni specifically claimed that there was going to be a "a fast settlement for hernia mesh" and he knew "that something is imminent".

18.     These high-pressure tactics and misrepresentations continued on various occasions.

19.     During the same June 23rd, 2021 call, and discussions shortly after, Melchionni, Benito and Teh specifically discussed the risks associated with a large capital

contribution to the yet to be formed law firm, and Melchionni and Benito represented those risks to be "none".

20.     At no point in time during these conversations did Melchionni mention the possibility of future case "drop-off" relative to the earlier representations.

21.     On or about July 20th, 2021, there were multiple follow up calls where Melchionni and Benito specifically promised Teh that upon the formation of the law firm, they would both send "monthly updates on our cases".

22.     As a result of these direct, specific and material representations made to Teh by Melchionni and Benito regarding inter alia, the number of cases that the firm would sign up as counsel and the associated costs of those cases, Teh agreed to form a law firm with Teh as 50% equity partner and Melchionni and Benito as 25% partners respectively. *See KS Law Partnership Agreement attached as* **Exhibit 5.**

23.     The name of the firm is KS Law Group LLP ("KS Law") and the Partnership Agreement (the "Agreement") was executed by Teh, Melchionni, and Benito on August 24th, 2021.

24.     Interestingly, non-party KS law had its initial place of business in Washington D.C. but changed its address to 20900 NE 30th Avenue, Miami, Florida 33180 as evidenced by multiple bank account documents dated after the signing of the earlier referenced Agreement.

25.     Relevant to this Complaint, this "updated" place of business address is the same "business" address as Melchionni (a 25% partner in KS Law) and Benito (another 25% partner in KS Law).

26.     Neither Melchionni nor Benito advised their partner Teh of this address change.

27.     In reliance upon the representations set out herein, Teh provided $4 million as a capital contribution for KS Law and its operations.

28.     Upon information and belief, this was the only monetary capital contribution made by anyone to KS Law.

29.     That $4 million capital contribution was paid by Teh via Federal Wire on Friday September 3, 2021, into the KS Law Account at Chase Bank (Acct. Ending in ***6138) at the direction of Teh's partners, Melchionni and Benito.

30.     On September 16th, 2021, thirteen days after Teh's $4,000,000 was deposited into KS Law's Chase bank account, the funds were transferred and drained from that account.

31.     The funds were sent to Defendant Persist's account at TD Bank, Acct ending in ***2721.

32.     The effectuation and execution of that transfer was at the direction of Melchionni, Benito, Lake Law, and Persist.

33.     Teh was not informed of the transfer at that time or any appropriate time thereafter.

34.     It was only until the Fall of 2022, approximately one (1) year following those transfers, that Teh finally received documents obliquely referencing said transfer.  To wit: a one-and-a-half-page invoice from Lake Law "to" KS Law for $3,880,000.00.  *See Exhibit 2.*

35.     Put simply, Defendants Melchionni and Benito, with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Mr. Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

36.     Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

37.     Critical to the allegations regarding the misrepresentations made, as stated herein, it must be noted the original, and represented purpose, of Teh's $4 million capital contribution was for working up, qualifying, processing, managing and settling cases as well as for firm marketing services, professional management services, obtaining new clients and cases, and firm infrastructure management.

38.     As shown by the transfer of the entirety of KS Law's working capital to Defendant, Persist, and the allegations set out herein, Teh's $4 million was not used for those represented purposes.

39.     Upon the formation of KS Law, the "monthly updates" promised by Melchionni and Benito never occurred.

40.     In addition, "monthly updates" are utterly insufficient and inappropriate considering the important duties of the Partners set forth herein.

41.     When updates did come, they were irregularly sent, and were accompanied with repeated representations that there was "non-material drop offs" in the number of cases of KS Law.

42.     Moreover, multiple "updates" sent were simply "copy and pasted" from Google News and similar sources.  Nothing in any of these "updates" remotely comports with or fulfills the Fiduciary Obligations set out herein and each of these "updates" is, in and of itself, a Breach of those duties.

43.     Again, to emphasize the specificity of the fraudulent misrepresentations set out herein, the Plaintiff was specifically told by Melchionni, regarding the Hernia Mesh cases that KS Law would have, "some money may flow before the end of the year."

44.     As of today's date, the Plaintiff has not been advised of a single settlement.

45.     As further evidence of the breach of fiduciary duties owed directly to Teh, the Defendants, Melchionni and Benito, conspicuously and deliberately failed to keep even the most basic financial, operating, or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the profound logistics of managing hundreds of personal injury cases, Defendants, Melchionni and Bentio, have even admitted that they did not even bother to keep a general ledger for KS Law.

46.     As updates from Melchionni and Benito became increasingly sparse, on October 18th, 2021, Teh and Melchionni, with others present, had a call to discuss Teh's request for specific data relating to KS Law's cases.

47.     On the same date, an email was sent to Teh by Melchionni, with Benito cc'd.

48.     The October 18th email claimed:

*"The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost...Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We*

*are cautiously optimistic that **the majority of our docket will be settled by Q2 of 2022."***

See October 18th, 2021, email attached as **Exhibit 6.**

49.    Suffice to say, the majority of KS Law's "docket" was, in fact, not "settled by Q2 of 2022."

50.    As of today's date, Teh has not been advised of a single settlement.

51.    These acts, omissions and failures constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

52.    On October 20th, 2021, Melchionni sent another email to Teh stating:

> ***"For Allan's law firm, KS Law Group, we spent $3,880,080.00 to acquire** 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. **We are entitled to 60% of the attorney fee."***

See October 20th, 2021 Email attached as **Exhibit 7**

53.    It is important to note that Rules 1.5(c) and 1.5(e) of Rules of Professional Conduct governing D.C. law firms explicitly state:

> **1.5(c)** A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.
>
> **1.5(e)** A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing,** of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; _**and**_

(4) The total fee is reasonable.

54.     In direct breach of Rules 1.5(c) and (e) and the duties alleged herein, Defendants Melchionni and Benito never secured or obtained such agreements. Moreover, Teh has never been provided even a single written fee agreement between KS Law, co-counsel, referring counsel or any client pertaining to KS Law's involvement in the cases.

55.     In addition, Melchionni stated under oath that the is not aware of any retainer agreements in which KS law is party.

56.     The notion that this formerly multi-million dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein.

57.     These Professional Conduct Rules are not cited to suggest an independent cause of action based upon the Rules. They are set out herein as evidence of the acts, omissions and failures that constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

58.   On September 28th, 2022, Melchionni sent an email, cc'ing Benito, attempting to explain how the prior representations made to Teh have gone sideways. See September 28th email as **Exhibit 8.**

59.   Melchionni writes in the September 28th email:

*"Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.*

***There is an explanation from the CEO of Persis/Lake Law Firm** below regarding the drop off in Mass Torts.*

*Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.*
*1.    Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.*
*2.    Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).*
*a.    Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.*
*3.    Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.*
*a.    Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).*

4.     *Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.*

a.     *Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified.  As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.*

5.     *Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.*

a.     *Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.*

*A few outlier reasons for rejection:*
1.     *No will/estate, unable to file on behalf of*
2.     *Client no longer wishes to pursue*
3.     *Client is uncooperative*
4.     *Client is unresponsive/unable to reach*
*While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.*

*Lee Melchionni, Esq.."*

**See Exhibit 8**

60.     Even to the untrained eye, this information and risk factors should have been disclosed to Teh prior to formation of KS Law and his sizable $4 million capital contribution.

61.     Defendants' calculated failure to do so as well as their omissions set out herein clearly demonstrate the Defendants' liability for such conduct.

62.     To further comply with the requirements of specificity, and only by way of example, the September 28th, 2022, email attached a spreadsheet which demonstrated

just how significant and misleading the earlier representations made by Melchionni and Benito were. *See attached spreadsheet showing "KS Law Group – Cases Owed - % of Total Cases – Cases Allocated" as* **Exhibit 9**.

63.    Even a cursory review of the "Cases Owed vs Allocated" as set out in Column "D" demonstrate that KS Law's case "drop-offs" were now abysmal.

64.    Teh made his frustrations with Defendants' constant and repetitive misrepresentations explicitly known in an October 14th, 2022, email where he stated that "the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said." *See October 14th Email attached as* **Exhibit 10**.

65.    Despite Plaintiff's obvious and warranted frustrations Defendants' misrepresentations continued.

66.    After a long period without any update regarding the value, status, or quality of Teh's $4 million equity interest on March 3rd, 2023, Teh received a surprise . . . a conspicuously unsolicited email from Melchionni containing further worrisome representations and disclosures. *See March 3rd, 2023 email attached as* **Exhibit 11.**

67.    The March 3rd email contained spreadsheets outlining the "clients" of KS Law and their current status. *Exhibit 12 will be submitted to the Court under seal because it contains client information.*

68.    Present on the spreadsheets were "clients" of KS Law labeling many of these "clients" as "Retained – Sent to Firm."

69. To reiterate, Teh, as a partner in KS Law, has never been provided a single retainer agreement with any "clients" of KS Law.

70. Upon information and belief, the spreadsheets provided by Melchionni were not prepared by KS Law but in fact were prepared by Lake Law Firm.

71. Attached to the March 3rd email was also a "Case Replacement Agreement" with Lake Law Firm. *See "Case Replacement Agreement" attached as* **Exhibit 13.**

72. Teh was never provided notice of, or allowed input in, the execution of the Case Replacement Agreement with Lake Law Firm.

73. In addition, the Case Replacement Agreement sets forth numbers of cases and the price of acquiring said cases that materially differ from the representations made to Teh prior to the execution of the Partnership Agreement and as set out previously.

74. The Case Replacement Agreement also explicitly states and admits that Lake Law Firm "has not delivered equivalent value in cases to the Funded Amount . . ."

75. The misrepresentations that are specifically set out in this Complaint are provided to highlight and illuminate the specific nature of the fraud and breaches alleged herein.

76. Since the Complaint should contain a "short and plain statement" regarding the nature of the claims asserted, the Plaintiff cannot provide every single misrepresentation made within the body of this Complaint and reserves the right to amend and supplement this pleading as the circumstances warrant.

## COUNT 1
## FRAUDULENT INDUCEMENT
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

77.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

78.    As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm was going to be retained and how KS Law's funds were going to be used.

79.    Melchionni and Benito, individually and collectively made false statements including that the funds were to be used for marketing and operations along with the misrepresentations set forth above.

80.    Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

81.    Melchionni and Benito, individually and collectively made these, and many other statements, to induce the plaintiff to pay the funds referenced above and enter into the Agreement.

82.    As set out herein, these statements were clearly made before the execution of the Agreement.

83.    These statements have proximately caused specific and direct damages to the Plaintiff when he acted in reliance on those misrepresentations. To wit: he wired $4 million of his funds to an account controlled by Melchionni and Benito, individually and

collectively, and to date has not received even $1 in the form of distribution, payment or otherwise.

84. Regarding such direct damages, Plaintiff would not have entered into the Agreement if defendants had not made misrepresentations.

**WHEREFORE**, Plaintiff demands judgment against these Defendants for damages, pre and post judgment interest, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT 2
## RESCISSION
## (PLED IN THE ALTERNATIVE)

85. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

86. As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm had would be retained as counsel. Melchionni and Benito, individually and collectively, made additional false statements including that the funds were to be used for case management, marketing and operations.

87. Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

88. Melchionni and Benito, individually and collectively made these and many other statements to induce the plaintiff to enter into the Agreement.

89. These statements were clearly made before the execution of the Agreement.

90.     These statements have proximately caused specific and direct injury to the Plaintiff, Teh, when he acted in reliance on those misrepresentations. To wit: Teh wired $4 million of his funds to an account controlled by Melchionni and Benito individually and collectively and to date has not received even $1 in the form of distribution, payment or otherwise.

91.     Rescission is an appropriately pled alternative remedy because regarding such conduct and direct damages, Teh would not have entered into the Agreement if Defendants had not made misrepresentations and rescission of the Agreement is an appropriate claim to place the parties back in their original positions.

**WHEREFORE**, Plaintiff, as rescission damages, seeks this equitable relief and demands the return of his $4 million, pre and post judgment interest, attorneys' fees and costs and all other relief that this Court deems just and proper.

**COUNT 3**
**DIRECT BREACH OF CONTRACTUAL INDEMNITY**
**(AS TO LEE MELCHIONNI)**

92.     Plaintiff re-alleges by reference paragraphs 1 through 76 as if fully set forth herein.

93.     Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni...agrees to indemnify Allan Teh...from and against all...loss, cost, damage and expense ... which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

94. Prior to the filing of this complaint, Mr. Teh demanded indemnification from Melchionni.

95. To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

96. As a result of the acts, breaches and omissions set out herein, Allan Teh has suffered direct and individual damages because, inter alia, the contractual indemnity provisions referenced above run specifically and only to the benefit of Teh and not the Partnership or any other partner.

**WHEREFORE**, Plaintiff demands judgment against Defendant, Lee Melchionni, for damages including but not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 4
## DECLARATORY ACTION REGARDING CONTRACTUAL INDEMNITY DUTIES
### (AS TO LEE MELCHIONNI)

97. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

98. Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni...agrees to indemnify Allan Teh...from and against all...loss, cost, damage and expense ... which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

99. Prior to the filing of this complaint, Teh demanded indemnification from Melchionni.

Page **18** of **26**

100. To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

101. There is a bona fide, actual and present, practical need for the declaration sought herein.

102. Specifically, there is a significant controversy regarding defendant Melchionni's failure to provide indemnity as set forth in the Agreement and Teh's rights regarding that indemnity provision.

103. The rights and interests of Melchionni and Teh are actual, present, adverse and antagonistic regarding the indemnity provision referenced herein because Melchionni has failed to comply with his duties and obligations in that regard.

104. These antagonistic and adverse interests are all before this Court as set out in this Complaint.

105. The relief and claims set out herein are not a request for legal advice by this Court or to seek answers to questions based on curiosity.

**WHEREFORE,** Plaintiff seeks a declaration from this Court, regarding the contractual provisions cited herein and Melchionni's duties thereupon that Melchionni shall forthwith, immediately and on a continuing basis, indemnify Plaintiff for his losses, damages and costs which include but are not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 5
## BREACH OF FIDUICARY DUTY
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

106.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

107.   Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

108.   Melchionni and Benito, individually and collectively breached these duties as set forth above. Specifically, but without limitation, by Defendants Melchionni and Benito unilaterally and with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

109.   Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

110.   Melchionni and Benito, individually and collectively breached additional fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

111.   As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

112. Teh has been directly and individually damaged in a manner distinct from any damage suffered by others.

113. Specifically, these distinct damages to Teh include, but are not limited to, the loss of his discrete and identifiable funds used to fully capitalize KS Law.

114. This is especially relevant in the context of no other Partners contributing to the firm.

115. Allan Teh has suffered direct and individual damages because, inter alia, all of the money involved in the acts and breaches sent out herein belonged to and was sent by Allan Teh and he was the only partner and investor to suffer direct financial losses as a result.

116. Teh has suffered damages which were proximately caused by the breaches set forth above.

**WHEREFORE,** Plaintiff demands judgment against Defendants, Lee Melchionni and Sylvia Benito, jointly and severally, for damages, including pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 6
## EQUITABLE ACCOUNTING
## (AS TO LEE MELCHIONNI AND SYVLIA BENITO)

117. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

118. Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

119.   Melchionni and Benito, individually and collectively, breached their fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

120.   Specifically, but without limitation, Defendants Melchionni and Benito unilaterally and with no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

121.   As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

122.   In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

123.   The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

124.   Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as complex transactions involving the parties hereto.

125.   Moreover, a breach of the duty imposed by those relationships is grounds for an equitable accounting.

**WHEREFORE,** Plaintiff states a remedy at law would be inadequate and demands judgment against Defendants, Lee Melchionni and Sylvia Benito, for all appropriate relief in this Claim, including damages, pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 7
### UNJUST ENRICHMENT
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

126.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

127.   As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the millions of dollars, arose from acts and omissions by Lake Law and Persist and those other named Defendants.

128.   Specifically, neither Lake Law or Persist have provided anything of value to the Teh in exchange for the $4 million they received.

129.   Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as specifically set forth herein.

130.   As referenced herein, Teh has conferred a benefit on the defendants Lake Law and Persist individually and collectively by paying such funds.

131.   Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

132. The Defendants, individually and collectively, voluntarily accepted and retained the benefit conferred, i.e., the Defendants, to this day, have continued to retain those funds.

133. As specifically set out herein, circumstances are such that it would be inequitable for the Defendants to retain the benefit conferred upon them without first providing the appropriate exchange of value and consideration to the plaintiff.

134. Teh was legally impoverished as that term is used in the context of this claim. Specifically, $4,000,000 of Teh's dollars was wrongfully transferred to, and is being held by, Defendants, Lake Law and Persist.

135. As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

136. There is no justification regarding the enrichment realized by Lake Law and Persist.

137. There is no adequate remedy available at law regarding that which Lake Law and Persist have occasioned upon the Plaintiff.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT 8
## EQUITABLE ACCOUNTING
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

138. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

139. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the subject funds arose from acts and omissions by Lake Law and Persist and those Defendants have been unjustly enriched thereby.

140. Specifically, neither Lake Law or Persist have provided anything of value to Teh in exchange for the $4 million they received.

141. Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as alleged herein.

142. As referenced herein, Teh has conferred a benefit on the Defendants Lake Law and Persist, individually and collectively.

143. Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

144. The Defendants, individually and collectively, voluntarily accepted and retained the benefits conferred.

145. The Defendants, to this day, have continued to retain those funds.

146. Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

147. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

148. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Lake Law and Persist's knowledge and direction, transferred

essentially all of Teh's funds and the entire working capital of Teh's law firm to Defendants Lake law and Persist with no cognizable contract or agreement in place.

149. In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

150. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

151. Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

The Plaintiff hereby demands trial by jury on all issues and claims so triable as of right.

Dated: March 15, 2023

Respectfully submitted,

**JONES & ADAMS, P.A.**
*Attorney for Plaintiff*
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335
matthew@jones-adams.com

# 2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P15000085963

**Entity Name:** PERSIST COMMUNICATIONS, CORPORATION

**FILED**
**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

# Exhibit 1

**Current Principal  Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE, FL  33316

**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316  US

**FEI Number: 81-0851001**

Certificate of Status Desired:  No

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL  33316  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   EDWARD LAKE                                                                              01/20/2023

            Electronic Signature of Registered Agent                                                       Date

## Officer/Director Detail :

| | |
|---|---|
| Title | PRESIDENT |
| Name | LAKE, EDWARD J |
| Address | 1815 CORDOVA RD |
| City-State-Zip: | FT. LAUDERDALE  FL  33316 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EDWARD J LAKE                                         PRESIDENT                      01/20/2023

          Electronic Signature of Signing Officer/Director Detail                                          Date



# Exhibit 2

## Invoice

| BILL TO: KS Law Group | | CAMPAIGN: HM/TALC/3M/RU | |
|---|---|---|---|
| | | DATE: 9/1/2021 | |
| | | DUE DATE: | |
| Phone: | | TERMS: See Below | |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 220 | Hernia Mesh | $5,600 | $1,232,000 |
| 200 | Talc | $6,000 | $1,200,000 |
| 155 | Round Up | $5,048.39 | $782,500 |
| 220 | 3M | $3,025 | $665,500 |
| | | Total | $3,880,000.00 |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000050

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Print Name: Lee Melchionni

Signature: _____ Date: 9/1/21

## REMITTANCE BY WIRE:

*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000051

**Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, allan.teh@icloud.com, Sylvia Benito

Thu, Jun 24, 2021, 2:10 PM

# Exhibit 3

Hi Sohail,

Yes, you are correct. Those are the current outstanding MDL"s against hernia mesh manufacturers.

As for our hypothetical settlements question, there will be cases where plaintiff's have suffered horrific injuries where settlement values are several hundred thousand dollars, potentially $1M+. There will also be 'nuisance' claims that will be worth $15,000. Based on our criteria for acceptable claims, we felt comfortable with the hypothetical ranges we provided. Obviously, the hope is that the compensable value of the cases we acquire is higher than our hypothetical averages.

Attached, you will find the returns for two previous torts I was involved in, Actos and DePuy ASR Hips. Please note that the return in these two torts were abnormally positive. Feel free to call me to discuss if there is any confusion.

Finally, I wanted to articulate the difference for Allan if he were to have his own law firm, versus being in the fund.

- Veto power on what litigations are pursued
- Control over dollar amounts in specific litigations
- Simplicity of documentation, meaning we have a simple operating agreement governing Allan's law firm
- The firm can be evergreen
- Ability for Allan to add partners/investors to his firm

If a follow up call makes sense, please let us know Sohail. Thank you for your time.

Best,
Lee

On Thu, Jun 24, 2021 at 12:22 PM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Lee,

Great speaking with you and Sylvia yesterday. While I wait for an email back on my outstanding questions, I had two specific questions on the Herniated Mesh opportunity specifically.

1. Are the below listed cases the current outstanding MDLs against hernia mesh manufacturers?
   a. In Re: Ethicon, Case No: 1:17-md-02782-RWS (subsidiary of Johnson & Johnson) in the Northern District of Georgia
   b. In Re: Davol, Inc./C.R. Bard, Inc., Case No: 2:18-md-2846 in the Southern District of Ohio
   c. In Re: Atrium Medical Corp., Case No: 16-md-2753 LM in the District of New Hampshire
2. I know you ranged the potential hypothetical settlement amounts for Hernia Mesh. Doing some digging showed on that on individual cases, ranges went as high as a million and below the low end of the range on

the provided spreadsheet. Was the range provided based on the criteria you set for viable claimants?

Any additional information would be appreciated. Thank you!

Best Regards
Sohail Shahrasebi
Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

**2 Attachments** · Scanned by Gmail



Actos.xlsx          DePuy ASR.xlsx

**From:** Sylvia Benito <sylvia@capital4justice.com>
**Date:** June 21, 2021 at 11:24:32 AM EDT
**To:** allan.teh@icloud.com
**Cc:** Lee Melchionni <lee@capital4justice.com>
**Subject: Potential Allocation + Outcome Ranges**

# Composite Exhibit 4

Allan,

Please find attached the possible allocations for cases in an individual law firm should you choose to add more allocation to your current investment. We can send background notes on all these cases for your analyst and/or schedule a call at your convenience to discuss.

Warmly
S

One attachment · Scanned by Gmail



Potential Allocati...

## Subject: Re: Question / Request



**Lee Melchionni** <lee@capital4justice.com>

to Sohail Shahrasebi, Brent Steinberg ■

Tue, Aug 3, 2021,

Hi Sohail,

Below is our current breakdown. We look forward to discussing in more detail on Friday.

- RoundUp - 2%
- Firefighter Foam - 5%
- Zantac - 10%
- Talc - 34%
- 3M - 8%
- Hernia Mesh - 41%

Best,
Lee

On Tue, Aug 3, 2021 at 7:36 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hi Lee,

The last time we spoke you mentioned you were calling an additional $2 million of Allan's investment - bringing t total to $4 million.

I wanted to know if you could give me a break- down, by case type/bucket, of the money invested so far (the tot$4mln.)

This should help me better assess how to distribute, by case type, the additional capital being injected into the d law firm. Please call me if you have any questions.

Best Regards
Sohail Shahrasebi
646-707-4484

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

# Exhibit 5

**KS LAW GROUP, LLP**
**LIMITED LIABILITY PARTNERSHIP AGREEMENT**
**EFFECTIVE AS OF July 26, 2021**

This Limited Liability Partnership Agreement ("Agreement") is entered into by Attorney Lee Melchionni and Non-Attorneys Allan Teh[1] and Sylvia Benito (collectively, the Managing "Partners"), pursuant to the provisions of the Business Organizations Title in the District of Columbia Code (specifically, D.C. Code § 29-101.01, *et seq.*, the "Act").

1.      **Formation.**

Pursuant to this Agreement, the limited liability partnership was formed (the "Partnership"), and the Managing Partners elected to become a registered, Limited Liability Partnership, in accordance with the provisions of the Code. The Managing Partners shall be:

1. Lee Melchionni, Esq.; (Melchionni as the "Attorney") and

2. Allan Teh,

3. Sylvia Benito

The Managing Partners agree that no person shall be added or admitted to the Partnership as either a Partner or Managing Partner without the unanimous, affirmative vote of the Managing Partners, with the sole exception of the provisions set forth in Section 16.

2.      **Name.**

The name of the Partnership shall be KS Law Group, LLP, and all business of the Partnership shall be conducted under and in such name. There shall be no change to the Partnership name without the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

3.      **Primary Place of Business.**

The Partnership shall be established and have the place of business in the District of Columbia, located at 1100 H Street NW, Suite 840, Washington, D.C. 20005 or at an address or location to be determined by the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

---

[1] All references to Allan Teh are to him in his capacity as Partner and nominee for Kamunting Street Capital Management, L.P. shall have the right to designate a replacement Partner for Allan Teh, who shall then become a Managing Partner, in the event that Allan Teh is unwilling to serve, becomes incapacitated or dies.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

4.    **Sole Purpose.**

The Partnership's sole purpose is to engage in the practice of law, in order to provide the Partners with the opportunity for pecuniary gain, professional growth and service to the bar and the state and communities which the Partnership serves.

The Partnership shall be a partnership only for the purpose specified in this Section. Except as otherwise provided in this Agreement, the Partnership shall not engage in any other activity or business that is not reasonably necessary or appropriate to the accomplishment of its purpose, and no Partner shall have any authority to hold himself out as the agent of another Partner in regard to any other business or activity.

5.    **Statutory Compliance.**

The Partnership shall exist under and be governed by, and this Agreement shall be construed in accordance with, all the applicable laws of the District of Columbia and the District of Columbia Rules of Professional Conduct. The Managing Partners agree to and shall make all filings and disclosures required by, and shall otherwise comply with, all such laws. The Managing Partners agree to and shall execute and file any assumed or fictitious name certificates and other documents and instruments as may necessary or appropriate with respect to the formation of and conduct of business by the Partnership.

Further, each Managing Partner and Partner, other than the designated Legal Managing Partner (identified in Section 14 of this Agreement), hereby agrees not to hold himself or herself out to the general public, nor publicize in any media or forum their or any other Members' ownership, membership or affiliation with the Partnership.

6.    **Indemnification.**

Melchionni (an "Indemnifying Partner") hereby agrees to indemnify Allan Teh from time to time, and hold them harmless from and against all liability, loss, cost, damage and expense (including attorneys' fees and costs incurred in the investigation, defense and settlement of the matter) which the Partnership or any of such other Partners shall ever sustain, suffer or incur which relate or arise out of or in connection with the operation of the Partnership or a breach by the Indemnifying Partner of any representation, warranty or covenant made by the Indemnifying Partner in this Agreement. If the Partnership, Allan Teh from time to time are made a party to any litigation or otherwise incurs any loss or expense as a result of or in connection with any Indemnifying Partner's personal or professional obligations or liabilities unrelated to Partnership business, such Indemnifying Partner shall indemnify and reimburse the Partnership, Allan Teh from time to time, for all such loss and expense incurred, including reasonable attorneys' fees.

7.    **Title to Property.**

The Partnership shall hold all real and personal property interests in the name of the Partnership, and not in the name of any Partner.

8.    **No Payments of Individual Obligations.**

The Partners agree to and shall use the Partnership's credit and assets solely for the benefit of

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

the Partnership.

Melchionni in his capacity as agent and nominee for KS Law Group, LLP, shall pay the costs of acquiring and maintaining malpractice and general liability insurance (to the extent these coverages are available) for KS Law Group, LLP. The policy shall be at least $5 million per claim/ $5 million in the aggregate and cover all Managing Partners for acts undertaken in their official capacity as Managing Partners.

### 9. Limitation of Duties

Each Partner hereby agrees that he/she owes duties of care, honesty and loyalty to the other Partners and to the Partnership itself, subject only to the following limitations:

(a)  Subject to their Non-Circumvention obligations, the Partners are not restricted from competing with the Partnership. Each Partner and the Partnership itself waives any breach of duty arising from a Partner engaging in any business, enterprise or transaction, which may directly or indirectly compete with the partnership, or that otherwise would constitute a business opportunity for the Partnership.

(b)  Each Partner who is an Attorney shall have no limitation regarding the ethical practice of law, and any duty under this Agreement or implied in law shall be waived to the extent it would interfere with a lawyer's ability to represent any client as required by the rules of ethics and professional responsibility.

### 10. Non-Circumvention.

Notwithstanding any other provision in this Agreement, if an attorney Partner withdraws from the Partnership, the withdrawing attorney Partner shall pay to the Partnership a share of the fees received for legal services provided to any client of the Partnership who subsequently engages the withdrawing attorney Partner. The allocation of the fees received shall be in proportion to the work done before and after the withdrawal. Recoverable costs shall be reimbursed upon receipt. The Partners irrevocably agree that they shall not, directly or indirectly, interfere with, circumvent or attempt to circumvent, avoid, by-pass or obviate the Partnership's interest in and relationship with pre-established sellers, buyers, brokers, dealers, distributors, technology providers, intermediaries, entrepreneurs, consultants, employees, legal counsel, professional relationships, individuals, or any other pre-established or un-contracted relationships revealed or introduced by one Partner to another in connection with any present and future transactions related to this Partnership.

### 11. Ownership Interests.

The Managing Partners' Ownership Interest in the Partnership shall be:

| | |
|---|---|
| 1. Lee Melchionni, Esq. | 25% |
| 2. Allan Teh, | 50% |
| 3. Sylvia Benito, | 25% |

The Managing Partners agree that, other than the percentages and adjustments set forth in this Section, the Ownership Interest of the Partners shall not be amended or changed without the unanimous, affirmative vote of the Managing Partners.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

## 12.    Capital Contributions.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm. The Partners agree that Capital Contributions, will be made from time to time over a six (6) month period, for a total minimum amount of $4,000,000. The Capital Contributions will be made by Allan Teh in the amount of $4,000,000.

## 13.    Rights, Powers and Responsibilities of the Managing Partners.

The Managing Partners shall divide the responsibility for certain areas of Partnership operations as set forth herein:

A) Lee Melchionni shall be the Legal Managing Partner. The Legal Managing Partner shall provide the legal support to work up, qualify, process, manage and settle cases. He shall also be responsible for case related expenses, including the use of third party vendors to accomplish these tasks. In fulling these roles the Legal Managing Partner shall have complete and unequivocal control and veto power over any and all decisions relating to the practice of law, the prosecution of each of the Partnership's client's legal claims, the outward conduct of the law firm, the handling of funds in any IOLTA or client trust accounts, the public statements and representations of the law firm (including any and all marketing, branding and website design), conflicts of interest, whether actual or potential, co-counsel relationships, referrals to counsel, fee disputes, and client confidentiality, as well as any activities by or on behalf of the law firm, including the activities of any Partners, employees, agents, and independent contractors, which are regulated, limited or otherwise addressed in any way by the District of Columbia Rules of Professional Conduct.

Per District of Columbia Rule of Professional Conduct 5.4, the Legal Managing Partner hereby agrees to be responsible for and to supervise the managerial and other activities of the nonlawyer Partner, Allan Teh, and other Partners as they may be added, as if these non-lawyer Partners were lawyers admitted to practice in the District of Columbia, and to supervise the ethical conduct of same under the standards set forth in District of Columbia Rule of Professional Conduct 5.1. It is hereby agreed that this provision will require the Partnership and Legal Managing Partner to make reasonable efforts to ensure that the Partnership has in effect measures giving reasonable assurance that all the participants in the Partnership conform to the D.C. Rules of Professional Conduct.

Allan Teh and Sylvia Benito, as a Non-Lawyers participant in the Partnership per D.C. Rule of Professional Conduct 5.4, shall have the authority over marketing Partnership Activities, and provide other professional management services, all in order to assist the Partnership in providing legal services to the Partnership's clients. These managerial activities will include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership, obtaining new clients and cases, joint venturing, firm infrastructure management, and advising the Managing Partners regarding the same.

A)    In the event that the Managing Partners disagree regarding a Partnership operation or activity which is directly addressed within the District of Columbia Rules of Professional Conduct and also relates to marketing, branding, marketing campaigns, internet marketing or internet design, or regarding any proposed, contemplated or actual activity for or on behalf of the Partnership which is

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

regulated and/or limited by the District of Columbia Rules of Professional Conduct, the Legal Managing Partners shall have complete and unequivocal control of and veto power over, any such activity, as set forth in Section 14(A) above.

Per District of Columbia Rule of Professional Conduct 5.4, the Non-Lawyer Managing Partner, hereby agrees and undertakes to abide by the D.C. Rules of Professional Conduct as if she was a lawyer admitted in the District of Columbia.

### 14. Partner Compensation.

No Partner shall receive any interest or salary with respect to his/her Capital Contributions or his/her Ownership Interest, or for services rendered to or on behalf of the Partnership, or otherwise in his/her capacity as Partner, except as otherwise provided in this Agreement or by unanimous written consent of all Partners.

### 15. Withdrawal, Divorce or Death of a Partner.

Any Partner may withdraw from the Partnership upon sixty (60) calendar days' written notice to the other Partners and Managing Partners. Upon withdrawal, the withdrawing Partner shall cease to have any rights to further participation in the management or operations of the Partnership. Such withdrawing Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on claims that were retained by the Partnership prior to the day the Partner gave his/her notice of withdrawal to the Partnership. For purposes of this Section, the retainer date shall be deemed to be the first date on which the client executed a retainer agreement with the Partnership.

Furthermore, a Partner's death or permanent disability shall be deemed a "withdrawal" as of the date of the death or permanent disability. A deceased or permanently disabled Partner and/or his/her estate and heirs shall continue to have the right to payment of his/her share of the fees paid to the Partnership in accordance with the Partner's Partnership Interest as of the date of death or permanent disability on cases that were retained by the Partnership on or before such date. Payments under this provision shall be made in the normal course of business pursuant to the rules for distribution set forth in Section 22 of this Agreement.

The Partners hereby agree that, if by operation of law or by judgment or judicial decree in a bankruptcy or divorce case, any portion of a Partner's Ownership Interest in the Partnership is assigned to a third party, said assigned or transferred interest, to the extent it is assigned or transferred to a third party, shall be treated as if, on the date of the assignment or transfer order, the Partner in question became deceased, and any such Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on cases that were retained by the Partnership prior to the date of withdrawal.

### 16. Expulsion for Cause.

(a)     For Cause Only.

Any Partner may be expelled" for cause", upon the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership, For purposes of this provision, "cause" for expulsion will include but not be limited to any of the following:

(i)     Disbarment, suspension, or other major disciplinary action determined

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

adversely to any Attorney Partner by any duly constituted authority;

(ii)    Professional misconduct or violation of the canons of professional ethics, if such misconduct continues after its cessation bas been requested by the Managing Partners;

(iii)    Any action or inaction that injures or threatens the professional standing or business operations of the Partnership, if such action or inaction continues after its cessation is requested by the Managing Partners, as set forth below;

(iv)    Any Partner takes a position that adversely effects the continuation of the Partnership, if such continues after its cessation is requested by the Managing Partners.

(b)    Notice of Expulsion for Cause.

If majority of the combined ownership interests held by the Managing Partners in the Partnership determines that "cause" exists for expulsion of a Partner, then the Partnership shall provide notice of this decision to the Partner who is subject to expulsion, and the Partner shall have ten (10) business days after notice is given to cure or remedy the reason for expulsion, if a cure or remedy is possible.

(c)    Entitlement to Profits After Expulsion.

Upon any expulsion, the expelled Partner shall be treated as a "withdrawn" Partner pursuant to Section 15, above, as of the date on which the expelled Partner failed to cure the reason for his expulsion, or five (5) business days from the Notice of Expulsion, whichever is later. The expelled Partner will have no other entitlement to any compensation. Furthermore, the Managing Partners may withhold future payments to any Partner who has been expelled for cause and apply those payments as a setoff against any damages to the Partnership caused by the expelled Partner or any liabilities due from the expelled Partner to the Partnership.

## 18. Liquidating Events.

The Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)    The affirmative vote of the majority of the total, combined ownership interests held by the Managing Partners in the Partnership, to dissolve, wind up, and/or liquidate the Partnership; or

(b)    The happening of any other event that makes it unlawful or impossible to carry on the business of the Partnership.

The Partnership shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined by a court of competent jurisdiction, that the Partnership has dissolved prior to or without the occurrence of a Liquidating Event, the Managing Partners hereby agree to continue the business of the Partnership without a winding up or liquidation.

## 19. Winding Up.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

(a)     Upon the occurrence of a Liquidating Event, the Partnership shall continue for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for this winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Agreement and the Partnership has terminated all operations.

(b)     The Managing Partners (or any Person elected for this purpose by the Managing Partners) shall be responsible for overseeing the winding up and liquidation of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds there from, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)     First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors other than the Partners;

(ii)     Second, to the payment and discharge of the Underwriting Contribution (defined in Section 20);

(iii)     to the payment and discharge of all other Partnership's debts and liabilities to Partners; and

(iii)     The balance, if any, to the Partners in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)     Except with respect to the Underwriting Contribution (defined in Section 20), each Partner hereby expressly waives any right which the Partner individually, as a creditor of the Partnership, might otherwise have under the Code, to receive distributions of Partnership assets *pari passu* with the other creditors of the Partnership, in connection with a distribution of assets of the Partnership or in satisfaction of any liability of the Partnership, and hereby subordinates any such right to said creditors.

## 20. Preferred Return.

Fifteen percent (15%) per annum simple interest multiplied by the invested capital, which shall accrue from the date of the Firm's acceptance of Allan Teh's Underwriting Contributions, until the Firm receives its first mass tort settlement proceeds via a Qualified Settlement Fund.

## 21. Profits and Losses.

After the Partnership repays the Underwriting Contribution (defined in this Section), the profit/loss allocation shall be calculated on a net basis as a percentage of the resulting fee, net of expenses, which shall not include legal fees and expenses of any kind. Expenses which pertain to a particular case should be deducted from the fees received for that case before allocating profits/losses to the extent that they cannot be charged to the client. Partnership Expenses which do not pertain to a particular case shall be amortized over all pending cases at the time the expense was incurred, in an

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

equal amount for each case.

Profits

Net Profits after full and complete reimbursement of funding by Allan Teh for a particular mass tort campaign shall be allocated as follows after the holdback of reserves as unanimously agreed to and approved by the Managing Partners:

(a)     Return of Capital: First, one hundred percent (100%) to Allan Teh until Distributions to such equal the amount of Allan Teh's Capital Contributions.

(b)     Preferred Return: Second, one hundred percent (100%) to Allan Teh until Distributions to such of Distributable Cash on a cumulative basis pursuant to this clause equal the Preferred Return.

(c)     Catch up: Second, one hundred percent (100%) to Lee Melchionni and Sylvia Benito until Distributions to Lee Melchionni and Sylvia Benito on a cumulative basis as carried interest Distributions equal twenty percent (20%) of all Distributions,

(d)     Split: Any balance, (i) eighty percent (80%) to Allan Teh and (ii) twenty percent (20%) to Lee Melchionni and Sylvia Benito.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Law Firm.  Allan Teh is committing to fund a total of $4,000,000 ("Underwriting Contributions") to be paid to the firm as needed and determined by the Managing Partners to run a campaign related to any case/litigation as determined by the Managing Partners.  The Managing Partners agree and understand that all such costs incurred by Allan Teh on behalf of the Company, including the Underwriting Contribution, shall be treated as an interest-free loan and paid back in full prior to any Partnership distributions.

Losses

It is understood that Lee Melchionni, Esq. shall not be responsible to pay back Allan Teh in the event that a particular mass tort campaign, case or litigation effort fails to generate profits. In the event that either party wants to recoup losses from a particular Mass Tort campaign that did not generate a profit from the profit(s) of other Mass Tort campaign(s) that do generate profits, then all Parties shall have the right to recoup their losses. In the case of Allan Teh, the amount of the loan referenced above and all Capital Contribution made by them used to acquire such cases which are not paid back or recovered shall be subject to such offset.

## 22. Management Fee.

KS Law Group will charge a management fee of one percent (1%) on invested Capital Contributions.

## 23. Entire Agreement.

This Agreement constitutes and shall be considered the entire agreement between the parties with respect to the subject matter of this document, and supersedes all previous arrangements, understandings, representations or agreements between the parties, whether written or oral. As set forth

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

in Section 12, the Partners may, from time to time, by unanimous, affirmative vote, agree to alter certain portions of this Agreement for Special Allocations. However, the Partners hereby agree that any such secondary agreement shall apply only to the special circumstances considered therein and will not alter the terms or conditions of this Agreement beyond the limited time and scope set forth in said secondary, written agreement.

### 24. Distributions to Partners.

Distribution to the Managing Partners shall occur at the conclusion of any singular case pursuant to Section 21.

### 25. Amounts Withheld.

All amounts withheld pursuant to the Tax Codes or any other state or local tax law, with respect to any payment, compensation or distribution to the Partnership or the Partners, shall be treated as amounts distributed to the Partners, for all purposes under this Agreement. The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partner and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate such amounts to the Partners with respect to which such amount was withheld.

### 26. Decisions

Except as otherwise provided in this Agreement, all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized only by the affirmative vote of 66 2/3% of the total, combined ownership interests held by the Managing Partners in the Partnership. It is further acknowledged and agreed, however, that any decision falling under the matters set forth in Section 14 of this Agreement shall be within the professional discretion of the Legal Managing Partner.

### 27. Vote Required for Certain Actions.

Notwithstanding Section 24 hereof:

(d)    no decision or action regarding the incurrence by the Partnership of any debt, contract or obligation for which the Partners are individually liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership; and

(e)    no decision or action regarding the incurrence by the Partnership of any debt for which the Partnership is liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership.

### 28. Partners Authorized to Take Certain Actions on Behalf of the Partnership.

Except as otherwise provided elsewhere in this Agreement, each Managing Partner is authorized to take the following actions and make the following decisions to the extent that such actions and decisions are necessary to permit such Managing Partner to carry on the Partnership's routine, day-to-day practice of law:

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

a. Accept clients on behalf of the Partnership based on criteria set forth by Legal Managing Partners, and agree to undertake specific matters for any Partnership client based on criteria set forth by Legal Managing Partners provided that a Managing Partner accepting such client or undertaking such matter is responsible for assuring that such action will not create a conflict with the interests of any other client and is otherwise consistent with the types of clients and matters normally handled by the Partnership, and provided further that such Managing Partner obtains the concurrence of any other Managing Partner or Managing Partners whose services may reasonably be expected to be required to service such client or matter.

b. Take any other action and make any other decision that is clearly routine and incidental to the day-to-day conduct of the Partnership and/or its practice.

## 29. Banking.

All funds of the Partnership shall be deposited in the Partnership's name, in such account or accounts with member banks of the FDIC as may be approved by an affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership; provided, however that the Managing Partners may elect to deposit all or a portion of the funds standing in the Partnership reserves in interest-bearing accounts with, or apply such funds to purchase short-term interest-bearing investments issued or guaranteed as to payment by, such banks or other financial institutions that are members of the FDIC or the United States (or its agencies or instrumentalities).

## 30. Restrictions on Transfers.

Except as provided in footnote 1, no Partner shall transfer all or any portion of his Partnership interest or any rights therein without the unanimous consent of the Managing Partners. The Partners not seeking to transfer their interests shall have the right of first refusal to purchase any such interest in equal shares. Any transfer or attempted transfer by any Partner in violation of the preceding sentence shall be null and void and of no force or effect whatsoever. Each Partner hereby acknowledges the reasonableness of the restrictions on transfer imposed by this Agreement in of the Partnership purposes and the relationship of the Partners. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable. Each Partner hereby further agrees to hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes or costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a transfer or an attempted transfer in violation of this Agreement.

## 31. Waiver of Partition.

No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and his legal representatives, successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his Partnership interest, or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

### 32. Rights of Partners.

Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership. No Partner shall have priority over any other Partner as to the return of his Capital Contributions, distributions, or allocations unless otherwise provided in this Agreement.

### 33. Notice of Dissolution.

In the event a Liquidating Event occurs, or any other event occurs that would result in a dissolution of the Partnership, the Partnership shall, within thirty (30) calendar days thereafter: (a) provide written notice thereof to each of the Partners and to all other parties with whom the Partnership regularly conducts business, and (b) publish notice of such dissolution in a newspaper of general circulation in each place in which the Partnership regularly conducts business.

### 34. No Liability for Partnership Debts.

Except as provided in Section 7, no Partner shall be personally liable or accountable, directly or indirectly, including by way of indemnification, contribution, assessment, or otherwise, for debts, obligations or liabilities of or chargeable to the Partnership or other Partner, whether arising in tort, contract, or otherwise that are incurred, created or assumed by the Partnership, except with respect to an obligation as to which all of the Partners have unanimously agreed in writing that the Partners would be personally liable.

### 35. Indemnification of Managing Partners/Partners by Partnership.

The Partnership shall, to the extent of its assets, indemnify, defend and hold each Partner in the Partnership free and harmless from any and all claims, demands, liabilities, obligations, damages, losses, costs and expenses, including attorneys' fees (individually, a "Liability" and collectively, the "Liabilities") incurred in connection with the business of the Partnership, provided the acts or omissions from which the Liabilities arise were performed by the Partner in good faith and with a reasonable belief that the Partner was acting within the scope of the Partner's authority under this Agreement and the Partner was not grossly negligent or guilty of intentional misconduct. Neither the Partnership nor any Partner shall have any claim against any other Partner by reason of any act or omission for which such Partner is entitled to indemnification under the Agreement.

### 36. Partnership Representative and Indemnification Thereof.

Partner Lee Melchionni, Esq. is specifically authorized to act as the "Partnership Representative" (hereafter the "PR") under the applicable tax Code, and in any similar capacity under state or local law. The Partnership and the other Partners agree to defend, indemnify and hold harmless the PR, from all costs and expenses, including fees of outside attorneys, accountants and experts, incurred in acting as PR during or after the termination or expiration of the term of the Partnership. The Partnership and the other Partners further agree to execute such powers of attorney and other forms and authorizations as may be required by the IRS for a Partner to act as PR.

### 37. Professional Liability Insurance.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

The Partnership shall maintain policies of professional liability, errors and omissions, general liability, in the amount of $5 million per occurrence/$5 million aggregate. As stated above, this shall be paid annually by the Partnership.

### 38. Notices.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing, and sent by overnight courier to recipient's hands, or U.S. certified mail with return receipt requested, to the following addresses:

Lee Melchionni, Esq.
20900 NE 30th Ave
Suite 510
Miami, FL 33180

Sylvia Benito
20900 NE 30th Ave
Suite 510
Miami, FL 33180

Allan Teh
119 Washington Ave
Suite 600
Miami Beach, FL 33139

Such addresses may be changed from time to time by any party by providing written notice in the manner set forth above. The date the party receiving notice will be considered to have been noticed will be the date of the delivery, as shown on the courier confirmation or return receipt from the U.S. postal service.

### 39. Resolution of Disputes.

Any controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and shall be resolved via arbitration under the American Arbitration Action, 9 U.S.C. § 2, in the District of Columbia, in accordance with the rules of the American Arbitration Association, and judgment entered upon the award rendered may be enforced or appealed by appropriate judicial action pursuant to the District of Columbia Code of Civil Procedure. The arbitration shall be heard by a single arbitrator, which shall be a person unanimously agreed to by the Managing Partners, and the dispute shall be heard within thirty (30) days following notice by one party that he/she desires that a matter be arbitrated.

If the parties are unable, within such 30-day period to agree upon an arbitrator, then the issue shall be heard by an arbitrator selected by the District of Columbia office of the American Arbitration Association, which arbitrator shall be experienced in the area of legal partnerships and who shall be knowledgeable with respect to the subject matter area of the dispute.

The arbitrator shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal. The parties shall agree within thirty (30) days following

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery; provided, in any event each Partner shall be entitled to discovery in accordance with the District of Columbia Code of Civil Procedure. The arbitrator shall determine a prevailing party in the proceeding, and award the prevailing party his costs and expenses, including but not limited to reasonable attorneys' fees and arbitration costs, from the non-prevailing party in such proceeding.

**40. Counterparts.**

This Agreement may be executed by facsimile and/or in two or more counterparts, each of which shall constitute an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties have entered into this Agreement of Partnership as of the dates set forth below.

*Lee Melchionni*

Lee Melchionni, Esq.                                                    Aug 24, 2021
                                                                        Date

Allan Teh,                                                              Date: August 24th, 2021

Sylvia Benito (Aug 24, 2021 16:33 EDT)                                 Aug 24, 2021

Sylvia Benito,                                                         Date

# KS Law Group Operating Agreement.docx

Final Audit Report                                                    2021-08-24

| | |
|---|---|
| Created: | 2021-08-24 |
| By: | Lee Melchionni (lee@capital4justice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_4MpQdjxaqLAEo3BNLfP3BscoK90ghu0 |

## "KS Law Group Operating Agreement.docx" History

✍ Document digitally presigned by DocuSign\, Inc. (enterprisesupport@docusign.com)
   2021-08-24 - 2:40:53 PM GMT- IP address: 71.77.192.124

🗎 Document created by Lee Melchionni (lee@capital4justice.com)
   2021-08-24 - 6:10:55 PM GMT- IP address: 71.77.192.124

✉ Document emailed to Lee Melchionni (lee@capital4justice.com) for signature
   2021-08-24 - 6:12:21 PM GMT

✉ Document emailed to Sylvia Benito (sylvia@capital4justice.com) for signature
   2021-08-24 - 6:12:21 PM GMT

🗎 Email viewed by Sylvia Benito (sylvia@capital4justice.com)
   2021-08-24 - 6:12:22 PM GMT- IP address: 74.125.150.38

✍ Document e-signed by Lee Melchionni (lee@capital4justice.com)
   Signature Date: 2021-08-24 - 6:12:32 PM GMT - Time Source: server- IP address: 71.77.192.124

✍ Document e-signed by Sylvia Benito (sylvia@capital4justice.com)
   Signature Date: 2021-08-24 - 8:33:37 PM GMT - Time Source: server- IP address: 172.58.175.96

✔ Agreement completed.
   2021-08-24 - 8:33:37 PM GMT


Adobe Sign

## Subject: Re: Data request / update

# Exhibit 6

 **Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, Sylvia Benito

Mon, Oct 18, 2021, 5:37 PM

Sohail,

We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.

- Could we be given the following

- A final copy of the legal documents supporting the supporting the Denovo US law firm?
    - We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
- Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    - We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
    - Justice Partners
    - 200 Firefighter Foam
    - 208 Talc
    - 380 Hernia Mesh
    - 350 3M
    - 150 RoundUp
    - 200 Zantac
        - KS Law Group
        - 155 RoundUp
        - 200 Talc
        - 212 Hernia Mesh
        - 212 3M
- Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.
- Update on the status of the various cases in the US and timing on each case
    - Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
    - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.

- 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
- RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
- Firefighter Foam - There is no substantive update since our last investor communication.
- Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?
  - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following
  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - Update on the status of the various cases in the US and timing on each case
- On the Diesel stuff
  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi

Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139

O: 786-484-0771
M: 646-707-4484

**2 Attachments** • Scanned by Gmail



X   KS Case List 10.1...

PDF   Non-Lawyer Part...

# Exhibit 7

**From:** Lee Melchionni <lee@capital4justice.com>
**Date:** October 20, 2021 at 2:33:33 PM EDT
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>, ALLAN TEH <allan.teh@icloud.com>
**Subject:** Re: Data request / update

Sohail,

For Allan's independent law firm, KS Law Group, we spent $3,880,080.00 to acquire 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. We are entitled to 60% of the attorney fee.

For Justice Partners, we have spent $11,250,000.00 to acquire 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases. We are entitled to 72% of the attorney fee.

In addition, we purchased 12% of the attorney fee for 1128 Talc Cases, 1220 Hernia Mesh Cases, 302 3M Cases, and 300 RoundUp Cases. All of these cases were mature, meaning the clients had already been acquired and cases worked up to a certain point, mitigating case acquisition, drop off, and timing of settlement risk.

Best,
Lee

On Tue, Oct 19, 2021 at 9:52 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
> Lee thanks for this. When you get a chance, as a follow-up can you please send me the $ invested per case type? Thank you.
>
> **From:** Lee Melchionni <lee@capital4justice.com>
> **Sent:** Monday, October 18, 2021 5:37 PM
> **To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
> **Cc:** Sylvia Benito <sylvia@capital4justice.com>
> **Subject:** Re: Data request / update
>
> Sohail,
>
> We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.
> - Could we be given the following
>
>   o A final copy of the legal documents supporting the supporting the Denovo US law firm?
>
>     o We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
>
>   o Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
>
>     o We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
>     o Justice Partners
>     o 200 Firefighter Foam
>     o 208 Talc
>     o 380 Hernia Mesh
>     o 350 3M
>     o 150 RoundUp
>     o 200 Zantac
>
>         o KS Law Group
>         o 155 RoundUp
>         o 200 Talc
>         o 212 Hernia Mesh
>         o 212 3M

- Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.

  - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.

- Update on the status of the various cases in the US and timing on each case

  - Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
  - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.
  - 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
  - RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
  - Firefighter Foam - There is no substantive update since our last investor communication.
  - Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

  - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following

  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - Update on the status of the various cases in the US and timing on each case

- On the Diesel stuff

  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi

Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

**Subject: KS Law Group**

 **Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, Allan Teh, Sylvia Benito ▉

Wed, Sep 28, 2022, 9:59 PM

# Exhibit 8

Sohail,

We have attached our agreement with the Lake Law Firm outlining our docket. In addition, I have attached a breakdown of the allocation of cases, pari passu, for each entity we manage, along with a list of every single client signed up, per case type, and their current status.

We have also attached an LOI for a loan the Lake Law Firm is about to receive, which addresses their credit worthiness.

Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.

There is an explanation from the CEO of Persis/Lake Law Firm below regarding the drop off in Mass Torts.

- Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.

1. Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.
2. Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).
   a. Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.

3. Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.

    a. Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).

4. Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.

    a. Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified.  As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.

5. Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.

    a. Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.

A few outlier reasons for rejection:

1. No will/estate, unable to file on behalf of
2. Client no longer wishes to pursue
3. Client is uncooperative
4. Client is unresponsive/unable to reach

While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.

--

**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**



3 Attachments · Scanned by Gmail



| KS Law Group IO... | KS Case Allocati... | LLF LOI.pdf |

# Exhibit 9

| Row Labels | Total # of Cases | # of Good Cases | # of Bad Cases | Equity % |
|---|---|---|---|---|
| Hernia Mesh | 1533 | 519 | 1014 | 14% |
| Round Up | 252 | 83 | 169 | 44% |
| 3M | 770 | 399 | 371 | 29% |
| Talcum Powder | 1026 | 327 | 699 | 19% |
| Grand Total | 3581 | 1328 | 2253 | |

| Litigation | Total Cases Owed | Good Cases |
|---|---|---|
| Firefighter FM | 200 | 140 |
| Talc | 1026 | 327 |
| Hernia Mesh | 1533 | 519 |
| 3M | 770 | 399 |
| Roundup | 355 | 83 |

| KS Law Group | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 200 | 19% | 64 |
| Hernia Mesh | 220 | 14% | 74 |
| 3M | 220 | 29% | 114 |
| Roundup | 155 | 44% | 36 |

| Law Firm 1 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 380 | 25% | 129 |
| 3M | 350 | 45% | 181 |
| Roundup | 150 | 42% | 35 |
| Firefighter FM | 200 | 100% | 140 |

| Law Firm 2 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 348 | 34% | 111 |

| Law Firm 3 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 34 | 2% | 12 |

| Law Firm 4 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 237 | 23% | 76 |

| Law Firm 5 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 43 | 4% | 3 |
| Hernia Mesh | 49 | 3% | 17 |

| Law Firm 6 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 380 | 25% | 129 |

| Law Firm 7 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 200 | 19% | 64 |
| Hernia Mesh | 350 | 23% | 118 |

| Law Firm 8 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 113 | 7% | 38 |
| 3M | 100 | 13% | 52 |
| Roundup | 50 | 14% | 12 |

From: **ALLAN TEH** <allan.teh@icloud.com>
Date: Fri, Oct 14, 2022 at 8:10 PM
Subject: Re: Communication
To: Sylvia Benito <sylvia@capital4justice.com>
Cc: Sohail Shahrasebi <sohail.shahrasebi@gmail.com>, Lee Melchionni <lee@capital4justice.com>

# Exhibit 10

I have been in many good and bad deals but the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said. Sohail shares my frustrations as well. If not my disappointment. This is not what I signed up for. Losing money is one thing but for me to get angry like this makes it worth less

Sent from my iPhone

> On Oct 14, 2022, at 7:41 PM, Sylvia Benito <sylvia@capital4justice.com> wrote:
>
> Allan
>
> I just got off another call with you, after multiple calls today. While I respect and honor you as a valued investor, and how to respond to all investors responsibly this communication is not professional or constructive.
>
> I suggest that we communicate through your CIO as he is a great fiduciary and can keep the flow of information appropriately on course.
>
> Next week you will receive:
>
> 1- your weekly report
> 2- any other updates as available
> 3- invitation to calls with co counsel  over the next two weeks as they are available
> 4- all questions answered via Sohail or emails
> 5- every option to move ahead in written detail
> 6- vendor letter
>
> I understand that investing can be an emotional rollercoaster but I continue to believe that we have solid and competent plans as your managers to preserve and grow your investor capital.
>
> Sylvia

**From:** Lee Melchionni <lee@capital4justice.com>
**Sent:** Friday, March 3, 2023 3:17:48 PM
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>; ALLAN TEH <allan.teh@icloud.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>
**Subject:** KS Law Group Update

# Exhibit 11

Sohail,

Attached are the case lists for KS Law Group ("KS"). To provide some context, KS is owed 200 Talcum Powder cases, with a maximum non-medical record drop off of 25%. Any shortfall in Talcu employees per converted Talcum Powder case, with the Internal Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Ec Hernia Mesh cases, with a maximum non-medical record drop off of 30%. KS is owed 155 Roundup Cases, with a maximum non-medical record drop off of 25%. Any shortfall in Roundup case: one conversion basis. KS is owed 220 3M cases, with a maximum non-medical record drop off of 25%.

We are also sharing the executed case replacement agreement with the Lake Law Firm.

- **3M Earplugs**
    - 11 - Attempting to Contact
    - 3 - Filed
    - 54 - Pending
    - 79 - Retained and Sent to Firm
    - 5 - Unable to Reach/Unresponsive
- **Hernia Mesh**
    - 3 - Attempting to Contact
    - 8 - Filed
    - 82 - Pending
    - 2 - Ready to Submit
    - 43 - Retained and Sent to Firm
    - 4 - Unable to Reach/Unresponsive
- **Round Up**
    - 2 - Attempting to Contact
    - 27 - Pending
    - 14 - Ready to Submit
    - 18 - Retained - Sent to Firm
    - 14 - Unable to Reach/Unresponsive
- **Talcum Powder**
    - 1 - Attempting to Contact
    - 5 - Pending
    - 2 - Retained and Sent to Firm
    - 1 - Unable to Reach/Unresponsive

—

Lee Melchionni, Esq.
Founder, COO
lee@capital4justice.com
717.380.7709



5 Attachments · Scanned by Gmail



KS_Talcum_Pow...   KS_3M_Earplugs...   KS_Round_Up_R...   KS_Hernia_Mesh...   KS Law Group - C...

# Exhibit 12

## CASE REPLACEMENT AGREEMENT

This CASE REPLACEMENT AGREEMENT (this "Agreement") is made and entered into as of December 1, 2022 by and among KS Law Group LLP, a District of Columbia limited liability partnership ("KS"), and Lake Law Firm, LLC, a New York limited liability company ("Lake") (each a "Party" and collectively the "Parties").

### RECITALS

WHEREAS, Lake is a professional law firm engaged in the practice of law, with its principal offices in the State of New York;

WHEREAS, Lake is engaged in the acquisition of clients and case workup across multiple types of mass tort litigations, including talcum powder litigation ("Talcum Powder"), hernia mesh litigation ("Hernia Mesh"), Roundup litigation ("Roundup"), and 3M litigation ("3M", and combined with Talcum Powder, Hernia Mesh, Roundup, 3M, Firefighter Foam and Zantac, the "Cases", and each individual case within the Cases, a "Case");

WHEREAS, KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount");

WHEREAS, Lake has not delivered equivalent value in cases to the Funded Amount and owes KS Cases and replacement Cases, the quantity and identity of which are set forth below; and

WHEREAS, the Parties seek to memorialize the terms of their agreement.

NOW, THEREFORE, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

1.     Replacement of Cases.  KS has previously paid Lake the Funded Amount for certain Cases as described below which Lake has yet to provide.  The Parties agree that notwithstanding any earlier agreement for Cases that existed between the Parties, Cases shall be provided by Lake to KS as set forth below.

    a.  Talcum Powder.

        i.   Lake agrees that KS is owed 200 Talcum Powder cases, guaranteed for medical records, which were purchased for $1,200,000, or $6,000 a Case (the "Talcum Power Purchase Price). The criteria for the medical record guarantee of the Talcum Powder cases are set forth in Exhibit A to this Agreement.

        ii.  Lake agrees that the maximum non-medical record drop off of KS' Talcum Powder cases will be 25%.

        iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

        iv.  Lake hereby agrees to allow KS to convert any shortfall in Talcum Powder cases owed into 6 filed employees per converted Talcum Powder case, with the Internal

Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

    v.    Lake agrees that if the owed filed employees are filed with the IRS by a law firm or company other than Lake, KS will receive 95% of the ERC fee received by Lake.

    vi.    Lake agrees that if the owed filed employees are filed with the IRS by Lake, KS will receive 50% of the ERC fee received by Lake.

    vii.    If Lake is unable to provide the filed employees before the statute of limitations expires on ERTC under the CARES Act, Lake agrees that within 90 days of the statute of limitations expiring, Lake will reimburse KS for the costs paid for each un-converted Talcum Powder case ($6,000 per case), plus 8% interest, per year, per case, from the purchase date of September 1, 2021.

b.  Hernia Mesh.

    i.    Lake agrees that KS is owed 220 Hernia Mesh cases, guaranteed for medical records, which were purchased for $1,232,000, or $5,000 a Case (the "Hernia Mesh Purchase Price). The criteria for the medical record guarantee of the Hernia Mesh cases are set forth in Exhibit A to this Agreement.

    ii.    Lake agrees that the maximum non-medical record drop off of KS' Hernia Mesh cases will be 30%.

    iii.    Lake agrees that KS' is owed 60% of the total attorney contingency fee.

    iv.    Lake agrees to continue to replace Hernia Mesh cases for KS with additional Hernia Mesh cases

    v.    For Hernia Mesh cases that are replaced past October 15, 2022, Lake shall pay KS 79% of the attorney fee, which shall be identified by KS to Lake in writing.

    vi.    Solely as an example, if 100 Hernia Mesh cases are owed to KS where 79% of the attorney fee is paid to KS, the number of owed cases to KS shall be reduced to 91

    vii.    If the Hernia Mesh litigation were to reach a global settlement and cases are still owed to KS, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Hernia Mesh cases ($5,000 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

    viii.    The Hernia Mesh litigations include, but are not limited to, the litigations related to Johnson and Johnson Proceed and Prolene Hernia System, Ethicon Physio Mesh, Covidien, W.L. Gore & Associates, Atrium C-Qur, and Davol, Inc/C.R. Bard, Inc.

c.  Roundup.

    i.    Lake agrees that KS is owed 155 Roundup cases, guaranteed for medical records, which were purchased for $782,500, or $5,048.39 a Case (the "Roundup Purchase Price). The criteria for the medical record guarantee of the Roundup cases are set

forth in Exhibit A to this Agreement.

ii.   Lake agrees that the maximum non-medical record drop off of KS' Roundup cases will be 25%.

iii.  Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv.   Lake agrees to allow KS to convert any shortfall of Roundup cases into Camp Lejeune cases on a one-for-one conversion basis upon request from KS. Solely as an example, KS would have the ability to convert 50 Roundup cases into 50 Camp Lejeune cases. To avoid any confusion, this example does not take into account non-medical record drop off.

v.    If the Roundup litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Roundup cases ($5,048.39 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

d.  3M.

i.    Lake agrees that KS is owed 220 3M cases, guaranteed for medical records, which were purchased for $665,500, or $3,025 a Case (the "3M Purchase Price). The criteria for the medical record guarantee of the 3M cases are outlined in Exhibit A to this Agreement.

ii.   Lake agrees that the maximum non-medical record drop off of KS' 3M cases will be 25%.

iii.  Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv.   Lake agrees to continue to replace 3M cases.

v.    If the 3M litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered 3M cases ($3,025 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

2.    **Written Notice of Modifications.** In the event that a case should be replaced, converted, or modified, KS will provide written notice to Lake informing them of the need for such replacement, conversion, or modification pursuant to Section 5(b) below. Lake shall then use its best efforts to effect such replacement, conversion, or modification within a commercially reasonable timeframe.

3.    **Guarantee of Medical Records.** Subject to the agreed upon non-medical drop off for each of the Cases described above, if a client is disqualified based on the phases below, Lake agrees that the case will be replaced one-to-one, but subject to replacement provisions set forth above,

a.  Phase 1 – Verbal Confirmation. The intake details are reconfirmed verbally, and additional information is added, based on the specific case type. Secondary outreach from Lake reconfirms the information provided over the phone with additional details such as injury,

3

length of use, diagnosis, and doctor information to be provided.

b. Phase 2 – Medical Record Retrieval Phase. Medical records are obtained, proving injury, diagnosis, and/or surgery where applicable.

c. Phase 3 – Nurse Review. The medical records are reviewed by a nurse or medical professional to determine if the injury, diagnosis, and/or surgery criteria are met, based on the specific case type.

d. Phase 4 – Filing. The plaintiff fact sheet, census form, and/or [PPF] are filed with the courts. They contain details of the case, including diagnosis, medical history, etc. and is based on the specific case type.

4. Responsibilities of Lake. Lake agrees to the following:

a. Lake will market, intake, and sign-up potential clients.

b. Lake will gather medical records, a medical summary, a plaintiff fact sheet, and/or court complaint as necessary.

c. Lake will act as liaison between the undesigned and trial firms.

d. Lake will handle any client inquiries. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.

5. Miscellaneous.

a. Expenses. Except as otherwise provided herein, KS, on the one hand, and Lake, on the other, shall each pay their own expenses incident to the negotiation, preparation, and carrying out of this Agreement, including all fees and expenses of its counsel and accountants for all activities of such counsel and accountants undertaken pursuant to this Agreement, irrespective of whether or not the transactions contemplated hereby are consummated.

b. Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made if and when delivered personally or by overnight courier to the Parties at the following addresses or sent by electronic transmission, with confirmation received (or at such other address for a Party as shall be specified by like notice):

To KS:

KS Law Group LLP
20900 NE 30th Ave, Suite 510, Miami, FL 33180
Attention: Lee Melchionni
Email: lee@capital4justice.com

To Lake:

Lake Law Firm, LLC
One Rockefeller Center, 11th Floor, New York, NY 10020
Attention: Jeffrey Dubin

Email: elake@forpersist.com

Any such notice shall, when sent in accordance with the preceding sentence, be deemed to have been given and received on the earliest of (i) the day delivered to such address, (ii) the fifth (5th) business day following the date deposited with the United States Postal Service, or (iii) twenty-four (24) hours after shipment by such courier service.

c.  Assignment; Third Party Beneficiaries. Neither this Agreement nor any rights or obligations under it are assignable, except that KS may assign its rights hereunder. Except for any indemnified parties, there shall be no third party beneficiaries of this Agreement.

d.  Governing Law; Venue. This Agreement shall be governed by, and construed in accordance with, the laws of New York applicable to contracts executed in and to be performed in New York. Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of New York and of the United States, in each case located in New York, for any litigation arising out of or relating to this Agreement (and agrees not to commence any litigation relating thereto except in such courts).

e.  Counterparts. This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. It is the express intent of the Parties to be bound by the exchange of signatures on this Agreement via DocuSign (or similar electronic means) or emailed PDF copies.

f.  No Implied Waiver; Remedies. No failure or delay on the part of the Parties to exercise any right, power, or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. All rights, powers, and privileges granted herein shall be in addition to other rights and remedies to which the Parties may be entitled at law or in equity.

g.  Entire Agreement. This Agreement, including the Exhibit attached hereto, sets forth the entire understandings of the Parties with respect to the subject matter hereof and thereof, and it incorporates and merges any and all previous communications, understandings, oral or written as to the subject matter hereof and thereof.

h.  Amendments; Actual Waivers. This Agreement may not be amended except by an instrument in writing signed on behalf of KS and Lake. Any agreement on the part of KS or Lake to any such extension or waiver shall be valid if set forth in an instrument in writing signed on behalf of KS or Lake.

i.  Headings. The headings of the Sections of this Agreement, where employed, are for convenience only and do not form a part hereof and in no way modify, interpret or construe the meanings of the Parties.

5

j.  Severability.  Any provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions of this Agreement; provided, however, in the event the provision which is invalid or unenforceable pertains to a material element of the transaction such that the principal objectives of the transaction provided for herein are materially impaired or are invalid or unenforceable, this Agreement shall be terminated.

k.  Specific Performance.  Each Party acknowledges that, in view of the uniqueness of the transactions contemplated by this Agreement, each Party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore each Party agrees that the other Parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

l.  No Presumption Regarding Drafter.  The Parties acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between them, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, it would not be appropriate to deem any Party to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

\* \* \* \* \*

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Parties hereto have executed this Case Replacement Agreement as of the date first set forth above.

**KS**:

KS Law Group LLP

By: *Lee Melchionni*
    Lee Melchionni (Dec 27, 2022 20:53 EST)
Name: Lee Melchionni
Title:

**LAKE**:

Lake Law Firm, LLC

By:
    Edward Lake (Dec 27, 2022 20:47 EST)
Name: Edward Lake
Title:

[Signature Page to Case Replacement Agreement]

## Exhibit A

**Talcum Powder:** Cases provided with the following criteria below and guaranteed by medical records:
- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer).
- Seventy-five (75) years old or younger.
- Four (4) years plus of exposure.
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer with chemotherapy or treatment.
- Death within eighteen (18) months and original diagnosis within four (4) years of death.

**Hernia Mesh:** Cases provided with the following criteria below and guaranteed by medical records:
- Records showing revision, removal, or replacement surgery, or scheduled within ninety (90) days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery in 2011 or afterward.

**Roundup:** Cases provided with the following criteria below and guaranteed by medical records:
- Diagnosed with Non-Hodgkin lymphoma or subtype within the last ten (10) years, [unless medical records access then 2007 forward].
- Direct exposure only to Roundup for more than one (1) year.
- No existing attorney.

**3M:** Cases provided with the following criteria below and guaranteed by medical records:
- Used 3M Combat Arms CAEv2 Earplugs between 2003 and 2015.
- Diagnosed with tinnitus or documented loss of hearing of ten percent (10%) or more in at least one (1) ear.
- No existing attorney.

**Camp Lejeune:** Cases provided with the following criteria below and guaranteed by medical records:
- -PC must have resided, worked, or was otherwise exposed at Camp Lejeune, NC not less than 30 days from 8/1/1953 through 12/31/1987
- -PC must have been diagnosed with one of the following injuries after exposure at Camp Lejeune: Bladder Cancer, Brain Cancer, Brain Tumor, Cervical Cancer, Ovarian Cancer, Prostate Cancer, Rectal Cancer, Breast Cancer, Esophageal Cancer, Kidney Cancer, Liver Cancer, Lung Cancer, Leukemia, Hodgkin's Disease, Lymphoma, Multiple Myeloma, Hepatic Steatosis (Fatty Liver Disease), Parkinson's Disease, Renal Toxicity, Scleroderma, Non-Hodgkin's Lymphoma, Soft Tissue Cancer, Basal Cell Carcinoma, Melanoma, Merkel Cell Carcinoma, Squamous Cell Carcinoma, Colon (Colorectal) Cancer, Intestinal Cancer, Appendix Cancer, Aplastic Anemia and other Myelodysplastic syndromes, Cirrhosis of the Liver, Renal/Kidney Failure, Birth Defects (non-Cardiac), Cardiac Birth Defects, Miscarriage (19 weeks or earlier), Fetal Death (20 weeks gestation), Fertility Issues, Tremors (musculoskeletal), Pre-Parkinson's Disease, Neurobehavioral Effects - must have all symptoms: delayed reaction times, memory problems, attention/concentration problems, and motor function problems (e.g. hand tremor, postural sway)
- -PC must not currently be represented by an attorney

[Exhibit A]

# KS Law Group - Case Replacement Agreement

Final Audit Report                                                                2022-12-28

| | |
|---|---|
| Created: | 2022-12-28 |
| By: | Lee Melchionni (lee@redwoodlg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4IPGrt0ky7Gi-3IFKgGAkBJ5kv2fPsl0 |

## "KS Law Group - Case Replacement Agreement" History

📄 Document created by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:44:56 AM GMT- IP address: 99.110.180.129

📧 Document emailed to elake@forpersist.com for signature
2022-12-28 - 1:45:53 AM GMT

📄 Email viewed by elake@forpersist.com
2022-12-28 - 1:46:43 AM GMT- IP address: 73.205.234.141

✍️ Signer elake@forpersist.com entered name at signing as Edward Lake
2022-12-28 - 1:47:04 AM GMT- IP address: 73.205.234.141

✍️ Document e-signed by Edward Lake (elake@forpersist.com)
Signature Date: 2022-12-28 - 1:47:06 AM GMT - Time Source: server- IP address: 73.205.234.141

📧 Document emailed to Lee Melchionni (lee@redwoodlg.com) for signature
2022-12-28 - 1:47:07 AM GMT

📄 Email viewed by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:53:47 AM GMT- IP address: 99.110.180.129

✍️ Document e-signed by Lee Melchionni (lee@redwoodlg.com)
Signature Date: 2022-12-28 - 1:53:57 AM GMT - Time Source: server- IP address: 99.110.180.129

✅ Agreement completed.
2022-12-28 - 1:53:57 AM GMT

📜 **Adobe Acrobat Sign**

Filing # 175401559 E-Filed 06/15/2023 12:37:22 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

On a derivative basis as a
Partner of,

KS LAW GROUP, a District of
Columbia LLP,

Plaintiffs,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

Defendants

And

KS LAW GROUP, LLP, a District of
Columbia LLP,

Nominal Defendant.

---

## MOTION TO COMPEL ARBITRATION AND DISMISS
### (And Incorporated Memorandum of Law)

Defendants The Lake Law Firm ("Lake Law") and Persist Communications,

Inc. ("Persist Communications"), move to compel arbitration and state:

1. This derivative complaint on behalf of KS Law Group, LLP, a

Washington DC limited partnership ("KS Law"), arises out of KS Law's

1

Partnership Agreement.  Plaintiff, in his individual capacity, is a 50% partner and Defendants Melchionni and Benitez are each 25% partners.

2.      The same Plaintiff, Allan Teh, is suing these same Defendants in his individual capacity for damages and other relief arising from the same Partnership Agreement and the same transactions and occurrences in a companion case: *Allan Teh v. Melchionni, et. al.,* Case No. 2023-004474 CA 44 before Judge Walsh. As a threshold matter, this case should be transferred to Judge Walsh's Division 44 for disposition of this arbitration motion and any subsequent proceedings. Plaintiff did disclose that related case on the Civil Cover Sheet for this case but for some reason the clerk assigned this case to a different division.

3.      Housekeeping aside, Plaintiff, Teh individually, and the Defendants Melchionni and Benito, are parties to the KS Law Partnership Agreement attached to the Complaint. Paragraph 39 of the Agreement titled "Resolution of Disputes" contains the following language:

> Any controversy arising out of or related to this Agreement or the breach thereof shall be settled under the laws of the District of Columbia without reference or regard to any conflict of laws principles, and shall be resolved via arbitration under the American Arbitration Action, 9 U.S.C. § 2, in the District of Columbia, in accordance with the rules of the American Arbitration Association, and judgment entered upon an award may be enforced or appealed by appropriate judicial action pursuant to the District of Columbia Code of Civil Procedure.

4.      Defendants Lake Law and Persist Communications are **not** parties to the Partnership Agreement, but arbitration of the claims made against them

2

should be compelled under the principle of equitable estoppel. The argument goes like this:

    a. The Defendants Melchionni and Benito, who are parties to the Partnership Agreement with Mr. Teh, are entitled to and will be demanding arbitration of this case under its provisions;

    b. Because Lake Law and Persist are alleged to have acted in concert with Melchionni and Benito, the claims against all Defendants are intertwined, interdependent and based upon the same facts. Since Melchionni and Benito may compel arbitration of the claims made on behalf of KS Law in this derivative action, Lake Law and Persist Communications likewise have a right to compel arbitration under the settled principle of equitable estoppel; and

    c. It is in the interests of justice and efficiency that the claims proceed together (fortifying the equitable estoppel argument), especially where there is a threat of inconsistent results if they travel separately.

5.    In addition, the Complaint fails to state a cause of action. The allegations and claims against these Defendants – unjust enrichment and equitable accounting – are incongruous with Exhibit 7 to the Complaint, which is a contract executed in December 2022 that covers the exact subject matter and issue of which Plaintiff complains. As there is a contract in place that covers the issues, there is no basis for equity to intervene, particularly since the contract is still in its executory stage. In fact, the Third District has held that claims for unjust enrichment and equitable accounting do not exist where a contract covers the same subject matter.

WHEREFORE, Defendants move to compel arbitration and/or dismiss the Complaint.

3

<u>**MEMORANDUM OF LAW**</u>

I.     **MOTION TO COMPEL ARBITRATION**

**A. Overview of the Complaint**

This derivative Complaint is brought by one 50% partner on behalf of the partnership against the other two partners (each owning 25% interests) as well as against non-partners Lake Law and Persist Communications. The Complaint contains 9 counts. The first 5 claims are against signatories to the Partnership Agreement – Melchionni and Benito – and the last 4 (counts 6-9) are against Lake Law and Persist Communications.

The gravamen of the Complaint is that Melchionni and Benito breached their fiduciary duties and engaged in constructive fraud against the partnership, KS Law.  The claims against Lake Law and Persis Communications are for unjust enrichment, and equitable accounting.

Paragraph 9 of the Partnership Agreement provides that, "[e]ach Partner hereby agrees that he/she owes duties of care, honesty and loyalty to the other Partners and to the Partnership itself …" Thus, the fiduciary duties which Plaintiff claims Melchionni and Benito breached arose from the terms of the Agreement containing the arbitration provision.

Moreover, paragraph 12 of the Agreement states:

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm. The Partners agree that Capital Contributions will be made from time to time over a six (6) month period, for a total minimum amount of $4,000,000,00. The Capital Contributions will be made by Allan Teh in the amount of $4,000,000.00.

4

Thus, Teh's performance – which he claims was induced by the misdeeds of the two other partners – arose from the Partnership Agreement containing the arbitration provision.

Plaintiff alleges that "KS Law was to partner with co-counsel and trial-counsel in order to obtain, work-up, and handle various mass tort injury cases …" (¶ 14). Plaintiff individually would underwrite the enterprise and fund KS Law **pursuant to Section 12 of the Partnership Agreement**. (¶ 15). Plaintiff wired $4 million as capital contribution to KS Law and claims that Melchionni and Benito, "**acting in concert with Defendants Persist and Lake Law**, have misappropriated the entirety of KS Law's working capital and [Melchionni and Benito] breached their fiduciary duties to the Partnership through fraudulent conduct which has led to the unjust enrichment of Persist and Lake Law." (¶¶ 17, 20) (All emphasis added). Plaintiff further alleges that essentially all working capital was transferred to Persist Communications by Melchionni and Benito, (¶29), in their capacity as general partners [**under the Partnership Agreement**] of KS Law. (¶ 58).

In addition to the above, Count 1 alleges a **breach of the Partnership Agreement** by Melchionni and Benitez as justification for the appointment of a receiver. (¶ 63). Plaintiff also alleges that "**the contract** and events that led to the cascade of events leading to Lake Law [and Persist] unjustly receiving the millions of dollars, **arose from acts and omissions by Lake Law [and Persist] and those other named Defendants**." (¶¶ 100, 112).

5

There is thus no question but that the claims alleged (1) arise from the Partnership Agreement and (2) the discrete claims against Lake Law and Persist Communications arise from their alleged concerted conduct with Melchionni and Benito and are inextricably intertwined with the claims made against them.

### B. MELCHIONNI AND BENITO WILL COMPEL ARBITRATION AND SO CAN LAKE LAW AND PERSIST COMMUNICATIONS.

Generally, a non-signatory to an arbitration agreement cannot compel arbitration. But in *Kolsky v. Jackson Square, LLC*, 28 So. 3d 965, 969 (Fla. 3d DCA 2010), the Third District, applying well settled Florida law, held as follows:

> [W]hen an arbitrable issue exists, a non-signatory may compel arbitration based on the doctrine of equitable estoppel. Application of the doctrine of equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract.

See also *Hagstrom v. USA Marine Exhaust, LLC,* 322 So. 3d 145 (Fla. 3d DCA 2021) (derivative claim ordered to arbitration).

In *Lash & Goldberg LLP v. Clarke*, 88 So. 3d 426, 428 (Fla. 4th DCA 2012), the plaintiff – in her effort to avoid arbitration with a non-signatory to the agreement containing the arbitration provision - tried to "spin the legal malpractice count as involving only her independent attorney-client relationship with the Lash & Goldberg [law firm] defendants." The appellate court rejected her argument because, as here, she "alleged concerted misconduct by non-signatories … and signatories."

It is manifest that the claims against Lake Law and Persist Communications "aris[e] out of or relate[ ] to this [Partnership] Agreement or the

breach thereof," which is a broad arbitration provision.  To be sure, as observed earlier, Plaintiff alleges on behalf of KS Law that he individually wired $4 million as capital contribution to KS Law and that Melchionni and Benitez, "**acting in concert with Defendants Persist and Lake Law**, have misappropriated the entirety of KS Law's working capital and breached their fiduciary duties to the Partnership through fraudulent conduct which has led to the unjust enrichment of Persist and Lake Law." (¶ 20). These allegations directly implicate the Partnership Agreement because (1) the fiduciary duties that Plaintiff claims Melchionni and Benito breached arise from section 9 of the Agreement outlining the scope of their fiduciary duties and (2) Plaintiff alleges he made the $4 million capital contribution based upon his obligations under paragraph 12 of the Agreement.

Moreover, there is a risk of inconsistent results if Plaintiff arbitrates with only Melchionni and Benitez while litigating with only Lake Law and Persist Communications because of the allegations of concerted conduct and the interconnection between the claims against the two groups of Defendants. *Cf. Piquet v. Clareway Properties Limited*, 314 So. 2d 423 (Fla. 3d DCA 2020) ("severing claims that are inextricably intertwined is a departure from the essential requirements of law due to the risk of inconsistent verdicts."). That would defeat the purpose for arbitration. *See MS Dealers Serv. Corp. v. Franklin,* 177 F. 3d 942, 947 (11th Cir. 1999).

Because the claim against Lake Law and Persist Communications are based upon their alleged concerted action with signatories to the Partnership

Agreement containing the arbitration provision and the claims against both signatories and non-signatories are inextricably intertwined, Plaintiff is equitably estopped from blocking these non-signatories from compelling arbitration of the claims made against them.

## II.   MOTION TO DISMISS COMPLAINT

### A. Unjust Enrichment Claims Fail

"[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *12550 Biscayne Condominium Assoc., Inc. v. NRD Investments, LLC,* 336 So. 3d 750 (Fla. 3rd DCA 2021); *see also Diamond "S" Dev. Corp. v. Mercantile Bank,* 989 So, 2d 696, 697 (Fla. 1st DCA 2008) (same).

Here, KS Law gave $3.8 of the $4 million to Persist Communications, which transferred the funds to Lake Law for the purpose of marketing, signing clients and working up various mass tort cases. The Complaint admits that the funds were ultimately received by Lake Law. (¶ 31).   When the agreed upon target for client retentions went unfulfilled, on December 1, 2022, KS Law and Lake Law executed a **Case Replacement Agreement** which set a formula for joint cases to replace those lost for various reasons (e.g., statute of limitations, insufficient records to support claims). That Agreement is attached to the Complaint as **Exhibit 7**.

The December 2022 Case Replacement Agreement was very specific, outlining an agreement on Talcum Powder, Hernia Mesh, Roundup, and 3M cases in detail. It entirely covers the subject matter of the unjust enrichment

8

claims against Persist Communications and Lake Law. As it was only entered into in December 2022, and given how long these cases take to run their course, Plaintiff, an obvious disgruntled partner in KS Law, has jumped the gun in seeking any relief, let alone accounting and unjust enrichment. The contract is still in its executory stage.

The Complaint further alleges that the purpose of the transfer of funds to Lake Law "is not yet known." (¶ 33). But that is false. **If Plaintiff would just read Exhibit 7 to his own Complaint**, it has the answer. The Recitals section makes clear that the $3.8 of the $4 million was paid to Lake Law "to acquire client leads in connection with the Cases" and that because Lake Law "has not delivered equivalent value in cases to the Funded Amount and owes KS Cases and replacement Cases, the quantity and identity of which are set forth below, "the Parties seek to memorialize the terms of their agreement."

> When a party attaches exhibits to the complaint those exhibits become part of the pleading and the court will review those exhibits accordingly … The conclusions of the pleader, as to the meaning of the exhibits attached to the complaint, are not binding on the court… Exhibits attached to the complaint are controlling, where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control."

*Ginsberg v. Lennar Florida Holdings, Inc.,* 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

Given that the Case Replacement Agreement entirely covers the subject matter of the unjust enrichment claims, those claims fail as a matter of law. *See 12550 Biscayne Condominium Assoc., Inc.,* 336 So. 3d 750.

### B. Equitable Accounting Fails

A claim for equitable accounting cannot coexist with a breach of contract claim covering the same subject matter, as plaintiff would be able to obtain that information through discovery of the breach of contract claim. *Bedoyan v. Samra,* 352 So. 3d 361, n.5 (Fla. 3d DCA 2022). Here, although Plaintiff has not brought a breach of contract action, instead suing for unjust enrichment, **he should have** because unjust enrichment is unavailable where there is a contract covering the same subject matter. *See* argument A above. The only actual remedy he has is breach of contract because Exhibit 7 covers the entirety of the gravamen of his claims.

The common thread running through all claims asserted against these Defendants is that they are all covered by the contract between KS Law and Lake Law.  Moreover, as to the equitable accounting claim, Lake Law is an arms-length contracting party with KS Law such that it owes it no fiduciary duty.

In sum, no matter how it is sliced and diced, KS Law has no claims against these Defendants as a matter of law, save for breach of contract, which it has not and cannot bring because the contract is still in its executory phase and has not been breached.

WHEREFORE, Defendants move the Court to compel Plaintiff to arbitrate the claims made in the Complaint and/or dismiss the Complaint.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
Counsel for Defendants, Lake Law and Persist Communications
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131

10

Telephone: (305)-377-2290
Primary: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By: /s/ Andrew S. Berman
ANDREW S. BERMAN, ESQ.
Fla. Bar No.: 370932

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 15th day of June 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com  and Blank Rome LLP, Michelle M. Gervais, Esq, 100 S. Ashley Drive Suite 600, Tampa, FL, michelle.gervais@blankrome.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

    /s/ Andrew S. Berman

Andrew S. Berman
Florida Bar No.: 370932

11

Filing # 175711005 E-Filed 06/20/2023 01:29:36 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

On a derivative basis as a
Partner of,

KS LAW GROUP, a District of
Columbia LLP,

Plaintiffs,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

Defendants

And

KS LAW GROUP, LLP, a District of
Columbia LLP,

Nominal Defendant.

---

## DEFENDANTS' JOINT MOTION TO TRANSER

Defendants The Lake Law Firm ("Lake Law") and Persist Communications,
Inc. ("Persist Communications"), Defendants Lee Melchionni and Sylvia Benito,
and Nominal Defendant KS Law Group, LLP, by and through their respective
separate counsel, move to transfer this case to Division 44 and state:

1

1.      This derivative complaint on behalf of KS Law Group, LLP, a District of Columbia Limited Partnership ("KS Law"), arises out of KS Law's Partnership Agreement and a contract between KS Law and Lake Law.  Plaintiff, in his individual capacity, is a 50% partner and Defendants Melchionni and Benitez are each 25% partners.

2.      The same Plaintiff, Allan Teh, is suing all these same Defendants in his individual capacity for damages and other relief arising from the same Partnership Agreement and the same transactions and occurrences in a companion case: *Allan Teh v. Melchionni, et. al.,* Case No. 2023-004474 **CA 44** before Judge Walsh.  The parties are the same, (though here KS Law is a required Nominal Defendant in this derivative action).  The lawyers are the same.

3.      Plaintiff did, in fact, disclose the related case before Judge Walsh on the Civil Cover Sheet for this case (copy attached) but for some reason the clerk assigned this case to Division 43.

4.      There is great risk of inconsistent rulings if the same or similar claims – one brought in an individual capacity and one derivative – are litigated before separate judges. In fact, the first issue will be whether arbitration should be compelled.  It would be incongruous to compel arbitration in one case but not the other.

5.      Given the overlapping legal and factual issues, identity of parties (identical) and identity of counsel (identical), and risk of inconsistent results, this case should be transferred to Division 44.

2

6.     On June 15, 2023, counsel for Defendants communicated their intent to file this motion to Plaintiff's counsel by email. Plaintiff's counsel replied by email on June 16, 2023 and indicated that he would follow up, but as of filing this motion (four days later) has not done so.

7.     WHEREFORE, Defendants move to transfer this case to Division 44.

June 20, 2023

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Telephone: (305)-377-2290
Primary: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By: */s/ Andrew S. Berman*
ANDREW S. BERMAN, ESQ.
Fla. Bar No.: 370932

*Attorneys for Defendants, Lake Law and Persist Communications*


**BLANK ROME LLP**

*/s/ Kenneth Bressler*
Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

*Attorneys for Defendants Benito, Melchionni, and KS Law Group, LLP*

3

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 20th day of June 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

_/s/ Andrew S. Berman_

Andrew S. Berman
Florida Bar No.: 370932

Filing # 171724175 E-Filed 04/25/2023 10:40:40 AM

**FORM 1.997.     CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.     CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>Allan Teh</u>
Plaintiff                                                          Case # _____
                                                                          Judge   _____

vs.

<u>KS Law Group, LLP, Lee Melchionni, Sylvia Benito, Persist Communications, Inc., The Lake Law Firm, LLC</u>
Defendant

**II.     AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.     TYPE OF CASE**     (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐ Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☒ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☐ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☐ Libel/Slander
      ☒ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☒ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  9

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☐ no
    ☒ yes If "yes," list all related cases by name, case number, and court.
    2023-004474-CA-01; and 2022-022470-CA-01

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**     **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Cheyenne Moghadam        Fla. Bar # 1040660
      Attorney or party                   (Bar # if attorney)

Cheyenne Moghadam               04/25/2023
  (type or print name)                  Date

Filing # 176046485 E-Filed 06/23/2023 05:26:43 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA43
JUDGE: Thomas J. Rebull

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## AGREED ORDER EXTENDING PLAINTIFF'S TIME TO RESPOND TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND DISMISS

**THIS CAUSE** having come before this Court and the Court being fully advised of opposing counsels being consulted and their agreement, it is hereupon,

**ORDERED** and **ADJUDGED** that Plaintiff will have two (2) additional days to file his Response in Opposition to Defendants, Lee Melchionni and Sylvia Benito's, Motion to Compel Arbitration and Dismiss, and Defendants, The Lake Law Firm, LLC and Persist Communications, Inc.'s, Motion to Compel Arbitration and Dismiss placing Plaintiff's deadline to respond on or before June 28th, 2023.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 23rd day of June, 2023.

2023-015702-CA-01 06-23-2023 5:18 PM

2023-015702-CA-01 06-23-2023 5:18 PM
Hon. Thomas J. Rebull

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Heather.Bunner@blankrome.com

**Physically Served:**

Filing # 176390278 E-Filed 06/28/2023 05:53:14 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

 On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

 Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

 Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

 Nominal Defendant in Derivative Action.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership") files this Response in Opposition to Defendants, PERSIST COMMUNICATIONS, INC ("Persist") and THE LAKE LAW FIRM, LLC ("Lake Law") (hereinafter, collectively "Defendants"), Motion to Compel Arbitration and Dismiss (the "Motion"), on behalf of KS Law, and in support thereof alleges as follows:

Page **1** of **13**

## <u>INTRODUCTION</u>

Although Lake Law and Persist's Motion to Compel Arbitration and Motion to Dismiss are distinct motions, each governed by separate standards, they have chosen to comingle both arguments within the same motion. Plaintiff will first address Defendants' Motion to Compel Arbitration and then address Defendants' Motion to Dismiss.

## <u>RESPONSE IN OPPOSITION TO MOTION TO COMPEL ARBITRATION</u>

As mentioned in Lake Law and Persist's Motion this is a derivative action brought by Allan Teh on behalf of the **law firm**, KS Law, as the fifty percent (50%) Partner/owner of that Law Firm. Lake Law and Persist's Motion to Compel Arbitration fails for two distinct reasons: 1) there exists no arbitration agreement between the Plaintiff, KS Law and/or these Defendants and 2) even if this Court finds that an enforceable arbitration agreement exists between the Plaintiff and those Defendants, they have waived their right to compel arbitration.

Lake Law and Persist are moving to compel arbitration by inappropriately utilizing the arbitration provision present in Section 39 of KS Law's Partnership Agreement, to which **Lake Law and Persist are not signatories**. Further, despite the fact that the Partnership Agreement specifically sets forth that the laws of the District of Columbia would govern this action (*see Section 39 of Partnership Agreement)*, Lake Law and Persist have chosen to only cite Florida law in support of their Motion. Plaintiff will provide both Florida and D.C. law in support of its opposition to Defendants' Motion.

In ruling on a motion to compel arbitration, the trial court must consider three elements: (1) whether a valid written agreement to arbitrate existed; (2) whether an

arbitrable issue has been raised; and (3) whether the right to compel arbitration has been waived. *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999); *see also Univ. of the D.C. Faculty Ass'n / Nat'l Educ. Ass'n v. Bd. of Trustees of Univ. of the D.C.*, 257 A.3d 1026, 1031 (D.C. 2021). The first of these issues necessitates a determination of whether a valid agreement exists *between the parties*. *Lion Gables Realty Ltd. v. Randall Mech., Inc.*, 65 So. 3d 1098, 1099 (Fla. 5th DCA 2011).

**I.** **Lake Law and Persist are not Parties to the Arbitration Agreement and Therefore Cannot Compel Arbitration.**

It is well settled that non-parties to an arbitration clause cannot compel parties to a contract to arbitrate. *Nestler–Poletto Realty, Inc. v. Kassin,* 730 So.2d 324, 326 (Fla. 4th DCA 1999). The exception to that general rule is if the non-party attempting to compel arbitration is a "third party beneficiary to the contract." *Id.* A third-party beneficiary is defined as an intended beneficiary which is determined "only if the parties to the contract intended to primarily and directly benefit the third party." *Aetna Cas. & Sur. Co. v. Jelac Corp.,* 505 So.2d 37, 38 (Fla. 4th DCA 1987). The intent required is only established if **all the contracting parties** intended to benefit the third party. *Florida Power & Light Co. v. Rd. Rock, Inc.*, 920 So. 2d 201, 203 (Fla. 4th DCA 2006)[1].

The facts set out in the Derivative Complaint clearly establish that: 1) Lake Law and Persist are not signatories to the arbitration agreement and 2) they are not an intended beneficiary of the Partnership Agreement. Tellingly, Lake Law and Persist are not named, or referenced, in the Partnership Agreement. In fact, the causes of action

---

[1] After a diligent inquiry Plaintiff has not located any District of Columbia case law on point regarding third-party beneficiaries right to compel arbitration.

against them, for Unjust Enrichment and Equitable Accounting, are rooted in virtually the opposite of them being a beneficiary of the Partnership Agreement.

Lake Law and Persist knowingly and voluntarily accepted the $3,880,000 sent from the Law Firm's account and have provided no benefit or consideration in return. *See ¶ 105, 106 of Derivative Complaint*. The transfer of those funds was effectuated without any contract or agreement in place and the transfer took place without any prior notice, or input, from Allan Teh, who is a 50% Partner of KS Law. *See ¶ 29 of Derivative Complaint*.

As outlined above, even if the other partners of KS Law, Lee Melchionni and Sylvia Benito, who are also defendants in this action, intended Lake Law and Persist to be intended beneficiaries, the argument still fails. For Lake Law and Persist to be an intended beneficiary it would require the intent of **all** the partners of KS Law. *Florida Power & Light Co. v. Rd. Rock, Inc.*, 920 So. 2d 201, 203 (Fla. 4th DCA 2006).

Further, despite the clear case law regarding Lake Law and Persist's inability to compel arbitration because they are not signatories to the agreement, Lake Law and Persist mischaracterize the facts and legal standards governing this case to improperly invoke the doctrine of equitable estoppel.

Equitable estoppel cannot be utilized because the claims against Defendants are distinct and not interdependent with the claims against the other defendants. *See Kolsky v. Jackson Square, LLC,* 28 So. 3d 965, 969 (Fla. 3d DCA 2010)(finding that equitable estoppel can only be utilized by a non-signatory of an arbitration agreement where a signatory of the arbitration agreement raises allegations of substantially interdependent

and concerted misconduct by both the non-signatory and one or more of the signatories to the agreement).

Lake Law and Persist mischaracterize the fraud allegations as to Defendants Melchionni and Benito to somehow imply that there are claims for fraud as to Defendants Lake Law and Persist. There are not. The claims against Lake Law and Persist are for Unjust Enrichment and Equitable Accounting. Both claims can be adjudicated without reference to, or intermingling with, the claims against Melchionni and Benito.

The purpose of a claim for unjust enrichment is to provide restitution where a person or entity has been unjustly enriched at the expense of another. *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). Courts will look to see if the plaintiff has established that: 1) plaintiff has conferred a benefit on the defendant; 2) defendant had knowledge of the benefit; 3) defendant voluntarily accepted and retained the conferred benefit; and 4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff. *Flatirons Bank v. Alan W. Steinberg Ltd. P'ship*, 233 So. 3d 1207, 1219 (Fla. 3d DCA 2017); *see also Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016).

Lake Law and Persist's own Motion clearly illustrates that the elements to establish Plaintiff's claim for unjust enrichment requires no reference to the facts alleged against Melchionni and Benito. On Page 8 of Lake Law and Persist's Motion, they admit and acknowledge receipt of the benefit of the $3,880,000 conferred upon them by KS Law. **They even admit that they have not provided KS Law the equivalent value for the funds received.** *See Page 9 of Motion.*

In addition, the totality of Defendants' Motion and filings establish that, at the time the funds were transferred (September 16th, 2021), no agreement was in place between KS Law and Lake Law and Persist. This is evidenced Lake Law and Persist's failure to cite to or attach any agreement but also their odd references to the "Case Replacement Agreement" executed on December 1st, 2022. This "Agreement" was executed over a year after the transfer was effectuated. Defendants contend that this "Case Replacement Agreement" somehow governs the unjust enrichment that occurred over a year prior.

Defendants also state that the "Case Replacement Agreement" is "still in its executory phase." *See Page 9 of Motion.* First, Lake Law and Persist's contention that the Agreement is "still in its executory phase" is completely unsupported and falls well outside the four corners of the Derivative Complaint. Second, at the time of the filing of this Response KS Law has not received any return of its funds from the Defendants even though their receipt of the $3,880,000 occurred almost two years ago. To contend Plaintiff has "jumped the gun" with the filing of this action is absurd and not supported by anything before this Court.

Plaintiff's equitable accounting claim is even further distinct from the claims as to the other defendants. To state a claim for an equitable accounting a plaintiff must allege that a fiduciary relationship **or a complex transaction exists**, and second, that a remedy at law would be inadequate. *Bedoyan v. Samra*, 352 So. 3d 361, 365 (Fla. 3d DCA 2022); *Bankers Tr. Realty, Inc. v. Kluger*, 672 So. 2d 897, 898 (Fla. 3d DCA 1996); *see also Sodikoff v. Allen Parker Co.*, 202 So. 2d 4, 6 (Fla. 3d DCA 1967); *see also Landise v. Mauro,* 141 A.3d 1067, 1073 (D.C. 2016). The pending Derivative Complaint contains multiple contentions regarding the various complex transactions involved.

Lake Law and Persist's Motion also illustrates the distinctness and validity of the equitable accounting claims brought against them. Although the "invoice" evidencing the transfer of KS Law's $3,880,000 to Defendants was generated by Lake Law, Lake Law admits in the Motion that it was Persist who received the funds and then somehow transferred the funds back to Lake Law. *See Page 8 of Motion.* Despite Lake Law being a **law firm** and Persist Communications, Inc. being a **communications** company, Lake Law and Persist state that the funds transferred to Lake Law was for the "purpose of marketing, signing clients and working up various mass tort cases."  *See Page 8 of Motion.* Defendants have failed to provide any update on the current disposition of KS Law's $3,880,000, and given the multiple bank account transfers clearly illustrate the complexity and need for an equitable accounting.

As previously referenced, the facts necessary to establish the elements of the claims against Defendants do not require any reference to the other defendants in this case, and therefore Defendants' reliance on the exception of equitable estoppel is unfounded and should be denied.

## II.    Lake Law and Persist Have Waived Their Right to Arbitration

Should this Court find that Lake Law and Persist can somehow invoke the arbitration agreement even though they are not signatories to it, their Motion still fails because they have waived their right to compel arbitration.

Lake Law and Persist correctly point out that the Plaintiff also has a pending action in the Eleventh Judicial Circuit, *Allan Teh v. Melchionni, et. al.*, Case No. 2023-004474 CA 44, for direct claims against similar parties to the present action. Lake Law and Persist have actively participated in the litigation of the related case by filing a Motion to Dismiss.

*See Defendants' 2023-004474 CA 44 Motion to Dismiss attached as* **Exhibit "1".** As the Court will clearly see, their Motion to Dismiss in that matter is devoid of a single reference to, or request for, arbitration. As more fully set forth below, Defendants' active participation in the related case, and their failure to request or reference arbitration, constitutes a waiver of their right to request arbitration in the present proceedings.

Both D.C. and Florida courts recognize that just like any contractual provision an agreement to arbitrate can be waived by the actions of the parties. *See Bland v. Green Acres Group, L.L.C.*, 12 So. 3d 822, 824 (Fla. 4th DCA 2009); *See also BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 704 (D.C. 2022). D.C. courts have established that motion practice that "invokes the authority of the trial judge to alter the course of the case" that does not request arbitration can constitute a waiver of the parties right to compel arbitration. *See BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 705 (D.C. 2022); *see also TRG Customer Sols., Inc. v. Smith,* 226 A.3d 751, 759 (D.C. 2020). Florida courts echo D.C.'s rulings in finding that arbitration is waived by a party where its participation in litigation conflicts with the right to arbitrate. *Bland v. Green Acres Group, L.L.C.*, 12 So. 3d 822, 825 (Fla. 4th DCA 2009). Waiver has been found where active participation in litigation occurs when the party seeking arbitration has attacked "the merits of the case as opposed to initially challenging the plaintiff's right to judicial remedy in the first place." *Miller & Solomon Gen. Contractors, Inc. v. Brennan's Glass Co., Inc.*, 824 So. 2d 288, 290 (Fla. 4th DCA 2002).

Additionally, waiver of the right to arbitrate is not time, or delay, dependent but rather depends on prior inconsistent positions taken by the moving party. *Paine, Webber, Jackson & Curtis, Inc. v. Fredray, Inc.*, 521 So. 2d 271 (Fla. 5th DCA 1988). **It is**

**important to note that in 2022 the United States Supreme Court clarified that "prejudice is not a condition of finding that a party has waived its right to stay litigation or compel arbitration."** *Morgan v. Sundance, Inc.*, **212 L. Ed. 2d 753 (2022).**

As stated above, Lake Law and Persist are not a party to the arbitration agreement, but should this Court somehow find that they are, they have clearly waived their right to compel arbitration. They had knowledge of the arbitration agreement when they filed their prior motion to dismiss in the related matter, as it was attached to the complaint. Defendants even concede that the present and related action relate to the same "transactions and occurrences." *See Page 2 of Motion.* Defendants' prior motion to dismiss clearly "invokes the authority of the trial judge to alter the course of the case" and attacks the "merits of the case," as if it were to be granted it would dismiss the claims against them. Defendants' prior actions clearly conflict with their present request to compel arbitration. D.C. courts have similarly held that the use of arbitration as a "strategy to manipulate the legal process" and get a "second bite at a favorable outcome" constitutes a waiver. *See BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 704 (D.C. 2022); *see also Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999)(finding that "[n]either the statutes validating arbitration clauses nor the policy favoring such provisions should be used to block a party's access to the judicial forum")

### <u>RESPONSE IN OPPOSITION TO MOTION TO DISMISS</u>

Plaintiff will now address Defendants' Motion to Dismiss. There are several overlaps in Defendants' arguments in support of their Motion to Compel Arbitration with their Motion to Dismiss. Therefore, Plaintiff incorporates his above arguments in an effort to avoid repetition.

## STANDARD OF REVIEW

A motion to dismiss tests "whether the plaintiff has stated a cause of action, not whether the plaintiff will prevail at trial." *Lonestar Alternative Sol., Inc. v. Leview-Boymelgreen Soleil Developers, LLC.*, 10 So. 3d 1169, 1171 (Fla. 3d DCA 2009). The trial court is bound by the four corners of the complaint and attachments, and all ambiguities and inferences drawn from "the recitals in the complaint, together with the exhibits attached," must be construed in the light most favorable to the plaintiff. *Id.* (*quoting Vienneau v. Metro. Life Ins. Co.*, 548 So.2d 856, 858 (Fla. 4th DCA 1989)). The material allegations of the complaint must be taken as true. *See Davidson v. Iona-McGregor Fire Protection and Rescue District,* 674 So. 2d 858, 859 (Fla. 2d DCA 1996). A motion to dismiss a complaint "must be decided on questions of law and questions of law only." *Connolly v. Sebeco, Inc.*, 89 So. 2d 482, 484 (Fla. 1956). It is error for the trial court to rely "upon matters raised in the motion, but not contained within the four corners of the complaint." *Chatham Mfg., Corp. v. Cates*, 969 So.2d 515, 516 (Fla. 1st DCA 2007). A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that Plaintiff cannot prove a set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Bracewell v. Nicholson Air Servs., Inc.* 680 F.2d 103, 104 (11th Cir. 1982). "If a complaint does not state a cause of action, the opportunity to amend a complaint should be liberally given, unless it is apparent the pleading cannot be amended to state a cause of action." *Samuels v. King Motor Co.*, 782 So. 2d 489, 495 (Fla. 4th DCA 2001).

## LEGAL ARGUMENT

Lake Law and Persist's entire legal argument in support of dismissing Plaintiff's claims for unjust enrichment and equitable accounting rests on the absurd proposition that "the Case Replacement Agreement entirely covers the subject matter of the unjust enrichment claims." *See Page 9 of Motion.* They then proceed with legal acrobatics to argue the dismissal of Plaintiff's equitable accounting claims. Defendants state that a "claim for equitable accounting cannot coexist with a breach of contract claim" and "although the Plaintiff has not brought a breach of contract action . . . he should have." *See Page 10 of Motion.*

Lake Law and Persist's argument has no basis in legal reality. Defendants would like this Court to entirely ignore the fact that the "Case Replacement Agreement" was executed on December 1st, 2022. The transfer of the $3,880,000 in funds was transferred to Defendants **over a year prior** on September 16th, 2021. Moreover, Lake Law and Persist even admit that they have "not delivered equivalent value in cases to the Funded Amount and owes KS . . ." *See Page 9 of Motion.*

Regardless, the material allegations of the complaint must be taken as true. *See Davidson v. Iona-McGregor Fire Protection and Rescue District,* 674 So. 2d 858, 859 (Fla. 2d DCA 1996). Plaintiff's Derivative Complaint sets forth all pleading requirements necessary to survive a motion to dismiss. Plaintiff incorporates the pleading standards for unjust enrichment and equitable accounting as set forth above.

Counts six (6) and seven (7) for unjust enrichment clearly set forth that KS Law conferred a benefit upon Lake Law and Persist, Lake Law and Persist had knowledge of and voluntarily accepted the conferred benefit, and that the under the circumstances it would be inequitable for Lake Law and Persist to retain the benefit conferred upon them.

*Flatirons Bank v. Alan W. Steinberg Ltd. P'ship*, 233 So. 3d 1207, 1219 (Fla. 3d DCA 2017); *see also Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016).

Counts eight (8) a nine (9) for equitable accounting also satisfy all pleading requirements. The counts clearly state that they are premised on the "complex and significant transactions described herein" and states "that a remedy at law would be inadequate." *Bedoyan v. Samra*, 352 So. 3d 361, 365 (Fla. 3d DCA 2022); *Bankers Tr. Realty, Inc. v. Kluger*, 672 So. 2d 897, 898 (Fla. 3d DCA 1996); *see also Sodikoff v. Allen Parker Co.*, 202 So. 2d 4, 6 (Fla. 3d DCA 1967); *see also Landise v. Mauro,* 141 A.3d 1067, 1073 (D.C. 2016). Both Plaintiff's Derivative Complaint and Lake Law and Persist's Motion demonstrate the complexity of the transactions at play.

Although the "invoice" evidencing the transfer of KS Law's $3,880,000 to Defendants was generated by Lake Law, Lake Law admits in the Motion that it was Persist who received the funds and then somehow transferred the funds back to Lake Law. *See Page 8 of Motion.* Despite Lake Law being a **law firm** and Persist Communications, Inc. being a **communications** company, Lake Law and Persist state that the funds transferred to Lake Law was for the "purpose of marketing, signing clients and working up various mass tort cases." *See Page 8 of Motion.* The purpose of the original transfer, and these subsequent transfers between Lake Law and Persist, are not yet known and no contract has ever been produced. *See ¶ 33 and 34 of Derivative Complaint.*

**WHEREFORE,** Plaintiff, ALLAN TEH, on behalf of KS Law Group, LLP, respectfully requests that this Court deny Defendants, The Lake Law Firm, LLC and Persist Communications Inc.'s, Motion to Compel Arbitration and Dismiss in its entirety,

Order Defendants to Answer Plaintiff's Complaint within ten (10) days, and for such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 28th day of June, 2023.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:    /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

Filing # 171946438 E-Filed 04/27/2023 01:52:11 PM

# Exhibit "1"

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-004474 CA 44

ALLAN TEH, individually,                COMPLEX BUSINESS LITIGATION

      Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants.

_____/

**PERSIST COMMUNICATIONS' AND THE
LAKE LAW FIRM'S MOTION TO DISMISS
(and incorporated Memorandum of Law)**

Defendants Persist Communications, Inc. ("Persist Communications") and

The Lake Law Firm, LLC ("Lake Law") move to dismiss Plaintiff Allan Teh's,

Complaint for failure to state a claim as to the counts of Unjust enrichment

(Count 7) and Equitable Accounting (Count 8).

## I.    INTRODUCTION

Persist Communications and Lake Law are not the primary targets of the

Plaintiff. And they can't be because he lacks privity with them. They received

$3,880,000.00 from an entity, KS Law Group, LLP ("KS Law"), pursuant to a

1

contract with KS Law, a D.C. law firm. Plaintiff owns a 50%-member interest in KS Law, and each individual Defendant owns 25%.

Plaintiff has sued the individual Defendants under various theories arising from their internal business relationship as members in KS Law. Plaintiff claims he was duped by the individual Defendants, who are his co-members in KS Law, into funding $4 million in KS Law's investment in hundreds of Hernia Mesh, Talc and Roundup cases being handled (or to be handled) by Lake Law, in exchange for a financial interest in each of the cases. (Persist Communications is a marketing company for Lake Law). Plaintiff claims he has not yet seen any results from his September 2021 investment in KS Law arising from **its**, not his, business relationship with Persist Communications and Lake Law.

But as this Court knows, pre-litigation and litigation of mass tort cases takes years. The cases that Lake Law is trying to attract and has signed up are percolating in various stages of litigation and pre-litigation. The contract between KS Law and Persist Communications and Lake Law, governed by New York law, is still in its executory stage. It appears that Plaintiff simply woke up one morning and decided he wanted his money back. But whatever his motivation, his targeting of these Defendants is misplaced.

Plaintiff's two claims against Persist Communications and Lake Law are unsustainable for the simple reason that he is trying to circumvent the corporate structure of KS Law.  He is not in privity with these Defendants.  **He** did not pay them any money. They owe **him** no money. They owe **him** no fiduciary duties or

2

any at all. They are **legal strangers** vis-à-vis Plaintiff. All their dealings are and have been with KS Law.

Counts 7 (unjust enrichment) and 8 (equitable accounting) should therefore be dismissed with prejudice for these and other reasons.

WHEREFORE, the Complaint against Persist Communications and Lake Law should be dismissed with prejudice.

## II.   LEGAL ARGUMENT

### A. COUNT 7 FAILS TO STATE A CAUSE OF ACTION FOR UNJUST ENRICHMENT.

#### i.   Plaintiff has no Standing.

It is obvious from the Complaint that any injury or damage caused by Lake Law or Persist Communications was to KS Law, the legal entity with whom they are in **contractual privity**.  It is established law that, "[g]enerally, a shareholder cannot sue in the shareholder's name for injuries to the corporation unless there is a special duty between the wrongdoer and the shareholder, and the shareholder has suffered an injury separate and distinct from that suffered by other shareholders." *Houri v. Boaziz,* 196 So. 3d 383, 392 (Fla. 3d DCA 2016). In that case, the plaintiff LLC member "**only suffered a harm that flowed from an initial harm to [the LLC]**. He was, therefore, without authority to bring this action directly …" *Id.*

Here there is no special duty between Plaintiff and these Defendants, **and none is alleged**, because they are legal strangers.  Plaintiff, like Boaziz, is simply a member of an LLC that has a contract with these Defendants. Any harm he allegedly suffered would only be indirect by virtue of his membership status.

3

### ii. The Elements of the Cause of Action Itself Cannot be Met by Plaintiff

Count 7 alleges that Lake Law and Persist Communications were somehow unjustly enriched by Plaintiff's investment in KS Law. That cannot be. The elements of a cause of action for unjust enrichment are:

(1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the conferred benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

*Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. 3d DCA 2009). This claim fails because the benefit conferred by a plaintiff on a defendant must be a "**direct benefit**" *Id.*

In *Extraordinary Tile*, the plaintiff brought a claim for unjust enrichment against a defendant with whom it had "no relationship." The Third District held that the plaintiff could not have conferred a benefit on that defendant because unjust enrichment required the conferring of a "direct benefit," holding: "Plaintiff contracted with FPL, not Group, for electricity; Plaintiff paid FPL, not Group; and Group provided no services to Plaintiff. Based on these facts, which are not in dispute, the Plaintiff cannot allege nor establish that it conferred a direct benefit upon Group." *Id.*

A better illustration of this concept in an analogous situation to here is *Peoples National Bank of Commerce v. First Union Nat. Bank of Florida, N.A.*, 667 So. 2d 876 (Fla. 3d DCA 1996). The facts are a bit convoluted but, in that case, Peoples, a participating lender in a syndicated loan package, claimed that other participating lenders were inequitably overpaid with the indubitable equivalent

4

of Peoples' creditor interest in the loan from the defaulted debtor (in that case voting rights rather than cash). Peoples received nothing because it refused to participate in an Intercreditor Agreement (as the others did). It sued the other lenders for unjust enrichment, claiming the value that they received were its interest inequitably distributed to them. The Third District disagreed and affirmed the dismissal with prejudice because Peoples conferred no direct benefit on them. Rather, the lead bank that collected the consideration from the defaulted borrower and distributed it to the other participating lenders is the one who conferred the direct benefit directly on them.

The claims against Persist Communications and Lake Law fall squarely within these holdings. Plaintiff conferred **no direct benefit** to Lake Law or Persist Communications. He never paid them a single dollar – **KS Law did**. He did not have a contract with them – **KS Law did**. And neither Lake Law nor Persist Communications ever provided a single service to Plaintiff – they provided services **to KS Law**.

To be sure, the Lake Law Invoice attached to the Complaint states that the amount of $3.88 million was directed to KS Law with the line "BILL TO: KS Law Group." (Complaint, Ex. 2, p. 1). This amount was directly pursuant to the agreement to furnish cases, which is evidenced by the Case Replacement Agreement – "KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount")." (Complaint, Ex. 12, p. 1.).

5

Where a plaintiff cannot and does not "allege ultimate facts that support a prima facie case of unjust enrichment," it is proper for the Court to dismiss an unjust enrichment claim with prejudice. *Peoples Nat. Bank of Com. v. First Union Nat. Bank of Fla.*, N.A., 667 So. 2d 876, 879 (Fla. 3d DCA 1996) (affirming dismissal of an unjust enrichment claim, with prejudice, where "the plaintiff, Peoples National, could not and did not allege that it had directly conferred a benefit on the defendants...").

Moreover, for unjust enrichment to be found, it must be "inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Extraordinary Title Servs., LLC*, 1 So. 3d at 404. Under the Case Replacement Agreement, KS Law agreed to pay the already furnished amount of $3.88 million **in exchange for the receipt of 60% of the contingency fees of 795 cases** which Lake Law and Persist Communications would acquire and handle, through trial firms. (*See,* Complaint Ex. 12.). In essence, in exchange for the benefit of $3.88 million, Lake agreed to provide equal or greater value: a contingency fee on 795 cases, with guarantees of reimbursement and replacement. *See id.* Further, the Case Replacement Agreement explicitly states that the $3.88 million was paid to Lake Law "in order to acquire client leads in connection with the Cases." *Id.* at p.1.

Because KS Law has been provided the benefit of **its bargain** – it is just too early for that inchoate benefit to bear fruit - it cannot be deemed "inequitable" for Lake Law or Persist Communications to have retained their benefit (received from KS Law) because they "gave value in exchange," even if Plaintiff had

6

standing to sue. *See Pincus v. Am. Traffic Sols., Inc.,* 333 So. 3d 1095, 1097 (Fla. 2022) (holding that it would not be unjust for a defendant to retain a benefit where it returned value to the plaintiff.).

The bottom line is that neither Lake Law nor Persist Communications owe **anything** to Plaintiff. Their contractual dealings are all with KS Law. An individual member of KS Law has no standing to pursue claims in his own name when he lacks privity.

### B. COUNT 8 FAILS TO STATE A CAUSE OF ACTION FOR EQUITABLE ACCOUNTING

This claim fails for the simple reason that the parties are not in privity; they are legal strangers. And Defendants owe Plaintiff no fiduciary duties.

One cannot sue a legal stranger for an accounting. There must be some duty to account in the first instance. In the typical case the right to equitable accounting spring from a contract. *See F.A. Chastain Constr., Inc. v. Pratt,* 146 So. 2d 910 (Fla. 3d DCA 1962), which states: "although courts of law have jurisdiction to enforce **contract demands** which involve an accounting, equity will take cognizance where the **contract demands** between litigants involve extensive or complicated accounts." Or it may arise from a fiduciary duty to account. But here there is nothing to give rise to any right to an accounting.

Accordingly, this claim fails as well.

### III. CONCLUSION

The Complaint fails to state a cause of action against these Defendants for the reasons stated and Counts 7 and 8 should therefore be dismissed with prejudice.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 27th day of April 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com  and Blank Rome LLP, Michelle M. Gervais, Esq, 100 S. Ashley Drive Suite 600, Tampa, FL, michelle.gervais@blankrome.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

_/s/ Andrew S. Berman_

Andrew S. Berman
Florida Bar No.: 370932

Filing # 176390278 E-Filed 06/28/2023 05:55:14 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

     On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

     Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

     Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

     Nominal Defendant in Derivative Action.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DISMISS

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership") files this Response in Opposition to Defendants, Lee Melchionni ("Melchionni") and Sylvia Benito's ("Benito") (hereinafter, collectively "Defendants"), Motion to Compel Arbitration and Dismiss (the "Motion"), on behalf of KS Law, and in support thereof alleges as follows:

**LEGAL ARGUMENT**

Defendants, Melchionni and Benito, argue that "[e]ach and every count Teh raises against the KS Law Defendants arise from or relates to the Partnership Agreement requiring arbitration." *See Page 3 of Motion*. This is simply not true. In ruling on a motion to compel arbitration, the trial court must consider three elements: (1) whether a valid written agreement to arbitrate existed; (2) whether an arbitrable issue has been raised; and (3) whether the right to compel arbitration has been waived. *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999); *see also Univ. of the D.C. Faculty Ass'n / Nat'l Educ. Ass'n v. Bd. of Trustees of Univ. of the D.C.*, 257 A.3d 1026, 1031 (D.C. 2021).

In the present case, there is not an enforceable arbitration agreement and even if this Court finds that an enforceable arbitration agreement exists there are claims present in the Derivative Complaint that cannot be adjudicated by an arbitrator. For purposes of bringing this issue to this Court's immediate attention, Plaintiff's analysis begins with the non-arbitrability of Plaintiff's request for the appointment of a receiver.

I.    **An Arbitrator Cannot Appoint a Receiver**

The facts and claims contained in the Derivative Complaint focus on the fraudulent activities of Plaintiff's fellow Partners in KS Law, Melchionni and Benito. As fully set forth in the Derivative Complaint Melchionni and Benito have failed to perform any of their duties under KS Law's Partnership Agreement.

A mere **thirteen days** after Plaintiff, Allan Teh, provided $4 million in funds to KS Law, representing the entirety of its capital, Melchionni and Benito transferred $3,880,000 to fellow Defendants, Lake Law and Persist. *See ¶ 27 and 28 of Derivative Complaint*.

This transfer, of essentially all of KS Law's working capital, was effectuated with no known contract or agreement in place. *See ¶29 of Derivative Complaint.* Melchionni and Benito then proceeded with an onslaught of misrepresentations regarding the use of the transferred funds, along with the amount of mass tort litigation "cases" acquired by KS Law, **a law firm**. These misrepresentations are critical because the represented purpose of KS Law is to obtain, work-up, and handle various mass tort injury cases. *See ¶ 14 of Derivative Complaint.* It later was learned that despite KS Law being **a law firm**, Melchionni admitted that **KS Law does not have a single retainer, co-counsel, referring counsel, or trial counsel agreement in place.** *See ¶ 40 of Derivative Complaint.*

Plaintiff sets out these facts to demonstrate to the Court the necessity of Plaintiff's request that a receiver be appointed to manage the affairs of KS Law. The power to appoint a receiver rest solely in this Court's equitable powers. *Metro-Dade Investments, Co. v. Granada Lakes Villas Condo., Inc.*, 74 So. 3d 593, 595 (Fla. 2d DCA 2011); *see also Granada Lakes Villas Condo. Ass'n, Inc. v. Metro-Dade Investments Co.,* 125 So. 3d 756, 758 (Fla. 2013). The Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, is silent on an arbitrator's power to appoint a receiver, and Plaintiff is aware of no known legal authority allowing a District of Columbia arbitrator to bargain away this Court's equitable power.

Therefore, under the second prong of this Court's analysis, it is clear that the appointment of a receiver is not an arbitrable matter. *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999).

**I.**      **There Exists no Enforceable Arbitration Agreement**

There is no valid arbitration provision in place because there exists no valid Partnership Agreement in which the arbitration provision is contained. While Section 39 of KS Law's Partnership Agreement does contain an arbitration provision, Melchionni and Benito are attempting to wield the provision as a cudgel against Plaintiff and wishes this Court to allow them to have their cake and eat it too. To reiterate, KS Law is a **law firm** that was formed on August 24th, 2021. Almost two years following its inception, its "Legal Managing Partner," Melchionni, admitted under oath, that the **law firm does not have a single retainer, co-counsel, referring counsel, or trial counsel agreement in place.** *See ¶ 40 of Derivative Complaint.* Defendants have ignored and failed to perform every substantive duty present within the Partnership Agreement and now attempt to pick and choose the provisions of the Agreement to which they want to be bound. Melchionni and Benito's breaches of the Partnership Agreement are material, as they go to the essence of the Partnership Agreement, which was for KS Law to acquire, obtain, and manage mass tort litigation cases. *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015).  Melchionni and Benito's material breaches following the execution of the Agreement illustrate that they never had the intention of being bound by or complying with the provisions set forth in the Partnership Agreement. Therefore, Plaintiff, on behalf of KS Law, as the injured party, is relieved from further performance of the duties under the Partnership Agreement. *Id.*

Melchionni and Benito heavily rely on the notion that public policy favors arbitration clauses but they do not take into account that "[n]either the statutes validating arbitration clauses nor the policy favoring such provisions should be used to block a party's access

to the judicial forum." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999). D.C. and Florida Law both follow the view that arbitration provisions are contractual in nature and therefore the construction of such a provision remains a matter of contract interpretation left to the court. *See Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999); *Menna v. Plymouth Rock Assur. Corp.*, 987 A.2d 458, 465 (D.C. 2010).

The authority of the arbitrator is derived from the consent of the parties and whether the parties are bound by an arbitration provision first raises the question of arbitrarily for the court to decide. *Hossain v. JMU Properties, LLC*, 147 A.3d 816, 821 (D.C. 2016). In addition, since Melchionni and Benito are seeking to enforce the arbitration provision the burden falls on them to establish an enforceable agreement to arbitrate. *Palm Garden of Healthcare Holdings, LLC v. Haydu*, 209 So. 3d 636, 638 (Fla. 5th DCA 2017). Melchionni and Benito induced Plaintiff to provide $4 million to fund the entire operations of a **law firm** and in return established an entity that does not and has not engaged in the practice of the law.

There is no manifestation of assent if that assent is procured by either the fraudulent or material misrepresentations of the other party upon the which the recipient is justified in relying. *Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1255–56 (D.C. 2018). In the present case, the execution of the Partnership Agreement was procured by material misrepresentations by Melchionni and Benito and therefore there exists no enforceable arbitration provision. Various partitions of the pending Derivative Complaint make specific reference to these misrepresentations that were justifiably relied upon by the Plaintiff.

**WHEREFORE,** Plaintiff, ALLAN TEH, on behalf of KS Law Group, LLP, respectfully requests that this Court deny Defendants, Lee Melchionni and Sylvia Benito's, Motion to Compel Arbitration and Dismiss in its entirety, Order Defendants to Answer Plaintiff's Derivative Complaint within ten (10) days, and for such other and further relief as this Court deems just and proper.

<u>**CERTIFICATE OF SERVICE**</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 28th day of June, 2023.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:   _/s/ Matthew L. Jones, Esq._
Matthew L. Jones, Esq.
Florida Bar No. 909335

Filing # 176543873 E-Filed 06/30/2023 01:20:27 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

      Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

      Nominal Defendant in Derivative Action.
_____/

## PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT MOTION TO TRANSFER

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership") files this Response to Defendants' Joint Motion to Transfer, on behalf of KS Law, and in support thereof alleges as follows:

Plaintiff does not oppose Defendants' Motion and the transfer of this case to Judge Walsh.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 30th day of June, 2023.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

Filing # 176647493 E-Filed 07/03/2023 03:29:49 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

      On a derivative basis as a
Partner of,

KS LAW GROUP, a District of
Columbia LLP,

      Plaintiffs,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants

And

KS LAW GROUP, LLP, a District of
Columbia LLP,

      Nominal Defendant.

---

## REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND DISMISS
### (And Incorporated Memorandum of Law)

Defendants The Lake Law Firm ("Lake Law") and Persist Communications,

Inc. ("Persist Communications"), file this Reply in support of their motion to

compel arbitration and dismiss the derivative complaint against them.

1

## <u>MOTION TO COMPEL ARBITRATION REPLY</u>

### 1. That These Defendants are Not Parties to the Arbitration Agreement Makes No Difference.

Plaintiff states the obvious: Lake Law and Persist Communications are not parties to the arbitration agreement. We know that which is why we cited case law addressing this discrete issue. The reason these Defendants may avail themselves of arbitration is grounded in Plaintiff's own allegations.

Plaintiff confuses discrete legal claims with an overall cause of action. As stated in *Signo v. Florida Farm Bureau Cas. Ins. Co.,* 454 So. 2d 3, 5 (Fla. 4th DCA 1984), "merely changing of the theory on which plaintiff proceeds does not constitute a distinct and different cause of action":

> **From one episode or transaction one cause of action emerges, though different theories of liability may exist**. As the text writer [of the Restatement of the Law of Judgments, Second §§ 25 and 26] puts it:
>
> That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims. **This remains true although several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief**. (Emphasis added).

Discrete claims against different parties may arise from a single cause of action. Here, Plaintiff alleges that Melchionni and Benito, "**acting in concert with Defendants Persist and Lake Law** have misappropriated the entirety of KS Law's working capital ..."  That is as **inextricable** as it can get.

In *Lash & Goldberg LLP v. Clark,* 88 So. 3d 426, 428 (Fla. 4th DCA 2012), cited in our primary motion, the law firm was sued for legal malpractice.

2

Obviously that claim could not be brought against the other non-lawyer defendants, but the point was that the alleged malpractice arose from the same "cause of action" and was inextricably intertwined with the claims against the other defendants. Hence Lash & Goldberg could compel the plaintiff there to arbitrate the malpractice claim along with all the claims against the other defendants, even though it was not a party to the arbitration clause.

Accordingly, Plaintiff's effort to distinguish the claims raised against these Defendants – equitable estoppel and unjust enrichment – is inapt and misses the key point, i.e., that he alleges a factual landscape in which the conduct of all Defendants is implicated, interrelated and out of which liability is alleged to have arisen.

## 2. Defendants Did Not Waive the Right to Arbitrate

To support this erroneous argument, Plaintiff looks everywhere but in his own backyard, namely controlling Third District precedent. In *Truly Nolen of America, Inc., v. King Cole Condo. Assoc, Inc.,* 143 So. 3d 1015, 1017 (Fla. 3d DCA 2014), the Third District held that combining a motion to change venue with a motion to compel arbitration is not a waiver of the right to arbitrate. Here Defendants combined a motion to compel arbitration with a motion to dismiss. Same result; no waiver.

To be sure, had Defendants not even moved to compel arbitration alongside their motion to dismiss – as they did not do in the related case referenced by Plaintiff - that would still **not** be a waiver of arbitration.  In *Hirschfeld v. Heights X, Inc.,* 707 So. 2d 955 (Fla. 3d DCA 1998), the Third

3

District was faced with **that exact issue**. The defendant there moved to dismiss the complaint for failure to state a cause of action. Only when that motion was denied did the defendant, **prior to answering**, first move to compel arbitration. Like here, the plaintiff claimed arbitration was waived by the filing of the first motion to dismiss unaccompanied by a motion to compel arbitration. The Third District held that the filing of the motion to dismiss for failure to state a cause of action was not inconsistent with the right to arbitrate. It wrote:

> Here, it cannot be said that the defendant actively participated in litigating to the extent of waiving the right to arbitration. The filing of a motion to dismiss directed at technical deficiencies in the complaint, such as the defendants' first motion, is not "active participation" amounting to a waiver.

*Id.* at 1017.

Thus, if the motion to dismiss filed in the companion case is denied, **Plaintiff and the Court can expect a motion to compel arbitration of that case to follow**. And this all makes perfect sense. If a defendant sees that no cause of action is viable, why should it have to move to compel arbitration, go to arbitration and be exposed to all sorts of administrative, filing and arbitrator fees, when it is manifest that a plaintiff can't get to first base. Efficiency suggests that since Plaintiff chose this forum, let's just wrap it up here and now and not waste more time and money. That is the policy of the Third District.

Arbitration should be ordered.

## <u>MOTION TO DISMISS</u>

Not much needs to be added here that was not fully covered in the motion itself. Suffice it to say Plaintiff is wrong.  The fact that funds were advanced

4

before the Case Replacement Agreement was executed is of no legal consequence, any more than a prior agreement would be relevant if a novation thereafter supplanted it. The Case Replacement Agreement eliminates any perceived uncertainty or squishiness in the agreement between the legal entities which concerned Plaintiff to begin with. He should be happy it is in place. It clearly defines the rights and obligations of KS Law and the Defendants. Instead, he curiously tries to run from it.

Bottom line: with an agreement in place, as here, the remedies of equitable accounting and quantum meruit are unavailable. Period.

WHEREFORE, the motion to dismiss or compel arbitration should be granted, with a preference for outright dismissal.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
Counsel for Defendants, Lake Law and Persist Communications
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Telephone: (305)-377-2290
Primary: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By: /s/ Andrew S. Berman
ANDREW S. BERMAN, ESQ.
Fla. Bar No.: 370932

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 3rd day of July 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134,

5

matthew@jones-adams.com  and Blank Rome LLP, Michelle M. Gervais, Esq, 100

S. Ashley Drive Suite 600, Tampa, FL, michelle.gervais@blankrome.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

    */s/ Andrew S. Berman*

Andrew S. Berman
Florida Bar No.: 370932

Filing # 176749556 E-Filed 07/05/2023 04:26:22 PM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

      Nominal Defendant.

                                      /

## DEFENDANTS LEE MELCHIONNI'S, SYLVIA BONITO'S, AND KS LAW GROUP'S *REPLY* IN FURTHER SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND DISMISS

Defendants Sylvia Benito, Lee Melchionni, and Nominal Defendant KS Law Group, LLP

(collectively the "KS Law Defendants"), file this Reply in Further Support of their Motion to

Compel Arbitration and Dismiss.

Plaintiff Allan Teh ("Plaintiff" and/or "Teh") makes two arguments in opposition to the KS Law Defendants' Motion, both of which do not withstand scrutiny.

First, Teh argues that this case cannot be sent to arbitration because an arbitrator cannot appoint a receiver, as he requests in his complaint. Teh is wrong.  The KS Law Limited Liability Partnership Agreement (the "Partnership Agreement") specifically sets forth that the arbitrations shall be in front of the American Arbitration Association ("AAA") applies. (Complaint Ex 3 at ¶ 39). Under the AAA rules, arbitrators may impose measures that are "necessary for the protection or conservation or property." R-34, AAA Commercial Arbitration Rules and Mediation Procedures, *available at www.adr.org/Rules*. This includes the appointment of a receiver. *Sun Valley Ranch 308 Ltd. Partnership ex rel. Englewood Properties, Inc. v. Robson*, 294 P.3d 125, 132 (Ariz. App. Div. 1, 2012) (holding that arbitrator could appoint a receiver and the request for appointment of a receiver was an arbitrable issue.); *see also Stone v. Theatrical Inv. Corp.*, 64 F.Supp.3d 527, 540 (S.D.N.Y. 2014) (holding that "Under the rules of the AAA, '[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.'"). And the two *Metro Dade* cases cited by Teh do not say otherwise. Instead, they merely say that a court of equity has the power to appoint a receiver. The cases do not say that the power is *solely* vested in a court, nor do the cases even mention or have anything to do with arbitration. *Metro-Dade Investments, Co. v. Granada Lakes Villas Condominium, Inc.*, 74 So.3d 593, 594 (Fla. 2nd DCA 2011) (Stating that the court's "right to appoint a receiver . . . is inherent in a court of equity."); *Granada Lakes Villas Condominium Ass'n, Inc. v. Metro-Dade Investments Co.*, 125 So.3d 756, 758 (Fla. 2013) ("The power to appoint a receiver has long been recognized as one that is inherent in a court of equity[.]").

Instead, the question of whether a receiver is necessary or appropriate, is subject to arbitration the same as all of Teh's other claims. *Herrera Cedeno v. Morgan Stanley Smith Barney, LLC*, 154 F. Supp. 3d 1318, 1327 (S.D. Fla. 2016) (holding that when an arbitration clause broadly covers "all claims or controversies" that arises out an agreement, any claim is covered, barring only "the most forceful evidence of a purpose to exclude" a particular claim.).

Second, Teh argues that the arbitration clause of the Partnership Agreement is unenforceable because Defendants purportedly fraudulent induced Teh to enter said Agreement is unsupported by law. But the law is crystal clear—allegations of fraud in the inducement of a contract as a whole are resolved by arbitration, while allegations of fraud in the inducement of the arbitration clause itself are resolved by the court. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 87 S. Ct. 1801, 1806, 388 U.S. 395, 404 (1967); *see also Medident Const., Inc. v. Chappell*, 632 So. 2d 194, 195 (Fla. 3rd DCA 1994) ("Where fraud or some other ground for avoidance or invalidity of contract is alleged as to an entire agreement rather than specifically as to the arbitration clause contained within that agreement, the entire matter should be resolved by arbitration."); *see also Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A. 2d 916, 924 (D.C. 1992) ("[A] party seeking to avoid arbitration by raising a claim of fraudulent inducement must allege that the arbitration clause itself—rather than the contract as a whole—was fraudulently induced.").

Teh's Response specifically argues that that the agreement as a whole was fraudulently induced stating "the execution of the Partnership Agreement was procured by material misrepresentations by Melchionni and Benito and therefore there exists no enforceable arbitration provision." (Opposition at p. 5). Teh does not allege that he was fraudulently induced to enter into the *actual arbitration clause* of the Agreement, and therefore, Teh's Complaint must be submitted

3

to arbitration and this matter dismissed. Defendants should be granted its attorney's fees and costs for having to prepare this Reply.

Dated:  July 5, 2023

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Kenneth L. Bressler*

Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

*Attorneys for Defendants Benito,
Melchionni, and KS Law Group, LLP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on this 5th day of July 2023, with the Clerk of the Circuit Court using the Florida Courts e-filing e-portal and served by an automatic email generated by the Florida Courts e-filing portal to:

Matthew Jones, Esq.
matthew@jones-adams.com
Cheyenne Moghadam, Esq.
c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

4

*Counsel for Plaintiff, Allan Teh*

Andrew Berman, Esq.
Email: aberman@ybklaw.com
YOUNG, BERMAN, KARPF & KARPF, P.A.
825 Brickell Bay Drive, Tower III, Suite 1748
Miami, Florida 33131
Telephone: (305) 945-1851
Facsimile: (786) 219-1981

*Counsel for Defendants Persist Communications, Inc. and Lake Law Firm, LLC*

/s/ Kenneth Bressler
Kenneth Bressler
Admitted *Pro Hac Vice*

Filing # 176751784 E-Filed 07/05/2023 04:39:20 PM

IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

     On a derivative basis as a Partner of,

KS LAW GROUP, a District of Columbia LLP,

     Plaintiffs,

v.

LEE MELCHIONNI, individually, SYLVIA BENITO, individually, PERSIST COMMUNICATIONS, INC., a Florida Corporation, and THE LAKE LAW FIRM, a New York Limited Liability Company,

     Defendants

And

KS LAW GROUP, LLP, a District of Columbia LLP,

     Nominal Defendant.

---

## MOTION TO STAY PROCEEDINGS EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS

Defendants The Lake Law Firm ("Lake Law") and Persist Communications, Inc. ("Persist Communications"), and Defendants Lee Melchionni and Sylvia Benito, move to stay all proceeding except their Motion to Stay and Dismiss and state:

1

1.    Defendants have moved to compel arbitration and dismiss this Complaint. The motion to dismiss for failure to state a cause of action is not inconsistent with their motion to compel arbitration and hence is not a waiver. *Truly Nolen of America, Inc., v. King Cole Condo. Assoc, Inc.,* 143 So. 3d 1015, 1017 (Fla. 3d DCA 2014) (combining a motion to change venue with motion to compel arbitration not a waiver of right to arbitrate). A motion to compel arbitration may be filed even **after** a motion to dismiss challenging the legal sufficiency of a complaint is denied without waiving the right to arbitrate. *Hirschfeld v. Heights X, Inc.,* 707 So. 2d 955 (Fla. 3d DCA 1998).

2.    But participation in pretrial scheduling along the lines of what is required in the Case Management Order may be deemed a waiver of the right to arbitrate.  Accordingly, in an abundance of caution, Defendants move to stay all proceedings - including compliance with the Case Management Order (other than disposition of their pending motion)- until the issue of arbitration is resolved.

WHEREFORE, Defendants move to stay all proceedings other than their Motion to Compel Arbitration and to Dismiss.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Telephone: (305)-377-2290
Primary: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By: /s/ Andrew S. Berman
ANDREW S. BERMAN, ESQ.
Fla. Bar No.: 370932

2

*Attorneys for Defendants, Lake Law and Persist Communications*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 5th of July 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com and all counsel of record.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

*/s/ Andrew S. Berman*

Andrew S. Berman
Florida Bar No.: 370932

3

Filing # 176810597 E-Filed 07/06/2023 12:08:02 PM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

      Nominal Defendant.

                                  /

## DEFENDANTS LEE MELCHIONNI, SYLVIA BENITO, AND KS LAW GROUP, LLP'S MOTION FOR SANCTIONS PURSUANT TO FLORIDA STATUTES § 57.105

      Defendants Sylvia Benito ("Benito"), Lee Melchionni ("Melchionni), and Nominal Defendant KS Law Group, LLP ("KS Law") (the "KS Law Defendants"), move for entry of an award of sanctions against Plaintiff Allan Teh ("Teh") and his counsel pursuant to Fla. Stat. § 57.105 ("Motion") and state as follows:

This lawsuit is the third action brought by Teh and his counsel regarding his investment in KS Law.  In November of 2022, Teh initiated a books and records arbitration action (the "First Action") against KS Law acknowledging in his Demand for Arbitration that the KS Law Partnership Agreement (the "Partnership Agreement") between the Parties contains an arbitration provision (the "Arbitration Provision") that "requires that a dispute between the Parties will be submitted to the American Arbitration Association (the "AAA")." (KS Law Demand for Arbitration at ¶ 26, attached hereto as Exhibit A). Despite knowing this, on March 15, 2023, the same attorney who filed the Demand for Arbitration then filed an action (the "Second Action") by Teh in his individual capacity against Melchionni, Benito, The Lake Law Firm, LLC ("Lake Law"), and Persist Communications, Inc. ("Persist") for causes of action that "aris[e] out of or relate[] to the [KS Law Partnership] Agreement." (*Teh v. Melchionni et al.*, Case No. 2023-004474-CA-01, Complaint, Ex. 5 at ¶ 39, attached hereto as Exhibit B). Before Melchionni and Benito responded to the Second Action (with a motion to compel the mandatory arbitration), Teh's counsel filed this action (the "Third Action"), alleging practically identical causes of action for fraud and breach of fiduciary duties, again against Melchionni and Benito, based off the same Partnership Agreement, in defiance of the Arbitration Provision. (Complaint at ¶ 61-98, attached hereto as Exhibit C; Complaint Ex. 3 at ¶39).

When commencing this action, Teh and his counsel knew that all of Teh's claims against Benito and Melchionni are covered by the Arbitration Provision and must be brought in front of AAA.  The KS Law Defendants are simultaneously moving to dismiss and compel arbitration. Despite demand, Teh and his counsel refuse to voluntarily dismiss this action and submit his claims to AAA and thus the KS Law Defendants respectfully request that this Court award sanctions under Fla. Stat. § 57.105.

2

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

1.     Teh and Defendants are partners in KS Law, a law firm formed under the laws of the District of Columbia. (Exhibit C, Complaint Ex. 3, p. 1).

2.     On November 19, 2022, Teh filed the First Action—a Demand for Arbitration against KS Law asserting that KS Law failed to comply with a "Demand for Inspection of Records." (Exhibit A, p. 1).

3.     On March 15, 2023, Teh filed the Second Action—a Complaint against Defendants Melchionni, Benito, Lake Law and Persist. (*See generally* Exhibit B). As against Melchionni and Benito, Teh alleges[1]:

   i.    fraudulent inducement into the Partnership Agreement, or alternatively rescission of the Partnership Agreement,

   ii.   breach of contract and a request for declaratory relief regarding rights and obligations under the Partnership Agreement,

   iii.  breach of fiduciary duties allegedly established pursuant to the Partnership Agreement, and

   iv.   demand for equitable accounting of the Partnership, based on the alleged duties owed pursuant to the Partnership Agreement.

(Exhibit B at ¶¶ 77-151).

4.     On April 25, 2023, Teh filed this Third Action—a Complaint on a derivative basis against Melchionni and Benito, as well as Lake Law and Persist again, and adding KS Law as a Nominal Defendant. (*See generally*, Exhibit C). As against Defendants Melchionni and Benito, Teh brought the following causes of action:

---

[1] As KS Law is a nominal defendant there are no claims asserted against it.

3

     i.   equitable appointment of a receiver,

    ii.   constructive fraud against Defendant Melchionni,

   iii.   constructive fraud against Defendant Benito,

   iv.   breach of fiduciary duty against Defendant Melchionni, and

    v.   breach of fiduciary duty against Defendant Benito.

(Exhibit C at ¶¶ 61-98).

5.      Teh knew at the time he filed the Complaint in this Third Action that the Arbitration Provision required him to submit all of his claims against Melchionni and Benito to AAA. He commenced an arbitration just months earlier recognizing that all disputes involving the Agreement must be arbitrated under an Arbitration Provision that is mandatory, clear, and unambiguous. It provides that "[a]ny controversy arising out of or related to this Agreement **or the breach thereof** … shall be resolved under the [AAA]." (Exhibit B, Complaint, Ex. 5 at ¶ 39) (emphasis added). Teh then filed the Second Action, in defiance of the Arbitration Provision, wherein each and every cause of action against Melchionni and Benito arises from or out of the Partnership Agreement.

6.      Following two actions that expressly fall under the Arbitration Provision, Teh once again flouted that provision by filing this Third Action.

7.      As a result of this lawsuit, the KS Law Defendants are again forced to incur additional legal fees defending a matter that Teh and his counsel know or should have known is improper at the outset.

8.      The KS Law Defendants have also filed a motion to dismiss and compel arbitration, which is attached hereto as Exhibit D, and incorporate by reference the facts and legal authorities from that motion into this motion for sanctions.

9.      The KS Law Defendants complied with the procedural requirements of Fla. Stat. § 57.105(4) by serving this proposed motion on Teh's counsel on June 15, 2023, via electronic mail and FedEx and providing the requite time for compliance by Teh before filing said Motion with the Court. Teh failed to dismiss this action against Defendants within 21 days of service of the draft motion.

## II.     THIS COURT SHOULD AWARD DEFENDANTS ITS ATTORNEYS' FEES AND COSTS PURSUANT TO FLA. STAT.§ 57.105.

Fla. Stat. § 57.105(1) provides:

> Upon the court's initiative or motion of any party, the court shall award a reasonable attorney's fee, including prejudgment interest, to be paid to the prevailing party in equal amounts by the losing party and the losing party's attorney on any claim or defense at any time during a civil proceeding or action in which the court finds that the losing party or the losing party's attorney knew or should have known that a claim or defense when initially presented to the court or at any time before trial:
> (a)   Was not supported by the material facts necessary to establish the claim or defense; or
> (b)   Would not be supported by the application of then-existing law to those material facts.

Section 57.105(1) mandates an award of fees where the court finds that the party or its attorney knew or should have known that a claim was, among other things, not supported by the application of then-existing law to the material facts relating to the claim. *De Vaux v. Westwood Baptist Church*, 953 So.2d 677, 684 (Fla. 1st DCA 2007) (awarding sanctions for filing frivolous claim that "imposed needless burdens on both [defendant] and the courts. [Defendant] was obligated to incur substantial expense defending de Vaux's claims in the trial court and on appeal, and the judicial system was required to expend its resources to address the meritless claims"); *see also Aspen Air Conditioning, Inc. v. Safeco Ins. Co. of Am.*, 170 So. 3d 892, 897 (Fla. 3d DCA 2015) (awarding sanctions upon finding, "[a]t the least, Aspen's counsel knew or should have known . . . that Aspen did not have a factual basis for its misrepresentation claims. . . Yet, Aspen and its

5

counsel subsequently decided to include the false allegations made in Section III despite the documents establishing that the allegations were baseless").

Teh filed this Third Action, despite knowing that his causes of action are governed by the mandatory Arbitration Provision in the Partnership Agreement and that application of both the Florida Arbitration Code and the FAA did not support bringing such claims in this Court. Teh's continued failure and refusal to dismiss this lawsuit caused and continues to cause the KS Law Defendants to incur significant and unnecessary expenses litigating this action.

## III.    CONCLUSION

For the reasons set forth above, the KS Law Defendants respectfully request that this Court grant this Motion, award Defendants' attorney's fees and costs against both Plaintiff Teh and his counsel and grant any further relief that this Court deems just and proper.

Dated: June 15, 2023

Respectfully submitted,
**BLANK ROME LLP**

*/s/ Kenneth Bressler*
Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

*Attorneys for Defendants Benito,*
*Melchionni, and KS Law Group, LLP*

6

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email and overnight Fedex on this 15th day of June, 2023 **BUT NOT E-SERVED OR FILED WITH THE CLERK'S E-PORTAL** to:

Matthew Jones, Esq.
matthew@jones-adams.com
Cheyenne Moghadam, Esq.
c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

*Counsel for Plaintiff, Allan Teh*

*/s/ Kenneth Bressler*
Kenneth Bressler
Admitted *Pro Hac Vice*

7

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on July 6, 2023, with the Clerk of the Circuit Court using the Florida Courts e-filing eportal and served by an automatic email generated by the Florida Courts e-filing portal to:

Matthew Jones, Esq.
Email: matthew@jones-adams.com
Cheyenne Moghadam
Email: c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

*Counsel for Plaintiff, Allan Teh*

Andrew Berman, Esq.
Email: aberman@ybklaw.com
YOUNG, BERMAN, KARPF & KARPF, P.A.
825 Brickell Bay Drive, Tower III, Suite 1748
Miami, Florida 33131
Telephone: (305) 945-1851
Facsimile: (786) 219-1981

*Counsel for Defendants Persist Communications, Inc. and Lake Law Firm, LLC*

*/s/ Kenneth Bressler*
Kenneth Bressler

# Exhibit A

## AMERICAN ARBITRATION ASSOCIATION
## DEMAND FOR ARBITRATION

In The Matter of the Arbitration

RE:   ALLAN TEH, Claimant

     vs.                      AAA Case No.: _____

     KS LAW GROUP, LLP, Respondent.

Date: November 19, 2022

_____/

The Claimant, Allan Teh, and Respondent, KS Law Group, LLP, (hereinafter collectively, the "Parties") executed a Partnership Agreement (the "Agreement") which provided Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP, in exchange for a $4,000,000 capital contribution. This Demand for Arbitration arises from Respondent's failure to comply with Claimant's Demand for Inspection of Records, as required by Section 29-604.06(b) of the Code of District Colombia (the "Code").

### Background

1. On August 24, 2021, the Claimant, Allan Teh, and Respondent, KS Law Group, LLP, executed a Partnership Agreement providing Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP. (*See Partnership Agreement attached as Exhibit "A"*).

2. From the execution of the Agreement to the present date, the Respondent has failed to provide Claimant with any substantive correspondence, information or documentation allowing Claimant to assess the value, status and quality of his **$4,000,000 equity interest** in the Respondent.

3. On November 5, 2022, Claimant emailed, and mailed via certified mail on November 7th, 2022, a Demand for Inspection of Records to the Respondent (the "Demand"). (*See Demand attached as Exhibit "B"*)

4. The Demand was made pursuant to Section 29-604.06(b) of the Code of District Colombia, which sets forth a partner's rights and duties with respect to information of the partnership:

> A partnership shall provide partners and their agents and attorneys **access to its books and records**. It shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to **inspect and copy books and records** during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished.

D.C. Code § 29-604.06(b)

5. After providing the Respondent ten (10) days in which to comply with Claimant's statutory demand, the Respondent failed to provide the records sought.

6. On November 16, 2022, counsel for Respondent submitted a letter to Claimant's counsel. (*See Respondent's letter attached as Exhibit "C", including enclosure*)

7. Respondent's letter did not contain any documents demanded by the Claimant, but instead contained a list of proposed items that would be provided to Claimant upon the execution of a Confidentiality Agreement by Claimant along with Claimant's counsel, Jones & Adams, P.A. (*See Exhibit "C", including enclosure*).

8. Interestingly, the proposed Confidentiality Agreement requests Claimant's counsel, Jones & Adams, P.A., be a signatory of the Confidentiality Agreement but it makes no such request of Respondent's counsel, Blank Rome, LLP.

9. It is important to note that the Partnership Agreement between the Parties is devoid of any reference to the requirement of executing a confidentiality agreement in connection with a statutory demand for books and records.

10. Further, Claimant cannot locate any reference to the requirement of a confidentiality agreement in the D.C. Code.

11. Nevertheless, the Claimant recognizes that all the matters pertaining to the Partnership involve various confidential and proprietary matters and will continue to protect and preserve that information.

12. As is quite clear, Claimant's Demand sets forth ten (10) reasonable requests so that Claimant may adequately assess the value, status and quality of his $4,000,000 equity interest.

13. Respondent's letter only provided proposed inadequate documentation to nine out of the ten requests in Claimant's Demand.

14. In many instances, Respondent's proposed documents did not correlate to Claimant's demands or severely minimized the scope of Claimant's requests.

15. Just by way of example, Claimant requested access to "[c]opies of the financial statements of the Partnership, which include, profit and loss statements, balance sheets, and cash flow statements." (*See ¶ 2 of Exhibit "B"*)

16. To which, Respondent stated in its letter that it would provide "[a] spreadsheet reflecting KS Law's Chase banking activity as of November 10, 2022 and KS Law's monthly bank statements." (*See ¶ 2 of Exhibit "C"*)

17. Not only did Respondent fail to produce the required documents but the proposed documents do not remotely correspond to the Claimant's requests.

18. Regarding Claimant's request for "[a]ll documents relating to Mr. Teh's equity interest in the Partnership", Respondent oddly proposed that it will provide "a letter regarding Mr. Teh's investment, dated May 19, 2022."

19. This oblique reference to a "letter" is clearly an insufficient response to Claimant's request.

20. Claimant also requested the "[u]sernames and passwords to all bank accounts in the name of the Partnership." (*See ¶ 8 of Exhibit "B"*)

21. Respondents did not even acknowledge or address that request.

22. Nor did Respondent address Claimant's request for all "communications regarding the equity interest of Mr. Teh in the Partnership." (*See ¶ 9 of Exhibit "B"*)

23. To date, Claimant has not received the requested books or records, nor has the Claimant been offered or been provided access to inspect the Respondent's books and records as required by the Code. (*See D.C. Code § 29-604.06(b)*).

24. The Agreement between the Parties requires that any dispute arising out of the Agreement shall be settled under the laws of the District of Colombia. (*See Exhibit "A" Section 39*).

25. The Agreement between the Parties further contains an arbitration clause set forth in Section 39.

26. Section 39 requires that a dispute between the Parties will be submitted to the American Arbitration Association and be arbitrated by a single arbitrator in the District of Colombia. (*See Exhibit "A" Section 39*).

27. Due to Respondent's failure to comply with Section 29-604.06(b) Claimant demands this matter proceed to the American Arbitration Association.

## The Claim

Claimant seeks an award and order from the American Arbitration Association requiring Respondent to comply with Claimant's statutory right to inspect the Respondents books and records. Further, as set out in the Agreement, Claimant requests an award of his attorneys' fees, costs and expenses pursuant to Section 39 of the Partnership Agreement.

DATED this 19th day of November, 2022.

**JONES & ADAMS, P.A.**
*Attorneys for Claimant*
Coral Gables Centre
999 Ponce de Leon Boulevard
Suite 925
Coral Gables, FL 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     */s/ Matthew L. Jones_____*
          Matthew L. Jones, Esq.
          Florida Bar No.: 909335

# Exhibit B

Filing # 168815642 E-Filed 03/15/2023 04:58:39 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH, individually,

     Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York Limited Liability Company

     Defendants.

_____/

## COMPLAINT

Plaintiff, ALLAN TEH ("Teh"), sues Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), PERSIST COMMUNICATIONS, INC ("Persist"), and THE LAKE LAW FIRM, LLC ("Lake Law Firm") (collectively referred to as "Defendants") and in support thereof alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. This action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2. Plaintiff, Allan Teh, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County, Florida.

Page **1** of **26**

3. Defendant, Lee Melchionni, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

4. Defendant, Sylvia Benito, is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5. Persist Communications, Inc. is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of operation is located in Broward County Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

6. Persist's President and Registered Agent is Edward Lake ("Mr. Lake"). Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoice dated 9/1/2021 as **Exhibit 2.***

7. Lake Law Firm, LLC, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law firm has an office located in Broward County Florida and issues invoices regarding alleged services with the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See **Exhibit 2.***

8. As more fully set forth herein, Lake Law Firm has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to F.S. §48.193 et seq., Lake Law

Firm is subject to specific personal jurisdiction because Lake committed multiple acts and breaches enumerated in F.S. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law Firm has an office in Florida, has committed a tortious act within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

9.      This venue and forum are appropriate based upon F.S. § 47.011 and F.S. § 47.051 and also because virtually every act, breach and transaction set out in this Complaint occurred in Miami-Dade County Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

**GENERAL ALLEGATIONS**

10.     During the spring and summer of 2021, Melchionni and Benito approached Teh regarding various business opportunities involving "litigation funding" for mass tort cases.

11.     One such business opportunity was for Teh to provide capital to a limited liability company which would then invest (via loan or capital contributions) into a law firm which would then utilize the "investment" to obtain and handle various mass tort cases.

12.     Melchionni and Benito subsequently represented to Teh that there would be significant advantages if he also formed his own law firm. *See June 24th, 2021 email as* ***Exhibit 3.***

13.     These represented advantages of Teh having his own law firm included Teh having: 1) veto power over what litigation was pursued; 2) control over dollar amounts in specific litigations; 3) the ability to add partners to "his firm"; and 4) simplified governing documents. *See Exhibit 3.*

14.     According to Melchionni and Benito this proposed law firm would handle different types of mass tort injury cases, including claims and lawsuits involving Hernia Mesh injuries, Talc toxicity, Round Up toxicity, and 3M Ear Plugs injuries.

15.     During that time frame, multiple meetings, conversations and emails took place wherein various specific representations were made to Teh by Melchionni and Benito regarding the viability of the proposed law firm, the cost of acquiring cases, and the number of cases that the firm would have. *See June 21ˢᵗ, 2021 and August 3ʳᵈ, 2021 Emails as Composite Exhibit 4.*

16.     As set out herein, Teh has learned that these direct and specific representations were false.

17.     On June 23rd, 2021, during a conference call with the Plaintiff, and others present, Melchionni specifically claimed that there was going to be a "a fast settlement for hernia mesh" and he knew "that something is imminent".

18.     These high-pressure tactics and misrepresentations continued on various occasions.

19.     During the same June 23ʳᵈ, 2021 call, and discussions shortly after, Melchionni, Benito and Teh specifically discussed the risks associated with a large capital

contribution to the yet to be formed law firm, and Melchionni and Benito represented those risks to be "none".

20.     At no point in time during these conversations did Melchionni mention the possibility of future case "drop-off" relative to the earlier representations.

21.     On or about July 20th, 2021, there were multiple follow up calls where Melchionni and Benito specifically promised Teh that upon the formation of the law firm, they would both send "monthly updates on our cases".

22.     As a result of these direct, specific and material representations made to Teh by Melchionni and Benito regarding inter alia, the number of cases that the firm would sign up as counsel and the associated costs of those cases, Teh agreed to form a law firm with Teh as 50% equity partner and Melchionni and Benito as 25% partners respectively. *See KS Law Partnership Agreement attached as **Exhibit 5**.*

23.     The name of the firm is KS Law Group LLP ("KS Law") and the Partnership Agreement (the "Agreement") was executed by Teh, Melchionni, and Benito on August 24th, 2021.

24.     Interestingly, non-party KS law had its initial place of business in Washington D.C. but changed its address to 20900 NE 30th Avenue, Miami, Florida 33180 as evidenced by multiple bank account documents dated after the signing of the earlier referenced Agreement.

25.     Relevant to this Complaint, this "updated" place of business address is the same "business" address as Melchionni (a 25% partner in KS Law) and Benito (another 25% partner in KS Law).

26. Neither Melchionni nor Benito advised their partner Teh of this address change.

27. In reliance upon the representations set out herein, Teh provided $4 million as a capital contribution for KS Law and its operations.

28. Upon information and belief, this was the only monetary capital contribution made by anyone to KS Law.

29. That $4 million capital contribution was paid by Teh via Federal Wire on Friday September 3, 2021, into the KS Law Account at Chase Bank (Acct. Ending in ***6138) at the direction of Teh's partners, Melchionni and Benito.

30. On September 16th, 2021, thirteen days after Teh's $4,000,000 was deposited into KS Law's Chase bank account, the funds were transferred and drained from that account.

31. The funds were sent to Defendant Persist's account at TD Bank, Acct ending in ***2721.

32. The effectuation and execution of that transfer was at the direction of Melchionni, Benito, Lake Law, and Persist.

33. Teh was not informed of the transfer at that time or any appropriate time thereafter.

34. It was only until the Fall of 2022, approximately one (1) year following those transfers, that Teh finally received documents obliquely referencing said transfer. To wit: a one-and-a-half-page invoice from Lake Law "to" KS Law for $3,880,000.00. *See Exhibit 2.*

35. Put simply, Defendants Melchionni and Benito, with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Mr. Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

36. Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

37. Critical to the allegations regarding the misrepresentations made, as stated herein, it must be noted the original, and represented purpose, of Teh's $4 million capital contribution was for working up, qualifying, processing, managing and settling cases as well as for firm marketing services, professional management services, obtaining new clients and cases, and firm infrastructure management.

38. As shown by the transfer of the entirety of KS Law's working capital to Defendant, Persist, and the allegations set out herein, Teh's $4 million was not used for those represented purposes.

39. Upon the formation of KS Law, the "monthly updates" promised by Melchionni and Benito never occurred.

40. In addition, "monthly updates" are utterly insufficient and inappropriate considering the important duties of the Partners set forth herein.

41. When updates did come, they were irregularly sent, and were accompanied with repeated representations that there was "non-material drop offs" in the number of cases of KS Law.

42.     Moreover, multiple "updates" sent were simply "copy and pasted" from Google News and similar sources. Nothing in any of these "updates" remotely comports with or fulfills the Fiduciary Obligations set out herein and each of these "updates" is, in and of itself, a Breach of those duties.

43.     Again, to emphasize the specificity of the fraudulent misrepresentations set out herein, the Plaintiff was specifically told by Melchionni, regarding the Hernia Mesh cases that KS Law would have, "some money may flow before the end of the year."

44.     As of today's date, the Plaintiff has not been advised of a single settlement.

45.     As further evidence of the breach of fiduciary duties owed directly to Teh, the Defendants, Melchionni and Benito, conspicuously and deliberately failed to keep even the most basic financial, operating, or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the profound logistics of managing hundreds of personal injury cases, Defendants, Melchionni and Bentio, have even admitted that they did not even bother to keep a general ledger for KS Law.

46.     As updates from Melchionni and Benito became increasingly sparse, on October 18th, 2021, Teh and Melchionni, with others present, had a call to discuss Teh's request for specific data relating to KS Law's cases.

47.     On the same date, an email was sent to Teh by Melchionni, with Benito cc'd.

48.     The October 18th email claimed:

*"The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost…Hernia Mesh - We continue to march towards settlement with multiple manufacturers. We are in the process of working up our cases and replacing those that have been disqualified. We*

*are cautiously optimistic that **the majority of our docket will be settled by Q2 of 2022.***"

See October 18th, 2021, email attached as **Exhibit 6.**

49.    Suffice to say, the majority of KS Law's "docket" was, in fact, not "settled by Q2 of 2022."

50.    As of today's date, Teh has not been advised of a single settlement.

51.    These acts, omissions and failures constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

52.    On October 20th, 2021, Melchionni sent another email to Teh stating:

***"For Allan's law firm, KS Law Group, we spent $3,880,080.00 to acquire** 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. **We are entitled to 60% of the attorney fee.**"*

See October 20th, 2021 Email attached as **Exhibit 7**

53.    It is important to note that Rules 1.5(c) and 1.5(e) of Rules of Professional Conduct governing D.C. law firms explicitly state:

**1.5(c)** A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

**1.5(e)** A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing,** of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; *and*

(4) The total fee is reasonable.

54.    In direct breach of Rules 1.5(c) and (e) and the duties alleged herein, Defendants Melchionni and Benito never secured or obtained such agreements. Moreover, Teh has never been provided even a single written fee agreement between KS Law, co-counsel, referring counsel or any client pertaining to KS Law's involvement in the cases.

55.    In addition, Melchionni stated under oath that the is not aware of any retainer agreements in which KS law is party.

56.    The notion that this formerly multi-million dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein.

57.    These Professional Conduct Rules are not cited to suggest an independent cause of action based upon the Rules. They are set out herein as evidence of the acts, omissions and failures that constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

58.     On September 28th, 2022, Melchionni sent an email, cc'ing Benito, attempting to explain how the prior representations made to Teh have gone sideways. *See September 28th email as **Exhibit 8.***

59.     Melchionni writes in the September 28th email:

*"Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.*

***There is an explanation from the CEO of Persis/Lake Law Firm** below regarding the drop off in Mass Torts.*

*Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.*
*1.     Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.*
*2.     Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).*
*a.     Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.*
*3.     Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.*
*a.     Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).*

4.    *Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.*

a.    *Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified. As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.*

5.    *Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.*

a.    *Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.*

*A few outlier reasons for rejection:*
1.    *No will/estate, unable to file on behalf of*
2.    *Client no longer wishes to pursue*
3.    *Client is uncooperative*
4.    *Client is unresponsive/unable to reach*
*While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.*

*Lee Melchionni, Esq.."*

**See Exhibit 8**

60.    Even to the untrained eye, this information and risk factors should have been disclosed to Teh prior to formation of KS Law and his sizable $4 million capital contribution.

61.    Defendants' calculated failure to do so as well as their omissions set out herein clearly demonstrate the Defendants' liability for such conduct.

62.    To further comply with the requirements of specificity, and only by way of example, the September 28th, 2022, email attached a spreadsheet which demonstrated

just how significant and misleading the earlier representations made by Melchionni and Benito were. *See attached spreadsheet showing "KS Law Group – Cases Owed - % of Total Cases – Cases Allocated" as* **Exhibit 9**.

63.    Even a cursory review of the "Cases Owed vs Allocated" as set out in Column "D" demonstrate that KS Law's case "drop-offs" were now abysmal.

64.    Teh made his frustrations with Defendants' constant and repetitive misrepresentations explicitly known in an October 14th, 2022, email where he stated that "the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said." *See October 14th Email attached as* **Exhibit 10**.

65.    Despite Plaintiff's obvious and warranted frustrations Defendants' misrepresentations continued.

66.    After a long period without any update regarding the value, status, or quality of Teh's $4 million equity interest on March 3rd, 2023, Teh received a surprise . . . a conspicuously unsolicited email from Melchionni containing further worrisome representations and disclosures. *See March 3rd, 2023 email attached as* **Exhibit 11**.

67.    The March 3rd email contained spreadsheets outlining the "clients" of KS Law and their current status. **Exhibit 12** *will be submitted to the Court under seal because it contains client information.*

68.    Present on the spreadsheets were "clients" of KS Law labeling many of these "clients" as "Retained – Sent to Firm."

69.     To reiterate, Teh, as a partner in KS Law, has never been provided a single retainer agreement with any "clients" of KS Law.

70.     Upon information and belief, the spreadsheets provided by Melchionni were not prepared by KS Law but in fact were prepared by Lake Law Firm.

71.     Attached to the March 3rd email was also a "Case Replacement Agreement" with Lake Law Firm. *See "Case Replacement Agreement" attached as **Exhibit 13**.*

72.     Teh was never provided notice of, or allowed input in, the execution of the Case Replacement Agreement with Lake Law Firm.

73.     In addition, the Case Replacement Agreement sets forth numbers of cases and the price of acquiring said cases that materially differ from the representations made to Teh prior to the execution of the Partnership Agreement and as set out previously.

74.     The Case Replacement Agreement also explicitly states and admits that Lake Law Firm "has not delivered equivalent value in cases to the Funded Amount . . ."

75.     The misrepresentations that are specifically set out in this Complaint are provided to highlight and illuminate the specific nature of the fraud and breaches alleged herein.

76.     Since the Complaint should contain a "short and plain statement" regarding the nature of the claims asserted, the Plaintiff cannot provide every single misrepresentation made within the body of this Complaint and reserves the right to amend and supplement this pleading as the circumstances warrant.

## COUNT 1
## FRAUDULENT INDUCEMENT
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

77.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

78.     As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm was going to be retained and how KS Law's funds were going to be used.

79.     Melchionni and Benito, individually and collectively made false statements including that the funds were to be used for marketing and operations along with the misrepresentations set forth above.

80.     Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

81.     Melchionni and Benito, individually and collectively made these, and many other statements, to induce the plaintiff to pay the funds referenced above and enter into the Agreement.

82.     As set out herein, these statements were clearly made before the execution of the Agreement.

83.     These statements have proximately caused specific and direct damages to the Plaintiff when he acted in reliance on those misrepresentations.  To wit: he wired $4 million of his funds to an account controlled by Melchionni and Benito, individually and

collectively, and to date has not received even $1 in the form of distribution, payment or otherwise.

84.     Regarding such direct damages, Plaintiff would not have entered into the Agreement if defendants had not made misrepresentations.

**WHEREFORE**, Plaintiff demands judgment against these Defendants for damages, pre and post judgment interest, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT 2
## RESCISSION
## (PLED IN THE ALTERNATIVE)

85.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

86.     As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm had would be retained as counsel. Melchionni and Benito, individually and collectively, made additional false statements including that the funds were to be used for case management, marketing and operations.

87.     Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

88.     Melchionni and Benito, individually and collectively made these and many other statements to induce the plaintiff to enter into the Agreement.

89.     These statements were clearly made before the execution of the Agreement.

90.    These statements have proximately caused specific and direct injury to the Plaintiff, Teh, when he acted in reliance on those misrepresentations. To wit: Teh wired $4 million of his funds to an account controlled by Melchionni and Benito individually and collectively and to date has not received even $1 in the form of distribution, payment or otherwise.

91.    Rescission is an appropriately pled alternative remedy because regarding such conduct and direct damages, Teh would not have entered into the Agreement if Defendants had not made misrepresentations and rescission of the Agreement is an appropriate claim to place the parties back in their original positions.

**WHEREFORE**, Plaintiff, as rescission damages, seeks this equitable relief and demands the return of his $4 million, pre and post judgment interest, attorneys' fees and costs and all other relief that this Court deems just and proper.

**COUNT 3**
**<u>DIRECT BREACH OF CONTRACTUAL INDEMNITY</u>**
**(AS TO LEE MELCHIONNI)**

92.    Plaintiff re-alleges by reference paragraphs 1 through 76 as if fully set forth herein.

93.    Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni…agrees to indemnify Allan Teh…from and against all…loss, cost, damage and expense … which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

94. Prior to the filing of this complaint, Mr. Teh demanded indemnification from Melchionni.

95. To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

96. As a result of the acts, breaches and omissions set out herein, Allan Teh has suffered direct and individual damages because, inter alia, the contractual indemnity provisions referenced above run specifically and only to the benefit of Teh and not the Partnership or any other partner.

**WHEREFORE,** Plaintiff demands judgment against Defendant, Lee Melchionni, for damages including but not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 4
## DECLARATORY ACTION REGARDING CONTRACTUAL INDEMNITY DUTIES
### (AS TO LEE MELCHIONNI)

97. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

98. Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni...agrees to indemnify Allan Teh...from and against all...loss, cost, damage and expense ... which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

99. Prior to the filing of this complaint, Teh demanded indemnification from Melchionni.

100. To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

101. There is a bona fide, actual and present, practical need for the declaration sought herein.

102. Specifically, there is a significant controversy regarding defendant Melchionni's failure to provide indemnity as set forth in the Agreement and Teh's rights regarding that indemnity provision.

103. The rights and interests of Melchionni and Teh are actual, present, adverse and antagonistic regarding the indemnity provision referenced herein because Melchionni has failed to comply with his duties and obligations in that regard.

104. These antagonistic and adverse interests are all before this Court as set out in this Complaint.

105. The relief and claims set out herein are not a request for legal advice by this Court or to seek answers to questions based on curiosity.

**WHEREFORE,** Plaintiff seeks a declaration from this Court, regarding the contractual provisions cited herein and Melchionni's duties thereupon that Melchionni shall forthwith, immediately and on a continuing basis, indemnify Plaintiff for his losses, damages and costs which include but are not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 5
## BREACH OF FIDUICARY DUTY
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

106.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

107.   Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

108.   Melchionni and Benito, individually and collectively breached these duties as set forth above. Specifically, but without limitation, by Defendants Melchionni and Benito unilaterally and with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

109.   Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

110.   Melchionni and Benito, individually and collectively breached additional fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

111.   As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

112.   Teh has been directly and individually damaged in a manner distinct from any damage suffered by others.

113.   Specifically, these distinct damages to Teh include, but are not limited to, the loss of his discrete and identifiable funds used to fully capitalize KS Law.

114.   This is especially relevant in the context of no other Partners contributing to the firm.

115.   Allan Teh has suffered direct and individual damages because, inter alia, all of the money involved in the acts and breaches sent out herein belonged to and was sent by Allan Teh and he was the only partner and investor to suffer direct financial losses as a result.

116.   Teh has suffered damages which were proximately caused by the breaches set forth above.

**WHEREFORE,** Plaintiff demands judgment against Defendants, Lee Melchionni and Sylvia Benito, jointly and severally, for damages, including pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 6
### EQUITABLE ACCOUNTING
### (AS TO LEE MELCHIONNI AND SYVLIA BENITO)

117.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

118.   Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

119.   Melchionni and Benito, individually and collectively, breached their fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

120.   Specifically, but without limitation, Defendants Melchionni and Benito unilaterally and with no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

121.   As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

122.   In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

123.   The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

124.   Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as complex transactions involving the parties hereto.

125.   Moreover, a breach of the duty imposed by those relationships is grounds for an equitable accounting.

**WHEREFORE,** Plaintiff states a remedy at law would be inadequate and demands judgment against Defendants, Lee Melchionni and Sylvia Benito, for all appropriate relief in this Claim, including damages, pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 7
## UNJUST ENRICHMENT
## (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

126.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

127.   As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the millions of dollars, arose from acts and omissions by Lake Law and Persist and those other named Defendants.

128.   Specifically, neither Lake Law or Persist have provided anything of value to the Teh in exchange for the $4 million they received.

129.   Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as specifically set forth herein.

130.   As referenced herein, Teh has conferred a benefit on the defendants Lake Law and Persist individually and collectively by paying such funds.

131.   Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

132.   The Defendants, individually and collectively, voluntarily accepted and retained the benefit conferred, i.e., the Defendants, to this day, have continued to retain those funds.

133.   As specifically set out herein, circumstances are such that it would be inequitable for the Defendants to retain the benefit conferred upon them without first providing the appropriate exchange of value and consideration to the plaintiff.

134.   Teh was legally impoverished as that term is used in the context of this claim.  Specifically, $4,000,000 of Teh's dollars was wrongfully transferred to, and is being held by, Defendants, Lake Law and Persist.

135.   As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

136.   There is no justification regarding the enrichment realized by Lake Law and Persist.

137.   There is no adequate remedy available at law regarding that which Lake Law and Persist have occasioned upon the Plaintiff.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT 8
## EQUITABLE ACCOUNTING
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

138.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

139. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the subject funds arose from acts and omissions by Lake Law and Persist and those Defendants have been unjustly enriched thereby.

140. Specifically, neither Lake Law or Persist have provided anything of value to Teh in exchange for the $4 million they received.

141. Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as alleged herein.

142. As referenced herein, Teh has conferred a benefit on the Defendants Lake Law and Persist, individually and collectively.

143. Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

144. The Defendants, individually and collectively, voluntarily accepted and retained the benefits conferred.

145. The Defendants, to this day, have continued to retain those funds.

146. Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

147. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

148. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Lake Law and Persist's knowledge and direction, transferred

essentially all of Teh's funds and the entire working capital of Teh's law firm to Defendants Lake law and Persist with no cognizable contract or agreement in place.

149.    In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

150.    The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

151.    Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

The Plaintiff hereby demands trial by jury on all issues and claims so triable as of right.

Dated: March 15, 2023

Respectfully submitted,

**JONES & ADAMS, P.A.**
*Attorney for Plaintiff*
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335
matthew@jones-adams.com

**2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT**

DOCUMENT# P15000085963

**Entity Name:** PERSIST COMMUNICATIONS, CORPORATION

**FILED**

**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

**Current Principal Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE, FL 33316

# Exhibit 1

**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE, FL 33316 US

**FEI Number:** 81-0851001

**Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL 33316 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  EDWARD LAKE                                                01/20/2023

Electronic Signature of Registered Agent                                      Date

**Officer/Director Detail :**

| | |
|---|---|
| Title | PRESIDENT |
| Name | LAKE, EDWARD J |
| Address | 1815 CORDOVA RD |
| City-State-Zip: | FT. LAUDERDALE  FL  33316 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EDWARD J LAKE                    PRESIDENT              01/20/2023

Electronic Signature of Signing Officer/Director Detail                          Date



# Exhibit 2

## Invoice

| BILL TO: KS Law Group | | CAMPAIGN: HM/TALC/3M/RU | |
|---|---|---|---|
| | | DATE: 9/1/2021 | |
| | | DUE DATE: | |
| Phone: | | TERMS: See Below | |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 220 | Hernia Mesh | $5,600 | $1,232,000 |
| 200 | Talc | $6,000 | $1,200,000 |
| 155 | Round Up | $5,048.39 | $782,500 |
| 220 | 3M | $3,025 | $665,500 |
| | | Total | $3,880,000.00 |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000050

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Print Name: Lee Melchionni

Signature: _____    Date: 9/1/21

**REMITTANCE BY WIRE:**

*Beneficiary Name: Persist

*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316

*Bank Account No.: 4326532721

*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

**Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, allan.teh@icloud.com, Sylvia Benito

Thu, Jun 24, 2021, 2:10 PM

# Exhibit 3

Hi Sohail,

Yes, you are correct. Those are the current outstanding MDL"s against hernia mesh manufacturers.

As for our hypothetical settlements question, there will be cases where plaintiff's have suffered horrific injuries where settlement values are several hundred thousand dollars, potentially $1M+. There will also be 'nuisance' claims that will be worth $15,000. Based on our criteria for acceptable claims, we felt comfortable with the hypothetical ranges we provided. Obviously, the hope is that the compensable value of the cases we acquire is higher than our hypothetical averages.

Attached, you will find the returns for two previous torts I was involved in, Actos and DePuy ASR Hips. Please note that the return in these two torts were abnormally positive. Feel free to call me to discuss if there is any confusion.

Finally, I wanted to articulate the difference for Allan if he were to have his own law firm, versus being in the fund.

- Veto power on what litigations are pursued
- Control over dollar amounts in specific litigations
- Simplicity of documentation, meaning we have a simple operating agreement governing Allan's law firm
- The firm can be evergreen
- Ability for Allan to add partners/investors to his firm

If a follow up call makes sense, please let us know Sohail. Thank you for your time.

Best,
Lee

On Thu, Jun 24, 2021 at 12:22 PM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
> Lee,
>
> Great speaking with you and Sylvia yesterday. While I wait for an email back on my outstanding questions, I had two specific questions on the Herniated Mesh opportunity specifically.
>
>   1. Are the below listed cases the current outstanding MDLs against hernia mesh manufacturers?
>       a. In Re: Ethicon, Case No: 1:17-md-02782-RWS (subsidiary of Johnson & Johnson) in the Northern District of Georgia
>       b. In Re: Davol, Inc./C.R. Bard, Inc., Case No: 2:18-md-2846 in the Southern District of Ohio
>       c. In Re: Atrium Medical Corp., Case No: 16-md-2753 LM in the District of New Hampshire
>   2. I know you ranged the potential hypothetical settlement amounts for Hernia Mesh. Doing some digging showed on that on individual cases, ranges went as high as a million and below the low end of the range on

the provided spreadsheet. Was the range provided based on the criteria you set for viable claimants?

Any additional information would be appreciated. Thank you!

Best Regards
Sohail Shahrasebi
Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

**2 Attachments**  •  Scanned by Gmail



X  Actos.xlsx                    X  DePuy ASR.xlsx

**From:** Sylvia Benito <sylvia@capital4justice.com>
**Date:** June 21, 2021 at 11:24:32 AM EDT
**To:** allan.teh@icloud.com
**Cc:** Lee Melchionni <lee@capital4justice.com>
**Subject: Potential Allocation + Outcome Ranges**

# Composite Exhibit 4

Allan,

Please find attached the possible allocations for cases in an individual law firm should you choose to add more allocation to your current investment.  We can send background notes on all these cases for your analyst and/or schedule a call at your convenience to discuss.

Warmly
S

**One attachment · Scanned by Gmail**



Potential Allocati...

## Subject: Re: Question / Request



**Lee Melchionni** <lee@capital4justice.com>                    Tue, Aug 3, 2021,
to Sohail Shahrasebi, Brent Steinberg ■

Hi Sohail,

Below is our current breakdown. We look forward to discussing in more detail on Friday.

- RoundUp - 2%
- Firefighter Foam - 5%
- Zantac - 10%
- Talc - 34%
- 3M - 8%
- Hernia Mesh - 41%

Best,
Lee

On Tue, Aug 3, 2021 at 7:36 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hi Lee,

The last time we spoke you mentioned you were calling an additional $2 million of Allan's investment - bringing t total to $4 million.

I wanted to know if you could give me a break- down, by case type/bucket, of the money invested so far (the tot$4mln.)

This should help me better assess how to distribute, by case type, the additional capital being injected into the d law firm. Please call me if you have any questions.

Best Regards
Sohail Shahrasebi
646-707-4484

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

# Exhibit 5

**KS LAW GROUP, LLP**
**LIMITED LIABILITY PARTNERSHIP AGREEMENT**
**EFFECTIVE AS OF July 26, 2021**

This Limited Liability Partnership Agreement ("Agreement") is entered into by Attorney Lee Melchionni and Non-Attorneys Allan Teh[1] and Sylvia Benito (collectively, the Managing "Partners"), pursuant to the provisions of the Business Organizations Title in the District of Columbia Code (specifically, D.C, Code § 29-101.01, *et seq.*, the "Act").

**1.    Formation.**

Pursuant to this Agreement, the limited liability partnership was formed (the "Partnership"), and the Managing Partners elected to become a registered, Limited Liability Partnership, in accordance with the provisions of the Code. The Managing Partners shall be:

1. Lee Melchionni, Esq.; (Melchionni as the "Attorney") and

2. Allan Teh,

3. Sylvia Benito

The Managing Partners agree that no person shall be added or admitted to the Partnership as either a Partner or Managing Partner without the unanimous, affirmative vote of the Managing Partners, with the sole exception of the provisions set forth in Section 16.

**2.    Name.**

The name of the Partnership shall be KS Law Group, LLP, and all business of the Partnership shall be conducted under and in such name. There shall be no change to the Partnership name without the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

**3.    Primary Place of Business.**

The Partnership shall be established and have the place of business in the District of Columbia, located at 1100 H Street NW, Suite 840, Washington, D.C. 20005 or at an address or location to be determined by the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

---

[1] All references to Allan Teh are to him in his capacity as Partner and nominee for Kamunting Street Capital Management, L.P. shall have the right to designate a replacement Partner for Allan Teh, who shall then become a Managing Partner, in the event that Allan Teh is unwilling to serve, becomes incapacitated or dies.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

4.   **Sole Purpose.**

The Partnership's sole purpose is to engage in the practice of law, in order to provide the Partners with the opportunity for pecuniary gain, professional growth and service to the bar and the state and communities which the Partnership serves.

The Partnership shall be a partnership only for the purpose specified in this Section. Except as otherwise provided in this Agreement, the Partnership shall not engage in any other activity or business that is not reasonably necessary or appropriate to the accomplishment of its purpose, and no Partner shall have any authority to hold himself out as the agent of another Partner in regard to any other business or activity.

5.   **Statutory Compliance.**

The Partnership shall exist under and be governed by, and this Agreement shall be construed in accordance with, all the applicable laws of the District of Columbia and the District of Columbia Rules of Professional Conduct. The Managing Partners agree to and shall make all filings and disclosures required by, and shall otherwise comply with, all such laws. The Managing Partners agree to and shall execute and file any assumed or fictitious name certificates and other documents and instruments as may necessary or appropriate with respect to the formation of and conduct of business by the Partnership.

Further, each Managing Partner and Partner, other than the designated Legal Managing Partner (identified in Section 14 of this Agreement), hereby agrees not to hold himself or herself out to the general public, nor publicize in any media or forum their or any other Members' ownership, membership or affiliation with the Partnership.

6.   **Indemnification.**

Melchionni (an "Indemnifying Partner") hereby agrees to indemnify Allan Teh from time to time, and hold them harmless from and against all liability, loss, cost, damage and expense (including attorneys' fees and costs incurred in the investigation, defense and settlement of the matter) which the Partnership or any of such other Partners shall ever sustain, suffer or incur which relate or arise out of or in connection with the operation of the Partnership or a breach by the Indemnifying Partner of any representation, warranty or covenant made by the Indemnifying Partner in this Agreement. If the Partnership, Allan Teh from time to time are made a party to any litigation or otherwise incurs any loss or expense as a result of or in connection with any Indemnifying Partner's personal or professional obligations or liabilities unrelated to Partnership business, such Indemnifying Partner shall indemnify and reimburse the Partnership, Allan Teh from time to time, for all such loss and expense incurred, including reasonable attorneys' fees.

7.   **Title to Property.**

The Partnership shall hold all real and personal property interests in the name of the Partnership, and not in the name of any Partner.

8.   **No Payments of Individual Obligations.**

The Partners agree to and shall use the Partnership's credit and assets solely for the benefit of

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

the Partnership.

Melchionni in his capacity as agent and nominee for KS Law Group, LLP, shall pay the costs of acquiring and maintaining malpractice and general liability insurance (to the extent these coverages are available) for KS Law Group, LLP. The policy shall be at least $5 million per claim/ $5 million in the aggregate and cover all Managing Partners for acts undertaken in their official capacity as Managing Partners.

### 9.   Limitation of Duties

Each Partner hereby agrees that he/she owes duties of care, honesty and loyalty to the other Partners and to the Partnership itself, subject only to the following limitations:

(a)   Subject to their Non-Circumvention obligations, the Partners are not restricted from competing with the Partnership. Each Partner and the Partnership itself waives any breach of duty arising from a Partner engaging in any business, enterprise or transaction, which may directly or indirectly compete with the partnership, or that otherwise would constitute a business opportunity for the Partnership.

(b)   Each Partner who is an Attorney shall have no limitation regarding the ethical practice of law, and any duty under this Agreement or implied in law shall be waived to the extent it would interfere with a lawyer's ability to represent any client as required by the rules of ethics and professional responsibility.

### 10.   Non-Circumvention.

Notwithstanding any other provision in this Agreement, if an attorney Partner withdraws from the Partnership, the withdrawing attorney Partner shall pay to the Partnership a share of the fees received for legal services provided to any client of the Partnership who subsequently engages the withdrawing attorney Partner. The allocation of the fees received shall be in proportion to the work done before and after the withdrawal. Recoverable costs shall be reimbursed upon receipt. The Partners irrevocably agree that they shall not, directly or indirectly, interfere with, circumvent or attempt to circumvent, avoid, by-pass or obviate the Partnership's interest in and relationship with pre-established sellers, buyers, brokers, dealers, distributors, technology providers, intermediaries, entrepreneurs, consultants, employees, legal counsel, professional relationships, individuals, or any other pre-established or un-contracted relationships revealed or introduced by one Partner to another in connection with any present and future transactions related to this Partnership.

### 11.   Ownership Interests.

The Managing Partners' Ownership Interest in the Partnership shall be:

| | |
|---|---|
| 1. Lee Melchionni, Esq. | 25% |
| 2. Allan Teh, | 50% |
| 3. Sylvia Benito, | 25% |

The Managing Partners agree that, other than the percentages and adjustments set forth in this Section, the Ownership Interest of the Partners shall not be amended or changed without the unanimous, affirmative vote of the Managing Partners.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

12.     **Capital Contributions.**

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm. The Partners agree that Capital Contributions, will be made from time to time over a six (6) month period, for a total minimum amount of $4,000,000. The Capital Contributions will be made by Allan Teh in the amount of $4,000,000.

13.     **Rights, Powers and Responsibilities of the Managing Partners.**

The Managing Partners shall divide the responsibility for certain areas of Partnership operations as set forth herein:

A) Lee Melchionni shall be the Legal Managing Partner. The Legal Managing Partner shall provide the legal support to work up, qualify, process, manage and settle cases. He shall also be responsible for case related expenses, including the use of third party vendors to accomplish these tasks. In fulling these roles the Legal Managing Partner shall have complete and unequivocal control and veto power over any and all decisions relating to the practice of law, the prosecution of each of the Partnership's client's legal claims, the outward conduct of the law firm, the handling of funds in any IOLTA or client trust accounts, the public statements and representations of the law firm (including any and all marketing, branding and website design), conflicts of interest, whether actual or potential, co-counsel relationships, referrals to counsel, fee disputes, and client confidentiality, as well as any activities by or on behalf of the law firm, including the activities of any Partners, employees, agents, and independent contractors, which are regulated, limited or otherwise addressed in any way by the District of Columbia Rules of Professional Conduct.

Per District of Columbia Rule of Professional Conduct 5.4, the Legal Managing Partner hereby agrees to be responsible for and to supervise the managerial and other activities of the nonlawyer Partner, Allan Teh, and other Partners as they may be added, as if these non-lawyer Partners were lawyers admitted to practice in the District of Columbia, and to supervise the ethical conduct of same under the standards set forth in District of Columbia Rule of Professional Conduct 5.1. It is hereby agreed that this provision will require the Partnership and Legal Managing Partner to make reasonable efforts to ensure that the Partnership has in effect measures giving reasonable assurance that all the participants in the Partnership conform to the D.C. Rules of Professional Conduct.

Allan Teh and Sylvia Benito, as a Non-Lawyers participant in the Partnership per D.C. Rule of Professional Conduct 5.4, shall have the authority over marketing Partnership Activities, and provide other professional management services, all in order to assist the Partnership in providing legal services to the Partnership's clients. These managerial activities will include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership, obtaining new clients and cases, joint venturing, firm infrastructure management, and advising the Managing Partners regarding the same.

A)      In the event that the Managing Partners disagree regarding a Partnership operation or activity which is directly addressed within the District of Columbia Rules of Professional Conduct and also relates to marketing, branding, marketing campaigns, internet marketing or internet design, or regarding any proposed, contemplated or actual activity for or on behalf of the Partnership which is

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

regulated and/or limited by the District of Columbia Rules of Professional Conduct, the Legal Managing Partners shall have complete and unequivocal control of and veto power over, any such activity, as set forth in Section 14(A) above.

Per District of Columbia Rule of Professional Conduct 5.4, the Non-Lawyer Managing Partner, hereby agrees and undertakes to abide by the D.C. Rules of Professional Conduct as if she was a lawyer admitted in the District of Columbia.

### 14. Partner Compensation.

No Partner shall receive any interest or salary with respect to his/her Capital Contributions or his/her Ownership Interest, or for services rendered to or on behalf of the Partnership, or otherwise in his/her capacity as Partner, except as otherwise provided in this Agreement or by unanimous written consent of all Partners.

### 15. Withdrawal, Divorce or Death of a Partner.

Any Partner may withdraw from the Partnership upon sixty (60) calendar days' written notice to the other Partners and Managing Partners. Upon withdrawal, the withdrawing Partner shall cease to have any rights to further participation in the management or operations of the Partnership. Such withdrawing Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on claims that were retained by the Partnership prior to the day the Partner gave his/her notice of withdrawal to the Partnership. For purposes of this Section, the retainer date shall be deemed to be the first date on which the client executed a retainer agreement with the Partnership.

Furthermore, a Partner's death or permanent disability shall be deemed a "withdrawal" as of the date of the death or permanent disability. A deceased or permanently disabled Partner and/or his/her estate and heirs shall continue to have the right to payment of his/her share of the fees paid to the Partnership in accordance with the Partner's Partnership Interest as of the date of death or permanent disability on cases that were retained by the Partnership on or before such date. Payments under this provision shall be made in the normal course of business pursuant to the rules for distribution set forth in Section 22 of this Agreement.

The Partners hereby agree that, if by operation of law or by judgment or judicial decree in a bankruptcy or divorce case, any portion of a Partner's Ownership Interest in the Partnership is assigned to a third party, said assigned or transferred interest, to the extent it is assigned or transferred to a third party, shall be treated as if, on the date of the assignment or transfer order, the Partner in question became deceased, and any such Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on cases that were retained by the Partnership prior to the date of withdrawal.

### 16.   Expulsion for Cause.

(a)   For Cause Only.

Any Partner may be expelled" for cause", upon the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership, For purposes of this provision, "cause" for expulsion will include but not be limited to any of the following:

(i)   Disbarment, suspension, or other major disciplinary action determined

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

adversely to any Attorney Partner by any duly constituted authority;

(ii)    Professional misconduct or violation of the canons of professional ethics, if such misconduct continues after its cessation bas been requested by the Managing Partners;

(iii)   Any action or inaction that injures or threatens the professional standing or business operations of the Partnership, if such action or inaction continues after its cessation is requested by the Managing Partners, as set forth below;

(iv)    Any Partner takes a position that adversely effects the continuation of the Partnership, if such continues after its cessation is requested by the Managing Partners.

(b)    Notice of Expulsion for Cause.

If majority of the combined ownership interests held by the Managing Partners in the Partnership determines that "cause" exists for expulsion of a Partner, then the Partnership shall provide notice of this decision to the Partner who is subject to expulsion, and the Partner shall have ten (10) business days after notice is given to cure or remedy the reason for expulsion, if a cure or remedy is possible.

(c)    Entitlement to Profits After Expulsion.

Upon any expulsion, the expelled Partner shall be treated as a "withdrawn" Partner pursuant to Section 15, above, as of the date on which the expelled Partner failed to cure the reason for his expulsion, or five (5) business days from the Notice of Expulsion, whichever is later. The expelled Partner will have no other entitlement to any compensation. Furthermore, the Managing Partners may withhold future payments to any Partner who has been expelled for cause and apply those payments as a setoff against any damages to the Partnership caused by the expelled Partner or any liabilities due from the expelled Partner to the Partnership.

## 18. Liquidating Events.

The Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)    The affirmative vote of the majority of the total, combined ownership interests held by the Managing Partners in the Partnership, to dissolve, wind up, and/or liquidate the Partnership; or

(b)    The happening of any other event that makes it unlawful or impossible to carry on the business of the Partnership.

The Partnership shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined by a court of competent jurisdiction, that the Partnership has dissolved prior to or without the occurrence of a Liquidating Event, the Managing Partners hereby agree to continue the business of the Partnership without a winding up or liquidation.

## 19. Winding Up.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

(a)     Upon the occurrence of a Liquidating Event, the Partnership shall continue for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for this winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Agreement and the Partnership has terminated all operations.

(b)     The Managing Partners (or any Person elected for this purpose by the Managing Partners) shall be responsible for overseeing the winding up and liquidation of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds there from, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)     First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors other than the Partners;

(ii)     Second, to the payment and discharge of the Underwriting Contribution (defined in Section 20);

(iii)     to the payment and discharge of all other Partnership's debts and liabilities to Partners; and

(iii)     The balance, if any, to the Partners in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)     Except with respect to the Underwriting Contribution (defined in Section 20), each Partner hereby expressly waives any right which the Partner individually, as a creditor of the Partnership, might otherwise have under the Code, to receive distributions of Partnership assets *pari passu* with the other creditors of the Partnership, in connection with a distribution of assets of the Partnership or in satisfaction of any liability of the Partnership, and hereby subordinates any such right to said creditors.

## 20. Preferred Return.

Fifteen percent (15%) per annum simple interest multiplied by the invested capital, which shall accrue from the date of the Firm's acceptance of Allan Teh's Underwriting Contributions, until the Firm receives its first mass tort settlement proceeds via a Qualified Settlement Fund.

## 21. Profits and Losses.

After the Partnership repays the Underwriting Contribution (defined in this Section), the profit/loss allocation shall be calculated on a net basis as a percentage of the resulting fee, net of expenses, which shall not include legal fees and expenses of any kind. Expenses which pertain to a particular case should be deducted from the fees received for that case before allocating profits/losses to the extent that they cannot be charged to the client. Partnership Expenses which do not pertain to a particular case shall be amortized over all pending cases at the time the expense was incurred, in an

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

equal amount for each case.

Profits

Net Profits after full and complete reimbursement of funding by Allan Teh for a particular mass tort campaign shall be allocated as follows after the holdback of reserves as unanimously agreed to and approved by the Managing Partners:

(a)    Return of Capital: First, one hundred percent (100%) to Allan Teh until Distributions to such equal the amount of Allan Teh's Capital Contributions.

(b)    Preferred Return: Second, one hundred percent (100%) to Allan Teh until Distributions to such of Distributable Cash on a cumulative basis pursuant to this clause equal the Preferred Return.

(c)    Catch up: Second, one hundred percent (100%) to Lee Melchionni and Sylvia Benito until Distributions to Lee Melchionni and Sylvia Benito on a cumulative basis as carried interest Distributions equal twenty percent (20%) of all Distributions,

(d)    Split: Any balance, (i) eighty percent (80%) to Allan Teh and (ii) twenty percent (20%) to Lee Melchionni and Sylvia Benito.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Law Firm.  Allan Teh is committing to fund a total of $4,000,000 ("Underwriting Contributions") to be paid to the firm as needed and determined by the Managing Partners to run a campaign related to any case/litigation as determined by the Managing Partners.  The Managing Partners agree and understand that all such costs incurred by Allan Teh on behalf of the Company, including the Underwriting Contribution, shall be treated as an interest-free loan and paid back in full prior to any Partnership distributions.

Losses

It is understood that Lee Melchionni, Esq. shall not be responsible to pay back Allan Teh in the event that a particular mass tort campaign, case or litigation effort fails to generate profits. In the event that either party wants to recoup losses from a particular Mass Tort campaign that did not generate a profit from the profit(s) of other Mass Tort campaign(s) that do generate profits, then all Parties shall have the right to recoup their losses. In the case of Allan Teh, the amount of the loan referenced above and all Capital Contribution made by them used to acquire such cases which are not paid back or recovered shall be subject to such offset.

22. Management Fee.

KS Law Group will charge a management fee of one percent (1%) on invested Capital Contributions.

23. Entire Agreement.

This Agreement constitutes and shall be considered the entire agreement between the parties with respect to the subject matter of this document, and supersedes all previous arrangements, understandings, representations or agreements between the parties, whether written or oral. As set forth

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

in Section 12, the Partners may, from time to time, by unanimous, affirmative vote, agree to alter certain portions of this Agreement for Special Allocations. However, the Partners hereby agree that any such secondary agreement shall apply only to the special circumstances considered therein and will not alter the terms or conditions of this Agreement beyond the limited time and scope set forth in said secondary, written agreement.

### 24. Distributions to Partners.

Distribution to the Managing Partners shall occur at the conclusion of any singular case pursuant to Section 21.

### 25. Amounts Withheld.

All amounts withheld pursuant to the Tax Codes or any other state or local tax law, with respect to any payment, compensation or distribution to the Partnership or the Partners, shall be treated as amounts distributed to the Partners, for all purposes under this Agreement. The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partner and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate such amounts to the Partners with respect to which such amount was withheld.

### 26. Decisions

Except as otherwise provided in this Agreement, all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized only by the affirmative vote of 66 2/3% of the total, combined ownership interests held by the Managing Partners in the Partnership. It is further acknowledged and agreed, however, that any decision falling under the matters set forth in Section 14 of this Agreement shall be within the professional discretion of the Legal Managing Partner.

### 27. Vote Required for Certain Actions.

Notwithstanding Section 24 hereof:

(d)     no decision or action regarding the incurrence by the Partnership of any debt, contract or obligation for which the Partners are individually liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership; and

(e)     no decision or action regarding the incurrence by the Partnership of any debt for which the Partnership is liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership.

### 28. Partners Authorized to Take Certain Actions on Behalf of the Partnership.

Except as otherwise provided elsewhere in this Agreement, each Managing Partner is authorized to take the following actions and make the following decisions to the extent that such actions and decisions are necessary to permit such Managing Partner to carry on the Partnership's routine, day-to-day practice of law:

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

a. Accept clients on behalf of the Partnership based on criteria set forth by Legal Managing Partners, and agree to undertake specific matters for any Partnership client based on criteria set forth by Legal Managing Partners provided that a Managing Partner accepting such client or undertaking such matter is responsible for assuring that such action will not create a conflict with the interests of any other client and is otherwise consistent with the types of clients and matters normally handled by the Partnership, and provided further that such Managing Partner obtains the concurrence of any other Managing Partner or Managing Partners whose services may reasonably be expected to be required to service such client or matter.

b. Take any other action and make any other decision that is clearly routine and incidental to the day-to-day conduct of the Partnership and/or its practice.

**29. Banking.**

All funds of the Partnership shall be deposited in the Partnership's name, in such account or accounts with member banks of the FDIC as may be approved by an affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership; provided, however that the Managing Partners may elect to deposit all or a portion of the funds standing in the Partnership reserves in interest-bearing accounts with, or apply such funds to purchase short-term interest-bearing investments issued or guaranteed as to payment by, such banks or other financial institutions that are members of the FDIC or the United States (or its agencies or instrumentalities).

**30. Restrictions on Transfers.**

Except as provided in footnote 1, no Partner shall transfer all or any portion of his Partnership interest or any rights therein without the unanimous consent of the Managing Partners. The Partners not seeking to transfer their interests shall have the right of first refusal to purchase any such interest in equal shares. Any transfer or attempted transfer by any Partner in violation of the preceding sentence shall be null and void and of no force or effect whatsoever. Each Partner hereby acknowledges the reasonableness of the restrictions on transfer imposed by this Agreement in of the Partnership purposes and the relationship of the Partners. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable. Each Partner hereby further agrees to hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes or costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a transfer or an attempted transfer in violation of this Agreement.

**31. Waiver of Partition.**

No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and his legal representatives, successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his Partnership interest, or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

### 32. Rights of Partners.

Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership. No Partner shall have priority over any other Partner as to the return of his Capital Contributions, distributions, or allocations unless otherwise provided in this Agreement.

### 33. Notice of Dissolution.

In the event a Liquidating Event occurs, or any other event occurs that would result in a dissolution of the Partnership, the Partnership shall, within thirty (30) calendar days thereafter: (a) provide written notice thereof to each of the Partners and to all other parties with whom the Partnership regularly conducts business, and (b) publish notice of such dissolution in a newspaper of general circulation in each place in which the Partnership regularly conducts business.

### 34. No Liability for Partnership Debts.

Except as provided in Section 7, no Partner shall be personally liable or accountable, directly or indirectly, including by way of indemnification, contribution, assessment, or otherwise, for debts, obligations or liabilities of or chargeable to the Partnership or other Partner, whether arising in tort, contract, or otherwise that are incurred, created or assumed by the Partnership, except with respect to an obligation as to which all of the Partners have unanimously agreed in writing that the Partners would be personally liable.

### 35. Indemnification of Managing Partners/Partners by Partnership.

The Partnership shall, to the extent of its assets, indemnify, defend and hold each Partner in the Partnership free and harmless from any and all claims, demands, liabilities, obligations, damages, losses, costs and expenses, including attorneys' fees (individually, a "Liability" and collectively, the "Liabilities") incurred in connection with the business of the Partnership, provided the acts or omissions from which the Liabilities arise were performed by the Partner in good faith and with a reasonable belief that the Partner was acting within the scope of the Partner's authority under this Agreement and the Partner was not grossly negligent or guilty of intentional misconduct. Neither the Partnership nor any Partner shall have any claim against any other Partner by reason of any act or omission for which such Partner is entitled to indemnification under the Agreement.

### 36. Partnership Representative and Indemnification Thereof.

Partner Lee Melchionni, Esq. is specifically authorized to act as the "Partnership Representative" (hereafter the "PR") under the applicable tax Code, and in any similar capacity under state or local law. The Partnership and the other Partners agree to defend, indemnify and hold harmless the PR, from all costs and expenses, including fees of outside attorneys, accountants and experts, incurred in acting as PR during or after the termination or expiration of the term of the Partnership. The Partnership and the other Partners further agree to execute such powers of attorney and other forms and authorizations as may be required by the IRS for a Partner to act as PR.

### 37. Professional Liability Insurance.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

The Partnership shall maintain policies of professional liability, errors and omissions, general liability, in the amount of $5 million per occurrence/$5 million aggregate. As stated above, this shall be paid annually by the Partnership.

**38. Notices.**

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing, and sent by overnight courier to recipient's hands, or U.S. certified mail with return receipt requested, to the following addresses:

Lee Melchionni, Esq.
20900 NE 30th Ave
Suite 510
Miami, FL 33180

Sylvia Benito
20900 NE 30th Ave
Suite 510
Miami, FL 33180

Allan Teh
119 Washington Ave
Suite 600
Miami Beach, FL 33139

Such addresses may be changed from time to time by any party by providing written notice in the manner set forth above. The date the party receiving notice will be considered to have been noticed will be the date of the delivery, as shown on the courier confirmation or return receipt from the U.S. postal service.

**39. Resolution of Disputes.**

Any controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and shall be resolved via arbitration under the American Arbitration Action, 9 U.S.C. § 2, in the District of Columbia, in accordance with the rules of the American Arbitration Association, and judgment entered upon the award rendered may be enforced or appealed by appropriate judicial action pursuant to the District of Columbia Code of Civil Procedure. The arbitration shall be heard by a single arbitrator, which shall be a person unanimously agreed to by the Managing Partners, and the dispute shall be heard within thirty (30) days following notice by one party that he/she desires that a matter be arbitrated.

If the parties are unable, within such 30-day period to agree upon an arbitrator, then the issue shall be heard by an arbitrator selected by the District of Columbia office of the American Arbitration Association, which arbitrator shall be experienced in the area of legal partnerships and who shall be knowledgeable with respect to the subject matter area of the dispute.

The arbitrator shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal. The parties shall agree within thirty (30) days following

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery; provided, in any event each Partner shall be entitled to discovery in accordance with the District of Columbia Code of Civil Procedure. The arbitrator shall determine a prevailing party in the proceeding, and award the prevailing party his costs and expenses, including but not limited to reasonable attorneys' fees and arbitration costs, from the non-prevailing party in such proceeding.

### 40. Counterparts.

This Agreement may be executed by facsimile and/or in two or more counterparts, each of which shall constitute an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties have entered into this Agreement of Partnership as of the dates set forth below.

*Lee Melchionni*

Lee Melchionni, Esq.                                          Aug 24, 2021
                                                             Date

Allan Teh,                                                   Date: August 24th, 2021

Sylvia Benito (Aug 24, 2021 16:33 EDT)

Sylvia Benito,                                               Aug 24, 2021
                                                             Date

# KS Law Group Operating Agreement.docx

Final Audit Report                                                                 2021-08-24

| Created: | 2021-08-24 |
|---|---|
| By: | Lee Melchionni (lee@capital4justice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_4MpQdjxaqLAEo3BNLfP3BscoK90ghu0 |

## "KS Law Group Operating Agreement.docx" History

✍ Document digitally presigned by DocuSign\, Inc. (enterprisesupport@docusign.com)
2021-08-24 - 2:40:53 PM GMT- IP address: 71.77.192.124

🗅 Document created by Lee Melchionni (lee@capital4justice.com)
2021-08-24 - 6:10:55 PM GMT- IP address: 71.77.192.124

✉ Document emailed to Lee Melchionni (lee@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

✉ Document emailed to Sylvia Benito (sylvia@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

🗅 Email viewed by Sylvia Benito (sylvia@capital4justice.com)
2021-08-24 - 6:12:22 PM GMT- IP address: 74.125.150.38

✍ Document e-signed by Lee Melchionni (lee@capital4justice.com)
Signature Date: 2021-08-24 - 6:12:32 PM GMT - Time Source: server- IP address: 71.77.192.124

✍ Document e-signed by Sylvia Benito (sylvia@capital4justice.com)
Signature Date: 2021-08-24 - 8:33:37 PM GMT - Time Source: server- IP address: 172.58.175.96

✔ Agreement completed.
2021-08-24 - 8:33:37 PM GMT

 Adobe Sign

Subject: Re: Data request / update

# Exhibit 6

 **Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, Sylvia Benito

Mon, Oct 18, 2021, 5:37 PM

Sohail,

We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.

- Could we be given the following

  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
    - We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    - We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
    - Justice Partners
    - 200 Firefighter Foam
    - 208 Talc
    - 380 Hernia Mesh
    - 350 3M
    - 150 RoundUp
    - 200 Zantac
      - KS Law Group
      - 155 RoundUp
      - 200 Talc
      - 212 Hernia Mesh
      - 212 3M
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.
  - Update on the status of the various cases in the US and timing on each case
    - Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
    - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.

- 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
  - RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
  - Firefighter Foam - There is no substantive update since our last investor communication.
  - Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?
    - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following
  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - Update on the status of the various cases in the US and timing on each case
- On the Diesel stuff
  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi


Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139

O: 786-484-0771
M: 646-707-4484

---

**2 Attachments** • Scanned by Gmail



X  KS Case List 10.1...

PDF  Non-Lawyer Part...

# Exhibit 7

**From:** Lee Melchionni <lee@capital4justice.com>
**Date:** October 20, 2021 at 2:33:33 PM EDT
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>, ALLAN TEH <allan.teh@icloud.com>
**Subject: Re: Data request / update**

Sohail,

For Allan's independent law firm, KS Law Group, we spent $3,880,080.00 to acquire 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. We are entitled to 60% of the attorney fee.

For Justice Partners, we have spent $11,250,000.00 to acquire 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases. We are entitled to 72% of the attorney fee.

In addition, we purchased 12% of the attorney fee for 1128 Talc Cases, 1220 Hernia Mesh Cases, 302 3M Cases, and 300 RoundUp Cases. All of these cases were mature, meaning the clients had already been acquired and cases worked up to a certain point, mitigating case acquisition, drop off, and timing of settlement risk.

Best,
Lee

On Tue, Oct 19, 2021 at 9:52 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
> Lee thanks for this. When you get a chance, as a follow-up can you please send me the $ invested per case type? Thank you.
>
> **From:** Lee Melchionni <lee@capital4justice.com>
> **Sent:** Monday, October 18, 2021 5:37 PM
> **To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
> **Cc:** Sylvia Benito <sylvia@capital4justice.com>
> **Subject: Re: Data request / update**
>
> Sohail,
>
> We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.
> - Could we be given the following
>
>   o A final copy of the legal documents supporting the supporting the Denovo US law firm?
>
>       o We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
>
>   o Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
>
>       o We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
>       o Justice Partners
>       o 200 Firefighter Foam
>       o 208 Talc
>       o 380 Hernia Mesh
>       o 350 3M
>       o 150 RoundUp
>       o 200 Zantac
>
>           o KS Law Group
>           o 155 RoundUp
>           o 200 Talc
>           o 212 Hernia Mesh
>           o 212 3M

- Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.

  - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.

- Update on the status of the various cases in the US and timing on each case

  - Hernia Mesh - We continue to march towards settlement with multiple manufacturers. We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
  - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.
  - 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
  - RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
  - Firefighter Foam - There is no substantive update since our last investor communication.
  - Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

  - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following

  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - Update on the status of the various cases in the US and timing on each case

- On the Diesel stuff

  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi

Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

## Subject: KS Law Group



**Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, Allan Teh, Sylvia Benito



Wed, Sep 28, 2022, 9:59 PM

# Exhibit 8

Sohail,

We have attached our agreement with the Lake Law Firm outlining our docket. In addition, I have attached a breakdown of the allocation of cases, pari passu, for each entity we manage, along with a list of every single client signed up, per case type, and their current status.

We have also attached an LOI for a loan the Lake Law Firm is about to receive, which addresses their credit worthiness.

Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.

There is an explanation from the CEO of Persis/Lake Law Firm below regarding the drop off in Mass Torts.

- Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.

1. Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.
2. Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).
   a. Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.

3. Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.

   a. Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).

4. Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.

   a. Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified.  As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.

5. Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.

   a. Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.

A few outlier reasons for rejection:

1. No will/estate, unable to file on behalf of
2. Client no longer wishes to pursue
3. Client is uncooperative
4. Client is unresponsive/unable to reach

While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.

--

**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**



3 Attachments  •  Scanned by Gmail



| KS Law Group IO... | KS Case Allocati... | LLF LOI.pdf |

# Exhibit 9

| Row Labels | Total # of Cases | # of Good Cases | # of Bad Cases | Equity % |
|---|---|---|---|---|
| Hernia Mesh | 1533 | 519 | 1014 | 14% |
| Round Up | 252 | 83 | 169 | 44% |
| 3M | 770 | 399 | 371 | 29% |
| Talcum Powder | 1026 | 327 | 699 | 19% |
| Grand Total | 3581 | 1328 | 2253 | |

| Litigation | Total Cases Owed | Good Cases |
|---|---|---|
| Firefighter FM | 200 | 140 |
| Talc | 1026 | 327 |
| Hernia Mesh | 1533 | 519 |
| 3M | 770 | 399 |
| Roundup | 355 | 83 |

| KS Law Group | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 200 | 19% | 64 |
| Hernia Mesh | 220 | 14% | 74 |
| 3M | 220 | 29% | 114 |
| Roundup | 155 | 44% | 36 |

| Law Firm 1 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 380 | 25% | 129 |
| 3M | 350 | 45% | 181 |
| Roundup | 150 | 42% | 35 |
| Firefighter FM | 200 | 100% | 140 |

| Law Firm 2 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 348 | 34% | 111 |

| Law Firm 3 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 34 | 2% | 12 |

| Law Firm 4 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 237 | 23% | 76 |

| Law Firm 5 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 43 | 4% | 3 |
| Hernia Mesh | 49 | 3% | 17 |

| Law Firm 6 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 380 | 25% | 129 |

| Law Firm 7 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 200 | 19% | 64 |
| Hernia Mesh | 350 | 23% | 118 |

| Law Firm 8 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 113 | 7% | 38 |
| 3M | 100 | 13% | 52 |
| Roundup | 50 | 14% | 12 |

From: **ALLAN TEH** <allan.teh@icloud.com>
Date: Fri, Oct 14, 2022 at 8:10 PM
Subject: Re: Communication
To: Sylvia Benito <sylvia@capital4justice.com>
Cc: Sohail Shahrasebi <sohail.shahrasebi@gmail.com>, Lee Melchionni <lee@capital4justice.com>

# Exhibit 10

I have been in many good and bad deals but the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said. Sohail shares my frustrations as well. If not my disappointment. This is not what I signed up for. Losing money is one thing but for me to get angry like this makes it worth less

Sent from my iPhone

> On Oct 14, 2022, at 7:41 PM, Sylvia Benito <sylvia@capital4justice.com> wrote:
>
> Allan
>
> I just got off another call with you, after multiple calls today. While I respect and honor you as a valued investor, and how to respond to all investors responsibly this communication is not professional or constructive.
>
> I suggest that we communicate through your CIO as he is a great fiduciary and can keep the flow of information appropriately on course.
>
> Next week you will receive:
>
> 1- your weekly report
> 2- any other updates as available
> 3- invitation to calls with co counsel  over the next two weeks as they are available
> 4- all questions answered via Sohail or emails
> 5- every option to move ahead in written detail
> 6- vendor letter
>
> I understand that investing can be an emotional rollercoaster but I continue to believe that we have solid and competent plans as your managers to preserve and grow your investor capital.
>
> Sylvia

**From:** Lee Melchionni <lee@capital4justice.com>
**Sent:** Friday, March 3, 2023 3:17:48 PM
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>; ALLAN TEH <allan.teh@icloud.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>
**Subject:** KS Law Group Update



# Exhibit 11

Sohail,

Attached are the case lists for KS Law Group ("KS"). To provide some context, KS is owed 200 Talcum Powder cases, with a maximum non-medical record drop off of 25%. Any shortfall in Talcu employees per converted Talcum Powder case, with the Internal Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Ec Hernia Mesh cases, with a maximum non-medical record drop off of 30%. KS is owed 155 Roundup Cases, with a maximum non-medical record drop off of 25%. Any shortfall in Roundup case one conversion basis. KS is owed 220 3M cases, with a maximum non-medical record drop off of 25%.

We are also sharing the executed case replacement agreement with the Lake Law Firm.

- **3M Earplugs**
  - 11 - Attempting to Contact
  - 3 - Filed
  - 54 - Pending
  - 79 - Retained and Sent to Firm
  - 5 - Unable to Reach/Unresponsive
- **Hernia Mesh**
  - 3 - Attempting to Contact
  - 8 - Filed
  - 82 - Pending
  - 2 - Ready to Submit
  - 43 - Retained and Sent to Firm
  - 4 - Unable to Reach/Unresponsive
- **Round Up**
  - 2 - Attempting to Contact
  - 27 - Pending
  - 14 - Ready to Submit
  - 18 - Retained - Sent to Firm
  - 14 - Unable to Reach/Unresponsive
- **Talcum Powder**
  - 1 - Attempting to Contact
  - 5 - Pending
  - 2 - Retained and Sent to Firm
  - 1 - Unable to Reach/Unresponsive

--

Lee Melchionni, Esq.
Founder, COO
lee@capital4justice.com
717.380.7709



5 Attachments · Scanned by Gmail



KS_Talcum_Pow...   KS_3M_Earplugs...   KS_Round_Up_R...   KS_Hernia_Mesh...   KS Law Group - C...

# Exhibit 12

### CASE REPLACEMENT AGREEMENT

This CASE REPLACEMENT AGREEMENT (this "Agreement") is made and entered into as of December 1, 2022 by and among KS Law Group LLP, a District of Columbia limited liability partnership ("KS"), and Lake Law Firm, LLC, a New York limited liability company ("Lake") (each a "Party" and collectively the "Parties").

### RECITALS

WHEREAS, Lake is a professional law firm engaged in the practice of law, with its principal offices in the State of New York;

WHEREAS, Lake is engaged in the acquisition of clients and case workup across multiple types of mass tort litigations, including talcum powder litigation ("Talcum Powder"), hernia mesh litigation ("Hernia Mesh"), Roundup litigation ("Roundup"), and 3M litigation ("3M", and combined with Talcum Powder, Hernia Mesh, Roundup, 3M, Firefighter Foam and Zantac, the "Cases", and each individual case within the Cases, a "Case");

WHEREAS, KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount");

WHEREAS, Lake has not delivered equivalent value in cases to the Funded Amount and owes KS Cases and replacement Cases, the quantity and identity of which are set forth below; and

WHEREAS, the Parties seek to memorialize the terms of their agreement.

NOW, THEREFORE, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

1.    Replacement of Cases.  KS has previously paid Lake the Funded Amount for certain Cases as described below which Lake has yet to provide.  The Parties agree that notwithstanding any earlier agreement for Cases that existed between the Parties, Cases shall be provided by Lake to KS as set forth below.

   a.  Talcum Powder.

   i.    Lake agrees that KS is owed 200 Talcum Powder cases, guaranteed for medical records, which were purchased for $1,200,000, or $6,000 a Case (the "Talcum Power Purchase Price). The criteria for the medical record guarantee of the Talcum Powder cases are set forth in Exhibit A to this Agreement.

   ii.   Lake agrees that the maximum non-medical record drop off of KS' Talcum Powder cases will be 25%.

   iii.  Lake agrees that KS' is owed 60% of the total attorney contingency fee.

   iv.   Lake hereby agrees to allow KS to convert any shortfall in Talcum Powder cases owed into 6 filed employees per converted Talcum Powder case, with the Internal

Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

v. Lake agrees that if the owed filed employees are filed with the IRS by a law firm or company other than Lake, KS will receive 95% of the ERC fee received by Lake.

vi. Lake agrees that if the owed filed employees are filed with the IRS by Lake, KS will receive 50% of the ERC fee received by Lake.

vii. If Lake is unable to provide the filed employees before the statute of limitations expires on ERTC under the CARES Act, Lake agrees that within 90 days of the statute of limitations expiring, Lake will reimburse KS for the costs paid for each un-converted Talcum Powder case ($6,000 per case), plus 8% interest, per year, per case, from the purchase date of September 1, 2021.

b. Hernia Mesh.

i. Lake agrees that KS is owed 220 Hernia Mesh cases, guaranteed for medical records, which were purchased for $1,232,000, or $5,000 a Case (the "Hernia Mesh Purchase Price). The criteria for the medical record guarantee of the Hernia Mesh cases are set forth in Exhibit A to this Agreement.

ii. Lake agrees that the maximum non-medical record drop off of KS' Hernia Mesh cases will be 30%.

iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv. Lake agrees to continue to replace Hernia Mesh cases for KS with additional Hernia Mesh cases

v. For Hernia Mesh cases that are replaced past October 15, 2022, Lake shall pay KS 79% of the attorney fee, which shall be identified by KS to Lake in writing.

vi. Solely as an example, if 100 Hernia Mesh cases are owed to KS where 79% of the attorney fee is paid to KS, the number of owed cases to KS shall be reduced to 91

vii. If the Hernia Mesh litigation were to reach a global settlement and cases are still owed to KS, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Hernia Mesh cases ($5,000 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

viii. The Hernia Mesh litigations include, but are not limited to, the litigations related to Johnson and Johnson Proceed and Prolene Hernia System, Ethicon Physio Mesh, Covidien, W.L. Gore & Associates, Atrium C-Qur, and Davol, Inc/C.R. Bard, Inc.

c. Roundup.

i. Lake agrees that KS is owed 155 Roundup cases, guaranteed for medical records, which were purchased for $782,500, or $5,048.39 a Case (the "Roundup Purchase Price). The criteria for the medical record guarantee of the Roundup cases are set

2

forth in Exhibit A to this Agreement.

ii. Lake agrees that the maximum non-medical record drop off of KS' Roundup cases will be 25%.

iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv. Lake agrees to allow KS to convert any shortfall of Roundup cases into Camp Lejeune cases on a one-for-one conversion basis upon request from KS. Solely as an example, KS would have the ability to convert 50 Roundup cases into 50 Camp Lejeune cases. To avoid any confusion, this example does not take into account non-medical record drop off.

v. If the Roundup litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Roundup cases ($5,048.39 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

d. 3M.

i. Lake agrees that KS is owed 220 3M cases, guaranteed for medical records, which were purchased for $665,500, or $3,025 a Case (the "3M Purchase Price). The criteria for the medical record guarantee of the 3M cases are outlined in Exhibit A to this Agreement.

ii. Lake agrees that the maximum non-medical record drop off of KS' 3M cases will be 25%.

iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv. Lake agrees to continue to replace 3M cases.

v. If the 3M litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered 3M cases ($3,025 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

2. Written Notice of Modifications. In the event that a case should be replaced, converted, or modified, KS will provide written notice to Lake informing them of the need for such replacement, conversion, or modification pursuant to Section 5(b) below. Lake shall then use its best efforts to effect such replacement, conversion, or modification within a commercially reasonable timeframe.

3. Guarantee of Medical Records. Subject to the agreed upon non-medical drop off for each of the Cases described above, if a client is disqualified based on the phases below, Lake agrees that the case will be replaced one-to-one, but subject to replacement provisions set forth above,

a. Phase 1 – Verbal Confirmation. The intake details are reconfirmed verbally, and additional information is added, based on the specific case type. Secondary outreach from Lake reconfirms the information provided over the phone with additional details such as injury,

3

length of use, diagnosis, and doctor information to be provided.

b. Phase 2 – Medical Record Retrieval Phase. Medical records are obtained, proving injury, diagnosis, and/or surgery where applicable.

c. Phase 3 – Nurse Review. The medical records are reviewed by a nurse or medical professional to determine if the injury, diagnosis, and/or surgery criteria are met, based on the specific case type.

d. Phase 4 – Filing. The plaintiff fact sheet, census form, and/or [PPF] are filed with the courts. They contain details of the case, including diagnosis, medical history, etc. and is based on the specific case type.

4. Responsibilities of Lake. Lake agrees to the following:

a. Lake will market, intake, and sign-up potential clients.

b. Lake will gather medical records, a medical summary, a plaintiff fact sheet, and/or court complaint as necessary.

c. Lake will act as liaison between the undesigned and trial firms.

d. Lake will handle any client inquiries. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.

5. Miscellaneous.

a. Expenses. Except as otherwise provided herein, KS, on the one hand, and Lake, on the other, shall each pay their own expenses incident to the negotiation, preparation, and carrying out of this Agreement, including all fees and expenses of its counsel and accountants for all activities of such counsel and accountants undertaken pursuant to this Agreement, irrespective of whether or not the transactions contemplated hereby are consummated.

b. Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made if and when delivered personally or by overnight courier to the Parties at the following addresses or sent by electronic transmission, with confirmation received (or at such other address for a Party as shall be specified by like notice):

To KS:

KS Law Group LLP
20900 NE 30th Ave, Suite 510, Miami, FL 33180
Attention: Lee Melchionni
Email: lee@capital4justice.com

To Lake:

Lake Law Firm, LLC
One Rockefeller Center, 11th Floor, New York, NY 10020
Attention: Jeffrey Dubin

4

Email: elake@forpersist.com

Any such notice shall, when sent in accordance with the preceding sentence, be deemed to have been given and received on the earliest of (i) the day delivered to such address, (ii) the fifth (5th) business day following the date deposited with the United States Postal Service, or (iii) twenty-four (24) hours after shipment by such courier service.

c.   Assignment; Third Party Beneficiaries.  Neither this Agreement nor any rights or obligations under it are assignable, except that KS may assign its rights hereunder.  Except for any indemnified parties, there shall be no third party beneficiaries of this Agreement.

d.   Governing Law; Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of New York applicable to contracts executed in and to be performed in New York.  Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of New York and of the United States, in each case located in New York, for any litigation arising out of or relating to this Agreement (and agrees not to commence any litigation relating thereto except in such courts).

e.   Counterparts.  This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  It is the express intent of the Parties to be bound by the exchange of signatures on this Agreement via DocuSign (or similar electronic means) or emailed PDF copies.

f.   No Implied Waiver; Remedies.  No failure or delay on the part of the Parties to exercise any right, power, or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  All rights, powers, and privileges granted herein shall be in addition to other rights and remedies to which the Parties may be entitled at law or in equity.

g.   Entire Agreement.  This Agreement, including the Exhibit attached hereto, sets forth the entire understandings of the Parties with respect to the subject matter hereof and thereof, and it incorporates and merges any and all previous communications, understandings, oral or written as to the subject matter hereof and thereof.

h.   Amendments; Actual Waivers.  This Agreement may not be amended except by an instrument in writing signed on behalf of KS and Lake.  Any agreement on the part of KS or Lake to any such extension or waiver shall be valid if set forth in an instrument in writing signed on behalf of KS or Lake.

i.   Headings.   The headings of the Sections of this Agreement, where employed, are for convenience only and do not form a part hereof and in no way modify, interpret or construe the meanings of the Parties.

5

j.  Severability.  Any provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions of this Agreement; provided, however, in the event the provision which is invalid or unenforceable pertains to a material element of the transaction such that the principal objectives of the transaction provided for herein are materially impaired or are invalid or unenforceable, this Agreement shall be terminated.

k.  Specific Performance.  Each Party acknowledges that, in view of the uniqueness of the transactions contemplated by this Agreement, each Party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore each Party agrees that the other Parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

l.  No Presumption Regarding Drafter.  The Parties acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between them, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, it would not be appropriate to deem any Party to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

* * * * *

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Parties hereto have executed this Case Replacement Agreement as of the date first set forth above.


**KS**:

KS Law Group LLP


By: *Lee Melchionni*
    Lee Melchionni (Dec 27, 2023 20:53 EST)
Name: Lee Melchionni
Title:


**LAKE**:

Lake Law Firm, LLC


By: _____
    Edward Lake (Dec 27, 2023 20:47 EST)
Name: Edward Lake
Title:

[Signature Page to Case Replacement Agreement]

## Exhibit A

**Talcum Powder:** Cases provided with the following criteria below and guaranteed by medical records:
- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer).
- Seventy-five (75) years old or younger.
- Four (4) years plus of exposure.
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer with chemotherapy or treatment.
- Death within eighteen (18) months and original diagnosis within four (4) years of death.

**Hernia Mesh:** Cases provided with the following criteria below and guaranteed by medical records:
- Records showing revision, removal, or replacement surgery, or scheduled within ninety (90) days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery in 2011 or afterward.

**Roundup:** Cases provided with the following criteria below and guaranteed by medical records:
- Diagnosed with Non-Hodgkin lymphoma or subtype within the last ten (10) years, [unless medical records access then 2007 forward].
- Direct exposure only to Roundup for more than one (1) year.
- No existing attorney.

**3M:** Cases provided with the following criteria below and guaranteed by medical records:
- Used 3M Combat Arms CAEv2 Earplugs between 2003 and 2015.
- Diagnosed with tinnitus or documented loss of hearing of ten percent (10%) or more in at least one (1) ear.
- No existing attorney.

**Camp Lejeune:** Cases provided with the following criteria below and guaranteed by medical records:
- -PC must have resided, worked, or was otherwise exposed at Camp Lejeune, NC not less than 30 days from 8/1/1953 through 12/31/1987
- -PC must have been diagnosed with one of the following injuries after exposure at Camp Lejeune: Bladder Cancer, Brain Cancer, Brain Tumor, Cervical Cancer, Ovarian Cancer, Prostate Cancer, Rectal Cancer, Breast Cancer, Esophageal Cancer, Kidney Cancer, Liver Cancer, Lung Cancer, Leukemia, Hodgkin's Disease, Lymphoma, Multiple Myeloma, Hepatic Steatosis (Fatty Liver Disease), Parkinson's Disease, Renal Toxicity, Scleroderma, Non-Hodgkin's Lymphoma, Soft Tissue Cancer, Basal Cell Carcinoma, Melanoma, Merkel Cell Carcinoma, Squamous Cell Carcinoma, Colon (Colorectal) Cancer, Intestinal Cancer, Appendix Cancer, Aplastic Anemia and other Myelodysplastic syndromes, Cirrhosis of the Liver, Renal/Kidney Failure, Birth Defects (non-Cardiac), Cardiac Birth Defects, Miscarriage (19 weeks or earlier), Fetal Death (20 weeks gestation), Fertility Issues, Tremors (musculoskeletal), Pre-Parkinson's Disease, Neurobehavioral Effects - must have all symptoms: delayed reaction times, memory problems, attention/concentration problems, and motor function problems (e.g. hand tremor, postural sway)
- -PC must not currently be represented by an attorney

[Exhibit A]

# KS Law Group - Case Replacement Agreement

Final Audit Report                                                    2022-12-28

| | |
|---|---|
| Created: | 2022-12-28 |
| By: | Lee Melchionni (lee@redwoodlg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4IPGrt0ky7Gi-3IFKgGAkBJ5kv2fPsI0 |

## "KS Law Group - Case Replacement Agreement" History

📄 Document created by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:44:56 AM GMT- IP address: 99.110.180.129

✉️ Document emailed to elake@forpersist.com for signature
2022-12-28 - 1:45:53 AM GMT

📄 Email viewed by elake@forpersist.com
2022-12-28 - 1:46:43 AM GMT- IP address: 73.205.234.141

✍️ Signer elake@forpersist.com entered name at signing as Edward Lake
2022-12-28 - 1:47:04 AM GMT- IP address: 73.205.234.141

✍️ Document e-signed by Edward Lake (elake@forpersist.com)
Signature Date: 2022-12-28 - 1:47:06 AM GMT - Time Source: server- IP address: 73.205.234.141

✉️ Document emailed to Lee Melchionni (lee@redwoodlg.com) for signature
2022-12-28 - 1:47:07 AM GMT

📄 Email viewed by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:53:47 AM GMT- IP address: 99.110.180.129

✍️ Document e-signed by Lee Melchionni (lee@redwoodlg.com)
Signature Date: 2022-12-28 - 1:53:57 AM GMT - Time Source: server- IP address: 99.110.180.129

✔️ Agreement completed.
2022-12-28 - 1:53:57 AM GMT

📑 **Adobe Acrobat Sign**

# Exhibit C

Filing # 171724175 E-Filed 04/25/2023 10:40:40 AM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH,

      On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

      Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

      Nominal Defendant.

_____/

## DERIVATIVE COMPLAINT

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership") files this derivative suit on behalf of KS Law against Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), PERSIST COMMUNICATIONS, INC ("Persist"), THE LAKE LAW FIRM, LLC ("Lake Law Firm")

(hereinafter, collectively "Defendants"), and Nominal Defendant KS Law Group, LLP, and in support thereof alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1. This action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2. Plaintiff, Allan Teh, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County, Florida.

3. Nominal Defendant, KS Law Group, LLP is a District of Columbia Limited Liability Partnership which operates in the State of Florida, maintains bank accounts in the State of Florida, and whose principals all reside in the State of Florida.

4. Defendant, Lee Melchionni, is a citizen and resident of the State of Florida and is currently a managing partner of KS Law with a twenty-five percent (25%) ownership interest in KS Law. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5. Defendant, Sylvia Benito, is a citizen and resident of the State of Florida and is currently a Managing Partner of KS Law with a twenty-five percent (25%) ownership interest. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

6. Persist Communications, Inc. is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of

operation is located in Broward County Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

7.   Persist's President and Registered Agent is Edward Lake ("Mr. Lake").  Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as* **Exhibit 1** *and Lake Law invoice dated 9/1/2021 as* **Exhibit 2.**

8.   Lake Law Firm, LLC, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law firm has an office located in Broward County Florida and issues invoices regarding alleged services with the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See* **Exhibit 2**.

9.   As more fully set forth herein, Lake Law Firm has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to F.S. §48.193 et seq., Lake Law Firm is subject to specific personal jurisdiction because Lake committed multiple acts and breaches enumerated in F.S. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law Firm has an office in Florida, has committed a tortious act within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

10. This venue and forum are appropriate based upon F.S. § 47.011 and F.S. § 47.051 and also because virtually every act, breach and transaction set out in this Complaint occurred in Miami-Dade County Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

**GENERAL ALLEGATIONS**

11. KS Law was formed on August 24th, 2021, upon the execution of the Partnership Agreement. *See Partnership Agreement attached as **Exhibit 3**.*

12. At all times material hereto, KS Law had three "Managing Partners" each owning a certain equity interest, as set forth below:

   a. Lee Melchionni, Esq. (25% Ownership Interest)

   b. Sylvia Benito (25% Ownership Interest)

   c. Allan Teh (50% Ownership Interest)

13. Pursuant to Section 4 of the Partnership Agreement KS Law's "sole purpose is to engage in the practice of law."

14. KS Law was to partner with co-counsel and trial-counsel in order to obtain, work-up, and handle various mass tort injury cases which were represented to include:

   a. Hernia Mesh Injury Cases;

   b. Round Up Toxicity Cases;

   c. 3M Ear Plug Injury Cases; and

   d. Talcum Powder Toxicity Cases.

15. Further, pursuant to Section 12 of the Partnership Agreement "[i]t is expressly understood" that Teh would underwrite and fund the activities of KS Law.

16. On September 3rd, 2021, Teh, in compliance with his duties to the Partnership, wired $4 million as a capital contribution into the KS Law Account at Chase Bank (Acct. Ending in ***6138) at the direction of his fellow Partners, Melchionni and Benito.

17. Teh's $4 million capital contribution constitutes KS Law's entire working capital.

18. Despite Teh funding the entirety of KS Law's operations his fellow partners, Melchionni and Benito, have continuously left Teh in the dark on substantive management decisions of KS Law.

19. Melchionni and Benito, each unilaterally and amongst themselves and with absolutely no authority, have hijacked the management of KS Law and have treated Teh as mere investor rather than a 50% owner and partner of KS Law.

20. Managing Partners, Melchionni and Benito, for their own pecuniary gain, and acting in concert with Defendants Persist and Lake Law, have misappropriated the entirety of KS Law's working capital and breached their fiduciary duties to the Partnership through fraudulent conduct which has led to the unjust enrichment of Persist and Lake Law.

21. Melchionni and Benito are both partners in at least five (5) other D.C. law firms that handle similar cases.

22. Upon information and belief, Melchionni, Benito, and Lake Law have been siphoning "good" cases from KS Law and transferring the cases to Defendant,

Lake Law, and other law firms in which Melchionni and Benito are partners or have a financial interest.

23. Lee Melchionni is the "Legal Managing Partner" of KS Law. In Melchionni's capacity as the "Legal Managing Partner" his duties include:

   a. Providing "legal support to work up, qualify, process, manage, and settle cases";

   b. Being "responsible for case related expenses, including the use of third party vendors to accomplish these tasks"; and

   c. Payment of the "cost of acquiring and maintaining malpractice and general liability insurance . . . for KS Law Group, LLP";

24. There is no evidence that Melchionni fulfilled or understood any of these duties.

25. Sylvia Benito is a "non-lawyer" partner of KS Law with "the authority over marketing Partnership Activities, and provide other professional management services" which "include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership," and "obtaining new clients and cases."

26. There is no evidence that Benito fulfilled or understood any of these duties.

27. Despite Melchionni and Benito's representations that Teh's $4 million contribution would be utilized for the acquisition and management of these mass-tort cases, the truth of the matter is that a mere **thirteen days after the funds were deposited into** KS Law's bank account it was transferred out to an entity with whom KS Law has no written agreement.

28.   Specifically, on September 16th, 2021, $3,880,000 was transferred from KS Law's Chase bank account to Defendant, Persist's, TD Bank account ending in ***2721. *See **Exhibit 2***.

29.   Defendants, Melchionni and Benito, with absolutely no authority or legitimate reason transferred essentially all of KS Law's working capital to a third-party (Defendant Persist) with no known contract or agreement in place.

30.   Further, Teh, as the 50% owner of KS Law was not informed of the transfer at that time or any appropriate time thereafter.

31.   It was only until the Fall of 2022, approximately one (1) year following those transfers, that Teh finally received documents obliquely referencing said transfer. To wit: a one-and-a-half-page invoice from Lake Law "to" KS Law for $3,880,000.00.  *See **Exhibit 2***.

32.   The transfer of $3,880,000 of KS Law's funds to Persist was made at the direction of Melchionni, Benito, and Lake Law.

33.   The purpose of this transfer is not yet known since Persist appears to be a communications or marketing company. Again, there is no known contract between KS Law and Persist.

34.   Persist has failed to account or provide any benefit to KS Law in exchange for the $3,880,000 payment.

35.   On October 18th, 2021, approximately two (2) months after KS Law was formed, Melchionni represented that KS Law had:

    a.  155 Round Up Cases;

b.  200 Talcum Powder Cases;

c.  212 Hernia Mesh Cases; and

d.  212 3M Earplug Cases. *See October 18th Email as **Exhibit 4**.*

36.  Benito represented that KS Law's Talcum Powder cases alone would bring in a total of $2,978,000.00 in revenue to KS Law. *See redacted July 11th, 2022, Excel Spreadsheet attached as **Exhibit 5**.*

37.  A mere three (3) months later, the represented number of Talcum Powder Cases KS Law had was whittled down to only 59. *See October 14th, 2022 Email attached as **Exhibit 6**.*

38.  This represents a 70% drop-off from the original 200 Talcum Powder cases Melchionni and Benito represented KS Law to have.

39.  The representations made by both Melchionni and Benito regarding the cases KS Law had and KS Law's entitlement to any settlement fees were false and fraudulent and Melchionni and Benito knew these were false representations at the time they made them.

40.  Melchionni himself has admitted that **KS Law does not have a single retainer agreement in place**. Nor does KS Law have any agreements as co-counsel, referring counsel, or trial counsel.

41.  It is important to note that Rules 1.5(c) and 1.5(e) of Rules of Professional Conduct governing D.C. law firms explicitly state:

**1.5(c)** A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or

percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

**1.5(e)** A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing**, of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; **_and_**

(4) The total fee is reasonable.

42.     As stated above, KS Law is not party to any known fee agreement and upon information and belief no "client" has ever been informed of KS Law's involvement in their case.

43.     On December 18th, 2022, Melchionni on behalf of the Partnership executed a "Case Replacement Agreement" with Lake Law. *See Case Replacement Agreement attached as* **Exhibit 7.**

44.     Although $3,880,000 was deposited into Persist's TD bank account and Persist and Lake Law are separate and distinct entities, the Case Replacement Agreement claims that the $3,880,000 was actually paid to Lake Law rather than Persist. *See* **Exhibit 7.**

45. The agreement contains several admissions that Melchionni and Benito's representation of the number of cases KS Law had were false.

46. Specifically, the Case Replacement Agreement appears to be Defendant's attempt to backtrack their representations and "replace" cases that KS Law never had in the first place.

47. The agreement itself admits that "Lake has not delivered equivalent value in cases."

48. For example the Case Replacement Agreement states that "Lake agrees that KS is owed 200 Talcum Powder cases."

49. To date, KS Law has not been provided evidence of these "replacement cases" nor received any return on the benefits provided to Lake Law and Persist.

50. On March 3rd, 2023, despite the multiple previous representations made by Melchionni and Benito, the "drop-off" in KS Law cases was astounding and was now represented that KS Law had:

    a. 152 3M Ear Plug Cases;

    b. 142 Hernia Mesh Cases;

    c. 75 Round Up Cases; and

    d. **9 Talcum Powder Cases**. *See March 3, 2023 email attached as **Exhibit 8**.*

51. This represents a 51% drop-off in cases previously represented by Melchionni and Benito and a 96% drop-off from KS Law's original amount of Talcum Powder cases.

52. On April 13th, 2023, Johnson & Johnson announced an 8.9 Billion Dollar settlement offer to claimants in Talcum Powder Cases. *See attached press release as **Exhibit 9.***

53. Melchionni, as the Legal Managing Partner of KS Law, provided no update on this settlement nor any clarity on the amount of Talcum Power Cases KS Law currently has.

54. Melchionni has breached his fiduciary duties to KS Law not only by misappropriating the working capital of KS Law but openly admitting that KS Law does not hold general or professional liability insurance required under the Partnership Agreement.

55. Nor does KS Law have a "Interest on Lawyer Trust Account" ("IOLTA") required by the D.C. Rules of Professional Conduct

56. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, a single contingent fee agreement, and having no general or professional liability insurance is shocking and clearly demonstrates the breaches alleged herein.

### DEMAND ON KS LAW GROUP, LLP'S MANAGING PARTNERS IS EXCUSED AS FUTILE

57. Plaintiff has not made a formal demand on the general partners of KS Law to investigate or initiate the claims asserted herein because such demand is excused as futile.

58. As detailed herein, the actions that have directly damaged KS Law arise out of the conduct of general partners Melchionni and Benito.

59. Pursuant to Section 26 of the Partnership Agreement "all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized **only by the affirmative vote of 66 2/3% of the total, combined ownership interests.**"

60. Together, Defendants, Melchionni and Benito, hold a 50% ownership interest in KS Law and based on their breaches of fiduciary duty and fraudulent conduct to request they investigate their own wrongdoings would be inappropriate and futile.

## COUNT 1
## DERIVATIVE CLAIM FOR THE EQUITABLE APPOINTMENT OF A RECEIVER

61. Plaintiff re-alleges and incorporated by reference paragraphs 1 through 60 as if fully set forth herein.

62. This is an action for the appointment of a receiver for KS Law pursuant to the inherent equitable powers of this Court.

63. The basis for the appointment of a receiver over KS Law is predicated upon the various wrongful acts and conduct of Defendants, Melchionni and Benito, in breaching the Partnership Agreement and their fiduciary duties, including but not limited to:

    a. Misrepresentation of the number of cases KS Law had;

    b. Misappropriation of Partnership Funds in the form of transferring $3,880,000 to Defendant, Persist;

    c. Failure to maintain general or professional liability insurance;

    d. Failure to maintain and IOLTA account; and

    e.  Failure to have a single retainer, co-counsel, or referring counsel agreement in place.

64. Further, given the gravity and extent of misconduct by Melchionni and Benito, they should be permanently removed as partners in KS Law.

65. Based on the foregoing, KS Law is entitled to the appointment of a receiver to manage the affairs of KS Law and who shall have all the powers and duties required to effectuate that management.

66. Accordingly, in order to preserve KS Law and protect it from further waste and damage, the Plaintiff seeks the appointment of a receiver over KS Law, and for an order conferring upon such receiver all powers and authority by law

**WHEREFORE**, Plaintiff respectfully requests this Court enter an Order appointing a receiver to manage the affairs of KS Law Group, LLP, permanently expel Melchionni and Benito from the Partnership, award attorneys' fees and costs, and any such further relief this Court deems just and proper.

## COUNT 2
## DERIVATIVE CLAIM FOR CONSTRUCTIVE FRAUD
### (AS TO LEE MELCHIONNI)

67. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

68. Melchionni holds a 25% ownership interest in KS Law.

69. At all times material hereto, there has been a relationship of trust and confidence between Melchionni, on the one hand, and KS Law on the other hand.

70.   At all times material hereto, Melchionni has served as the Legal Managing Partner of KS Law.

71.   As alleged herein, Melchionni has committed constructive fraud by, among other things, participating in self-dealing, fraudulent transactions whereby transferring essentially all of KS Law's working capital to Defendant, Persist, without any known agreement in place. Further, Melchionni has siphoned "good" cases away from KS Law for his own pecuniary gain damaging and continuing to damage KS Law.

72.   By virtue of Melchionni's fiduciary relationship, Melchionni had the continuing duty of care, honesty, and loyalty to KS Law and his fellow Partners which he has blatantly ignored and breached.

73.   Melchionni's knew or should have known that his conduct and inaction would necessarily damage KS Law.

74.   Melchionni's material breaches of his duties have proximately caused serious damage to KS Law. All such damages proximately result from Melchionni's breaches of his duties

**WHEREFORE**, Plaintiff, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Lee Melchionni for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 3
## DERIVATIVE CLAIM FOR CONSTRUCTIVE FRAUD
### (AS TO SYLVIA BENITO)

75.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

76.    Benito holds a 25% ownership interest in KS Law.

77.    At all times material hereto, there has been a relationship of trust and confidence between Benito, on the one hand, and KS Law on the other hand.

78.    At all times material hereto, Benito has served as a Non-Lawyer Partner of KS Law.

79.    As alleged herein, Benito has committed constructive fraud by, among other things, participating in self-dealing, fraudulent transaction whereby transferring essentially all of KS Law's working capital to Defendant, Persist, without any known agreement in place. Further, Benito has siphoned "good" cases away from KS Law for her own pecuniary gain damaging and continuing to damage KS Law.

80.    By virtue of Benito's fiduciary relationship, Benito had the continuing duty of care, honesty, and loyalty to KS Law and his fellow Partners which she has blatantly ignored and breached.

81.    Benito knew or should have known that her conduct and inaction would necessarily damage KS Law.

82.    Benito's material breaches of her duties have proximately caused serious damage to KS Law. All such damages proximately result from Benito's breaches of his duties

**WHEREFORE**, Plaintiff, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Sylvia Benito

for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 4
## DERIVATIVE CLAIM BREACH OF FIDUICARY DUTY
### (AS TO LEE MELCHIONNI)

83. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

84. Melchionni holds a 25% ownership interest in KS Law.

85. At all times material times hereto, Melchionni served as the "Legal Managing Partner" of KS Law, and, as a result, owed KS Law and its Partners a fiduciary duty.

86. As alleged herein, Melchionni committed constructive fraud and breached his fiduciary duties by misappropriating KS Law's funds, wasting partnership assets, and fraudulently concealing and failing to disclose the same, for his own personal pecuniary gain and to the detriment of KS Law.

87. For example, Plaintiff has discovered that Melchionni without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred essentially all of KS Law's working capital, amounting to $3,880,000, to Defendant, Persist's TD Bank account.

88. Further, Melchionni has admitted that KS Law, as a law firm, does not have a single retainer agreement in place, as co-counsel, or referring counsel, or any other capacity.

89. Melchionni has also failed to acquire or maintain any general or professional liability insurance for KS Law as is his duty and obligation under the Partnership

Agreement nor has he maintained an IOLTA as required by the D.C. Rules of Professional Conduct.

90. Finally, upon information and belief, Melchionni has siphoned "good" cases from KS Law to Lake Law and the other law firms in which Melchionni is a partner in.

91. The misconduct of Melchionni has materially harmed KS Law.

**WHEREFORE,** Plaintiff, Allan Teh, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Lee Melchionni for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 5
## DERIVATIVE CLAIM BREACH OF FIDUICARY DUTY
### (AS TO SYLVIA BENITO)

92. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

93. Benito holds a 25% ownership interest in KS Law.

94. At all times material times hereto, Benito served as a "Non-Lawyer" Partner of KS Law, and, as a result, owed KS Law and its Partners a fiduciary duty.

95. As alleged herein, Benito committed constructive fraud and breached her fiduciary duties by misappropriating KS Law's funds, wasting partnership assets, and fraudulently concealing and failing to disclose the same, for her own personal pecuniary gain and to the detriment of KS Law.

96. For example, Plaintiff has discovered that Benito without any safeguards, benchmarks, or monitoring agreements in place, fraudulently transferred

essentially all of KS Law's working capital, amounting to $3,880,000, to Defendant, Persist's TD Bank account.

97. Upon information and belief, Benito has siphoned "good" cases from KS Law to Lake Law and the other law firms in which Benito is a partner in.

98. The misconduct of Benito has materially harmed KS Law.

**WHEREFORE,** Plaintiff, Allan Teh, on behalf of KS Law, respectfully requests that this Court appoint a receiver over KS Law and its assets, and enter a judgment against Sylvia Benito for all damages, plus interest, costs, and attorneys' fees, and any such further relief this Court finds just and proper.

## COUNT 6
## <u>DERIVATIVE CLAIM FOR UNJUST ENRICHMENT</u>
### (AS TO LAKE LAW FIRM)

99. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

100. As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Lake Law unjustly receiving the millions of dollars, arose from acts and omissions by Lake Law and those other named Defendants.

101. Specifically, Lake Law has not provided anything of value to KS Law in exchange for the $3,880,000 it received.

102. Lake Law was individually enriched by the receipt of funds as specifically set forth herein.

103. As referenced herein, KS Law has conferred a benefit on Lake Law by paying such funds.

104. Lake Law had and has knowledge of the significant benefit conferred upon it.

105. Defendant voluntarily accepted and retained the benefit conferred, i.e., Lake Law, to this day, has continued to retain those funds.

106. As specifically set out herein, circumstances are such that it would be inequitable for the Defendant to retain the benefit conferred upon it without first providing the appropriate exchange of value and consideration to KS Law.

107. KS Law was legally impoverished as that term is used in the context of this claim.  Specifically, $3,880,000 of KS Law's funds was wrongfully transferred to, and is being held by Lake Law.

108. As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

109. There is no justification regarding the enrichment realized by Lake Law.

110. There is no adequate remedy available at law regarding that which has occasioned upon KS Law.

**WHEREFORE,** Plaintiff, on behalf of KS Law demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT 7
## DERIVATIVE CLAIM FOR UNJUST ENRICHMENT
### (AS TO PERSIST COMMUNICATIONS)

111. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

112. As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Persist unjustly receiving the millions of dollars, arose from acts and omissions by Persist and those other named Defendants.

113. Specifically Persist has not provided anything of value to the KS Law in exchange for the $3,880,000 it received.

114. Persist was individually enriched by the receipt of funds as specifically set forth herein.

115. As referenced herein, KS Law has conferred a benefit on the Persist individually by paying such funds.

116. Persist had and has knowledge of the significant benefit conferred upon it.

117. Defendant voluntarily accepted and retained the benefit conferred, i.e., Persist, to this day, has continued to retain those funds.

118. As specifically set out herein, circumstances are such that it would be inequitable for the Defendant to retain the benefit conferred upon it without first providing the appropriate exchange of value and consideration to KS Law.

119. KS Law was legally impoverished as that term is used in the context of this claim. Specifically, $3,880,000 of KS Law's funds was wrongfully transferred to, and is being held by Persist.

120. As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

121. There is no justification regarding the enrichment realized by Persist.

122. There is no adequate remedy available at law regarding that which has occasioned upon KS Law.

**WHEREFORE,** Plaintiff, on behalf of KS Law demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT 8
## DERIVATIVE CLAIM FOR EQUITABLE ACCOUNTING
### (AS TO LAKE LAW)

123. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

124. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Lake Law unjustly receiving the subject funds arose from acts and omissions by Lake Law and they have been unjustly enriched thereby.

125. Specifically, Lake Law has not provided anything of value to KS Law in exchange for the $3,880,000 they received.

126. Defendants Lake Law and Persist were individually enriched by the receipt of funds as alleged herein.

127. As referenced herein, KS Law has conferred a benefit on the Defendant Lake Law.

128. Lake Law had and have knowledge of the significant benefit conferred upon it.

129. Lake Law voluntarily accepted and retained the benefits conferred.

130. Lake Law, to this day, has continued to retain those funds.

131. KS Law's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

132. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

133. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Lake Law's knowledge and direction, transferred essentially all of KS Law's working capital to Defendant, Lake Law, with no cognizable contract or agreement in place.

134. In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

135. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

136. Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff, on behalf of KS Law, demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

**COUNT 9**
**DERIVATIVE CLAIM FOR EQUITABLE ACCOUNTING**
**(AS TO PERSIST COMMUNICATIONS)**

137. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 60 as if fully set forth herein.

138. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Persist unjustly receiving the subject funds arose from acts and omissions by Persist and it has been unjustly enriched thereby.

139. Specifically, Persist has not provided anything of value to KS Law in exchange for the $3,880,000 it received.

140. Defendant Persist was enriched by the receipt of funds as alleged herein.

141. As referenced herein, KS Law has conferred a benefit on the Defendant Persist.

142. Persist had and have knowledge of the significant benefit conferred upon it.

143. Persist voluntarily accepted and retained the benefits conferred.

144. Persist, to this day, has continued to retain those funds.

145. KS Law's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

146. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

147. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Persist's knowledge and direction, transferred essentially all of KS Law's working capital to Defendant, Persist, with no cognizable contract or agreement in place.

148. In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

149. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

150. Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff, on behalf of KS Law, demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

The Plaintiff hereby demands trial by jury on all issues and claims so triable as of right.

Dated: April 25, 2023

Respectfully submitted,

**JONES & ADAMS, P.A.**
*Attorney for Plaintiff*
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

# 2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT

DOCUMENT# P15000085963

**Entity Name:** PERSIST COMMUNICATIONS, CORPORATION

**FILED**
**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

**Current Principal  Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316

**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE,  FL  33316  US

**FEI Number: 81-0851001**

**Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL  33316  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   EDWARD LAKE                                                                01/20/2023
_____
               Electronic Signature of Registered Agent                                       Date

**Officer/Director Detail :**

Title            PRESIDENT

Name         LAKE, EDWARD J

Address      1815 CORDOVA RD

City-State-Zip:   FT. LAUDERDALE  FL  33316

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EDWARD J LAKE                              PRESIDENT                  01/20/2023
_____
           Electronic Signature of Signing Officer/Director Detail                            Date

# THE LAKE LAW FIRM

## Invoice

| BILL TO: KS Law Group | | CAMPAIGN: HM/TALC/3M/RU |
|---|---|---|
| | | DATE: 9/1/2021 |
| | | DUE DATE: |
| Phone: | | TERMS: See Below |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 220 | Hernia Mesh | $5,600 | $1,232,000 |
| 200 | Talc | $6,000 | $1,200,000 |
| 155 | Round Up | $5,048.39 | $782,500 |
| 220 | 3M | $3,025 | $665,500 |
| | | Total | $3,880,000.00 |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

**REMITTANCE BY WIRE:** *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com

CONFIDENTIAL

KS-Law-Teh-000050

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Print Name: _Lee Melchionni_

Signature: _[signature]_          Date: __9/1/21__

## REMITTANCE BY WIRE:

*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000051

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834



**KS LAW GROUP, LLP**
**LIMITED LIABILITY PARTNERSHIP AGREEMENT**
**EFFECTIVE AS OF July 26, 2021**

This Limited Liability Partnership Agreement ("Agreement") is entered into by Attorney Lee Melchionni and Non-Attorneys Allan Teh[1] and Sylvia Benito (collectively, the Managing "Partners"), pursuant to the provisions of the Business Organizations Title in the District of Columbia Code (specifically, D.C, Code § 29-101.01, *et seq.*, the "Act").

1.      **Formation.**

Pursuant to this Agreement, the limited liability partnership was formed (the "Partnership"), and the Managing Partners elected to become a registered, Limited Liability Partnership, in accordance with the provisions of the Code. The Managing Partners shall be:

1. Lee Melchionni, Esq.; (Melchionni as the "Attorney") and

2. Allan Teh,

3. Sylvia Benito

The Managing Partners agree that no person shall be added or admitted to the Partnership as either a Partner or Managing Partner without the unanimous, affirmative vote of the Managing Partners, with the sole exception of the provisions set forth in Section 16.

2.      **Name.**

The name of the Partnership shall be KS Law Group, LLP, and all business of the Partnership shall be conducted under and in such name. There shall be no change to the Partnership name without the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

3.      **Primary Place of Business.**

The Partnership shall be established and have the place of business in the District of Columbia, located at 1100 H Street NW, Suite 840, Washington, D.C. 20005 or at an address or location to be determined by the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

---

[1] All references to Allan Teh are to him in his capacity as Partner and nominee for Kamunting Street Capital Management, L.P. shall have the right to designate a replacement Partner for Allan Teh, who shall then become a Managing Partner, in the event that Allan Teh is unwilling to serve, becomes incapacitated or dies.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

4.      **Sole Purpose.**

The Partnership's sole purpose is to engage in the practice of law, in order to provide the Partners with the opportunity for pecuniary gain, professional growth and service to the bar and the state and communities which the Partnership serves.

The Partnership shall be a partnership only for the purpose specified in this Section. Except as otherwise provided in this Agreement, the Partnership shall not engage in any other activity or business that is not reasonably necessary or appropriate to the accomplishment of its purpose, and no Partner shall have any authority to hold himself out as the agent of another Partner in regard to any other business or activity.

5.      **Statutory Compliance.**

The Partnership shall exist under and be governed by, and this Agreement shall be construed in accordance with, all the applicable laws of the District of Columbia and the District of Columbia Rules of Professional Conduct. The Managing Partners agree to and shall make all filings and disclosures required by, and shall otherwise comply with, all such laws. The Managing Partners agree to and shall execute and file any assumed or fictitious name certificates and other documents and instruments as may necessary or appropriate with respect to the formation of and conduct of business by the Partnership.

Further, each Managing Partner and Partner, other than the designated Legal Managing Partner (identified in Section 14 of this Agreement), hereby agrees not to hold himself or herself out to the general public, nor publicize in any media or forum their or any other Members' ownership, membership or affiliation with the Partnership.

6.      **Indemnification.**

Melchionni (an "Indemnifying Partner") hereby agrees to indemnify Allan Teh from time to time, and hold them harmless from and against all liability, loss, cost, damage and expense (including attorneys' fees and costs incurred in the investigation, defense and settlement of the matter) which the Partnership or any of such other Partners shall ever sustain, suffer or incur which relate or arise out of or in connection with the operation of the Partnership or a breach by the Indemnifying Partner of any representation, warranty or covenant made by the Indemnifying Partner in this Agreement. If the Partnership, Allan Teh from time to time are made a party to any litigation or otherwise incurs any loss or expense as a result of or in connection with any Indemnifying Partner's personal or professional obligations or liabilities unrelated to Partnership business, such Indemnifying Partner shall indemnify and reimburse the Partnership, Allan Teh from time to time, for all such loss and expense incurred, including reasonable attorneys' fees.

7.      **Title to Property.**

The Partnership shall hold all real and personal property interests in the name of the Partnership, and not in the name of any Partner.

8.      **No Payments of Individual Obligations.**

The Partners agree to and shall use the Partnership's credit and assets solely for the benefit of

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

the Partnership.

Melchionni in his capacity as agent and nominee for KS Law Group, LLP, shall pay the costs of acquiring and maintaining malpractice and general liability insurance (to the extent these coverages are available) for KS Law Group, LLP. The policy shall be at least $5 million per claim/ $5 million in the aggregate and cover all Managing Partners for acts undertaken in their official capacity as Managing Partners.

9.      **Limitation of Duties**

Each Partner hereby agrees that he/she owes duties of care, honesty and loyalty to the other Partners and to the Partnership itself, subject only to the following limitations:

(a)      Subject to their Non-Circumvention obligations, the Partners are not restricted from competing with the Partnership. Each Partner and the Partnership itself waives any breach of duty arising from a Partner engaging in any business, enterprise or transaction, which may directly or indirectly compete with the partnership, or that otherwise would constitute a business opportunity for the Partnership.

(b)      Each Partner who is an Attorney shall have no limitation regarding the ethical practice of law, and any duty under this Agreement or implied in law shall be waived to the extent it would interfere with a lawyer's ability to represent any client as required by the rules of ethics and professional responsibility.

10.     **Non-Circumvention.**

Notwithstanding any other provision in this Agreement, if an attorney Partner withdraws from the Partnership, the withdrawing attorney Partner shall pay to the Partnership a share of the fees received for legal services provided to any client of the Partnership who subsequently engages the withdrawing attorney Partner. The allocation of the fees received shall be in proportion to the work done before and after the withdrawal. Recoverable costs shall be reimbursed upon receipt. The Partners irrevocably agree that they shall not, directly or indirectly, interfere with, circumvent or attempt to circumvent, avoid, by-pass or obviate the Partnership's interest in and relationship with pre-established sellers, buyers, brokers, dealers, distributors, technology providers, intermediaries, entrepreneurs, consultants, employees, legal counsel, professional relationships, individuals, or any other pre-established or un-contracted relationships revealed or introduced by one Partner to another in connection with any present and future transactions related to this Partnership.

11.     **Ownership Interests.**

The Managing Partners' Ownership Interest in the Partnership shall be:

| | |
|---|---|
| 1. Lee Melchionni, Esq. | 25% |
| 2. Allan Teh, | 50% |
| 3. Sylvia Benito, | 25% |

The Managing Partners agree that, other than the percentages and adjustments set forth in this Section, the Ownership Interest of the Partners shall not be amended or changed without the unanimous, affirmative vote of the Managing Partners.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

12.    **Capital Contributions.**

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm. The Partners agree that Capital Contributions, will be made from time to time over a six (6) month period, for a total minimum amount of $4,000,000. The Capital Contributions will be made by Allan Teh in the amount of $4,000,000.

13.    **Rights, Powers and Responsibilities of the Managing Partners.**

The Managing Partners shall divide the responsibility for certain areas of Partnership operations as set forth herein:

A) Lee Melchionni shall be the Legal Managing Partner. The Legal Managing Partner shall provide the legal support to work up, qualify, process, manage and settle cases. He shall also be responsible for case related expenses, including the use of third party vendors to accomplish these tasks. In fulling these roles the Legal Managing Partner shall have complete and unequivocal control and veto power over any and all decisions relating to the practice of law, the prosecution of each of the Partnership's client's legal claims, the outward conduct of the law firm, the handling of funds in any IOLTA or client trust accounts, the public statements and representations of the law firm (including any and all marketing, branding and website design), conflicts of interest, whether actual or potential, co-counsel relationships, referrals to counsel, fee disputes, and client confidentiality, as well as any activities by or on behalf of the law firm, including the activities of any Partners, employees, agents, and independent contractors, which are regulated, limited or otherwise addressed in any way by the District of Columbia Rules of Professional Conduct.

Per District of Columbia Rule of Professional Conduct 5.4, the Legal Managing Partner hereby agrees to be responsible for and to supervise the managerial and other activities of the nonlawyer Partner, Allan Teh, and other Partners as they may be added, as if these non-lawyer Partners were lawyers admitted to practice in the District of Columbia, and to supervise the ethical conduct of same under the standards set forth in District of Columbia Rule of Professional Conduct 5.1. It is hereby agreed that this provision will require the Partnership and Legal Managing Partner to make reasonable efforts to ensure that the Partnership has in effect measures giving reasonable assurance that all the participants in the Partnership conform to the D.C. Rules of Professional Conduct.

Allan Teh and Sylvia Benito, as a Non-Lawyers participant in the Partnership per D.C. Rule of Professional Conduct 5.4, shall have the authority over marketing Partnership Activities, and provide other professional management services, all in order to assist the Partnership in providing legal services to the Partnership's clients. These managerial activities will include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership, obtaining new clients and cases, joint venturing, firm infrastructure management, and advising the Managing Partners regarding the same.

A)    In the event that the Managing Partners disagree regarding a Partnership operation or activity which is directly addressed within the District of Columbia Rules of Professional Conduct and also relates to marketing, branding, marketing campaigns, internet marketing or internet design, or regarding any proposed, contemplated or actual activity for or on behalf of the Partnership which is

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

regulated and/or limited by the District of Columbia Rules of Professional Conduct, the Legal Managing Partners shall have complete and unequivocal control of and veto power over, any such activity, as set forth in Section 14(A) above.

Per District of Columbia Rule of Professional Conduct 5.4, the Non-Lawyer Managing Partner, hereby agrees and undertakes to abide by the D.C. Rules of Professional Conduct as if she was a lawyer admitted in the District of Columbia.

### 14. Partner Compensation.

No Partner shall receive any interest or salary with respect to his/her Capital Contributions or his/her Ownership Interest, or for services rendered to or on behalf of the Partnership, or otherwise in his/her capacity as Partner, except as otherwise provided in this Agreement or by unanimous written consent of all Partners.

### 15. Withdrawal, Divorce or Death of a Partner.

Any Partner may withdraw from the Partnership upon sixty (60) calendar days' written notice to the other Partners and Managing Partners. Upon withdrawal, the withdrawing Partner shall cease to have any rights to further participation in the management or operations of the Partnership. Such withdrawing Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on claims that were retained by the Partnership prior to the day the Partner gave his/her notice of withdrawal to the Partnership. For purposes of this Section, the retainer date shall be deemed to be the first date on which the client executed a retainer agreement with the Partnership.

Furthermore, a Partner's death or permanent disability shall be deemed a "withdrawal" as of the date of the death or permanent disability. A deceased or permanently disabled Partner and/or his/her estate and heirs shall continue to have the right to payment of his/her share of the fees paid to the Partnership in accordance with the Partner's Partnership Interest as of the date of death or permanent disability on cases that were retained by the Partnership on or before such date. Payments under this provision shall be made in the normal course of business pursuant to the rules for distribution set forth in Section 22 of this Agreement.

The Partners hereby agree that, if by operation of law or by judgment or judicial decree in a bankruptcy or divorce case, any portion of a Partner's Ownership Interest in the Partnership is assigned to a third party, said assigned or transferred interest, to the extent it is assigned or transferred to a third party, shall be treated as if, on the date of the assignment or transfer order, the Partner in question became deceased, and any such Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on cases that were retained by the Partnership prior to the date of withdrawal.

### 16. Expulsion for Cause.

(a)     For Cause Only.

Any Partner may be expelled" for cause", upon the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership, For purposes of this provision, "cause" for expulsion will include but not be limited to any of the following:

(i)     Disbarment, suspension, or other major disciplinary action determined

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

adversely to any Attorney Partner by any duly constituted authority;

(ii)    Professional misconduct or violation of the canons of professional ethics, if such misconduct continues after its cessation bas been requested by the Managing Partners;

(iii)    Any action or inaction that injures or threatens the professional standing or business operations of the Partnership, if such action or inaction continues after its cessation is requested by the Managing Partners, as set forth below;

(iv)    Any Partner takes a position that adversely effects the continuation of the Partnership, if such continues after its cessation is requested by the Managing Partners.

(b)    Notice of Expulsion for Cause.

If majority of the combined ownership interests held by the Managing Partners in the Partnership determines that "cause" exists for expulsion of a Partner, then the Partnership shall provide notice of this decision to the Partner who is subject to expulsion, and the Partner shall have ten (10) business days after notice is given to cure or remedy the reason for expulsion, if a cure or remedy is possible.

(c)    Entitlement to Profits After Expulsion.

Upon any expulsion, the expelled Partner shall be treated as a "withdrawn" Partner pursuant to Section 15, above, as of the date on which the expelled Partner failed to cure the reason for his expulsion, or five (5) business days from the Notice of Expulsion, whichever is later. The expelled Partner will have no other entitlement to any compensation. Furthermore, the Managing Partners may withhold future payments to any Partner who has been expelled for cause and apply those payments as a setoff against any damages to the Partnership caused by the expelled Partner or any liabilities due from the expelled Partner to the Partnership.

### 18. Liquidating Events.

The Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)    The affirmative vote of the majority of the total, combined ownership interests held by the Managing Partners in the Partnership, to dissolve, wind up, and/or liquidate the Partnership; or

(b)    The happening of any other event that makes it unlawful or impossible to carry on the business of the Partnership.

The Partnership shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined by a court of competent jurisdiction, that the Partnership has dissolved prior to or without the occurrence of a Liquidating Event, the Managing Partners hereby agree to continue the business of the Partnership without a winding up or liquidation.

### 19. Winding Up.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

(a)     Upon the occurrence of a Liquidating Event, the Partnership shall continue for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for this winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Agreement and the Partnership has terminated all operations.

(b)     The Managing Partners (or any Person elected for this purpose by the Managing Partners) shall be responsible for overseeing the winding up and liquidation of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds there from, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)     First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors other than the Partners;

(ii)     Second, to the payment and discharge of the Underwriting Contribution (defined in Section 20);

(iii)     to the payment and discharge of all other Partnership's debts and liabilities to Partners; and

(iii)     The balance, if any, to the Partners in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)     Except with respect to the Underwriting Contribution (defined in Section 20), each Partner hereby expressly waives any right which the Partner individually, as a creditor of the Partnership, might otherwise have under the Code, to receive distributions of Partnership assets *pari passu* with the other creditors of the Partnership, in connection with a distribution of assets of the Partnership or in satisfaction of any liability of the Partnership, and hereby subordinates any such right to said creditors.

## 20. Preferred Return.

Fifteen percent (15%) per annum simple interest multiplied by the invested capital, which shall accrue from the date of the Firm's acceptance of Allan Teh's Underwriting Contributions, until the Firm receives its first mass tort settlement proceeds via a Qualified Settlement Fund.

## 21. Profits and Losses.

After the Partnership repays the Underwriting Contribution (defined in this Section), the profit/loss allocation shall be calculated on a net basis as a percentage of the resulting fee, net of expenses, which shall not include legal fees and expenses of any kind. Expenses which pertain to a particular case should be deducted from the fees received for that case before allocating profits/losses to the extent that they cannot be charged to the client. Partnership Expenses which do not pertain to a particular case shall be amortized over all pending cases at the time the expense was incurred, in an

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

equal amount for each case.

Profits

Net Profits after full and complete reimbursement of funding by Allan Teh for a particular mass tort campaign shall be allocated as follows after the holdback of reserves as unanimously agreed to and approved by the Managing Partners:

(a)   Return of Capital: First, one hundred percent (100%) to Allan Teh until Distributions to such equal the amount of Allan Teh's Capital Contributions.

(b)   Preferred Return: Second, one hundred percent (100%) to Allan Teh until Distributions to such of Distributable Cash on a cumulative basis pursuant to this clause equal the Preferred Return.

(c)   Catch up: Second, one hundred percent (100%) to Lee Melchionni and Sylvia Benito until Distributions to Lee Melchionni and Sylvia Benito on a cumulative basis as carried interest Distributions equal twenty percent (20%) of all Distributions,

(d)   Split: Any balance, (i) eighty percent (80%) to Allan Teh and (ii) twenty percent (20%) to Lee Melchionni and Sylvia Benito.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Law Firm.  Allan Teh is committing to fund a total of $4,000,000 ("Underwriting Contributions") to be paid to the firm as needed and determined by the Managing Partners to run a campaign related to any case/litigation as determined by the Managing Partners.  The Managing Partners agree and understand that all such costs incurred by Allan Teh on behalf of the Company, including the Underwriting Contribution, shall be treated as an interest-free loan and paid back in full prior to any Partnership distributions.

Losses

It is understood that Lee Melchionni, Esq. shall not be responsible to pay back Allan Teh in the event that a particular mass tort campaign, case or litigation effort fails to generate profits. In the event that either party wants to recoup losses from a particular Mass Tort campaign that did not generate a profit from the profit(s) of other Mass Tort campaign(s) that do generate profits, then all Parties shall have the right to recoup their losses. In the case of Allan Teh, the amount of the loan referenced above and all Capital Contribution made by them used to acquire such cases which are not paid back or recovered shall be subject to such offset.

22. Management Fee.

KS Law Group will charge a management fee of one percent (1%) on invested Capital Contributions.

23. Entire Agreement.

This Agreement constitutes and shall be considered the entire agreement between the parties with respect to the subject matter of this document, and supersedes all previous arrangements, understandings, representations or agreements between the parties, whether written or oral. As set forth

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

in Section 12, the Partners may, from time to time, by unanimous, affirmative vote, agree to alter certain portions of this Agreement for Special Allocations. However, the Partners hereby agree that any such secondary agreement shall apply only to the special circumstances considered therein and will not alter the terms or conditions of this Agreement beyond the limited time and scope set forth in said secondary, written agreement.

### 24. Distributions to Partners.

Distribution to the Managing Partners shall occur at the conclusion of any singular case pursuant to Section 21.

### 25. Amounts Withheld.

All amounts withheld pursuant to the Tax Codes or any other state or local tax law, with respect to any payment, compensation or distribution to the Partnership or the Partners, shall be treated as amounts distributed to the Partners, for all purposes under this Agreement. The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partner and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate such amounts to the Partners with respect to which such amount was withheld.

### 26. Decisions

Except as otherwise provided in this Agreement, all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized only by the affirmative vote of 66 2/3% of the total, combined ownership interests held by the Managing Partners in the Partnership. It is further acknowledged and agreed, however, that any decision falling under the matters set forth in Section 14 of this Agreement shall be within the professional discretion of the Legal Managing Partner.

### 27. Vote Required for Certain Actions.

Notwithstanding Section 24 hereof:

(d)     no decision or action regarding the incurrence by the Partnership of any debt, contract or obligation for which the Partners are individually liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership; and

(e)     no decision or action regarding the incurrence by the Partnership of any debt for which the Partnership is liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership.

### 28. Partners Authorized to Take Certain Actions on Behalf of the Partnership.

Except as otherwise provided elsewhere in this Agreement, each Managing Partner is authorized to take the following actions and make the following decisions to the extent that such actions and decisions are necessary to permit such Managing Partner to carry on the Partnership's routine, day-to-day practice of law:

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

a. Accept clients on behalf of the Partnership based on criteria set forth by Legal Managing Partners, and agree to undertake specific matters for any Partnership client based on criteria set forth by Legal Managing Partners provided that a Managing Partner accepting such client or undertaking such matter is responsible for assuring that such action will not create a conflict with the interests of any other client and is otherwise consistent with the types of clients and matters normally handled by the Partnership, and provided further that such Managing Partner obtains the concurrence of any other Managing Partner or Managing  Partners whose services may reasonably be expected to be required to service such client or matter.

b. Take any other action and make any other decision that is clearly routine and incidental to the day-to-day conduct of the Partnership and/or its practice.

## 29. Banking.

All funds of the Partnership shall be deposited in the Partnership's name, in such account or accounts with member banks of the FDIC as may be approved by an affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership; provided, however that the Managing Partners may elect to deposit all or a portion of the funds standing in the Partnership reserves in interest-bearing accounts with, or apply such funds to purchase short-term interest-bearing investments issued or guaranteed as to payment by, such banks or other financial institutions that are members of the FDIC or the United States (or its agencies or instrumentalities).

## 30. Restrictions on Transfers.

Except as provided in footnote 1, no Partner shall transfer all or any portion of his Partnership interest or any rights therein without the unanimous consent of the Managing Partners. The Partners not seeking to transfer their interests shall have the right of first refusal to purchase any such interest in equal shares. Any transfer or attempted transfer by any Partner in violation of the preceding sentence shall be null and void and of no force or effect whatsoever. Each Partner hereby acknowledges the reasonableness of the restrictions on transfer imposed by this Agreement in of the Partnership purposes and the relationship of the Partners. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable. Each Partner hereby further agrees to hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes or costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a transfer or an attempted transfer in violation of this Agreement.

## 31. Waiver of Partition.

No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and his legal representatives, successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his Partnership interest, or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

## 32. Rights of Partners.

Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership. No Partner shall have priority over any other Partner as to the return of his Capital Contributions, distributions, or allocations unless otherwise provided in this Agreement.

## 33. Notice of Dissolution.

In the event a Liquidating Event occurs, or any other event occurs that would result in a dissolution of the Partnership, the Partnership shall, within thirty (30) calendar days thereafter: (a) provide written notice thereof to each of the Partners and to all other parties with whom the Partnership regularly conducts business, and (b) publish notice of such dissolution in a newspaper of general circulation in each place in which the Partnership regularly conducts business.

## 34. No Liability for Partnership Debts.

Except as provided in Section 7, no Partner shall be personally liable or accountable, directly or indirectly, including by way of indemnification, contribution, assessment, or otherwise, for debts, obligations or liabilities of or chargeable to the Partnership or other Partner, whether arising in tort, contract, or otherwise that are incurred, created or assumed by the Partnership, except with respect to an obligation as to which all of the Partners have unanimously agreed in writing that the Partners would be personally liable.

## 35. Indemnification of Managing Partners/Partners by Partnership.

The Partnership shall, to the extent of its assets, indemnify, defend and hold each Partner in the Partnership free and harmless from any and all claims, demands, liabilities, obligations, damages, losses, costs and expenses, including attorneys' fees (individually, a "Liability" and collectively, the "Liabilities") incurred in connection with the business of the Partnership, provided the acts or omissions from which the Liabilities arise were performed by the Partner in good faith and with a reasonable belief that the Partner was acting within the scope of the Partner's authority under this Agreement and the Partner was not grossly negligent or guilty of intentional misconduct. Neither the Partnership nor any Partner shall have any claim against any other Partner by reason of any act or omission for which such Partner is entitled to indemnification under the Agreement.

## 36. Partnership Representative and Indemnification Thereof.

Partner Lee Melchionni, Esq. is specifically authorized to act as the "Partnership Representative" (hereafter the "PR") under the applicable tax Code, and in any similar capacity under state or local law. The Partnership and the other Partners agree to defend, indemnify and hold harmless the PR, from all costs and expenses, including fees of outside attorneys, accountants and experts, incurred in acting as PR during or after the termination or expiration of the term of the Partnership. The Partnership and the other Partners further agree to execute such powers of attorney and other forms and authorizations as may be required by the IRS for a Partner to act as PR.

## 37. Professional Liability Insurance.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

The Partnership shall maintain policies of professional liability, errors and omissions, general liability, in the amount of $5 million per occurrence/$5 million aggregate. As stated above, this shall be paid annually by the Partnership.

### 38. Notices.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing, and sent by overnight courier to recipient's hands, or U.S. certified mail with return receipt requested, to the following addresses:

Lee Melchionni, Esq.
20900 NE 30th Ave
Suite 510
Miami, FL 33180

Sylvia Benito
20900 NE 30th Ave
Suite 510
Miami, FL 33180

Allan Teh
119 Washington Ave
Suite 600
Miami Beach, FL 33139

Such addresses may be changed from time to time by any party by providing written notice in the manner set forth above. The date the party receiving notice will be considered to have been noticed will be the date of the delivery, as shown on the courier confirmation or return receipt from the U.S. postal service.

### 39. Resolution of Disputes.

Any controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and shall be resolved via arbitration under the American Arbitration Action, 9 U.S.C. § 2, in the District of Columbia, in accordance with the rules of the American Arbitration Association, and judgment entered upon the award rendered may be enforced or appealed by appropriate judicial action pursuant to the District of Columbia Code of Civil Procedure. The arbitration shall be heard by a single arbitrator, which shall be a person unanimously agreed to by the Managing Partners, and the dispute shall be heard within thirty (30) days following notice by one party that he/she desires that a matter be arbitrated.

If the parties are unable, within such 30-day period to agree upon an arbitrator, then the issue shall be heard by an arbitrator selected by the District of Columbia office of the American Arbitration Association, which arbitrator shall be experienced in the area of legal partnerships and who shall be knowledgeable with respect to the subject matter area of the dispute.

The arbitrator shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal. The parties shall agree within thirty (30) days following

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery; provided, in any event each Partner shall be entitled to discovery in accordance with the District of Columbia Code of Civil Procedure. The arbitrator shall determine a prevailing party in the proceeding, and award the prevailing party his costs and expenses, including but not limited to reasonable attorneys' fees and arbitration costs, from the non-prevailing party in such proceeding.

**40. Counterparts.**

This Agreement may be executed by facsimile and/or in two or more counterparts, each of which shall constitute an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties have entered into this Agreement of Partnership as of the dates set forth below.

_Lee Melchionni_

Lee Melchionni, Esq.

Aug 24, 2021
Date

Allan Teh,

Date: August 24th, 2021

Sylvia Benito (Aug 24, 2021 16:33 EDT)

Sylvia Benito,

Aug 24, 2021
Date

# KS Law Group Operating Agreement.docx

Final Audit Report                                                          2021-08-24

| | |
|---|---|
| Created: | 2021-08-24 |
| By: | Lee Melchionni (lee@capital4justice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_4MpQdjxaqLAEo3BNLfP3BscoK90ghu0 |

## "KS Law Group Operating Agreement.docx" History

Document digitally presigned by DocuSign\, Inc. (enterprisesupport@docusign.com)
2021-08-24 - 2:40:53 PM GMT- IP address: 71.77.192.124

Document created by Lee Melchionni (lee@capital4justice.com)
2021-08-24 - 6:10:55 PM GMT- IP address: 71.77.192.124

Document emailed to Lee Melchionni (lee@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

Document emailed to Sylvia Benito (sylvia@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

Email viewed by Sylvia Benito (sylvia@capital4justice.com)
2021-08-24 - 6:12:22 PM GMT- IP address: 74.125.150.38

Document e-signed by Lee Melchionni (lee@capital4justice.com)
Signature Date: 2021-08-24 - 6:12:32 PM GMT - Time Source: server- IP address: 71.77.192.124

Document e-signed by Sylvia Benito (sylvia@capital4justice.com)
Signature Date: 2021-08-24 - 8:33:37 PM GMT - Time Source: server- IP address: 172.58.175.96

Agreement completed.
2021-08-24 - 8:33:37 PM GMT

**Adobe Sign**

**Subject: Re: Data request / update**

 **Lee Melchionni** <lee@capital4justice.com>                Mon, Oct 18, 2021, 5:37 PM
to Sohail Shahrasebi, Sylvia Benito

Sohail,

We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.

- Could we be given the following

  ○ A final copy of the legal documents supporting the supporting the Denovo US law firm?
    ○ We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
  ○ Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    ○ We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
    ○ Justice Partners
    ○ 200 Firefighter Foam
    ○ 208 Talc
    ○ 380 Hernia Mesh
    ○ 350 3M
    ○ 150 RoundUp
    ○ 200 Zantac
      ▪ KS Law Group
      ▪ 155 RoundUp
      ▪ 200 Talc
      ▪ 212 Hernia Mesh
      ▪ 212 3M
  ○ Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    ○ The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.
  ○ Update on the status of the various cases in the US and timing on each case
    ○ Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
    ○ Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.

- 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
- RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
- Firefighter Foam - There is no substantive update since our last investor communication.
- Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?
    - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following
    - A final copy of the legal documents supporting the supporting the Denovo US law firm?
    - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    - Update on the status of the various cases in the US and timing on each case
- On the Diesel stuff
    - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?


Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi


Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139

O: 786-484-0771
M: 646-707-4484

---

**2 Attachments** • Scanned by Gmail



| X  KS Case List 10.1…  🟩 | PDF  Non-Lawyer Part…  🟧 |

Redacted ( [ KEIV

| Full Name | Last Name | Estimated Case Value | Net KS Law Firm |
|---|---|---|---|
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |
| | | $ 80,000.00 | $ 14,892.00 |

| | | | |
|---|---|---|---|
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |
| Ä A | ĽKÍKKKIKKA | Ä A | ĶLÏĽĻLIKKA |

2

| | | | | | |
|---|---|---|---|---|---|
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |
| | | A A | ĽKÍKKKIKKA | A A | ĶLÍĽLLIKKA |

3

| | | | | |
|---|---|---|---|---|
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |
| | A A | ĽKĬKKKĬKKA | A A | ĶĿĬĿĻLIKKA |

| | | Ä A | ĽKĬKKKĬKKÄ | Ä A | ĶĹĬĽĻĹĬKKÄ |
|---|---|---|---|---|---|
| | | | | | |
| | | **Hypo Value of Docket** | | **$** | **2,978,400.00** |

|  |
| --- |
|  |
|  |

## Subject: KS Law Group Weekly Case Update

 **Lee Melchionni** \<lee@capital4justice.com\>          Fri, Oct 14, 2022,

to Sohail Shahrasebi, Allan Teh, Sylvia Benito

Sohail,

As requested, here is the weekly update on KS Law Group's Active cases.

- Talc - 59 Active Cases
- Hernia Mesh - 62 Active Cases
- 3M - 156 Active Cases
- Roundup - 34 Active Cases

--

**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**





## CASE REPLACEMENT AGREEMENT

This CASE REPLACEMENT AGREEMENT (this "Agreement") is made and entered into as of December 1, 2022 by and among KS Law Group LLP, a District of Columbia limited liability partnership ("KS"), and Lake Law Firm, LLC, a New York limited liability company ("Lake") (each a "Party" and collectively the "Parties").

## RECITALS

WHEREAS, Lake is a professional law firm engaged in the practice of law, with its principal offices in the State of New York;

WHEREAS, Lake is engaged in the acquisition of clients and case workup across multiple types of mass tort litigations, including talcum powder litigation ("Talcum Powder"), hernia mesh litigation ("Hernia Mesh"), Roundup litigation ("Roundup"), and 3M litigation ("3M", and combined with Talcum Powder, Hernia Mesh, Roundup, 3M, Firefighter Foam and Zantac, the "Cases", and each individual case within the Cases, a "Case");

WHEREAS, KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount");

WHEREAS, Lake has not delivered equivalent value in cases to the Funded Amount and owes KS Cases and replacement Cases, the quantity and identity of which are set forth below; and

WHEREAS, the Parties seek to memorialize the terms of their agreement.

NOW, THEREFORE, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      Replacement of Cases.  KS has previously paid Lake the Funded Amount for certain Cases as described below which Lake has yet to provide.  The Parties agree that notwithstanding any earlier agreement for Cases that existed between the Parties, Cases shall be provided by Lake to KS as set forth below.

    a.  Talcum Powder.

        i.   Lake agrees that KS is owed 200 Talcum Powder cases, guaranteed for medical records, which were purchased for $1,200,000, or $6,000 a Case (the "Talcum Power Purchase Price). The criteria for the medical record guarantee of the Talcum Powder cases are set forth in Exhibit A to this Agreement.

        ii.  Lake agrees that the maximum non-medical record drop off of KS' Talcum Powder cases will be 25%.

        iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

        iv.  Lake hereby agrees to allow KS to convert any shortfall in Talcum Powder cases owed into 6 filed employees per converted Talcum Powder case, with the Internal

Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

v. Lake agrees that if the owed filed employees are filed with the IRS by a law firm or company other than Lake, KS will receive 95% of the ERC fee received by Lake.

vi. Lake agrees that if the owed filed employees are filed with the IRS by Lake, KS will receive 50% of the ERC fee received by Lake.

vii. If Lake is unable to provide the filed employees before the statute of limitations expires on ERTC under the CARES Act, Lake agrees that within 90 days of the statute of limitations expiring, Lake will reimburse KS for the costs paid for each un-converted Talcum Powder case ($6,000 per case), plus 8% interest, per year, per case, from the purchase date of September 1, 2021.

b. Hernia Mesh.

i. Lake agrees that KS is owed 220 Hernia Mesh cases, guaranteed for medical records, which were purchased for $1,232,000, or $5,000 a Case (the "Hernia Mesh Purchase Price). The criteria for the medical record guarantee of the Hernia Mesh cases are set forth in Exhibit A to this Agreement.

ii. Lake agrees that the maximum non-medical record drop off of KS' Hernia Mesh cases will be 30%.

iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv. Lake agrees to continue to replace Hernia Mesh cases for KS with additional Hernia Mesh cases

v. For Hernia Mesh cases that are replaced past October 15, 2022, Lake shall pay KS 79% of the attorney fee, which shall be identified by KS to Lake in writing.

vi. Solely as an example, if 100 Hernia Mesh cases are owed to KS where 79% of the attorney fee is paid to KS, the number of owed cases to KS shall be reduced to 91

vii. If the Hernia Mesh litigation were to reach a global settlement and cases are still owed to KS, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Hernia Mesh cases ($5,000 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

viii. The Hernia Mesh litigations include, but are not limited to, the litigations related to Johnson and Johnson Proceed and Prolene Hernia System, Ethicon Physio Mesh, Covidien, W.L. Gore & Associates, Atrium C-Qur, and Davol, Inc/C.R. Bard, Inc.

c. Roundup.

i. Lake agrees that KS is owed 155 Roundup cases, guaranteed for medical records, which were purchased for $782,500, or $5,048.39 a Case (the "Roundup Purchase Price). The criteria for the medical record guarantee of the Roundup cases are set

forth in Exhibit A to this Agreement.

    ii.    Lake agrees that the maximum non-medical record drop off of KS' Roundup cases will be 25%.

    iii.    Lake agrees that KS' is owed 60% of the total attorney contingency fee.

    iv.    Lake agrees to allow KS to convert any shortfall of Roundup cases into Camp Lejeune cases on a one-for-one conversion basis upon request from KS. Solely as an example, KS would have the ability to convert 50 Roundup cases into 50 Camp Lejeune cases. To avoid any confusion, this example does not take into account non-medical record drop off.

    v.    If the Roundup litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Roundup cases ($5,048.39 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

d.   3M.

    i.    Lake agrees that KS is owed 220 3M cases, guaranteed for medical records, which were purchased for $665,500, or $3,025 a Case (the "3M Purchase Price). The criteria for the medical record guarantee of the 3M cases are outlined in Exhibit A to this Agreement.

    ii.    Lake agrees that the maximum non-medical record drop off of KS' 3M cases will be 25%.

    iii.    Lake agrees that KS' is owed 60% of the total attorney contingency fee.

    iv.    Lake agrees to continue to replace 3M cases.

    v.    If the 3M litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered 3M cases ($3,025 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

2.    Written Notice of Modifications.  In the event that a case should be replaced, converted, or modified, KS will provide written notice to Lake informing them of the need for such replacement, conversion, or modification pursuant to Section 5(b) below. Lake shall then use its best efforts to effect such replacement, conversion, or modification within a commercially reasonable timeframe.

3.    Guarantee of Medical Records. Subject to the agreed upon non-medical drop off for each of the Cases described above, if a client is disqualified based on the phases below, Lake agrees that the case will be replaced one-to-one, but subject to replacement provisions set forth above,

a.   Phase 1 – Verbal Confirmation. The intake details are reconfirmed verbally, and additional information is added, based on the specific case type. Secondary outreach from Lake reconfirms the information provided over the phone with additional details such as injury,

3

length of use, diagnosis, and doctor information to be provided.

b. Phase 2 – Medical Record Retrieval Phase. Medical records are obtained, proving injury, diagnosis, and/or surgery where applicable.

c. Phase 3 – Nurse Review. The medical records are reviewed by a nurse or medical professional to determine if the injury, diagnosis, and/or surgery criteria are met, based on the specific case type.

d. Phase 4 – Filing. The plaintiff fact sheet, census form, and/or [PPF] are filed with the courts. They contain details of the case, including diagnosis, medical history, etc. and is based on the specific case type.

4. Responsibilities of Lake. Lake agrees to the following:

a. Lake will market, intake, and sign-up potential clients.

b. Lake will gather medical records, a medical summary, a plaintiff fact sheet, and/or court complaint as necessary.

c. Lake will act as liaison between the undesigned and trial firms.

d. Lake will handle any client inquiries. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.

5. Miscellaneous.

a. Expenses. Except as otherwise provided herein, KS, on the one hand, and Lake, on the other, shall each pay their own expenses incident to the negotiation, preparation, and carrying out of this Agreement, including all fees and expenses of its counsel and accountants for all activities of such counsel and accountants undertaken pursuant to this Agreement, irrespective of whether or not the transactions contemplated hereby are consummated.

b. Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made if and when delivered personally or by overnight courier to the Parties at the following addresses or sent by electronic transmission, with confirmation received (or at such other address for a Party as shall be specified by like notice):

To KS:

KS Law Group LLP
20900 NE 30th Ave, Suite 510, Miami, FL 33180
Attention: Lee Melchionni
Email: lee@capital4justice.com

To Lake:

Lake Law Firm, LLC
One Rockefeller Center, 11th Floor, New York, NY 10020
Attention: Jeffrey Dubin

4

Email: elake@forpersist.com

Any such notice shall, when sent in accordance with the preceding sentence, be deemed to have been given and received on the earliest of (i) the day delivered to such address, (ii) the fifth (5th) business day following the date deposited with the United States Postal Service, or (iii) twenty-four (24) hours after shipment by such courier service.

c.  Assignment; Third Party Beneficiaries.  Neither this Agreement nor any rights or obligations under it are assignable, except that KS may assign its rights hereunder.  Except for any indemnified parties, there shall be no third party beneficiaries of this Agreement.

d.  Governing Law; Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of New York applicable to contracts executed in and to be performed in New York.  Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of New York and of the United States, in each case located in New York, for any litigation arising out of or relating to this Agreement (and agrees not to commence any litigation relating thereto except in such courts).

e.  Counterparts.  This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  It is the express intent of the Parties to be bound by the exchange of signatures on this Agreement via DocuSign (or similar electronic means) or emailed PDF copies.

f.  No Implied Waiver; Remedies.  No failure or delay on the part of the Parties to exercise any right, power, or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  All rights, powers, and privileges granted herein shall be in addition to other rights and remedies to which the Parties may be entitled at law or in equity.

g.  Entire Agreement.  This Agreement, including the Exhibit attached hereto, sets forth the entire understandings of the Parties with respect to the subject matter hereof and thereof, and it incorporates and merges any and all previous communications, understandings, oral or written as to the subject matter hereof and thereof.

h.  Amendments; Actual Waivers.  This Agreement may not be amended except by an instrument in writing signed on behalf of KS and Lake.  Any agreement on the part of KS or Lake to any such extension or waiver shall be valid if set forth in an instrument in writing signed on behalf of KS or Lake.

i.  Headings.  The headings of the Sections of this Agreement, where employed, are for convenience only and do not form a part hereof and in no way modify, interpret or construe the meanings of the Parties.

5

j.   Severability.  Any provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions of this Agreement; provided, however, in the event the provision which is invalid or unenforceable pertains to a material element of the transaction such that the principal objectives of the transaction provided for herein are materially impaired or are invalid or unenforceable, this Agreement shall be terminated.

k.   Specific Performance.  Each Party acknowledges that, in view of the uniqueness of the transactions contemplated by this Agreement, each Party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore each Party agrees that the other Parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

l.   No Presumption Regarding Drafter.  The Parties acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between them, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, it would not be appropriate to deem any Party to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

* * * * *

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Parties hereto have executed this Case Replacement Agreement as of the date first set forth above.

**KS**:

KS Law Group LLP

By: *Lee Melchionni*
Name: Lee Melchionni
Title:

**LAKE**:

Lake Law Firm, LLC

By: _____
Name: Edward Lake
Title:

[Signature Page to Case Replacement Agreement]

## Exhibit A

**Talcum Powder:** Cases provided with the following criteria below and guaranteed by medical records:
o   Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer).
o   Seventy-five (75) years old or younger.
o   Four (4) years plus of exposure.
o   Negative BRCA test, preferred but acceptable if unknown.
o   No previous or existing attorney representation.
o   Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer with chemotherapy or treatment.
o   Death within eighteen (18) months and original diagnosis within four (4) years of death.

**Hernia Mesh**: Cases provided with the following criteria below and guaranteed by medical records:
o   Records showing revision, removal, or replacement surgery, or scheduled within ninety (90) days or needed, but unable to be performed due to medical professional recommendation.
o   Client states no previous or existing attorney representation.
o   All manufacturers.
o   Surgery in 2011 or afterward.

**Roundup**: Cases provided with the following criteria below and guaranteed by medical records:
o   Diagnosed with Non-Hodgkin lymphoma or subtype within the last ten (10) years, [unless medical records access then 2007 forward].
o   Direct exposure only to Roundup for more than one (1) year.
o   No existing attorney.

**3M**: Cases provided with the following criteria below and guaranteed by medical records:
o   Used 3M Combat Arms CAEv2 Earplugs between 2003 and 2015.
o   Diagnosed with tinnitus or documented loss of hearing of ten percent (10%) or more in at least one (1) ear.
o   No existing attorney.

**Camp Lejeune:** Cases provided with the following criteria below and guaranteed by medical records:
o   -PC must have resided, worked, or was otherwise exposed at Camp Lejeune, NC not less than 30 days from 8/1/1953 through 12/31/1987
o   -PC must have been diagnosed with one of the following injuries after exposure at Camp Lejeune: Bladder Cancer, Brain Cancer, Brain Tumor, Cervical Cancer, Ovarian Cancer, Prostate Cancer, Rectal Cancer, Breast Cancer, Esophageal Cancer, Kidney Cancer, Liver Cancer, Lung Cancer, Leukemia, Hodgkin's Disease, Lymphoma, Multiple Myeloma, Hepatic Steatosis (Fatty Liver Disease), Parkinson's Disease, Renal Toxicity, Scleroderma, Non-Hodgkin's Lymphoma, Soft Tissue Cancer, Basal Cell Carcinoma, Melanoma, Merkel Cell Carcinoma, Squamous Cell Carcinoma, Colon (Colorectal) Cancer, Intestinal Cancer, Appendix Cancer, Aplastic Anemia and other Myelodysplastic syndromes, Cirrhosis of the Liver, Renal/Kidney Failure, Birth Defects (non-Cardiac), Cardiac Birth Defects, Miscarriage (19 weeks or earlier), Fetal Death (20 weeks gestation), Fertility Issues, Tremors (musculoskeletal), Pre-Parkinson's Disease, Neurobehavioral Effects - must have all symptoms: delayed reaction times, memory problems, attention/concentration problems, and motor function problems (e.g. hand tremor, postural sway)
o   -PC must not currently be represented by an attorney

[Exhibit A]

# KS Law Group - Case Replacement Agreement

Final Audit Report                                      2022-12-28

| | |
|---|---|
| Created: | 2022-12-28 |
| By: | Lee Melchionni (lee@redwoodlg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4IPGrt0ky7Gi-3IFKgGAkBJ5kv2IPsl0 |

## "KS Law Group - Case Replacement Agreement" History

Document created by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:44:56 AM GMT- IP address: 99.110.180.129

Document emailed to elake@forpersist.com for signature
2022-12-28 - 1:45:53 AM GMT

Email viewed by elake@forpersist.com
2022-12-28 - 1:46:43 AM GMT- IP address: 73.205.234.141

Signer elake@forpersist.com entered name at signing as Edward Lake
2022-12-28 - 1:47:04 AM GMT- IP address: 73.205.234.141

Document e-signed by Edward Lake (elake@forpersist.com)
Signature Date: 2022-12-28 - 1:47:06 AM GMT - Time Source: server- IP address: 73.205.234.141

Document emailed to Lee Melchionni (lee@redwoodlg.com) for signature
2022-12-28 - 1:47:07 AM GMT

Email viewed by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:53:47 AM GMT- IP address: 99.110.180.129

Document e-signed by Lee Melchionni (lee@redwoodlg.com)
Signature Date: 2022-12-28 - 1:53:57 AM GMT - Time Source: server- IP address: 99.110.180.129

Agreement completed.
2022-12-28 - 1:53:57 AM GMT

Adobe Acrobat Sign



**From:** Lee Melchionni <lee@capital4justice.com>
**Sent:** Friday, March 3, 2023 3:17:48 PM
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>; ALLAN TEH <allan.teh@icloud.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>
**Subject:** KS Law Group Update

Sohail,

Attached are the case lists for KS Law Group ("KS"). To provide some context, KS is owed 200 Talcum Powder cases, with a maximum non-medical record drop off of 25%. Any shortfall in Talcu employees per converted Talcum Powder case, with the Internal Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Ec Hernia Mesh cases, with a maximum non-medical record drop off of 30%. KS is owed 155 Roundup Cases, with a maximum non-medical record drop off of 25%. Any shortfall in Roundup cases one conversion basis. KS is owed 220 3M cases, with a maximum non-medical record drop off of 25%.

We are also sharing the executed case replacement agreement with the Lake Law Firm.

- **3M Earplugs**
  - 11 - Attempting to Contact
  - 3 - Filed
  - 54 - Pending
  - 79 - Retained and Sent to Firm
  - 5 - Unable to Reach/Unresponsive
- **Hernia Mesh**
  - 3 - Attempting to Contact
  - 8 - Filed
  - 82 - Pending
  - 2 - Ready to Submit
  - 43 - Retained and Sent to Firm
  - 4 - Unable to Reach/Unresponsive
- **Round Up**
  - 2 - Attempting to Contact
  - 27 - Pending
  - 14 - Ready to Submit
  - 18 - Retained - Sent to Firm
  - 14 - Unable to Reach/Unresponsive
- **Talcum Powder**
  - 1 - Attempting to Contact
  - 5 - Pending
  - 2 - Retained and Sent to Firm
  - 1 - Unable to Reach/Unresponsive

--
**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**



**5 Attachments** • Scanned by Gmail



| X KS_Talcum_Pow… | X KS_3M_Earplugs… | X KS_Round_Up_R… | X KS_Hernia_Mesh… | PDF KS Law Group - C… |



**The New York Times**

# Johnson & Johnson Reaches Deal for $8.9 Billion Talc Settlement

The company faces a flood of lawsuits claiming its talc products caused cancer. The proposed settlement requires approval by a bankruptcy court, but has the backing of plaintiffs' lawyers.

 Give this article



The talc in Johnson & Johnson's baby powder may have been contaminated with asbestos, plaintiffs claim.   Lucas Jackson/Reuters

 **By Tiffany Hsu**
Tiffany Hsu has followed the Johnson & Johnson talc litigation closely for more than five years.

April 4, 2023

Johnson & Johnson said on Tuesday that it had agreed to pay $8.9 billion to tens of thousands of people who claimed the company's talcum powder products caused cancer, a proposal that lawyers for the plaintiffs called a "significant victory" in a legal fight that has

**Special offer:** Subscribe for ~~$4.25~~ $1 a week for the first year.                    EXPAND

# Exhibit D

Filing # 175411876 E-Filed 06/15/2023 01:55:06 PM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

      Nominal Defendant.

                                  /

## DEFENDANTS LEE MELCHIONNI'S, SYLVIA BONITO'S, AND KS LAW GROUP'S MOTION TO COMPEL ARBITRATION AND DISMISS

      Defendants Sylvia Benito, Lee Melchionni, and Nominal Defendant KS Law Group, LLP

(collectively the "KS Law Defendants"), pursuant to Fla. R. Civ. P. 1.110, the parties' Limited

Liability Partnership Agreement, the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 3, and the

Florida Arbitration Code (the "FAC"), Fla. Stat. § 682.03, hereby move to compel arbitration and

dismiss Plaintiff Allen Teh's derivative action and state:

## I.      INTRODUCTION

On August 24, 2021, Teh, Benito, and Melchionni joined as partners in the formation of KS Law Group LLP, a District of Columbia partnership.  (Complaint at ¶ 11).  In accordance with KS Law's Limited Liability Partnership Agreement, Teh provided KS Law with a capital contribution of $4 million.  (Complaint at ¶ 16).  Pursuant to the Partnership Agreement, any dispute or concern arising out of or related to a breach of the Partnership Agreement must be submitted to arbitration. (Complaint, Ex. 3 at ¶ 39). In violation of this mandatory arbitration provision, Teh commenced this suit. It should be dismissed and Teh compelled to comply with his agreement to arbitrate.

## II.      FACTUAL BACKGROUND

Teh, Melchionni, and Benito are partners in KS Law, a law firm formed under the laws of the District of Columbia.  (Complaint Ex. 3, p. 1).  Melchionni, a D.C. admitted lawyer is the Managing Partner while Teh and Benito are permitted non-lawyer participants.  *See id*.  KS Law, governed by the Partnership Agreement, was formed for the purposes of funding mass tort cases, with Teh providing the financing for the firm.  (Complaint at ¶¶ 11, 14; Ex. 3, p. 1).

Pursuant to the Partnership Agreement, "…any controversy arising out of or related to [the Partnership Agreement] or the breach thereof shall be settled under the law of the District of Columbia . . . and shall be resolved via arbitration under the American Arbitration Association, 9 U.S.C. § 2, in the District of Columbia[.]" (Complaint Ex 3 at ¶ 39).  All of Teh's fives causes of action against the KS Law Defendants arise out of and/or relate to the Partnership Agreement requiring arbitration in the District of Columbia.

In conformance with the mandatory Arbitration Clause, in November of 2022, Teh initiated a books and records action (the "First Action") against KS Law in front of the American Arbitration Association. (KS Law Demand for Arbitration at ¶ 26, attached hereto as Exhibit A).

But despite knowing that the Partnership Agreement requires that disputes be submitted to arbitration, on March 15, 2023 the same attorney who filed the Demand for Arbitration then filed an action (the "Second Action") by Teh in his individual capacity against Melchionni, and Benito, The Lake Law Firm, LLC, and Persist Communications, Inc. On April 25, 2023, before Melchionni and Benito had responded to the Second Action (with a motion to compel the mandatory arbitration), Teh's counsel filed this Third Action.

This Third Action is nearly identical to the Second Action. (*See Teh v. Melchionni et al.*, Case No. 2023-004474-CA-01, Complaint, attached hereto as Exhibit B). In this Third Action, Teh alleges five derivative causes of action against the KS Law Defendants: (1) equitable appointment of a receiver, (2) constructive fraud (against Melchionni), (3) constructive fraud (against Benito), (4) breach of fiduciary duty (against Melchionni), and (5) breach of fiduciary duty (against Benito). (Complaint at ¶¶ 61-98).

Each and every count Teh raises against the KS Law Defendants arises from or relates to the Partnership Agreement requiring arbitration.  Pursuant to the Partnership Agreement, the FAA and FAC, Teh's Complaint must be arbitrated in the District of Columbia, and this action dismissed.

## III.   ARGUMENT

### A.   Legal Standard

#### 1.   This Court has the authority to order these claims to be arbitrated in the District of Columbia.

"When underlying contracts involve interstate commerce, agreements to arbitrate under the law of another state are enforceable in Florida under the FAA." *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008). The FAA is applicable "where an agreement evidences 'a transaction involving commerce.'" *Mintz & Fraade, P.C. v. Beta Drywall*

3

*Acquisition, LLC*, 59 So. 3d 1173, 1175 (Fla. 4th DCA 2011) (citing 9 U.S.C. § 2). Florida courts recognize that the term "involving commerce" "means 'a transaction that, in fact, involves interstate commerce[.]' *Id.* (quoting *Default Proof Credit Card Sys., Inc.*, 992 So. 2d at 445). And "the term 'interstate commerce' is to be interpreted broadly." *Id.* (citing *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So.2d 658, 660 (Fla. 4th DCA 2008).

The FAA is applicable to the Arbitration Clause. First, the Arbitration Clause specifically mentions 9 U.S.C. § 2, recognizing that the FAA would govern an arbitration under its terms. (Complaint, Ex. 3 at ¶ 39). Second, the Partnership Agreement explicitly provided for Teh, a Florida resident, to transfer of $4 million to KS Law, a D.C. partnership created and organized under the Business Organization Title of the District of Columbia Code. (Complaint at ¶¶ 11, 16; Complaint, Ex. 3, p. 1). This interstate transaction is specifically described in the Partnership Agreement: "It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm . . . . The Capital Contributions will be made by Allan Teh in the amount of $4,000,000." (Complaint, Ex. 3 at ¶ 12). Indeed, Teh admits in his Complaint that, as a resident of Florida, he initiated the $4 million transaction wire transaction on September 3, 2021, and that the funds were sent **directly** "into the KS Law Account[.]" (Complaint at ¶ 16). Third, the entire Partnership, taken together, plainly evidences an agreement by which Teh invests in, expects profits from, and becomes a partner of, a D.C. partnership – one that does business across state lines and with Florida entities. (*See* Complaint, Ex. 3, ¶ 21; Complaint, Ex. 2; Complaint, Ex. 7). This transaction plainly involves "interstate commerce" and thereby the Arbitration Clause falls within the scope of the FAA and is enforceable in Florida courts. *See Catastrophe Servs., Inc. v. Fouche*, 145 So. 3d 151, 154 (Fla. 5th DCA 2014) (holding that a contract between a Florida resident and a foreign entity evidences interstate commerce.).

4

### 2.    Arbitration clauses are favored in both federal and Florida courts.

"Where a contract falls within the scope of the [FAA], federal law applies in state courts as well as federal courts in construing and enforcing an arbitration agreement." *Donald & Co. Sec. v. Mid-Fla. Cmty. Servs., Inc.*, 620 So. 2d 192, 193 (Fla. 2d DCA 1993) (stating that "Florida courts are bound only by the United States Supreme Court in interpreting acts of Congress.").

The U.S. Supreme Court has held that "Congress declared a national policy favoring arbitration" in enacting the FAA. *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858 (1984). Likewise, the Supreme Court of Florida has held that "arbitration provisions are common, and their use generally favored by the courts." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999). And federal courts in Florida have held that the FAA "creates a presumption in favor of arbitrability." *Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1325 (S.D. Fla. 2004) (citing *Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309 (11th Cir.2002)).

### B.    Under the FAA and the Florida Arbitration Code, the Partnership Agreement satisfies all the elements required to compel arbitration.

In Florida, "an arbitration clause in a contract involving interstate commerce is subject to the Florida Arbitration Code (FAC)[.]" *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 463–64 (Fla. 2011). The Supreme Court of Florida has held that, when ruling on a motion to compel arbitration, "the inquiry follows the same three-step process regardless whether the inquiry is conducted under the FAC or the FAA," stating:

> Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived.

*Id.* at 465 (quoting *Seifert v. U.S. Home Corp.*, 750 So.2d 633 (Fla.1999).

5

### 1.    A valid agreement to arbitrate exists.

"The issue of 'whether a valid written agreement to arbitrate exists' is controlled by principles of state contract law." *Shotts*, 86 So. 3d at 464. Here, District of Columbia state law applies to all questions of contract as KS Law is a Limited Liability Partnership created "pursuant to the Business Organizations Title in the District of Columbia Code" and the Partnership Agreement contains a choice of law provision designating that "[a]ny claim or controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia[.]" (Complaint at Ex. 3, p. 1.; ¶ 39). "Florida courts are required to enforce choice of law provisions in contracts unless the law of the foreign state contravenes the strong public policy of Florida or is unjust or unreasonable." *Default Proof Credit Card Sys., Inc. v. Friedland*, 992 So. 2d 442, 444 (Fla. 3d DCA 2008) (citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000)). Since there is no public policy exception this Court must apply District of Columbia law in determining whether a valid written agreement to arbitrate exists.

Under District of Columbia law, for an enforceable contract to exist the parties must "express[ ] an intent to be bound, agree[ ] to all material terms, and assume[ ] mutual obligations sufficient to create an enforceable contract." *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A. 2d 996, 1004 (D.C. 2008). There "must be mutual assent of each party to all the essential terms of the contract." *Malone v. Saxony Co-op. Apartments, Inc.*, 763 A. 2d 725, 729 (D.C. 2000).

It is beyond dispute that Teh, Benito, and Melchionni all assumed mutual obligations throughout the Partnership Agreement, financial obligations, ownership interests, and other rights and powers in the partnership. (Complaint, Ex. 3 at ¶¶ 9, 11-13). This is evidenced by the parties' signatures and further supported by Teh's own admissions in his Complaint regarding the formation of KS Law. (Complaint, ¶¶ 11-16; Ex. 3, p. 13). In fact, Teh has attached the Partnership Agreement as an exhibit to his own Complaint. (Complaint, Ex. 3).

6

That Teh added KS Law as a nominal defendant in this derivative action does not change the result.  While KS Law did not sign the Partnership Agreement, it is bound by its terms, including the Arbitration Provision. Under District of Columbia law, KS Law is bound by and may enforce this arbitration provision as if it were a signatory to its own Partnership Agreement. Section 29-701.08 of the Code of the District of Columbia plainly states, "A limited partnership is bound by and may enforce the partnership agreement, *whether or not the partnership has itself manifested assent to the partnership agreement*." DC ST § 29-701.08 (emphasis added).

### 2. All of the claims asserted are arbitrable under the broad Arbitration Clause in the Partnership Agreement.

The Partnership Agreement contains an unambiguous and broad Arbitration Clause:

> **Any controversy arising out of or related to this Agreement** or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and **shall be resolved via arbitration** under the American Arbitration Association[.]

(Complaint Ex. 3 at ¶ 39) (emphasis added).

Both state and federal courts analyzing FAA arbitration clauses have found that an arbitration "provision which is broad in scope allows for arbitration of all claims 'arising out of or related to' the contract, including tort claims." *Cooper v. Rehab. Ctr. at Hollywood Hills LLC*, 305 So. 3d 3, 4 (Fla. 4th DCA 2020) (quoting *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 639 (Fla. 1999)); *see also Herrera*, 154 F. Supp. 3d at 1327 ("The presumption of arbitrability is particularly applicable where the arbitration clause is broad.") (citing *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 650 (1986)).

As the U.S. Supreme Court has held:

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

7

*AT&T Technologies*, 475 U.S. at 650.

Where an unambiguous arbitration clause broadly covers "all claims or controversies" that arises out an agreement, any claim is covered thereunder barring **only** "the most forceful evidence of a purpose to exclude" a specific claim. *Herrera Cedeno v. Morgan Stanley Smith Barney*, LLC, 154 F. Supp. 3d 1318, 1327 (S.D. Fla. 2016).

The arbitration provision in *Herrera* is similar to the one here:

| *Herrera* | KS Law |
|---|---|
| **[A]ll claims or controversies** . . . concerning or **arising from [the agreement] . . . or breach of** this or any other agreement between us . . . shall be determined by arbitration[.] | **Any controversy arising out of or related to this Agreement or the breach thereof** … shall be resolved via arbitration[.] |

*Herrera,* 154 F. Supp. 3d at 1322.

As the court in *Herrera* held, for a claim to be outside the scope of such a broad arbitration clause, the parties must "clearly express their intent to exclude categories of claims from their arbitration agreement." *Id*. (citing *Paladino v. Avnet Comp. Techs., Inc.*, 134 F.3d 1057, 1057 (11th Cir.1998).

And like in *Herrera*, the Arbitration Clause here does not narrow or limit the types of claims that are subject to arbitration. Instead, it broadly covers "any controversy" and explicitly includes any claims arising out of or relating to alleged breaches of the Partnership Agreement. The Arbitration Clause does not exclude any categories of claims, and no evidence has been put forth to the contrary. Teh's claims are covered within the scope of the broad Arbitration Clause, which afforded no exclusions. As such, all of Teh's claims against the KS Law Defendants must be arbitrated.

8

**3.     The right to arbitration has not been waived.**

Finally, the KS Law Defendants have not waived their right to arbitration. The right to arbitration is considered waived when a party acts inconsistently with that right, such as by actively participating in a lawsuit without asserting their right or filing an answer without claiming that the matter should be arbitrated. *See Bland v. Green Acres Grp., L.L.C.*, 12 So. 3d 822, 824 (Fla. 4th DCA 2009); *see also Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004) (waiving right to arbitrate involves "taking actions inconsistent with that right."). This Motion is the KS Law Defendants' first action in this matter, and therefore their right to arbitrate has been maintained.

## IV.     CONCLUSION

The KS Law Defendants respectfully request this Court dismiss Counts 1-5 of Plaintiff Teh's Complaint and order that they be submitted to arbitration pursuant to the Partnership Agreement, grant the KS Law Defendants their attorney's fees and costs for having to file this Motion and grant any further relief deemed just under the circumstances.

Dated:  June 15, 2023

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Kenneth Bressler*

Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

9

_Attorneys for Defendants Benito,_
_Melchionni, and KS Law Group, LLP_

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed

on this 15th day of June 2023, with the Clerk of the Circuit Court using the Florida Courts e-filing

e-portal and served by an automatic email generated by the Florida Courts e-filing portal to::

Matthew Jones, Esq.
matthew@jones-adams.com
Cheyenne Moghadam, Esq.
c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

_Counsel for Plaintiff, Allan Teh_

Andrew Berman, Esq.
Email: aberman@ybklaw.com
YOUNG, BERMAN, KARPF & KARPF, P.A.
825 Brickell Bay Drive, Tower III, Suite 1748
Miami, Florida 33131
Telephone: (305) 945-1851
Facsimile: (786) 219-1981

_Counsel for Defendants Persist Communications, Inc. and Lake Law Firm, LLC_

_/s/ Kenneth Bressler_
Kenneth Bressler
Admitted _Pro Hac Vice_

10

# Exhibit A

## AMERICAN ARBITRATION ASSOCIATION
## DEMAND FOR ARBITRATION

In The Matter of the Arbitration

RE:    ALLAN TEH, Claimant

    vs.                           AAA Case No.: _____

    KS LAW GROUP, LLP, Respondent.

Date: November 19, 2022

_____/

The Claimant, Allan Teh, and Respondent, KS Law Group, LLP, (hereinafter collectively, the "Parties") executed a Partnership Agreement (the "Agreement") which provided Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP, in exchange for a $4,000,000 capital contribution. This Demand for Arbitration arises from Respondent's failure to comply with Claimant's Demand for Inspection of Records, as required by Section 29-604.06(b) of the Code of District Colombia (the "Code").

### Background

1. On August 24, 2021, the Claimant, Allan Teh, and Respondent, KS Law Group, LLP, executed a Partnership Agreement providing Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP. (*See Partnership Agreement attached as Exhibit "A"*).

2. From the execution of the Agreement to the present date, the Respondent has failed to provide Claimant with any substantive correspondence, information or documentation allowing Claimant to assess the value, status and quality of his **$4,000,000 equity interest** in the Respondent.

3. On November 5, 2022, Claimant emailed, and mailed via certified mail on November 7th, 2022, a Demand for Inspection of Records to the Respondent (the "Demand"). (*See Demand attached as Exhibit "B"*)

4. The Demand was made pursuant to Section 29-604.06(b) of the Code of District Colombia, which sets forth a partner's rights and duties with respect to information of the partnership:

> A partnership shall provide partners and their agents and attorneys **access to its books and records**. It shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to **inspect and copy books and records** during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished.

D.C. Code § 29-604.06(b)

5. After providing the Respondent ten (10) days in which to comply with Claimant's statutory demand, the Respondent failed to provide the records sought.

6. On November 16, 2022, counsel for Respondent submitted a letter to Claimant's counsel. (*See Respondent's letter attached as Exhibit "C", including enclosure*)

7. Respondent's letter did not contain any documents demanded by the Claimant, but instead contained a list of proposed items that would be provided to Claimant upon the execution of a Confidentiality Agreement by Claimant along with Claimant's counsel, Jones & Adams, P.A. (*See Exhibit "C", including enclosure*).

8. Interestingly, the proposed Confidentiality Agreement requests Claimant's counsel, Jones & Adams, P.A., be a signatory of the Confidentiality Agreement but it makes no such request of Respondent's counsel, Blank Rome, LLP.

9. It is important to note that the Partnership Agreement between the Parties is devoid of any reference to the requirement of executing a confidentiality agreement in connection with a statutory demand for books and records.

10. Further, Claimant cannot locate any reference to the requirement of a confidentiality agreement in the D.C. Code.

11. Nevertheless, the Claimant recognizes that all the matters pertaining to the Partnership involve various confidential and proprietary matters and will continue to protect and preserve that information.

12. As is quite clear, Claimant's Demand sets forth ten (10) reasonable requests so that Claimant may adequately assess the value, status and quality of his $4,000,000 equity interest.

13. Respondent's letter only provided proposed inadequate documentation to nine out of the ten requests in Claimant's Demand.

14. In many instances, Respondent's proposed documents did not correlate to Claimant's demands or severely minimized the scope of Claimant's requests.

15. Just by way of example, Claimant requested access to "[c]opies of the financial statements of the Partnership, which include, profit and loss statements, balance sheets, and cash flow statements." (*See ¶ 2 of Exhibit "B"*)

16. To which, Respondent stated in its letter that it would provide "[a] spreadsheet reflecting KS Law's Chase banking activity as of November 10, 2022 and KS Law's monthly bank statements." (*See ¶ 2 of Exhibit "C"*)

17. Not only did Respondent fail to produce the required documents but the proposed documents do not remotely correspond to the Claimant's requests.

18. Regarding Claimant's request for "[a]ll documents relating to Mr. Teh's equity interest in the Partnership", Respondent oddly proposed that it will provide "a letter regarding Mr. Teh's investment, dated May 19, 2022."

19. This oblique reference to a "letter" is clearly an insufficient response to Claimant's request.

20. Claimant also requested the "[u]sernames and passwords to all bank accounts in the name of the Partnership." (*See ¶ 8 of Exhibit "B"*)

21. Respondents did not even acknowledge or address that request.

22. Nor did Respondent address Claimant's request for all "communications regarding the equity interest of Mr. Teh in the Partnership." (*See ¶ 9 of Exhibit "B"*)

23. To date, Claimant has not received the requested books or records, nor has the Claimant been offered or been provided access to inspect the Respondent's books and records as required by the Code. (*See D.C. Code § 29-604.06(b)*).

24. The Agreement between the Parties requires that any dispute arising out of the Agreement shall be settled under the laws of the District of Colombia. (*See Exhibit "A" Section 39*).

25. The Agreement between the Parties further contains an arbitration clause set forth in Section 39.

26. Section 39 requires that a dispute between the Parties will be submitted to the American Arbitration Association and be arbitrated by a single arbitrator in the District of Colombia. (*See Exhibit "A" Section 39*).

27. Due to Respondent's failure to comply with Section 29-604.06(b) Claimant demands this matter proceed to the American Arbitration Association.

## The Claim

Claimant seeks an award and order from the American Arbitration Association requiring Respondent to comply with Claimant's statutory right to inspect the Respondents books and records. Further, as set out in the Agreement, Claimant requests an award of his attorneys' fees, costs and expenses pursuant to Section 39 of the Partnership Agreement.

DATED this 19th day of November, 2022.

**JONES & ADAMS, P.A.**
*Attorneys for Claimant*
Coral Gables Centre
999 Ponce de Leon Boulevard
Suite 925
Coral Gables, FL 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:    */s/ Matthew L. Jones*_____
       Matthew L. Jones, Esq.
       Florida Bar No.: 909335

# Exhibit B

Filing # 168815642 E-Filed 03/15/2023 04:58:39 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.:

ALLAN TEH, individually,

     Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York Limited Liability Company

     Defendants.

_____/

## COMPLAINT

Plaintiff, ALLAN TEH ("Teh"), sues Defendants, LEE MELCHIONNI ("Melchionni"), SYLVIA BENITO ("Benito"), PERSIST COMMUNICATIONS, INC ("Persist"), and THE LAKE LAW FIRM, LLC ("Lake Law Firm") (collectively referred to as "Defendants") and in support thereof alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. This action is for damages, declaratory relief and equitable relief in excess of the minimum jurisdictional limits of this Court.

2. Plaintiff, Allan Teh, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County, Florida.

3. Defendant, Lee Melchionni, is a citizen and resident of the State of Florida. His current residential address is located in Miami-Dade County Florida. His apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

4. Defendant, Sylvia Benito, is a citizen and resident of the State of Florida. Her current residential address is located in Miami-Dade County Florida. Her apparent business address is 20900 NE 30th Ave., Miami, FL 33180.

5. Persist Communications, Inc. is a Florida Corporation formed in the State of Florida and doing business in the state of Florida. Persist's current office and the place of operation is located in Broward County Florida - specifically, 1815 Cordova Road, Fort Lauderdale, FL 33316.

6. Persist's President and Registered Agent is Edward Lake ("Mr. Lake"). Mr. Lake's address as President and Registered Agent of Persist is the same principal address as Persist and The Lake Law Firm - 1815 Cordova Road, Fort Lauderdale, FL 33316. *See attached Persist Annual Report filed on January 20, 2023 as **Exhibit 1** and Lake Law invoice dated 9/1/2021 as **Exhibit 2.***

7. Lake Law Firm, LLC, upon information and belief, is a New York law firm with operations in the State of Florida. Lake Law firm has an office located in Broward County Florida and issues invoices regarding alleged services with the 1815 Cordova Road, Fort Lauderdale, FL 33316 office address on its invoices. *See **Exhibit 2**.*

8. As more fully set forth herein, Lake Law Firm has purposefully availed itself of the privilege of conducting activities within Florida and is therefore under the jurisdiction of this Court. As set out herein and pursuant to F.S. §48.193 et seq., Lake Law

Firm is subject to specific personal jurisdiction because Lake committed multiple acts and breaches enumerated in F.S. §48.193(1) including, but not limited to: operating, conducting, engaging in, and carrying on a business or business venture in Florida, Lake Law Firm has an office in Florida, has committed a tortious act within the State of Florida and has breached and is continuing to breach agreements in Florida by failing to perform acts required by the agreements to be performed in Florida.

9.     This venue and forum are appropriate based upon F.S. § 47.011 and F.S. § 47.051 and also because virtually every act, breach and transaction set out in this Complaint occurred in Miami-Dade County Florida. To the extent other acts, breaches and transactions are stated within this complaint, those occurred in Broward County Florida. Moreover, the overwhelming majority of fact witnesses are located in Miami-Dade County, Florida.

**GENERAL ALLEGATIONS**

10.     During the spring and summer of 2021, Melchionni and Benito approached Teh regarding various business opportunities involving "litigation funding" for mass tort cases.

11.     One such business opportunity was for Teh to provide capital to a limited liability company which would then invest (via loan or capital contributions) into a law firm which would then utilize the "investment" to obtain and handle various mass tort cases.

12.     Melchionni and Benito subsequently represented to Teh that there would be significant advantages if he also formed his own law firm. *See June 24th, 2021 email as Exhibit 3.*

13. These represented advantages of Teh having his own law firm included Teh having: 1) veto power over what litigation was pursued; 2) control over dollar amounts in specific litigations; 3) the ability to add partners to "his firm"; and 4) simplified governing documents. *See Exhibit 3.*

14. According to Melchionni and Benito this proposed law firm would handle different types of mass tort injury cases, including claims and lawsuits involving Hernia Mesh injuries, Talc toxicity, Round Up toxicity, and 3M Ear Plugs injuries.

15. During that time frame, multiple meetings, conversations and emails took place wherein various specific representations were made to Teh by Melchionni and Benito regarding the viability of the proposed law firm, the cost of acquiring cases, and the number of cases that the firm would have. *See June 21st, 2021 and August 3rd, 2021 Emails as Composite Exhibit 4.*

16. As set out herein, Teh has learned that these direct and specific representations were false.

17. On June 23rd, 2021, during a conference call with the Plaintiff, and others present, Melchionni specifically claimed that there was going to be a "a fast settlement for hernia mesh" and he knew "that something is imminent".

18. These high-pressure tactics and misrepresentations continued on various occasions.

19. During the same June 23rd, 2021 call, and discussions shortly after, Melchionni, Benito and Teh specifically discussed the risks associated with a large capital

contribution to the yet to be formed law firm, and Melchionni and Benito represented those risks to be "none".

20.     At no point in time during these conversations did Melchionni mention the possibility of future case "drop-off" relative to the earlier representations.

21.     On or about July 20th, 2021, there were multiple follow up calls where Melchionni and Benito specifically promised Teh that upon the formation of the law firm, they would both send "monthly updates on our cases".

22.     As a result of these direct, specific and material representations made to Teh by Melchionni and Benito regarding inter alia, the number of cases that the firm would sign up as counsel and the associated costs of those cases, Teh agreed to form a law firm with Teh as 50% equity partner and Melchionni and Benito as 25% partners respectively. *See KS Law Partnership Agreement attached as **Exhibit 5**.*

23.     The name of the firm is KS Law Group LLP ("KS Law") and the Partnership Agreement (the "Agreement") was executed by Teh, Melchionni, and Benito on August 24th, 2021.

24.     Interestingly, non-party KS law had its initial place of business in Washington D.C. but changed its address to 20900 NE 30th Avenue, Miami, Florida 33180 as evidenced by multiple bank account documents dated after the signing of the earlier referenced Agreement.

25.     Relevant to this Complaint, this "updated" place of business address is the same "business" address as Melchionni (a 25% partner in KS Law) and Benito (another 25% partner in KS Law).

26. Neither Melchionni nor Benito advised their partner Teh of this address change.

27. In reliance upon the representations set out herein, Teh provided $4 million as a capital contribution for KS Law and its operations.

28. Upon information and belief, this was the only monetary capital contribution made by anyone to KS Law.

29. That $4 million capital contribution was paid by Teh via Federal Wire on Friday September 3, 2021, into the KS Law Account at Chase Bank (Acct. Ending in ***6138) at the direction of Teh's partners, Melchionni and Benito.

30. On September 16th, 2021, thirteen days after Teh's $4,000,000 was deposited into KS Law's Chase bank account, the funds were transferred and drained from that account.

31. The funds were sent to Defendant Persist's account at TD Bank, Acct ending in ***2721.

32. The effectuation and execution of that transfer was at the direction of Melchionni, Benito, Lake Law, and Persist.

33. Teh was not informed of the transfer at that time or any appropriate time thereafter.

34. It was only until the Fall of 2022, approximately one (1) year following those transfers, that Teh finally received documents obliquely referencing said transfer. To wit: a one-and-a-half-page invoice from Lake Law "to" KS Law for $3,880,000.00. *See Exhibit 2.*

35.    Put simply, Defendants Melchionni and Benito, with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Mr. Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

36.    Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

37.    Critical to the allegations regarding the misrepresentations made, as stated herein, it must be noted the original, and represented purpose, of Teh's $4 million capital contribution was for working up, qualifying, processing, managing and settling cases as well as for firm marketing services, professional management services, obtaining new clients and cases, and firm infrastructure management.

38.    As shown by the transfer of the entirety of KS Law's working capital to Defendant, Persist, and the allegations set out herein, Teh's $4 million was not used for those represented purposes.

39.    Upon the formation of KS Law, the "monthly updates" promised by Melchionni and Benito never occurred.

40.    In addition, "monthly updates" are utterly insufficient and inappropriate considering the important duties of the Partners set forth herein.

41.    When updates did come, they were irregularly sent, and were accompanied with repeated representations that there was "non-material drop offs" in the number of cases of KS Law.

42.   Moreover, multiple "updates" sent were simply "copy and pasted" from Google News and similar sources.  Nothing in any of these "updates" remotely comports with or fulfills the Fiduciary Obligations set out herein and each of these "updates" is, in and of itself, a Breach of those duties.

43.   Again, to emphasize the specificity of the fraudulent misrepresentations set out herein, the Plaintiff was specifically told by Melchionni, regarding the Hernia Mesh cases that KS Law would have, "some money may flow before the end of the year."

44.   As of today's date, the Plaintiff has not been advised of a single settlement.

45.   As further evidence of the breach of fiduciary duties owed directly to Teh, the Defendants, Melchionni and Benito, conspicuously and deliberately failed to keep even the most basic financial, operating, or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the profound logistics of managing hundreds of personal injury cases, Defendants, Melchionni and Bentio, have even admitted that they did not even bother to keep a general ledger for KS Law.

46.   As updates from Melchionni and Benito became increasingly sparse, on October 18th, 2021, Teh and Melchionni, with others present, had a call to discuss Teh's request for specific data relating to KS Law's cases.

47.   On the same date, an email was sent to Teh by Melchionni, with Benito cc'd.

48.   The October 18th email claimed:

*"The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost…Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We*

*are cautiously optimistic that **the majority of our docket will be settled by Q2 of 2022."***

See October 18th, 2021, email attached as **Exhibit 6.**

49. Suffice to say, the majority of KS Law's "docket" was, in fact, not "settled by Q2 of 2022."

50. As of today's date, Teh has not been advised of a single settlement.

51. These acts, omissions and failures constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

52. On October 20th, 2021, Melchionni sent another email to Teh stating:

*"**For Allan's law firm, KS Law Group, we spent $3,880,080.00 to acquire** 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. **We are entitled to 60% of the attorney fee."***

See October 20th, 2021 Email attached as **Exhibit 7**

53. It is important to note that Rules 1.5(c) and 1.5(e) of Rules of Professional Conduct governing D.C. law firms explicitly state:

**1.5(c)** A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. **A contingent fee agreement shall be in writing** and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial, or appeal, litigation, other expenses to be deducted from the recovery, whether such expenses are to be deducted before or after the contingent fee is calculated, and whether the client will be liable for expenses regardless of the outcome of the matter. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and if there is a recovery, showing the remittance to the client and the method of its determination.

**1.5(e)** A division of a fee between lawyers who are not in the same firm may be made only if:

(1) The division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) **The client is advised, in writing,** of the identity of the lawyers who will participate in the representation, of the contemplated division of responsibility, and of the effect of the association of lawyers outside the firm on the fee to be charged;

(3) The client gives informed consent to the arrangement; **_and_**

(4) The total fee is reasonable.

54.     In direct breach of Rules 1.5(c) and (e) and the duties alleged herein, Defendants Melchionni and Benito never secured or obtained such agreements. Moreover, Teh has never been provided even a single written fee agreement between KS Law, co-counsel, referring counsel or any client pertaining to KS Law's involvement in the cases.

55.     In addition, Melchionni stated under oath that the is not aware of any retainer agreements in which KS law is party.

56.     The notion that this formerly multi-million dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein.

57.     These Professional Conduct Rules are not cited to suggest an independent cause of action based upon the Rules. They are set out herein as evidence of the acts, omissions and failures that constitute profound and significant breaches of fiduciary duties owed directly to Teh by the Defendants Melchionni and Benito.

58.   On September 28th, 2022, Melchionni sent an email, cc'ing Benito, attempting to explain how the prior representations made to Teh have gone sideways. See September 28th email as **Exhibit 8.**

59.   Melchionni writes in the September 28th email:

*"Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.*

***There is an explanation from the CEO of Persis/Lake Law Firm*** *below regarding the drop off in Mass Torts.*

*Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.*
*1.    Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.*
*2.    Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).*
*a.    Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.*
*3.    Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.*
*a.    Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).*

4.     *Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.*

a.     *Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified. As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.*

5.     *Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.*

a.     *Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.*

*A few outlier reasons for rejection:*
1.     *No will/estate, unable to file on behalf of*
2.     *Client no longer wishes to pursue*
3.     *Client is uncooperative*
4.     *Client is unresponsive/unable to reach*
*While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.*
--
*Lee Melchionni, Esq.."*

**See Exhibit 8**

60.     Even to the untrained eye, this information and risk factors should have been disclosed to Teh prior to formation of KS Law and his sizable $4 million capital contribution.

61.     Defendants' calculated failure to do so as well as their omissions set out herein clearly demonstrate the Defendants' liability for such conduct.

62.     To further comply with the requirements of specificity, and only by way of example, the September 28th, 2022, email attached a spreadsheet which demonstrated

just how significant and misleading the earlier representations made by Melchionni and Benito were. *See attached spreadsheet showing "KS Law Group – Cases Owed - % of Total Cases – Cases Allocated" as* **Exhibit 9**.

63.     Even a cursory review of the "Cases Owed vs Allocated" as set out in Column "D" demonstrate that KS Law's case "drop-offs" were now abysmal.

64.     Teh made his frustrations with Defendants' constant and repetitive misrepresentations explicitly known in an October 14th, 2022, email where he stated that "the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said." *See October 14th Email attached as* **Exhibit 10**.

65.     Despite Plaintiff's obvious and warranted frustrations Defendants' misrepresentations continued.

66.     After a long period without any update regarding the value, status, or quality of Teh's $4 million equity interest on March 3rd, 2023, Teh received a surprise . . . a conspicuously unsolicited email from Melchionni containing further worrisome representations and disclosures. *See March 3rd, 2023 email attached as* **Exhibit 11**.

67.     The March 3rd email contained spreadsheets outlining the "clients" of KS Law and their current status. **Exhibit 12** *will be submitted to the Court under seal because it contains client information.*

68.     Present on the spreadsheets were "clients" of KS Law labeling many of these "clients" as "Retained – Sent to Firm."

69.     To reiterate, Teh, as a partner in KS Law, has never been provided a single retainer agreement with any "clients" of KS Law.

70.     Upon information and belief, the spreadsheets provided by Melchionni were not prepared by KS Law but in fact were prepared by Lake Law Firm.

71.     Attached to the March 3rd email was also a "Case Replacement Agreement" with Lake Law Firm. *See "Case Replacement Agreement" attached as **Exhibit 13.***

72.     Teh was never provided notice of, or allowed input in, the execution of the Case Replacement Agreement with Lake Law Firm.

73.     In addition, the Case Replacement Agreement sets forth numbers of cases and the price of acquiring said cases that materially differ from the representations made to Teh prior to the execution of the Partnership Agreement and as set out previously.

74.     The Case Replacement Agreement also explicitly states and admits that Lake Law Firm "has not delivered equivalent value in cases to the Funded Amount . . ."

75.     The misrepresentations that are specifically set out in this Complaint are provided to highlight and illuminate the specific nature of the fraud and breaches alleged herein.

76.     Since the Complaint should contain a "short and plain statement" regarding the nature of the claims asserted, the Plaintiff cannot provide every single misrepresentation made within the body of this Complaint and reserves the right to amend and supplement this pleading as the circumstances warrant.

## COUNT 1
## FRAUDULENT INDUCEMENT
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

77.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

78.     As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm was going to be retained and how KS Law's funds were going to be used.

79.     Melchionni and Benito, individually and collectively made false statements including that the funds were to be used for marketing and operations along with the misrepresentations set forth above.

80.     Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

81.     Melchionni and Benito, individually and collectively made these, and many other statements, to induce the plaintiff to pay the funds referenced above and enter into the Agreement.

82.     As set out herein, these statements were clearly made before the execution of the Agreement.

83.     These statements have proximately caused specific and direct damages to the Plaintiff when he acted in reliance on those misrepresentations. To wit: he wired $4 million of his funds to an account controlled by Melchionni and Benito, individually and

collectively, and to date has not received even $1 in the form of distribution, payment or otherwise.

84.     Regarding such direct damages, Plaintiff would not have entered into the Agreement if defendants had not made misrepresentations.

**WHEREFORE**, Plaintiff demands judgment against these Defendants for damages, pre and post judgment interest, attorneys' fees and costs, and any other relief this Court deems just and proper.

## COUNT 2
### RESCISSION
### (PLED IN THE ALTERNATIVE)

85.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 66 as if fully set forth herein.

86.     As set forth herein, both Melchionni and Benito, individually and collectively made multiple false statements of a material facts, including but not limited to the number of cases in which the firm had would be retained as counsel. Melchionni and Benito, individually and collectively, made additional false statements including that the funds were to be used for case management, marketing and operations.

87.     Melchionni and Benito, individually and collectively, knew or should have known that those statements were false.

88.     Melchionni and Benito, individually and collectively made these and many other statements to induce the plaintiff to enter into the Agreement.

89.     These statements were clearly made before the execution of the Agreement.

90.    These statements have proximately caused specific and direct injury to the Plaintiff, Teh, when he acted in reliance on those misrepresentations. To wit: Teh wired $4 million of his funds to an account controlled by Melchionni and Benito individually and collectively and to date has not received even $1 in the form of distribution, payment or otherwise.

91.    Rescission is an appropriately pled alternative remedy because regarding such conduct and direct damages, Teh would not have entered into the Agreement if Defendants had not made misrepresentations and rescission of the Agreement is an appropriate claim to place the parties back in their original positions.

**WHEREFORE**, Plaintiff, as rescission damages, seeks this equitable relief and demands the return of his $4 million, pre and post judgment interest, attorneys' fees and costs and all other relief that this Court deems just and proper.

## COUNT 3
### DIRECT BREACH OF CONTRACTUAL INDEMNITY
### (AS TO LEE MELCHIONNI)

92.    Plaintiff re-alleges by reference paragraphs 1 through 76 as if fully set forth herein.

93.    Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni…agrees to indemnify Allan Teh…from and against all…loss, cost, damage and expense … which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

94.     Prior to the filing of this complaint, Mr. Teh demanded indemnification from Melchionni.

95.     To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

96.     As a result of the acts, breaches and omissions set out herein, Allan Teh has suffered direct and individual damages because, inter alia, the contractual indemnity provisions referenced above run specifically and only to the benefit of Teh and not the Partnership or any other partner.

**WHEREFORE**, Plaintiff demands judgment against Defendant, Lee Melchionni, for damages including but not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 4
## DECLARATORY ACTION REGARDING CONTRACTUAL INDEMNITY DUTIES
### (AS TO LEE MELCHIONNI)

97.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

98.     Paragraph 6 of the Agreement, attached as **Exhibit 5**, states, inter alia: "Melchionni...agrees to indemnify Allan Teh...from and against all...loss, cost, damage and expense ... which relate to arise out of or in connection with the operation of the Partnership or a breach by the indemnifying partner (Lee Melchionni)".

99.     Prior to the filing of this complaint, Teh demanded indemnification from Melchionni.

100. To date, Melchionni has breached his obligations and refused to comply with this indemnity provision.

101. There is a bona fide, actual and present, practical need for the declaration sought herein.

102. Specifically, there is a significant controversy regarding defendant Melchionni's failure to provide indemnity as set forth in the Agreement and Teh's rights regarding that indemnity provision.

103. The rights and interests of Melchionni and Teh are actual, present, adverse and antagonistic regarding the indemnity provision referenced herein because Melchionni has failed to comply with his duties and obligations in that regard.

104. These antagonistic and adverse interests are all before this Court as set out in this Complaint.

105. The relief and claims set out herein are not a request for legal advice by this Court or to seek answers to questions based on curiosity.

**WHEREFORE,** Plaintiff seeks a declaration from this Court, regarding the contractual provisions cited herein and Melchionni's duties thereupon that Melchionni shall forthwith, immediately and on a continuing basis, indemnify Plaintiff for his losses, damages and costs which include but are not limited to the $4 million investment, lost opportunity costs, pre and post judgment interest, attorneys' fees and costs and any other relief this Court deems just and proper.

## COUNT 5
## BREACH OF FIDUICARY DUTY
### (AS TO LEE MELCHIONNI AND SYLVIA BENITO)

106.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

107.   Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

108.   Melchionni and Benito, individually and collectively breached these duties as set forth above. Specifically, but without limitation, by Defendants Melchionni and Benito unilaterally and with absolutely no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

109.   Moreover, this transfer by Teh's partners was done with literally no safeguards, benchmarks or monitoring arrangements regarding the use of these funds.

110.   Melchionni and Benito, individually and collectively breached additional fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

111.   As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

112. Teh has been directly and individually damaged in a manner distinct from any damage suffered by others.

113. Specifically, these distinct damages to Teh include, but are not limited to, the loss of his discrete and identifiable funds used to fully capitalize KS Law.

114. This is especially relevant in the context of no other Partners contributing to the firm.

115. Allan Teh has suffered direct and individual damages because, inter alia, all of the money involved in the acts and breaches sent out herein belonged to and was sent by Allan Teh and he was the only partner and investor to suffer direct financial losses as a result.

116. Teh has suffered damages which were proximately caused by the breaches set forth above.

**WHEREFORE,** Plaintiff demands judgment against Defendants, Lee Melchionni and Sylvia Benito, jointly and severally, for damages, including pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 6
### EQUITABLE ACCOUNTING
### (AS TO LEE MELCHIONNI AND SYVLIA BENITO)

117. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

118. Melchionni and Benito and Teh are partners in KS Law. As such, these partners owe each other and the firm fiduciary duties.

119.    Melchionni and Benito, individually and collectively, breached their fiduciary duties by: failing to honestly and timely disclose and report the potential and actual cases in which KS Law was and has been retained as co-counsel, referring counsel, or otherwise.

120.    Specifically, but without limitation, Defendants Melchionni and Benito unilaterally and with no authority or legitimate reason transferred essentially all of Teh's funds and the entire working capital of Teh's law firm to a third-party (Defendant Persist) with no cognizable contract or agreement in place.

121.    As further evidence of the direct breach of fiduciary duties owed to Teh, the Defendants conspicuously and deliberately failed to keep even remotely competent financial operational or accounting records for KS Law. Shockingly and despite a $4 million capitalization and the logistics of managing hundreds of personal injury cases, Defendants have admitted that they did not even bother to keep a general ledger.

122.    In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

123.    The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

124.    Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as complex transactions involving the parties hereto.

125.   Moreover, a breach of the duty imposed by those relationships is grounds for an equitable accounting.

**WHEREFORE,** Plaintiff states a remedy at law would be inadequate and demands judgment against Defendants, Lee Melchionni and Sylvia Benito, for all appropriate relief in this Claim, including damages, pre and post judgment interest, attorneys' fees and costs and any such further relief this Court deems just and proper.

## COUNT 7
## UNDERLINED UNJUST ENRICHMENT
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

126.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

127.   As is clear from the allegations set out herein, the contract and events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the millions of dollars, arose from acts and omissions by Lake Law and Persist and those other named Defendants.

128.   Specifically, neither Lake Law or Persist have provided anything of value to the Teh in exchange for the $4 million they received.

129.   Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as specifically set forth herein.

130.   As referenced herein, Teh has conferred a benefit on the defendants Lake Law and Persist individually and collectively by paying such funds.

131.   Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

132.   The Defendants, individually and collectively, voluntarily accepted and retained the benefit conferred, i.e., the Defendants, to this day, have continued to retain those funds.

133.   As specifically set out herein, circumstances are such that it would be inequitable for the Defendants to retain the benefit conferred upon them without first providing the appropriate exchange of value and consideration to the plaintiff.

134.   Teh was legally impoverished as that term is used in the context of this claim.  Specifically, $4,000,000 of Teh's dollars was wrongfully transferred to, and is being held by, Defendants, Lake Law and Persist.

135.   As set forth herein, there was and is an obvious relationship between the above-described enrichment and impoverishment.

136.   There is no justification regarding the enrichment realized by Lake Law and Persist.

137.   There is no adequate remedy available at law regarding that which Lake Law and Persist have occasioned upon the Plaintiff.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Unjust Enrichment claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

## COUNT 8
### EQUITABLE ACCOUNTING
### (AS TO LAKE LAW FIRM AND PERSIST COMMUNICATIONS)

138.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 76 as if fully set forth herein.

139. As is clear from the allegations set out herein, the events that led to the cascade of events leading to Lake Law and Persist unjustly receiving the subject funds arose from acts and omissions by Lake Law and Persist and those Defendants have been unjustly enriched thereby.

140. Specifically, neither Lake Law or Persist have provided anything of value to Teh in exchange for the $4 million they received.

141. Defendants Lake Law and Persist were individually and collectively enriched by the receipt of funds as alleged herein.

142. As referenced herein, Teh has conferred a benefit on the Defendants Lake Law and Persist, individually and collectively.

143. Lake Law and Persist, individually and collectively, had and have knowledge of the significant benefit conferred upon each of them.

144. The Defendants, individually and collectively, voluntarily accepted and retained the benefits conferred.

145. The Defendants, to this day, have continued to retain those funds.

146. Teh's right to an accounting is premised upon the existence of the fiduciary relationships set out herein as well as the complex and significant transactions described herein.

147. According to evidence available thus far, the funds referenced herein relate to a KS Law's ability to secure and manage hundreds personal injury mass tort cases.

148. Specifically, Melchionni and Benito, unilaterally and with no authority or legitimate reason, and with Lake Law and Persist's knowledge and direction, transferred

essentially all of Teh's funds and the entire working capital of Teh's law firm to Defendants Lake law and Persist with no cognizable contract or agreement in place.

149. In addition, Melchionni has stated under oath that he is not aware of any retainer agreements in which KS Law is a party.

150. The notion that this formerly multi-million-dollar law firm would be obtaining and handling hundreds of personal injury cases without a single retainer agreement, is shocking and clearly demonstrates the breaches alleged herein as well as the Plaintiff's right to an Equitable Accounting.

151. Plaintiff states that a remedy at law would be inadequate.

**WHEREFORE,** Plaintiff demands judgment for all damages allowable by this Equitable Accounting claim, including but not limited to damages, pre and post judgment interest, attorneys' fees and costs, and all other relief this Court deems just and proper.

The Plaintiff hereby demands trial by jury on all issues and claims so triable as of right.

Dated: March 15, 2023

Respectfully submitted,

**JONES & ADAMS, P.A.**
*Attorney for Plaintiff*
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

By:

/s/ Matthew Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335
matthew@jones-adams.com

**2023 FLORIDA PROFIT CORPORATION ANNUAL REPORT**

DOCUMENT# P15000085963

Entity Name: PERSIST COMMUNICATIONS, CORPORATION

**FILED**
**Jan 20, 2023**
**Secretary of State**
**7254299730CC**

**Current Principal Place of Business:**

1815 CORDOVA RD
FT. LAUDERDALE, FL 33316

# Exhibit 1

**Current Mailing Address:**

1815 CORDOVA RD
FT. LAUDERDALE, FL 33316 US

**FEI Number:** 81-0851001

Certificate of Status Desired: No

**Name and Address of Current Registered Agent:**

LAKE, EDWARD J
1815 CORDOVA RD
FT. LAUDERDALE, FL 33316 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   EDWARD LAKE                                                                 01/20/2023

Electronic Signature of Registered Agent                                                      Date

**Officer/Director Detail :**

Title            PRESIDENT

Name          LAKE, EDWARD J

Address       1815 CORDOVA RD

City-State-Zip:   FT. LAUDERDALE  FL  33316

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EDWARD J LAKE                                    PRESIDENT                      01/20/2023

Electronic Signature of Signing Officer/Director Detail                                    Date



# Exhibit 2

# THE LAKE LAW FIRM

## Invoice

| BILL TO: KS Law Group | | CAMPAIGN: HM/TALC/3M/RU |
|---|---|---|
| | | DATE: 9/1/2021 |
| | | DUE DATE: |
| Phone: | | TERMS: See Below |

| Quantity | Description | Unit Price | Line Total |
|---|---|---|---|
| 220 | Hernia Mesh | $5,600 | $1,232,000 |
| 200 | Talc | $6,000 | $1,200,000 |
| 155 | Round Up | $5,048.39 | $782,500 |
| 220 | 3M | $3,025 | $665,500 |
| | | Total | $3,880,000.00 |

**Hernia Mesh:** Cases provided with the following criteria below & guaranteed by medical records:

- Records showing revision, removal, or replacement surgery, or scheduled within 90 days or needed, but unable to be performed due to medical professional recommendation.
- Client states no previous or existing attorney representation.
- All manufacturers.
- Surgery 2011+

**Talc:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer)
- 75 years old or younger
- 4 years plus of exposure
- Negative BRCA test, preferred but acceptable if unknown.
- No previous or existing attorney representation.
- Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer w/ chemo or treatment
- Death w/in 18 months and original diagnosis within four (4) years of death

**Round Up:** Cases provided with the following criteria below & guaranteed by medical records::

- Diagnosed with NHL or subtype within the last 10 years, unless medical records access then 2007 forward.
- Direct exposure ONLY to RoundUp for more than one year
- No existing attorney

REMITTANCE BY WIRE: *Beneficiary Name: Persist | *Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316 | *Bank Account No.: 4326532721 | *Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000050

**3M:** Cases provided with the following criteria below & guaranteed by medical records:

- Used 3M Combat Arms CAEv2 Earplugs between 2003-2015
- Diagnosed with tinnitus or documented loss of hearing 10% or more in at least one ear
- No existing attorney

**Edward J. Lake, Esq. (EL) agrees to the following:**

1. Market, intake, and sign-up potential clients.
2. Gather medical records, a medical summary, a plaintiff fact sheet and/or court complaint, as necessary.
3. EL will act as liaison between the undesigned and trial firms.
4. The Lake Law Offices will handle any client inquiries.
5. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.
6. Joint venture fee splits will be as follows: 20 % The Lake Law Offices; 60% Client firm; 20% Trial firm.

Print Name: Lee Melchionni

Signature: _____ Date: 9/1/21

**REMITTANCE BY WIRE:**
*Beneficiary Name: Persist
*Bank Info: TD BANK, 1215 SE 17th Street, Fort Lauderdale, FL 33316
*Bank Account No.: 4326532721
*Bank Routing Info: 067014822

*1815 Cordova Road, Fort Lauderdale, FL 33316 US | www.LeadersInMassTorts.com*

CONFIDENTIAL

KS-Law-Teh-000051

**Lee Melchionni** <lee@capital4justice.com>                                    Thu, Jun 24, 2021, 2:10 PM
to Sohail Shahrasebi, allan.teh@icloud.com, Sylvia Benito

# Exhibit 3

Hi Sohail,

Yes, you are correct. Those are the current outstanding MDL"s against hernia mesh manufacturers.

As for our hypothetical settlements question, there will be cases where plaintiff's have suffered horrific injuries where settlement values are several hundred thousand dollars, potentially $1M+. There will also be 'nuisance' claims that will be worth $15,000. Based on our criteria for acceptable claims, we felt comfortable with the hypothetical ranges we provided. Obviously, the hope is that the compensable value of the cases we acquire is higher than our hypothetical averages.

Attached, you will find the returns for two previous torts I was involved in, Actos and DePuy ASR Hips. Please note that the return in these two torts were abnormally positive. Feel free to call me to discuss if there is any confusion.

Finally, I wanted to articulate the difference for Allan if he were to have his own law firm, versus being in the fund.

- Veto power on what litigations are pursued
- Control over dollar amounts in specific litigations
- Simplicity of documentation, meaning we have a simple operating agreement governing Allan's law firm
- The firm can be evergreen
- Ability for Allan to add partners/investors to his firm

If a follow up call makes sense, please let us know Sohail. Thank you for your time.

Best,
Lee

On Thu, Jun 24, 2021 at 12:22 PM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
> Lee,
>
> Great speaking with you and Sylvia yesterday. While I wait for an email back on my outstanding questions, I had two specific questions on the Herniated Mesh opportunity specifically.
>
> 1. Are the below listed cases the current outstanding MDLs against hernia mesh manufacturers?
>    a. In Re: Ethicon, Case No: 1:17-md-02782-RWS (subsidiary of Johnson & Johnson) in the Northern District of Georgia
>    b. In Re: Davol, Inc./C.R. Bard, Inc., Case No: 2:18-md-2846 in the Southern District of Ohio
>    c. In Re: Atrium Medical Corp., Case No: 16-md-2753 LM in the District of New Hampshire
> 2. I know you ranged the potential hypothetical settlement amounts for Hernia Mesh. Doing some digging showed on that on individual cases, ranges went as high as a million and below the low end of the range on

the provided spreadsheet. Was the range provided based on the criteria you set for viable claimants?

Any additional information would be appreciated. Thank you!

Best Regards
Sohail Shahrasebi
Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

**2 Attachments** • Scanned by Gmail



X  Actos.xlsx            X  DePuy ASR.xlsx

**From:** Sylvia Benito <sylvia@capital4justice.com>
**Date:** June 21, 2021 at 11:24:32 AM EDT
**To:** allan.teh@icloud.com
**Cc:** Lee Melchionni <lee@capital4justice.com>
**Subject: Potential Allocation + Outcome Ranges**

# Composite Exhibit 4

Allan,

Please find attached the possible allocations for cases in an individual law firm should you choose to add more allocation to your current investment.  We can send background notes on all these cases for your analyst and/or schedule a call at your convenience to discuss.

Warmly
S

**One attachment** · Scanned by Gmail



Potential Allocati...

## Subject: Re: Question / Request



**Lee Melchionni** <lee@capital4justice.com>                          Tue, Aug 3, 2021,
to Sohail Shahrasebi, Brent Steinberg ■

Hi Sohail,

Below is our current breakdown. We look forward to discussing in more detail on Friday.

- RoundUp - 2%
- Firefighter Foam - 5%
- Zantac - 10%
- Talc - 34%
- 3M - 8%
- Hernia Mesh - 41%

Best,
Lee

On Tue, Aug 3, 2021 at 7:36 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hi Lee,

The last time we spoke you mentioned you were calling an additional $2 million of Allan's investment - bringing t total to $4 million.

I wanted to know if you could give me a break- down, by case type/bucket, of the money invested so far (the tot$4mln.)

This should help me better assess how to distribute, by case type, the additional capital being injected into the d law firm. Please call me if you have any questions.

Best Regards
Sohail Shahrasebi
646-707-4484

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

# Exhibit 5

**KS LAW GROUP, LLP**
**LIMITED LIABILITY PARTNERSHIP AGREEMENT**
**EFFECTIVE AS OF July 26, 2021**

This Limited Liability Partnership Agreement ("Agreement") is entered into by Attorney Lee Melchionni and Non-Attorneys Allan Teh[1] and Sylvia Benito (collectively, the Managing "Partners"), pursuant to the provisions of the Business Organizations Title in the District of Columbia Code (specifically, D.C, Code § 29-101.01, *et seq.*, the "Act").

1. **Formation.**

Pursuant to this Agreement, the limited liability partnership was formed (the "Partnership"), and the Managing Partners elected to become a registered, Limited Liability Partnership, in accordance with the provisions of the Code. The Managing Partners shall be:

1. Lee Melchionni, Esq.; (Melchionni as the "Attorney") and

2. Allan Teh,

3. Sylvia Benito

The Managing Partners agree that no person shall be added or admitted to the Partnership as either a Partner or Managing Partner without the unanimous, affirmative vote of the Managing Partners, with the sole exception of the provisions set forth in Section 16.

2. **Name.**

The name of the Partnership shall be KS Law Group, LLP, and all business of the Partnership shall be conducted under and in such name. There shall be no change to the Partnership name without the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

3. **Primary Place of Business.**

The Partnership shall be established and have the place of business in the District of Columbia, located at 1100 H Street NW, Suite 840, Washington, D.C. 20005 or at an address or location to be determined by the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership.

---

[1] All references to Allan Teh are to him in his capacity as Partner and nominee for Kamunting Street Capital Management, L.P. shall have the right to designate a replacement Partner for Allan Teh, who shall then become a Managing Partner, in the event that Allan Teh is unwilling to serve, becomes incapacitated or dies.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

4.    **Sole Purpose.**

The Partnership's sole purpose is to engage in the practice of law, in order to provide the Partners with the opportunity for pecuniary gain, professional growth and service to the bar and the state and communities which the Partnership serves.

The Partnership shall be a partnership only for the purpose specified in this Section. Except as otherwise provided in this Agreement, the Partnership shall not engage in any other activity or business that is not reasonably necessary or appropriate to the accomplishment of its purpose, and no Partner shall have any authority to hold himself out as the agent of another Partner in regard to any other business or activity.

5.    **Statutory Compliance.**

The Partnership shall exist under and be governed by, and this Agreement shall be construed in accordance with, all the applicable laws of the District of Columbia and the District of Columbia Rules of Professional Conduct. The Managing Partners agree to and shall make all filings and disclosures required by, and shall otherwise comply with, all such laws. The Managing Partners agree to and shall execute and file any assumed or fictitious name certificates and other documents and instruments as may necessary or appropriate with respect to the formation of and conduct of business by the Partnership.

Further, each Managing Partner and Partner, other than the designated Legal Managing Partner (identified in Section 14 of this Agreement), hereby agrees not to hold himself or herself out to the general public, nor publicize in any media or forum their or any other Members' ownership, membership or affiliation with the Partnership.

6.    **Indemnification.**

Melchionni (an "Indemnifying Partner") hereby agrees to indemnify Allan Teh from time to time, and hold them harmless from and against all liability, loss, cost, damage and expense (including attorneys' fees and costs incurred in the investigation, defense and settlement of the matter) which the Partnership or any of such other Partners shall ever sustain, suffer or incur which relate or arise out of or in connection with the operation of the Partnership or a breach by the Indemnifying Partner of any representation, warranty or covenant made by the Indemnifying Partner in this Agreement. If the Partnership, Allan Teh from time to time are made a party to any litigation or otherwise incurs any loss or expense as a result of or in connection with any Indemnifying Partner's personal or professional obligations or liabilities unrelated to Partnership business, such Indemnifying Partner shall indemnify and reimburse the Partnership, Allan Teh from time to time, for all such loss and expense incurred, including reasonable attorneys' fees.

7.    **Title to Property.**

The Partnership shall hold all real and personal property interests in the name of the Partnership, and not in the name of any Partner.

8.    **No Payments of Individual Obligations.**

The Partners agree to and shall use the Partnership's credit and assets solely for the benefit of

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

the Partnership.

Melchionni in his capacity as agent and nominee for KS Law Group, LLP, shall pay the costs of acquiring and maintaining malpractice and general liability insurance (to the extent these coverages are available) for KS Law Group, LLP. The policy shall be at least $5 million per claim/ $5 million in the aggregate and cover all Managing Partners for acts undertaken in their official capacity as Managing Partners.

9.   **Limitation of Duties**

Each Partner hereby agrees that he/she owes duties of care, honesty and loyalty to the other Partners and to the Partnership itself, subject only to the following limitations:

(a)   Subject to their Non-Circumvention obligations, the Partners are not restricted from competing with the Partnership. Each Partner and the Partnership itself waives any breach of duty arising from a Partner engaging in any business, enterprise or transaction, which may directly or indirectly compete with the partnership, or that otherwise would constitute a business opportunity for the Partnership.

(b)   Each Partner who is an Attorney shall have no limitation regarding the ethical practice of law, and any duty under this Agreement or implied in law shall be waived to the extent it would interfere with a lawyer's ability to represent any client as required by the rules of ethics and professional responsibility.

10.   **Non-Circumvention.**

Notwithstanding any other provision in this Agreement, if an attorney Partner withdraws from the Partnership, the withdrawing attorney Partner shall pay to the Partnership a share of the fees received for legal services provided to any client of the Partnership who subsequently engages the withdrawing attorney Partner. The allocation of the fees received shall be in proportion to the work done before and after the withdrawal. Recoverable costs shall be reimbursed upon receipt. The Partners irrevocably agree that they shall not, directly or indirectly, interfere with, circumvent or attempt to circumvent, avoid, by-pass or obviate the Partnership's interest in and relationship with pre-established sellers, buyers, brokers, dealers, distributors, technology providers, intermediaries, entrepreneurs, consultants, employees, legal counsel, professional relationships, individuals, or any other pre-established or un-contracted relationships revealed or introduced by one Partner to another in connection with any present and future transactions related to this Partnership.

11.   **Ownership Interests.**

The Managing Partners' Ownership Interest in the Partnership shall be:

| | |
|---|---|
| 1. Lee Melchionni, Esq. | 25% |
| 2. Allan Teh, | 50% |
| 3. Sylvia Benito, | 25% |

The Managing Partners agree that, other than the percentages and adjustments set forth in this Section, the Ownership Interest of the Partners shall not be amended or changed without the unanimous, affirmative vote of the Managing Partners.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

12.     **Capital Contributions.**

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Firm. The Partners agree that Capital Contributions, will be made from time to time over a six (6) month period, for a total minimum amount of $4,000,000. The Capital Contributions will be made by Allan Teh in the amount of $4,000,000.

13.     **Rights, Powers and Responsibilities of the Managing Partners.**

The Managing Partners shall divide the responsibility for certain areas of Partnership operations as set forth herein:

A) Lee Melchionni shall be the Legal Managing Partner. The Legal Managing Partner shall provide the legal support to work up, qualify, process, manage and settle cases. He shall also be responsible for case related expenses, including the use of third party vendors to accomplish these tasks. In fulling these roles the Legal Managing Partner shall have complete and unequivocal control and veto power over any and all decisions relating to the practice of law, the prosecution of each of the Partnership's client's legal claims, the outward conduct of the law firm, the handling of funds in any IOLTA or client trust accounts, the public statements and representations of the law firm (including any and all marketing, branding and website design), conflicts of interest, whether actual or potential, co-counsel relationships, referrals to counsel, fee disputes, and client confidentiality, as well as any activities by or on behalf of the law firm, including the activities of any Partners, employees, agents, and independent contractors, which are regulated, limited or otherwise addressed in any way by the District of Columbia Rules of Professional Conduct.

Per District of Columbia Rule of Professional Conduct 5.4, the Legal Managing Partner hereby agrees to be responsible for and to supervise the managerial and other activities of the nonlawyer Partner, Allan Teh, and other Partners as they may be added, as if these non-lawyer Partners were lawyers admitted to practice in the District of Columbia, and to supervise the ethical conduct of same under the standards set forth in District of Columbia Rule of Professional Conduct 5.1. It is hereby agreed that this provision will require the Partnership and Legal Managing Partner to make reasonable efforts to ensure that the Partnership has in effect measures giving reasonable assurance that all the participants in the Partnership conform to the D.C. Rules of Professional Conduct.

Allan Teh and Sylvia Benito, as a Non-Lawyers participant in the Partnership per D.C. Rule of Professional Conduct 5.4, shall have the authority over marketing Partnership Activities, and provide other professional management services, all in order to assist the Partnership in providing legal services to the Partnership's clients. These managerial activities will include securing financing and funding, identifying emerging trends in litigation, planning and implementing marketing and branding of the Partnership, obtaining new clients and cases, joint venturing, firm infrastructure management, and advising the Managing Partners regarding the same.

A)      In the event that the Managing Partners disagree regarding a Partnership operation or activity which is directly addressed within the District of Columbia Rules of Professional Conduct and also relates to marketing, branding, marketing campaigns, internet marketing or internet design, or regarding any proposed, contemplated or actual activity for or on behalf of the Partnership which is

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

regulated and/or limited by the District of Columbia Rules of Professional Conduct, the Legal Managing Partners shall have complete and unequivocal control of and veto power over, any such activity, as set forth in Section 14(A) above.

Per District of Columbia Rule of Professional Conduct 5.4, the Non-Lawyer Managing Partner, hereby agrees and undertakes to abide by the D.C. Rules of Professional Conduct as if she was a lawyer admitted in the District of Columbia.

## 14. Partner Compensation.

No Partner shall receive any interest or salary with respect to his/her Capital Contributions or his/her Ownership Interest, or for services rendered to or on behalf of the Partnership, or otherwise in his/her capacity as Partner, except as otherwise provided in this Agreement or by unanimous written consent of all Partners.

## 15. Withdrawal, Divorce or Death of a Partner.

Any Partner may withdraw from the Partnership upon sixty (60) calendar days' written notice to the other Partners and Managing Partners. Upon withdrawal, the withdrawing Partner shall cease to have any rights to further participation in the management or operations of the Partnership. Such withdrawing Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on claims that were retained by the Partnership prior to the day the Partner gave his/her notice of withdrawal to the Partnership. For purposes of this Section, the retainer date shall be deemed to be the first date on which the client executed a retainer agreement with the Partnership.

Furthermore, a Partner's death or permanent disability shall be deemed a "withdrawal" as of the date of the death or permanent disability. A deceased or permanently disabled Partner and/or his/her estate and heirs shall continue to have the right to payment of his/her share of the fees paid to the Partnership in accordance with the Partner's Partnership Interest as of the date of death or permanent disability on cases that were retained by the Partnership on or before such date. Payments under this provision shall be made in the normal course of business pursuant to the rules for distribution set forth in Section 22 of this Agreement.

The Partners hereby agree that, if by operation of law or by judgment or judicial decree in a bankruptcy or divorce case, any portion of a Partner's Ownership Interest in the Partnership is assigned to a third party, said assigned or transferred interest, to the extent it is assigned or transferred to a third party, shall be treated as if, on the date of the assignment or transfer order, the Partner in question became deceased, and any such Partner shall continue to have the right to payment of his/her percentage of the fees paid to the Partnership on cases that were retained by the Partnership prior to the date of withdrawal.

## 16. Expulsion for Cause.

(a)    For Cause Only.

Any Partner may be expelled" for cause", upon the affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership, For purposes of this provision, "cause" for expulsion will include but not be limited to any of the following:

(i)    Disbarment, suspension, or other major disciplinary action determined

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

adversely to any Attorney Partner by any duly constituted authority;

(ii)     Professional misconduct or violation of the canons of professional ethics, if such misconduct continues after its cessation bas been requested by the Managing Partners;

(iii)    Any action or inaction that injures or threatens the professional standing or business operations of the Partnership, if such action or inaction continues after its cessation is requested by the Managing Partners, as set forth below;

(iv)    Any Partner takes a position that adversely effects the continuation of the Partnership, if such continues after its cessation is requested by the Managing Partners.

(b)     Notice of Expulsion for Cause.

If majority of the combined ownership interests held by the Managing Partners in the Partnership determines that "cause" exists for expulsion of a Partner, then the Partnership shall provide notice of this decision to the Partner who is subject to expulsion, and the Partner shall have ten (10) business days after notice is given to cure or remedy the reason for expulsion, if a cure or remedy is possible.

(c)     Entitlement to Profits After Expulsion.

Upon any expulsion, the expelled Partner shall be treated as a "withdrawn" Partner pursuant to Section 15, above, as of the date on which the expelled Partner failed to cure the reason for his expulsion, or five (5) business days from the Notice of Expulsion, whichever is later. The expelled Partner will have no other entitlement to any compensation. Furthermore, the Managing Partners may withhold future payments to any Partner who has been expelled for cause and apply those payments as a setoff against any damages to the Partnership caused by the expelled Partner or any liabilities due from the expelled Partner to the Partnership.

## 18. Liquidating Events.

The Partnership shall dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a)  The affirmative vote of the majority of the total, combined ownership interests held by the Managing Partners in the Partnership, to dissolve, wind up, and/or liquidate the Partnership; or

(b)  The happening of any other event that makes it unlawful or impossible to carry on the business of the Partnership.

The Partnership shall not dissolve prior to the occurrence of a Liquidating Event. If it is determined by a court of competent jurisdiction, that the Partnership has dissolved prior to or without the occurrence of a Liquidating Event, the Managing Partners hereby agree to continue the business of the Partnership without a winding up or liquidation.

## 19. Winding Up.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

(a)   Upon the occurrence of a Liquidating Event, the Partnership shall continue for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Partners, and no Partner shall take any action that is inconsistent with, or not necessary to or appropriate for this winding up of the Partnership's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Property has been distributed pursuant to this Agreement and the Partnership has terminated all operations.

(b)   The Managing Partners (or any Person elected for this purpose by the Managing Partners) shall be responsible for overseeing the winding up and liquidation of the Partnership, shall take full account of the Partnership's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds there from, to the extent sufficient therefore, to be applied and distributed in the following order:

(i)   First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors other than the Partners;

(ii)   Second, to the payment and discharge of the Underwriting Contribution (defined in Section 20);

(iii)   to the payment and discharge of all other Partnership's debts and liabilities to Partners; and

(iii)   The balance, if any, to the Partners in accordance with their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)   Except with respect to the Underwriting Contribution (defined in Section 20), each Partner hereby expressly waives any right which the Partner individually, as a creditor of the Partnership, might otherwise have under the Code, to receive distributions of Partnership assets *pari passu* with the other creditors of the Partnership, in connection with a distribution of assets of the Partnership or in satisfaction of any liability of the Partnership, and hereby subordinates any such right to said creditors.

### 20. Preferred Return.

Fifteen percent (15%) per annum simple interest multiplied by the invested capital, which shall accrue from the date of the Firm's acceptance of Allan Teh's Underwriting Contributions, until the Firm receives its first mass tort settlement proceeds via a Qualified Settlement Fund.

### 21. Profits and Losses.

After the Partnership repays the Underwriting Contribution (defined in this Section), the profit/loss allocation shall be calculated on a net basis as a percentage of the resulting fee, net of expenses, which shall not include legal fees and expenses of any kind. Expenses which pertain to a particular case should be deducted from the fees received for that case before allocating profits/losses to the extent that they cannot be charged to the client. Partnership Expenses which do not pertain to a particular case shall be amortized over all pending cases at the time the expense was incurred, in an

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

equal amount for each case.

Profits

Net Profits after full and complete reimbursement of funding by Allan Teh for a particular mass tort campaign shall be allocated as follows after the holdback of reserves as unanimously agreed to and approved by the Managing Partners:

(a)   Return of Capital: First, one hundred percent (100%) to Allan Teh until Distributions to such equal the amount of Allan Teh's Capital Contributions.

(b)   Preferred Return: Second, one hundred percent (100%) to Allan Teh until Distributions to such of Distributable Cash on a cumulative basis pursuant to this clause equal the Preferred Return.

(c)   Catch up: Second, one hundred percent (100%) to Lee Melchionni and Sylvia Benito until Distributions to Lee Melchionni and Sylvia Benito on a cumulative basis as carried interest Distributions equal twenty percent (20%) of all Distributions,

(d)   Split: Any balance, (i) eighty percent (80%) to Allan Teh and (ii) twenty percent (20%) to Lee Melchionni and Sylvia Benito.

It is expressly understood that Allan Teh will be underwriting and funding the activities of the Law Firm.  Allan Teh is committing to fund a total of $4,000,000 ("Underwriting Contributions") to be paid to the firm as needed and determined by the Managing Partners to run a campaign related to any case/litigation as determined by the Managing Partners.  The Managing Partners agree and understand that all such costs incurred by Allan Teh on behalf of the Company, including the Underwriting Contribution, shall be treated as an interest-free loan and paid back in full prior to any Partnership distributions.

Losses

It is understood that Lee Melchionni, Esq. shall not be responsible to pay back Allan Teh in the event that a particular mass tort campaign, case or litigation effort fails to generate profits. In the event that either party wants to recoup losses from a particular Mass Tort campaign that did not generate a profit from the profit(s) of other Mass Tort campaign(s) that do generate profits, then all Parties shall have the right to recoup their losses. In the case of Allan Teh, the amount of the loan referenced above and all Capital Contribution made by them used to acquire such cases which are not paid back or recovered shall be subject to such offset.

## 22. Management Fee.

KS Law Group will charge a management fee of one percent (1%) on invested Capital Contributions.

## 23. Entire Agreement.

This Agreement constitutes and shall be considered the entire agreement between the parties with respect to the subject matter of this document, and supersedes all previous arrangements, understandings, representations or agreements between the parties, whether written or oral. As set forth

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

in Section 12, the Partners may, from time to time, by unanimous, affirmative vote, agree to alter certain portions of this Agreement for Special Allocations. However, the Partners hereby agree that any such secondary agreement shall apply only to the special circumstances considered therein and will not alter the terms or conditions of this Agreement beyond the limited time and scope set forth in said secondary, written agreement.

### 24. Distributions to Partners.

Distribution to the Managing Partners shall occur at the conclusion of any singular case pursuant to Section 21.

### 25. Amounts Withheld.

All amounts withheld pursuant to the Tax Codes or any other state or local tax law, with respect to any payment, compensation or distribution to the Partnership or the Partners, shall be treated as amounts distributed to the Partners, for all purposes under this Agreement. The Partnership is authorized to withhold from distributions, or with respect to allocations, to the Partner and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate such amounts to the Partners with respect to which such amount was withheld.

### 26. Decisions

Except as otherwise provided in this Agreement, all determinations, decisions, approvals, and actions affecting the Partnership and its business and affairs shall be determined, made, approved, or authorized only by the affirmative vote of 66 2/3% of the total, combined ownership interests held by the Managing Partners in the Partnership. It is further acknowledged and agreed, however, that any decision falling under the matters set forth in Section 14 of this Agreement shall be within the professional discretion of the Legal Managing Partner.

### 27. Vote Required for Certain Actions.

Notwithstanding Section 24 hereof:

(d)    no decision or action regarding the incurrence by the Partnership of any debt, contract or obligation for which the Partners are individually liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership; and

(e)    no decision or action regarding the incurrence by the Partnership of any debt for which the Partnership is liable shall be made or taken without the affirmative vote of all Managing Partners in the Partnership.

### 28. Partners Authorized to Take Certain Actions on Behalf of the Partnership.

Except as otherwise provided elsewhere in this Agreement, each Managing Partner is authorized to take the following actions and make the following decisions to the extent that such actions and decisions are necessary to permit such Managing Partner to carry on the Partnership's routine, day-to-day practice of law:

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

a.  Accept clients on behalf of the Partnership based on criteria set forth by Legal Managing Partners, and agree to undertake specific matters for any Partnership client based on criteria set forth by Legal Managing Partners provided that a Managing Partner accepting such client or undertaking such matter is responsible for assuring that such action will not create a conflict with the interests of any other client and is otherwise consistent with the types of clients and matters normally handled by the Partnership, and provided further that such Managing Partner obtains the concurrence of any other Managing Partner or Managing Partners whose services may reasonably be expected to be required to service such client or matter.

b.  Take any other action and make any other decision that is clearly routine and incidental to the day-to-day conduct of the Partnership and/or its practice.

## 29. Banking.

All funds of the Partnership shall be deposited in the Partnership's name, in such account or accounts with member banks of the FDIC as may be approved by an affirmative majority vote of the total, combined ownership interests held by the Managing Partners in the Partnership; provided, however that the Managing Partners may elect to deposit all or a portion of the funds standing in the Partnership reserves in interest-bearing accounts with, or apply such funds to purchase short-term interest-bearing investments issued or guaranteed as to payment by, such banks or other financial institutions that are members of the FDIC or the United States (or its agencies or instrumentalities).

## 30. Restrictions on Transfers.

Except as provided in footnote 1, no Partner shall transfer all or any portion of his Partnership interest or any rights therein without the unanimous consent of the Managing Partners. The Partners not seeking to transfer their interests shall have the right of first refusal to purchase any such interest in equal shares. Any transfer or attempted transfer by any Partner in violation of the preceding sentence shall be null and void and of no force or effect whatsoever. Each Partner hereby acknowledges the reasonableness of the restrictions on transfer imposed by this Agreement in of the Partnership purposes and the relationship of the Partners. Accordingly, the restrictions on transfer contained herein shall be specifically enforceable. Each Partner hereby further agrees to hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes or costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a transfer or an attempted transfer in violation of this Agreement.

## 31. Waiver of Partition.

No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or cause the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and his legal representatives, successors or assigns) hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to his Partnership interest, or with respect to any assets or properties of the Partnership, except as expressly provided in this Agreement.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

## 32. Rights of Partners.

Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for the return of his Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership. No Partner shall have priority over any other Partner as to the return of his Capital Contributions, distributions, or allocations unless otherwise provided in this Agreement.

## 33. Notice of Dissolution.

In the event a Liquidating Event occurs, or any other event occurs that would result in a dissolution of the Partnership, the Partnership shall, within thirty (30) calendar days thereafter: (a) provide written notice thereof to each of the Partners and to all other parties with whom the Partnership regularly conducts business, and (b) publish notice of such dissolution in a newspaper of general circulation in each place in which the Partnership regularly conducts business.

## 34. No Liability for Partnership Debts.

Except as provided in Section 7, no Partner shall be personally liable or accountable, directly or indirectly, including by way of indemnification, contribution, assessment, or otherwise, for debts, obligations or liabilities of or chargeable to the Partnership or other Partner, whether arising in tort, contract, or otherwise that are incurred, created or assumed by the Partnership, except with respect to an obligation as to which all of the Partners have unanimously agreed in writing that the Partners would be personally liable.

## 35. Indemnification of Managing Partners/Partners by Partnership.

The Partnership shall, to the extent of its assets, indemnify, defend and hold each Partner in the Partnership free and harmless from any and all claims, demands, liabilities, obligations, damages, losses, costs and expenses, including attorneys' fees (individually, a "Liability" and collectively, the "Liabilities") incurred in connection with the business of the Partnership, provided the acts or omissions from which the Liabilities arise were performed by the Partner in good faith and with a reasonable belief that the Partner was acting within the scope of the Partner's authority under this Agreement and the Partner was not grossly negligent or guilty of intentional misconduct. Neither the Partnership nor any Partner shall have any claim against any other Partner by reason of any act or omission for which such Partner is entitled to indemnification under the Agreement.

## 36. Partnership Representative and Indemnification Thereof.

Partner Lee Melchionni, Esq. is specifically authorized to act as the "Partnership Representative" (hereafter the "PR") under the applicable tax Code, and in any similar capacity under state or local law. The Partnership and the other Partners agree to defend, indemnify and hold harmless the PR, from all costs and expenses, including fees of outside attorneys, accountants and experts, incurred in acting as PR during or after the termination or expiration of the term of the Partnership. The Partnership and the other Partners further agree to execute such powers of attorney and other forms and authorizations as may be required by the IRS for a Partner to act as PR.

## 37. Professional Liability Insurance.

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

The Partnership shall maintain policies of professional liability, errors and omissions, general liability, in the amount of $5 million per occurrence/$5 million aggregate. As stated above, this shall be paid annually by the Partnership.

### 38. Notices.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing, and sent by overnight courier to recipient's hands, or U.S. certified mail with return receipt requested, to the following addresses:

> Lee Melchionni, Esq.
> 20900 NE 30th Ave
> Suite 510
> Miami, FL 33180
>
> Sylvia Benito
> 20900 NE 30th Ave
> Suite 510
> Miami, FL 33180
>
> Allan Teh
> 119 Washington Ave
> Suite 600
> Miami Beach, FL 33139

Such addresses may be changed from time to time by any party by providing written notice in the manner set forth above. The date the party receiving notice will be considered to have been noticed will be the date of the delivery, as shown on the courier confirmation or return receipt from the U.S. postal service.

### 39. Resolution of Disputes.

Any controversy arising out of or related to this Agreement or the breach thereof shall be settled under the law of the District of Columbia without reference or regards to any conflict of laws principles, and shall be resolved via arbitration under the American Arbitration Action, 9 U.S.C. § 2, in the District of Columbia, in accordance with the rules of the American Arbitration Association, and judgment entered upon the award rendered may be enforced or appealed by appropriate judicial action pursuant to the District of Columbia Code of Civil Procedure. The arbitration shall be heard by a single arbitrator, which shall be a person unanimously agreed to by the Managing Partners, and the dispute shall be heard within thirty (30) days following notice by one party that he/she desires that a matter be arbitrated.

If the parties are unable, within such 30-day period to agree upon an arbitrator, then the issue shall be heard by an arbitrator selected by the District of Columbia office of the American Arbitration Association, which arbitrator shall be experienced in the area of legal partnerships and who shall be knowledgeable with respect to the subject matter area of the dispute.

The arbitrator shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal. The parties shall agree within thirty (30) days following

DocuSign Envelope ID: 3CEFF3A9-195E-44C8-8A9B-084BC0EF0834

selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery; provided, in any event each Partner shall be entitled to discovery in accordance with the District of Columbia Code of Civil Procedure. The arbitrator shall determine a prevailing party in the proceeding, and award the prevailing party his costs and expenses, including but not limited to reasonable attorneys' fees and arbitration costs, from the non-prevailing party in such proceeding.

**40. Counterparts.**

This Agreement may be executed by facsimile and/or in two or more counterparts, each of which shall constitute an original and all of which together shall be deemed to be one and the same instrument.

IN WITNESS WHEREOF, the parties have entered into this Agreement of Partnership as of the dates set forth below.

_Lee Melchionni_

Lee Melchionni, Esq.                                    Aug 24, 2021
                                                        Date

Allan Teh,                                              Date: August 24th, 2021

Sylvia Benito (Aug 24, 2021 16:33 EDT)

Sylvia Benito,                                          Aug 24, 2021
                                                        Date

# KS Law Group Operating Agreement.docx

Final Audit Report                                                                        2021-08-24

| | |
|---|---|
| Created: | 2021-08-24 |
| By: | Lee Melchionni (lee@capital4justice.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_4MpQdjxaqLAEo3BNLiP3BscoK90ghu0 |

## "KS Law Group Operating Agreement.docx" History

✍ Document digitally presigned by DocuSign\, Inc. (enterprisesupport@docusign.com)
2021-08-24 - 2:40:53 PM GMT- IP address: 71.77.192.124

📄 Document created by Lee Melchionni (lee@capital4justice.com)
2021-08-24 - 6:10:55 PM GMT- IP address: 71.77.192.124

📧 Document emailed to Lee Melchionni (lee@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

📧 Document emailed to Sylvia Benito (sylvia@capital4justice.com) for signature
2021-08-24 - 6:12:21 PM GMT

📄 Email viewed by Sylvia Benito (sylvia@capital4justice.com)
2021-08-24 - 6:12:22 PM GMT- IP address: 74.125.150.38

✍ Document e-signed by Lee Melchionni (lee@capital4justice.com)
Signature Date: 2021-08-24 - 6:12:32 PM GMT - Time Source: server- IP address: 71.77.192.124

✍ Document e-signed by Sylvia Benito (sylvia@capital4justice.com)
Signature Date: 2021-08-24 - 8:33:37 PM GMT - Time Source: server- IP address: 172.58.175.96

✔ Agreement completed.
2021-08-24 - 8:33:37 PM GMT

 Adobe Sign

Subject: Re: Data request / update

# Exhibit 6

 **Lee Melchionni** <lee@capital4justice.com>                    Mon, Oct 18, 2021, 5:37 PM
to Sohail Shahrasebi, Sylvia Benito

Sohail,

We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.

- Could we be given the following

  ○ A final copy of the legal documents supporting the supporting the Denovo US law firm?
    ○ We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.
  ○ Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
    ○ We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
    ○ Justice Partners
    ○ 200 Firefighter Foam
    ○ 208 Talc
    ○ 380 Hernia Mesh
    ○ 350 3M
    ○ 150 RoundUp
    ○ 200 Zantac
      ■ KS Law Group
      ■ 155 RoundUp
      ■ 200 Talc
      ■ 212 Hernia Mesh
      ■ 212 3M
  ○ Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
    ○ The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.
  ○ Update on the status of the various cases in the US and timing on each case
    ○ Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
    ○ Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.

- o 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
  - o RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
  - o Firefighter Foam - There is no substantive update since our last investor communication.
  - o Zantac - There is no substantive update since our last investor communication.

- • On the Diesel stuff

- o Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?
  - o Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- • Could we be given the following
  - o A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - o Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - o Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - o Update on the status of the various cases in the US and timing on each case
- • On the Diesel stuff
  - o Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi


Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139

O: 786-484-0771
M: 646-707-4484

**2 Attachments** • Scanned by Gmail



X  KS Case List 10.1…          PDF  Non-Lawyer Part…

# Exhibit 7

**From:** Lee Melchionni <lee@capital4justice.com>
**Date:** October 20, 2021 at 2:33:33 PM EDT
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>, ALLAN TEH <allan.teh@icloud.com>
**Subject:** Re: Data request / update

Sohail,

For Allan's independent law firm, KS Law Group, we spent $3,880,080.00 to acquire 155 RoundUp cases, 200 Talc Cases, 212 Hernia Mesh Cases, and 212 3M cases. We are entitled to 60% of the attorney fee.

For Justice Partners, we have spent $11,250,000.00 to acquire 200 Firefighter Foam Cases, 208 Talc Cases, 380 Hernia Mesh Cases, 350 3M Cases, 150 RoundUp Cases, and 200 Zantac Cases. We are entitled to 72% of the attorney fee.

In addition, we purchased 12% of the attorney fee for 1128 Talc Cases, 1220 Hernia Mesh Cases, 302 3M Cases, and 300 RoundUp Cases. All of these cases were mature, meaning the clients had already been acquired and cases worked up to a certain point, mitigating case acquisition, drop off, and timing of settlement risk.

Best,
Lee

On Tue, Oct 19, 2021 at 9:52 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:
Lee thanks for this. When you get a chance, as a follow-up can you please send me the $ invested per case type? Thank you.

**From:** Lee Melchionni <lee@capital4justice.com>
**Sent:** Monday, October 18, 2021 5:37 PM
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>
**Subject:** Re: Data request / update

Sohail,

We have answered your questions in blue below. Do not hesitate to reach out with follow up questions.
- Could we be given the following

  - A final copy of the legal documents supporting the supporting the Denovo US law firm?

    - We have attached an opinion from our ethics counsel, Jack Marshall, on non-lawyer partners.

  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type

    - We have invested all of the $8mln committed. I have broken down the number of cases and case type, for Justice Partners and then KS Law Group below.
    - Justice Partners
    - 200 Firefighter Foam
    - 208 Talc
    - 380 Hernia Mesh
    - 350 3M
    - 150 RoundUp
    - 200 Zantac

      - KS Law Group
      - 155 RoundUp
      - 200 Talc
      - 212 Hernia Mesh
      - 212 3M

- Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.

  - The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost.

- Update on the status of the various cases in the US and timing on each case

  - Hernia Mesh - We continue to march towards settlement with multiple manufacturers.  We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022.
  - Talc - We will send a separate, longer update, given the bankruptcy news. We are in the process of gathering information.
  - 3M - There have been four trials with mostly positive results. The first trial resulted in a $7.1M verdict for three plaintiffs in April, while the second ended in a victory for 3M in May. This was not a surprise, given that it was a 3M pick for trial. The third trial found 3M 62% liable for the $1.7M in damages a veteran sustained. A jury in the fourth trial awarded a U.S. Army veteran $8.2M after finding that 3M's Combat Arms Earplugs Version 2 caused him to suffer hearing loss and tinnitus. There are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months.
  - RoundUp - in 2020, a global settlement agreement was proposed, where $10 billion was allocated to resolve existing claims and a controversial scientific panel was created to decide the fate of future claims. In March 2021 the RoundUp MDL Judge rejected Bayer's motion for approval of the proposed settlement for all future RoundUp claims. In August 2021 Bayer announced that it had set aside $4.5B for future RoundUp claims and that it had pulled glyphosate-based RoundUp from the U.S. consumer market.
  - Firefighter Foam - There is no substantive update since our last investor communication.
  - Zantac - There is no substantive update since our last investor communication.

- On the Diesel stuff

- Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

  - Yes, our attorneys are currently preparing documents.

On Fri, Oct 15, 2021 at 9:34 AM Sohail Shahrasebi <Sohail@kstreetcap.com> wrote:

Hey Guys –

I spoke with Allan and he is asking for a bunch of stuff related to both the US cases we've invested in and Europe cases we intend to invest in.

- Could we be given the following

  - A final copy of the legal documents supporting the supporting the Denovo US law firm?
  - Of the $8mln we've committed to the US cases, an update on how much has been invested and what the distribution is per case type
  - Any granularity on the number of claimants per case type that have been been warehoused with the amount currently invested.
  - Update on the status of the various cases in the US and timing on each case

- On the Diesel stuff

  - Similar to Sam, could we be furnished with a copy of the agreement between you and the litigating counterparties when the documentation is completed?

Sorry again for the request. Just fulfilling Allan's demands.

Best Regards,
Sohail Shahrasebi

Director
Kamunting Street Capital
119 Washington Ave, Suite 600
Miami Beach, Fl 33139
O: 786-484-0771
M: 646-707-4484

## Subject: KS Law Group



**Lee Melchionni** <lee@capital4justice.com>
to Sohail Shahrasebi, Allan Teh, Sylvia Benito

Wed, Sep 28, 2022, 9:59 PM



# Exhibit 8

Sohail,

We have attached our agreement with the Lake Law Firm outlining our docket. In addition, I have attached a breakdown of the allocation of cases, pari passu, for each entity we manage, along with a list of every single client signed up, per case type, and their current status.

We have also attached an LOI for a loan the Lake Law Firm is about to receive, which addresses their credit worthiness.

Finally, we are in the process of negotiating replacement cases for KS Law Group which will most likely be 76 Talcum Powder cases, 98 Hernia Mesh cases, 22 Roundup cases, and we can discuss 3M in person on Monday. There will be drop off in these replacement cases as well. We also have alternative options to discuss on Monday. Any case, less those cases that drop off for non-medical records reasons, will be replaced when the litigation settles, at the cost of the case plus 8% interest per year.

There is an explanation from the CEO of Persis/Lake Law Firm below regarding the drop off in Mass Torts.

- Reasons why mass tort cases are rejected, what phase and reasons, with specific examples using talcum powder and hernia mesh. Most of the rejection is during/after phase 2 - the retrieval phase.

1. Clients are signed based on a verbal intake done, if they meet the specified criteria under the lawsuit, they are signed.
2. Phase 1 - Verbal Confirmation: Reconfirm intake details verbally, add additional information specific to case type. Shortly after, secondary outreach reconfirms the information provided over the phone with the addition of details not on the intake (details on the injury, length of use, diagnosis and doctor information).
   a. Reasons for Rejection - unfortunately, sometimes the potential new client doesn't recall the information required to proceed (or they do not have access to medical records if it's prior 7-10 years) to the next step of the case. So, they may be disqualified at this phase. Re: hernia mesh, fall off can be because they do not have access to the records proving the initial mesh implant product ID/records necessary to prove manufacturer of mesh implanted, particularly if the original mesh was implanted over 10 years ago, most facilities purge their records after 10 years and 7 in some cases.

3. Phase 2 - Retrieval Phase (medical records retrieval): Obtain medical records proving injury, diagnosis, and/or surgery where applicable.

    a. Reasons for Rejection - if the records are incomplete, no records found, or any issue with the records prohibiting us from moving forward with the case, they will have to be disqualified. Example re hernia mesh, if a product ID or "sticker" showing the manufacturer is not present/available, they will be disqualified (unable to prove).

4. Phase 3 - Nurse Review: review of medical records by a nurse/medical professional to determine if the injury, diagnosis, and/or surgery criteria are met based on case type.

    a. Reasons for Rejection - if upon reviewing the records, the link is not established between the case type and injury, criteria are not met. Therefore, the potential new client is disqualified.  As an example, with hernia mesh, the defect wasn't actually a defect with the mesh, but a recurrence of the hernia due to the individual and not a mesh defect, they will be disqualified. Example using talc, many times potential new clients believe they have ovarian cancer, but it is actually uterine or another cancer not part of criteria.

5. Phase 4 - PPF/PFS/Census Form: this is the document filed with the courts. It contains details involving the case including injuries, diagnosis, medical history, etc. as determined by the case type.

    a. Reasons for Rejection - very few will be disqualified at this phase. Mainly would be due to a client no longer wishing to pursue or unable to reach, but that will generally occur much earlier in the process.

A few outlier reasons for rejection:

1. No will/estate, unable to file on behalf of
2. Client no longer wishes to pursue
3. Client is uncooperative
4. Client is unresponsive/unable to reach

While these are reasons for rejection, there are processes in place to reduce the above. However, clients may be "rejected" due to one of the above reasons.

--

**Lee Melchionni, Esq.**
**Founder, COO**
**lee@capital4justice.com**
**717.380.7709**



**3 Attachments** · Scanned by Gmail



KS Law Group IO...   KS Case Allocati...   LLF LOI.pdf

# Exhibit 9

Equity %

| Row Labels | Total # of Cases | # of Good Cases | # of Bad Cases | |
|---|---|---|---|---|
| Hernia Mesh | 1533 | 519 | 1014 | 14% |
| Round Up | 252 | 83 | 169 | 44% |
| 3M | 770 | 399 | 371 | 29% |
| Talcum Powder | 1026 | 327 | 699 | 19% |
| **Grand Total** | **3581** | **1328** | **2253** | |

| Litigation | Total Cases Owed | Good Cases |
|---|---|---|
| Firefighter FM | 200 | 140 |
| Talc | 1026 | 327 |
| Hernia Mesh | 1533 | 519 |
| 3M | 770 | 399 |
| Roundup | 355 | 83 |

| KS Law Group | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 200 | 19% | 64 |
| Hernia Mesh | 220 | 14% | 74 |
| 3M | 220 | 29% | 114 |
| Roundup | 155 | 44% | 36 |

| Law Firm 1 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 380 | 25% | 129 |
| 3M | 350 | 45% | 181 |
| Roundup | 150 | 42% | 35 |
| Firefighter FM | 200 | 100% | 140 |

| Law Firm 2 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 348 | 34% | 111 |

| Law Firm 3 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 34 | 2% | 12 |

| Law Firm 4 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 237 | 23% | 76 |

| Law Firm 5 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 43 | 4% | 3 |
| Hernia Mesh | 49 | 3% | 17 |

| Law Firm 6 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 380 | 25% | 129 |

| Law Firm 7 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Talc | 200 | 19% | 64 |
| Hernia Mesh | 350 | 23% | 118 |

| Law Firm 8 | Cases Owed | % of Total Cases | Cases Allocated |
|---|---|---|---|
| Hernia Mesh | 113 | 7% | 38 |
| 3M | 100 | 13% | 52 |
| Roundup | 50 | 14% | 12 |

From: **ALLAN TEH** <allan.teh@icloud.com>
Date: Fri, Oct 14, 2022 at 8:10 PM
Subject: Re: Communication
To: Sylvia Benito <sylvia@capital4justice.com>
Cc: Sohail Shahrasebi <sohail.shahrasebi@gmail.com>, Lee Melchionni <lee@capital4justice.com>

# Exhibit 10

I have been in many good and bad deals but the lack of transparency and competency I have seen so far has been appalling. Constant negative surprises. To the point that I have no confidence what so ever in anything that you said. Sohail shares my frustrations as well. If not my disappointment. This is not what I signed up for. Losing money is one thing but for me to get angry like this makes it worth less

Sent from my iPhone

> On Oct 14, 2022, at 7:41 PM, Sylvia Benito <sylvia@capital4justice.com> wrote:
>
> Allan
>
> I just got off another call with you, after multiple calls today. While I respect and honor you as a valued investor, and how to respond to all investors responsibly this communication is not professional or constructive.
>
> I suggest that we communicate through your CIO as he is a great fiduciary and can keep the flow of information appropriately on course.
>
> Next week you will receive:
>
> 1- your weekly report
> 2- any other updates as available
> 3- invitation to calls with co counsel  over the next two weeks as they are available
> 4- all questions answered via Sohail or emails
> 5- every option to move ahead in written detail
> 6- vendor letter
>
> I understand that investing can be an emotional rollercoaster but I continue to believe that we have solid and competent plans as your managers to preserve and grow your investor capital.
>
> Sylvia

**From:** Lee Melchionni <lee@capital4justice.com>
**Sent:** Friday, March 3, 2023 3:17:48 PM
**To:** Sohail Shahrasebi <Sohail@kstreetcap.com>; ALLAN TEH <allan.teh@icloud.com>
**Cc:** Sylvia Benito <sylvia@capital4justice.com>
**Subject:** KS Law Group Update



# Exhibit 11

Sohail,

Attached are the case lists for KS Law Group ("KS"). To provide some context, KS is owed 200 Talcum Powder cases, with a maximum non-medical record drop off of 25%. Any shortfall in Talcu employees per converted Talcum Powder case, with the Internal Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Ec Hernia Mesh cases, with a maximum non-medical record drop off of 30%. KS is owed 155 Roundup Cases, with a maximum non-medical record drop off of 25%. Any shortfall in Roundup case: one conversion basis. KS is owed 220 3M cases, with a maximum non-medical record drop off of 25%.

We are also sharing the executed case replacement agreement with the Lake Law Firm.

- **3M Earplugs**
  - 11 - Attempting to Contact
  - 3 - Filed
  - 54 - Pending
  - 79 - Retained and Sent to Firm
  - 5 - Unable to Reach/Unresponsive
- **Hernia Mesh**
  - 3 - Attempting to Contact
  - 8 - Filed
  - 82 - Pending
  - 2 - Ready to Submit
  - 43 - Retained and Sent to Firm
  - 4 - Unable to Reach/Unresponsive
- **Round Up**
  - 2 - Attempting to Contact
  - 27 - Pending
  - 14 - Ready to Submit
  - 18 - Retained - Sent to Firm
  - 14 - Unable to Reach/Unresponsive
- **Talcum Powder**
  - 1 - Attempting to Contact
  - 5 - Pending
  - 2 - Retained and Sent to Firm
  - 1 - Unable to Reach/Unresponsive

—

Lee Melchionni, Esq.
Founder, COO
lee@capital4justice.com
717.380.7709



5 Attachments · Scanned by Gmail



| KS_Talcum_Pow... | KS_3M_Earplugs... | KS_Round_Up_R... | KS_Hernia_Mesh... | KS Law Group - C... |

# Exhibit 12

### CASE REPLACEMENT AGREEMENT

This CASE REPLACEMENT AGREEMENT (this "Agreement") is made and entered into as of December 1, 2022 by and among KS Law Group LLP, a District of Columbia limited liability partnership ("KS"), and Lake Law Firm, LLC, a New York limited liability company ("Lake") (each a "Party" and collectively the "Parties").

### RECITALS

WHEREAS, Lake is a professional law firm engaged in the practice of law, with its principal offices in the State of New York;

WHEREAS, Lake is engaged in the acquisition of clients and case workup across multiple types of mass tort litigations, including talcum powder litigation ("Talcum Powder"), hernia mesh litigation ("Hernia Mesh"), Roundup litigation ("Roundup"), and 3M litigation ("3M", and combined with Talcum Powder, Hernia Mesh, Roundup, 3M, Firefighter Foam and Zantac, the "Cases", and each individual case within the Cases, a "Case");

WHEREAS, KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount");

WHEREAS, Lake has not delivered equivalent value in cases to the Funded Amount and owes KS Cases and replacement Cases, the quantity and identity of which are set forth below; and

WHEREAS, the Parties seek to memorialize the terms of their agreement.

NOW, THEREFORE, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby agree as follows:

1.      Replacement of Cases.  KS has previously paid Lake the Funded Amount for certain Cases as described below which Lake has yet to provide.  The Parties agree that notwithstanding any earlier agreement for Cases that existed between the Parties, Cases shall be provided by Lake to KS as set forth below.

    a.  Talcum Powder.

        i.  Lake agrees that KS is owed 200 Talcum Powder cases, guaranteed for medical records, which were purchased for $1,200,000, or $6,000 a Case (the "Talcum Power Purchase Price). The criteria for the medical record guarantee of the Talcum Powder cases are set forth in Exhibit A to this Agreement.

        ii.  Lake agrees that the maximum non-medical record drop off of KS' Talcum Powder cases will be 25%.

        iii.  Lake agrees that KS' is owed 60% of the total attorney contingency fee.

        iv.  Lake hereby agrees to allow KS to convert any shortfall in Talcum Powder cases owed into 6 filed employees per converted Talcum Powder case, with the Internal

Revenue Service ("IRS") under the Employee Retention Tax Credit program ("ERTC") under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

v.    Lake agrees that if the owed filed employees are filed with the IRS by a law firm or company other than Lake, KS will receive 95% of the ERC fee received by Lake.

vi.   Lake agrees that if the owed filed employees are filed with the IRS by Lake, KS will receive 50% of the ERC fee received by Lake.

vii.  If Lake is unable to provide the filed employees before the statute of limitations expires on ERTC under the CARES Act, Lake agrees that within 90 days of the statute of limitations expiring, Lake will reimburse KS for the costs paid for each un-converted Talcum Powder case ($6,000 per case), plus 8% interest, per year, per case, from the purchase date of September 1, 2021.

b.   Hernia Mesh.

i.    Lake agrees that KS is owed 220 Hernia Mesh cases, guaranteed for medical records, which were purchased for $1,232,000, or $5,000 a Case (the "Hernia Mesh Purchase Price). The criteria for the medical record guarantee of the Hernia Mesh cases are set forth in Exhibit A to this Agreement.

ii.   Lake agrees that the maximum non-medical record drop off of KS' Hernia Mesh cases will be 30%.

iii.  Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv.   Lake agrees to continue to replace Hernia Mesh cases for KS with additional Hernia Mesh cases

v.    For Hernia Mesh cases that are replaced past October 15, 2022, Lake shall pay KS 79% of the attorney fee, which shall be identified by KS to Lake in writing.

vi.   Solely as an example, if 100 Hernia Mesh cases are owed to KS where 79% of the attorney fee is paid to KS, the number of owed cases to KS shall be reduced to 91

vii.  If the Hernia Mesh litigation were to reach a global settlement and cases are still owed to KS, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Hernia Mesh cases ($5,000 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

viii. The Hernia Mesh litigations include, but are not limited to, the litigations related to Johnson and Johnson Proceed and Prolene Hernia System, Ethicon Physio Mesh, Covidien, W.L. Gore & Associates, Atrium C-Qur, and Davol, Inc/C.R. Bard, Inc.

c.   Roundup.

i.    Lake agrees that KS is owed 155 Roundup cases, guaranteed for medical records, which were purchased for $782,500, or $5,048.39 a Case (the "Roundup Purchase Price). The criteria for the medical record guarantee of the Roundup cases are set

2

forth in Exhibit A to this Agreement.

ii. Lake agrees that the maximum non-medical record drop off of KS' Roundup cases will be 25%.

iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv. Lake agrees to allow KS to convert any shortfall of Roundup cases into Camp Lejeune cases on a one-for-one conversion basis upon request from KS. Solely as an example, KS would have the ability to convert 50 Roundup cases into 50 Camp Lejeune cases. To avoid any confusion, this example does not take into account non-medical record drop off.

v. If the Roundup litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered Roundup cases ($5,048.39 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

d. 3M.

i. Lake agrees that KS is owed 220 3M cases, guaranteed for medical records, which were purchased for $665,500, or $3,025 a Case (the "3M Purchase Price). The criteria for the medical record guarantee of the 3M cases are outlined in Exhibit A to this Agreement.

ii. Lake agrees that the maximum non-medical record drop off of KS' 3M cases will be 25%.

iii. Lake agrees that KS' is owed 60% of the total attorney contingency fee.

iv. Lake agrees to continue to replace 3M cases.

v. If the 3M litigation were to reach a global settlement and a shortfall of cases owed to KS still exists, Lake agrees that within 90 days of the global settlement being reached, Lake will reimburse KS for the costs paid for the undelivered 3M cases ($3,025 per Case), plus 8% interest, per year, per Case, from the purchase date of September 1, 2021.

2. Written Notice of Modifications. In the event that a case should be replaced, converted, or modified, KS will provide written notice to Lake informing them of the need for such replacement, conversion, or modification pursuant to Section 5(b) below. Lake shall then use its best efforts to effect such replacement, conversion, or modification within a commercially reasonable timeframe.

3. Guarantee of Medical Records. Subject to the agreed upon non-medical drop off for each of the Cases described above, if a client is disqualified based on the phases below, Lake agrees that the case will be replaced one-to-one, but subject to replacement provisions set forth above,

a. Phase 1 – Verbal Confirmation. The intake details are reconfirmed verbally, and additional information is added, based on the specific case type. Secondary outreach from Lake reconfirms the information provided over the phone with additional details such as injury,

3

length of use, diagnosis, and doctor information to be provided.

b. Phase 2 – Medical Record Retrieval Phase.  Medical records are obtained, proving injury, diagnosis, and/or surgery where applicable.

c. Phase 3 – Nurse Review.  The medical records are reviewed by a nurse or medical professional to determine if the injury, diagnosis, and/or surgery criteria are met, based on the specific case type.

d. Phase 4 – Filing.  The plaintiff fact sheet, census form, and/or [PPF] are filed with the courts. They contain details of the case, including diagnosis, medical history, etc. and is based on the specific case type.

4.   Responsibilities of Lake.  Lake agrees to the following:

a. Lake will market, intake, and sign-up potential clients.

b. Lake will gather medical records, a medical summary, a plaintiff fact sheet, and/or court complaint as necessary.

c. Lake will act as liaison between the undesigned and trial firms.

d. Lake will handle any client inquiries. Any out-of-pocket expenses paid as result of the above will be a lien on clients' portion of any recovery.

5.   Miscellaneous.

a. Expenses.  Except as otherwise provided herein, KS, on the one hand, and Lake, on the other, shall each pay their own expenses incident to the negotiation, preparation, and carrying out of this Agreement, including all fees and expenses of its counsel and accountants for all activities of such counsel and accountants undertaken pursuant to this Agreement, irrespective of whether or not the transactions contemplated hereby are consummated.

b. Notices.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made if and when delivered personally or by overnight courier to the Parties at the following addresses or sent by electronic transmission, with confirmation received (or at such other address for a Party as shall be specified by like notice):

     To KS:

     KS Law Group LLP
     20900 NE 30th Ave, Suite 510, Miami, FL 33180
     Attention: Lee Melchionni
     Email: lee@capital4justice.com

     To Lake:

     Lake Law Firm, LLC
     One Rockefeller Center, 11th Floor, New York, NY 10020
     Attention: Jeffrey Dubin

4

Email: elake@forpersist.com

Any such notice shall, when sent in accordance with the preceding sentence, be deemed to have been given and received on the earliest of (i) the day delivered to such address, (ii) the fifth (5th) business day following the date deposited with the United States Postal Service, or (iii) twenty-four (24) hours after shipment by such courier service.

c. Assignment; Third Party Beneficiaries. Neither this Agreement nor any rights or obligations under it are assignable, except that KS may assign its rights hereunder. Except for any indemnified parties, there shall be no third party beneficiaries of this Agreement.

d. Governing Law; Venue. This Agreement shall be governed by, and construed in accordance with, the laws of New York applicable to contracts executed in and to be performed in New York. Each of the Parties hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of New York and of the United States, in each case located in New York, for any litigation arising out of or relating to this Agreement (and agrees not to commence any litigation relating thereto except in such courts).

e. Counterparts. This Agreement may be executed in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. It is the express intent of the Parties to be bound by the exchange of signatures on this Agreement via DocuSign (or similar electronic means) or emailed PDF copies.

f. No Implied Waiver; Remedies. No failure or delay on the part of the Parties to exercise any right, power, or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. All rights, powers, and privileges granted herein shall be in addition to other rights and remedies to which the Parties may be entitled at law or in equity.

g. Entire Agreement. This Agreement, including the Exhibit attached hereto, sets forth the entire understandings of the Parties with respect to the subject matter hereof and thereof, and it incorporates and merges any and all previous communications, understandings, oral or written as to the subject matter hereof and thereof.

h. Amendments; Actual Waivers. This Agreement may not be amended except by an instrument in writing signed on behalf of KS and Lake. Any agreement on the part of KS or Lake to any such extension or waiver shall be valid if set forth in an instrument in writing signed on behalf of KS or Lake.

i. Headings. The headings of the Sections of this Agreement, where employed, are for convenience only and do not form a part hereof and in no way modify, interpret or construe the meanings of the Parties.

5

j.  Severability.  Any provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions of this Agreement; provided, however, in the event the provision which is invalid or unenforceable pertains to a material element of the transaction such that the principal objectives of the transaction provided for herein are materially impaired or are invalid or unenforceable, this Agreement shall be terminated.

k.  Specific Performance.  Each Party acknowledges that, in view of the uniqueness of the transactions contemplated by this Agreement, each Party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore each Party agrees that the other Parties shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

l.  No Presumption Regarding Drafter.  The Parties acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between them, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, it would not be appropriate to deem any Party to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

* * * * *

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the Parties hereto have executed this Case Replacement Agreement as of the date first set forth above.

**KS**:

KS Law Group LLP

By: *Lee Melchionni*
    Lee Melchionni (Dec 27, 2023 20:53 EST)
Name: Lee Melchionni
Title:

**LAKE**:

Lake Law Firm, LLC

By: Edward Lake (Dec 27, 2023 20:47 EST)
Name: Edward Lake
Title:

[Signature Page to Case Replacement Agreement]

## Exhibit A

**Talcum Powder:** Cases provided with the following criteria below and guaranteed by medical records:
- o   Diagnosed with ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer).
- o   Seventy-five (75) years old or younger.
- o   Four (4) years plus of exposure.
- o   Negative BRCA test, preferred but acceptable if unknown.
- o   No previous or existing attorney representation.
- o   Ovarian cancer, fallopian cancer, primary peritoneal cancer, or endometrioid cancer with chemotherapy or treatment.
- o   Death within eighteen (18) months and original diagnosis within four (4) years of death.

**Hernia Mesh:** Cases provided with the following criteria below and guaranteed by medical records:
- o   Records showing revision, removal, or replacement surgery, or scheduled within ninety (90) days or needed, but unable to be performed due to medical professional recommendation.
- o   Client states no previous or existing attorney representation.
- o   All manufacturers.
- o   Surgery in 2011 or afterward.

**Roundup:** Cases provided with the following criteria below and guaranteed by medical records:
- o   Diagnosed with Non-Hodgkin lymphoma or subtype within the last ten (10) years, [unless medical records access then 2007 forward].
- o   Direct exposure only to Roundup for more than one (1) year.
- o   No existing attorney.

**3M:** Cases provided with the following criteria below and guaranteed by medical records:
- o   Used 3M Combat Arms CAEv2 Earplugs between 2003 and 2015.
- o   Diagnosed with tinnitus or documented loss of hearing of ten percent (10%) or more in at least one (1) ear.
- o   No existing attorney.

**Camp Lejeune:** Cases provided with the following criteria below and guaranteed by medical records:
- o   -PC must have resided, worked, or was otherwise exposed at Camp Lejeune, NC not less than 30 days from 8/1/1953 through 12/31/1987
- o   -PC must have been diagnosed with one of the following injuries after exposure at Camp Lejeune: Bladder Cancer, Brain Cancer, Brain Tumor, Cervical Cancer, Ovarian Cancer, Prostate Cancer, Rectal Cancer, Breast Cancer, Esophageal Cancer, Kidney Cancer, Liver Cancer, Lung Cancer, Leukemia, Hodgkin's Disease, Lymphoma, Multiple Myeloma, Hepatic Steatosis (Fatty Liver Disease), Parkinson's Disease, Renal Toxicity, Scleroderma, Non-Hodgkin's Lymphoma, Soft Tissue Cancer, Basal Cell Carcinoma, Melanoma, Merkel Cell Carcinoma, Squamous Cell Carcinoma, Colon (Colorectal) Cancer, Intestinal Cancer, Appendix Cancer, Aplastic Anemia and other Myelodysplastic syndromes, Cirrhosis of the Liver, Renal/Kidney Failure, Birth Defects (non-Cardiac), Cardiac Birth Defects, Miscarriage (19 weeks or earlier), Fetal Death (20 weeks gestation), Fertility Issues, Tremors (musculoskeletal), Pre-Parkinson's Disease, Neurobehavioral Effects - must have all symptoms: delayed reaction times, memory problems, attention/concentration problems, and motor function problems (e.g. hand tremor, postural sway)
- o   -PC must not currently be represented by an attorney

[Exhibit A]

# KS Law Group - Case Replacement Agreement

Final Audit Report                                        2022-12-28

| | |
|---|---|
| Created: | 2022-12-28 |
| By: | Lee Melchionni (lee@redwoodlg.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4IPGrt0ky7Gi-3IFKgGAkBJ5kv2IPsI0 |

## "KS Law Group - Case Replacement Agreement" History

📄 Document created by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:44:56 AM GMT- IP address: 99.110.180.129

📧 Document emailed to elake@forpersist.com for signature
2022-12-28 - 1:45:53 AM GMT

📄 Email viewed by elake@forpersist.com
2022-12-28 - 1:46:43 AM GMT- IP address: 73.205.234.141

✒️ Signer elake@forpersist.com entered name at signing as Edward Lake
2022-12-28 - 1:47:04 AM GMT- IP address: 73.205.234.141

✒️ Document e-signed by Edward Lake (elake@forpersist.com)
Signature Date: 2022-12-28 - 1:47:06 AM GMT - Time Source: server- IP address: 73.205.234.141

📧 Document emailed to Lee Melchionni (lee@redwoodlg.com) for signature
2022-12-28 - 1:47:07 AM GMT

📄 Email viewed by Lee Melchionni (lee@redwoodlg.com)
2022-12-28 - 1:53:47 AM GMT- IP address: 99.110.180.129

✒️ Document e-signed by Lee Melchionni (lee@redwoodlg.com)
Signature Date: 2022-12-28 - 1:53:57 AM GMT - Time Source: server- IP address: 99.110.180.129

✓ Agreement completed.
2022-12-28 - 1:53:57 AM GMT

📄 **Adobe Acrobat Sign**

Filing # 176907212 E-Filed 07/07/2023 11:47:13 AM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

      Nominal Defendant.

                         /

## DEFENDANTS LEE MELCHIONNI, SYLVIA BENITO, AND KS LAW GROUP'S MOTION TO STAY PROCEEDINGS
### EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS

Defendants Sylvia Benito, Lee Melchionni, and Nominal Defendant KS Law Group, LLP

move to stay all proceedings except for Defendants' Motion to Compel Arbitration and Dismiss,

and the related Motion to Compel and to Dismiss filed by co-Defendants Persist Communications,

Inc. and The Lake Law Firm. *See* Dkt. #25, 26.  The proceedings should be stayed because all

167482.00602/132203278v.3

Defendants have moved to compel arbitration, and because participating in additional proceedings, including the pre-trial scheduling contemplated in the Case Management Order, could be deemed a waiver of the right to arbitrate.

Dated:  July 7, 2023

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Kenneth L. Bressler*
Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

*Attorneys for Defendants Benito,*
*Melchionni, and KS Law Group, LLP*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on this 7th day of July 2023, with the Clerk of the Circuit Court using the Florida Courts e-filing e-portal and served by an automatic email generated by the Florida Courts e-filing portal to:

Matthew Jones, Esq.
matthew@jones-adams.com
Cheyenne Moghadam, Esq.
c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

2

167482.00602/132203278v.3

*Counsel for Plaintiff, Allan Teh*

Andrew Berman, Esq.
Email: aberman@ybklaw.com
YOUNG, BERMAN, KARPF & KARPF, P.A.
825 Brickell Bay Drive, Tower III, Suite 1748
Miami, Florida 33131
Telephone: (305) 945-1851
Facsimile: (786) 219-1981

*Counsel for Defendants Persist Communications, Inc. and Lake Law Firm, LLC*

*/s/ Kenneth Bressler*
Kenneth Bressler
Admitted *Pro Hac Vice*

167482.00602/132203278v.3

Filing # 176911275 E-Filed 07/07/2023 12:12:57 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

On a derivative basis as a
Partner of,

KS LAW GROUP, a District of
Columbia LLP,

     Plaintiffs,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

     Defendants

and

KS LAW GROUP, LLP, a District of
Columbia LLP,

     Nominal Defendant.

---

## AMENDED[1] MOTION TO STAY PROCEEDINGS EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS

Defendants The Lake Law Firm ("Lake Law") and Persist Communications,

Inc. ("Persist Communications"), move to stay all proceeding except their Motion

to Stay and Dismiss and state:

---

[1] This amended motion supplants the initial one and is only filed on behalf of these Defendants. The other Defendants are expected to seek a stay separately.

1

1.      Defendants have moved to compel arbitration and dismiss this Complaint. The motion to dismiss for failure to state a cause of action is not inconsistent with their motion to compel arbitration and hence is not a waiver. *Truly Nolen of America, Inc., v. King Cole Condo. Assoc, Inc.,* 143 So. 3d 1015, 1017 (Fla. 3d DCA 2014) (combining a motion to change venue with motion to compel arbitration not a waiver of right to arbitrate). A motion to compel arbitration may be filed even **after** a motion to dismiss challenging the legal sufficiency of a complaint is denied without waiving the right to arbitrate. *Hirschfeld v. Heights X, Inc.,* 707 So. 2d 955 (Fla. 3d DCA 1998).

2.      But participation in pretrial scheduling along the lines of what is required in the Case Management Order may be deemed a waiver of the right to arbitrate.  Accordingly, in an abundance of caution, Defendants move to stay all proceedings - including compliance with the Case Management Order (other than disposition of their pending motion)- until the issue of arbitration is resolved.

WHEREFORE, Defendants move to stay all proceedings other than their Motion to Compel Arbitration and to Dismiss.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Telephone: (305)-377-2290
Primary: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By: /s/ Andrew S. Berman
ANDREW S. BERMAN, ESQ.
Fla. Bar No.: 370932

2

*Attorneys for Defendants, Lake Law and Persist Communications*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 7th of July 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com and all counsel of record.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

*/s/ Andrew S. Berman*

Andrew S. Berman
Florida Bar No.: 370932

3

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: **2023-15702 CA 01**

**ALLAN TEH,**

     Plaintiff(s),

vs.

**KS LAW GROUP, LLP, ET AL,**

     Defendant(s),

_____/

## ORDER GRANTING/DENYING MOTION TO TRANSFER

THIS CAUSE came on to be heard upon the Motion to Transfer, and the Court being

fully advised in the premises, it is hereby,

_____✓___ GRANTED.  It is further ORDERED AND ADJUDGED that this cause is hereby

transferred to Section No. __44__.  *Rel - 23-4474 CA 44.*

_____ DENIED.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, this

____7____ day of JULY, 2023.

JENNIFER D. BAILEY
Administrative Judge

Copies furnished to:
aberman@ybkklaw.com
eservice@ybkklaw.com
c.moghadam@jones-adams.com
matthew@jones-adams.com

CASE NO.:   **2023-15702 CA 01**

ken.bressler@blankrome.com
michelle.gervais@blankrome.com
BRFLeservice@blankrome.com
Silvia.Membreno@blankrome.com

Filing # 177591098 E-Filed 07/17/2023 04:33:41 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## AGREED ORDER EXTENDING PLAINTIFF'S TIME TO RESPOND TO DEFENDANTS' MOTION FOR SANCTIONS [DE#37]

**THIS CAUSE** having come before this Court and the Court being fully advised of opposing counsels being consulted and their agreement, it is hereupon,

**ORDERED** and **ADJUDGED** that Plaintiff will have four (4) additional days to file his Response in Opposition to Defendants, Lee Melchionni and Sylvia Benito's, Motion for Sanctions [DE#37] placing Plaintiff's deadline to respond on or before July 21st, 2023.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 17th day of July, 2023.

2023-015702-CA-01 07-17-2023 4:21 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

Case No: 2023-015702-CA-01

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com


**Physically Served:**

Filing # 177800939 E-Filed 07/19/2023 04:58:03 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

     On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

     Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

     Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

     Nominal Defendant in Derivative Action.
_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS, THE LAKE LAW FIRM, LLC AND PERSIST COMMUNICATIONS, INC'S, MOTION TO STAY PROCEEDINGS EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS [DE#39]**

     Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group,

LLP ("KS Law" or "Partnership") files this Response in Opposition to Defendants, The

Lake Law Firm, LLC ("Lake Law") and Persist Communications, Inc's ("Persist")

(hereinafter, collectively "Defendants"), Motion to Stay Proceedings Except for Motion to

Compel Arbitration and to Dismiss [DE#39] (the "Motion"), on behalf of KS Law, and in support thereof alleges as follows:

## BACKGROUND

Defendants' sole basis for moving to stay their **compliance with all Case Management Deadlines set by this Court** is that they fear any further participation, outside this Court ruling on their Motion to Compel Arbitration and Dismiss [DE#26] would constitute a waiver of their right to compel arbitration. However, this does not provide an appropriate basis to stay these proceedings. Set out below is Plaintiff's detailed response in that regard.

Interestingly, Defendants have failed to cite to any case law to support its contention that complying with this Court's Orders would waive their right to compel arbitration. Despite this Defendants have chosen to commit to a strategy of delay rather than arguing the merits of the claims brought against them. Defendants have already weaponized their strategy of delay in failing to comply with this Court's June 2, 2023, Order [DE#21] setting the deadline for the parties to submit their Joint Case Management Report on February 13th, 2023.

In addition to Lake Law failing to support their arguments with case law, Defendants' Motion fails because the underlying premise to their argument, that an arbitration agreement between the parties exists, is incorrect. Not only does the Motion fail because there exists no arbitration agreement between Plaintiff and Defendant, but even if there was an agreement, Defendants have waived their right to compel arbitration.

## LEGAL ARGUMENT

Page **2** of **6**

I.     **Lake Law and Persist are not a Party to any Arbitration Agreement with the Plaintiff**

Defendants' entire Motion rests on the false assumption that an arbitration agreement exists between the Plaintiff on one hand and the Defendants on the other, **there is no such agreement**. The arbitration provision that Defendants' arguments rest is present in the Partnership Agreement of KS Law which the Defendants are not a party to or referenced in.

It is well settled that non-parties to an arbitration clause cannot compel parties to a contract to arbitrate. *Nestler–Poletto Realty, Inc. v. Kassin,* 730 So.2d 324, 326 (Fla. 4th DCA 1999). The exception to that general rule is if the non-party attempting to compel arbitration is a "third party beneficiary to the contract." *Id.* A third-party beneficiary is defined as an intended beneficiary which is determined "only if the parties to the contract intended to primarily and directly benefit the third party." *Aetna Cas. & Sur. Co. v. Jelac Corp.,* 505 So.2d 37, 38 (Fla. 4th DCA 1987). The intent required is only established if **all the contracting parties** intended to benefit the third party. *Florida Power & Light Co. v. Rd. Rock, Inc.*, 920 So. 2d 201, 203 (Fla. 4th DCA 2006).

The facts set out in the Derivative Complaint clearly establish that: 1) Lake Law and Persist are not signatories to the arbitration agreement and 2) they are not an intended beneficiary of the Partnership Agreement. Tellingly, Lake Law and Persist are not named, or referenced, in the Partnership Agreement.

For Defendants to invoke an arbitration agreement that they are not a party to should be seen by this Court as merely an attempt to delay these proceedings and place the parties behind schedule and out of compliance with this Court's Order.

## II.    <u>Lake Law and Persist Have Waived Their Right to Arbitration</u>

Should this Court find that Lake Law and Persist can somehow invoke the arbitration agreement even though they are not signatories to it, their Motion still fails because they have waived their right to compel arbitration.

Within Lake Law and Persists' Motion to Compel Arbitration and Dismiss they reference that the Plaintiff also has a pending action in the Eleventh Judicial Circuit, *Allan Teh v. Melchionni, et. al.*, Case No. 2023-004474 CA 44, for direct claims against similar parties to the present action. Lake Law and Persist have actively participated in the litigation of the related case by filing a Motion to Dismiss. *See Defendants' 2023-004474 CA 44 Motion to Dismiss attached as* **Exhibit "1".** As the Court will clearly see, their Motion to Dismiss in that matter is devoid of a single reference to, or request for, arbitration. As more fully set forth below, Defendants' active participation in the related case, and their failure to request or reference arbitration, constitutes a waiver of their right to request arbitration in the present proceedings.

Both D.C. and Florida courts recognize that just like any contractual provision an agreement to arbitrate can be waived by the actions of the parties. *See Bland v. Green Acres Group, L.L.C.*, 12 So. 3d 822, 824 (Fla. 4th DCA 2009); *See also BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 704 (D.C. 2022). D.C. courts have established that motion practice that "invokes the authority of the trial judge to alter the course of the case" that does not request arbitration can constitute a waiver of the parties right to compel arbitration. *See BDO USA, LLP v. Jia-Sobota*, 283 A.3d 699, 705 (D.C. 2022); *see also*

*TRG Customer Sols., Inc. v. Smith,* 226 A.3d 751, 759 (D.C. 2020). Florida courts echo D.C.'s rulings in finding that arbitration is waived by a party where its participation in litigation conflicts with the right to arbitrate. *Bland v. Green Acres Group, L.L.C.*, 12 So. 3d 822, 825 (Fla. 4th DCA 2009). Waiver has been found where active participation in litigation occurs when the party seeking arbitration has attacked "the merits of the case as opposed to initially challenging the plaintiff's right to judicial remedy in the first place." *Miller & Solomon Gen. Contractors, Inc. v. Brennan's Glass Co., Inc.*, 824 So. 2d 288, 290 (Fla. 4th DCA 2002).

Additionally, waiver of the right to arbitrate is not time, or delay, dependent but rather depends on prior inconsistent positions taken by the moving party. *Paine, Webber, Jackson & Curtis, Inc. v. Fredray, Inc.*, 521 So. 2d 271 (Fla. 5th DCA 1988). **It is important to note that in 2022 the United States Supreme Court clarified that "prejudice is not a condition of finding that a party has waived its right to stay litigation or compel arbitration." *Morgan v. Sundance, Inc.*, 212 L. Ed. 2d 753 (2022).**

Interestingly, in Defendants' Motion they make it a point to state that their Motion to Compel Arbitration in the present proceedings does not waive their right to arbitration, but entirely fail to reference Lake Law and Persist's prior Motion to Dismiss in the related case that failed to reference in any way the arbitration provision. The essential question in determining if waiver has occurred is if under the totality of the circumstances, the defaulting party has acted inconsistently with the right to arbitrate. *Leder v. Imburgia Constr. Services, Inc.*, 325 So. 3d 256, 259 (Fla. 3d DCA 2021). Inconsistent acts include acts that occur pre-suit acts and in separate legal proceedings where the arbitration

agreement could have been invoked. *Bland v. Green Acres Group*, L.L.C., 12 So. 3d 822, 825 (Fla. 4th DCA 2009).

Under the totality of the circumstances even if Lake Law and Persist were parties to an arbitration agreement, which they are not, their active participation in the related case, and their failure to even attempt to compel arbitration constitutes a waiver. To halt all case management deadlines would only accomplish Defendants' goal of delay and waste judicial resources when this case inevitably moves forward in the Eleventh Judicial Circuit.

**WHEREFORE,** Plaintiff, ALLAN TEH, on behalf of KS Law Group, LLP, respectfully requests that this Court deny Defendants, The Lake Law Firm, LLC and Persist Communications Inc.'s, Motion to Stay, and for such other and further relief as this Court deems just and proper.

<u>**CERTIFICATE OF SERVICE**</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 19th day of July, 2023.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:   _/s/ Matthew L. Jones, Esq._
Matthew L. Jones, Esq.
Florida Bar No. 909335

Filing # 171946438 E-Filed 04/27/2023 01:52:11 PM

# Exhibit "1"

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-004474 CA 44

ALLAN TEH, individually,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

     Defendants.

_____/

COMPLEX BUSINESS LITIGATION

**PERSIST COMMUNICATIONS' AND THE
LAKE LAW FIRM'S MOTION TO DISMISS
(and incorporated Memorandum of Law)**

Defendants Persist Communications, Inc. ("Persist Communications") and The Lake Law Firm, LLC ("Lake Law") move to dismiss Plaintiff Allan Teh's, Complaint for failure to state a claim as to the counts of Unjust enrichment (Count 7) and Equitable Accounting (Count 8).

## I.    <u>INTRODUCTION</u>

Persist Communications and Lake Law are not the primary targets of the Plaintiff. And they can't be because he lacks privity with them. They received $3,880,000.00 from an entity, KS Law Group, LLP ("KS Law"), pursuant to a

1

contract with KS Law, a D.C. law firm. Plaintiff owns a 50%-member interest in KS Law, and each individual Defendant owns 25%.

Plaintiff has sued the individual Defendants under various theories arising from their internal business relationship as members in KS Law. Plaintiff claims he was duped by the individual Defendants, who are his co-members in KS Law, into funding $4 million in KS Law's investment in hundreds of Hernia Mesh, Talc and Roundup cases being handled (or to be handled) by Lake Law, in exchange for a financial interest in each of the cases. (Persist Communications is a marketing company for Lake Law). Plaintiff claims he has not yet seen any results from his September 2021 investment in KS Law arising from **its**, not his, business relationship with Persist Communications and Lake Law.

But as this Court knows, pre-litigation and litigation of mass tort cases takes years. The cases that Lake Law is trying to attract and has signed up are percolating in various stages of litigation and pre-litigation. The contract between KS Law and Persist Communications and Lake Law, governed by New York law, is still in its executory stage. It appears that Plaintiff simply woke up one morning and decided he wanted his money back. But whatever his motivation, his targeting of these Defendants is misplaced.

Plaintiff's two claims against Persist Communications and Lake Law are unsustainable for the simple reason that he is trying to circumvent the corporate structure of KS Law.  He is not in privity with these Defendants.  **He** did not pay them any money. They owe **him** no money. They owe **him** no fiduciary duties or

2

any at all. They are **legal strangers** vis-à-vis Plaintiff. All their dealings are and have been with KS Law.

Counts 7 (unjust enrichment) and 8 (equitable accounting) should therefore be dismissed with prejudice for these and other reasons.

WHEREFORE, the Complaint against Persist Communications and Lake Law should be dismissed with prejudice.

## II.   LEGAL ARGUMENT

### A. COUNT 7 FAILS TO STATE A CAUSE OF ACTION FOR UNJUST ENRICHMENT.

#### i.   Plaintiff has no Standing.

It is obvious from the Complaint that any injury or damage caused by Lake Law or Persist Communications was to KS Law, the legal entity with whom they are in **contractual privity**.  It is established law that, "[g]enerally, a shareholder cannot sue in the shareholder's name for injuries to the corporation unless there is a special duty between the wrongdoer and the shareholder, and the shareholder has suffered an injury separate and distinct from that suffered by other shareholders." *Houri v. Boaziz,* 196 So. 3d 383, 392 (Fla. 3d DCA 2016). In that case, the plaintiff LLC member "**only suffered a harm that flowed from an initial harm to [the LLC]**. He was, therefore, without authority to bring this action directly …" *Id.*

Here there is no special duty between Plaintiff and these Defendants, **and none is alleged**, because they are legal strangers.  Plaintiff, like Boaziz, is simply a member of an LLC that has a contract with these Defendants. Any harm he allegedly suffered would only be indirect by virtue of his membership status.

3

### ii.    The Elements of the Cause of Action
###        Itself Cannot be Met by Plaintiff

Count 7 alleges that Lake Law and Persist Communications were somehow unjustly enriched by Plaintiff's investment in KS Law. That cannot be. The elements of a cause of action for unjust enrichment are:

> (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the conferred benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff.

*Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So. 3d 400, 404 (Fla. 3d DCA 2009). This claim fails because the benefit conferred by a plaintiff on a defendant must be a "**direct benefit**" *Id*.

In *Extraordinary Tile*, the plaintiff brought a claim for unjust enrichment against a defendant with whom it had "no relationship." The Third District held that the plaintiff could not have conferred a benefit on that defendant because unjust enrichment required the conferring of a "direct benefit," holding: "Plaintiff contracted with FPL, not Group, for electricity; Plaintiff paid FPL, not Group; and Group provided no services to Plaintiff. Based on these facts, which are not in dispute, the Plaintiff cannot allege nor establish that it conferred a direct benefit upon Group." *Id*.

A better illustration of this concept in an analogous situation to here is *Peoples National Bank of Commerce v. First Union Nat. Bank of Florida, N.A.,* 667 So. 2d 876 (Fla. 3d DCA 1996). The facts are a bit convoluted but, in that case, Peoples, a participating lender in a syndicated loan package, claimed that other participating lenders were inequitably overpaid with the indubitable equivalent

4

of Peoples' creditor interest in the loan from the defaulted debtor (in that case voting rights rather than cash). Peoples received nothing because it refused to participate in an Intercreditor Agreement (as the others did). It sued the other lenders for unjust enrichment, claiming the value that they received were its interest inequitably distributed to them. The Third District disagreed and affirmed the dismissal with prejudice because Peoples conferred no direct benefit on them. Rather, the lead bank that collected the consideration from the defaulted borrower and distributed it to the other participating lenders is the one who conferred the direct benefit directly on them.

The claims against Persist Communications and Lake Law fall squarely within these holdings. Plaintiff conferred **no direct benefit** to Lake Law or Persist Communications. He never paid them a single dollar – **KS Law did**. He did not have a contract with them – **KS Law did**. And neither Lake Law nor Persist Communications ever provided a single service to Plaintiff – they provided services **to KS Law**.

To be sure, the Lake Law Invoice attached to the Complaint states that the amount of $3.88 million was directed to KS Law with the line "BILL TO: KS Law Group." (Complaint, Ex. 2, p. 1). This amount was directly pursuant to the agreement to furnish cases, which is evidenced by the Case Replacement Agreement – "KS has previously paid Lake $3,880,000.00 in order to acquire client leads in connection with the Cases (the "Funded Amount")." (Complaint, Ex. 12, p. 1.).

5

Where a plaintiff cannot and does not "allege ultimate facts that support a prima facie case of unjust enrichment," it is proper for the Court to dismiss an unjust enrichment claim with prejudice. *Peoples Nat. Bank of Com. v. First Union Nat. Bank of Fla.*, N.A., 667 So. 2d 876, 879 (Fla. 3d DCA 1996) (affirming dismissal of an unjust enrichment claim, with prejudice, where "the plaintiff, Peoples National, could not and did not allege that it had directly conferred a benefit on the defendants...").

Moreover, for unjust enrichment to be found, it must be "inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Extraordinary Title Servs., LLC*, 1 So. 3d at 404. Under the Case Replacement Agreement, KS Law agreed to pay the already furnished amount of $3.88 million **in exchange for the receipt of 60% of the contingency fees of 795 cases** which Lake Law and Persist Communications would acquire and handle, through trial firms. (*See*, Complaint Ex. 12.). In essence, in exchange for the benefit of $3.88 million, Lake agreed to provide equal or greater value: a contingency fee on 795 cases, with guarantees of reimbursement and replacement. *See id.* Further, the Case Replacement Agreement explicitly states that the $3.88 million was paid to Lake Law "in order to acquire client leads in connection with the Cases." *Id.* at p.1.

Because KS Law has been provided the benefit of **its bargain** – it is just too early for that inchoate benefit to bear fruit - it cannot be deemed "inequitable" for Lake Law or Persist Communications to have retained their benefit (received from KS Law) because they "gave value in exchange," even if Plaintiff had

6

standing to sue. *See Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022) (holding that it would not be unjust for a defendant to retain a benefit where it returned value to the plaintiff.).

The bottom line is that neither Lake Law nor Persist Communications owe **anything** to Plaintiff. Their contractual dealings are all with KS Law. An individual member of KS Law has no standing to pursue claims in his own name when he lacks privity.

### B. COUNT 8 FAILS TO STATE A CAUSE OF ACTION FOR EQUITABLE ACCOUNTING

This claim fails for the simple reason that the parties are not in privity; they are legal strangers.  And Defendants owe Plaintiff no fiduciary duties.

One cannot sue a legal stranger for an accounting. There must be some duty to account in the first instance. In the typical case the right to equitable accounting spring from a contract. *See F.A. Chastain Constr., Inc. v. Pratt,* 146 So. 2d 910 (Fla. 3d DCA 1962), which states: "although courts of law have jurisdiction to enforce **contract demands** which involve an accounting, equity will take cognizance where the **contract demands** between litigants involve extensive or complicated accounts." Or it may arise from a fiduciary duty to account. But here there is nothing to give rise to any right to an accounting.

Accordingly, this claim fails as well.

### III.   CONCLUSION

The Complaint fails to state a cause of action against these Defendants for the reasons stated and Counts 7 and 8 should therefore be dismissed with prejudice.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 27th day of April 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com and Blank Rome LLP, Michelle M. Gervais, Esq, 100 S. Ashley Drive Suite 600, Tampa, FL, michelle.gervais@blankrome.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

_/s/ Andrew S. Berman_

Andrew S. Berman
Florida Bar No.: 370932

8

Filing # 177892825 E-Filed 07/20/2023 03:48:33 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2023-015702-CA-01</u>
SECTION: <u>CA44</u>
JUDGE: <u>Lisa Walsh</u>

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

<u>**ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND TO PREPARE A MANDATORY CASE MANAGEMENT REPORT**</u>

**WHEREAS**, the Complex Business Litigation Procedures shall apply to all actions in the Complex Business Litigation Section and Fla. R. Civ. P. 1.201 Complex Litigation, except to the extent that, in any particular action, they are superseded by an Order.

**WHEREAS,** the Complex Business Litigation Procedures are designed to facilitate the proceedings of cases by the Eleventh Judicial Circuit Complex Business Litigation Section; to promote the transmission and access to case information by the Court, litigants, counsel, and the public; and to facilitate the efficient and effective presentation of evidence in the courtroom. These Procedures shall be construed and enforced to avoid technical delay, **encourage civility**, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

**NOTICE IS HEREBY GIVEN** that all outstanding and future motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Section Procedures, which are available at the court's website:

*http://www.jud11.flcourts.org/About-the-Court/Ourt-Courts/Civil-Court/Complex-Business-Litigation*.

**NOTICE IS HEREBY GIVEN** that on **October 9th, 2023** at **9:30 AM** via Zoom, the undersigned shall convene a Case Management Conference ("CMC") in this cause.

**The Parties are ordered to provide courtesy copies of <u>all</u> motions and where required, memoranda pertaining thereto, hereinafter filed in this case, to the undersigned Judge via**

Case No: 2023-015702-CA-01                                                                                      Page 1 of 6

**CourtMAP as a supporting document to the event. Courtesy copies are not needed to be e-mailed.**

**Orders, agreed and otherwise, shall be submitted via CourtMAP.**

**Plaintiff is required to provide a full set of pending motion(s) to dismiss, opposition(s) and reply to chambers a minimum of one (1) week prior to the initially scheduled CMC. MOTIONS FILED WITHOUT COURTESY COPIES UPLOADED TO THE EVENT ON COURTMAP AS SUPPORTING DOCUMENTS MAY NOT BE CONSIDERED.**

**Any previously filed motion not in compliance with procedures, e.g., memorandum of law where required, must be resubmitted in conformity with the Complex Business Litigation Procedures**.

**Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED** to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order. If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third Party Plaintiff <u>shall</u> provide the party with a copy of this Notice.

**Trial Counsel and their clients shall appear via Zoom for the CMC.**[1] Failure of any party to attend, including the insurance carrier representative, shall subject that party to sanctions and/or fees. Regardless of the pendency of any undecided motions, Trial Counsel shall meet no less than 30 days in advance of the CMC and address the following which will be included in the Joint Case Management Report, along with other appropriate topics, including those set forth in Fla. R. Civ. P. 1.201(b) Complex Litigation, some of which subjects and topics will be incorporated into a Case Management Order:

1. The name of lead trial counsel for each party, and the name of any unrepresented party;

2. A brief factual statement of the case;

3. Pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed and applicable defenses;

4. The identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

5. A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

5.a.  A description of pertinent documents and a list of fact witnesses the parties believe to be relevant.

6. Anticipated areas of any expert testimony, the number of experts to be called by each party, timing for identification of experts, and exchange of expert reports;

7. An estimate of the volume of documents and computerized information likely to be the

subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost;

8. The possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity of documents, electronically stored information, and the need for advance rulings from the Court on admissibility of evidence.

9. The advisability of using the general magistrate for discovery purposes at no cost to the parties; and the advisability of using the general and/or a special magistrate(s) for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

10. The time period, after the close of discovery within which post-discovery dispositive motions shall be filed, briefed and argued, and a tentative schedule for such activities;

11. The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s);

12. Whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent that this is the case, a determination of the following:
    a. Fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;

    b. Issues related to compatibility of court and party facilities and equipment;

    c. Issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits;

    d. Such other issues related to the use of the Court's and parties' special technological facilities as may be raised by any party or the Court or its technological advisor, given the nature of the case and the resources of the parties.

13. A good faith estimate by counsel for each party based upon consultation with all of the parties of the costs and fees each party is likely to incur in pursuing the litigation through trial court adjudication;

14. A preliminary listing of the principal legal and factual issues which counsel believe will need to be decided in the case;

15. A preliminary listing of any legal principles and facts that are not in dispute;

16. A good faith estimate by counsel for each party of the length of time to try the case;

17. Whether a demand for jury trial has been made.

Within ten (10) days of the meeting among Trial Counsel, but no less than fourteen (14) days in advance of the Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1 - 17 above and shall provide a courtesy copy to the Court via CourtMap as supporting documents to the event.

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely notify the Court by written motion to be set and heard on motion calendar or request for a status conference.  Failure to provide the required case management report may subject the violating party(ies) to sanctions and/or fees.

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, at the initial case management conference, the Court will set the trial date or dates no sooner than 6 months and no later than 24 months from the date of the initial case management conference unless good cause is shown for an earlier or later setting. **As provided in the rule, continuance of the trial of a complex action should rarely be granted, and then only upon good cause shown.**

## MANDATORY CASE MANAGEMENT SCHEDULE TO BE FILED

| | |
|---|---|
| ESI EXCHANGE PROPOSAL (including search terms, formats, data sources to be searched, etc) | Proposal -<br><br>Commence Exchange -<br><br>Complete Exchange - |
| MOTIONS TO AMEND/ADD PARTIES<br><br>(Includes Affirmative Defenses) | |
| FACT WITNESS DEPOSITIONS/ DISCOVERY CONCLUDES | |
| INITIAL MEDIATION DEADLINE | On or before |
| NUMBER OF EXPERTS PER PARTY/SIDE | |
| PLAINTIFF/THIRD PARTY PLAINTIFF/CROSS PLAINTIFF(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION<br><br>**MUST INCLUDE: EXPERTS** | |

| | |
|---|---|
| **QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| DEFENDANT/THIRD PARTY/CROSS DEFENDANT(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| REBUTTAL EXPERT DISCLOSURE REPORTS DUE<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| EXPERT DEPOSITIONS COMPLETED | |
| DISPOSITIVE MOTIONS FILED | |
| DAUBERT/FRYE MOTIONS FILED | |
| MOTIONS IN LIMINE FILED | |
| FINAL MEDIATION DEADLINE | On or before |
| FINAL PRETRIAL CONFERENCE<br><br>**THE COURT SHALL ADDRESS ALL PENDING MOTIONS, INCLUDING JURY INSTRUCTIONS, VERDICT FORM, MOTIONS IN LIMINE, DEPOSITION DESIGNATIONS, OBJECTIONS TO EXHIBITS AND FRYE** | |

| **MOTIONS** | |
|---|---|
| | |

[1]  A representative of the insurance carrier for any insured party who is **not** such carrier's outside counsel and who has decision making authority without further consultation shall attend.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 20th day of July, 2023.

2023-015702-CA-01 07-20-2023 3:29 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 177892844 E-Filed 07/20/2023 03:48:38 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## NOTICE AND ORDER OF ADHERENCE TO COMPLEX BUSINESS LITIGATION SECTION PROCEDURES

**WHEREAS**, the Complex Business Litigation Procedures shall apply to all actions in the Complex Business Litigation Section and Fla. R. Civ. P. 1.201 Complex Litigation, except to the extent that, in any particular action, they are superseded by an Order.

**WHEREAS,** the Complex Business Litigation Procedures are designed to facilitate the proceedings of cases by the Eleventh Judicial Circuit Complex Business Litigation Section; to promote the transmission and access to case information by the Court, litigants, counsel, and the public; and to facilitate the efficient and effective presentation of evidence in the courtroom. These Procedures shall be construed and enforced to avoid technical delay, **encourage civility**, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

**NOTICE IS HEREBY GIVEN** that all outstanding and future motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Section Procedures, which are available at the court's website www.jud11.flcourts.org.

**Any previously filed motion not in compliance with procedures, e.g., memorandum of**

**law where required, must be resubmitted in conformity with the Complex Business Litigation Procedures.**

Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED to confirm all parties subsequently named or appearing herein have been served copies of this Notice. If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third Party Plaintiff <u>shall</u> provide the party with a copy of this Notice.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>20th day of July, 2023</u>.

2023-015702-CA-01 07-20-2023 3:29 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 177892858 E-Filed 07/20/2023 03:48:41 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## NOTICE AND ORDER OF MOTION AND MEMORANDUM REQUIREMENTS

This case is pending in the Complex Business Litigation division, and must follow the Complex

Business Litigation rules.  **In addition,** it is

**ORDERED** and **ADJUDGED** as follows:

### Short Motions

As a general rule, five-minute Motion Calendar motions do not require memoranda of law. Copies of

motions and any response shall be submitted through CourtMap in accordance with the Court's motion

calendar procedures posted on its website.

### Motions Requesting a Special Set Hearing

Hearings must be requested using CourtMap which is available on the judge's webpage.  Motions

may be scheduled or ruled upon without a hearing, in the court's discretion.

**Content of motions** shall state with particularity the grounds therefore, citing any statute or rule of

procedure relied upon; shall set forth the relief sought and shall include the required certification of

conferral.  The Court will not consider issues at a hearing on the motion that were not addressed in the

motion and memoranda in support of and in opposition to the motion.

## Memoranda Requirements

**These requirements and deadlines may not be waived or altered except by court order.**

**Failure to File and Serve Motion Materials:** CBL 4.4   A motion or opposition unaccompanied by a required memorandum may be summarily rejected or denied.   Failure to timely file a memorandum in opposition to a motion may result in the pending motion being considered and decided as an uncontested motion.   **Motion briefing deadlines are court orders.**

| Motion | Memoranda of law | Page limit | Time deadline | |
|---|---|---|---|---|
| Motion filed by movant | As required by CBL rules | 20 | When filing the motion | Memos which are not filed with the motion will be disregarded |
| Opposition to motion | At time of filing opposition, if needed | 20 | 10 days after service of motion<br><br>as computed in Fla. R. Civ. P. 1.090 | If no response is timely filed, the Court will proceed and may grant the motion as unopposed |
| Reply | If needed, limited to matters raised in the opposition | 10 | 5 days after service of opposition<br><br>as computed in Fla. R. Civ. P. 1.090 | If no reply is timely filed, the Court will proceed |
| Sur-reply | With Court | | | |

| | permission only | | | |
|---|---|---|---|---|

**Motions Decided on Papers and Memoranda:** Motions may be considered and decided by the Court without a hearing. CBL 4.5   **A hearing is at the discretion of the Court.**

**Sealed and Confidential Documents**

Sealed or confidential documents should be e-filed pursuant to the instructions on the Clerk's e-filing portal.  In Camera inspections shall be conducted as instructed by the Court.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 20th day of July, 2023.

2023-015702-CA-01 07-20-2023 3:29 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 177892867 E-Filed 07/20/2023 03:48:45 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## MANDATORY ORDER TO CONFER AND CERTIFICATION REQUIREMENT

This case is subject to the Complex Business Litigation Rules.  The rules require that parties meet and confer prior to filing any motion to determine if issues can be narrowed, the appropriate amount of time required for hearing if hearing is requested, and any other issues such as the completion of related discovery.  Meet and Confer under these rules requires **an actual effort** between attorneys, not staff.

It is therefore:  **ORDERED** and **ADJUDGED** as follows:

All parties to a motion must meet the conferral requirements of the division.  The motion must contain a certification of the efforts at meet and confer, which shall include:

- A description of all efforts at a meet and confer, including names of movant and respondent attorneys, dates and method (email, telephone, live meeting) requesting a meet and confer; and

- A description of all dates for meet and confer actually held and the method and names of participating attorneys; and

- Results achieved, including consensus as to amount of time required for hearing, if granted.

The only motions exempt from the meet and confer requirement are Motions for Injunctive Relief

Case No: 2023-015702-CA-01

Page 1 of 2

Without Notice; Motions for Summary Judgment and Motions to Amend to Add Punitive Damages. **ANY OTHER MOTION** submitted without a certificate of conferral will be rejected by the Court without prejudice.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 20th day of July, 2023.

2023-015702-CA-01 07-20-2023 3:29 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 177956122 E-Filed 07/21/2023 12:18:57 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

derivatively on behalf of,

KS LAW GROUP, a District of
Columbia LLP,

     Plaintiffs,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

     Defendants

and

KS LAW GROUP, LLP, a District of
Columbia LLP,

     Nominal Defendant.

---

## REPLY IN SUPPORT OF MOTION TO STAY

Defendants The Lake Law Firm and Persist Communications, Inc., file this reply in support of their motion to stay.

The Plaintiff is remarkable for his aversion to Third District precedent. His deliberate sidestep of controlling cases in his own backyard borders on bad faith.

Plaintiff argues that these Defendants waived their right to arbitrate by filing a motion to dismiss alongside their motion to arbitrate. He is wrong. *See*

1

*Truly Nolen of America, Inc., v. King Cole Condo. Assoc, Inc.,* 143 So. 3d 1015, 1017 (Fla. 3d DCA 2014) (combining a motion to compel arbitration with motion to change venue does not waive right to arbitrate) and *Hirschfeld v. Heights X, Inc.,* 707 So. 2d 955 (Fla. 3d DCA 1998) (filing motion to dismiss on technical grounds does not waive later motion to compel arbitration filed before answer).

There is no need to address the other issues raised in the Response because they will be sorted out at the hearing on the dispositive motion.  For now, it is enough that arbitration has not been waived.

WHEREFORE, Defendants move to stay all proceedings other than their Motion to Compel Arbitration and to Dismiss.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Telephone: (305)-377-2290
Primary: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By: /s/ Andrew S. Berman
ANDREW S. BERMAN, ESQ.
Fla. Bar No.: 370932

*Attorneys for Defendants, Lake Law and Persist Communications*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 21st day of July 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com and all counsel of record.

2

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

   /s/ Andrew S. Berman

Andrew S. Berman
Florida Bar No.: 370932

3

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

      Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

      Nominal Defendant in Derivative Action.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FLORIDA STATUTE § 57.105 [DE#37]**

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership") files this Response in Opposition to Defendants, Lee Melchionni ("Melchionni") and Sylvia Benito's ("Benito") (hereinafter, collectively "Defendants"), Motion for Sanctions (the "Motion") [DE#37], on behalf of KS Law, and in support states:

Page **1** of **8**

## **<u>INTRODUCTION</u>**

Defendants' Motion should be summarily denied because it not only fails to provide any applicable case law in its support but also fails to provide any admissible evidence upon which this Court can render a ruling. Defendants' sole argument is that Plaintiff and his counsel knew at the time the Derivative Complaint was filed "that all of Teh's claims against Benito and Melchionni are covered by the Arbitration Provision and must be brought in front AAA." *See Page 2 of Motion*. Defendants provide no affidavits or admissible evidence to support the contentions in their Motion. The only support Defendants provide are references to separate legal proceedings that involve similar parties to the present case, while wholly ignoring the distinct legal theories involved in each of those distinct proceedings.

Defendants are asking this Court to believe that somehow Plaintiff's initiation of a Books and Records demand in arbitration somehow handcuffs or requires the Plaintiff to initiate arbitration for every other legal issue and dispute. Defendants' argument conspicuously ignores the breadth of both Florida and District of Columbia (D.C.) case law that involves trial courts' determination of what is arbitrable, the enforceability of arbitration provisions, the scope of arbitration provisions, and whether a waiver of right to arbitrate has occurred.  Defendants' argument is that, since one legal issue was submitted to arbitration that then, ipso facto, all legal issues of the parties must be submitted to arbitration. Again, not only is this unsupported by case law but falls well short of the standard necessary to grant a motion for sanctions.

Defendants own Motion illustrates the obvious absence of any case law to support an award of attorneys' fees and costs under these facts. Defendants juxtapose their

overreaching and speculative statements with citations to a total of two cases, *de Vaux v. Westwood Baptist Church*, 953 So. 2d 677 (Fla. 1st DCA 2007) and *Aspen Air Conditioning, Inc. v. Safeco Ins. Co. of Am.*, 170 So. 3d 892 (Fla. 3d DCA 2015), neither of which involve sanctions being awarded in the context of arbitration agreements. *De Vaux* was decided in the context of arguments made on an appeal which related to specific performance under a real estate agreement. *de Vaux,* 953 So. 2d at 685. The *Aspen Air Conditioning, Inc* matter involved issues of jurisdiction and venue. *Aspen Air Conditioning, Inc. v. Safeco Ins. Co. of Am.*, 170 So. 3d 892 (Fla. 3d DCA 2015).

## LEGAL STANDARD

Regarding an award of attorney's fees under section 57.105, Florida Statutes (2019), the trial court's findings must be based upon substantial competent evidence presented to the court at the hearing on attorney's fees, or otherwise before the court and in the trial record. *Davis v. Bailynson*, 268 So. 3d 762, 765 (Fla. 4th DCA 2019). The statute must be applied with restraint to ensure that it serves its intended purpose of discouraging baseless claims without casting a chilling effect on use of the courts. *Schurr v. Silverio & Hall, P.A.*, 290 So.3d 634, 637 (Fla 2d DCA 2020).

Where a party reasonably believes the factual basis for its claim exists, it is entitled to proceed with its claims and seek to prove those facts. *MC Liberty Express, Inc. v. All Points Services, Inc.*, 252 So.3d 397, 403 (Fla 3d DCA 2018). In the context of a motion for sanctions, if attempts to prove those facts are fruitless, there is still not cause for sanctions where the party's initial belief was well-founded. *Id.* Where there is an arguable basis in law and fact for a party's claim, a trial court may not sanction that party

under statute on fee awards as a sanction. *Minto PBLH, LLC v. 1000 Friends of Florida, Inc.*, 228 So.3d 147, 149 (Fla. 4th DCA 2017).

Courts have made it clear that sanctions will only be awarded where the court finds that the action is frivolous and "so clearly devoid of merit both on the facts and the law as to be completely untenable." *Young v. Ganese Dharamdass*, 695 So. 2d 828, 829 (Fla. 4th DCA 1997). Furthermore, merely losing a case is not a basis for sanctions under section 57.105. *Cullen v. Marsh*, 34 So.3d 235, 242 (Fla. 3d DCA 2010). Similarly, a court's finding that a party's interpretation of a legal document is incorrect "does not mean that the other party is necessarily entitled to section 57.105 fees." *Peyton v. Horner*, 920 So.2d 180, 183 (Fla. 2d DCA 2006).

## <u>ARGUMENT</u>

Defendants' arguments that Plaintiff knew his claims **must** have been brought in arbitration fail for several reasons including that those arguments ignore: 1) the contractual nature of arbitration provisions; 2) that certain claims brought by the Plaintiff are not arbitrable; and 3) that there exists no valid arbitration agreement in this case. None of the referenced arguments fall close to being "so clearly devoid of merit both on facts and law as to be completely untenable." *Young v. Ganese Dharamdass*, 695 So. 2d 828, 829 (Fla. 4th DCA 1997).

D.C. and Florida Law both follow the view that arbitration provisions are contractual in nature and therefore the construction of such a provision remains a matter of contract interpretation left to the court. *See Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999); *Menna v. Plymouth Rock Assur. Corp.*, 987 A.2d 458, 465 (D.C. 2010). To compel arbitration a court must first determine that (1) the parties have an enforceable agreement to arbitrate, (2) the parties' underlying dispute falls within the scope of that agreement;

Page **4** of **8**

and (3) whether the right to compel arbitration has been waived. *Univ. of the D.C. Faculty Ass'n / Nat'l Educ. Ass'n v. Bd. of Trustees of Univ. of the D.C.*, 257 A.3d 1026, 1031 (D.C. 2021); *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, (Fla. 1999). Courts have found that parties waive their right to compel arbitration where their participation in litigation conflicts with the right to arbitrate. *Bland v. Green Acres Group, L.L.C.*, 12 So. 3d 822, 825 (Fla. 4th DCA 2009).

Waiver is an important concept for this Court to note because it is Defendants' position that Plaintiff **was required** to bring his claims in arbitration. As this Court is well aware even in instances where the parties have a valid arbitration agreement in place it does not restrict the parties to mutually choose to litigate their disputes in court. The fact that after the filing of the Derivative Complaint Defendants could have chosen not to enforce the arbitration agreement, waived their right to compel arbitration, or the Court could find, and should find, that an enforceable arbitration agreement does not exist clearly establishes that the Plaintiff **was not required to initiate** his claims in arbitration an easily satisfies the appliable standards in defeating this bad faith Motion for Sanctions.

In addition, Defendants have ignored the fact that Derivative Complaint seeks to have this this Court appoint a receiver to manage the affairs of KS Law. The power to appoint a receiver rest solely in this Court's equitable powers and is therefore not an arbitrable issue. *Metro-Dade Investments, Co. v. Granada Lakes Villas Condo., Inc.*, 74 So. 3d 593, 595 (Fla. 2d DCA 2011); *see also Granada Lakes Villas Condo. Ass'n, Inc. v. Metro-Dade Investments Co.,* 125 So. 3d 756, 758 (Fla. 2013). The facts necessitating the appointment of a receiver are clear. A mere **thirteen days** after Plaintiff, Allan Teh, provided $4 million in funds to KS Law, representing the entirety of its capital, Melchionni

and Benito transferred $3,880,000 to fellow Defendants, Lake Law and Persist. *See ¶ 27 and 28 of Derivative Complaint.* This transfer, of essentially all of KS Law's working capital, was effectuated with no known contract or agreement in place. *See ¶ 29 of Derivative Complaint.* Melchionni and Benito then proceeded with an onslaught of misrepresentations regarding the use of the transferred funds, along with the amount of mass tort litigation "cases" acquired by KS Law, **a law firm**. These misrepresentations are critical because the represented purpose of KS Law is to obtain, work-up, and handle various mass tort injury cases. *See ¶ 14 of Derivative Complaint.* The Plaintiff learned much later, despite KS Law being **a law firm**, Melchionni admitted that **KS Law does not have a single retainer (co-counsel, referring counsel, or as trial counsel) agreement in place.** *See ¶ 40 of Derivative Complaint.*

Finally, Defendants' Motion fails because there exists cognizable legal authority to support Plaintiff's stance that there exists no valid arbitration agreement between the parties. Defendants have moved to compel arbitration [DE#35] and in response Plaintiff's have set forth several arguments regarding the unenforceability of the arbitration agreement. Defendants heavily rely on the notion that public policy favors arbitration clauses but they do not take into account that "[n]either the statutes validating arbitration clauses nor the policy favoring such provisions should be used to block a party's access to the judicial forum." *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 642 (Fla. 1999).

The authority of the arbitrator is derived from the consent of the parties and whether the parties are bound by an arbitration provision first raises the question of arbitrarily for the court to decide. *Hossain v. JMU Properties, LLC*, 147 A.3d 816, 821 (D.C. 2016). For a valid contract to exist requires mutual assent between all parties, and

there is no manifestation of assent if that assent is procured by either the fraudulent or material misrepresentations of the other party upon the which the recipient is justified in relying. *Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1255–56 (D.C. 2018).

Melchionni and Benito induced Plaintiff to provide $4 million to fund the entire operations of a **law firm** and in return established an entity that does not and has not engaged in the practice of the law. The execution of the Partnership Agreement was procured through the material misrepresentations by Melchionni and Benito and therefore there exists no enforceable arbitration provision. Various partitions of the pending Derivative Complaint make specific reference to these misrepresentations that were justifiably relied upon by the Plaintiff.

The Third District Court of Appeals ("Third DCA") in *MC Liberty Express, Inc. v. All Points Services*, Inc., 252 So. 3d 397 (Fla. 3d DCA 2018) found that even when a party is successful in dismissing an action, that does not amount to the substantial competent evidence required to grant a motion for sanctions. The Third DCA has even affirmed denials of motions for sanctions where plaintiff's arguments were in fact "not supported by material facts or existing case law," but the plaintiff acted in good faith, and no finding of misconduct was evidenced on the record. *Fils-Aime v. Roberson*, 273 So. 3d 1112, 1114 (Fla. 3d DCA 2019).

Defendants' Motion for Sanctions is merely an attempt to intimidate the Plaintiff as well as inappropriately take "another bite of the apple" to argue in favor of its Motion to Compel Arbitration. These arguments are devoid of any legal authority or facts to support an award of attorneys' fees and costs under Florida Statute § 57.105. The lack of

admissible evidence proffered by Defendants in support of their Motion is critical in this Court's analysis because the Third District Court of Appeals has frequently overturned rulings where the trial court has failed to find "the requisite findings that the claim was frivolous or untenable." *Quoting James S. Lavold, Inc. v. Oracle Elevator Co.*, 309 So. 3d 252 (Fla. 3d DCA 2020); *see also Preferred Gov't Ins. Tr. v. Aelion,* 307 So. 3d 129, 131 (Fla. 3d DCA 2020); *see also Llanso v. WNF Law, P.L.*, 306 So. 3d 221, 222 (Fla. 3d DCA 2020) (reversing sanctions where the court relied on facts outside the four corners of the complaint and failed to make detailed, specific findings of bad faith and reciting the facts on which the its ruling was based on).

**WHEREFORE,** Plaintiff, Allan Teh, on behalf of KS Law Group, LLP, respectfully requests that this Court deny Defendants, Lee Melchionni and Sylvia Benito's, Motion for Sanctions Pursuant to Florida Statute § 57.105 [DE#37].

## <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 21st day of July, 2023.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:   /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

Filing # 178263321 E-Filed 07/26/2023 11:54:31 AM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

        On a derivative basis as a partner of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

        Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

        Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

        Nominal Defendant.

_____/

**DEFENDANTS LEE MELCHIONNI, SYLVIA BENITO, AND KS LAW GROUP'S
REPLY IN SUPPORT OF MOTION TO STAY PROCEEDINGS
EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS**

This Court has already granted Melchionni's and Benito's Motion to Compel Arbitration

and Dismiss in a companion case in which Teh makes many of the same arguments he makes in

opposition to the Motion to Compel and Dismiss in this case. *Allan Teh v. Lee Melchionni, et al.*,

No. 2023-004474-CA-01. If Teh desired swift action then he would have complied with the

167482.00602/132203278v.3

arbitration clause in the governing agreement as he—represented by Mr. Jones—did in the first action he brought relating to his investment in KS Law. In that arbitration he pled "The Agreement between the Parties … contains an arbitration clause set forth in Section 39. Section 39 requires that a dispute between the Parties will be submitted to the American Arbitration Association." (**Exhibit A,** Demand at ¶¶ 25-26). The "delay" resulting from the Motion to Compel Arbitration is of Teh's own making. The Motion to Compel Arbitration is fully briefed, and counsel is in the process of setting a hearing date at the Court's earliest availability. Teh should not be permitted to conduct discovery in this Court in the interim.

Dated: July 26, 2023

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Kenneth L. Bressler*
Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com

Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Direct: 813.255.2323
Michelle.gervais@blankrome.com

*Attorneys for Defendants Benito,*
*Melchionni, and KS Law Group, LLP*

2

=

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed

on this 26th day of July 2023, with the Clerk of the Circuit Court using the Florida Courts e-filing

e-portal and served by an automatic email generated by the Florida Courts e-filing portal to:

Matthew Jones, Esq.
matthew@jones-adams.com
Cheyenne Moghadam, Esq.
c.moghadam@jones-adams.com
JONES & ADAMS, P.A.
999 Ponce de Leon Blvd., # 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778

*Counsel for Plaintiff, Allan Teh*


Andrew Berman, Esq.
Email: aberman@ybklaw.com
YOUNG, BERMAN, KARPF & KARPF, P.A.
825 Brickell Bay Drive, Tower III, Suite 1748
Miami, Florida 33131
Telephone: (305) 945-1851
Facsimile: (786) 219-1981

*Counsel for Defendants Persist Communications, Inc. and Lake Law Firm, LLC*


*/s/ Kenneth Bressler*
Kenneth Bressler
Admitted *Pro Hac Vice*

3

=

# EXHIBIT "A"



**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☑. There is no additional administrative fee for this service.

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent:  KS Law Group, LLP

Address:  20900 NE 30th Ave. Suite 510

| City:  Miami | State:  Florida | Zip Code:  33180 |
|---|---|---|

| Phone No.: | Fax No.: |
|---|---|

Email Address:

Name of Representative (if known):  Kenneth L. Bressler

Name of Firm (if applicable):  Blank Rome, LLP

Representative's Address:  1271 Avenue of the Americas

| City:  New York | State:  New York | Zip Code:  10020 |
|---|---|---|

| Phone No.:  (212) 885-5203 | Fax No.:  (917) 332-3740 |
|---|---|

Email Address:  ken.bressler@blankrome.com

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

The Claimant, Allan Teh, and Respondent, KS Law Group, LLP, executed a Partnership Agreement providing Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP, in exchange for a $4,000,000 capital contribution. This Demand for Arbitration arises from Respondent's failure to comply with Claimant's Demand for Inspection of Records, as required by Section 29-604.06(b) of the Code of ⊞

Dollar Amount of Claim: $  Undetermined Monetary Claim

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☐ Punitive/Exemplary
☐ Other:

Amount enclosed: $  $7,700

In accordance with Fee Schedule: ☐ Flexible Fee Schedule  ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

An attorney with over twenty (20) years of experience in corporate litigaiton.

Hearing locale:  District of Colombia

*(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract

*Please visit our website at www.adr.org/support to file this case online.*
*AAA Customer Service can be reached at 800-778-7879.*



**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | | | |
|---|---|---|---|
| Estimated time needed for hearings overall: | | hours  or  2 | days |

Type of Business:

Claimant:  Allan Teh

Respondent:  KS Law Group, LLP

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?

No.

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Matthew L. Jones | |

Name of Claimant:  Allan Teh

Address (to be used in connection with this case):  999 Ponce de Leon Blvd. Suite 925

| City:  Coral Gables | State:  Florida | Zip Code:  33134 |
|---|---|---|

| Phone No.:  (305) 270-8858 | Fax No.:  (305) 270-6778 |
|---|---|

Email Address:  Matthew@jones-adams.com

Name of Representative:  Matthew L. Jones

Name of Firm (if applicable):  Jones & Adams, P.A.

Representative's Address:  999 Ponce de Leon Blvd. Suite 925

| City:  Coral Gables | State:  Florida | Zip Code:  33134 |
|---|---|---|

| Phone No.:  (305) 270-8858 | Fax No.:  (305) 270-6778 |
|---|---|

Email Address:  Matthew@jones-adams.com

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

**AMERICAN ARBITRATION ASSOCIATION**
**DEMAND FOR ARBITRATION**

In The Matter of the Arbitration

RE:    ALLAN TEH, Claimant

vs.                                                    AAA Case No.: _____

KS LAW GROUP, LLP, Respondent.

Date: November 19, 2022

_____/

The Claimant, Allan Teh, and Respondent, KS Law Group, LLP, (hereinafter collectively, the "Parties") executed a Partnership Agreement (the "Agreement") which provided Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP, in exchange for a $4,000,000 capital contribution. This Demand for Arbitration arises from Respondent's failure to comply with Claimant's Demand for Inspection of Records, as required by Section 29-604.06(b) of the Code of District Colombia (the "Code").

**Background**

1. On August 24, 2021, the Claimant, Allan Teh, and Respondent, KS Law Group, LLP, executed a Partnership Agreement providing Claimant a fifty percent (50%) ownership interest in KS Law Group, LLP. (*See Partnership Agreement attached as Exhibit "A"*).

2. From the execution of the Agreement to the present date, the Respondent has failed to provide Claimant with any substantive correspondence, information or documentation allowing Claimant to assess the value, status and quality of his **$4,000,000 equity interest** in the Respondent.

3. On November 5, 2022, Claimant emailed, and mailed via certified mail on November 7th, 2022, a Demand for Inspection of Records to the Respondent (the "Demand"). (*See Demand attached as Exhibit "B"*)

4. The Demand was made pursuant to Section 29-604.06(b) of the Code of District Colombia, which sets forth a partner's rights and duties with respect to information of the partnership:

> A partnership shall provide partners and their agents and attorneys **access to its books and records**. It shall provide former partners and their agents and attorneys access to books and records pertaining to the period during which they were partners. The right of access provides the opportunity to **inspect and copy books and records** during ordinary business hours. A partnership may impose a reasonable charge, covering the costs of labor and material, for copies of documents furnished.

D.C. Code § 29-604.06(b)

5. After providing the Respondent ten (10) days in which to comply with Claimant's statutory demand, the Respondent failed to provide the records sought.

6. On November 16, 2022, counsel for Respondent submitted a letter to Claimant's counsel. (*See Respondent's letter attached as Exhibit "C", including enclosure*)

7. Respondent's letter did not contain any documents demanded by the Claimant, but instead contained a list of proposed items that would be provided to Claimant upon the execution of a Confidentiality Agreement by Claimant along with Claimant's counsel, Jones & Adams, P.A. (*See Exhibit "C", including enclosure*).

8. Interestingly, the proposed Confidentiality Agreement requests Claimant's counsel, Jones & Adams, P.A., be a signatory of the Confidentiality Agreement but it makes no such request of Respondent's counsel, Blank Rome, LLP.

9. It is important to note that the Partnership Agreement between the Parties is devoid of any reference to the requirement of executing a confidentiality agreement in connection with a statutory demand for books and records.

10. Further, Claimant cannot locate any reference to the requirement of a confidentiality agreement in the D.C. Code.

11. Nevertheless, the Claimant recognizes that all the matters pertaining to the Partnership involve various confidential and proprietary matters and will continue to protect and preserve that information.

12. As is quite clear, Claimant's Demand sets forth ten (10) reasonable requests so that Claimant may adequately assess the value, status and quality of his $4,000,000 equity interest.

13. Respondent's letter only provided proposed inadequate documentation to nine out of the ten requests in Claimant's Demand.

14. In many instances, Respondent's proposed documents did not correlate to Claimant's demands or severely minimized the scope of Claimant's requests.

15. Just by way of example, Claimant requested access to "[c]opies of the financial statements of the Partnership, which include, profit and loss statements, balance sheets, and cash flow statements." (*See ¶ 2 of Exhibit "B"*)

16. To which, Respondent stated in its letter that it would provide "[a] spreadsheet reflecting KS Law's Chase banking activity as of November 10, 2022 and KS Law's monthly bank statements." (*See ¶ 2 of Exhibit "C"*)

17. Not only did Respondent fail to produce the required documents but the proposed documents do not remotely correspond to the Claimant's requests.

18. Regarding Claimant's request for "[a]ll documents relating to Mr. Teh's equity interest in the Partnership", Respondent oddly proposed that it will provide "a letter regarding Mr. Teh's investment, dated May 19, 2022."

19. This oblique reference to a "letter" is clearly an insufficient response to Claimant's request.

20. Claimant also requested the "[u]sernames and passwords to all bank accounts in the name of the Partnership." (*See ¶ 8 of Exhibit "B"*)

21. Respondents did not even acknowledge or address that request.

22. Nor did Respondent address Claimant's request for all "communications regarding the equity interest of Mr. Teh in the Partnership." (*See ¶ 9 of Exhibit "B"*)

23. To date, Claimant has not received the requested books or records, nor has the Claimant been offered or been provided access to inspect the Respondent's books and records as required by the Code. (*See D.C. Code § 29-604.06(b)*).

24. The Agreement between the Parties requires that any dispute arising out of the Agreement shall be settled under the laws of the District of Colombia. (*See Exhibit "A" Section 39*).

25. The Agreement between the Parties further contains an arbitration clause set forth in Section 39.

26. Section 39 requires that a dispute between the Parties will be submitted to the American Arbitration Association and be arbitrated by a single arbitrator in the District of Colombia. (*See Exhibit "A" Section 39*).

27. Due to Respondent's failure to comply with Section 29-604.06(b) Claimant demands this matter proceed to the American Arbitration Association.

## The Claim

Claimant seeks an award and order from the American Arbitration Association requiring Respondent to comply with Claimant's statutory right to inspect the Respondents books and records. Further, as set out in the Agreement, Claimant requests an award of his attorneys' fees, costs and expenses pursuant to Section 39 of the Partnership Agreement.

DATED this 19th day of November, 2022.

**JONES & ADAMS, P.A.**
*Attorneys for Claimant*
Coral Gables Centre
999 Ponce de Leon Boulevard
Suite 925
Coral Gables, FL 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     */s/ Matthew L. Jones*_____
        Matthew L. Jones, Esq.
        Florida Bar No.: 909335

Filing # 178283791 E-Filed 07/26/2023 02:18:42 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 43

COMPLEX BUSINESS LITIGATION

ALLAN TEH,

     On a derivative basis as a
Partner of,

KS LAW GROUP, a District of
Columbia LLP,

     Plaintiffs,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

     Defendants

And

KS LAW GROUP, LLP, a District of
Columbia LLP,

     Nominal Defendant.

---

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that the undersigned attorneys have called up

for hearing:

    DATE:          Wednesday, August 9th, 2023

    TIME:          9:00 a.m.

LOCATION:          VIA ZOOM: https://zoom.us/j/5374476802

JUDGE:             Honorable Lisa S. Walsh

SPECIFIC MATTERS TO BE HEARD:

1. *[DE39]* **DEFENDANTS LAKE LAW AND PERSIST COMMUNICATIONS AMENDED MOTION TO STAY PROCEEDINGS EXCEPT FOR MOTION TO COMPEL ARBITRATION AND TO DISMISS**

2. *[DE38]* **DEFENDANTS LEE MELCHIONNI, SYLVIA BENITO, AND KS LAW GROUPS MOTION TO STAY PROCEEDINGS EXCEPT FOR MOTION TO COMPEL ARBITRATION AND DISMISS**

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that a true and correct copy of the foregoing was E-filed via the Florida Courts E-Filing Portal that generates E-Service upon Counsel of Record this 26 day of July 2023.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**
Attorneys for Plaintiff
825 Brickell Bay Dr., Tower III Ste. 1748
Miami, FL 33131
Tel: 954-809-3300
Direct Tel: (305) 377-2291
Email: aberman@ybkklaw.com
Secondary: eservice@ybkklaw.com

By  /s/ *Andrew S. Berman*
ANDREW S. BERMAN
Florida Bar No.: 370932

!

Filing # 179514514 E-Filed 08/12/2023 03:33:34 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## ORDER STAYING PROCEEDINGS PENDING DISPOSITION OF MOTIONS TO COMPEL ARBITRATION

   **THIS CAUSE** was heard on August 9, 2023 on Defendants' Motions to Stay Pending

hearing on and dispositions of their separate motions to compel arbitration. [D.E. 38, 39]. The

Court, having heard argument of counsel and being otherwise fully advised in the premises, it is,

   ORDERED and ADJUDGED that the Motions to Stay be and the same are

hereby **GRANTED**. The parties are ordered to secure a hearing date on the Motions to Compel

Arbitration during the latter part of September 2023 or sooner, as the Court's and their schedules

permit.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 12th day of August,
2023.

2023-015702-CA-01 08-12-2023 3:13 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

Case No: 2023-015702-CA-01

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com


**Physically Served:**

Filing # 183803540 E-Filed 10/12/2023 09:06:54 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2023-015702-CA-01</u>
SECTION: <u>CA44</u>
JUDGE: <u>Lisa Walsh</u>

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND TO PREPARE A MANDATORY CASE MANAGEMENT REPORT

**WHEREAS**, the Complex Business Litigation Procedures shall apply to all actions in the Complex Business Litigation Section and Fla. R. Civ. P. 1.201 Complex Litigation, except to the extent that, in any particular action, they are superseded by an Order.

**WHEREAS,** the Complex Business Litigation Procedures are designed to facilitate the proceedings of cases by the Eleventh Judicial Circuit Complex Business Litigation Section; to promote the transmission and access to case information by the Court, litigants, counsel, and the public; and to facilitate the efficient and effective presentation of evidence in the courtroom. These Procedures shall be construed and enforced to avoid technical delay, **encourage civility**, permit just and prompt determination of all proceedings, and promote the efficient administration of justice.

**NOTICE IS HEREBY GIVEN** that all outstanding and future motions pertaining to cases within the Complex Business Litigation Section must adhere to Complex Business Litigation Section Procedures, which are available at the court's website:

*http://www.jud11.flcourts.org/About-the-Court/Ourt-Courts/Civil-Court/Complex-Business-Litigation*.

**NOTICE IS HEREBY GIVEN** that on **October 19, 2023** at ____**9:00 AM** via Zoom, the undersigned shall convene a Case Management Conference ("CMC") in this cause.

**The Parties are ordered to provide courtesy copies of <u>all</u> motions and where required, memoranda pertaining thereto, hereinafter filed in this case, to the undersigned Judge via CourtMAP as a supporting document to the event. Courtesy copies are not needed to be e-mailed.**

**Orders, agreed and otherwise, shall be submitted via CourtMAP.**

**Plaintiff is required to provide a full set of pending motion(s) to dismiss, opposition(s) and reply to chambers a minimum of one (1) week prior to the initially scheduled CMC. MOTIONS FILED WITHOUT COURTESY COPIES UPLOADED TO THE EVENT ON COURTMAP AS SUPPORTING DOCUMENTS MAY NOT BE CONSIDERED.**

**<u>Any previously filed motion not in compliance with procedures, e.g., memorandum of law where required, must be resubmitted in conformity with the Complex Business Litigation Procedures</u>**.

**Counsel for Plaintiff(s) and Third Party Plaintiff(s) is/are ORDERED** to confirm all parties subsequently named or appearing herein have been served copies of this Notice and Order. If any subsequently served or named party has not been served with a copy of this notice, Plaintiff and Third Party Plaintiff <u>shall</u> provide the party with a copy of this Notice.

**Trial Counsel and their clients shall appear via Zoom for the CMC.[1]** Failure of any party to attend, including the insurance carrier representative, shall subject that party to sanctions and/or fees.  Regardless of the pendency of any undecided motions, Trial Counsel shall meet no less than 30 days in advance of the CMC and address the following which will be included in the Joint Case Management Report, along with other appropriate topics, including those set forth in Fla. R. Civ. P. 1.201(b) Complex Litigation, some of which subjects and topics will be incorporated into a Case Management Order:

1. The name of lead trial counsel for each party, and the name of any unrepresented party;

2. A brief factual statement of the case;

3. Pleading issues, including service of process, venue, joinder of additional parties, theories of liability, damages claimed and applicable defenses;

4. The identity and number of any motions to dismiss or other preliminary or pre-discovery motions which have been filed and the time period in which they shall be filed, briefed and argued;

5. A discovery plan and schedule including the length of the discovery period, the anticipated number of fact and expert depositions to be permitted and, as appropriate, the length and sequence of such depositions;

5.a.  A description of pertinent documents and a list of fact witnesses the parties believe to be relevant.

6. Anticipated areas of any expert testimony, the number of experts to be called by each party, timing for identification of experts, and exchange of expert reports;

7. An estimate of the volume of documents and computerized information likely to be the subject of discovery from parties and nonparties and whether there are technological means which may render document discovery more manageable at an acceptable cost;

8. The possibility of obtaining admissions of fact and voluntary exchange of documents and electronically stored information, stipulations regarding authenticity of documents,

electronically stored information, and the need for advance rulings from the Court on admissibility of evidence.

9. The advisability of using the general magistrate for discovery purposes at no cost to the parties; and the advisability of using the general and/or a special magistrate(s) for fact finding, mediation, or discovery disputes or such other matters as the parties may agree upon;

10. The time period, after the close of discovery within which post-discovery dispositive motions shall be filed, briefed and argued, and a tentative schedule for such activities;

11. The possibility of settlement and the timing of Alternative Dispute Resolution, including the selection of a mediator or arbitrator(s);

12. Whether or not a party or parties desire to use technologically advanced methods of presentation or court-reporting and, to the extent that this is the case, a determination of the following:

    a. Fairness issues, including but not necessarily limited to use of such capabilities by some but not all of the parties and/or by parties whose resources permit or require variations in the use of such capabilities;

    b. Issues related to compatibility of court and party facilities and equipment;

    c. Issues related to the use of demonstrative exhibits and any balancing of relevance and potential prejudice which may need to occur in connection with such exhibits;

    d. Such other issues related to the use of the Court's and parties' special technological facilities as may be raised by any party or the Court or its technological advisor, given the nature of the case and the resources of the parties.

13. A good faith estimate by counsel for each party based upon consultation with all of the parties of the costs and fees each party is likely to incur in pursuing the litigation through trial court adjudication;

14. A preliminary listing of the principal legal and factual issues which counsel believe will need to be decided in the case;

15. A preliminary listing of any legal principles and facts that are not in dispute;

16. A good faith estimate by counsel for each party of the length of time to try the case;

17. Whether a demand for jury trial has been made.

Within ten (10) days of the meeting among Trial Counsel, but no less than fourteen (14) days in advance of the Case Management Conference, the Parties shall file a Joint Case Management Report addressing the matters described in paragraphs 1 - 17 above and shall provide a courtesy copy to the Court via CourtMap as supporting documents to the event.

All counsel and parties are responsible for filing a Joint Case Management Report in full compliance with this Order. Plaintiff's counsel shall have the primary responsibility to coordinate the meeting of Lead Trial Counsel and unrepresented parties in person, and the filing of the Joint Case Management Report. If counsel is unable to coordinate such compliance, counsel shall timely

notify the Court by written motion to be set and heard on motion calendar or request for a status conference.   Failure to provide the required case management report may subject the violating party(ies) to sanctions and/or fees.

Pursuant to the provisions of Fla. R. Civ. P. 1.201(b)(3), and notwithstanding rule 1.440, at the initial case management conference, the Court will set the trial date or dates no sooner than 6 months and no later than 24 months from the date of the initial case management conference unless good cause is shown for an earlier or later setting. **As provided in the rule, continuance of the trial of a complex action should rarely be granted, and then only upon good cause shown.**

## MANDATORY CASE MANAGEMENT SCHEDULE TO BE FILED

| | |
|---|---|
| ESI EXCHANGE PROPOSAL (including search terms, formats, data sources to be searched, etc) | Proposal - <br><br> Commence Exchange - <br><br> Complete Exchange - |
| MOTIONS TO AMEND/ADD PARTIES <br><br> (Includes Affirmative Defenses) | |
| FACT WITNESS DEPOSITIONS/ DISCOVERY CONCLUDES | |
| INITIAL MEDIATION DEADLINE | On or before |
| NUMBER OF EXPERTS PER PARTY/SIDE | |
| PLAINTIFF/THIRD PARTY PLAINTIFF/CROSS PLAINTIFF(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION <br><br> **MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |

| | |
|---|---|
| DEFENDANT/THIRD PARTY/CROSS DEFENDANT(S) DESIGNATE EXPERTS AND COMPLY WITH CBL 6.3 AND DATES OF AVAILABILITY FOR DEPOSITION<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| REBUTTAL EXPERT DISCLOSURE REPORTS DUE<br><br>**MUST INCLUDE: EXPERTS QUALIFICATIONS, REPORT DETAILING OPINION, BASIS FOR OPINION, AND DOCUMENTS RELIED UPON FOR OPINION** | |
| EXPERT DEPOSITIONS COMPLETED | |
| DISPOSITIVE MOTIONS FILED | |
| DAUBERT/FRYE MOTIONS FILED | |
| MOTIONS IN LIMINE FILED | |
| FINAL MEDIATION DEADLINE | On or before |
| FINAL PRETRIAL CONFERENCE<br><br>**THE COURT SHALL ADDRESS ALL PENDING MOTIONS, INCLUDING JURY INSTRUCTIONS, VERDICT FORM, MOTIONS IN LIMINE, DEPOSITION DESIGNATIONS, OBJECTIONS TO EXHIBITS AND FRYE MOTIONS** | |

---

[1] A representative of the insurance carrier for any insured party who is **not** such carrier's outside counsel and who has decision making authority without further consultation shall attend.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 12th day of October, 2023.

2023-015702-CA-01 10-12-2023 8:52 AM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 184308506 E-Filed 10/19/2023 09:27:52 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## ORDER REQUIRING PARTIES' JOINT CASE MANAGEMENT PRELIMINARY ORDER

The parties shall provide the court a joint order setting deadlines for setting all pending motions. The court will enter an order providing interim cmcs until all preliminary motions are heard. A stay entered previously is lifted.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 19th day of October, 2023.

2023-015702-CA-01 10-19-2023 9:11 AM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com

Case No: 2023-015702-CA-01

Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY,
FLORIDA

ALLAN TEH,

      On a derivative basis as a partner
of

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants,

and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership,

      Nominal Defendant.

_____/

CASE NO.: 2023-015702-CA-01

## LEE MELCHIONNI, SYLVIA BENITO, AND KS LAW GROUP'S JOINDER TO THE LAKE LAW FIRM AND PERSIST COMMUNICATIONS' MOTION FOR SANCTIONS

For the reasons stated for the reasons set forth in the accompanying

motion filed by the Lake Law Firm and Persist Communications in *Teh v.*

*Melchionni, et al.*, Case No. 2023-004474 CA 44, Lee Melchionni, Sylvia Benito,

and KS Law Group hereby move for sanctions against Plaintiff Allan Teh and

Page **1** of 3

his counsel with respect to Mr. Teh's Motion to Enforce Settlement.  *See* Dkt. # 59.

Dated:  December 22, 2023,                    Respectfully submitted,

                                                          **BLANK ROME LLP**

                                                          */s/ Kenneth Bressler*

                                                          Kenneth L. Bressler (*pro hac vice*)
                                                          1271 Avenue of the Americas
                                                          New York, New York 10020
                                                          Phone: 212-885-5000
                                                          Fax: 212-885-5001
                                                          ken.bressler@blankrome.com

                                                          *Counsel for Lee Melchionni, Sylvia*
                                                          *Benito, and KS Law Group*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and served on Matthew Jones, matthew@jones-adams.com, Steven Adams, steve@jones-adams.com and Cheyenne Moghadam, c.moghadam@jones-adams.com on December 22, 2023.

/s/ Kenneth Bressler
Kenneth L. Bressler
Admitted *Pro Hac Vice*

# EXHIBIT

# "A"

Filing # 188032358 E-Filed 12/14/2023 11:58:53 AM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-004474 CA 44

COMPLEX BUSINESS LITIGATION

ALLAN TEH, individually,

     Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

     Defendants.

_____/

## DEFENDANTS PERSIST COMMUNICATIONS AND LAKE LAW'S MOTION FOR SANCTIONS UNDER SECTION 57.105 IN CONNECTION WITH PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT

Defendants, Persist Communications, Inc. and The Lake Law Firm, move for sanctions against Plaintiff and his counsel pursuant to Section 57.105 (1-4), Florida Statutes, in connection with their entirely frivolous and misguided Motion to Enforce a non-existent settlement and state:

1.     In 40 years of practicing law, undersigned counsel can count on one hand the times he served, let alone filed, a motion for sanctions under Section 57.105. It is an extreme remedy and should not be employed cavalierly. But this settlement issue, regrettably, warrants invocation of the remedy because Defendants should not have to pay to defend this vacuous motion, especially at a live hearing, as there are no justiciable issues of law or fact.

1

2.      On October 10, 2023, Plaintiff, through his current counsel, filed a Motion to Enforce Settlement. [D.E. 40].  On October 17, 2023, Defendants filed their Joint Response to the motion. [D.E. 42].  Defendants attach their response to this motion as **Exhibit A** and adopt its contents as if fully set forth herein. In addition to the legal arguments, case law, and facts contained in that response, Persist Communications and Lake Law additionally offer the following:

3.      ***First***, in the initial draft settlement agreement sent by counsel for Plaintiff to the undersigned on September 8, 2023, counsel for Plaintiff recognized that a settlement would not be binding until executed by the parties:

> This Agreement has been, and **upon their execution the Assignments** will be, duly executed and delivered by the Parties hereto and, assuming the due authorization, execution and delivery of this Agreement by the Parties, constitutes, and **upon their execution this Agreement will constitute, valid and binding obligations of the parties, enforceable in accordance with their respective terms**.

Section 7(b)I (Emphasis added).

4.      ***Second***, Plaintiff seems to be relying in large measure on a statement made by counsel for the other Defendants on the morning of September 6, 2023 - at a Case Management Hearing **in a case where neither Persist Communications nor the Lake Law Firm are parties** - as evidence of a settlement with Persist Communications and Lake Law. Persist Communications and Lake Law did not attend that hearing through counsel. That representation cannot bind these Defendants and was only that the parties have an agreement in principle. But one cannot go to the bank with an agreement "in principle." There can be many slips between the cup and the lip.

2

5.      In fact, consistent with counsel for Plaintiff's initial draft settlement agreement of September 8, it was always clear prior to that September 6 Case Management Conference that a settlement was conditioned on a written agreement being executed. In a September 5 email from counsel for Persist Communications and Lake Law to Plaintiff's counsel at 4:51 pm the evening before the hearing, he wrote, "We have not documented a settlement. I said we need to draw up papers. A written settlement was always contemplated."

6.      ***Third,*** and consistent with the foregoing email, while there were settlement discussions and emails between counsel for Persist Communications and Lake Law and Plaintiff, and while some concepts were agreed upon, the settlement was conditioned, from the beginning, on (1) third party financing to fund the settlement payment to Plaintiff and (2) a written settlement agreement. In fact, **even before the final settlement figure was agreed upon**, counsel for Persist Communications and Lake Law sent the following email from his iPhone to counsel for Plaintiff on **Friday September 1, 2023**: "[Client] Has verbal on funds. Waiting for money to hit. If we are in agreement **should move forward on documents conditioned on funding**."

7.      ***Fourth***. Which brings us to the next point.  The hiring of a lawyer does not give the lawyer carte blanch authority to settle.  "A party seeking to compel enforcement of a settlement bears the burden of proving that the attorney has the clear unequivocal authority to settle on the client's behalf." *Tavarez v. Nu-Way Towing Service, Inc.,* 326 So. 3d 133 (Fla. 3d DCA 2021); *Dejour v. Coral Springs KGB, Inc.,* 293 So. 3d 502 (Fla. 4th DCA 2020) (silence by

3

client or lack of objection is not proof that the client gave clear and unequivocal consent to attorney to settle case).

8.     While Defendants' counsel had authority to negotiate the framework of the settlement and lay out tentative agreement on its terms, it was always subject to being reduced to writing where the clients would have the final word to ratify what was negotiated through later execution of a formal agreement.

9.     As it went, the parties had exchanged settlement drafts and redlines which exposed large fissures in their understanding of the deal and its terms, the primary one being that it was conditioned on third-party funding. Plaintiff wanted a judgment against all Defendants if the funds were not paid, while defense counsel reminded and redlined the draft to make clear that, from inception, it was conditioned on third-party funding.

10.    Thus, a month before the motion to enforce settlement was filed (and through this initial draft three days after counsel agreed to a framework for settlement), even the Plaintiff knew and contemplated, and rightfully so, that until pen was put to paper, there is no deal.

11.    In sum, there is currently no agreement to settle, and frankly Plaintiff's specious and frivolous motion is giving these Defendants second thoughts on whether they want one.  There are no justiciable issues of law or fact regarding whether a binding settlement agreement exists.  It does not.

WHEREFORE, Defendants move for attorney's fees against Plaintiff and his counsel because there are no justiciable issues of law or fact.

4

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 14th day of December 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com and Blank Rome LLP, Michelle M. Gervais, Esq, and Kenneth L. Bressler, Esq. 100 S. Ashley Drive Suite 600, Tampa, FL, michelle.gervais@blankrome.com, ken.bressler@blankrome.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com

*/s/ Andrew S. Berman*

Andrew S. Berman
Florida Bar No.: 370932

5

Filing # 184431700 E-Filed 10/20/2023 12:55:16 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-004474  CA 44

ALLAN TEH, individually,

      Plaintiff,

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

      Defendants.

_____/

COMPLEX BUSINESS LITIGATION

## DEFENDANTS' JOINT RESPONSE TO MOTION TO ENFORCE FOR SETTLEMENT

Defendants jointly respond to Plaintiff's Motion to Enforce Settlement.

On July 17, 2023, this Court dismissed this action and granted Defendants Melchionni and Benito's Motion to Compel Arbitration. Dkt. # 36. The Court thus lacks jurisdiction to hear Plaintiff's Motion to Enforce Settlement. Courts have routinely held that broad arbitration provisions, like in the KS Law Partnership Agreement here, cover disputes relating to the validity and enforcement of a settlement agreement resolving claims thereunder. *See Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 484 F. Supp. 2d 850, 853–54 (N.D. Ill. 2007); *Prime Vision Health Inc. v. Indiana Eye Clinic PC*, 1P00-0096-C-B/S, 2000 WL 977397, at *4 (S.D. Ind. July 13, 2000). For example, in

1

**"EXHIBIT A"**

*Trustmark Ins. Co*, an arbitration clause covering disputes "related to" a contract included claims relating to the validity of a settlement agreement purporting to settle claims in a dispute involving the parties' performance of the contract and the funds owed thereunder. *Trustmark Ins. Co.* 484 F. Supp. 2d at 853-54; *see also Prime Vision Health Inc. v. Indiana Eye Clinic PC*, 1P00-0096-C-B/S, 2000 WL 977397, at *4 (S.D. Ind. July 13, 2000) ("In order to enter into a settlement agreement, there must be an underlying dispute to settle. In this case, the dispute allegedly resolved by the Settlement Agreement was the alleged breach of the ASA...**we find, as a matter of law, that this dispute had its origin in the ASA...and is, therefore, well within the scope of the ASA's arbitration clause.**") (emphasis added).

But even if the Court does consider Plaintiff's motion, the motion is specious and designed solely to try to poison the Court against Defendants by forcing an evidentiary hearing that will show Plaintiff receiving consideration to go away. The thought is that if Defendants, or any of them, are willing to unwind the transactions, they must have done something wrong.

Defendants do not believe the Court will be swayed by such tactics and will compartmentalize settlement discussions from merits arguments should the case not settle.

While there was a settlement in principle, two aspects of the settlement remain outstanding. Acceptable documentation and funding, as evidenced by the following:

1. On August 24, 2023, Andrew Berman, counsel for Persist Communications, Inc. ("Persist Communications") and The Lake Law Firm, LLC ("Lake Law") sent Mathew Jones, counsel for Alan Teh, an email confirming that the principal of his clients is raising funds to buy out Teh's position in the various funds.

2. On September 1, 2023, Mr. Berman informed Mr. Jones that his client has a verbal on funds and that they "should move forward on documents **conditioned on funding**." (Emphasis supplied.)

3. On September 5, 2023, Mr. Berman again confirmed to Mr. Jones that his client "has a verbal confirmation of funds but until he has them in hand we cannot formally close, although we can document."

4. Later that day the parties agreed on the amount of the settlement and Mr. Jones acknowledged Mr. Berman's missive that the parties cannot close until funds are in hand but that the parties can document the agreement.

5. And on that day, Kenneth Bressler, counsel for Justice Partners, KS Law Group, Lee Melchionni and Sylvia Benito, informed this Court that the parties had a "settlement in principle."

6. The parties have exchanged several drafts of a settlement agreement but have not come to a final agreement on the provisions. And funds are not in hand, preventing a settlement from closing.

It is well settled in Florida that an enforceable settlement agreement requires an acceptance of an offer that is "(1) absolute **and unconditional;** (2) identical with the terms of the offer; and (3) in the mode, at the place, and within

3

the time expressly or impliedly." *Vision Palm Springs, LLLP v.Michael Anthony Co.*, 272 So. 3d 444 (Fla. 3d DCA 2019) (emphasis added).  It is black letter contract law that in the absence of the performance of a condition precedent, no settlement agreement is formed. S. *Internet Sys., Inc. ex rel. Menotte v. Pritula*, 856 So. 2d 1125, 1128 (Fla. 4th DCA 2003) (no enforceable settlement agreement existed in the absence of condition requiring board approval of settlement agreement and where board acknowledged that the company did not have financing to comply with settlement terms) (emphasis added). Here, while the parties agreed on an amount in principle, that agreement was **conditioned on funding** as explained above.   In other words, there will be no enforceable settlement agreement unless and until funding is in hand.

Moreover, without a signed agreement executed by all parties, there is no binding settlement agreement for Teh to enforce. *See Rork v. Las Olas Co.*, 23 So. 2d 839, 842 (Fla. 1945) ("where parties intend that their verbal negotiations shall be reduced to writing as the evidence of the terms of their agreement, there is nothing binding on them until the writing is executed"); *see also Stoothoff v. Hobdy*, 79 So. 3d 198 (Fla. 5th DCA 2012) ("where it appears 'that the parties, or either of them, intended that the contract should be reduced to writing, so that its terms would be fully understood and definitely stated in the writing, the contract will not be regarded as complete or binding until it is reduced to writing and acquiesced in by both parties.") Because no settlement agreement has been signed by any party, and the very terms of the draft proposals and the parties' conduct evidence that no one intended to be bound without an executed final

4

agreement, Teh cannot establish a binding obligation. Put simply, there is no settlement to enforce.

Here, the settlement proposal offered by Teh's lawyer indicates that no obligations would arise until "execution of this Agreement"—not any time sooner. Indeed, the parties' contemplated the timeframe for payment being 5 days after the settlement agreement's "full execution". In analogous circumstances, Florida courts have confirmed that such requirements preclude court enforcement of a settlement agreement:

> Thus, the signatures of all parties establish the effective date that triggers the thirty-day clock for the Coscan Defendants's payment of the funds. **Without signatures, there is no effective date. Without an effective date, there is no obligation to pay. Accordingly, the trial court erred when it imposed its own effective date.**

*Vision Palm Springs, LLLP*, 272 So. 3d at 448 (emphasis added). The same result would readily extend here.

The foregoing unequivocally establishes that there was no FINAL settlement and that there would be none until the settlement was documented and the funds are in hand. For any one of the following reasons, the Motion to Enforce Settlement lacks merit and should be denied outright.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via the e-portal system this 20th day of October 2023, to Jones & Adams, P.A. Matthew Jones, Esq, 999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, matthew@jones-adams.com and Blank Rome LLP, Michelle M.

5

Gervais, Esq, 100 S. Ashley Drive Suite 600, Tampa, FL, michelle.gervais@blankrome.com.

**YOUNG BERMAN KARPF & KARPF, P.A.**
Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Dr., Tower III, Ste. 1748
Miami, Florida 33131
Tel. 305-377-2290
aberman@ybkklaw.com


   /s/ Andrew S. Berman

Andrew S. Berman
Florida Bar No.: 370932

*Attorney for The Lake Law Firm and
Persist Communications, Inc.*

**BLANK ROME LLP**
Kenneth L. Bressler (pro hac vice)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
ken.bressler@blankrome.com


Michelle M. Gervais
Florida Bar No. 173827
100 S. Ashley Drive, Suite 600
Tampa, FL 33602
Phone: 813.255.2323
Michelle.gervais@blankrome.com

*Attorneys for Lee Melchionni and Sylvia
Benito*

Filing # 189108217 E-Filed 01/04/2024 02:58:24 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

      On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

      Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

      Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

      Nominal Defendant in Derivative Action.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FLORIDA STATUTE § 57.105 [DE #48] COMPEL ARBITRATION AND DISMISS

Plaintiff, ALLAN TEH ("Teh") as the fifty percent (50%) owner of KS Law Group, LLP ("KS Law" or "Partnership"), by and through undersigned counsel, hereby files this Response in Opposition to Defendants, Lee Melchionni ("Melchionni") and Sylvia Benito's ("Bentio"), Motion for Sanctions Pursuant to Florida Statute § 57.105 [DE# 67] (the "Response"), and in support thereof states as follows:

## INTRODUCTION

On December 14th, 2023, Defendants, Lake Law and Persist, through Counsel Andrew Berman, Esq. ("Mr. Berman"), filed their Motion for Sanctions [DE #47] against Plaintiff, Allan Teh in the Related Case, *Teh v. Melchionni, et al.*, Case No. 2023-004474-CA 43 [DE #47]. On December 12th, 2023, Mr. Bressler, Counsel for Benito and Melchionni, filed their Motion for Sanctions [DE #67] in the present action. Rather than drafting a separate Motion Mr. Bressler has chosen to merely incorporate the entirety of Mr. Berman's Motion as his argument for why sanctions should be imposed upon the Plaintiff and his counsel (hereinafter referred to as the "Joint Motion").

Defendants' Joint Motion is attempting to credibly contend that the mere filing of Plaintiff's Motion to Enforce Settlement [DE #59] constitutes a sanctionable offense. Defendants argue this while the parties have represented to this Court that this matter is settled and an Order on Reported Settlement (the "Order") was entered by this Court reflecting the same. *See Order on Reported Settlement attached as* **Exhibit 1.** This Court's Order alone demonstrates how baseless and in bad-faith the Joint Motion is and the credible fact and legal bases Plaintiff has to enforce the settlement between the Parties.

Despite Defendants' selective reference to "favorable" and out of context email excerpts, this case and the related cases are settled. The related cases include: *Teh v. Justice Partners, LLC*, et al., Case No. 2022-022470-CA-1; *Teh v. Melchionni, et al.*, Case No. 2023-004474-CA 43; and *Teh v. Justice Partners*, LLC, et al., Case No. 2023-018039-CA-0 (the "Related Cases"). The parties in this case, and the Related Cases, have agreed that these matters are settled, have represented to this Court that these

matters are settled, and Defendants are now choosing to misrepresent the terms and enforceability of the settlement agreement. Not only are Defendants misrepresenting the terms and enforceability of the settlement agreement but they are somehow contending that Plaintiff's valid and reasonable attempts to enforce the settlement amount to a sanctionable offense.

The Joint Motion is merely another attempt by the Defendants to inappropriately discredit and disparage Plaintiff's legal and factual arguments. Thus far, five baseless Motions for Sanctions have already been filed by Mr. Bressler, counsel for Melchionni and Benito. Those motions include an additional Motion for Sanctions in this Case [DE #37], two Motion for Sanctions in the Related Case, *Teh v. KS Law Group, LLP, et al*, Case No. 2023-004474 CA 44 [DE #48] [DE #30], and two additional Motion for Sanctions [DE #146] [DE #135] in Related Case, *Teh v. Justice Partners*, LLC, et al., Case No. 2023-018039-CA-0. Neither Mr. Bressler's prior Motions for Sanctions or the present Joint Motion set forth any sanctionable offense. The Joint Motion reads more so as a response to Plaintiff's Motion to Enforce Settlement [DE #59], and should be seen by this Court as nothing more than another bite at the apple to argue against Plaintiff's valid grounds to enforce the settlement between the parties.

## **LEGAL STANDARD**

Regarding an award of attorney's fees under section 57.105, Florida Statutes (2001), the trial court's findings must be based upon substantial competent evidence presented to the court at the hearing on attorney's fees, or otherwise before the court and in the trial record. *Davis v. Bailynson*, 268 So. 3d 762, 765 (Fla. 4th DCA 2019). Furthermore, the statute must be applied with restraint to ensure that it serves its intended

purpose of discouraging baseless claims without casting a chilling effect on use of the courts. *Schurr v. Silverio & Hall, P.A.*, 290 So.3d 634, 637 (Fla 2d DCA 2020).

A claim is supported by the material facts, within the meaning of statute authorizing an award of attorney fees against a losing party who knew or should have known that the claim was not supported by the material facts, when the party possesses admissible evidence sufficient to establish the fact if accepted by the finder of fact. *Casey v. Jensen*, 189 So.3d 924, 926 (Fla 2d DCA 2016). Where a party reasonably believes the factual basis for its claim exists, it is entitled to proceed with its claims and seek to prove those facts, for purposes of statute allowing award of fees as a sanction for raising unsupported claims or defenses; if attempts to prove those facts are fruitless, that is still not cause for sanctions where the party's initial belief was well-founded. *MC Liberty Express, Inc. v. All Points Services, Inc.*, 252 So.3d 397, 403 (Fla 3d DCA 2018). Where there is an arguable basis in law and fact for a party's claim, a trial court may not sanction that party under statute on fee awards as a sanction. *Minto PBLH, LLC v. 1000 Friends of Florida, Inc.*, 228 So.3d 147, 149 (Fla. 4th DCA 2017).

Section 57.105 authorizes an attorney's fees award to the prevailing party in any civil action in which the court finds that there was a complete absence of a justiciable issue of either law or fact raised by the complaint. Such fees will only be awarded where the court finds that the action is frivolous and "so clearly devoid of merit both on the facts and the law as to be completely untenable." *Young v. Ganese Dharamdass*, 695 So. 2d 828, 829 (Fla. 4th DCA 1997).

## ARGUMENT

Section 57.105 authorizes an attorney's fees award to the prevailing party in any civil action in which the court finds that there was a complete absence of a justiciable

issue of either law or fact. Defendants' own Motion for Sanctions highlights the multitude of issues of law and fact surrounding the global settlement between the parties which resolved the claims and disputes in this Case as well as the Related Cases. Defendants' Joint Motion requests this Court to impose sanctions purely based on their one-sided rendition of facts.

This misplaced tactic is accompanied with no legal authority to support that sanctions should be imposed for a party seeking to enforce a settlement agreement. Settlement agreements have been long favored by the courts as a means to conserve judicial resources, and courts will enforce them when it is possible to do so. *See Spiegel v. H. Allen Holmes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2002); *see also Long Term Mgmt., Inc. v. Univ. Nursing Ctr., Inc.*, 704 So.2d 669, 673 (Fla. 1st DCA 1997). The Florida Supreme Court has been clear that "[t]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." *Robbie v. City of Miami*, 469 So.2d 1384 (Fla.1985). *see also Silva v. Silva*, 467 So. 2d 1065, 1065 (Fla. 3d DCA 1985) (affirming trial court's order enforcing an oral settlement agreement where disputed but substantial evidence showed the parties orally agreed to terms of a settlement agreement following the parties representation to the court that a settlement had been reached during a status conference); *see also Don L. Tullis and Assocs., Inc. v. Benge,* 473 So.2d 1384 (Fla. 1st DCA 1985) (finding that the plaintiff need only show defendant's assent to the essential terms to enforce the settlement agreement).

Defendants' "arguments" in favor of sanctions furthers the need for an evidentiary hearing to be held on Plaintiff's Motions to Enforce Settlement, it does not retract from that need. Defendants are requesting this Court to impose sanctions based on a one-side, unverified, and unsworn rendition of facts. Facts that are easily refuted.

The Parties have agreed to all essential terms to enforce the settlement agreement. The Parties have agreed to the settlement amount, which is in the millions. Additionally, conspicuously left out of Defendants self-serving selection of email correspondences is Mr. Berman's September 11th, 2023, email in which he stated "[t]he hearings on our motions to compel and dismiss are scheduled for October 19. . . **[w]e have until October 18 to fund**." The referenced hearing took place in the Related Case of *Teh v. Melchionni, et al.*, Case No. 2023-015702-CA 43.

Following Mr. Berman's September 11th email, drafts of the written memorialization of the settlement were circulated and the "October 18" fund date was added by Mr. Berman. The Parties therefore have agreed to not only the settlement amount, which is undisputed in Defendants' Joint Motion, but also the timing in which that payment was to be made. It is the responsibility of the Defendants to acquire the agreed to amount in funds, not the Plaintiffs. Defendants' failure to do so constitutes a material breach of the agreement. As of the filing of this Response Plaintiff has yet to receive the agreed to funds. Not only did Defendants fail to fund on October 18th, 2023, but Defendants proceeded with the October 19th, 2023, hearing on their Motions to Compel Arbitration and Dismiss.

Additionally, despite the Plaintiff and all Defendants, in this action and the Related Cases, entering into an enforceable settlement, Mr. Berman is now attempting to distance

himself from the representations made by Mr. Bressler before this Court. The Defendants'

wish this Court to view their representations as separate even as they work in direct

concert with each other, making identical arguments, and filing this Joint Motion.

To use Defendants' own words, sanctions under Section 57.105 "is an extreme

remedy and should not be employed cavalierly." *See ¶ 1 of Joint Motion.* Notwithstanding

the sentiment of Defendants' statement their Motion for Sanctions does not set forth a

single argument that would warrant sanctions being imposed. Plaintiff sets forth the above

arguments to demonstrate the clear factual and legal bases Plaintiff has to file and move

forward with his Motions to Enforce Settlement.

This Court should look to the clear message sent by United States District Court

Judge Carlos Mendoza's ruling in *Claudet v. First Fed. Credit Control, Inc.*, 2015 WL

7984410 (M.D. Fla. Nov. 17, 2015). Judge Mendoza awarded attorneys' fees **against** the

filer of an improper motion for sanctions, finding it was filed for the improper purpose to

harass opposing counsel. Judge Mendoza's Order speaks directly to the present facts.

> "Perhaps the most startling aspect of Defendant's motion **is the unsupported premise that defense counsel's proclamation of factual conclusions was the coup de grâce**. Under Defendant's theory, a reasonably competent attorney would have discharged his or her client's case based solely upon opposing counsel's statements regarding discrete factual issues–i.e., actual knowledge. Thus, Defendant's motion will be denied."

Both Mr. Bressler and Mr. Berman have intentionally chosen to base their Motions

for Sanctions on their "proclamation of factual conclusions." Defendants' Counsel cannot

be permitted to continue their vexatious and intentionally harassing behavior and in doing

so, weaponize this Court's power to impose sanctions. To allow such would encourage

the chilling effects courts have steadfastly warned of in imposing baseless sanctions

under Section 57.105. *Schurr v. Silverio & Hall, P.A.*, 290 So.3d 634, 637 (Fla 2d DCA 2020).

**WHEREFORE,** Plaintiff, Allan Teh, respectfully requests that this Court deny Defendants, Lee Melchionni Sylvia Benito, and KS Law's, Motion for Sanctions Pursuant to Florida Statute § 57.105 [DE #67].

<u>**CERTIFICATE OF SERVICE**</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 4th day of January, 2024.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:    /s/ Matthew L. Jones, Esq.
Matthew L. Jones, Esq.
Florida Bar No. 909335

Filing # 181192414 E-Filed 09/06/2023 11:14:06 AM

# Exhibit 1

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-022470-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**Justice Partners, LLC**

Defendant(s)

_____/

## ORDER ON REPORTED SETTLEMENT

Based on the parties' reported settlement, the parties shall either upload a proposed order dismissing the case or file a voluntary settlement within 30 days of this order or the court will dismiss the case reserving jurisdiction to enforce the settlement.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 6th day of September, 2023.

2022-022470-CA-01 09-06-2023 10:29 AM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Amanda Noonan, amanda.noonan@blankrome.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Elizabeth V. Young, elizabeth.young@blankrome.com

Case No: 2022-022470-CA-01                                    Page 1 of 2

Elizabeth Virginia Young, Elizabeth.Young@BlankRome.com
Eric Rojo-Dotel, e.rojodotel@jones-adams.com
Kenneth Bressler, ken.bressler@blankrome.com
Kenneth L Bressler, ken.bressler@blankrome.com
Kenneth L. Bressler, ken.bressler@jones-adams.com
Matthew L. Jones, matthew@jones-adams.com
Michael R Esposito, Michael.Esposito@BlankRome.com
Michael R Esposito, BRFLeservice@blankrome.com
Michael R Esposito, sol.cruz@blankrome.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com
Steven Adams, steven@jones-adams.com


**Physically Served:**

Filing # 190836425 E-Filed 01/30/2024 01:05:24 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

### AGREED ORDER STAYING THE CASE PENDING RESULT OF ARBITRATION

**THIS CAUSE** having come before this Court and the Court being fully advised of the agreement of counsel, it is hereupon,

**ORDERED** and **ADJUDGED** that On October 27th, 2023, the Court entered an "Order Granting Motions to Compel Arbitration by Both Signatories and Non-Signatories to the Partnership Agreement Containing the Arbitration Provision" [DE #64], in which this Court compelled arbitration of the above-captioned case. Due to the possibility of post arbitration enforcement of any award, or other disposition, and the possible need for equitable relief/receivership, the Court reserved jurisdiction and kept this case open. But other than the receivership issues and pending motions for sanctions, there are no other substantive issues extant and thus no need for monthly CMC's or close monitoring while the arbitration is proceeding. Accordingly, all CMC's are cancelled.

The parties shall set this case for a status hearing in 180 days. Failure to set the case for status will result in the presumption that the case has been resolved through arbitration, no further judicial action is required and the court will dismiss this case.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>30th day of January, 2024</u>.

<u>2023-015702-CA-01 01-30-2024 12:53 PM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com


**Physically Served:**

Filing # 199206968 E-Filed 05/25/2024 08:23:24 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

### ORDER DENYING PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT [DE #59]

THIS CAUSE, having come before this Court on Plaintiff's Motion to Enforce Settlement [DE #59] (the "Motion") filed on October 10th, 2023, and the Court having taken evidence, heard argument of counsel on April 15, 2024, reviewed the file, and being otherwise fully advised in the premises, it is

**ORDERED** and **ADJUDGED** that the Plaintiff's Motion is DENIED.

The court incorporates a transcript of proceedings April 15, 2024.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 25th day of May, 2024.

2023-015702-CA-01 05-25-2024 8:14 AM
 Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

Case No: 2023-015702-CA-01

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 199206968 E-Filed 05/25/2024 08:25:24 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

### ORDER DENYING PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT [DE #59]

THIS CAUSE, having come before this Court on Plaintiff's Motion to Enforce Settlement [DE #59] (the "Motion") filed on October 10th, 2023, and the Court having taken evidence, heard argument of counsel on April 15, 2024, reviewed the file, and being otherwise fully advised in the premises, it is

**ORDERED** and **ADJUDGED** that the Plaintiff's Motion is DENIED.

The court incorporates a transcript of proceedings April 15, 2024.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 25th day of May, 2024.

2023-015702-CA-01 05-25-2024 8:14 AM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

Case No: 2023-015702-CA-01                                                    Page 1 of 2

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com


**Physically Served:**

Filing # 226531087 E-Filed 07/02/2025 04:18:04 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

### ORDER SCHEDULING CASE MANAGEMENT CONFERENCE

This cause has been scheduled for a Case Management Conference on **November 10th, 2025** at **09:00 AM**, via zoom https://zoom.us/j/5374476802.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 2nd day of July, 2025.

2023-015702-CA-01 07-02-2025 4:02 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

Case No: 2023-015702-CA-01

**Electronically Served:**

- Andrew Scott Berman: aberman@ybkklaw.com
- Andrew Scott Berman: eservice@ybkklaw.com
- Cheyenne Moghadam: c.moghadam@jones-adams.com
- Matthew L. Jones: matthew@jones-adams.com
- Daniel Bitran: dbitran@mitrani.com
- Daniel Bitran: jlopez@mitrani.com
- Daniel Bitran: miamidocketing@mitrani.com
- Isaac J. Mitrani: imitrani@mitrani.com
- Isaac J. Mitrani: jlopez@mitrani.com
- Jesus A. Lopez: jlopez@mitrani.com

Filing # 228286528 E-Filed 07/29/2025 02:29:42 PM

IN THE CIRCUIT COURT OF THE
11th JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702 CA 44

ALLAN TEH,                                      COMPLEX BUSINESS LITIGATION

derivatively on behalf of,

KS LAW GROUP, a District of
Columbia LLP,

     Plaintiffs,
v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS,
INC., a Florida Corporation, and
THE LAKE LAW FIRM, a New York
Limited Liability Company,

     Defendants

and

KS LAW GROUP, LLP, a District of
Columbia LLP,

     Nominal Defendant.

---

### NOTICE AND CLAIM OF ATTORNEY'S CHARGING LIEN

**ALL PARTIES TO THIS CAUSE AND ALL OTHERS TO WHOM IT MAY CONCERN ARE HEREBY CALLED UPON TO TAKE NOTICE THAT:**

1.    The Law Office of **YOUNG BERMAN KARPF & KARPF, P.A.,** hereby files its Notice and Claim of Attorney's Charging Lien in the total sum of TWENTY SIX THOUSAND TWO HUNDREN NINE DOLLARS AND 19/100 ($26,209.19) as of July 14, 2025 as due as compensation for professional legal services rendered

1

on behalf of Defendants, **THE LAKE LAW FIRM, LLC and PERSIST COMMUNICATIONS, INC.** plus pre-judgment interest contractually agreed upon (1% per month) accruing thereafter until paid.

2.     This Charging Lien also covers all fees for professional services and suit monies and costs thereafter incurred as well.

3.     This Charging Lien is being filed pursuant to Florida law and the Retainer Agreement entered into between said law firm and Defendants, **THE LAKE LAW FIRM, LLC and PERSIST COMMUNICATIONS, INC.**, dated April 18, 2023, and relates to all rights, title and interest in any and all real or personal property as authorized in said Retainer Agreement.

4.     This Charging Lien relates back to the date of the Retainer Agreement referred to above and is superior in dignity to any other liens subsequent to that date.

Under penalties of perjury, I declare that I have read this document, and the facts stated in it are true.[1]

Executed this 29th  day of July, 2025.

**YOUNG, BERMAN, KARPF & KARPF, P.A.**

BY:    /s/ ANDREW S. BERMAN
ANDREW S. BERMAN, ESQ.
Florida Bar No. 370932

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been

---

[1] This Attestation is in accordance with Florida Supreme Court Administrative Order No. AOSC20 (present version and all prior Amendments).

2

served via the e-portal system on this 29th day of July 2025, to: Jones & Adams, P.A. Matthew Jones, Esq., matthew@jones-adams.com,  999 Ponce de Leon Blvd #925, Coral Gables, FL 33134, Cheyenne Moghadam, Esq., c.moghadam@jones-adams.com, Issac J. Mitrani, Esq., imitrani@mitrani.com, Daniel Bitran, Esq., dbitran@mitrani.com, Ian Weiss, Esq., iweiss@seidenlaw.com, Matt Gelber, Esq., matt@gelberlawgroup.com, and, Edward Lake, edlakelaw@yahoo.com.

Respectfully Submitted,

**YOUNG BERMAN KARPF & KARPF, P.A.**
Prior Counsel for The Lake Law Firm and
Persist Communications, Inc.
825 Brickell Bay Drive
Tower III, Ste. 1748
Miami, Florida 33131
Telephone: 305-945-1851
Direct Tel. 305-377-2290
Email: aberman@ybkklaw.com
Email: eservice@ybkklaw.com

　　/s/ Andrew S. Berman
Andrew S. Berman
Florida Bar No.: 370932

3

Filing # 234233486 E-Filed 10/22/2025 02:20:09 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

       On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

       Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

       Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

       Nominal Defendant in Derivative Action.

_____/

**PLAINTIFF'S MOTION TO CONFIRM FINAL ARBITRATION AWARD AND FOR
ENTRY OF FINAL JUDGGMENT**

       Plaintiff, Allan Teh, as 50% owner of KS Law Group, LLP by and through undersigned

counsel hereby files this Motion to Confirm Final Arbitration Award and for Entry of Final

Judgment:

1

## **INTRODUCTION**

Plaintiff, hereinafter referred to as Claimant, Allan Teh, on a derivative basis as a partner of KS Law Group, LLP ("KS Law"), respectfully moves this Court, pursuant to Section 682.12 of the Florida Revised Arbitration Code, for an Order confirming the Final Arbitration Award (the "Final Award") issued on October 14, 2025, by Arbitrator Sheila J. Carpenter of the American Arbitration Association ("AAA"). The Final Award, a true and correct copy of which is attached hereto as **Exhibit A**, was rendered in favor of KS Law and against Defendants/Respondents Sylvia Benito ("Benito") and Lee Melchionni ("Melchionni") following a comprehensive and hard-fought arbitration.

The Final Award grants KS Law substantial monetary relief totaling $3,075,266.16, plus the significant non-monetary relief of the appointment of a receiver to protect KS Law's interests. This Motion seeks to convert that decisive victory into an enforceable Final Judgment. The specific monetary awards against Respondents Benito and Melchionni, for which KS Law seeks a corresponding Final Judgment from this Court, are as follows:

| Award Component | Amount | Liability |
|---|---|---|
| Compensatory Damages | $2,500,000.00 | Joint and Several |
| Attorneys' Fees | $324,098.00 | Joint and Several |
| Costs | $183,080.66 | Joint and Several |

2

| Award Component | Amount | Liability |
|---|---|---|
| Sanction (vs. Melchionni) | $50,000.00 | Lee Melchionni, Individually |
| Sanction (vs. Benito) | $10,000.00 | Sylvia Benito, Individually |
| AAA Fee Reimbursement | $8,087.50 | Joint and Several |

As established herein, judicial review of an arbitration award is exceedingly narrow. Under Florida law, confirmation is a mandatory, summary proceeding.  Absent a timely and meritorious motion to vacate or modify the award on exceedingly limited statutory grounds, none of which exist here, this Court has no discretion and must confirm the Final Award.

### FACTUAL AND PROCEDRUAL BACKGROUND

**A.  The Underlying Dispute and this Court's Order Compelling Arbitration**

This action returns to the Court where it originated. The dispute arises from the formation and operation of KS Law, a District of Columbia law firm formed on August 24, 2021. The firm was structured with Claimant Teh owning a 50% interest, while Respondents Benito and Melchionni each owned a 25% interest. Critically, Teh provided 100% of the firm's capital via a single $4 million wire transfer on September 3, 2021.

When a dispute arose concerning Respondents' management of that capital and their fiduciary duties to the partnership, Teh initiated this derivative action in this Court. By Order dated

3

October 27, 2023, the Honorable Lisa Walsh compelled the parties to arbitrate their dispute pursuant to the binding arbitration agreement contained within the KS Law Partnership Agreement. *See October 27, 2023, Order attached as **Exhibit B**.* This Court, therefore, has both jurisdiction over this matter and a foundational familiarity with its history.

### B. The Comprehensive and Thorough Arbitration Proceeding.

The ensuing arbitration before the AAA was a comprehensive and rigorous adversarial process that afforded all parties, including Respondents Benito and Melchionni, full and complete due process. The proceeding was not a cursory review but a deep and thorough examination of the facts and law, which included:

- **Extensive Discovery:** The parties engaged in extensive discovery as permitted by their arbitration agreement.

- **Lengthy Evidentiary Hearings:** The Arbitrator presided over seven days of evidentiary hearings from January 6-10 and 13-14, 2025, where the parties presented testimony and evidence. An additional full-day hearing was held on April 24, 2025, to address Claimant's post-hearing motion for sanctions.

- **Competent Legal Representation:** All parties were represented by multiple, highly competent legal counsel throughout the entirety of the proceedings.

- **Extensive Briefing:** Following the evidentiary hearings, the parties submitted comprehensive post-hearing briefing to the Arbitrator.

- **Adjudication of Sanctions:** After the initial hearings, Teh filed a Motion for Sanctions based on newly discovered evidence that Respondents had been untruthful in their

4

testimony regarding their financial interests in other law firms. This motion was fully litigated, briefed, and resulted in the additional evidentiary hearing in April 2025.

This exhaustive process ensures that the resulting Final Award is the product of a fair, deliberate, and complete adjudication on the merits.

### C. The Arbitrator's Detailed Findings and Issuance of Final Award.

On October 14, 2025, after nearly a year of litigation, hearings, and deliberation, Arbitrator Carpenter issued a comprehensive, 25-page Final Award containing meticulous findings of fact and conclusions of law. The Arbitrator's core findings were dispositive and damning for Respondents:

- **Breach of Fiduciary Duty:** The Arbitrator found unequivocally that Benito and Melchionni breached their fiduciary duties of care and loyalty owed to KS Law.

- **Gross Negligence:** The Arbitrator found specific acts of gross negligence, including the reckless decision to transfer nearly all of KS Law's $4 million in capital to a single vendor immediately upon receipt and without a firm contract in place, an "oversight" that was not "corrected" for over a year. She also found Melchionni was grossly negligent for failing to obtain liability insurance for the partnership as required by the Partnership Agreement.

- **Lack of Credibility and Sanctions:** Most critically, the Arbitrator made severe adverse credibility findings against both Respondents Melchionni and Benito. The Arbitrator found their testimony, particularly Melchionni's, to be "misleading at best" and that they failed to be candid with the Arbitrator and opposing counsel. This misconduct was so clear that the Arbitrator imposed specific monetary sanctions of $50,000 against Melchionni and $10,000 against Benito for their "misleading testimony".

The Final Award is more than a simple ruling; it is a judicially-crafted fortress, deliberately constructed by an experienced arbitrator to be impervious to the limited judicial review permitted under the applicable law. The Arbitrator did not merely accept Claimant's arguments but conducted her own independent analysis, anticipating and neutralizing potential avenues of attack on the Award. For example, she expressly rejected the damages model put forth by Claimant's expert, which was based on profit projections, noting that the "failure to meet projections for an investment... cannot normally be the basis for damages". Instead, she crafted her own damages model based on the tangible "price paid" for client "cases" versus the "value" of what was actually received, thereby inoculating the award from any challenge that the damages were speculative.

Furthermore, the Arbitrator noted that Respondents argued they could only be held liable for "gross negligence." While the Arbitrator stated she did not agree with that interpretation of the Partnership Agreement, she strategically made explicit findings of gross negligence "should a reviewing court disagree." This creates a firewall; even if a court were to question her primary legal interpretation (which it cannot do), the alternative factual finding that meets the higher standard of proof still stands, rendering any such challenge moot. Finally, by documenting Respondents' own misconduct and "misleading testimony" as the basis for sanctions, the Arbitrator has effectively blocked any potential argument that the award was procured by "undue means" or that she was somehow biased against them. The record she created shows that any taint on the proceeding was the result of Respondents' own lack of candor. These deliberate analytical steps demonstrate a reasoned, bulletproof process that commands this Court's confirmation.

### D. The Arbitrator's Ruling on the Appointment of a Receiver.

In addition to the monetary relief awarded, the Arbitrator expressly ordered the appointment of a receiver to protect KS Law's interests. The Arbitrator found that KS Law's assets

6

and claims were at risk due to ongoing mismanagement and conflicts of interest among the Respondents and associated entities. Specifically, the Arbitrator determined that Lake Law, the entity responsible for managing KS Law's docket, was under the control of a manager appointed by a third-party creditor, Burford Capital, and that Respondents Benito and Melchionni "cannot be trusted to look after the rights of KS Law."

The Arbitrator concluded that these circumstances created "a dangerous situation for KS Law," warranting the appointment of a neutral receiver "to be sure that KS Law has received its assigned cases appropriately and collects what it is owed as cases are tried or settled." The Final Award directed counsel for Claimant, upon receipt of the Award, to transmit a copy to the Honorable Lisa Walsh "noting that the Arbitrator has requested the appointment of a receiver."

This directive represents a significant and independent component of the Final Award. The Arbitrator's explicit finding that a receiver is necessary underscores the need for judicial confirmation of the Award in its entirety so that the receiver may be formally appointed under the Court's supervision, ensuring the protection and recovery of KS Law's assets consistent with the Arbitrator's intent.

## ARGUMENT

### I. The Standard for Judicial Review is Exceedingly Narrow, and This Court Must Afford the Award a High Degree of Conclusiveness.

Florida maintains a strong public policy that favors arbitration and strictly limits the role of the judiciary in reviewing arbitration awards to ensure their finality and efficiency. Noteworthy, is recent case law from this very District, *Metalonis v. Boies Schiller Flexner LLP*, 350 So. 3d 458 (Fla. 3d DCA 2022).  That case and the cases cited within, powerfully articulate this principle. The court in *Metalonis* held that the scope of judicial review is **"very limited, with a high degree of conclusiveness attaching to [the] arbitration award"**.

7

The Court's role in a confirmation proceeding is not to conduct a de novo review, re-weigh the evidence, or substitute its judgment for that of the arbitrator. Indeed, a court is prohibited from overturning an award even if it believes the arbitrator made a clear error of fact or law. As *Metalonis* instructs, "[w]hether the arbitrator's decision was legally correct is irrelevant because '[a]n award of arbitration may not be reversed on the ground that the arbitrator made an error of law.'" The United States Supreme Court, interpreting the nearly identical federal standard, has held that the "sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013), quoted in *Metalonis*, 350 So. 3d at 464).

Applying this restrictive standard, the Final Award must be confirmed. Arbitrator Carpenter's detailed 25-page analysis of the partnership's formation, the fiduciary duties owed under the agreement, the material misrepresentations made to KS Law, the gross negligence of Respondents, and her carefully reasoned calculation of damages are all quintessential examples of an arbitrator "arguably construing or applying the contract" and the evidence presented. The Award draws its essence directly from the parties' agreement and the facts adduced during the extensive hearings. It is therefore entitled to the high degree of conclusiveness mandated by Florida law.

## II. Confirmation of the Final Award is Mandatory Under Section 682.12, Florida Statutes.

The Florida Revised Arbitration Code is unambiguous in its command to the courts. Section 682.12, Florida Statutes, provides:

> "After a party to an arbitration proceeding receives notice of an award, the party may make a motion to the court for an order confirming the award at which time **the court shall issue a confirming order unless** the award is modified or corrected pursuant to s. 682.10 or s. 682.14 or is vacated pursuant to s. 682.13."

*See Florida Statute 682.12*.

8

The Legislature's use of the word "shall" is not permissive; it imposes a mandatory, non-discretionary duty upon the Court. Confirmation is the required, default outcome. The statutory structure places the full burden on the party opposing confirmation to file a timely motion and prove that one of the narrow, exclusive statutory exceptions applies. As the Third District Court of Appeal recently affirmed in *Fisten v. Brown*, 388 So. 3d 963 (Fla. 3d DCA 2024), once the predicate for confirmation is met, the trial court "does not have any discretion and must confirm the award".

### III. No Statutory Grounds Exist to Vacate, Modify, or Correct the Final Arbitration Award.

The statutory exceptions to mandatory confirmation are exclusive and extraordinarily narrow. Respondents cannot satisfy the heavy burden of proving that any of these grounds apply to the Final Award.

Section 682.13(1), Florida Statutes, sets forth the only grounds upon which an arbitration award may be vacated. A review of these grounds reveals their complete inapplicability to the case at hand.

- **§ 682.13(1)(a) (Corruption, Fraud, or Other Undue Means):** This ground is not only inapplicable but is inverted by the Arbitrator's findings. The Arbitrator specifically found that it was Respondents who engaged in conduct tantamount to "undue means" by providing "misleading testimony" and failing to be candid, and she sanctioned them for it. It is impossible for Respondents to argue the Award was procured by undue means when the Arbitrator documented their own misconduct.

- **§ 682.13(1)(b) (Evident Partiality, Corruption, or Misconduct by an Arbitrator):** There is not a scintilla of evidence in the record of any partiality or

9

misconduct by Arbitrator Carpenter. To the contrary, her detailed and balanced 25-page award, which included rejecting Claimant's proposed damages model, demonstrates a neutral, thorough, and dispassionate evaluation of the evidence.

- **§ 682.13(1)(d) (An Arbitrator Exceeded the Arbitrator's Powers):** This is often the last refuge of a losing party, but it fails here. As explained in *Metalonis*, this ground is "jurisdictional in nature" and applies only when an arbitrator goes beyond the authority granted by the parties' agreement and rules on issues not submitted to them. Here, the Arbitrator ruled on the exact claims Claimant's Derivative Demand sought to have resolved: breach of fiduciary duty, damages, and the appointment of a receiver. The Arbitrator's careful, self-derived damages calculation and her strategic alternative finding of "gross negligence" are definitive proof that she was acting squarely within her delegated authority to interpret the agreement and resolve the submitted dispute.

Section 682.14, Florida Statutes, is even more limited. It is reserved for correcting clerical or formal errors, such as an "evident miscalculation of figures," an "evident mistake in the description of any person, thing, or property," or an award that is "imperfect as a matter of form, not affecting the merits." This section cannot be used as a backdoor to challenge the substantive merits of the Arbitrator's decision or her damages calculation. The Final Award contains no such clerical or formal errors and is therefore not subject to modification or correction.

The procedural posture of this case, governed by the strict framework of Chapter 682 and the controlling case law, creates an inescapable conclusion for the Respondents. Section 682.13(2) provides a strict 90-day deadline from receipt of an award for a party to file a motion to vacate.

Even if Respondents have filed, or intend to file, timely motions to vacate, such motions are meritless and doomed to fail. As demonstrated above, no statutory grounds for vacatur exist, and any attempt to re-litigate the merits of the case would be swiftly rejected under the highly deferential *Metalonis* standard.

## CONCLUSION AND RELIEF REQUESTED

Plaintiff/Claimant has established that the parties participated in a comprehensive and fair arbitration proceeding that resulted in a detailed, reasoned Final Award. Under the Florida Revised Arbitration Code and the controlling precedent of this District, judicial review of that Award is extraordinarily limited. No statutory grounds exist to vacate, modify, or correct the Award. Accordingly, this Court has a mandatory duty to confirm the Final Award and enter a judgment in conformity therewith.

**WHEREFORE**, Claimant/Plaintiff Allan Teh, on behalf of KS Law Group, LLP, respectfully moves and requests that this Court enter an Order and Judgment:

1. **Granting** this Motion to Confirm Final Arbitration Award;

2. **Confirming** the Final Award, attached as **Exhibit A**, in its entirety;

3. **Entering** a Final Judgment, pursuant to Section 682.15, Florida Statutes, in favor of KS Law Group, LLP and against Sylvia Benito and Lee Melchionni, jointly and severally, in the amount of **$3,015,266.16**;

4. **Entering** a Final Judgment in favor of KS Law Group, LLP and against Lee Melchionni, individually, in the amount of **$50,000.00**;

5. **Entering** a Final Judgment in favor of KS Law Group, LLP and against Sylvia Benito, individually, in the amount of **$10,000.00**;

11

6. **Confirming and implementing the Arbitrator's directive for the appointment of a receiver** to manage, collect, and protect the assets and receivables of KS Law Group, LLP, consistent with the Arbitrator's findings and recommendations set forth in the Final Award;

7. **Appointing** such receiver under the supervision of this Court and granting the receiver all powers necessary to perform those functions;

8. **Awarding** Claimant, pursuant to Section 682.15(3), Florida Statutes et seq., its reasonable attorneys' fees and costs incurred in connection with this proceeding to confirm the Final Award ; and

9. Granting such other and further relief as this Court deems just and proper.

<u>**CERTIFICATE OF SERVICE**</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 22nd day of October 2025.

> **JONES & ADAMS, P.A.**
> Coral Gables Centre
> 999 Ponce de Leon Blvd., Ste 925
> Coral Gables, Florida 33134
>  Telephone: (305) 270-8858
>  Facsimile: (305) 270-6778
> Email: matthew@jones-adams.com
>
> By:      /s/ Matthew L. Jones, Esq.
>         Matthew L. Jones, Esq.
>         Florida Bar No. 909335

12

# Exhibit A

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

**Allan Teh**, on a derivative basis as a partner of,
**KS Law Group, LLP**, a District of Columbia
Limited Liability Partnership, Claimant,

-vs-                                                        **Case No.: 01-23-0005-2721**

**KS Law Group, LLP**, a District of Columbia
Limited Liability Partnership,
**Lee Melchionni**, individually, **Sylvia Benito**,
individually,

-vs-

**Persist Communications, Inc**., a Florida Corporation,
**The Lake Law Firm, LLC**, a New York, LLC,
Respondents.

### FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into among Allan Teh, KS Law Group, LLP, Lee Melchionni and Sylvia Benito, and dated August 24, 2021, and having been duly sworn, and having duly heard the proofs and allegations during hearings conducted January 6-10, 13-14, 2025 and April 24, 2025, offered by Claimant, represented by Matthew Jones, Esq. and Cheyenne Moghadam, Esq., Respondents KS Law Group, LLP, Lee Melchionni, Esq. and Sylvia Benito, represented by Michael Stolper, Esq., Lauren Elliot, Esq., Ian Weiss, Esq., and Thomas Mott, Esq., and Respondents Persist Communications, Inc. and The Lake Law Firm, LLC, represented by Matthew Gelber, Esq. and Amiad Kushner, Esq., and having previously rendered a Partial Final Award dated July 11, 2025, hereby AWARD as follows:

For convenience the Partial Final Award rendered on July 11, 2025 is included in this Final Award, as modified by certain of the clarifications requested by the

Case No.: 01-23-0005-2721                                                        1

parties and some wordsmithing the Arbitrator deemed appropriate.  The Arbitrator ruled on the parties' requests for clarification in an Order dated August 29, 2025.

## PROCEDURAL BACKGROUND

Claimant Alan Teh ("Teh") originally brought this derivative action on behalf of KS Law Group, LLP ("KS Law") in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.  By Order dated October 27, 2023, the Honorable Lisa Walsh ordered the case into arbitration and determined that The Lake Law Firm, LLC ("Lake Law") and Persist Communications, Inc. ("Persist") should be included in the arbitration.  JX 124, Ex. 2 to Teh Demand.[1] Teh shortly thereafter filed his Demand for arbitration with the American Arbitration Association ("AAA").  This matter was heard pursuant to AAA's Commercial Rules.  The substantive law of the District of Columbia applies to Claimant's claims.

The Arbitrator finds that a demand on KS Law to address Teh's complaints would have been futile and is thus excused.

The arbitration agreement allowed for extensive discovery (JX 15@¶39), and after that took place, hearings were held for all or parts of seven days in January 2025. Post-hearing briefing was agreed to and on the same day that Respondents' post-hearing briefs were due, Teh filed a Motion for Sanctions.  The Motion argued that Respondents Lee Melchionni ("Melchionni") and Sylvia Benito ("Benito") had been untruthful in their testimony about their membership in certain District of Columbia law firms.  The Arbitrator was advised that discovery in a related matter subsequent to the hearing in this matter had revealed that these two Respondents had received millions of dollars from DC law firms that they failed to reveal to the Arbitrator during the hearings.  Melchionni and Benito attempted to excuse their failure to disclose these partnerships by pointing to the production by JP Morgan Bank of voluminous documents, a few of which contained the names of these partnerships.  Considering that the JP Morgan production took place a week before Christmas and that the lengthy hearing was to commence January 6, 2025, the Arbitrator cannot fault counsel for Teh for failing to go through these documents with a fine-toothed comb looking for undisclosed partnerships.  Information from a third party does not excuse withholding information.  "You should have caught me" is not an excuse for the failure to disclose the important information that a)

---

[1] Joint exhibits will be referred to as "JX", Claimant's as "CX", Melchionni and Benito's as "M/B Ex." and Persist/Lake Law's exhibits as "P/L Ex."

Melchionni and Benito had interests in other DC law firms not disclosed to the Arbitrator and b) they had been paid millions of dollars as a result of Employee Retention Tax Credit ("ERTC") claims filed by these firms at a time when KS Law had received zero dollars from any of its cases.  More important, the Arbitrator has carefully read and reread the testimony of these two witnesses at the hearing and finds that their answers, particularly Melchionni's, were misleading at best.

The Arbitrator, after considering the parties' submissions and input from counsel, held an additional hearing on April 24, 2025, at which Melchionni and Benito provided additional testimony.  The Arbitrator did not find their explanations and those of their counsel satisfactory.  However, Claimant requested default as a sanction and that is not permitted under the AAA's Commercial Rules.  Nonetheless, the failure to be candid at the hearings speaks to Melchionni and Benito's credibility and warrants a monetary sanction pursuant to the Arbitrator's power to enter an appropriate sanction per Commercial Rule 60(a).

## RELIEF SOUGHT

Teh's Demand seeks the following relief on behalf of KS Law:

1. Appointment of a receiver for KS Law.
2. Awards of damages against Melchionni and Benito for fraud.
3. Awards of damages against Melchionni and Benito for breach of fiduciary duty.
4. Awards of damages against Lake Law and Persist based on a theory of unjust enrichment.
5. An equitable accounting from Lake Law and Persist and damages pursuant to the accounting.
6. Awards of damages against Lake Law and Persist for aiding and abetting the alleged fraudulent actions of Melchionni and Benito.

The Arbitrator finds in favor of Claimant on the first and third claims and further finds that the remaining claims were not proved sufficiently.

## FACTS

The Parties stipulated to the following facts:

1. KS Law is a District of Columbia law firm formed on August 24th, 2021.

Case No.: 01-23-0005-2721

3

2. At all times material hereto, KS Law had three "Managing Partners," each owning a certain ownership interest, as set forth below:

a. Lee Melchionni, Esq.: 25%
b. Sylvia Benito: 25%
c. Allan Teh: 50%

3. On September 3rd, 2021, Teh wired $4 million as a capital contribution into the KS Law Account at Chase Bank (Acct. Ending in ***6138).

4. Teh's $4 million capital contribution is the only capital contribution KS Law has received.

5. Four days following the deposit of $4 million in KS Law's bank account, Melchionni began a series of eight (8) wire transfers, totaling $3,880,000, to Persist's TD Bank Account.

6. Persist Communications, Inc. ("Persist") is a Florida Corporation wholly owned by Edward J. Lake ("Lake").

7. Lake is also the sole equity partner of Respondent, The Lake Law Firm, LLC ("Lake Law"), a New York law firm.

8. KS Law was not identified by name on any retainer agreements when they were originally signed by clients.

9. Melchionni and Benito are partners in at least seven (7) other D.C. law firms which were formed within a year of KS Law's formation.

The Parties subsequently stipulated that all the Joint Exhibits could be admitted in evidence.  CX 1, 3, 5 and 6 were admitted.  M/B Ex. 1 and 2 were admitted as were 3 versions of P/L Ex. 1 and P/L Ex. 4-6.

It is undisputed that Melchionni, as the sole attorney in the partnership, was and is the legal managing partner of KS Law as well as numerous other DC law firms with a similar structure.  Benito worked closely with Melchionni to put together numerous litigation financing deals to fund the pursuit of mass tort settlements (or litigation) with the purpose of generating legal fees.  It is undisputed that the partners in KS Law owed fiduciary duties to one another.

Whether KS Law should have had an IOLTA account, as required by the DC Bar Rules of Professional Conduct when client funds are held, is not an issue because, at least to date, KS Law has never held client funds.

## Benito and Melchionni Introduce Teh to Litigation Financing

Teh is a wealthy investor with a Wall Street/hedge fund background who formed a family office which researched and helped him manage investments. Benito, who worked for a family office herself, was an acquaintance of Teh's and introduced him to the idea of litigation financing and to Melchionni in early 2021. Prior to speaking with Benito, neither Teh nor his staff had any familiarity with the workings of litigation financing. In his testimony, Teh complained that Benito and Melchionni led him to believe that they were experts in mass torts, but he discovered later that "they did not know what they were doing."

Teh's initial investment with Benito and Melchionni was with an entity named Justice Partners, LLC, a Delaware limited liability company. This was not a law firm like KS Law but an investment fund that supported a District of Columbia law firm, Justice Partners Law Group, LLC, through a loan to that firm of all its capital. *See* M/B Exs. 2, 4. Teh invested $4 million in Justice Partners, LLC. This investment provided him with the opportunity to make an additional investment of $4 million dollars into a DC law firm solely owned by Teh, Benito and Melchionni. As noted in the Stipulation, KS Law was formed on August 24, 2021 and Teh wired his $4 million capital contribution on September 3, 2021. Melchionni immediately forwarded $3.88 million from Teh's contribution to Persist, a marketing firm that worked with Lake Law. The Arbitrator finds that Teh was never told anything about Persist until much later and was not told that all his money would immediately be transferred to one marketing firm.

Justice Partners, LLC was sold using the types of disclosures that normally accompany the sales of securities. They contained the usual warnings about the risks accompanying a new venture and specifically stated that the generous return on investment suggested would take 3 to 5 years to develop. *See, e.g.*, M/B Ex. 2. As noted below, Benito and Melchionni repeatedly suggested to Teh that returns to KS Law in the form of legal fees from mass torts settlements could come much earlier. It has been almost four years since Teh invested in KS Law and so far, only a trivial amount of attorneys' fees has been collected. It is expected that at least some additional fees will be collected but the timing and amount are unknown.

Case No.: 01-23-0005-2721                                                                5

**Benito and Melchionni's Representations to Teh concerning KS Law**

KS Law's structure was different from Justice Partners.  There was a paucity of written material presented to the Arbitrator as to the representations and cautions that accompanied the formation of KS Law, resulting in oral testimony taking on some significance.  Unfortunately, none of the three partners in KS Law was a particularly compelling witness.

Teh testified that he met Benito in January 2021 when he was having drinks with some people that he knew. She told them about her success with a mass torts investment in the Boy Scouts cases.  He recalled that she said she was going to start a fund with Melchionni who had 10 years of mass torts experience.  She described the investment as tax efficient and not correlated with the stock market. He met Melchionni a month or two later and further discussion led to his investment in the Justice Partners fund.  He described his investment in KS Law developing as follows:

> Well, since I invested in Justice Partners in March, they were telling me how well the investments were doing. Basically they were only going to invest in cases that were already qualified and in negotiation settlements. So these are the cases where they pay a significant premium over the marketplace and they were telling me that the cases are going well and in some cases some of them might settle even at the end of 2021. So I said, you know, if that's the case, should we invest more.
>
> Q. And what did they say?
>
> A. They said sure. We can do it in a law firm structure, in which case you have better control over what you're going to own because it's a 50 percent ownership law firm that you're going to have.

Tr. 32.  He went on to say that Benito and Melchionni told him that "as far as Justice Partners is concerned, they have discretion as to what cases they are going to be acquiring for the fund, whereas with KS Law I had veto power over what cases the law firm can acquire."  Tr. 33.

Just prior to his investment in KS Law, on August 24, 2021, Benito sent Teh a text (JX 21) stating:

> 1- Talc. We have 714 cases. Continuing to see strong signals from J & J that we will see settlement in next 12 months, we took the move to bankruptcy as non material[.] 2mesh. Seeing fast intake, cost is steady, we have 1000 cases and monitoring work up for drop off ( we have case replacement) 3- roundup. We got a unique window of opportunity to invest in this case which we thought formerly was in accessible but we have a vendor now for the case- our base assumption is 2-3x in 24 months 4- 3M, three trials, two positive results and we are hearing they are ready to [remainder cut off]

Teh testified that Melchionni and Benito told him that they would be purchasing qualified cases for KS Law that were already in settlement negotiations. Benito and Melchionni denied that they said this.

Teh understood that he was providing all the capital for KS Law. In October 2021, Melchionni advised that his money had been used to purchase 775 cases. JX42. While the Arbitrator is not convinced that Teh was told all his cases were already in settlement discussions, he reasonably understood these to be actual "cases" of some sort, *i.e.*, clients in being. He did not understand that his money would be used to pay for advertising campaigns to attract new clients who not only had not yet filed cases, they had not even been screened to see if they had the potential ever to be clients and thus become "cases." Once potential clients responded to the advertising, their information needed to be confirmed and their medical records obtained to be sure they met the criteria needed to file suit. The clients needed to sign a retainer agreement and a package of information would be put together for use by a litigation firm that would actually file suit. This workup was done by Persist/Lake Law and/or its vendors. For the good cases, Lake Law would take care of hiring counsel to file suit. Melchionni is not a trial lawyer and had no experience managing a law firm. He has never spoken to a KS Law client and, of more concern, has never reviewed any medical records even to spot check whether Lake Law's determinations that potential clients were qualified were correct. Benito and Melchionni did monitor the *number* of cases produced by Lake Law and could track their progress via Lake Law's software from the initial lead to either disqualification or being sent to trial counsel for filing.

The Arbitrator concludes, after weighing the testimony and documents, that Teh was told that KS Law would be acquiring actual clients and was not told that his investment in KS Law would only fund an advertising campaign. He would not have invested $4 million in KS Law had he understood this. Teh proved by a preponderance of the evidence that Benito and Melchionni made material misrepresentations to him. However, the evidence did not rise to the level of the

Case No.: 01-23-0005-2721                                                              8

"clear and convincing" evidence required to prove fraud.  Nonetheless, once they became his partners, they had a fiduciary duty to disclose to Teh where and how his money was being spent.  They did not do so.

Benito and Melchionni took the position with Teh and at the hearing that it did not matter which version of their representations was true because Lake Law guaranteed a certain number of cases.  If a potential client did not turn into a viable case because medical records did not support their claim, Lake Law had to find another prospect with good medical records.  When it became apparent that Lake Law had not delivered the promised cases, Benito and Melchionni negotiated a "Case Replacement Agreement" ("CRA") (JX 91) that provided that KS Law would get its money back plus interest if Lake Law were not able to produce the promised cases.  This agreement is of little use to KS Law because Persist is no longer doing business and Lake Law is insolvent as a practical matter.  No more cases are going to be produced than are already on KS Law's docket and its only hope of more cases is if Lake Law can substitute ERTC cases for missing Talcum Powder cases.  Lake Law offered to replace each missing Talcum Powder case with claims for 6 employees who were part of an ERTC claim.

The Arbitrator finds that Benito and Melchionni did adequate due diligence before doing business with Lake and his companies.  They checked his reputation with others in the business and found him to be well-respected and experienced.  They had not actually worked with him, however, and they were not experienced in the roles they undertook for their law firm clients.  It was grossly negligent to put all of their clients' capital into his business all at once.  In particular, it was grossly negligent to pay Persist $6000 each for 200 Talcum Powder cases.  The Talcum Powder cases against Johnson & Johnson had been going on for several years, with the result that many potential clients had already retained counsel, making it unrealistic to expect a large volume of good clients.

Benito and Melchionni formed numerous DC law firms using the same model as KS Law.  They also formed a firm known as Titan Law Group ("Titan") in which they were the only partners.  Titan was used as a "placeholder" for certain of the law firms they formed with individual investors.  When clients were asked to sign retainer agreements after their vetting was complete, only Titan and Lake Law were named as the law firms that the clients were engaging.  Respondents' witnesses testified that there was then an internal process at Lake Law that allocated individual cases to the individual law firms on what was described as a "round robin" basis.  In other words, cases were assigned by a computer program to the individual law firms in a sequential pattern as they came in.  The result of

this process was that KS Law was never identified to clients as their law firm, and it has no retainer agreements with clients.  This was not disclosed to Teh before or at the time of his investment.  It was also, as discussed below, a violation of the DC Bar Rules of Professional Conduct.  In violation of their fiduciary duties, Benito and Melchionni did not look at the cases assigned to the DC law firms in question to make sure that the assignment resulted in an even distribution of qualified cases.  The Arbitrator was not supplied with sufficient information to determine whether this was the case.

<b>The Investment in KS Law Sours</b>

Shortly after Teh invested in KS Law, in response to Teh's assistant asking for "an update on how much [of Teh's $8 million] has been invested[2] and what the distribution is per case type", he was provided with a list of "cases" that the Melchionni and Benito had allegedly purchased for KS Law.  JX 42, an email from Melchionni to Teh's assistant dated October 18, 2021, recites that 775 cases had been or were to be acquired:  155 Round Up, 200 Talc[um Powder], 212 Hernia Mesh and 212 3M [ear plugs].  A list of client names and contact information was attached.  Melchionni further stated:  "The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost."  As to the Hernia Mesh cases, he said:  "We continue to march towards settlement with multiple manufacturers. We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022."  As to 3M, he reported that plaintiffs had been successful in 3 out of 4 trials and "[t]here are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months."  He reported old news about Bayer's allocation of funds toward RoundUp cases and indicated that he would report later on Johnson & Johnson's bankruptcy efforts.

In the fall of 2022, Benito and Melchionni revealed to Teh the fact that the 775 cases he thought he had purchased had dwindled down to a smaller number due to "drop off."  Drop off can occur for a variety of reasons, including lack of response from the potential client, difficulty in obtaining medical records (exacerbated

---

[2] Benito and Melchionni repeatedly argued that Teh should have known that all his money would be invested at once and he would have wanted to invest all his money all at once.  If that were the case, he would not have instructed his assistant to ask how much of his money had been invested several weeks after his capital contribution.

Case No.: 01-23-0005-2721                                                                                          10

during the Covid pandemic), the potential client not meeting the criteria for a good claim, or having previously engaged counsel.[3]  Teh was furious when he found out how his money had actually been used, that it was all spent and KS Law did not have anywhere near the number of cases he had been told it had.  He was also upset that Benito and Melchionni had not kept him informed of the problems with case development.  Benito testified that Teh kept screaming "I want my cases!", was abusive to her and was not cooperative in trying to find a solution for the problems.  Her proposed solution was to find a buyer who would buy Teh's portfolio for 80% of what he had paid for it.  Benito's fiancé also transferred some 3M cases from his DC law firm to KS Law.  Teh was not satisfied.

KS Law's situation got worse from there.  Benito and Melchionni testified that one reason they invested all their clients' money with Persist/Lake Law is that their contract offered a "medical records guarantee."  This meant that if a lead generated by a Persist advertising campaign turned out not to qualify for medical reasons, they would replace that potential client with a new one.  Although the guarantee sounded good in theory, it did not work in practice as Persist/Lake Law has not been able to find enough qualified clients to fulfill the numbers promised.  After this became apparent, as noted above, Benito and Melchionni negotiated the CRA with Lake.  JX 91.  The CRA, effective December 1, 2022, provided that KS Law's share of attorneys' fees was enhanced.  To the extent Lake Law was unable to fulfill its obligations on talcum powder cases, it could substitute ERTC claims at the rate of 6 employees supporting ERTC claims per talcum powder case.  Failing that, Lake Law would reimburse KS Law for the number of missing cases at the price paid, *i.e.*, $6,000 per Talcum Powder case plus 8% simple interest per year from September 1, 2021.  For the other categories of cases, monetary reimbursement was agreed.  Melchionni signed the CRA on behalf of KS Law on December 28, 2022.  Again, although the CRA sounded good in theory, it did not work in practice as Persist/Lake Law were unable to provide enough good cases and they were insolvent no later than the end of 2023.

There is another contract that was the focus of attention at the hearings, JX 26, a document on the letterhead of Lake Law entitled "Invoice."  Respondents referred to this document as an "insertion order."  It recites that KS Law is ordering the following "cases":  220 Hernia Mesh @$5,600 each for a total of $1,232,000, 200

---

[3] Information produced by Lake Law at the hearing suggests that the primary reasons for drop off in the KS Law docket were that the potential client was unresponsive to further contact or was unqualified for inclusion in the group of clients suing for a particular injury.  *See* P/L Ex. 1.  For example, a talcum powder claimant might have suffered from a cyst rather than cancer.

Case No.: 01-23-0005-2721                                                                                                    11

Talc @$6,000 each for a total of $1,200,000, 155 Round Up cases @$5,048.39 each for a total of $782,500, and 220 3M cases @$3,025 for a total of $665,500. The grand total was $3,880,000.00, all the money that KS Law transferred to Persist in September 2021 except for a bit held back to pay Benito and Melchionni for their services to KS Law.

The Invoice is signed by Melchionni and dated September 1, 2021 although Melchionni testified it was not actually signed until September of 2022.  The failure to document what KS Law was to receive for its $3.88 million was an "oversight" on Melchionni's part.  Tr. 366-67.  He went on to admit that he had not advised his partners of this oversight and when asked why he had not, he said:  "I don't recall."  (This answer was given with disturbing frequency during Melchionni's testimony.)  Lake testified that he was the one who initiated this documentation.  Tr. 1270-71.  Benito and Melchionni's decision to send all of KS Law's capital to Persist without a firm contract and their failure to correct that oversight for more than a year was grossly negligent.[4]

Melchionni also blamed "oversight" for his failure to obtain the liability insurance he was required to obtain by ¶37 of the Partnership Agreement.  He did not advise Teh of his failure to obtain insurance until Teh made a demand for the books and records of the partnership in late 2022.  KS Law was able to obtain insurance and no claims have been made against it that would trigger that insurance.  Melchionni argues that since no claims have been made, this is a "no harm, no foul" situation. Melchionni's failure to take this basic step was grossly negligent but KS Law has suffered no damage as a result.

Melchionni's "oversights" on important matters while he was the Legal Managing Partner of KS Law lead the Arbitrator to conclude that Melchionni provided little management to KS Law. This is not surprising given the large number of law firms in which he was a partner, the number of times he was named as Legal Managing Partner in those firms, that he had little relevant experience actually practicing law and no experience managing a law firm.

Benito testified that she became concerned about "drop off," particularly in the talc cases, by the summer of 2022.  Tr. 1085-87.  As late as May 12, 2022, when

---

[4] Benito and Melchionni take the position that the indemnification clause in the KS Law partnership agreement requires that they must be found to have been grossly negligent to have any liability to the partnership.  The Arbitrator does not agree with that interpretation but includes findings of gross negligence should a reviewing court disagree.

Melchionni updated Teh on progress, he continued to project confidence about the timing and amount of potential returns to KS Law.  His memo (JX 56) memorializing their conversation states that he told Teh:

> Talc
> ● I spoke to our co-counsel on Talc and he had a positive update. He sat in on settlement negotiations last week in NYC where several "indications" of settlement offers were floated by JJ. The potential numbers proposed by JJ were at the upper end of what we modeled. Now, obviously, things could change, and no agreement was reached, but there is positive momentum towards a resolution. From a timing standpoint, hard to predict, but cautiously optimistic a settlement is reached within 2022, followed by actual cash flow within 6-12 months.
>
> Hernia Mesh
> ● I know I am beating a dead horse, but our co-counsel tells me Bard could settle in 2 weeks or 2 months. This is because a global settlement needs to be reached with MDL before our counsel settles because our values will be higher. Bard will make up a minimum of 60% of our docket. Similar to Talc, we expect funds to flow 6-12 months after settlement is reached.

Melchionni testified at the hearing in January 2025 that KS Law had "100 active 3M cases, it has 70 active hernia mesh cases, it has 60 active Roundup cases, and it has 38 active employee retention tax credit."  Tr. 515.  These numbers do not exactly match the cases listed on P/L Ex. (v.3) but are close enough that the differences are not material.

Benito and Melchionni did not treat Teh as an equal partner in KS Law's business although he owned 50% of it and had provided all its capital.  They failed to provide him with important information in a timely way.  For example, they spent all his money at once with one vendor without consulting him and without telling him until he asked.  They led him to believe everything was fine until they had to admit it was not.  As his partners, Benito and Melchionni owed Teh and KS Law a fiduciary duty.  It is apparent from the facts recited above that they breached their duty of care and duty of loyalty, thus breaching their fiduciary duties.

## Damages

As discussed above, Claimant's fraud claims were not proved but its breach of fiduciary duty claims were.  The next question is: did KS Law suffer any damages

Case No.: 01-23-0005-2721                                                                13

as a result of the breaches of fiduciary duty, and if so, in what amount?  The Arbitrator does not accept the theory of damages put forward by Claimant's expert which primarily relies on Benito's projections of what KS Law might earn.  These projections are more reasonably construed as estimates rather than promises.  The failure to meet projections for an investment, particularly one as uncertain as mass torts, cannot normally be the basis for damages.

District of Columbia law prohibits the award of speculative damages.  It also requires that a plaintiff who discovers an injury must file suit for that injury, even if future damages are unknown, or risk a statute of limitations bar.  Thus, an injured party cannot simply wait until its damages are certain to make its claim.  The principles as to uncertain damages have often been outlined by the Court of Appeals and are summed up in *NCRIC, Inc. v. Columbia Hospital for Women Medical Center, Inc.*, 957 A.2d 890, 902-03 (D.C. 2008):

> A plaintiff need prove damages only with reasonable certainty. While an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award. "The evidence offered must form an adequate basis for a reasoned judgment;" "mathematical precision" is not required.  Furthermore, "the courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible."  [Citations omitted.]

In other words, difficulty in calculating damages does not allow a tortfeasor to escape the consequences of his or her actions.

The Arbitrator has no doubt that KS Law has suffered and will suffer losses due to the failures of Benito and Melchionni outlined above. A huge volume of leads has already been disqualified and little has been accomplished in the way of finding substitute cases.  The fact is that KS Law's final damages are unknown at this point.  It does have cases assigned to it at Lake Law that have been filed in court or sent to counsel for filing.  *See e.g.*, P/L Ex. 1.  Some 3M cases have been settled (although the fees had not made their way to KS Law at the time of the hearings) and it is reasonable to expect that some additional 3M ear plug cases will settle.

If Melchionni's recitation of the number of cases KS Law had is accurate, the firm is short 120 3M cases, 150 Hernia Mesh cases and 95 Round Up cases.  It is short

Case No.: 01-23-0005-2721

14

the entire 200 Talcum Powder cases for which it paid $1.2 million, $6,000 for each case.[5]

If credit is given for the 38 ERTC employees, then it is short 194 Talcum Powder cases and received $36,000 in value for its $1.2 million.  KS Law paid a total of $1,232,000 for the 220 Hernia Mesh ($5,600 each) but received only $560,000 in value.  KS Law paid a total of $782,500 for 155 Round Up cases ($5,048.39 each) but received only $479,597 in value.  It paid $665,500 for 220 3M ($3,025 each) but received only $302,500.  The Arbitrator is using the price paid as the "value" because there is no other basis for determining what the cases Persist was supposed to produce should have cost.  Since Melchionni and Benito agreed to pay these amounts with KS Law's money; they should have no complaint about the use of the cost charged as the value.

The shortfall is calculated as follows.

| Talc | $1,200,000 - $36,000 | = $1,164,000 |
|------|----------------------|--------------|
| Hernia Mesh | $1,232,000 - $560,000 | = $ 672,000 |
| Round UP | $ 782,500 - $479,597 | = $ 302,903 |
| 3M | $ 665,500 - $302,500 | = $ 363,000 |
| Total | | $2,501,903 |

To put it another way, for Teh's investment of $3.88 million, KS Law received $1,378,097 worth of leads.  These figures are of course not precise.  Some of the cases Melchionni mentioned may be disqualified and more ERTC claims may be added.  This is not the only way to value KS Law's damages but it is the best there is.  Persist/Lake Law had plenty of time to find clients for KS Law and Benito and Melchionni have had plenty of time to find another solution for their reckless actions and omissions.

On May 20, 2025, counsel for Benito and Melchionni represented in an email that KS Law had or would receive about $109,000 in attorneys' fees from 3M and ERTC cases.  This information is not in evidence and the timing of this announcement, a week before final argument, is problematic.  Nonetheless, the Arbitrator finds that it is likely that KS Law will receive some attorneys' fees from its assigned cases.  It is not possible to estimate how much since clients may drop out, offers of settlement may be disappointing or not materialize at all, and cases that are tried may produce great results or nothing.  This is an additional reason

---

[5] P/L Ex. 1 (v.3) does reflect a few Talcum Powder cases.

that the Arbitrator has chosen to measure KS Law's damages by looking at what KS Law was supposed to receive but did not.

This Final Award assesses Melchionni and Benito, jointly and severally, with $2.5 million in damages.

In addition, the Arbitrator will impose a monetary sanction of $40,000 on Melchionni and $10,000 on Benito for misleading the Arbitrator and the other parties at the hearings.

## Lake Law and Persist

Given that the fraud claims against Benito and Melchionni have not been proved, the claim for aiding and abetting fraud against Lake Law and Persist must be dismissed.  Mr. Lake and his employees were not involved in the representations made to Teh by Benito and Melchionni.  Lake Law and Persist did not deliver what they promised but Claimant did not assert a breach of contract claim against them. Testimony and exhibits at the hearing showed that Lake Law and Persist performed significant services for KS Law.  Persist paid for advertising campaigns which produced leads that Lake Law or its vendors worked up to see if they could turn them into viable cases.  Both companies had significant internal and external costs.  Lake Law and Persist were therefore not unjustly enriched.  There is, on this record, no reason for the accounting requested although certainly the receiver for KS Law could conduct an audit if he or she should suspect any impropriety in the allocation of cases to KS Law or the work done on those cases.

## A Receiver Should be Appointed

Lake Law is currently in the hands of a manager appointed by Burford Capital, a large litigation financing firm which loaned Lake Law $15 million.  This creditor, and Benito and Melchionni to a lesser extent, have kept Lake Law out of bankruptcy by paying its expenses in the hope that proper management of its docket will produce positive returns.  The current manager is beholden to the creditor that appointed him, and Benito and Melchionni cannot be trusted to look after the rights of KS Law.  This is a dangerous situation for KS Law.  It is therefore necessary to appoint a receiver to be sure that KS Law has received its assigned cases appropriately and collects what it is owed as cases are tried or settled.  Upon receipt of the Final Award in this matter, counsel for Claimant shall transmit a copy to Judge Walsh noting that the Arbitrator has requested the appointment of a receiver.

Case No.: 01-23-0005-2721

16

**KS Law and the District of Columbia Bar Rules of Professional Conduct**

D.C. Rule 5.4 provides in part:

> (b) A lawyer may practice law in a partnership or other form of organization in which a financial interest is held or managerial authority is exercised by *an individual nonlawyer who performs professional services which assist the organization in providing legal services to clients*, but only if:
>
> (1) The partnership or organization *has as its sole purpose providing legal services to clients;*
>
> (2) All persons having such managerial authority or holding a financial interest undertake to abide by these Rules of Professional Conduct;
>
> (3) The lawyers who have a financial interest or managerial authority in the partnership or organization undertake to be responsible for the nonlawyer participants to the same extent as if nonlawyer participants were lawyers under Rule 5.1;
>
> (4) The foregoing conditions are set forth in writing.

*Emphasis added.*  Comments to Rule 5.4 include the following:

> [7] As the introductory portion of paragraph (b) makes clear, the purpose of liberalizing the Rules regarding the possession of a financial interest or the exercise of management authority by a nonlawyer is to permit nonlawyer professionals to work with lawyers in the delivery of legal services without being relegated to the role of an employee. For example, the rule permits economists to work in a firm with antitrust or public utility practitioners, psychologists or psychiatric social workers to work with family law practitioners to assist in counseling clients, nonlawyer lobbyists to work with lawyers who perform legislative services, certified public accountants to work in conjunction with tax lawyers or others who use accountants' services in performing legal services, and professional managers to serve as office managers, executive directors, or in similar positions. In all of these situations, the professionals may be given financial interests or managerial responsibility, so long as all of the requirements of paragraph (c) are met.

[8] *Paragraph (b) does not permit an individual or entity to acquire all or any part of the ownership of a law partnership or other form of law practice organization for investment or other purposes. It thus does not permit* a corporation, an investment banking firm, *an investor*, or any other person or entity *to entitle itself to all or any portion of the income or profits of a law firm* or other similar organization. *Since such an investor would not be an individual performing professional services within the law firm or other organization, the requirements of paragraph (b) would not be met.*

*Emphasis added.*

KS Law's partnership agreement itself (JX 15) complies with Rule 5.4(b) in meticulous detail, outlining duties for Benito and Teh in ¶13, in accord with the advice received from ethics counsel.  One of the attachments to JX 42 is an opinion of ethics counsel, Jack Marshall, Esq., concerning the interpretation of this rule. He states that "[h]aving a non-lawyer who had no duties in the operation of the firm would be misrepresentation, which constitutes rule 8.4 misconduct."[6]  Mr. Marshall goes on to advise:

> Thus, a non-lawyer partner brought into the firm primarily to provide financial resources must still work to make the partnership valid and prevent the participation from appearing to be an investment.  Such a partner's function could include management, strategic consulting, or any other legitimate non-legal duties that would strengthen the firm and enhance its ability to serve clients. Obviously, they must be real duties, not imaginary ones.

However, it is undisputed that Teh performed no duties for the firm, he was never asked to perform any duties and no one expected that he would do anything other than wire transfer $4 million to KS Law.  His role was to supply capital for the firm and then sit back and wait for the legal fees to roll in from the settlement of mass tort cases filed by other law firms.  Teh's investment was exactly the passive investment that Rule 5.4(b) prohibits.

KS Law's partnership agreement recites that its sole purpose is the practice of law. In fact, it does not engage in the practice of law; its sole purpose was and is to act as a vehicle for Teh to invest in the mass torts industry and hopefully collect attorneys' fees as cases in which it was invested were tried or settled.  KS Law's

---

[6] The Arbitrator is dubious that violation of this Rule would constitute Rule 8.4 misconduct.

Case No.: 01-23-0005-2721

18

sole activity was to provide funding to Persist, a marketing firm that recruited clients for Lake Law through advertising campaigns.  KS Law has only one lawyer, Melchionni, who does not do legal work for it.  Melchionni's touted 10 years of experience with mass torts was primarily on the financing side.

In his testimony, Melchionni cited the above-quoted opinion of counsel in defense of the structure of KS Law and his other DC law firms.  It obviously does not support Melchionni's choices in structuring his DC law firms.  It is plain that KS Law was not a proper law firm within the meaning of Rule 5.4.  It was not in the interest of any party to this arbitration to argue this issue.  The Arbitrator mentions it because Melchionni's consistent denial of the fact that he ignored Mr. Marshall's advice is another factor speaking to Melchionni's credibility and his willingness to misrepresent KS Law's status.

### Retainer Agreements

D.C. Rule 1.5 provides in part:

> (e) A DIVISION OF A FEE BETWEEN LAWYERS WHO ARE NOT IN THE SAME FIRM MAY BE MADE ONLY IF:
>
> (1) THE DIVISION IS IN PROPORTION TO THE SERVICES PERFORMED BY EACH LAWYER OR EACH LAWYER ASSUMES JOINT RESPONSI BILITY FOR THE REPRESENTATION;
>
> (2) THE CLIENT IS ADVISED, IN WRITING, OF THE IDENTITY OF THE LAWYERS WHO WILL PARTICIPATE IN THE REPRESENTATION, OF THE CONTEMPLATED DIVISION OF RESPONSIBILITY, AND OF THE EFFECT OF THE ASSOCIATION OF LAWYERS OUTSIDE THE FIRM ON THE FEE TO BE CHARGED;
>
> (3) THE CLIENT GIVES INFORMED CONSENT TO THE ARRANGEMENT; AND
>
> (4) THE TOTAL FEE IS REASONABLE.

*Caps in original*.  Comment 14 to this Rule explains:

> [14] Paragraph (e) requires that the client be advised, in writing, of the fee division and states that the client must affirmatively give informed consent

Case No.: 01-23-0005-2721

19

to the proposed fee arrangement. For the definition of "informed consent," see Rule 1.0(e).[7] The Rule does not require disclosure to the client of the share that each lawyer is to receive but does require that the client be informed of the identity of the lawyers sharing the fee, their respective responsibilities in the representation, and the effect of the association of lawyers outside the firm on the fee charged.

There are no retainer agreements naming KS Law as counsel, let alone Melchionni. This is a fact that KS Law, and indeed its counsel, kept hidden from Teh and the Arbitrator until the Arbitrator ordered production of KS Law's retainer agreements. Then it was disclosed that there were none, but Lake Law was attempting to get client agreement to KS Law's participation through email correspondence. At the time of the hearing, some clients had agreed and others had not responded.

At the hearing, expert witnesses for Benito and Melchionni testified that this is the way things are done in the mass tort industry, and that it is of no consequence that KS Law is not named in any retainer agreements. It may well be that this is the way it is done, but it cannot be done this way by a District of Columbia law firm. Clients are entitled to know who is representing them although here there is arguably "no harm, no foul" because KS Law is not doing any legal work. Of much more significance, the failure to have retainer agreements for KS Law's clients meant that Teh and his counsel had no way to verify whether there had been any changes to cases assigned to KS Law through the proffered round robin arrangement, another breach of fiduciary duty by Melchionni and Benito.

## ATTORNEYS' FEES AND COSTS

KS Law's Partnership Agreement provides that the prevailing party in an arbitration is to be awarded its costs and fees, including reasonable attorneys' fees. JX 15@¶39. Claimant KS Law[8] is the prevailing party as to its claims against Respondents Melchionni and Benito. Persist and Lake Law are the prevailing parties as to the derivative claims against them brought by Teh on behalf KS Law. Counsel were instructed to submit their claims for fees and costs after providing the opposing party the opportunity to review them and raise any objections. The

---

[7] Rule 1.0(e) defines informed consents as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

[8] The Partial Final Award said that Mr. Teh was the prevailing party but should have said that it was Mr. Teh in his capacity as a partner in KS Law, suing on its behalf.

Arbitrator appreciates the cooperative manner in which counsel exchanged views. The party claiming fees and costs has the burden of proving that they were incurred (not an issue here) and that they are reasonable.  The Arbitrator has considered the claims for these expenses and the objections thereto and awards as follows:

### Lake Law/Persist

Counsel for Mr. Teh sought clarification that KS Law, and not Mr. Teh personally, was obligated to pay the fee and costs award in favor of Lake Law and Persist. The Arbitrator advised that this was not the case.  *See* August 29, 2025 Order.  Teh brought this derivative action to benefit himself in an effort to recoup his investment in KS Law and much more.  There was no benefit to KS Law from this claim and Teh should bear the burden of his errors in bringing and prosecuting it.

Lake Law and Persist requested attorneys' fees of $175,860.00 and costs of $36,794.31 for the period in which Mr. Gelber represented them.  Their prior counsel, Andrew Berman, submitted billing records with attorneys' fees of $49,706.23 and costs of $766.83.

Teh objected to certain entries by Mr. Gelber that are part of Lake Law/Persist's claim for fees and costs as "excessive" and lacking "specificity."  Mr. Gelber provided additional detail in his responses.  The Arbitrator has examined each of these entries and finds them to be within the range of reasonableness for the tasks described.  No objection was made to Mr. Berman's claim.

Therefore, Teh shall pay to Mr. Gelber's firm fees of $175,860.00 and costs of $36,794.31 for a total of $212,654.31 and pay to Mr. Berman's firm fees of $49,706.23 and costs of $766.83 for a total of $50,473.06.

### KS Law as Derivative Claimant

Claimant submitted a request for $355,140.00 in attorneys' fees and $237,102.57 in costs to be paid by Respondents Melchionni and Benito.  The Arbitrator awards $324,098.00 in attorneys' fees and $183,080.66 in costs.  Melchionni and Benito objected to some of the requests, Claimant agreed with some of the objections and the Arbitrator has agreed with some others.

Case No.: 01-23-0005-2721                                                                                   21

## Claimant's Attorneys' Fees

Respondents Melchionni and Benito also argued that because Claimant sought over $12 million in damages and was awarded much less than that, it was not very successful and should receive a fee award reflective of the portion of damages sought actually awarded.  The Arbitrator does not agree with this analysis or with their interpretation of the DC cases.  Claimant was largely successful in the arbitration, obtaining an award of $2.5 million toward a potential loss of $4 million and the appointment of a receiver.  Since Claimant will likely be receiving at least some attorneys' fees for cases yet to be settled, it could possibly be made whole and perhaps even better.  That Claimant argued for much more in damages is the usual puffery expected from claimants and not the measuring rod against which success should be measured.

Disallowed fees included the following:

1. Time spent resisting the motion to compel arbitration, the motion to stay and the motion to transfer to Judge Walsh.  The arbitration clause in the Partnership Agreement was broad and there was no benefit to KS Law in resisting arbitration as to Respondents Melchionni and Benito.  KS Law lost this issue and it was not so intertwined with the case against Respondents Melchionni and Benito that it should be considered part of the "common core" of facts or law.  Staying a case referred to arbitration rather than dismissing it is best practice.  Efforts to resist this motion and the motion to transfer were both unsuccessful, of no benefit to KS Law and unrelated to the successful claims.

2. Time spent on the case against Lake Law and Persist.  Claimant did not prevail on any of the claims against Lake Law and Persist.  The claims against these Respondents largely rested on Claimant's argument that they were part of a fraud perpetrated by Respondents Melchionni and Benito.  This fraud was not proved.

3. In some cases, Claimant's response to the objection did not meet the substance of the objection.  For example, there are numerous entries where the objection was that time recorded should be split with another case and the response was "Objection is unsupported; the work was directly responsive and necessary."

4. Time spent communicating with U.S. Attorney's office was not sufficiently explained.  While the Arbitrator did find that Respondents Melchionni and Benito had not revealed certain key information until after the hearing in this case, no relationship between this and discussion with the AUSA was established.

## Claimant's Costs

Claimant's primary expert witness, Adam Levitt, is a senior partner in a successful Chicago law firm.  He submitted bills for $200,011.00 in fees and costs of $2,334.96.  The costs were attributed to his trip to Virginia to participate in the arbitration hearing.  His firm did not charge for other costs such as copying, courier service, etc. that many firms do.  The out-of-pocket costs charged are not unreasonable for a law firm partner like Mr. Levitt and they will be awarded in full.

Respondents Melchionni and Benito primarily complain about Mr. Levitt's hourly rate of $1,675 per hour and the $1,275 and $1,125 rates charged by his partners.  No affidavit was submitted as to the customary rates charged by high end Chicago law firms which, as Mr. Levitt would know, would have been the better practice.  However, the Arbitrator is aware that standard hourly rates for successful law firm partners in large cities exceed $1,000 per hour and can be much more than that.  The Arbitrator believes the fairest result is to apply a blended rate of $1,200 per hour to the DiCello Levitt partners for a fee of $158,910.  It was cost effective for Mr. Levitt to have his partners take care of some of the tasks required of him.

Michael Portuondo was Claimant's accounting expert.  He submitted bills for $33,977.50 and costs of $2,974.07.  The Arbitrator did not accept his model for calculating damages and has reduced his fee to $20,000 to account for that.  As with Mr. Levitt, the only costs he submitted were for travel to Virginia for the arbitration.  Respondents question the multiple plane tickets apparently purchased by Mr. Portuondo, $1,138.37 to United Airlines on 01/06/2025, $537.48 to American Airlines on 01/07/2025 and $502.00 to American Airlines on 01/08/2025.  Because no explanation was offered, the Arbitrator can only speculate as to why multiple tickets were purchased but that cannot be the basis for an award.  The earliest ticket ($1,138.37) is disallowed so costs of $1,835.70 will be awarded.

To sum up, Claimant will be awarded $158,910.00 for Mr. Levitt's fees, $2,334.96 for his costs, $20,000 for Mr. Portuondo's fees and $1,835.70 for his costs for a total of $183,080.66.

## FINAL AWARD

In accord with the reasoning and findings above, it is hereby ORDERED that:

1. Upon receipt of this Final Award, counsel for Claimant shall transmit a copy to Judge Walsh noting that the Arbitrator has requested the appointment of a receiver.

2. Respondents Melchionni and Benito are liable, jointly and severally, to KS Law for Two Million Five Hundred Thousand Dollars ($2.5 million) in compensatory damages.

3. Respondents Melchionni and Benito are liable, jointly and severally, to KS Law for Three Hundred Twenty-Four Thousand Ninety-Eight Dollars ($324,098.00) in attorneys' fees and One Hundred Eighty-Three Thousand Eighty Dollars and Sixty-Six Cents ($183,080.66) in costs.

4. As a sanction for misleading testimony, Respondent Melchionni is liable to KS Law for Fifty Thousand Dollars ($50,000).

5. As a sanction for misleading testimony, Respondent Benito is liable to KS Law for Ten Thousand Dollars ($10,000).

6. Allan Teh is liable for Mr. Gelber's fees of One Hundred Seventy-Five Thousand Eight Hundred Sixty Dollars ($175,860.00) and costs of Thirty-Six Thousand Seven Hundred Ninety-Four Dollars and Thirty-One Cents ($36,794.31) for a total of Two Hundred Twelve Thousand Six Hundred Fifty-Four Dollars and Thirty-One Cents ($212,654.31).  He is further liable for Mr. Berman's fees of Forty-Nine Thousand Seven Hundred Six and Twenty-Three Cents ($49,706.23) and costs of Seven Hundred Sixty-Six Dollars and Eighty-Three Cents ($766.83) for a total of $50,473.06.

7. The administrative fees of the American Arbitration Association totaling $16,175.00 shall be borne equally by Claimant and Respondents Melchionni and Benito, and the compensation and expenses of the Arbitrator totaling $50,030.00 shall be borne equally by Claimant and Respondents Melchionni

and Benito.  Therefore, Respondents Melchionni and Benito, jointly and severally, shall reimburse Claimant the sum of $8,087.50, representing that portion of said fees in excess of the apportioned costs previously incurred and paid by Claimant, upon demonstration by Claimant that these costs have been paid.

The above sums are to be paid on or before 90 days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration.  All causes of action and claims for relief not expressly ruled on herein are denied with prejudice.


Date:  October 14, 2025                                                    *Sheila J. Carpenter*
                                                                                        Sheila J. Carpenter
                                                                                              Arbitrator


I, Sheila J. Carpenter, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Final Award.



                                                                                        *Sheila J. Carpenter*
Date:  October 14, 2025                                                    Sheila J. Carpenter
                                                                                              Arbitrator



Case No.: 01-23-0005-2721                                                                                25

Filing # 190836425 E-Filed 01/30/2024 01:05:24 PM

# Exhibit B

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## AGREED ORDER STAYING THE CASE PENDING RESULT OF ARBITRATION

**THIS CAUSE** having come before this Court and the Court being fully advised of the agreement of counsel, it is hereupon,

**ORDERED** and **ADJUDGED** that On October 27th, 2023, the Court entered an "Order Granting Motions to Compel Arbitration by Both Signatories and Non-Signatories to the Partnership Agreement Containing the Arbitration Provision" [DE #64], in which this Court compelled arbitration of the above-captioned case. Due to the possibility of post arbitration enforcement of any award, or other disposition, and the possible need for equitable relief/receivership, the Court reserved jurisdiction and kept this case open. But other than the receivership issues and pending motions for sanctions, there are no other substantive issues extant and thus no need for monthly CMC's or close monitoring while the arbitration is proceeding. Accordingly, all CMC's are cancelled.

The parties shall set this case for a status hearing in 180 days. Failure to set the case for status will result in the presumption that the case has been resolved through arbitration, no further judicial action is required and the court will dismiss this case.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>30th day of January, 2024</u>.

2023-015702-CA-01 01-30-2024 12:53 PM
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**

Filing # 235033858 E-Filed 11/03/2025 05:27:16 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 2023-015702-CA-01

ALAN TEH, on a derivative basis as partner of KS LAW GROUP, a District of Columbia Limited Liability Partnership,

     Plaintiff,

vs.

LEE MELCHIONI, individually; SYLVIA BENITO, individually; PERSIST COMMUNICATIONS, INC., a Florida Corporation; THE LAKE LAW FIRM, a New York Limited Liability Company,

     Defendants,

and

KS LAW GROUP, a District of Columbia Limited Liability Partnership,

     Nominal Defendant in Derivative Action.

_____/

## DEFENDANTS', PERSIST COMMUNICATIONS, INC. AND THE LAKE LAW FIRM'S, MOTION TO CONFIRM FINAL ARBITRATION AWARD AND FOR ENTRY OF FINAL JUDGMENT

Defendants, Persist Communications, Inc. ("Persist") and The Lake Law Firm ("LLF"), by

and through undersigned counsel, hereby file this Motion to Confirm Final Arbitration Award and

for Entry of Final Judgment:

## INTRODUCTION

Persist and LLF respectfully move this Court, pursuant to Section 682.12 of the Florida

Revised Arbitration Code, for an Order confirming the Final Arbitration Award ("Final Award")

issued on October 14, 2025, by Arbitrator Sheila J. Carpenter of the America Arbitration

**Gelber Law Group, P.A.**

2385 NW Executive Center Drive, Suite 100 Boca Raton, Florida 33431 ·Phone: 954-320-0100 · Fax: 754-217-5960

Association ("AAA"). The Final Award, a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "A"**, was rendered in favor of Persist and LLF following a week-long, in person arbitration hearing, continuing via Zoom over the following week.

The Final Award found in favor of LLF and Persist based on the claims brought against them on a basis of unjust enrichment, aiding and abetting the alleged fraudulent actions of Lee Melchionni ("Melchionni") and Sylvia Benito ("Benito"), and rejecting the notion that an equitable accounting was necessary. The Final Award also awarded LLF and Persist their reasonable attorney's fees and costs against Allan The ("Teh") for failing to prevail on the allegations raised against them. This Motion seeks to convert that vindicating decision into an enforceable Final Judgment. The specific monetary awards against Teh, for which LLF and Persist seek a corresponding Final Judgment from this Court, are as follows:

- Allan Teh is liable to Gelber Law Group for attorney's fees in the amount of One Hundred Seventy-Five Thousand Eight Hundred Sixty Dollars ($175,860.00);

- Allan Teh is liable to Gelber Law Group for costs in the amount of Thirty-Six Thousand Seven Hundred Ninety-Four Dollars and Thirty-One Cents ($36,794.31);

  o For a total of Two Hundred Twelve Thousand Six Hundred Fifty-Four Dollars and Thirty-One Cents ($212,654.31);

- Allan Teh is also liable to Young, Berman, Karpf & Karpf, P.A. for attorney's fees in the amount of Forty-Nine Thousand Seven Hundred Six Dollars and Twenty-Three Cents ($49,706.23); and

- Allan Teh is also liable to Young, Berman, Karpf & Karpf, P.A. for costs in the amount of $Seven Hundred Sixty-Six Dollars and Eighty-Three Cents ($766.83);

  o For a total of Fifty Thousand Four-Hundred Seventy-Three Dollars and Six cents

Page 2 of 6

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, Florida 33431 ·Phone: 954-320-0100 · Fax: 754-217-5960

($50,473.06).

As established herein, judicial review of an arbitration award is exceedingly narrow. Under Florida Law, confirmation is a mandatory, summary proceeding. Absent a timely and meritorious motion to vacate or modify the award on exceedingly limited statutory grounds, none of which exist here, this Court has no discretion and must confirm the Final Award.

## FACTUAL AND PROCEDURAL BACKGROUND

This action returns to the Court where it originated. Teh initiated this derivative action in this Court. By Order dated October 27, 2023, the Honorable Lisa Walsh compelled the parties to arbitrate their dispute pursuant to the binding arbitration agreement contained within the KS Law Partnership Agreement. *See* D.E. 64. Therefore, this Court has jurisdiction over this matter.

The ensuing arbitration before the AAA was a comprehensive and rigorous adversarial process that afforded all parties, including Teh, full and complete due process. The proceeding consisted of five full days of in-person testimony as well as two additional days via Zoom proceedings, and included post-hearing discussions and motions. The arbitrator continued to open the hearing to address any and all issues raised by the parties – on several occasions – and did not make her final ruling until eight months after the arbitration hearing concluded. With the exception of the undersigned – who came onto this case just three months before the final hearing – all parties had an army of attorneys and support staff to prosecute and defend this matter through post-hearing motions, including sanctions motions and post-hearing briefing. This exhaustive process ensures that the resulting Final Award is the product of a fair, deliberate, and complete adjudication on the merits.

On October 14, 2025, Arbitrator Carpenter finally issued her detailed 25-page Final Award, containing meticulous findings of facts and clarifying a few points raised in Rule 52 Motions. The

Page 3 of 6

Arbitrator's findings were dispositive, and fully vindicated LLF and Persist against these baseless and non-meritorious accusations raised by Teh.

## ARGUMENT

Florida maintains a strong public policy that favors arbitration and strictly limits the role of the judiciary in reviewing arbitration awards to ensure their finality and efficiency. *See Metalonis v. Boies Schiller Flexner LLP*, 350 So.3d 458 (Fla. 3d DCA 2022).

The Court's role in a confirmation proceeding is not to conduct a de novo review, re-weigh the evidence, or substitute its judgment for that of the arbitrator. Therefore, the Final Award must be confirmed pursuant to Florida law.

The Florida Revised Arbitration Code is unambiguous in its command to the courts. Section 682.12, Florida Statutes, provides:

> After a party to an arbitration proceeding receives notice of an award, the party may make a motion to the court for an order confirming the award at which time the court shall issue a confirming order unless the award is modified or corrected pursuant to s. 682.10 or s. 682.14 or is vacated pursuant to s. 682.13.
>
> *See Florida Statute § 682.12*

Seeing that Teh has also moved to confirm the Final Award, there is no basis not to confirm it, as Teh, LLF, and Persist all are in agreement that the Final Award should be converted to a Final Judgment. The Arbitrator's findings as it relates to Melchionni nor Benito affect LLF nor Persist from proceeding, and likewise none of the Arbitrator's findings as pertaining to LLF nor Persist affect Melchionni nor Benito.

## CONCLUSION

LLF and Persist have established that the parties participated in a comprehensive and fair arbitrator proceeding that resulted in a detailed, reasoned Final Award. Under the Florida Revised

**Gelber Law Group, P.A.**

2385 NW Executive Center Drive, Suite 100 Boca Raton, Florida 33431 ·Phone: 954-320-0100 · Fax: 754-217-5960

Arbitration Code and the controlling precedent of the Third District, judicial review of that Final Award is extraordinarily limited. No statutory grounds exist to vacate, modify, or correct the Final Award. Accordingly, this Court has a mandatory duty to confirm the Final Award and enter a judgment in conformity therewith.

**WHEREFORE**, Persist Communications, Inc. and the Lake Law Firm, respectfully move and request that this Court enter an Order and Judgment:

1. Granting this Motion to Confirm Final Arbitration Award;

2. Confirming the Final Award, attached as **Exhibit "A"**, in its entirety;

3. Entering a Final Judgment, pursuant to Section 682.15, Florida Statutes, in favor of Persist Communications, Inc. and Lake Law Firm in the amount of $212,654.31 in attorney's fees and costs payable to Gelber Law Group, P.A. and $50,473.06 in attorney's fees and costs payable to Young, Berman, Karpf & Karpf, P.A.;

4. Awarding LLF and Persist, pursuant to Section 682.15(3), Florida Statutes, their reasonable attorney's fees and costs incurred in connection with this proceeding to confirm the Final Award; and

5. Granting any such other relief that this Court deems just and proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was provided via Florida Courts e-filing Portal on this November 3, 2025, to: Matthew Jones, Esq. at JONES & ADAMS, P.A., Coral Gables Centre 999 Ponce de Leon Blvd., Suite 925 Coral Gables, FL 33134 (matthew@jones-adams.com).

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, Florida 33431 ·Phone: 954-320-0100 · Fax: 754-217-5960

**GELBER LAW GROUP, P.A.**
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida 33431
Phone: (954) 320-0100
Fax: (754) 217-5960
Primary email:      matt@gelberlawgroup.com
Secondary email:  victoria@gelberlawgroup.com
Service email:      eservice@gelberlawgroup.com
(For Pleadings Only)


By: ___/s/ Matt Gelber___
MATT GELBER, Esquire
Fla. Bar. No.: 115465

Page 6 of 6

**Gelber Law Group, P.A.**
2385 NW Executive Center Drive, Suite 100 Boca Raton, Florida 33431 ·Phone: 954-320-0100 · Fax: 754-217-5960

EXHIBIT "A"

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

**Allan Teh**, on a derivative basis as a partner of,
**KS Law Group, LLP**, a District of Columbia
Limited Liability Partnership, Claimant,

-vs-                                                    **Case No.: 01-23-0005-2721**

**KS Law Group, LLP**, a District of Columbia
Limited Liability Partnership,
**Lee Melchionni**, individually, **Sylvia Benito**,
individually,

-vs-

**Persist Communications, Inc**., a Florida Corporation,
**The Lake Law Firm, LLC**, a New York, LLC,
Respondents.

### FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into among Allan Teh, KS Law Group, LLP, Lee Melchionni and Sylvia Benito, and dated August 24, 2021, and having been duly sworn, and having duly heard the proofs and allegations during hearings conducted January 6-10, 13-14, 2025 and April 24, 2025, offered by Claimant, represented by Matthew Jones, Esq. and Cheyenne Moghadam, Esq., Respondents KS Law Group, LLP, Lee Melchionni, Esq. and Sylvia Benito, represented by Michael Stolper, Esq., Lauren Elliot, Esq., Ian Weiss, Esq., and Thomas Mott, Esq., and Respondents Persist Communications, Inc. and The Lake Law Firm, LLC, represented by Matthew Gelber, Esq. and Amiad Kushner, Esq., and having previously rendered a Partial Final Award dated July 11, 2025, hereby AWARD as follows:

For convenience the Partial Final Award rendered on July 11, 2025 is included in this Final Award, as modified by certain of the clarifications requested by the

Case No.: 01-23-0005-2721                                                        1

parties and some wordsmithing the Arbitrator deemed appropriate.  The Arbitrator ruled on the parties' requests for clarification in an Order dated August 29, 2025.

## PROCEDURAL BACKGROUND

Claimant Alan Teh ("Teh") originally brought this derivative action on behalf of KS Law Group, LLP ("KS Law") in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.  By Order dated October 27, 2023, the Honorable Lisa Walsh ordered the case into arbitration and determined that The Lake Law Firm, LLC ("Lake Law") and Persist Communications, Inc. ("Persist") should be included in the arbitration.  JX 124, Ex. 2 to Teh Demand.[1] Teh shortly thereafter filed his Demand for arbitration with the American Arbitration Association ("AAA").  This matter was heard pursuant to AAA's Commercial Rules.  The substantive law of the District of Columbia applies to Claimant's claims.

The Arbitrator finds that a demand on KS Law to address Teh's complaints would have been futile and is thus excused.

The arbitration agreement allowed for extensive discovery (JX 15@¶39), and after that took place, hearings were held for all or parts of seven days in January 2025. Post-hearing briefing was agreed to and on the same day that Respondents' post-hearing briefs were due, Teh filed a Motion for Sanctions.  The Motion argued that Respondents Lee Melchionni ("Melchionni") and Sylvia Benito ("Benito") had been untruthful in their testimony about their membership in certain District of Columbia law firms.  The Arbitrator was advised that discovery in a related matter subsequent to the hearing in this matter had revealed that these two Respondents had received millions of dollars from DC law firms that they failed to reveal to the Arbitrator during the hearings.  Melchionni and Benito attempted to excuse their failure to disclose these partnerships by pointing to the production by JP Morgan Bank of voluminous documents, a few of which contained the names of these partnerships.  Considering that the JP Morgan production took place a week before Christmas and that the lengthy hearing was to commence January 6, 2025, the Arbitrator cannot fault counsel for Teh for failing to go through these documents with a fine-toothed comb looking for undisclosed partnerships.  Information from a third party does not excuse withholding information.  "You should have caught me" is not an excuse for the failure to disclose the important information that a)

---

[1] Joint exhibits will be referred to as "JX", Claimant's as "CX", Melchionni and Benito's as "M/B Ex." and Persist/Lake Law's exhibits as "P/L Ex."

Case No.: 01-23-0005-2721                                                                  2

Melchionni and Benito had interests in other DC law firms not disclosed to the Arbitrator and b) they had been paid millions of dollars as a result of Employee Retention Tax Credit ("ERTC") claims filed by these firms at a time when KS Law had received zero dollars from any of its cases.  More important, the Arbitrator has carefully read and reread the testimony of these two witnesses at the hearing and finds that their answers, particularly Melchionni's, were misleading at best.

The Arbitrator, after considering the parties' submissions and input from counsel, held an additional hearing on April 24, 2025, at which Melchionni and Benito provided additional testimony.  The Arbitrator did not find their explanations and those of their counsel satisfactory.  However, Claimant requested default as a sanction and that is not permitted under the AAA's Commercial Rules.  Nonetheless, the failure to be candid at the hearings speaks to Melchionni and Benito's credibility and warrants a monetary sanction pursuant to the Arbitrator's power to enter an appropriate sanction per Commercial Rule 60(a).

## RELIEF SOUGHT

Teh's Demand seeks the following relief on behalf of KS Law:

1. Appointment of a receiver for KS Law.
2. Awards of damages against Melchionni and Benito for fraud.
3. Awards of damages against Melchionni and Benito for breach of fiduciary duty.
4. Awards of damages against Lake Law and Persist based on a theory of unjust enrichment.
5. An equitable accounting from Lake Law and Persist and damages pursuant to the accounting.
6. Awards of damages against Lake Law and Persist for aiding and abetting the alleged fraudulent actions of Melchionni and Benito.

The Arbitrator finds in favor of Claimant on the first and third claims and further finds that the remaining claims were not proved sufficiently.

## FACTS

The Parties stipulated to the following facts:

1. KS Law is a District of Columbia law firm formed on August 24th, 2021.

Case No.: 01-23-0005-2721                                                                 3

2. At all times material hereto, KS Law had three "Managing Partners," each owning a certain ownership interest, as set forth below:

a. Lee Melchionni, Esq.: 25%
b. Sylvia Benito: 25%
c. Allan Teh: 50%

3. On September 3rd, 2021, Teh wired $4 million as a capital contribution into the KS Law Account at Chase Bank (Acct. Ending in ***6138).

4. Teh's $4 million capital contribution is the only capital contribution KS Law has received.

5. Four days following the deposit of $4 million in KS Law's bank account, Melchionni began a series of eight (8) wire transfers, totaling $3,880,000, to Persist's TD Bank Account.

6. Persist Communications, Inc. ("Persist") is a Florida Corporation wholly owned by Edward J. Lake ("Lake").

7. Lake is also the sole equity partner of Respondent, The Lake Law Firm, LLC ("Lake Law"), a New York law firm.

8. KS Law was not identified by name on any retainer agreements when they were originally signed by clients.

9. Melchionni and Benito are partners in at least seven (7) other D.C. law firms which were formed within a year of KS Law's formation.

The Parties subsequently stipulated that all the Joint Exhibits could be admitted in evidence.  CX 1, 3, 5 and 6 were admitted.  M/B Ex. 1 and 2 were admitted as were 3 versions of P/L Ex. 1 and P/L Ex. 4-6.

It is undisputed that Melchionni, as the sole attorney in the partnership, was and is the legal managing partner of KS Law as well as numerous other DC law firms with a similar structure.  Benito worked closely with Melchionni to put together numerous litigation financing deals to fund the pursuit of mass tort settlements (or litigation) with the purpose of generating legal fees.  It is undisputed that the partners in KS Law owed fiduciary duties to one another.

Case No.: 01-23-0005-2721                                                                                     4

Whether KS Law should have had an IOLTA account, as required by the DC Bar Rules of Professional Conduct when client funds are held, is not an issue because, at least to date, KS Law has never held client funds.

### Benito and Melchionni Introduce Teh to Litigation Financing

Teh is a wealthy investor with a Wall Street/hedge fund background who formed a family office which researched and helped him manage investments. Benito, who worked for a family office herself, was an acquaintance of Teh's and introduced him to the idea of litigation financing and to Melchionni in early 2021. Prior to speaking with Benito, neither Teh nor his staff had any familiarity with the workings of litigation financing. In his testimony, Teh complained that Benito and Melchionni led him to believe that they were experts in mass torts, but he discovered later that "they did not know what they were doing."

Teh's initial investment with Benito and Melchionni was with an entity named Justice Partners, LLC, a Delaware limited liability company. This was not a law firm like KS Law but an investment fund that supported a District of Columbia law firm, Justice Partners Law Group, LLC, through a loan to that firm of all its capital. *See* M/B Exs. 2, 4. Teh invested $4 million in Justice Partners, LLC. This investment provided him with the opportunity to make an additional investment of $4 million dollars into a DC law firm solely owned by Teh, Benito and Melchionni. As noted in the Stipulation, KS Law was formed on August 24, 2021 and Teh wired his $4 million capital contribution on September 3, 2021. Melchionni immediately forwarded $3.88 million from Teh's contribution to Persist, a marketing firm that worked with Lake Law. The Arbitrator finds that Teh was never told anything about Persist until much later and was not told that all his money would immediately be transferred to one marketing firm.

Justice Partners, LLC was sold using the types of disclosures that normally accompany the sales of securities. They contained the usual warnings about the risks accompanying a new venture and specifically stated that the generous return on investment suggested would take 3 to 5 years to develop. *See, e.g.*, M/B Ex. 2. As noted below, Benito and Melchionni repeatedly suggested to Teh that returns to KS Law in the form of legal fees from mass torts settlements could come much earlier. It has been almost four years since Teh invested in KS Law and so far, only a trivial amount of attorneys' fees has been collected. It is expected that at least some additional fees will be collected but the timing and amount are unknown.

Case No.: 01-23-0005-2721                                                                 5

**Benito and Melchionni's Representations to Teh concerning KS Law**

KS Law's structure was different from Justice Partners.  There was a paucity of written material presented to the Arbitrator as to the representations and cautions that accompanied the formation of KS Law, resulting in oral testimony taking on some significance.  Unfortunately, none of the three partners in KS Law was a particularly compelling witness.

Teh testified that he met Benito in January 2021 when he was having drinks with some people that he knew. She told them about her success with a mass torts investment in the Boy Scouts cases.  He recalled that she said she was going to start a fund with Melchionni who had 10 years of mass torts experience.  She described the investment as tax efficient and not correlated with the stock market.  He met Melchionni a month or two later and further discussion led to his investment in the Justice Partners fund.  He described his investment in KS Law developing as follows:

> Well, since I invested in Justice Partners in March, they were telling me how well the investments were doing. Basically they were only going to invest in cases that were already qualified and in negotiation settlements. So these are the cases where they pay a significant premium over the marketplace and they were telling me that the cases are going well and in some cases some of them might settle even at the end of 2021. So I said, you know, if that's the case, should we invest more.
>
> Q. And what did they say?
>
> A. They said sure. We can do it in a law firm structure, in which case you have better control over what you're going to own because it's a 50 percent ownership law firm that you're going to have.

Tr. 32.  He went on to say that Benito and Melchionni told him that "as far as Justice Partners is concerned, they have discretion as to what cases they are going to be acquiring for the fund, whereas with KS Law I had veto power over what cases the law firm can acquire."  Tr. 33.

Just prior to his investment in KS Law, on August 24, 2021, Benito sent Teh a text (JX 21) stating:

Case No.: 01-23-0005-2721                                                                                          7

> 1- Talc. We have 714 cases. Continuing to see strong signals from J & J that we will see settlement in next 12 months, we took the move to bankruptcy as non material[.] 2mesh. Seeing fast intake, cost is steady, we have 1000 cases and monitoring work up for drop off ( we have case replacement) 3- roundup. We got a unique window of opportunity to invest in this case which we thought formerly was in accessible but we have a vendor now for the case- our base assumption is 2-3x in 24 months 4- 3M, three trials, two positive results and we are hearing they are ready to [remainder cut off]

Teh testified that Melchionni and Benito told him that they would be purchasing qualified cases for KS Law that were already in settlement negotiations. Benito and Melchionni denied that they said this.

Teh understood that he was providing all the capital for KS Law. In October 2021, Melchionni advised that his money had been used to purchase 775 cases. JX42. While the Arbitrator is not convinced that Teh was told all his cases were already in settlement discussions, he reasonably understood these to be actual "cases" of some sort, *i.e.*, clients in being. He did not understand that his money would be used to pay for advertising campaigns to attract new clients who not only had not yet filed cases, they had not even been screened to see if they had the potential ever to be clients and thus become "cases." Once potential clients responded to the advertising, their information needed to be confirmed and their medical records obtained to be sure they met the criteria needed to file suit. The clients needed to sign a retainer agreement and a package of information would be put together for use by a litigation firm that would actually file suit. This workup was done by Persist/Lake Law and/or its vendors. For the good cases, Lake Law would take care of hiring counsel to file suit. Melchionni is not a trial lawyer and had no experience managing a law firm. He has never spoken to a KS Law client and, of more concern, has never reviewed any medical records even to spot check whether Lake Law's determinations that potential clients were qualified were correct. Benito and Melchionni did monitor the *number* of cases produced by Lake Law and could track their progress via Lake Law's software from the initial lead to either disqualification or being sent to trial counsel for filing.

The Arbitrator concludes, after weighing the testimony and documents, that Teh was told that KS Law would be acquiring actual clients and was not told that his investment in KS Law would only fund an advertising campaign. He would not have invested $4 million in KS Law had he understood this. Teh proved by a preponderance of the evidence that Benito and Melchionni made material misrepresentations to him. However, the evidence did not rise to the level of the

Case No.: 01-23-0005-2721

8

"clear and convincing" evidence required to prove fraud.  Nonetheless, once they became his partners, they had a fiduciary duty to disclose to Teh where and how his money was being spent.  They did not do so.

Benito and Melchionni took the position with Teh and at the hearing that it did not matter which version of their representations was true because Lake Law guaranteed a certain number of cases.  If a potential client did not turn into a viable case because medical records did not support their claim, Lake Law had to find another prospect with good medical records.  When it became apparent that Lake Law had not delivered the promised cases, Benito and Melchionni negotiated a "Case Replacement Agreement" ("CRA") (JX 91) that provided that KS Law would get its money back plus interest if Lake Law were not able to produce the promised cases.  This agreement is of little use to KS Law because Persist is no longer doing business and Lake Law is insolvent as a practical matter.  No more cases are going to be produced than are already on KS Law's docket and its only hope of more cases is if Lake Law can substitute ERTC cases for missing Talcum Powder cases.  Lake Law offered to replace each missing Talcum Powder case with claims for 6 employees who were part of an ERTC claim.

The Arbitrator finds that Benito and Melchionni did adequate due diligence before doing business with Lake and his companies.  They checked his reputation with others in the business and found him to be well-respected and experienced.  They had not actually worked with him, however, and they were not experienced in the roles they undertook for their law firm clients.  It was grossly negligent to put all of their clients' capital into his business all at once.  In particular, it was grossly negligent to pay Persist $6000 each for 200 Talcum Powder cases.  The Talcum Powder cases against Johnson & Johnson had been going on for several years, with the result that many potential clients had already retained counsel, making it unrealistic to expect a large volume of good clients.

Benito and Melchionni formed numerous DC law firms using the same model as KS Law.  They also formed a firm known as Titan Law Group ("Titan") in which they were the only partners.  Titan was used as a "placeholder" for certain of the law firms they formed with individual investors.  When clients were asked to sign retainer agreements after their vetting was complete, only Titan and Lake Law were named as the law firms that the clients were engaging.  Respondents' witnesses testified that there was then an internal process at Lake Law that allocated individual cases to the individual law firms on what was described as a "round robin" basis.  In other words, cases were assigned by a computer program to the individual law firms in a sequential pattern as they came in.  The result of

Case No.: 01-23-0005-2721                                                                 9

this process was that KS Law was never identified to clients as their law firm, and it has no retainer agreements with clients.  This was not disclosed to Teh before or at the time of his investment.  It was also, as discussed below, a violation of the DC Bar Rules of Professional Conduct.  In violation of their fiduciary duties, Benito and Melchionni did not look at the cases assigned to the DC law firms in question to make sure that the assignment resulted in an even distribution of qualified cases.  The Arbitrator was not supplied with sufficient information to determine whether this was the case.

## The Investment in KS Law Sours

Shortly after Teh invested in KS Law, in response to Teh's assistant asking for "an update on how much [of Teh's $8 million] has been invested[2] and what the distribution is per case type", he was provided with a list of "cases" that the Melchionni and Benito had allegedly purchased for KS Law.  JX 42, an email from Melchionni to Teh's assistant dated October 18, 2021, recites that 775 cases had been or were to be acquired:  155 Round Up, 200 Talc[um Powder], 212 Hernia Mesh and 212 3M [ear plugs].  A list of client names and contact information was attached.  Melchionni further stated:  "The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost."  As to the Hernia Mesh cases, he said:  "We continue to march towards settlement with multiple manufacturers. We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022."  As to 3M, he reported that plaintiffs had been successful in 3 out of 4 trials and "[t]here are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months."  He reported old news about Bayer's allocation of funds toward RoundUp cases and indicated that he would report later on Johnson & Johnson's bankruptcy efforts.

In the fall of 2022, Benito and Melchionni revealed to Teh the fact that the 775 cases he thought he had purchased had dwindled down to a smaller number due to "drop off."  Drop off can occur for a variety of reasons, including lack of response from the potential client, difficulty in obtaining medical records (exacerbated

---

[2] Benito and Melchionni repeatedly argued that Teh should have known that all his money would be invested at once and he would have wanted to invest all his money all at once.  If that were the case, he would not have instructed his assistant to ask how much of his money had been invested several weeks after his capital contribution.

during the Covid pandemic), the potential client not meeting the criteria for a good claim, or having previously engaged counsel.[3]  Teh was furious when he found out how his money had actually been used, that it was all spent and KS Law did not have anywhere near the number of cases he had been told it had.  He was also upset that Benito and Melchionni had not kept him informed of the problems with case development.  Benito testified that Teh kept screaming "I want my cases!", was abusive to her and was not cooperative in trying to find a solution for the problems.  Her proposed solution was to find a buyer who would buy Teh's portfolio for 80% of what he had paid for it.  Benito's fiancé also transferred some 3M cases from his DC law firm to KS Law.  Teh was not satisfied.

KS Law's situation got worse from there.  Benito and Melchionni testified that one reason they invested all their clients' money with Persist/Lake Law is that their contract offered a "medical records guarantee."  This meant that if a lead generated by a Persist advertising campaign turned out not to qualify for medical reasons, they would replace that potential client with a new one.  Although the guarantee sounded good in theory, it did not work in practice as Persist/Lake Law has not been able to find enough qualified clients to fulfill the numbers promised.  After this became apparent, as noted above, Benito and Melchionni negotiated the CRA with Lake.  JX 91.  The CRA, effective December 1, 2022, provided that KS Law's share of attorneys' fees was enhanced.  To the extent Lake Law was unable to fulfill its obligations on talcum powder cases, it could substitute ERTC claims at the rate of 6 employees supporting ERTC claims per talcum powder case.  Failing that, Lake Law would reimburse KS Law for the number of missing cases at the price paid, *i.e.*, $6,000 per Talcum Powder case plus 8% simple interest per year from September 1, 2021.  For the other categories of cases, monetary reimbursement was agreed.  Melchionni signed the CRA on behalf of KS Law on December 28, 2022.  Again, although the CRA sounded good in theory, it did not work in practice as Persist/Lake Law were unable to provide enough good cases and they were insolvent no later than the end of 2023.

There is another contract that was the focus of attention at the hearings, JX 26, a document on the letterhead of Lake Law entitled "Invoice."  Respondents referred to this document as an "insertion order."  It recites that KS Law is ordering the following "cases":  220 Hernia Mesh @$5,600 each for a total of $1,232,000, 200

---

[3] Information produced by Lake Law at the hearing suggests that the primary reasons for drop off in the KS Law docket were that the potential client was unresponsive to further contact or was unqualified for inclusion in the group of clients suing for a particular injury.  *See* P/L Ex. 1.  For example, a talcum powder claimant might have suffered from a cyst rather than cancer.

Case No.: 01-23-0005-2721                                                            11

Talc @\$6,000 each for a total of \$1,200,000, 155 Round Up cases @\$5,048.39 each for a total of \$782,500, and 220 3M cases @\$3,025 for a total of \$665,500. The grand total was \$3,880,000.00, all the money that KS Law transferred to Persist in September 2021 except for a bit held back to pay Benito and Melchionni for their services to KS Law.

The Invoice is signed by Melchionni and dated September 1, 2021 although Melchionni testified it was not actually signed until September of 2022. The failure to document what KS Law was to receive for its \$3.88 million was an "oversight" on Melchionni's part. Tr. 366-67. He went on to admit that he had not advised his partners of this oversight and when asked why he had not, he said: "I don't recall." (This answer was given with disturbing frequency during Melchionni's testimony.) Lake testified that he was the one who initiated this documentation. Tr. 1270-71. Benito and Melchionni's decision to send all of KS Law's capital to Persist without a firm contract and their failure to correct that oversight for more than a year was grossly negligent.[4]

Melchionni also blamed "oversight" for his failure to obtain the liability insurance he was required to obtain by ¶37 of the Partnership Agreement. He did not advise Teh of his failure to obtain insurance until Teh made a demand for the books and records of the partnership in late 2022. KS Law was able to obtain insurance and no claims have been made against it that would trigger that insurance. Melchionni argues that since no claims have been made, this is a "no harm, no foul" situation. Melchionni's failure to take this basic step was grossly negligent but KS Law has suffered no damage as a result.

Melchionni's "oversights" on important matters while he was the Legal Managing Partner of KS Law lead the Arbitrator to conclude that Melchionni provided little management to KS Law. This is not surprising given the large number of law firms in which he was a partner, the number of times he was named as Legal Managing Partner in those firms, that he had little relevant experience actually practicing law and no experience managing a law firm.

Benito testified that she became concerned about "drop off," particularly in the talc cases, by the summer of 2022. Tr. 1085-87. As late as May 12, 2022, when

---

[4] Benito and Melchionni take the position that the indemnification clause in the KS Law partnership agreement requires that they must be found to have been grossly negligent to have any liability to the partnership. The Arbitrator does not agree with that interpretation but includes findings of gross negligence should a reviewing court disagree.

Melchionni updated Teh on progress, he continued to project confidence about the timing and amount of potential returns to KS Law.  His memo (JX 56) memorializing their conversation states that he told Teh:

> Talc
> ● I spoke to our co-counsel on Talc and he had a positive update. He sat in on settlement negotiations last week in NYC where several "indications" of settlement offers were floated by JJ. The potential numbers proposed by JJ were at the upper end of what we modeled. Now, obviously, things could change, and no agreement was reached, but there is positive momentum towards a resolution. From a timing standpoint, hard to predict, but cautiously optimistic a settlement is reached within 2022, followed by actual cash flow within 6-12 months.
>
> Hernia Mesh
> ● I know I am beating a dead horse, but our co-counsel tells me Bard could settle in 2 weeks or 2 months. This is because a global settlement needs to be reached with MDL before our counsel settles because our values will be higher. Bard will make up a minimum of 60% of our docket. Similar to Talc, we expect funds to flow 6-12 months after settlement is reached.

Melchionni testified at the hearing in January 2025 that KS Law had "100 active 3M cases, it has 70 active hernia mesh cases, it has 60 active Roundup cases, and it has 38 active employee retention tax credit."  Tr. 515.  These numbers do not exactly match the cases listed on P/L Ex. (v.3) but are close enough that the differences are not material.

Benito and Melchionni did not treat Teh as an equal partner in KS Law's business although he owned 50% of it and had provided all its capital.  They failed to provide him with important information in a timely way.  For example, they spent all his money at once with one vendor without consulting him and without telling him until he asked.  They led him to believe everything was fine until they had to admit it was not.  As his partners, Benito and Melchionni owed Teh and KS Law a fiduciary duty.  It is apparent from the facts recited above that they breached their duty of care and duty of loyalty, thus breaching their fiduciary duties.

## Damages

As discussed above, Claimant's fraud claims were not proved but its breach of fiduciary duty claims were.  The next question is: did KS Law suffer any damages

Case No.: 01-23-0005-2721

13

as a result of the breaches of fiduciary duty, and if so, in what amount?  The Arbitrator does not accept the theory of damages put forward by Claimant's expert which primarily relies on Benito's projections of what KS Law might earn.  These projections are more reasonably construed as estimates rather than promises.  The failure to meet projections for an investment, particularly one as uncertain as mass torts, cannot normally be the basis for damages.

District of Columbia law prohibits the award of speculative damages.  It also requires that a plaintiff who discovers an injury must file suit for that injury, even if future damages are unknown, or risk a statute of limitations bar.  Thus, an injured party cannot simply wait until its damages are certain to make its claim.  The principles as to uncertain damages have often been outlined by the Court of Appeals and are summed up in *NCRIC, Inc. v. Columbia Hospital for Women Medical Center, Inc*., 957 A.2d 890, 902-03 (D.C. 2008):

> A plaintiff need prove damages only with reasonable certainty. While an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award. "The evidence offered must form an adequate basis for a reasoned judgment;" "mathematical precision" is not required.  Furthermore, "the courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible."  [Citations omitted.]

In other words, difficulty in calculating damages does not allow a tortfeasor to escape the consequences of his or her actions.

The Arbitrator has no doubt that KS Law has suffered and will suffer losses due to the failures of Benito and Melchionni outlined above. A huge volume of leads has already been disqualified and little has been accomplished in the way of finding substitute cases.  The fact is that KS Law's final damages are unknown at this point.  It does have cases assigned to it at Lake Law that have been filed in court or sent to counsel for filing.  *See e.g.*, P/L Ex. 1.  Some 3M cases have been settled (although the fees had not made their way to KS Law at the time of the hearings) and it is reasonable to expect that some additional 3M ear plug cases will settle.

If Melchionni's recitation of the number of cases KS Law had is accurate, the firm is short 120 3M cases, 150 Hernia Mesh cases and 95 Round Up cases.  It is short

Case No.: 01-23-0005-2721                                                                14

the entire 200 Talcum Powder cases for which it paid $1.2 million, $6,000 for each case.[5]

If credit is given for the 38 ERTC employees, then it is short 194 Talcum Powder cases and received $36,000 in value for its $1.2 million.  KS Law paid a total of $1,232,000 for the 220 Hernia Mesh ($5,600 each) but received only $560,000 in value.  KS Law paid a total of $782,500 for 155 Round Up cases ($5,048.39 each) but received only $479,597 in value.  It paid $665,500 for 220 3M ($3,025 each) but received only $302,500.  The Arbitrator is using the price paid as the "value" because there is no other basis for determining what the cases Persist was supposed to produce should have cost.  Since Melchionni and Benito agreed to pay these amounts with KS Law's money; they should have no complaint about the use of the cost charged as the value.

The shortfall is calculated as follows.

| | | |
|---|---|---|
| Talc | $1,200,000 - $36,000 | = $1,164,000 |
| Hernia Mesh | $1,232,000 - $560,000 | = $   672,000 |
| Round UP | $  782,500 - $479,597 | = $   302,903 |
| 3M | $  665,500 - $302,500 | = $   363,000 |
| Total | | $2,501,903 |

To put it another way, for Teh's investment of $3.88 million, KS Law received $1,378,097 worth of leads.  These figures are of course not precise.  Some of the cases Melchionni mentioned may be disqualified and more ERTC claims may be added.  This is not the only way to value KS Law's damages but it is the best there is.  Persist/Lake Law had plenty of time to find clients for KS Law and Benito and Melchionni have had plenty of time to find another solution for their reckless actions and omissions.

On May 20, 2025, counsel for Benito and Melchionni represented in an email that KS Law had or would receive about $109,000 in attorneys' fees from 3M and ERTC cases.  This information is not in evidence and the timing of this announcement, a week before final argument, is problematic.  Nonetheless, the Arbitrator finds that it is likely that KS Law will receive some attorneys' fees from its assigned cases.  It is not possible to estimate how much since clients may drop out, offers of settlement may be disappointing or not materialize at all, and cases that are tried may produce great results or nothing.  This is an additional reason

---

[5] P/L Ex. 1 (v.3) does reflect a few Talcum Powder cases.

Case No.: 01-23-0005-2721                                                                 15

that the Arbitrator has chosen to measure KS Law's damages by looking at what KS Law was supposed to receive but did not.

This Final Award assesses Melchionni and Benito, jointly and severally, with $2.5 million in damages.

In addition, the Arbitrator will impose a monetary sanction of $40,000 on Melchionni and $10,000 on Benito for misleading the Arbitrator and the other parties at the hearings.

## Lake Law and Persist

Given that the fraud claims against Benito and Melchionni have not been proved, the claim for aiding and abetting fraud against Lake Law and Persist must be dismissed.  Mr. Lake and his employees were not involved in the representations made to Teh by Benito and Melchionni.  Lake Law and Persist did not deliver what they promised but Claimant did not assert a breach of contract claim against them. Testimony and exhibits at the hearing showed that Lake Law and Persist performed significant services for KS Law.  Persist paid for advertising campaigns which produced leads that Lake Law or its vendors worked up to see if they could turn them into viable cases.  Both companies had significant internal and external costs.  Lake Law and Persist were therefore not unjustly enriched.  There is, on this record, no reason for the accounting requested although certainly the receiver for KS Law could conduct an audit if he or she should suspect any impropriety in the allocation of cases to KS Law or the work done on those cases.

## A Receiver Should be Appointed

Lake Law is currently in the hands of a manager appointed by Burford Capital, a large litigation financing firm which loaned Lake Law $15 million.  This creditor, and Benito and Melchionni to a lesser extent, have kept Lake Law out of bankruptcy by paying its expenses in the hope that proper management of its docket will produce positive returns.  The current manager is beholden to the creditor that appointed him, and Benito and Melchionni cannot be trusted to look after the rights of KS Law.  This is a dangerous situation for KS Law.  It is therefore necessary to appoint a receiver to be sure that KS Law has received its assigned cases appropriately and collects what it is owed as cases are tried or settled.  Upon receipt of the Final Award in this matter, counsel for Claimant shall transmit a copy to Judge Walsh noting that the Arbitrator has requested the appointment of a receiver.

Case No.: 01-23-0005-2721                                                          16

**KS Law and the District of Columbia Bar Rules of Professional Conduct**

D.C. Rule 5.4 provides in part:

(b) A lawyer may practice law in a partnership or other form of organization in which a financial interest is held or managerial authority is exercised by *an individual nonlawyer who performs professional services which assist the organization in providing legal services to clients*, but only if:

(1) The partnership or organization *has as its sole purpose providing legal services to clients;*

(2) All persons having such managerial authority or holding a financial interest undertake to abide by these Rules of Professional Conduct;

(3) The lawyers who have a financial interest or managerial authority in the partnership or organization undertake to be responsible for the nonlawyer participants to the same extent as if nonlawyer participants were lawyers under Rule 5.1;

(4) The foregoing conditions are set forth in writing.

*Emphasis added.* Comments to Rule 5.4 include the following:

[7] As the introductory portion of paragraph (b) makes clear, the purpose of liberalizing the Rules regarding the possession of a financial interest or the exercise of management authority by a nonlawyer is to permit nonlawyer professionals to work with lawyers in the delivery of legal services without being relegated to the role of an employee. For example, the rule permits economists to work in a firm with antitrust or public utility practitioners, psychologists or psychiatric social workers to work with family law practitioners to assist in counseling clients, nonlawyer lobbyists to work with lawyers who perform legislative services, certified public accountants to work in conjunction with tax lawyers or others who use accountants' services in performing legal services, and professional managers to serve as office managers, executive directors, or in similar positions. In all of these situations, the professionals may be given financial interests or managerial responsibility, so long as all of the requirements of paragraph (c) are met.

Case No.: 01-23-0005-2721                                                                    17

> [8] *Paragraph (b) does not permit an individual or entity to acquire all or any part of the ownership of a law partnership or other form of law practice organization for investment or other purposes. It thus does not permit* a corporation, an investment banking firm, *an investor*, or any other person or entity *to entitle itself to all or any portion of the income or profits of a law firm* or other similar organization. *Since such an investor would not be an individual performing professional services within the law firm or other organization, the requirements of paragraph (b) would not be met.*

*Emphasis added.*

KS Law's partnership agreement itself (JX 15) complies with Rule 5.4(b) in meticulous detail, outlining duties for Benito and Teh in ¶13, in accord with the advice received from ethics counsel. One of the attachments to JX 42 is an opinion of ethics counsel, Jack Marshall, Esq., concerning the interpretation of this rule. He states that "[h]aving a non-lawyer who had no duties in the operation of the firm would be misrepresentation, which constitutes rule 8.4 misconduct."[6] Mr. Marshall goes on to advise:

> Thus, a non-lawyer partner brought into the firm primarily to provide financial resources must still work to make the partnership valid and prevent the participation from appearing to be an investment. Such a partner's function could include management, strategic consulting, or any other legitimate non-legal duties that would strengthen the firm and enhance its ability to serve clients. Obviously, they must be real duties, not imaginary ones.

However, it is undisputed that Teh performed no duties for the firm, he was never asked to perform any duties and no one expected that he would do anything other than wire transfer $4 million to KS Law. His role was to supply capital for the firm and then sit back and wait for the legal fees to roll in from the settlement of mass tort cases filed by other law firms. Teh's investment was exactly the passive investment that Rule 5.4(b) prohibits.

KS Law's partnership agreement recites that its sole purpose is the practice of law. In fact, it does not engage in the practice of law; its sole purpose was and is to act as a vehicle for Teh to invest in the mass torts industry and hopefully collect attorneys' fees as cases in which it was invested were tried or settled. KS Law's

---

[6] The Arbitrator is dubious that violation of this Rule would constitute Rule 8.4 misconduct.

Case No.: 01-23-0005-2721                                                                 18

sole activity was to provide funding to Persist, a marketing firm that recruited clients for Lake Law through advertising campaigns. KS Law has only one lawyer, Melchionni, who does not do legal work for it. Melchionni's touted 10 years of experience with mass torts was primarily on the financing side.

In his testimony, Melchionni cited the above-quoted opinion of counsel in defense of the structure of KS Law and his other DC law firms. It obviously does not support Melchionni's choices in structuring his DC law firms. It is plain that KS Law was not a proper law firm within the meaning of Rule 5.4. It was not in the interest of any party to this arbitration to argue this issue. The Arbitrator mentions it because Melchionni's consistent denial of the fact that he ignored Mr. Marshall's advice is another factor speaking to Melchionni's credibility and his willingness to misrepresent KS Law's status.

### Retainer Agreements

D.C. Rule 1.5 provides in part:

> (e) A DIVISION OF A FEE BETWEEN LAWYERS WHO ARE NOT IN THE SAME FIRM MAY BE MADE ONLY IF:
>
> (1) THE DIVISION IS IN PROPORTION TO THE SERVICES PERFORMED BY EACH LAWYER OR EACH LAWYER ASSUMES JOINT RESPONSI BILITY FOR THE REPRESENTATION;
>
> (2) THE CLIENT IS ADVISED, IN WRITING, OF THE IDENTITY OF THE LAWYERS WHO WILL PARTICIPATE IN THE REPRESENTATION, OF THE CONTEMPLATED DIVISION OF RESPONSIBILITY, AND OF THE EFFECT OF THE ASSOCIATION OF LAWYERS OUTSIDE THE FIRM ON THE FEE TO BE CHARGED;
>
> (3) THE CLIENT GIVES INFORMED CONSENT TO THE ARRANGEMENT; AND
>
> (4) THE TOTAL FEE IS REASONABLE.

*Caps in original.* Comment 14 to this Rule explains:

> [14] Paragraph (e) requires that the client be advised, in writing, of the fee division and states that the client must affirmatively give informed consent

Case No.: 01-23-0005-2721                                                          19

to the proposed fee arrangement. For the definition of "informed consent," see Rule 1.0(e).[7] The Rule does not require disclosure to the client of the share that each lawyer is to receive but does require that the client be informed of the identity of the lawyers sharing the fee, their respective responsibilities in the representation, and the effect of the association of lawyers outside the firm on the fee charged.

There are no retainer agreements naming KS Law as counsel, let alone Melchionni. This is a fact that KS Law, and indeed its counsel, kept hidden from Teh and the Arbitrator until the Arbitrator ordered production of KS Law's retainer agreements. Then it was disclosed that there were none, but Lake Law was attempting to get client agreement to KS Law's participation through email correspondence. At the time of the hearing, some clients had agreed and others had not responded.

At the hearing, expert witnesses for Benito and Melchionni testified that this is the way things are done in the mass tort industry, and that it is of no consequence that KS Law is not named in any retainer agreements. It may well be that this is the way it is done, but it cannot be done this way by a District of Columbia law firm. Clients are entitled to know who is representing them although here there is arguably "no harm, no foul" because KS Law is not doing any legal work.  Of much more significance, the failure to have retainer agreements for KS Law's clients meant that Teh and his counsel had no way to verify whether there had been any changes to cases assigned to KS Law through the proffered round robin arrangement, another breach of fiduciary duty by Melchionni and Benito.

## ATTORNEYS' FEES AND COSTS

KS Law's Partnership Agreement provides that the prevailing party in an arbitration is to be awarded its costs and fees, including reasonable attorneys' fees. JX 15@¶39.  Claimant KS Law[8] is the prevailing party as to its claims against Respondents Melchionni and Benito.  Persist and Lake Law are the prevailing parties as to the derivative claims against them brought by Teh on behalf KS Law. Counsel were instructed to submit their claims for fees and costs after providing the opposing party the opportunity to review them and raise any objections.  The

---

[7] Rule 1.0(e) defines informed consents as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

[8] The Partial Final Award said that Mr. Teh was the prevailing party but should have said that it was Mr. Teh in his capacity as a partner in KS Law, suing on its behalf.

Case No.: 01-23-0005-2721                                                                 20

Arbitrator appreciates the cooperative manner in which counsel exchanged views. The party claiming fees and costs has the burden of proving that they were incurred (not an issue here) and that they are reasonable. The Arbitrator has considered the claims for these expenses and the objections thereto and awards as follows:

### Lake Law/Persist

Counsel for Mr. Teh sought clarification that KS Law, and not Mr. Teh personally, was obligated to pay the fee and costs award in favor of Lake Law and Persist. The Arbitrator advised that this was not the case. *See* August 29, 2025 Order. Teh brought this derivative action to benefit himself in an effort to recoup his investment in KS Law and much more. There was no benefit to KS Law from this claim and Teh should bear the burden of his errors in bringing and prosecuting it.

Lake Law and Persist requested attorneys' fees of $175,860.00 and costs of $36,794.31 for the period in which Mr. Gelber represented them. Their prior counsel, Andrew Berman, submitted billing records with attorneys' fees of $49,706.23 and costs of $766.83.

Teh objected to certain entries by Mr. Gelber that are part of Lake Law/Persist's claim for fees and costs as "excessive" and lacking "specificity." Mr. Gelber provided additional detail in his responses. The Arbitrator has examined each of these entries and finds them to be within the range of reasonableness for the tasks described. No objection was made to Mr. Berman's claim.

Therefore, Teh shall pay to Mr. Gelber's firm fees of $175,860.00 and costs of $36,794.31 for a total of $212,654.31 and pay to Mr. Berman's firm fees of $49,706.23 and costs of $766.83 for a total of $50,473.06.

### KS Law as Derivative Claimant

Claimant submitted a request for $355,140.00 in attorneys' fees and $237,102.57 in costs to be paid by Respondents Melchionni and Benito. The Arbitrator awards $324,098.00 in attorneys' fees and $183,080.66 in costs. Melchionni and Benito objected to some of the requests, Claimant agreed with some of the objections and the Arbitrator has agreed with some others.

## Claimant's Attorneys' Fees

Respondents Melchionni and Benito also argued that because Claimant sought over $12 million in damages and was awarded much less than that, it was not very successful and should receive a fee award reflective of the portion of damages sought actually awarded. The Arbitrator does not agree with this analysis or with their interpretation of the DC cases. Claimant was largely successful in the arbitration, obtaining an award of $2.5 million toward a potential loss of $4 million and the appointment of a receiver. Since Claimant will likely be receiving at least some attorneys' fees for cases yet to be settled, it could possibly be made whole and perhaps even better. That Claimant argued for much more in damages is the usual puffery expected from claimants and not the measuring rod against which success should be measured.

Disallowed fees included the following:

1. Time spent resisting the motion to compel arbitration, the motion to stay and the motion to transfer to Judge Walsh. The arbitration clause in the Partnership Agreement was broad and there was no benefit to KS Law in resisting arbitration as to Respondents Melchionni and Benito. KS Law lost this issue and it was not so intertwined with the case against Respondents Melchionni and Benito that it should be considered part of the "common core" of facts or law. Staying a case referred to arbitration rather than dismissing it is best practice. Efforts to resist this motion and the motion to transfer were both unsuccessful, of no benefit to KS Law and unrelated to the successful claims.

2. Time spent on the case against Lake Law and Persist. Claimant did not prevail on any of the claims against Lake Law and Persist. The claims against these Respondents largely rested on Claimant's argument that they were part of a fraud perpetrated by Respondents Melchionni and Benito. This fraud was not proved.

3. In some cases, Claimant's response to the objection did not meet the substance of the objection. For example, there are numerous entries where the objection was that time recorded should be split with another case and the response was "Objection is unsupported; the work was directly responsive and necessary."

Case No.: 01-23-0005-2721                                                              22

4. Time spent communicating with U.S. Attorney's office was not sufficiently explained. While the Arbitrator did find that Respondents Melchionni and Benito had not revealed certain key information until after the hearing in this case, no relationship between this and discussion with the AUSA was established.

### Claimant's Costs

Claimant's primary expert witness, Adam Levitt, is a senior partner in a successful Chicago law firm. He submitted bills for $200,011.00 in fees and costs of $2,334.96. The costs were attributed to his trip to Virginia to participate in the arbitration hearing. His firm did not charge for other costs such as copying, courier service, etc. that many firms do. The out-of-pocket costs charged are not unreasonable for a law firm partner like Mr. Levitt and they will be awarded in full.

Respondents Melchionni and Benito primarily complain about Mr. Levitt's hourly rate of $1,675 per hour and the $1,275 and $1,125 rates charged by his partners. No affidavit was submitted as to the customary rates charged by high end Chicago law firms which, as Mr. Levitt would know, would have been the better practice. However, the Arbitrator is aware that standard hourly rates for successful law firm partners in large cities exceed $1,000 per hour and can be much more than that. The Arbitrator believes the fairest result is to apply a blended rate of $1,200 per hour to the DiCello Levitt partners for a fee of $158,910. It was cost effective for Mr. Levitt to have his partners take care of some of the tasks required of him.

Michael Portuondo was Claimant's accounting expert. He submitted bills for $33,977.50 and costs of $2,974.07. The Arbitrator did not accept his model for calculating damages and has reduced his fee to $20,000 to account for that. As with Mr. Levitt, the only costs he submitted were for travel to Virginia for the arbitration. Respondents question the multiple plane tickets apparently purchased by Mr. Portuondo, $1,138.37 to United Airlines on 01/06/2025, $537.48 to American Airlines on 01/07/2025 and $502.00 to American Airlines on 01/08/2025. Because no explanation was offered, the Arbitrator can only speculate as to why multiple tickets were purchased but that cannot be the basis for an award. The earliest ticket ($1,138.37) is disallowed so costs of $1,835.70 will be awarded.

Case No.: 01-23-0005-2721                                                                 23

To sum up, Claimant will be awarded $158,910.00 for Mr. Levitt's fees, $2,334.96 for his costs, $20,000 for Mr. Portuondo's fees and $1,835.70 for his costs for a total of $183,080.66.

## FINAL AWARD

In accord with the reasoning and findings above, it is hereby ORDERED that:

1. Upon receipt of this Final Award, counsel for Claimant shall transmit a copy to Judge Walsh noting that the Arbitrator has requested the appointment of a receiver.

2. Respondents Melchionni and Benito are liable, jointly and severally, to KS Law for Two Million Five Hundred Thousand Dollars ($2.5 million) in compensatory damages.

3. Respondents Melchionni and Benito are liable, jointly and severally, to KS Law for Three Hundred Twenty-Four Thousand Ninety-Eight Dollars ($324,098.00) in attorneys' fees and One Hundred Eighty-Three Thousand Eighty Dollars and Sixty-Six Cents ($183,080.66) in costs.

4. As a sanction for misleading testimony, Respondent Melchionni is liable to KS Law for Fifty Thousand Dollars ($50,000).

5. As a sanction for misleading testimony, Respondent Benito is liable to KS Law for Ten Thousand Dollars ($10,000).

6. Allan Teh is liable for Mr. Gelber's fees of One Hundred Seventy-Five Thousand Eight Hundred Sixty Dollars ($175,860.00) and costs of Thirty-Six Thousand Seven Hundred Ninety-Four Dollars and Thirty-One Cents ($36,794.31) for a total of Two Hundred Twelve Thousand Six Hundred Fifty-Four Dollars and Thirty-One Cents ($212,654.31).  He is further liable for Mr. Berman's fees of Forty-Nine Thousand Seven Hundred Six and Twenty-Three Cents ($49,706.23) and costs of Seven Hundred Sixty-Six Dollars and Eighty-Three Cents ($766.83) for a total of $50,473.06.

7. The administrative fees of the American Arbitration Association totaling $16,175.00 shall be borne equally by Claimant and Respondents Melchionni and Benito, and the compensation and expenses of the Arbitrator totaling $50,030.00 shall be borne equally by Claimant and Respondents Melchionni

and Benito.  Therefore, Respondents Melchionni and Benito, jointly and severally, shall reimburse Claimant the sum of $8,087.50, representing that portion of said fees in excess of the apportioned costs previously incurred and paid by Claimant, upon demonstration by Claimant that these costs have been paid.

The above sums are to be paid on or before 90 days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration.  All causes of action and claims for relief not expressly ruled on herein are denied with prejudice.


Date:  October 14, 2025                                    *Sheila J. Carpenter*
                                                          Sheila J. Carpenter
                                                          Arbitrator


I, Sheila J. Carpenter, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Final Award.


                                                          *Sheila J. Carpenter*
Date:  October 14, 2025                                    Sheila J. Carpenter
                                                          Arbitrator


Case No.: 01-23-0005-2721                                                    25

Filing # 235202292 E-Filed 11/05/2025 02:30:42 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

### AGREED ORDER ON DEFENDANT LEE MELCHIONNI'S REQUEST FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' MOTION TO CONFIRM FINAL ARBITRATION AWARD AND FOR ENTRY OF FINAL JUDGMENT

THIS CAUSE came before the Court upon the agreement of counsel on Defendants Lee Melchionni's Request for Extension of Time to Respond to Plaintiffs' Motion to Confirm Final Arbitration Award and for Entry of Final Judgment, and the Court having reviewed the file, been informed of the agreement of the parties, and being otherwise fully advised on the premises, it is hereby,

**ORDERED and ADJUDGED**, as follows:

1. Defendants' Request is **GRANTED.**

2. Defendants shall have an extension of time, through and including November 7, 2025, to respond to Plaintiffs' motion.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 5<u>th</u> day of November, 2025.

2023-015702-CA-01 11-05-2025 2:15 PM

<u>2023-015702-CA-01 11-05-2025 2:15 PM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

- Andrew Scott Berman: aberman@ybkklaw.com
- Andrew Scott Berman: eservice@ybkklaw.com
- Matt Gelber, Esq.: matt@gelberlawgroup.com
- Cheyenne Moghadam: c.moghadam@jones-adams.com
- Matthew L. Jones: matthew@jones-adams.com
- Daniel Bitran: dbitran@mitrani.com
- Daniel Bitran: jlopez@mitrani.com
- Daniel Bitran: miamidocketing@mitrani.com
- Isaac J. Mitrani: imitrani@mitrani.com
- Isaac J. Mitrani: jlopez@mitrani.com
- Jesus A. Lopez: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: imitrani@mitrani.com
- Isaac J. Mitrani Esq.: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: miamidocketing@mitrani.com
- Matthew R Gelber: matt@gelberlawgroup.com
- Matthew R Gelber: lais@gelberlawgroup.com
- Matthew R Gelber: eservice@gelberlawgroup.com

Filing # 235202390 E-Filed 11/05/2025 02:31:16 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

### AGREED ORDER EXTENDING TIME FOR SYLVIA BENITO TO FILE A RESPONSE TO MOTION TO CONFIRM FINAL ARBITRATION AWARD AND FOR ENTRY OF FINAL JUDGMENT

THIS CAUSE came before the Court upon the agreement of counsel on Defendant Sylvia Benito's Motion for Extension of Time to Respond to Plaintiff Allan Teh's Motion to Confirm Final Arbitration Award and for Entry of Final Judgment filed on November 5, 2025 at 11:52:50 AM with Filing # 235179846, [DE 87] and the Court having reviewed the file, been informed of the agreement of the parties, and being otherwise fully advised on the premises, it is hereby,

**ORDERED and ADJUDGED**, as follows:

1. Benito's Motion for Extension of Time is **GRANTED.**

1. Benito shall have an extension of time, through and including November 7, 2025, to file a Response.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 5<u>th</u> day of November, <u>2025</u>.

2023-015702-CA-01 11-05-2025 2:15 PM

<u>2023-015702-CA-01 11-05-2025 2:15 PM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

- Andrew Scott Berman: aberman@ybkklaw.com
- Andrew Scott Berman: eservice@ybkklaw.com
- Matt Gelber, Esq.: matt@gelberlawgroup.com
- Cheyenne Moghadam: c.moghadam@jones-adams.com
- Matthew L. Jones: matthew@jones-adams.com
- Daniel Bitran: dbitran@mitrani.com
- Daniel Bitran: jlopez@mitrani.com
- Daniel Bitran: miamidocketing@mitrani.com
- Isaac J. Mitrani: imitrani@mitrani.com
- Isaac J. Mitrani: jlopez@mitrani.com
- Jesus A. Lopez: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: imitrani@mitrani.com
- Isaac J. Mitrani Esq.: jlopez@mitrani.com
- Isaac J. Mitrani Esq.: miamidocketing@mitrani.com
- Jim Montalvo: jim@montalvopa.com
- Jim Montalvo: hjm_135@yahoo.com
- Matthew R Gelber: matt@gelberlawgroup.com
- Matthew R Gelber: lais@gelberlawgroup.com
- Matthew R Gelber: eservice@gelberlawgroup.com

Filing # 235414928 E-Filed 11/07/2025 05:27:16 PM

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

CBL Div. 44 (Judge Lisa S. Walsh)

ALLAN TEH,

    On a derivative basis as a member of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

    Plaintiff(s),

v.

LEE MELCHIONNI, individually
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

    Defendants
and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

Nominal Defendant in the Derivative Action.
_____/

**DEFENDANT SYLVIA BENITO'S OPPOSITION TO PLAINTIFF'S MOTION TO
CONFIRM FINAL ARBITRATION AWARD AND REQUEST TO STAY THE COURT'S
DECISION ON PLAINTIFF'S MOTION AND THESE PROCEEDINGS FOR AT LEAST
NINETY (90) DAYS TO ALLOW DEFENDANT TO MOVE TO VACATE ARBITRATION
AWARD**

Defendant Sylvia Benito hereby opposes Plaintiff Allan Teh's Motion to Confirm Final

Arbitration Award and For Entry of a Final Judgment (the "Motion"), which seeks confirmation of

the Final Award in an American Arbitration Association ("AAA") arbitration styled *Teh v. KS Law*

*Group, LLP, et al.*, Case No. 01-23-0005-2721 (the "KS Arbitration") and simultaneously hereby moves to stay the Court's decision on Teh's Motion and these proceedings for at least 90 days.

## I.   **INTRODUCTION**

The Court should stay its decision on Teh's Motion because the Motion is premature. The Revised Florida Arbitration Code (the "FAC") provides that a party has 90 days to seek vacatur of an arbitral award. The FAC further provides that if a party files a motion to vacate an arbitral award, then the court can only confirm the arbitral award after it has denied vacatur.

Here, Benito intends to file a motion to vacate the Final Award in the KS Arbitration within the statutorily allotted 90-day period after her new counsel—who was not involved in the KS Arbitration—has thoroughly reviewed the KS Arbitration proceedings. Accordingly, to prevent Teh from effectively stripping Benito her statutory right to seek vacatur of the Final Award, the Court should stay its decision on the Motion until after it decides Benito's motion for vacatur.

## II.   **BACKGROUND**

On April 25, 2023, Teh commenced this action. (D.E. 1–2.)

On June 15, 2023, Benito (and others) moved to compel arbitration based on the partnership agreement of a District of Columbia partnership called KS Law Group, LLP of which Teh, Benito, and Defendant Lee Melchionni are partners. (D.E. 25.) That agreement requires the parties to arbitrate any disputes "arising out of or related to" the agreement before to AAA and pursuant to the Federal Arbitration Act (the "FAA").[1] (D.E. 64, Order 2.)

On October 27, 2023, the Court granted the motion to compel arbitration, and the KS

---

[1]    As a result of a typographical error, the KS Law Group partnership agreement references the "American Arbitration Action" instead of the FAA. (D.E 64, Order 2.) But it is clear from the citation that follows reference to the "American Arbitration Action" that the parties meant that the FAA would govern any arbitration under the partnership agreement. (D.E. 64, Order 2.)

2

Arbitration ensued.  (D.E.  64.)

On October 14, 2025, the Arbitrator issued the Final Award in the KS Arbitration.  (D.E. 80, Ex. A at 25.)

On October 22, 2025, Teh filed the Motion—seeking confirmation of the Final Award. (D.E. 80.)

Benito intends to file a motion to vacate the Final Award within the time periods set out in the FAC and the FAA.

### III.    <u>**TEH'S MOTION IS PREMATURE**</u>

The Court should stay its decision on the Motion until it decides Benito's forthcoming motion to vacate the Final Award.  FAC § 682.13(2) grants a party 90 days to move to vacate an arbitral award.[2]  Further, FAC § 682.13(4) provides that "[i]f a motion to vacate is denied . . ., the court shall confirm the award."  In addition, FAC § 682.12 states that "[a]fter a party to an arbitration proceeding receives notice of an award, the party may make a motion to the court for an order confirming the award at which time the court shall issue a confirming order unless the award . . . is vacated pursuant to" FAC § 682.13.  Thus, the FAC contemplates that a court can only confirm an arbitral award only after it decides vacatur.

Here, Benito intends to file a motion to vacatur of the Final Award and her statutory right to do so has not elapsed (under the FAC, Benito has until January 12, 2026, to seek vacatur).[3]  *See*

---

[2]     Teh relies on the confirmation and vacatur provisions of the FAC.  (D.E. 80, Mot. 8-11.) Benito's position is that the FAA governs confirmation and vacatur of the Final Award because that is the body of law selected by the parties in the KS Law Group partnership agreement.  (D.E. 64, Order 2.)  Regardless of whether the FAC or the FAA applies, Benito's argument regarding prematurity holds because the FAA allows a party "three months" to move to vacate an arbitral award.  *See* 9 U.S.C. § 12.  Benito expressly reserves the right to argue that vacatur is appropriate under the standards set forth in the FAA and related caselaw.

[3]     Under the FAA, Benito has until January 14, 2026, to seek vacatur.  *See* 9 U.S.C. § 12.

3

FAC § 682.13(2).  If the Court were to confirm the Final Award before Benito's time to seek its vacatur has expired as Teh urges the Court to do, then the Court would effectively allow Teh to strip Benito of her statutory right to seek vacatur of that award.  Accordingly, the Court should not rule on Teh's Motion to confirm the Final Award until it decides Benito's forthcoming motion to vacate the Final award.  *See Battles v. Sw. Airlines Co.*, No. 1:18-CV-04822, 2020 WL 6781807, at *1 (N.D. Ill. Nov. 18, 2020) (denying plaintiff's petition to confirm the arbitral award as "premature" because defendant's time to file a motion to vacate the award has not expired and stating that "arbitration awards are appropriately confirmed after the three-month statutory window to challenge them has expired"); *Burlington N. & Santa Fe Ry Co. v. Pub. Serv. Co. of OK*, No. 05 CV 53 TCK FHM, 2007 WL 593621, at *2 (N.D. Okla. Feb. 21, 2007) ("Specifically, the Court holds that it erred in granting the Motion to Confirm as a matter of course when BNSF advised the Court, both in its original response to the Motion to Confirm and in its Motion to Amend, that it wished to file a Motion to Vacate on or before July 24, 2006.").

Indeed, Teh is well aware that he has jumped the gun.  Acknowledging that Benito can still file a "timely motion[ ] to vacate" the Final Award under the FAC, he nevertheless argues that the Court should deny Benito that statutory right because such a motion would be "meritless and doomed to fail."  (D.E. 80, Mot. 11.)  Teh does not, and cannot, provide any authority for the proposition that a party loses its right to seek vacatur just because her adversary thinks that a motion for vacatur is not well-taken.  The Court should allow Benito to file a timely motion to vacate the Final Award, so that Benito can argue for vacatur under the proper standards set forth in the FAA after her new counsel—who did not participate in the KS Arbitration—has had the opportunity to fully review the KS Arbitration file.  *See Loda Okla, LLC v. Overall*, No. 13-CV-191-GKF-FHM, 2014 WL 12704716, at *3 (N.D. Okla. Oct. 9, 2014) (staying decision on motion

4

to confirm arbitral award when party apprised the court that it intended to file a timely motion for vacatur after its new counsel has reviewed the arbitration file).

## IV.     CONCLUSION

Benito intends to file a motion to vacate the Final Award and her time to file that motion has not expired.  Under FAC § 682.13(4), the Court can only confirm an arbitral award after that motion has been denied.  Accordingly, the Court should stay its decision on Teh's Motion until it decides Benito's motion to vacate the Final Award.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all counsel of record on the e-filing service list via the Court's e-portal on November 7, 2025.

Respectfully submitted,
**BREWER ATTORNEYS AND COUNSELORS**

By: /s/ *Jim Montalvo*
Jim Montalvo, Esq.
Florida Bar No. 887056
hjm@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, TX 75201
Telephone: (214) 653-4000
Fax: (214) 653-1015

5

Filing # 235396188 E-Filed 11/07/2025 03:14:19 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

        On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

        Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida
Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

        Defendants
and

KS LAW GROUP, a District of Columbia Limited
Liability Partnership

        Nominal Defendant in Derivative Action.
_____/

## **NOTICE OF FILING**

Plaintiff, Allan Teh, as 50% owner of KS Law Group, LLP by and through undersigned

counsel hereby files this Notice of Filing:

- Complaint: *Benito v. Lake et. al.*, Index No: 628021/2025, Supreme Court of the State of

    New York County of Suffolk

- Complaint: *Law Office of Edward J. Lake v. Melchionni, Benito, Solit, et. al*, Supreme

    Court of the State of New York County of Suffolk

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

- Complaint*: Blakemore Investments, LLC v. Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm and Edward J. Lake*, Index No. 629003/2025, Supreme Court of the State of New York County of Suffolk

- Stipulation and Order Resolving Motion and Appointing Temporary Receiver in *Blakemore Investments, LLC v. Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm and Edward J. Lake*, Index No. 629003/2025, Supreme Court of the State of New York County of Suffolk

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 7th day of October, 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
Telephone: (305) 270-8858
Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:     _/s/ Matthew L. Jones, Esq._
Matthew L. Jones, Esq.
Florida Bar No. 909335

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 671 of 784

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

SYLVIA BENITO,

                                   Plaintiff,

                    v.                                         Index No.

EDWARD J. LAKE and LAW OFFICE OF EDWARD
J. LAKE d/b/a THE LAKE LAW FIRM

                                   Defendants.

## COMPLAINT

Plaintiff Sylvia Benito files this Complaint against Defendants Edward J. Lake ("Ed Lake")

and the Law Office of Edward J. Lake, P.C. d/b/a The Lake Law Firm ("Lake Law") on personal

knowledge as to herself and on information and belief as to all other facts as follows:

## I.
## PRELIMINARY STATEMENT

This case arises out of the failure of Lake Law and the numerous schemes orchestrated by

its founder, Ed Lake. For many years, Ed Lake has aggressively marketed his law firm as a highly

successful participant in the mass torts litigation finance space—touting Lake Law's unique

offerings such as a medical records review and guarantee.

Around 2017, Benito, an experienced investor relations professional, became interested in

mass torts litigation as an investment class. While pursuing that interest, she developed

relationships with attorneys who presented themselves as possessing expertise in the field. Among

those she came to know was Ed Lake, who held himself out as a trusted expert and industry leader.

In due course, Benito, like many others, was induced by Ed Lake's representations about his firm's

"unblemished" record of success to place confidence, and ultimately capital, in him and his firm.

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 672 of 784

In total, Benito recommended that investors entrust over $15 million to Lake Law in connection with the purchase of a docket of mass torts cases. Unfortunately, neither Lake Law nor Ed Lake ever came close to delivering on their promises. Instead, fully aware of Benito's strong desire to protect her investors, Defendants induced Benito to make personal loans to Lake Law as "rescue funding" under false pretenses—loans that Defendants never intended to repay.

Defendants' misconduct extended to defrauding Benito into making personal investments in Employee Retention Tax Credits ("ERC") claims, a federal tax-credit program under the CARES Act.[1] Benito transmitted $1.5 million to Defendants to purchase ERC claims for her benefit. Rather than honoring their agreement, Ed Lake used the funds for his own benefit, later recharacterizing her investment as a "loan" to himself and appropriating for his own gain the opportunity that belonged to her.

Benito now seeks redress for Defendants' malfeasance, recovery of funds owed, and protection for others who might otherwise fall victim to similar conduct.

## II.
## JURISDICTION & VENUE

1. The Court has general personal jurisdiction over Lake Law pursuant to CPLR 301 because Lake Law is incorporated in and has its principal place of business in Suffolk County, New York.

2. The Court has long-arm jurisdiction pursuant to CPLR 302, consistent with federal

---

[1] ERC was introduced under the CARES Act during the COVID-19 pandemic and is a refundable tax credit program for eligible employers who retained their employees during the pandemic. Under Lake Law's ERC investment model, the investor is assigned a specific taxpayer who has an ERC tax refund claim. The investor's money pays that taxpayer's legal fees and other costs associated with guiding the taxpayer through the refund application process. Once the taxpayer obtains his refund, the investor gets a portion of it as a return on investment. In this program, the investor does not fund litigation against the IRS.

2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 673 of 784

constitutional requirements, over Ed Lake because he: (1) has and continues to transact business in New York; (2) has and continues to commit tortious acts in New York; and (3) owns, uses, or possesses real property situated in New York.

3. Venue is proper in this Court under CPLR 501 and 502 because Lake Law is located in Suffolk County and many of the acts and omissions alleged in the Complaint occurred there.

### III.
### PARTIES

4. Plaintiff Benito is a resident and citizen of Florida.

5. Defendant Ed Lake is a New York licensed attorney who is the founder and sole owner of Lake Law. Ed Lake currently resides in and is a citizen of Florida.

6. Defendant Lake Law is a law firm duly organized and operating under the laws of the State of New York with its principal place of business at 270 West Main Street, Suite 3, Sayville, New York 11782.

7. Ed Lake completely controls and dominates Lake Law, such that Lake Law is Ed Lake's alter ego, and does not have a meaningful separate existence from Ed Lake.

### IV.
### STATEMENT OF RELEVANT FACTS

8. This lawsuit concerns Defendants' misconduct in connection with a mass torts litigation finance program involving Benito and investors she introduced to Defendants, and Benito's personal investment in ERC claims.

#### A. The Players: Benito, Melchionni, and Ed Lake

##### 1. Benito & Melchionni

9. Benito is an accomplished investment professional with over 20 years of experience in the financial industry, including roles at structured settlement companies, a hedge fund, and

3

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 674 of 784

family offices. Benito is particularly gifted in the areas of business development, capital raises, and investor relations. It is this expertise that led her to the field of mass torts litigation funding.

10. In 2016, Benito joined Structures, a structured settlement company, where she developed investment opportunities with mass tort attorneys. Shortly thereafter, Structures hired Melchionni, an attorney, for the same position.

11. In 2017, Benito, seeking a more manageable travel schedule as a single mother, left Structures to join a multi-family office called GenSpring. While there, Melchionni introduced Benito to mass torts litigation as an investable asset class that provided consistent returns at moderate risk.

12. Although Benito did not immediately invest, she found the concept appealing both financially and as a way to assist victims of mass torts.

13. By 2020, while working for another family office called ASK, Benito structured her first mass tort investment with Melchionni in connection with claims of sexual abuse against the Boy Scouts. This investment turned out to be a "home run" for the investors and continues to yield returns.

14. Benito and Melchionni's next investment was not as successful. In that investment, Benito's friend invested $300,000, which Benito and Melchionni used to fund talcum powder personal injury cases. This investment highlighted one of the risks of mass tort litigation funding: case drop-off. Specifically, when a litigation funder invests in a portfolio of mass torts litigation, the return on the investment is determined by the number of high-quality cases. While some case attrition in every portfolio is normal, if too many cases "drop off" because they are not viable, then the investment will not be profitable. Here, every talcum powder case in the portfolio was disqualified, so the investment went to zero. Nevertheless, Benito and Melchionni, without any

4

obligation to do so, personally covered the investor's entire loss.

### 2. Enter Ed Lake

15. In 2020, Melchionni met Ed Lake at an industry conference. Ed Lake touted himself as a leading attorney with almost 30 years' experience in personal injury and mass torts litigation. He claimed that his law firm "solved" the "case drop-off problem" through a medical records review and guarantee. That is, he claimed that any person that Lake Law signed up provided their medical records, so that the viability of his claim could quickly be assessed. If a case dropped off, then Lake Law's could replace the case.

16. He further claimed that, once a case was approved, he maximized recovery by acting as co-counsel with top trial firms.

### B. Justice Partners And KS Law Group

17. Ed Lake's representations induced Benito to work with Lake and his law firm as a potential investment source in mass tort litigation.

18. In late 2020, Melchionni and Benito launched Justice Partners with the intent to offer investors a diversified portfolio of mass torts cases. In the venture, Benito's role was to raise capital and handle investor relations while Melchionni, as the attorney, was responsible for managing the litigation docket.

19. Eventually, Justice Partners raised $11.25 million for investment. In addition, one of the Justice Partners investors made a $4 million "sidecar" investment in a venture called KS Law Group.

20. Once the funds closed, on April 15, 2021, Melchionni and Benito sent the

5

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 676 of 784

investment funds, in amount of $6.125 million, to Defendants to obtain the following cases:[2]

| Quantity | Description | Unit Price | Total Price |
|---|---|---|---|
| 380 | Hernia Mesh | $5,000 | $1.9 million |
| 208 | Talc | $5,700 | $1.185 million |
| 150 | Round Up | $5,000 | $750K |
| 350 | 3M | $2,000 | $700K |
| 200 | Fire Foam | $5447 | $1.0894 million |
| 200 | Zantac | $2,500 | $500K |

21.     On or about October 20, 2021, Justice Partners sent Defendants another $5.125 million to purchase an additional 12% of any recovered attorney's fees as follows:

| Quantity | Description |
|---|---|
| 1,606 | Hernia Mesh |
| 1,336 | Talc |
| 100 | Round Up |
| 850 | 3M |

---

[2]     The funds were transmitted to Defendants via a marketing firm owned and operated by Ed Lake called Persist Communications, Inc. ("Persist"), which Lake repeatedly claimed was his "engine room." According to Lake, the company ran the campaigns to locate and sign up the mass torts plaintiffs in whose cases the investors are investing.

6

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 677 of 784

22. On September 1, 2021, KS Law sent $3.88 million to Defendants to obtain the following cases:

| Quantity | Description | Unit Price | Total Price |
|----------|-------------|------------|-------------|
| 220 | Hernia Mesh | $5,600 | $1.232 million |
| 200 | Talc | $6,000 | $1.2 million |
| 1155 | Round Up | $5,048.39 | $782.5K |
| 220 | 3M | $3.025 | $665K |

23. In making the above-described investment decisions, Benito relied on Defendants' representation regarding the success of the fund, Ed Lake's representations regarding his firm's medical records review process and guarantees.

**C.      Benito Invests Her Own Money With Defendants**

24. In addition to the Justice Partners and KS Law investments, on April 26, 2022, Benito invested $1.5 million of her own money with Lake Law to purchase ERC claims for her own account based on Ed Lake's representation that Lake Law had secured access to a pipeline of lucrative ERC claims.

25. Unbeknownst to Benito, Ed Lake thereafter diverted those funds for his personal benefit rather than using them to acquire ERC claims for Benito, later recharacterizing her investment as a "loan" to himself.

26. Benito was therefore deprived of the benefits of the investment, including ownership interests and potential profits as promised.

7

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 678 of 784

## D. Trouble In Paradise

27. By summer 2022, the relationship among Benito, Melchionni, and Defendants began to deteriorate. Lake Law had fallen far short of the promised case counts. For Justice Partners, Lake Law was short 208 talc cases, 380 hernia mesh cases, 150 Roundup cases, 350 3M cases, and 200 firefighter foam cases. For KS Law, the shortfall was 200 talc cases, 220 hernia mesh cases, 155 Roundup cases, and 220 3M cases.

28. It also became apparent that Lake Law did not have sufficient "inventory" to cover Justice Partners' additional investment in 12% of attorney's fees. This, of course, was contrary to Ed Lake's specific representations.

29. Relying on Ed Lake's medical records guarantee, Melchionni, acting on behalf of Justice Partners and KS Law, negotiated and entered into Case Replacement Agreements with Lake Law on December 1, 2022. These agreements formalized Ed Lake's promises to substitute qualifying cases. But by July 2023, Ed Lake repudiated these Agreements, proposing new terms that were materially adverse to investors and inconsistent with prior guarantees.

30. Matters worsened when settlements began to materialize. After the resolution of 3M cases, Lake Law failed to distribute investor proceeds as required.

31. By late 2023, Ed Lake began threatening to close Lake Law unless he received operational funding for Lake Law. Specifically, he sought $400,000 in "rescue funding" from Benito and Melchionni on the false representation that the Lake Law would be getting significant financing within 90 days from Arena Investors LP and American Law Firm Capital LLC.

32. In reliance on Ed Lake's representation about the forthcoming financing and to protect their investors, in January 2024, Benito and Melchionni each loaned Lake Law $200,000 via a "Short-Term Funding and Security Agreement." Although the loan matured on April 1, 2024,

8

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 679 of 784

and despite repeated demands for repayment, the loan remains outstanding. Benito now knows that Ed Lake never intended to repay the debt.

33. As if that was not enough, Ed Lake requested more purported "rescue funding"— again based on the misrepresentation that he was about to secure large long-term financing.

34. Again, to protect their investors, Benito and Melchionni each loaned Lake Law $850,000 between March 2024 and March 2025. Benito now knows that Ed Lake never had any intention of repaying that debt either. Indeed, he never did so.

35. Ed Lake's malfeasance carried over into Benito's personal ERC investment as well. In a sleight of hand, Ed Lake used Benito's $1.5 million investment in ERC claims to build an ERC docket for himself and then claim that Benito's money was "merely" a loan.

36. Indeed, as time went on, it became clear that Ed Lake was effectively running a Ponzi scheme. As he failed to keep adequate reserves for his investment vehicles, he paid prior investors with new investors' funds. He also pledged the same attorneys' fees to multiple parties without their knowledge. The misconduct goes on and on.

37. Benito now seeks redress for Ed Lake's misconduct.

## V.
## FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT
### (Against Ed Lake & Lake Law)

38. Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

39. The elements of a cause of action for breach of contract in New York are: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.

40. Here, Benito entered into the "Short-Term Funding and Security Agreement" with

9

Case 1:25-cv-25581-BB    Document 1-2    Entered on FLSD Docket 11/26/2025    Page 680 of 784

Lake Law in or about January 2024; Benito lent Lake Law $200K under that agreement; Lake Law breached its obligations under that agreement by failing to repay the loan by the maturity date; and Benito was damaged as a result of the Lake Law's breach.

## VI.
## SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT
### (Against Ed Lake & Lake Law)

41.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

42.     The elements of a cause of action for breach of contract in New York are: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.

43.     Here, Benito entered into loan agreements with Lake Law between March 2024 and March 2025; Benito performed her obligation and loaned Lake Law $850,000 under those agreements; Lake Law breached its obligations under those agreements by failing to repay the loans by their maturity dates; and Benito was damaged as a result of the Lake Law's breaches.

## VII.
## THIRD CAUSE OF ACTION FOR BREACH OF CONTRACT
### (Against Ed Lake & Lake Law)

44.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

45.     The elements of a cause of action for breach of contract in New York are: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.

46.     Here, Benito entered into a contract with Lake Law in April 2022 to purchase ERC cases; Benito performed her obligation to pay the purchase price of $1.5 million for these cases;

10

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 681 of 784

Lake Law breached its obligations under that agreement by failing to deliver any ERC cases to Benito; and Benito was damaged as a result of the Lake Law's breach by losing out on an opportunity for a return on her investment.

## VIII.
## FOURTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
### (Against Ed Lake & Lake Law)

47. Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

48. The elements of a cause of action for fraudulent inducement in New York are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages.

49. Here, Ed Lake misrepresented that he would receive funding for his operations from Arena Investors LP and American Law Firm Capital LLC to induce Benito to loan Lake Law $200K; Benito justifiably relied on these representations and loaned Lake Law $200K; and Benito was damaged when Lake Law failed to repay the loan.

## IX.
## FIFTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
### (Against Ed Lake & Lake Law)

50. Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

51. The elements of a cause of action for fraudulent inducement in New York are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages.

11

52.     Here, Ed Lake misrepresented that he would receive funding for his operations from Arena Investors LP and American Law Firm Capital LLC to induce Benito to loan Lake Law $850K; Benito justifiably relied on these representations and loaned Lake Law $850K in a series of transactions; and Benito was damaged when Lake Law failed to repay the loans.

## X.
### SIXTH CAUSE OF ACTION FOR FRAUDULENT INDUCEMENT
**(Against Ed Lake & Lake Law)**

53.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

54.     The elements of a cause of action for fraudulent inducement in New York are: (1) a false representation of material fact; (2) known by the utterer to be untrue; (3) made with the intention of inducing reliance and forbearance from further inquiry; (4) that is justifiably relied upon; and (5) results in damages.

55.     Here, Ed Lake misrepresented in April 2022 that he would provide ERC claims to Benito in exchange for $1.5 million to induce Benito to send him that cash; Benito justifiably relied on Ed Lake's misrepresentation and sent Lake Law $1.5 million; and Benito was damaged when Ed Lake failed to deliver these cases because she lost out on an opportunity for a return on her investment.

## XI.
### SEVENTH CAUSE OF ACTION FOR AN ACCOUNTING
**(Against Ed Lake & Lake Law)**

56.     Benito repeats and re-alleges every allegation contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

57.     At all relevant times, a fiduciary and confidential relationship existed between Benito and Defendants.  Defendants solicited and received funds from Benito and the investors

12

she represented under the pretense that such funds would be used to acquire and manage portfolios of mass torts cases and related litigation assets for the investors' benefit. Defendants also received and controlled Benito's personal investment funds in connection with the ERC venture.

58. As a result, Defendants owed Benito a duty to act with good faith, to account accurately for all funds received and disbursed, and to maintain transparent records reflecting the use and disposition of investment proceeds, case recoveries, and operational expenditures.

59. Defendants commingled investor funds, diverted monies to unauthorized purposes, paid existing obligations with new investor capital, and double-pledged participation rights in attorney's fees and recoveries.

60. Because the relevant financial information lies solely within Defendants' possession and control, Benito lacks an adequate remedy at law to ascertain the true extent of her losses and the disposition of investor assets.

61. Accordingly, Benito is entitled to a full accounting of all monies and assets received, held, invested, disbursed, pledged, or otherwise managed by Defendants in connection with all the foregoing investments alleged.

## XII.
## PRAYER FOR RELIEF

WHEREFORE, Benito prays for relief against Defendants as follows:

1. Compensatory and consequential damages in an amount to be proven at trial, but not less than $2.55 million.

2. A constructive trust, a constructive trust over Ed Lake and Lake Law's assets in the amount of at least $8.55 million.

3. Equitable relief including the turnover of all collateral in which Plaintiff has a security.

13

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 684 of 784

4.  Disgorgement of any profits on ERC cases that rightfully belong to Benito because of her $1.5 million investment.

5.  Exemplary and punitive damages under New York law for fraud. Benito specifically alleges that Ed Lake's actions rise to felony-level misconduct in inducing Benito to send at least $2.55 million to Lake Law under false pretenses.

6.  Pre-judgment and post-judgment interest as permitted by law.

7.  Attorney's fees and costs as permitted by law.

8.  Such other and further relief that the Court deems just and proper.

## XIII.
## JURY DEMAND

Benito demands a trial by jury on all issues so triable.

Dated: October 20, 2025                Respectfully submitted,
New York, New York

*/s/ William A. Brewer III*
William A. Brewer III
**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Tel: (212) 489-1400
wab@brewerattorneys.com

**COUNSEL FOR PLAINTIFF SYLVIA BENITO**

14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

LAW OFFICE OF EDWARD J. LAKE D/B/A
THE LAKE LAW FIRM AND EDWARD J. LAKE
　　　*Plaintiffs*,

v.

LEE MELCHIONNI, RICHARD SOLIT,
SYLVIA BENITO, ACI LAW GROUP LLP,
ACI TALC LAW GROUP LLP, ASK LAW
GROUP LLP, BHI LAW GROUP LLP,
BLUE CHIP LAW GROUP LLP, ERC LAW
GROUP LLP, ERC PARTNERS LLC, JUSTICE
PARTNERS GROUP LLP, KS LAW GROUP LLP,
LRS LAW GROUP, LLP, TC LAW GROUP LLP,
TITAN LAW GROUP LLP, and JANE/JOHN DOES
1-12
　　　*Defendants*.

Index No.:

## <u>ORIGINAL COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION</u>

Come Now Plaintiffs, LAW OFFICE OF EDWARD J. LAKE, PC, d/b/a THE LAKE LAW

FIRM and EDWARD J. LAKE, by and through their undersigned counsel, and file this Complaint

and Motion for Preliminary Injunction against Defendants, LEE MELCHIONNI, RICHARD

SOLIT, SYLVIA BENITO, ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW

GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP,

ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW

GROUP, LLP, TC LAW GROUP LLP, TITAN LAW GROUP, LLP, and JANE/JOHN DOES 1-12,

and allege the following:

## I. <u>INTRODUCTION AND PRELIMINARY STATEMENT</u>

1.　　This action arises from a hostile takeover of the LAW OFFICE OF EDWARD J. LAKE d/b/a THE LAKE LAW FIRM ("LAKE LAW FIRM" or "FIRM") orchestrated by Defendants, LEE MELCHIONNI, SYLVIA BENITO, AND RICK SOLIT ("INDIVIDUAL DEFENDANTS") who, as persons not qualified or authorized to practice law in the State of New York, engaged in a broad pattern of willful, malicious, and unlawful conduct aimed to take over LAKE LAW FIRM, dismantle the firm without regard for its clients or staff, and to strip it of its future earnings. INDIVIDUAL DEFENDANTS, along with JANE/JOHN DOES 1-12, knowingly and falsely represented themselves as owners of legitimate District of Columbia law firms, including ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, and TITAN LAW GROUP, LLP, ("D.C. FIRMS") and unlawfully assumed control over LAKE LAW FIRM business operations, client relationships, and financial resources. Their conduct included misrepresentation, breach of fiduciary duty, conspiracy, racketeering under the Civil RICO statute, conversion of firm assets, coercion, tortious interference, breach of the duty of good faith and fair dealing, fraud, and the unauthorized practice of law, among other actionable wrongs. As a direct result, Plaintiffs suffered the conversion of $7 million in assets, the destruction of an $18 million financing opportunity, severe reputational harm, emotional distress, and the collapse of a $20 million revenue firm. Plaintiffs seek compensatory, punitive, and treble damages, costs, interest, and all other relief the Court deems just and proper.

## II. JURISDICTION AND VENUE

2. Jurisdiction is proper in this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302, as the claims arise from acts and omissions occurring within the State of New York, and Defendants transacted business and committed tortious acts within the state.

3. Venue is proper in this Court pursuant to CPLR § 503, as the principal place of business of LAKE LAW FIRM is located in Suffolk County, New York, and the acts and omissions alleged herein occurred in substantial part within this County.

## III. PARTIES

4. Plaintiff LAW OFFICE OF EDWARD J. LAKE, P.C. d/b/a THE LAKE LAW FIRM is a law firm duly organized and operating under the laws of the State of New York, with its principal place of business at 270 West Main Street, Suite 3, Sayville, New York 11782.

5. Plaintiff EDWARD J. LAKE ("LAKE") is an individual residing at 7701 Glendevon Lane, Unit 1903, Del Ray Beach, Florida 33446 and is the founder and sole owner of LAKE LAW FIRM. LAKE is licensed to practice in the State of New York and has over 25 years of legal experience.

6. Defendant LEE MELCHIONNI ("MELCHIONNI") an individual residing at 1537 Tryon Rd NE, Brookhaven, Georgia 30319, and may be served with process at this address. At all relevant times, MELCHIONNI has transacted business, engaged in commercial activities, and/or maintained sufficient contacts within the State of New York so as to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

7. Defendant RICHARD SOLIT ("SOLIT") is an individual residing at 9350 NE 12th Ave, Miami Shores, Florida 33138 and may be served with process at this address. At all

relevant times, SOLIT has transacted business, engaged in commercial activities, and/or maintained sufficient contacts within the State of New York so as to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

8. Defendant SYLVIA BENITO ("BENITO") is an individual whose address is 9350 NE 12th Ave, Miami Shores, Florida 33138 and may be served with process at this address. At all relevant times, BENITO has transacted business, engaged in commercial activities, and/or maintained sufficient contacts within the State of New York so as to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules §§ 301 and 302.

9. Defendant ACI LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 4062 Peachtree Rd NE, Unit A, Box 1667, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ACI LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with the LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ACI LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ACI LAW GROUP LLP by any other means authorized by law or order of the Court.

Page 4 of 36

10.     Defendant ACI TALC LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ACI TALC LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ACI TALC LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ACI TALC LAW GROUP LLP by any other means authorized by law or order of the Court.

11.     Defendant ASK LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ASK LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the

jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ASK LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ASK LAW GROUP LLP by any other means authorized by law or order of the Court.

12. Defendant BHI LAW GROUP LLP is a law firm existing under the laws of the District of Columbia whose principal address is 4062 Peachtree Rd NE, Unit A, Box 1667, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant BHI LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant BHI LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant BHI LAW GROUP LLP by any other means authorized by law or order of the Court.

13. Defendant BLUE CHIP LAW GROUP LLP, is a law firm existing under the laws of the District of Columbia whose principal address is 1100 H St NW, Suite 840, Washington, DC 20005. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant BLUE CHIP LAW GROUP LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant BLUE CHIP LAW GROUP LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant BLUE CHIP LAW GROUP LLP by any other means authorized by law or order of the Court.

14. Defendant ERC LAW GROUP is a law firm existing under the laws of the District of Columbia whose principal address is 1537 Tryon Rd NE, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ERC LAW GROUP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of

this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ERC LAW GROUP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ERC LAW GROUP by any other means authorized by law or order of the Court.

15. Defendant ERC PARTNERS LLC is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant ERC PARTNERS LLC has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant ERC PARTNERS LLC, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant ERC PARTNERS LLC by any other means authorized by law or order of the Court.

16.     Defendant LRS LAW GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Suite 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant LRS LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant LRS LAW GROUP, LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant LRS LAW GROUP, LLP by any other means authorized by law or order of the Court.

17.     Defendant JUSTICE PARTNERS GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 1100 H St NW, Suite 840, Washington, DC 20005. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant JUSTICE PARTNERS GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be

subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant JUSTICE PARTNERS GROUP, LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant JUSTICE PARTNERS GROUP, LLP by any other means authorized by law or order of the Court.

18.     Defendant KS LAW GROUP is a law firm existing under the laws of the District of Columbia whose principal address is 20900 NE 30th Ave, Ste 510, Miami, FL 33180. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant KS LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant KS LAW GROUP, LLP as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant KS LAW GROUP, LLP by any other means authorized by law or order of the Court.

19.    Defendant TC LAW GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 1100 H St NW, Suite 840, Washington, DC 20005. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant TC LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant TC LAW GROUP, LLP as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant TC LAW GROUP, LLP by any other means authorized by law or order of the Court.

20.    Defendant TITAN LAW GROUP, LLP is a law firm existing under the laws of the District of Columbia whose principal address is 4062 Peachtree Rd NE, Unit A, Box 1667, Brookhaven, GA 30319. Upon information and belief, it is not registered or authorized to do business in the State of New York pursuant to New York Business Corporation Law § 1301. At all relevant times, Defendant TITAN LAW GROUP, LLP has transacted business, entered into contracts, and engaged in commercial activities with parties located in New York, including but not limited to contractual agreements with LAKE LAW FIRM. Defendant has purposefully availed itself of the privilege of conducting business in New York and has sufficient contacts with the state

to be subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Pursuant to New York Business Corporation Law § 307, Defendant TITAN LAW GROUP, LLP, as a foreign corporation doing business in New York without being registered, may be served with process through the Secretary of State of the State of New York. Service upon the Secretary of State shall be deemed sufficient and effective service of process for purposes of this action. Plaintiffs reserve the right to effect service upon Defendant TITAN LAW GROUP, LLP by any other means authorized by law or order of the Court.

21.     Plaintiffs reserve the right to name additional parties as JANE/JOHN DOES 1-12 based on discovery of individuals who knowingly participated in, facilitated, or concealed the fraudulent conduct described in this complaint. These may include administrators, financial agents, attorneys, or others affiliated with MELCHIONNI'S network of law firms and funding arrangements. Such defendants will be held jointly and severally liable to the extent their conduct contributed to the injuries suffered by Plaintiffs.

## IV.  Background and Factual Allegations

22.     Plaintiff Edward J. Lake is the principal of Lake Law Firm, a reputable legal practice based in Sayville, New York, with a long-standing record of serving clients in mass tort litigation and maintaining significant contractual and fiduciary relationships with clients, staff, and co-counsel. At all relevant times, Lake Law Firm operated as a legitimate law firm, generating annual revenues in excess of $20 million.

23.     Defendants Lee Melchionni, Sylvia Benito, and Rick Solit, acting in concert and with a common purpose, knowingly and falsely represented themselves as legitimate law firm owners under the laws of the District of Columbia and as individuals authorized to serve as co-

counsel in mass tort litigation. Relying on Defendants' representations, Plaintiffs entered into a series of agreements with the Defendants.

24. Unbeknownst to Plaintiffs, the purported law firms formed by Individual Defendants were, in violation of Rule 5.4 of the D.C. Rules of Professional Conduct and analogous New York rules.

25. In a subsequent arbitration proceeding held in Washington D.C., the arbitrator determined that KS Law GROUP, one of the legal entities created by the Individual Defendants and managed by Melchionni, was not a proper law firm under D.C. Rule of Professional Conduct 5.4, and that the Individual Defendants' involvement constitutes an improper arrangement in violation of professional conduct rules. It can be reasoned that the twelve law firms mentioned by the arbitrator that were similarly formed by Melchionni are equally improper.

26. Throughout their involvement, Defendants made material false statements to Plaintiffs and others, including but not limited to representations that their law firm was legitimate, properly constituted, and compliant with all applicable laws and ethical rules. Relying on Defendants' false statements and representations, Plaintiffs permitted Defendants to access confidential business information, client relationships, and financial accounts. Defendants exploited this access to seize control of the firm's operations, including management of payroll, communications with staff and co-counsel, and interactions with funders. Defendants made repeated threats regarding payroll and employment, coercing staff and Plaintiff LAKE, and subjecting them to duress in order to force compliance with Defendants' demands.

27. On or about March 11, 2024, Defendants interfered with a secured $18 million financing opportunity, which would have covered firm overhead and expenses for thousands of mass tort cases pending with the firm. Defendants' false communications, threats, and

misrepresentations caused funders to withdraw their commitment, resulting in the loss of critical financing and the collapse of the firm's revenue stream.

28.     On or about March 11, 2024, Defendants used Plaintiffs' loss of funding as an opportunity to seize control of LAKE LAW FIRM, despite their lack of qualifications or experience in running a law firm or handling litigation. Defendants engaged in coercive and extortionate conduct by making economic threats against Plaintiffs, including threats to withhold necessary funding for payroll and operations at a time when Defendants knew Plaintiffs would have difficulty making payroll the following day. Defendants bragged about their unfair bargaining position to third parties, claiming "We own Ed Lake." Defendants also threatened to use their financial expertise to "find something" in the firm accounts, claiming they are "always able to find something." Defendants intentionally timed their actions to exploit Plaintiffs' financial vulnerability and forced LAKE to sign an unconscionable financial agreement divesting his interest in LAKE LAW FIRM under duress. As part of this scheme, Defendants made a wrongful demand for $39 million from Plaintiffs, without legal or factual basis, further compounding the coercion and duress inflicted upon Plaintiffs.

29.     Defendants lacked the requisite credentials, licensure, and professional standing, and were not admitted to the New York bar. However, through their fraudulent misrepresentations, Defendants induced Plaintiffs and third parties—including clients, staff, and co-counsel—to believe Defendants were entitled to control and direct the operations of Lake Law Firm.

30.     After seizing control of the Lake Law Firm, Defendants' exercised control of LAKE LAW FIRM as follows:

a. Directed staff to send e-mails to vendors and co-counsel, falsely stating that Plaintiff was no longer involved in firm operations, without LAKE's review or approval.

b.  Threatened to withhold LAKE's salary unless he removed his ability to sign on the firm's bank account.

c.  Conditioned continued funding of the firm on LAKE's execution of unconscionable agreements, timed just days before payroll deadlines.

d.  Took unilateral control of payroll, expenses, and financial decision-making for the firm.

e.  Exerted direct control over staff, including firing a large majority of employees, causing overwork and disruption of client services.

f.  Prevented LAKE from communicating freely with staff, clients, co-counsel or vendors by issuing directives that all communications flow through Defendants.

g.  Blocked or interfered with pending financing opportunities, including an $18 million loan, in order to maintain leverage over Plaintiff.

h.  Failed to pay firm obligations (e.g., American Express), resulting in the referral of obligations to collections and causing damage to LAKE's credit rating.

i.  Used threats and leverage to strip LAKE of effective authority in his own firm while continuing to benefit financially.

31.     Despite their fiduciary duty to clients, the sole concern of the Defendants was their fee interest in the cases. Because of their lack of legal experience, Defendants operated under the assumption that filed cases could be simply maintained until settlement with little to no firm staffing or resources. Defendants then terminated almost all staff with no notice or severance pay.

32.     Defendants, as investors and purported business partners, entered into contractual and fiduciary relationships with Plaintiffs, undertaking duties of loyalty, care, and good faith. Defendants breached these duties by acting in their own interests, misappropriating firm assets, and undermining the integrity and stability of the firm.

33.     Defendants engaged in a pattern of racketeering activity, including but not limited to wire and mail fraud, conversion of firm assets, extortionate threats, and repeated acts of fraud

and misrepresentation. These predicate acts were part of a scheme to unlawfully seize control of Lake Law Firm and its financial resources.

34.     Defendants wrongfully exercised dominion and control over at least $7 million in firm assets, converting these funds for their own benefit and contrary to Plaintiffs' rights and interests.

35.     Throughout their course of conduct, Defendants made defamatory statements attacking Plaintiff LAKE's professional competence and reputation, both internally to staff and externally to funders and co-counsel. These statements were false, malicious, and damaged LAKE's professional standing.

36.     Defendants' actions included interference with staff, funders, and clients, resulting in the loss of business opportunities, goodwill, and the destruction of LAKE LAW FIRM as an ongoing concern. Plaintiffs were subjected to coercion, duress, and emotional distress as a direct result of Defendants' threats, intimidation, and unlawful conduct.

37.     All acts described herein were willful, malicious, and undertaken with intent to harm Plaintiffs. As a direct and proximate result of Defendants' misconduct, including fraud, breach of fiduciary duty, racketeering, conversion, coercion, duress, breach of the duty of good faith and fair dealing, and the unauthorized practice of law, Plaintiffs have suffered substantial damages, including but not limited to the conversion of $7 million in assets, loss of an $18 million financing opportunity, reputational harm, emotional distress, and the destruction of a successful law firm.

38.     Plaintiffs reserve the right to supplement these allegations as additional facts become known through discovery and further investigation.

### V. <u>COUNT 1 - MISREPRESENTATION</u>

39.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

40.    Defendants made material false statements to Plaintiffs and others, including representations that the entities they formed were legitimate law firms, properly constituted and compliant with all applicable laws and ethical rules. As such, they had authority to operate LAKE LAW FIRM.

41.    Defendants knew or should have known that these statements were false, as they were not licensed to practice law in New York and their entities were not authorized to operate as law firms under New York law or Rule 5.4 of the D.C. and New York Rules of Professional Conduct.

42.    Defendants intended Plaintiff to rely on these misrepresentations in entering into agreements and permitting Defendants to participate in the management and control of LAKE LAW FIRM.

43.    Plaintiff reasonably relied on Defendants' representations to his detriment, resulting in financial loss, loss of control over his firm, and reputational harm.

44.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have suffered damages in an amount to be determined at trial.

## VI. COUNT 2 - TORTIOUS INTERFERENCE WITH CONTRACT

45.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

46.    Defendants interfered with a pending financing deal that would have provided necessary capital to the firm, intentionally sabotaging the transaction in order to force Plaintiffs into a position of financial distress and facilitate the Defendants' takeover of the firm.

47.     Defendants' interference was intentional, without justification, and caused Plaintiffs to lose the benefit of the $18 million contract.

## VII.  COUNT 3 - TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

48.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

49.     Defendants, acting individually and in concert with the other Defendants, contacted co-counsel and vendors, falsely stating that LAKE had mishandled the firm and was no longer in charge.

50.     These actions were intended to, and did, interfere with Plaintiff's business relationships, resulting in loss of business opportunities and damage to the firm's reputation.

51.     Defendants instructed firm employees not to accept calls from LAKE, thereby undermining Plaintiff's ability to manage the firm and maintain relationships with staff.

52.     Defendants' conduct was intentional and without justification, causing harm to Plaintiff's business operations.

## VIII.  COUNT 4- COERCION / ECONOMIC DURESS

65.      Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

66.     Defendants intentionally placed Plaintiff under unlawful pressure and coercion by interfering in a financial opportunity and then threatening to withhold salary, halt payroll, and block firm funding unless Plaintiff signed agreements surrendering control of his firm.

67.     Defendants timed their actions to exploit Plaintiffs' financial vulnerability and forced Plaintiffs to sign a financial agreement divesting his interest in LAKE LAW FIRM under duress.

68.     Defendant also threatened to "look at [LAKE's] books and "find something" unless LAKE signed agreements surrendering control of his firm.

69.     Such conduct constituted duress and was designed to force Plaintiff LAKE into executing documents and concessions he would not have otherwise agreed to.

70.     Plaintiff LAKE executed certain agreements under this coercion, immediately prior to payroll deadlines, when the firm and its staff would otherwise have been unable to operate.

71.     Defendants' conduct deprived Plaintiff of his free will, caused severe financial harm, and directly contributed to the loss of his law firm.

72.     Defendants' conduct constitutes coercion and economic duress under New York law, rendering the agreement voidable and entitling Plaintiff to damages and equitable relief.

73.     As a result of this coercion, Plaintiff sustained damages including destruction of a firm generating $20 million over two years, loss of an $18 million funding commitment, and reputational harm.

## IX. COUNT 5 - BREACH OF FIDUCIARY DUTY

74.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

75.     Defendants assumed positions of trust and control within the Lake Law Firm, creating fiduciary duties to Plaintiffs.

76.     Defendants owed duties of loyalty, good faith, honesty, and care to Plaintiffs.

77.     Defendants breached their fiduciary duties by failing to disclose material facts regarding the true nature of their entity, their lack of licensure, and their intentions to take control of the firm for their own benefit. Defendants breached these duties by diverting firm funds,

sabotaging client and lender relationships, interfering with payroll, and misrepresenting the solvency of the firm.

78.     Defendants acted in self-interest, to the detriment of Plaintiffs and their clients, resulting in substantial harm.

79.     As a result, Plaintiffs suffered damages including conversion of $7 million, collapse of client relationships, and destruction of goodwill.

80.     Defendants acted in bad faith and with malice, justifying punitive damages.

## X. COUNT 6 - CONVERSION

81.      Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82.     Defendants, without authorization or legal right, exercised control over and converted firm funds and assets for their own use, including withdrawing or redirecting monies from firm accounts.

83.     Plaintiff was deprived of the use and possession of firm property, resulting in financial loss.

## XI. COUNT 7 - CIVIL RICO / RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

84.      Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

85.     Defendants constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), and their conduct was part of a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

86.     Defendants engaged in a pattern of racketeering activity, including but not limited to wire fraud, mail fraud, and other predicate acts, in furtherance of their scheme to take over Lake Law Firm and deprive Plaintiff of his ownership and control.

87.     From approximately March 2024 through July 2025 Defendants entered into an explicit and tacit agreement to form and operate an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), for the express purpose of unlawfully seizing control of LAKE LAW FIRM, misappropriating its assets, and depriving Plaintiffs of their business and property.

88.     The enterprise was structured and operated through coordinated actions and the use of shell entities, including JUSTICE PARTNERS and TITAN, which served as instrumentalities for the movement and concealment of funds and to shield Individual Defendants from liability.

89.     Each Defendant played a specific and essential role in furtherance of the conspiracy and racketeering scheme:

a.  LEE MELCHIONNI orchestrated and directed communications, threats, and extortionate demands, including the timing of payroll threats and the wrongful demand for $39 million;

b.  SYLVIA BENITO and RICK SOLIT participated in and authorized financial transactions, asset transfers, the diversion of firm funds, and extortionate demands, including the timing of payroll threats and the wrongful demand for $39 million.

c.  ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, TITAN LAW GROUP, LLP, functioned as shell entities to facilitate the movement, concealment, and conversion of assets, and to provide a façade of legitimacy to the enterprise;

90.     Defendants, acting in concert, committed numerous predicate acts in furtherance of the enterprise and conspiracy, including but not limited to:

a.  Wire Fraud: Transmitting false statements, fraudulent documents, and extortionate demands via email, telephone, and/or electronic transfers to Plaintiffs, staff, funders, and third parties, particularly in connection with firm control and funding;

b.  Mail Fraud: Sending written correspondence and documents containing false statements and misrepresentations to Plaintiffs and third parties, including funders and co-counsel, to induce reliance and facilitate the unlawful takeover;

c. Extortion: Making threats to withhold payroll funding and demanding $39 million from Plaintiffs under duress, exploiting Plaintiffs' financial vulnerability and intentionally timing these threats to coincide with critical payroll deadlines;

d. Conversion: Wrongfully exercising dominion and control over at least $7 million in firm assets through misrepresentation, fraud, and coercion;

e. Misrepresentation: Disseminating false statements regarding their own credentials and position to LAKE and staff, in furtherance of their scheme to wrongfully take over the FIRM.

f. Interference with Contractual Relations: Sabotaging a pending $18 million financing opportunity through fraudulent communications and interference with funders, co-counsel, and staff.

91. These acts occurred on multiple occasions from at least March 2024, and were not isolated incidents but part of a continuous, coordinated pattern of racketeering activity and civil conspiracy designed to further the enterprise's unlawful objectives.

92. Defendants' coordinated conduct constitutes both a civil conspiracy under New York law and a pattern of racketeering activity under 18 U.S.C. § 1962(c) and (d). As a direct and proximate result of these violations, Plaintiffs have suffered substantial and direct injury to their business and property, including the loss and conversion of firm assets, destruction of financing opportunities, severe reputational harm, emotional distress, and the collapse of The Lake Law Firm.

93. Plaintiff has been injured in his business and property by reason of Defendants' violations of 18 U.S.C. § 1962.

## XII. COUNT 8 - NEGLIGENCE

94. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

95.     Defendants, acting individually and in concert with the other Defendants, fired essential staff, refused to accept new cases from clients calling in, and refused to terminate an employee who was reported to have sexually harassed another employee.

96.     These actions constituted gross mismanagement and caused substantial harm to the firm's operations and reputation.

### XIII. COUNT 9 - FRAUD

97.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

98.     Defendants made material misrepresentations regarding their qualifications to operate and manage a law firm, including false claims of licensure and experience. Defendants falsely and knowingly held themselves out as a legitimate law firm and/or authorized providers of legal services in New York, despite not being admitted to practice law nor properly organized to provide legal services.

99.     Defendants made such false representations with the intent to induce Plaintiff to rely upon their purported legitimacy in order to gain access to Plaintiffs' law firm, clients, staff, financial accounts, and business opportunities.

100.    Plaintiffs reasonably relied upon Defendants' misrepresentations to their detriment.

101.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered damages including conversion of $7 million, loss of an $18 million financing commitment, reputational harm, and destruction of a law firm generating $20 million over two years.

102.    Defendants acted willfully, wantonly, and maliciously, warranting punitive damages.

### XIV. COUNT 10 - CONSPIRACY

103.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

104.     Defendants conspired together to commit the above-described acts, agreeing to engage in a coordinated scheme to take control of LAKE LAW FIRM, deprive Plaintiff of his ownership interest, and commit multiple torts and violations of law.

105.     Each Defendant committed overt acts in furtherance of the conspiracy, resulting in harm to Plaintiffs.

## XV. <u>COUNT 11- BREACH OF DUTY OF CARE / BAD FAITH</u>

106.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

107.     Defendants, by virtue of their control over the firm, owed a duty of care and were required to act in good faith in the management and operation of LAKE LAW FIRM.

108.     Defendants breached this duty by running the firm into the ground, firing essential staff, refusing to accept new cases, and failing to address serious misconduct by employees, including harassment.

109.     Defendants' actions were grossly negligent, reckless, and in bad faith, resulting in substantial harm to LAKE and the FIRM.

## XVI. <u>COUNT 12 - UNAUTHORIZED PRACTICE OF LAW</u>

114.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

115.     Defendants, not licensed attorneys in New York, engaged in the unauthorized practice of law by holding themselves out as attorneys and/or by exerting control over the management, client relations, and financial operations of a New York law firm.

116.     Such conduct violated New York Judiciary Law §§ 478 and 484.

Page 24 of 36

117. Defendants' misrepresentations to clients, funders, and employees that they were legally authorized to control a law practice constituted fraud and deception.

118. As a direct and proximate result of Defendants' unauthorized practice, Plaintiff suffered damages including reputational harm, loss of client relationships, and destruction of firm goodwill.

119. Defendants acted knowingly and maliciously, warranting punitive damages.

## XVII. COUNT 13 – STATUTORY FRAUD

120. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

121. At all relevant times, Defendants JUSTICE PARTNERS, TITAN, LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, and JANE/JOHN DOES 1–12, acting individually and in concert, engaged in deceptive, fraudulent, and unlawful acts and practices in violation of New York General Business Law § 349 and § 350, and other applicable statutes.

122. Defendants, in connection with their takeover and operation of LAKE LAW FIRM, made and disseminated materially false and misleading representations to Plaintiffs, clients, staff, funders, and the public, including but not limited to:

a. Falsely representing themselves as a legitimate law firm authorized to practice law in the District of Columbia and New York;

b. Falsely claiming to possess the requisite licensure, credentials, and professional standing to own, operate, and manage a law firm in New York;

c. Misrepresenting the nature, terms, and legality of their investment agreements and financial arrangements with Plaintiffs;

d. Concealing material facts regarding their lack of authority, licensure, and professional qualifications;

e. Disseminating false and misleading statements regarding Plaintiff Edward J. Lake's professional competence, alleged criminal conduct, and the status of The Lake Law Firm.

123.    Defendants' deceptive acts and practices were consumer-oriented, affected the public interest, and were likely to mislead reasonable persons, including Plaintiffs, clients, staff, and funders, causing substantial injury.

124.    Plaintiffs and other affected parties reasonably relied on Defendants' false and misleading representations, resulting in the conversion of $7 million in firm assets, destruction of an $18 million financing opportunity, collapse of a $20 million revenue firm, severe reputational harm, emotional distress, and other damages.

125.    Defendants' conduct constitutes statutory fraud under New York law, including violations of General Business Law § 349 (prohibiting deceptive acts and practices in the conduct of any business, trade, or commerce) and § 350 (prohibiting false advertising), and any other applicable statutes.

126.    As a direct and proximate result of Defendants' statutory violations, Plaintiffs have suffered actual damages, including financial loss, reputational injury, and emotional distress. Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Plaintiffs' rights and the requirements of New York law.

127.    WHEREFORE, Plaintiffs seek judgment against Defendants for all damages resulting from Defendants' statutory fraud, including actual, statutory, and treble damages, costs, interest, attorneys' fees, and such other relief as the Court deems just and proper.

### XVIII. COUNT 14 - USURY

128.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

129.    At all relevant times, DEFENDANTS JUSTICE PARTNERS, TITAN, LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, and JANE/JOHN DOES 1–12, acting

individually and in concert, entered into financial arrangements, investment agreements, and/or loan transactions with Plaintiffs and subsequent demands for payment.

130. Defendants, in connection with these transactions, imposed, charged, or demanded interest rates, fees, or other charges in excess of the maximum permitted by New York General Obligations Law §§ 5-501 et seq. and New York Penal Law §§ 190.40 et seq., which prohibit the charging of interest on loans or forbearances of money at a rate exceeding 16% per annum (civil usury) and 25% per annum (criminal usury).

131. Defendants' conduct included, but was not limited to:

a. Demanding excessive payments and interest in connection with the wrongful $39 million demand and other financial arrangements;

b. Structuring transactions as loans, advances, or forbearances of money, disguised as investments or capital infusions, but in substance constituting usurious loans;

c. Imposing terms and conditions that required Plaintiffs to pay interest, fees, or other charges in excess of the legal limits, under threat of economic harm, coercion, and duress.

132. Plaintiffs did not knowingly consent to any usurious terms, and any such consent, if alleged, was obtained under duress, coercion, and without full disclosure of the true nature of the transactions.

133. Defendants' actions constitute civil and/or criminal usury under New York law. As a result, any agreements or obligations arising from such usurious transactions are void and unenforceable, and Plaintiffs are entitled to recover all amounts paid in excess of the legal rate, together with damages, costs, interest, and such other relief as the Court deems just and proper.

134. WHEREFORE, Plaintiffs seek judgment against Defendants:

a. Declaring any usurious agreements void and unenforceable;

b. Awarding restitution of all amounts paid in excess of the legal rate;

c. Awarding compensatory and punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## XIX. COUNT 15 - BREACH OF FIDUCIARY DUTY

135.   Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

136.   At all relevant times, Defendants, by virtue of their contractual, investment, and business relationships with Plaintiffs, owed Plaintiffs fiduciary duties, including duties of loyalty, care, candor, and good faith. These duties arose from Defendants' positions as investors, business partners, and persons exercising control over the operations, finances, and management of LAKE LAW FIRM.

137.   Defendants breached their fiduciary duties to Plaintiffs by, among other acts and omissions:

a. Failing to disclose material facts regarding their lack of licensure, professional standing, and authority to operate or control a law firm in New York;

b. Concealing their true intentions to unlawfully seize control of LAKE LAW FIRM for their own benefit;

c. Misappropriating and converting firm assets, including at least $7 million in funds;

d. Acting in self-interest and to the detriment of Plaintiffs, including making a wrongful demand for $39 million and sabotaging a pending $18 million financing opportunity;

e. Engaging in conduct that undermined the integrity, stability, and reputation of LAKE LAW FIRM, including the dissemination of false and defamatory statements about Plaintiff LAKE;

f. Failing to act in good faith and with due care in the management and operation of the firm, including gross mismanagement, firing essential staff, and refusing to address serious misconduct within the firm.

138.   Defendants' breaches of fiduciary duty were willful, malicious, and undertaken with intent to harm Plaintiffs and to benefit themselves at Plaintiffs' expense.

139.     As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs have suffered substantial damages, including but not limited to the conversion of $7 million in assets, loss of business opportunities, destruction of an $18 million financing opportunity, reputational injury, emotional distress, and the collapse of a $20 million revenue firm.

140.     WHEREFORE, Plaintiffs seek judgment against Defendants for all damages resulting from Defendants' breach of fiduciary duty, including compensatory, punitive, and treble damages, costs, interest, and such other relief as the Court deems just and proper.

## XX.    COUNT 16 - UNJUST ENRICHMENT

141.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

142.     At all relevant times, Defendants, acting individually and in concert, received and retained substantial benefits, including but not limited to the control, use, and enjoyment of LAKE LAW FIRM'S assets, including the wrongful transfer of approximately $7 million.

143.     Defendants' receipt and retention of these benefits was without legal right, and was obtained through wrongful conduct, including misrepresentation, fraud, conversion, and other unlawful acts as set forth in this Complaint.

144.     Plaintiffs conferred these benefits upon Defendants either directly or indirectly, in reliance on Defendants' false representations, threats, and misuse of their positions of control. Defendants' retention of such benefits is unjust and inequitable, as Plaintiffs have suffered substantial financial loss, reputational harm, and the destruction of their business, while Defendants have been enriched at Plaintiffs' expense.

145.     Defendants have not compensated Plaintiffs for the value of the benefits received, nor do they have any lawful entitlement to retain such benefits.

146.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered damages including, but not limited to, the loss and conversion of at least $7 million in firm assets.

147.     WHEREFORE, Plaintiffs seek judgment against Defendants for restitution and disgorgement of all benefits unjustly received and retained, together with compensatory and punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## XXI. COUNT 17 - PIERCING THE CORPORATE VEIL

148.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

149.     Upon information and belief, Defendants ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, and TITAN LAW GROUP, LLP, ("D.C. FIRMS") are entities formed, owned, and controlled by Defendants LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, and others, for the sole purpose of facilitating the wrongful acts described in this Complaint.

150.     At all relevant times, the D.C. FIRMS failed to observe corporate formalities, were inadequately capitalized, and commingled funds and assets with those of the individual Defendants. The D.C. FIRMS lacked independent business operations, assets, or decision-making authority, and functioned exclusively as instrumentalities and alter egos of the Individual Defendants.

151.     The Individual Defendants dominated and controlled the D.C. FIRMS to such an extent that the entities had no separate will, existence, or interests of their own, and were used as mere conduits for the personal benefit of MELCHIONNI, BENITO, SOLIT, and their associates.

152.     The D.C. FIRMS were used to perpetrate fraud, commit wrongful acts, and evade legal obligations, including but not limited to: (a) misrepresenting their status as a legitimate law firm; (b) unlawfully seizing control of LAKE LAW FIRM; (c) converting firm assets; (d) interfering with contracts and business relationships; and (e) shielding the Individual Defendants from personal liability for their misconduct.

153.     The misuse of the corporate form by the Individual Defendants resulted in injustice and inequity to Plaintiffs, including the loss of $7 million in firm assets, the destruction of an $18 million financing opportunity, reputational harm, and the collapse of a $20 million revenue firm.

154.     Under New York law, where the owners of a corporation so dominate and control the entity that it becomes a mere instrumentality for their personal business, and such control is used to commit a fraud or other wrong resulting in injury to a third party, the corporate veil may be pierced and the individuals held personally liable for the corporation's acts.

155.     Plaintiffs therefore request that the Court disregard the separate legal existence of ACI LAW GROUP LLP, ACI TALC LAW GROUP LLP, ASK LAW GROUP LLP, BHI LAW GROUP LLP, BLUE CHIP LAW GROUP LLP, ERC LAW GROUP LLP, ERC PARTNERS LLC, JUSTICE PARTNERS GROUP LLP, KS LAW GROUP LLP, LRS LAW GROUP, LLP, TC LAW GROUP LLP, and TITAN LAW GROUP, LLP,, and hold Defendants MELCHIONNI, BENITO, SOLIT, and any other individuals found to have exercised such domination and control, jointly and severally liable for all damages and relief awarded in this action.

## XXII. EXEMPLARY / PUNITIVE DAMAGES

156.     Plaintiffs repeat and reallege all prior factual allegations as if fully set forth herein.

157.     Defendants' conduct, as described throughout this Complaint, including fraud, conversion of firm assets, tortious interference with contracts and prospective business advantage,

coercion, and racketeering, was egregious, willful, malicious, and undertaken with conscious disregard for Plaintiffs' rights. The cumulative and repeated nature of Defendants' misconduct demonstrates a pattern of intentional harm and bad faith, warranting the imposition of exemplary and punitive damages to punish Defendants and deter similar future misconduct.

## XXIII. <u>DAMAGES</u>

158.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered substantial damages, including but not limited to:

    a.  Loss and conversion of at least $7 million in firm assets;

    b.  Destruction of an $18 million financing commitment due to funders withdrawing support based on Defendants' misrepresentations and interference;

    c.  Severe reputational harm within the legal and business communities;

    d.  Collapse of a $20 million revenue firm, resulting in loss of business opportunities, goodwill, and emotional distress.

    e.  Defendants' actions were willful, malicious, and undertaken with intent to harm Plaintiffs.

159.    WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with costs, interest, and such other relief as the Court deems just and proper.

## XXIV. <u>PRELIMINARY INJUNCTION</u>

160.    Plaintiffs seek preliminary injunctive relief to prohibit Defendants from withholding funding pursuant to the June 2025 letter of intent and agreement, preserving the status quo and compelling the Defendants to continue paying expenses as required under the contractual agreement during the pendency of this litigation. Immediate relief is necessary to prevent irreparable harm to Plaintiffs and to ensure that the contractual obligations are honored while the underlying dispute is adjudicated.

161.     Despite the unequivocal terms of the contract, Defendants have indicated their intent to refuse to continue making the required payments. This conduct constitutes a material breach or anticipatory breach of the agreement. Plaintiffs have made multiple demands for compliance, all of which have been ignored or rejected by Defendants. The refusal to honor the agreement is not based on any bona fide dispute as to the existence or enforceability of the obligation, but rather an attempt to gain leverage in the ongoing dispute and to exert further control over the LAKE LAW FIRM.

162.     Plaintiffs will suffer immediate and irreparable harm if Defendants are not compelled to continue paying expenses as contractually required. The ongoing viability of LAKE LAW FIRM depends on the timely payment of these expenses. Without such payments, Plaintiffs face the risk of operational shutdown, inability to meet payroll, default on third-party obligations, and loss of goodwill and business opportunities. These harms are not readily quantifiable and cannot be adequately remedied by monetary damages after the fact. New York courts recognize that the loss of an ongoing concern, business reputation, or unique business opportunities constitutes irreparable harm warranting injunctive relief.

163.     The relief sought merely preserves the status quo by requiring Defendants to continue performing their existing contractual obligations pending resolution of the underlying dispute. Granting the injunction does not impose any new or additional burden on Defendants; it simply enforces the bargain they voluntarily entered. The balance of equities thus tips decidedly in Plaintiffs' favor, as Defendants will suffer no cognizable harm from compliance, while Plaintiff faces severe and irreparable injury if relief is denied.

164.     Granting the requested injunction serves the public interest by upholding the sanctity of contracts, promoting commercial stability, and preventing the disruption of ongoing

business operations, which would result in harm to thousands of clients. It also discourages parties from using the pendency of litigation as a pretext to evade clear contractual duties, thereby fostering confidence in the enforceability of agreements and the integrity of the judicial process.

165. Plaintiffs have no adequate remedy at law because the damages resulting from Defendants' refusal to pay their contractual obligations are not fully ascertainable and may include loss of business, reputation, and opportunities that cannot be restored by a monetary award. Only injunctive relief can prevent the imminent and irreparable harm threatened by Defendants' conduct.

166. For these reasons, Plaintiffs respectfully submit that all elements required for a preliminary injunction under New York law are satisfied, and that the requested relief is both necessary and appropriate to preserve the status quo and protect Plaintiffs' rights during the pendency of this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs EDWARD J. LAKE and LAW OFFICE OF EDWARD J. LAKE, PC d/b/a THE LAKE LAW FIRM respectfully request that the Court enter judgment in their favor and against Defendants LEE MELCHIONNI, SYLVIA BENITO, RICK SOLIT, TITAN LAW GROUP, LLP, LRS LAW GROUP, LLP, ERC LAW GROUP, LLP, ERC PARTNERS, LLC, and JUSTICE PARTNERS GROUP, LLP, and any additional parties named as JANE/JOHN DOES 1-12, and grant the following relief:

a. Awarding compensatory damages in an amount to be determined at trial, including but not limited to $7 million in converted assets, damages for lost financing and business opportunities (including the destruction of an $18 million financing opportunity), and all other losses resulting from Defendants' conduct;

b. Awarding punitive damages for Defendants' willful, malicious, and egregious conduct, including but not limited to fraud, breach of fiduciary duty, conversion, misrepresentation, coercion, duress, and the unauthorized practice of law;

c. Awarding treble damages as permitted by law, including under the Civil RICO statute and any other applicable statutes;

d. Awarding damages for breach of contract and breach of the duty of good faith and fair dealing;

e. Awarding pre- and post-judgment interest as permitted by law;

f. Awarding costs of suit, including reasonable attorneys' fees;

g. Imposing equitable relief, including but not limited to accounting, constructive trust, disgorgement, and restitution, as the Court deems just and proper;

h. Issuing a preliminary injunction and/or protective order requiring Defendants to continue funding LAKE LAW FIRM through pursuant to the June 2025 investment agreement;

i. Issuing a temporary restraining order and preliminary injunction prohibiting Defendants from directly or indirectly communicating with firm employees, vendors, co-counsel, or clients regarding the management, operations, or status of LAKE LAW FIRM, except as expressly authorized by the Court;

j. Ordering Defendants to refrain from any further interference with Plaintiffs' business relations, contracts, employees, vendors, co-counsel, or clients, and to reinstate LAKE'S signing authority on firm financial accounts.

k. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

**EDWARD LAKE, ESQ.**
270 West Main Street, Suite 3
Sayville, NY 11782
Phone: 888-525-3529
Fax: 917-893-4392
Email: info@lakelawfirm.com
Email: edlakelaw@yahoo.com

By: /s/ *Edward J. Lake*
Edward J. Lake, Esquire
Reg. No.: 2522555

## VERIFICATION

I, Edward J. Lake, am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and know the contents thereof. The same is true to my knowledge, except as to matters stated to be alleged on information and belief, and as to those matters, I believe them to be true.

_____

Edward J. Lake

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 721 of 784

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BLAKEMORE INVESTMENTS LLC,

                Plaintiff,

    -against-

LAW OFFICES OF EDWARD J. LAKE, P.C. d/b/a
THE LAKE LAW FIRM and EDWARD J. LAKE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**SUMMONS**

Index No.

Date Index No. Purchased:

**TO THE ABOVE-NAMED DEFENDANTS**:

    **YOU ARE HEREBY SUMMONED**, to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this Summons, to serve a notice of appearance, on the Plaintiffs' attorney within twenty (20) days after service of this Summons, exclusive of the day of service (or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

    This action is brought in the County of Suffolk because: under C.P.L.R. § 302(a)(1), Defendants transacted business in New York in connection with the subject agreement pursuant to which, *inter alia*, funding was provided within New York; and based upon the Defendants' dealings with Plaintiff in connection therewith, which occurred within New York and within Suffolk County; and venue in Suffolk County is proper under C.P.L.R. §§ 503 and 509 as Defendants are residents of and/or have their primary place of business within Suffolk County.

4915-3863-5637v.1

1 of 18

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 722 of 784

Dated: Garden City, New York
      October 27, 2025

GARFUNKEL WILD, P.C.
*Attorneys for Plaintiff Blakemore Investments LLC*

By:    /s/ Kevin G. Donoghue
                 Kevin G. Donoghue
                 Burton S. Weston
900 Stewart Avenue
Garden City, New York 11530
(516) 393-2200

TO:    LAW OFFICES OF EDWARD J. LAKE, P.C.
        d/b/a THE LAKE LAW FIRM
        270 West Main Street, Suite 3
        Sayville, New York 11782

        EDWARD J. LAKE
        7701 Glendevon Lane, Unit 1903
        DelRay Beach, Florida 33446

4915-3863-5637v.1

INDEX NO. 629003/2025
RECEIVED NYSCEF: 10/27/2025

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 723 of 784

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

-------------------------------------------------------------------------X

BLAKEMORE INVESTMENTS LLC,                      Index No._____/2025

                            Plaintiff,

                -against-                         **COMPLAINT**

LAW OFFICES OF EDWARD J. LAKE, P.C. d/b/a THE
LAKE LAW FIRM and EDWARD J. LAKE,

                            Defendants.

-------------------------------------------------------------------------X

Plaintiff Blakemore Investments LLC ("Blakemore" or "Plaintiff"), by and through its undersigned attorneys, Togut, Segal & Segal, LLP and Garfunkel Wild, P.C., hereby makes this verified Complaint (the "Complaint") against defendants Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm (the "Firm") and Edward J. Lake ("Lake" and, together with the Firm, "Defendants"), and states and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' mismanagement, incompetence, and misconduct which rendered the Firm insolvent and unable to meet its financial obligations, including those owed to Plaintiff, which provided funding to the Firm amounting to more than $15 million. Despite this funding provided by Plaintiff, and others as described below, Defendants have, through mismanagement, incompetence, and misconduct, brought the Firm on the precipice of a total collapse. Defendants have done so in recent vintage in blatant disregard of their contractual obligations.

2.      Plaintiff brings this action to recover substantial damages Plaintiff has suffered as a result of Defendants' egregious breaches of those contracts, as detailed below.

1

4919-9976-9461v.2

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 724 of 784

## PARTIES

3.      Plaintiff Blakemore Investments, LLC is a Delaware limited liability company with an address at 251 Little Falls Drive, Wilmington, DE 19808.

4.      Upon information and belief, defendant Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm is a New York professional company with an address at 270 West Main Street, Suite 3, Sayville, New York 11782, which focuses its law practice primarily on representing individual plaintiffs pursuing mass-tort and other plaintiff-based claims, including those under the Employee Retention Tax Credit (the "ERTC") program.

5.      Upon information and belief, defendant Edward J. Lake is an individual and resident of Florida with an address at 7701 Glendevon Lane, Unit 1903, Del Ray Beach, Florida 33446.  Lake is a New York-licensed attorney and is the founder and sole owner of the Firm.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper before this Court pursuant to C.P.L.R. § 302(a)(1) because: (1) Defendants transacted business in New York in connection with the subject Agreement (defined below) pursuant to which, *inter alia*, funding was provided within New York; and (2) based upon the Defendants' dealings with Plaintiff in connection therewith, which occurred within New York.

7.      Venue is proper before this Court pursuant to CPLR §§ 503 and 509 as Defendants are residents of or have their primary place of business in Suffolk County.

## FACTUAL BACKGROUND

A.      **The Parties' Relationship**

8.      On December 14, 2022, the Plaintiff and the Firm entered into a Capital Provision Agreement, later amended, (the "CPA"), pursuant to which the Plaintiff advanced funds to the Firm in exchange for future expected payments from tax refunds pursuant to the ERTC program,

2

4919-9976-9461v.2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 725 of 784

which were claimed on payroll tax returns or amended tax returns filed with the Internal Revenue Service by the Firm on behalf of its client taxpayers. The Plaintiff advanced to the Firm $15 million (the "ERTC Principal").

9. The Firm's obligations under the CPA are secured by the Security Agreement, dated December 14, 2022 and later amended (the "Security Agreement"), pursuant to which the Firm granted to the Plaintiff a first-priority security interest in certain ERTC claims, the proceeds and any processing agreements related thereto, the Escrow Account (defined below), and all other assets or proceeds related to the foregoing (the "ERTC Collateral").

10. The Plaintiff perfected its security interest in the ERTC Collateral by filing a UCC-1 financing statement on December 16, 2022.

11. Under the CPA, Lake agreed to be jointly and severally liable to the Plaintiff for the Firm's performance and for the Firm's payment obligations under the CPA (the "Personal Guarantee").

12. In addition, the Plaintiff and the Firm executed an Escrow Agreement, dated January 17, 2023 and later amended (the "Escrow Agreement"), which required that the Firm deposit proceeds from the ERTC Collateral into an escrow account (the "Escrow Account").

13. The Firm failed to obtain the required ERTC claims due to the Plaintiff under the CPA.

14. As a result, on November 7, 2023, Plaintiff served on the Firm a Notice of Exercise of Rights under the CPA, which demanded that the Firm pay the penalty amount set forth in the CPA, which totaled $11,750,000 (the "Penalty Amount").

3

4919-9976-9461v.2

15. In mid-March 2024, the Plaintiff learned that the Firm entered into a Binding Term Sheet, dated March 11, 2024 (the "March 2024 Term Sheet"), with Titan Law Group and its affiliates (collectively, "Titan") to restructure the Firm.

16. The March 2024 Term Sheet, in Blakemore's view, violated the change-of-control provisions of the CPA as noted in the Default Notice.

17. The Plaintiff learned that prior to execution of the March 2024 Term Sheet, Titan advanced approximately $30 million, which was also exhausted by the Firm, on an unsecured basis to the Firm in exchange for future settlement proceeds from mass-tort claims.

18. The Plaintiff also learned that the Firm had failed to provide the mass-tort claims due to Titan and that the Firm was unable to pay its debts as they came due, including funding its day-to-day operations.

19. On March 25, 2024, the Plaintiff served on the Firm a Notice of Default under the CPA (the "Default Notice") as the Firm failed to pay the Penalty Amount.

20. The Default Notice also identified the occurrence of other "Remedy Events" (as defined in the CPA), including (1) the failure to obtain the required ERTC claims due to the Plaintiff and (2) a change of control of the Firm. That same date, the Plaintiff served on Lake a Notice of Joint and Several Liability, which confirmed that the Plaintiff did not waive its rights under the Personal Guarantee.

21. To date, the Defendants remain in default under the CPA and have not paid the Penalty Amount.

4

4919-9976-9461v.2

Case 1:25-cv-25581-BB    Document 1-2    Entered on FLSD Docket 11/26/2025    Page 727 of 784

**B.      Plaintiff's Funding of the Firm and the Attempt to Stabilize the Firm's Operations**

22.      On information and belief, the Firm has earned virtually no fees to fund its operations over the last two years, and what fees have been generated are far short of the amounts needed to sustain its operations.

23.      In April 2024, the Plaintiff and Titan (together, the "Creditor Parties") began discussions to stabilize the Firm's operations and implement a workout to address the Firm's overwhelming liabilities.

24.      The Creditor Parties believe that they hold more than 90% of Lake Law's outstanding liabilities.

25.      The Creditor Parties agreed to fund the day-to-day operations of the Firm (the "Go-Forward Financing") until such time as the Firm generated enough unencumbered revenue to fund its operations.

26.      The Creditor Parties also sought to negotiate a restructuring support agreement, with the intent of ultimately obtaining the support of the Firm's other creditors.

27.      The appointment of an independent fiduciary to control the Firm's bank accounts was, and remains, an indispensable condition of the Creditor Parties' agreement to provide the Go-Forward Financing.

28.      Lake's mismanagement of the Firm demonstrated to the Plaintiff an inability of Lake to serve as a fiduciary for the creditors of the Firm in its insolvent state.

29.      On or around July 17, 2024, the Firm retained Getzler Henrich & Associates LLC ("Getzler") as its financial restructuring advisor.

30.      On August 15, 2024, Blakemore and the Firm executed an amended and restated Security Agreement (the "Amended Security Agreement"), which, among other things, granted

5

4919-9976-9461v.2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 728 of 784

Blakemore a first-priority security interest in all assets of the Firm to secure Blakemore's share of the Go-Forward Financing. The Amended Security Agreement also provides that Blakemore's Go-Forward Financing is contingent upon the Firm's retention of Getzler to oversee the firm's operations and finances.

31. That same day, the Plaintiff and the Firm amended the Escrow Agreement to add Mark Samson of Getzler as a company representative of the Firm.

32. For several months thereafter, the Creditor Parties worked with Mr. Samson to stabilize the Firm's operations.

33. Simultaneously, the Creditor Parties engaged in negotiations toward the Restructuring Support Agreement.

34. Lake was updated on these negotiations through Mr. Samson and Lake's own counsel.

35. On or about March 13, 2025, the Creditor Parties entered into a Term Sheet (the "Term Sheet"), governed by New York law, pursuant to which the terms of a comprehensive restructuring and recovery waterfall for all creditors of the Firm was agreed upon, and which allowed the Firm to continue to receive additional Go-Forward Financing.

36. The Term Sheet memorialized the Go-Forward Financing, which remained crucial in keeping the Firm afloat and functioning since by that time the Firm was in grave financial straits.

37. The Term Sheet provides that, on a go-forward basis, if the Firm did not have sufficient funds remaining after it paid certain fees (so-called "Lake Revenue") to pay necessary operational costs in the upcoming month pursuant to the 13-week budget provided by the Financial Advisor (to be updated regularly) and acceptable to the parties in their reasonable discretion (the "Budget"), the Creditor Parties would fund the Firm's necessary operational expenses

6

4919-9976-9461v.2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 729 of 784

pursuant to the Budget on a month-by-month basis, with Titan providing two thirds of the funding and Blackmore providing the remaining third (*i.e.*, would fund Firm with the Go-Forward Financing).

38. The Term Sheet further provides that "[t]he Parties commit to provide the Go-Forward Financing until such time as the Firm receives and/or holds the Lake Revenue sufficient to satisfy the Firm's necessary operational expenses." *Id.* at p. 2.

39. But the Term Sheet also provides the Creditor Parties with a right to terminate the Go-Forward Financing: "[a]t the earlier of either Party (in its sole discretion) declaring a material adverse change (to be defined in the final agreement), or May 31, 2025, the Parties shall have the right to amend or revoke their respective commitments as to the Go-Forward Financing." *Id.*

40. With regard to distributions of recoveries received by the Firm, the Term Sheet determines the priority and waterfall distributions to be made from the Lake Revenue (the "Waterfall"). *Id.* pp. 4-6.

41. Thereafter, Lake and the Firm entered into an Addendum with Titan and Blakemore (the "Addendum" and, with the Term Sheet, the "Go-Forward Agreement"). Pursuant to the Addendum, Lake and the Firm agreed to the terms of the Addendum and also to the terms of the Term Sheet and agreed to be bound thereto.

42. The Addendum further provides for affirmative steps by Lake for the appointment of Mark Samson of the Financial Advisory firm as Chief Restructuring Officer of the Firm, and in that regard sets forth:

> Immediately following the execution of this Addendum, Lake shall take all actions and cooperate with any steps necessary to have Mark Samson, of Getzler Henrich & Associates LLC, the Firm's Financial Advisors, approved as the Chief Restructuring Officer of the Firm with sole authority and control over the Firm's receipts, disbursements and bank accounts.

7

4919-9976-9461v.2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 730 of 784

43. The Addendum even provides for the payment of a salary to Lake to be funded by the Creditor Parties, despite the fact that the Firm did not have any Lake Revenue from which to pay it, although the Creditor Parties reserved their rights to revoke their commitments to funding for that purpose. The Addendum provides:

> Commencing May 1, 2025, Lake shall receive a salary from [the Firm] of $30,000 per month, payable in the first payroll of each month for his services to the Firm for a period of one year following the execution of this Addendum (the "Lake Salary"). [Titan and Blakemore] shall have the right to revoke their respective commitment to fund the Lake Salary in the event either [Titan or Blakemore] (in its sole discretion) declares a material adverse change impacting operation of the Firm that cannot be cured within five (5) business days of notice being given by either [Titan or Blakemore].

44. Consistent with the fact that the Firm required rescue financing, the Addendum provides that the Creditor Parties' consent is required before Defendants could agree to pay other creditors:

> Lake shall not personally, or cause the Firm, to enter into any agreement with any creditor of Lake or the Firm regarding the payment of amounts due to such creditor or authorize any disbursement to any creditor or himself without the written consent of Titan Law Group and Blakemore.

45. The Addendum also requires that Lake cooperate with Titan and Blakemore in good faith:

> Lake shall cooperate with [Titan and Blakemore] in good faith. Upon reasonable request of [Plaintiff], Lake shall provide such information, execute and deliver such further documents, and take further actions as may be necessary or advisable to effectuate the provisions and intent of this Addendum and the Term Sheet.

46. Finally, and importantly, the Addendum also provides that if Lake were to breach any term of the Term Sheet or Addendum, the Plaintiff or Titan could have a receiver appointed or institute bankruptcy proceedings, and that Lake would consent to such actions:

8

4919-9976-9461v.2

In the event Lake breaches any terms of the Term Sheet or this Addendum, Titan Law Group and Blakemore, as the case may be, *are authorized to seek the appointment of a receiver or effectuate any insolvency or bankruptcy proceeding*, and Lake shall be deemed to have consented to such appointment or proceeding.

(emphasis added).

47.     To date, the Plaintiff has advanced approximately $1,083,165.09 in Go-Forward Financing to the Firm to maintain the Firm's ability to operate.

48.     With the Term Sheet and Addendum in place, all of the fundamental terms of a comprehensive rescue plan for the collection and liquidation of the Firm's mass-tort and ERTC Claim portfolio were agreed upon, and—as had been contemplated from the very beginning of the Creditor Parties' involvement with Defendants' rescue financing—the parties moved forward to document and implement a financial restructuring of the Firm pursuant to the terms of a restructuring support agreement that incorporated the terms of the Term Sheet and Addendum (the "Restructuring Support Agreement").

49.     The Term Sheet and Addendum were and are binding on the parties even without a further Restructuring Support Agreement.

50.     Lake was unquestionably aware of the terms of the Term Sheet and the Addendum as he is a party to them.

51.     On or about September 26, 2025, an execution copy of the Restructuring Support Agreement was forwarded to Lake and the Firm.

52.     However, Lake stalled and argued through his existing counsel that he needed *new* "restructuring counsel" to review the Restructuring Support Agreement.

9

4919-9976-9461v.2

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 732 of 784

53. Notably, the Creditor Parties had previously paid for the Firm to be represented by restructuring counsel, but for reasons unknown to the Creditor Parties, Lake either fired that attorney or the attorney terminated the engagement.

54. Throughout the Creditor Parties' involvement with Defendants' rescue financing, the Creditor Parties have provided the Firm with funding to pay the fees of the Firm's litigation counsel, which has been paid over time in accordance with the Budget.

55. As of the date of this Complaint, Lake refuses to finalize the Restructuring Support Agreement and, as a result, the Restructuring Support Agreement has never been executed.

56. Plaintiff fully performed under the Go-Forward Agreement by, *inter alia*, providing requisite funding to Defendants under the Go-Forward Agreement and notifying Defendants of their wrongful breaches and misconduct as further detailed below.

**C. Defendants' Breaches And Other Misconduct Contributing To Firm's Insolvency**

57. By virtue of their general mismanagement, incompetence, oversight failures, and egregious breaches of the Go-Forward Agreement, Defendants have rendered the Firm insolvent and unable to maintain consistent and normal operations or meet its financial obligations, as further detailed below.

58. Defendants breached the Go-Forward Agreement by, *inter alia*: (1) wrongfully and secretly terminating Mr. Samson from the Firm; and (2) wrongfully and secretly demoting Ms. Grace Montealegre from her position as chief executive officer with the Firm.

59. On or about October 9, 2025, Lake, acting on his own and on behalf of the Firm, secretly terminated Mr. Samson as CRO, which was a material breach of the Go-Forward Agreement which provided "Immediately following the execution of this Addendum, Lake shall take all actions and cooperate with any steps necessary to have Mark Samson, of Getzler Henrich

10

4919-9976-9461v.2

INDEX NO. 629003/2025

RECEIVED NYSCEF: 10/27/2025

& Associates LLC, the Firm's Financial Advisors, approved as the Chief Restructuring Officer of the Firm with sole authority and control over the Firm's receipts, disbursements and bank accounts" and which also provided "Lake shall cooperate with [Titan and Blakemore] in good faith . . . and take further actions as may be necessary or advisable to effectuate the provisions and intent of this Addendum and Term Sheet."

60. Upon information and belief, Lake wrongfully instructed Mr. Samson not to inform the Creditor Parties of his termination to further Defendants' scheme to hide that material breach of the Go-Forward Agreement from Plaintiff.

61. Defendants understood that the appointment of Mr. Samson as CRO was crucial to the Firm's operations and a necessary inducement for Plaintiff to enter into the Go-Forward Agreement and provide funding thereunder.

62. On October 12, 2025, in a joint letter from counsel to Titan and the Plaintiff, Defendants were given notice of their breach of the terms of the Go-Forward Agreement and were provided five (5) business days to cure the breaches (the "Notice").

63. In spite of the fact that the Go-Forward Agreement expressly requires that the CRO have "sole authority and control over the Firm's receipts, disbursements and bank accounts[,]" on or about October 15, 2025, Lake made unauthorized changes to the Firm's banking authorizations, making himself and/or his agent the signatory on accounts holding funds for the benefit of the Plaintiff and Titan.

64. On or about October 15, 2025, Defendants improperly threatened to sue Titan (and later, the Plaintiff), sending a draft complaint asserting a laundry list of frivolous claims (apparently drafted by Lake while his salary and the Firm's operations were funded by the Creditor Parties).

11

4919-9976-9461v.2

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 734 of 784

65.     On October 16, 2025, counsel to the Plaintiff and Titan again sent a joint notice to Defendants reminding them that any disbursements made by anyone other than an independent fiduciary was a breach of the Go-Forward Agreement (the "Second Notice").

66.     These most recent breaches of the Go-Forward Agreement are not the only evidence of Lake's mismanagement, incompetence, and malfeasance in connection with the Firm's management and reckless disregard for the interests of creditors like Plaintiff. Additional breaches and failures to comply with duties to creditors include the following:

a)      Lake sought to pay the credit card bills of the wife of one of his employees totaling approximately $106,000.00, stating that the charges were for expenses of the Firm.

b)      Lake had borrowed approximately $117,000.00 from an employee at the Firm.

c)      Lake made payments on his personal credit card with funds advanced to the Firm by Titan and Blakemore, and the balance owed on that credit card exceeded $136,000.[1]

d)      Lake sought to make payments to himself in excess of agreed-upon salary.

e)      Lake appears to owe at least $671,469.60 to the Internal Revenue Service.

f)      Lake appears to owe approximately $100,000 to New York State.

67.     All the foregoing speak to Defendants' mismanagement, incompetence, and inability to responsibly manage Firm funds that has rendered the Firm insolvent, caused the Firm to need rescue financing, and necessitated the commencement of this action by Plaintiff.

68.     Defendants never cured the aforementioned breaches of the Go-Forward Agreement, and none of these breaches have been excused.

69.     As a consequence of Defendants' egregious breaches of the Go-Forward Agreement, Plaintiff has suffered damages, including, but not limited to, *inter alia*: (1) money damages in the amount of Plaintiff's funds that have been misappropriated, lost, or wasted in

---

[1]     Ultimately, the Creditor Parties agreed to fund partial payments on this credit card as part of the Go-Forward Financing in an effort to insulate the Firm and maintain operations.

12

4919-9976-9461v.2

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 735 of 784

connection with Defendants' egregious and uncured breaches of the Go-Forward Agreement; (2) interest on those funds; and (3) attorneys' fees, costs, and expenses occasioned by Plaintiff's need to initiate this lawsuit.

70.     Based upon Defendants' egregious breaches, oversight failures and general mismanagement, Plaintiff is also entitled to additional relief against Defendants, including the contractually-agreed-upon appointment of a receiver under C.P.L.R. § 6401, which will be sought by order to show cause once this case is docketed.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

71.     Plaintiff repeats and reiterates the foregoing paragraphs of this Complaint as if fully set forth herein at length.

72.     The subject the Go-Forward Agreement is valid and enforceable by Plaintiff against Defendants and Defendants are both bound by the terms thereof.

73.     By virtue of the foregoing allegations, Defendants breached the Go-Forward Agreement and remain in breach thereunder.

74.     Plaintiff fully performed under the Go-Forward Agreement by, *inter alia*, providing the Defendants with the funding contemplated under the Go-Forward Agreement, and duly notifying the Defendants of their wrongful breaches and misconduct before bringing suit.

75.     By reason of Defendants' above-described breaches of the Go-Forward Agreement, Plaintiff has been harmed, and Defendants, jointly and severally, are liable to Plaintiff for damages, including, but not limited to, *inter alia*, (1) money damages in the amount of Plaintiff's funds that have been misappropriated, lost, or wasted in connection with Defendants' egregious and uncured

13

4919-9976-9461v.2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 736 of 784

breaches of the Go-Forward Agreement; and (2) attorneys' fees, costs, and expenses occasioned by Plaintiff's need to initiate this lawsuit.

## SECOND CAUSE OF ACTION
### (For Attorneys' Fees, Costs, And Expenses)

76. Plaintiff repeats and reiterates the foregoing paragraphs of this Complaint as if fully set forth herein at length.

77. By reason of Defendants' above-described breaches of the Go-Forward Agreement and the CPA (and its related agreements), Plaintiff was compelled to hire the undersigned attorneys to commence and prosecute the causes of action in this Complaint, as well as the forthcoming motion to appoint a receiver, against Defendants.

78. In the event that Plaintiff prevails on its causes of action against Defendants, Plaintiff is entitled to recover their reasonable attorneys' fees, costs, and expenses plus interest thereupon as permitted by applicable law.

*[Remainder of page left blank intentionally]*

14

4919-9976-9461v.2

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 737 of 784

**WHEREFORE**, Plaintiff Blakemore Investments LLC demands judgment of the Defendants as follows:

1. On its First Cause of Action for breaches of the Go-Forward Agreement against Defendants, jointly and severally, damages in an amount to be determined by the Court;

2. On their Second Cause of Action, for attorneys' fees, costs, and expenses against Defendants, jointly and severally, judgment awarding Plaintiff their reasonable attorneys' fees, costs and expenses plus interest thereupon as permitted by applicable law; and

3. For such other and further relief as this Court deems just and proper.

Dated: Garden City, New York  
October 27, 2025

TOGUT, SEGAL & SEGAL, LLP

By:    */s/ Frank A. Oswald*  
       Frank A. Oswald, Esq.  
       John N. McClain, III, Esq.  
       One Pennsylvania Plaza, Suite 3335  
       New York, New York 10019  
       (212) 594-5000

GARFUNKEL WILD, P.C.

By:      
       Kevin Donoghue, Esq.  
       Burton S. Weston, Esq.  
       900 Stewart Avenue  
       Garden City, New York 11530  
       (516) 393-2200

*Attorneys for Plaintiff*

15

4919-9976-9461v.2

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 738 of 784

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
-------------------------------------------------------------X

BLAKEMORE INVESTMENTS LLC,

       Plaintiff,

  -against-

LAW OFFICES OF EDWARD J. LAKE, P.C. d/b/a THE
LAKE LAW FIRM and EDWARD J. LAKE,

       Defendants.

-------------------------------------------------------------X

Index No._____/2025

**VERIFICATION**

CRAIG BATCHELOR herby affirms the following:

I am an authorized representative of Plaintiff Blakemore Investments LLC. I have read the foregoing verified Complaint, and I affirm under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, to my own knowledge, except those matters therein that are stated to be alleged on information and belief, and as to those matters, I believe them to be true and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: October 27, 2025

Craig Batchelor, *on behalf of Plaintiff,*
*Blakemore Investments LLC*

16

4919-9976-9461v.2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                 :

BLAKEMORE INVESTMENTS LLC,          :   **STIPULATION AND**
                                 :   **ORDER RESOLVING**
               Plaintiff,      :   **MOTION AND APPOINTING**
                                 :   **TEMPORARY RECEIVER**
   -against-                    :

LAW OFFICES OF EDWARD J. LAKE d/b/a THE  :   Index No. 629003/2025
LAKE LAW FIRM and EDWARD J. LAKE,      :
                                 :

             Defendants.     :
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**WHEREAS,** on October 27, 2025, Blakemore Investments LLC (the "Plaintiff") commenced this action by the filing of a verified Complaint, dated October 27, 2025 (NYSCEF Doc. No. 1) (the "Complaint"), along with the October 27, 2025 filing of a motion by Order to Show Cause for Immediate Relief (NYSCEF Doc. No. 2) (the "Order to Show Cause"); the Emergency Affirmation of Frank A. Oswald, Esq. In Support of Plaintiff's Order to Show Cause for Immediate Relief, dated October 27, 2025 (NYSCEF Doc. No. 3) ("Oswald Affirmation"); the Affirmation of Craig Batchelor In Support of Plaintiff's Order to Show Cause for Immediate Relief, dated October 27, 2025 (NYSCEF Doc. No. 5) (the "Batchelor Affirmation") and all the exhibits attached thereto (NYSCEF Doc. Nos. 6-9); and the Plaintiff's Memorandum of Law in Support of Its Order to Show Cause seeking the Appointment of a Receiver, A Temporary Restraining Order and a Preliminary Injunction, dated October 27, 2025 (NYSCEF Doc. No. 10)

1

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 740 of 784

(the "MOL" and, together with the Order to Show Cause, Oswald Affirmation, and Batchelor Affirmation, the "Motion");[1]

**WHEREAS**, on October 27, 2025, consistent with the Uniform Rules, Plaintiff notified Defendants Law Offices of Edward J. Lake, P.C. d/b/a The Lake Law Firm (the "Firm") and Edward J. Lake ("Lake" and, together with the Firm, "Defendants"), through counsel, of this action and the immediate TRO relief to be sought by the Plaintiff pursuant to the Motion;

**WHEREAS,** among other things, the Motion requested (i) a temporary restraining order and preliminary injunction preventing Defendants from wasting, losing or misappropriating Plaintiff's property or destroying any documents, and (ii) the immediate appointment of a temporary receiver for the Firm to take control of, and to have sole authority over the Firm's bank accounts;

**WHEREAS,** the Defendants, through undersigned counsel, contacted the Plaintiff's undersigned counsel to discuss Defendants' consent to the entry of the preliminary injunction and appointment of a receiver for the Firm with sole authority over Plaintiff's collateral, other client property and the Firm's bank accounts;

**WHEREAS,** the Motion recommends that this Court appoint Salvatore LaMonica, Esq. as the receiver based upon the qualifications set forth in the Oswald Affirmation;

**WHEREAS,** the Defendants have consented to the Court's appointment of Mr. LaMonica as the receiver of the Firm with sole authority over the Firm's bank accounts and assets as hereinafter set forth;  and

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Complaint or the Motion, as applicable.

2

**WHEREAS,** on October 28, 2025, the Court held a status conference regarding the Motion and wherein the Defendants consented to the entry of a temporary restraining order and expressed to the Court their consent to the entry of a preliminary injunction and appointment of a receiver for the Firm with sole authority over Plaintiff's collateral, other client property and the Firm's bank accounts.

**IN CONSIDERATION OF THE FOREGOING RECITALS, WHICH ARE INCORPORATED INTO THIS STIPULATION AND ORDER, IT IS HEREBY STIPULATED AND AGREED:**

1. The requested TRO and the Motion are GRANTED to the extent set forth herein;

2. Pursuant to C.P.L.R. § 6401, the appointment of a receiver for the Firm, who shall have sole authority to manage and control the Firm's bank accounts, collateral, property, receipts and disbursements until displaced by further order of this Court, is warranted;

3. On the consent of the parties and subject to Court approval, the Court shall appoint Salvatore LaMonica, Esq. as the temporary receiver of the Firm pending a further order of this Court and Mr. LaMonica shall have sole authority to manage the Firm's receipts and disbursements and control the Firm's bank accounts until displaced by further order of this Court;

4. The Defendants shall take all necessary steps to have Mr. LaMonica immediately approved as the sole person with authority and control over the Firm's receipts, disbursements, and bank accounts;

5. The Defendants shall file a status update on the docket of this action when it has taken the foregoing steps and Mr. LaMonica has sole authority and control over the Firm's receipts, disbursements, and bank accounts;

3

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 742 of 784

6. The Defendants are hereby restrained, prohibited, and directed to refrain from removing, losing, dissipating, or disbursing any funds from any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;

7. The Defendants are restrained and prohibited from taking any action directing, transferring, or diverting the proceeds of any portion of the Plaintiff's collateral, or any proceeds of claims made pursuant to the Employee Retention Tax Credit program, into any accounts other than the Firm's Escrow Account at U.S. Bank N.A. without the Plaintiff's express written consent;

8. The Defendants are hereby restrained, prohibited, and directed to refrain from secreting, destroying, modifying, altering, or deleting any documents, records, or communications relating to any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;

9. Nothing herein shall be considered a waiver of any right of the Plaintiff to pursue additional or further action against either of the Defendants, including, but not limited to the causes of action set forth in the Complaint; and

10. Defendants hereby confirm service of process of the Summons and Complaint and service of the Motion.

So Ordered

David T. Reilly, J.S.C.

**this 31st day of October, 2025**

4

Case 1:25-cv-25581-BB   Document 1-2   Entered on FLSD Docket 11/26/2025   Page 743 of 784

Respectfully submitted this **30th** day of October 2025.

GELBER LAW GROUP, P.A.

By: _____
Matt Gelber, Esq.
2385 NW Executive Center Dr.,
Suite 100
Boca Raton, Florida 33431
(954) 320-0100

*Attorney for Defendants*

LAW OFFICES OF EDWARD J. LAKE, P.C.

By: _____
Edward J. Lake, Esq.

*In his capacity as sole member*

EDWARD J. LAKE

By: _____
Edward J. Lake, Esq.

*In his individual capacity*

TOGUT, SEGAL & SEGAL, LLP

By: _____
Frank A. Oswald, Esq.
John N. McClain, III, Esq.
One Pennsylvania Plaza, Suite 3335
New York, New York 10019
(212) 594-5000

GARFUNKEL WILD, P.C.

By: _____
Kevin G. Donoghue, Esq.
Burton S. Weston, Esq.
900 Stewart Avenue
Garden City, New York 11530
(516) 393-2200

*Attorneys for Plaintiff*

5

Case 1:25-cv-25581-BB Document 1-2 Entered on FLSD Docket 11/26/2025 Page 744 of 784

authority to manage and control the Firm's bank accounts, collateral, property, receipts and disbursements until displaced by further order of this Court, is warranted;

3. On the consent of the parties and subject to Court approval, the Court shall appoint Salvatore LaMonica, Esq. as the temporary receiver of the Firm pending a further order of this Court and Mr. LaMonica shall have sole authority to manage the Firm's receipts and disbursements and control the Firm's bank accounts until displaced by further order of this Court;

4. The Defendants shall take all necessary steps to have Mr. LaMonica immediately approved as the sole person with authority and control over the Firm's receipts, disbursements, and bank accounts;

5. The Defendants shall file a status update on the docket of this action when it has taken the foregoing steps and Mr. LaMonica has sole authority and control over the Firm's receipts, disbursements, and bank accounts;

6. The Defendants are hereby restrained, prohibited, and directed to refrain from removing, losing, dissipating, or disbursing any funds from any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;

7. The Defendants are restrained and prohibited from taking any action directing, transferring, or diverting the proceeds of any portion of the Plaintiff's collateral, or any proceeds of claims made pursuant to the Employee Retention Tax Credit program, into any accounts other than the Firm's Escrow Account at U.S. Bank N.A. without the Plaintiff's express written consent;

**8. The Defendants are hereby restrained, prohibited, and directed to refrain from secreting, destroying, modifying, altering, or deleting any documents, records, or communications relating to any and all of the Firm's bank accounts or any of Blakemore's collateral and other client property;**

9. Nothing herein shall be considered a waiver of any right of the Plaintiff to pursue additional or further action against either of the Defendants, including, but not limited to the causes of action set forth in the Complaint; and

10. Defendants hereby confirm service of process of the Summons and Complaint and service of the Motion.

*[Remainder of page left blank intentionally]*

Respectfully submitted this ___ day of October 2025.

GELBER LAW GROUP, P.A.                    TOGUT, SEGAL & SEGAL, LLP

By:                                       By:
                                              Frank A. Oswald, Esq.
    Matt Gelber, Esq.                         John N. McClain, III, Esq.
    2385 NW Executive Center Dr.,             One Pennsylvania Plaza, Suite 3335
    Suite 100                                 New York, New York 10019
    Boca Raton, Florida 33431                 (212) 594-5000
    (954) 320-0100

*Attorney for Defendants*

LAW OFFICES OF EDWARD J. LAKE, P.C.       GARFUNKEL WILD, P.C.
By: _____              By:
                                              Kevin G. Donoghue, Esq.
    Edward J. Lake, Esq.                      Burton S. Weston, Esq.
                                              900 Stewart Avenue
*In his capacity as sole member*              Garden City, New York 11530
                                              (516) 393-2200
EDWARD J. LAKE
By: _____              *Attorneys for Plaintiff*
    Edward J. Lake, Esq.

*In his individual capacity*


**SO ORDERED**, this ___ day of October 2025


ENTER:

Filing # 235414928 E-Filed 11/07/2025 05:27:16 PM

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

CBL Div. 44 (Judge Lisa S. Walsh)

ALLAN TEH,

On a derivative basis as a member of,

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

Plaintiff(s),

v.

LEE MELCHIONNI, individually
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a
Florida Corporation,
THE LAKE LAW FIRM, a New York Limited
Liability Company,

Defendants
and

KS LAW GROUP, a District of Columbia
Limited Liability Partnership

Nominal Defendant in the Derivative Action.

_____/

**DEFENDANT SYLVIA BENITO'S OPPOSITION TO PLAINTIFF'S MOTION TO
CONFIRM FINAL ARBITRATION AWARD AND REQUEST TO STAY THE COURT'S
DECISION ON PLAINTIFF'S MOTION AND THESE PROCEEDINGS FOR AT LEAST
NINETY (90) DAYS TO ALLOW DEFENDANT TO MOVE TO VACATE ARBITRATION
AWARD**

Defendant Sylvia Benito hereby opposes Plaintiff Allan Teh's Motion to Confirm Final

Arbitration Award and For Entry of a Final Judgment (the "Motion"), which seeks confirmation of

the Final Award in an American Arbitration Association ("AAA") arbitration styled *Teh v. KS Law*

*Group, LLP, et al.*, Case No. 01-23-0005-2721 (the "KS Arbitration") and simultaneously hereby moves to stay the Court's decision on Teh's Motion and these proceedings for at least 90 days.

## I.   INTRODUCTION

The Court should stay its decision on Teh's Motion because the Motion is premature.  The Revised Florida Arbitration Code (the "FAC") provides that a party has 90 days to seek vacatur of an arbitral award.  The FAC further provides that if a party files a motion to vacate an arbitral award, then the court can only confirm the arbitral award after it has denied vacatur.

Here, Benito intends to file a motion to vacate the Final Award in the KS Arbitration within the statutorily allotted 90-day period after her new counsel—who was not involved in the KS Arbitration—has thoroughly reviewed the KS Arbitration proceedings.  Accordingly, to prevent Teh from effectively stripping Benito her statutory right to seek vacatur of the Final Award, the Court should stay its decision on the Motion until after it decides Benito's motion for vacatur.

## II.   BACKGROUND

On April 25, 2023, Teh commenced this action.  (D.E. 1–2.)

On June 15, 2023, Benito (and others) moved to compel arbitration based on the partnership agreement of a District of Columbia partnership called KS Law Group, LLP of which Teh, Benito, and Defendant Lee Melchionni are partners.  (D.E. 25.)  That agreement requires the parties to arbitrate any disputes "arising out of or related to" the agreement before to AAA and pursuant to the Federal Arbitration Act (the "FAA").[1]  (D.E. 64, Order 2.)

On October 27, 2023, the Court granted the motion to compel arbitration, and the KS

---

[1]   As a result of a typographical error, the KS Law Group partnership agreement references the "American Arbitration Action" instead of the FAA.  (D.E 64, Order 2.)  But it is clear from the citation that follows reference to the "American Arbitration Action" that the parties meant that the FAA would govern any arbitration under the partnership agreement.  (D.E. 64, Order 2.)

Arbitration ensued.  (D.E.  64.)

On October 14, 2025, the Arbitrator issued the Final Award in the KS Arbitration.  (D.E. 80, Ex. A at 25.)

On October 22, 2025, Teh filed the Motion—seeking confirmation of the Final Award. (D.E. 80.)

Benito intends to file a motion to vacate the Final Award within the time periods set out in the FAC and the FAA.

## III.   TEH'S MOTION IS PREMATURE

The Court should stay its decision on the Motion until it decides Benito's forthcoming motion to vacate the Final Award.  FAC § 682.13(2) grants a party 90 days to move to vacate an arbitral award.[2]  Further, FAC § 682.13(4) provides that "[i]f a motion to vacate is denied . . ., the court shall confirm the award."   In addition, FAC § 682.12 states that "[a]fter a party to an arbitration proceeding receives notice of an award, the party may make a motion to the court for an order confirming the award at which time the court shall issue a confirming order unless the award . . . is vacated pursuant to" FAC § 682.13.  Thus, the FAC contemplates that a court can only confirm an arbitral award only after it decides vacatur.

Here, Benito intends to file a motion to vacatur of the Final Award and her statutory right to do so has not elapsed (under the FAC, Benito has until January 12, 2026, to seek vacatur).[3]  *See*

---

[2]     Teh relies on the confirmation and vacatur provisions of the FAC.  (D.E. 80, Mot. 8-11.) Benito's position is that the FAA governs confirmation and vacatur of the Final Award because that is the body of law selected by the parties in the KS Law Group partnership agreement.  (D.E. 64, Order 2.)  Regardless of whether the FAC or the FAA applies, Benito's argument regarding prematurity holds because the FAA allows a party "three months" to move to vacate an arbitral award.  *See* 9 U.S.C. § 12.  Benito expressly reserves the right to argue that vacatur is appropriate under the standards set forth in the FAA and related caselaw.

[3]     Under the FAA, Benito has until January 14, 2026, to seek vacatur.  *See* 9 U.S.C. § 12.

3

FAC § 682.13(2). If the Court were to confirm the Final Award before Benito's time to seek its vacatur has expired as Teh urges the Court to do, then the Court would effectively allow Teh to strip Benito of her statutory right to seek vacatur of that award. Accordingly, the Court should not rule on Teh's Motion to confirm the Final Award until it decides Benito's forthcoming motion to vacate the Final award. *See Battles v. Sw. Airlines Co.*, No. 1:18-CV-04822, 2020 WL 6781807, at \*1 (N.D. Ill. Nov. 18, 2020) (denying plaintiff's petition to confirm the arbitral award as "premature" because defendant's time to file a motion to vacate the award has not expired and stating that "arbitration awards are appropriately confirmed after the three-month statutory window to challenge them has expired"); *Burlington N. & Santa Fe Ry Co. v. Pub. Serv. Co. of OK*, No. 05 CV 53 TCK FHM, 2007 WL 593621, at \*2 (N.D. Okla. Feb. 21, 2007) ("Specifically, the Court holds that it erred in granting the Motion to Confirm as a matter of course when BNSF advised the Court, both in its original response to the Motion to Confirm and in its Motion to Amend, that it wished to file a Motion to Vacate on or before July 24, 2006.").

Indeed, Teh is well aware that he has jumped the gun. Acknowledging that Benito can still file a "timely motion[ ] to vacate" the Final Award under the FAC, he nevertheless argues that the Court should deny Benito that statutory right because such a motion would be "meritless and doomed to fail." (D.E. 80, Mot. 11.) Teh does not, and cannot, provide any authority for the proposition that a party loses its right to seek vacatur just because her adversary thinks that a motion for vacatur is not well-taken. The Court should allow Benito to file a timely motion to vacate the Final Award, so that Benito can argue for vacatur under the proper standards set forth in the FAA after her new counsel—who did not participate in the KS Arbitration—has had the opportunity to fully review the KS Arbitration file. *See Loda Okla, LLC v. Overall*, No. 13-CV-191-GKF-FHM, 2014 WL 12704716, at \*3 (N.D. Okla. Oct. 9, 2014) (staying decision on motion

4

to confirm arbitral award when party apprised the court that it intended to file a timely motion for vacatur after its new counsel has reviewed the arbitration file).

## IV. CONCLUSION

Benito intends to file a motion to vacate the Final Award and her time to file that motion has not expired. Under FAC § 682.13(4), the Court can only confirm an arbitral award after that motion has been denied. Accordingly, the Court should stay its decision on Teh's Motion until it decides Benito's motion to vacate the Final Award.

### CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all counsel of record on the e-filing service list via the Court's e-portal on November 7, 2025.

Respectfully submitted,
**BREWER ATTORNEYS AND COUNSELORS**

By: /s/ *Jim Montalvo*
Jim Montalvo, Esq.
Florida Bar No. 887056
hjm@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, TX 75201
Telephone: (214) 653-4000
Fax: (214) 653-1015

5

Filing # 235498925 E-Filed 11/10/2025 03:18:39 PM

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2023-015702-CA-01

ALLAN TEH,

     On a derivative basis as a partner of,

KS LAW GROUP, a District of Columbia Limited Liability Partnership

     Plaintiff(s),

v.

LEE MELCHIONNI, individually,
SYLVIA BENITO, individually,
PERSIST COMMUNICATIONS, INC., a Florida Corporation,
THE LAKE LAW FIRM, a New York Limited Liability Company,

     Defendants
and

KS LAW GROUP, a District of Columbia Limited Liability Partnership

     Nominal Defendant in Derivative Action.
_____/

## **PLAINTIFF'S EMERGENCY MOTION TO APPOINT RECEIVER**

Plaintiff, Allan Teh, derivatively on behalf of KS Law Group, LLP ("KS Law"), moves on an emergency basis for the appointment of a receiver to protect and preserve KS Law's assets, receivables, and economic interests. The Court has before it a pending Motion to Confirm the Final Arbitration Award, which includes the Arbitrator's express directive that a receiver be appointed to safeguard KS Law. The Court must now act with urgency because the conditions that led the

1

Arbitrator to require a receivership have worsened, and the risks to KS Law are immediate and accelerating.

## INTRODUCTION

This is not a situation where the Court is being asked to weigh the fairness or wisdom of appointing a receiver in the abstract. The Arbitrator already made that determination after a full evidentiary hearing, post-hearing submissions, and a separate sanctions hearing. The Arbitrator found that KS Law is in a "dangerous situation" due to the combination of (1) KS Law's dependency on Lake Law to process and administer KS Law's mass-tort inventory, (2) the third-party control over Lake Law's operations by Burford Capital, and (3) the reality that Defendants Lee Melchionni and Sylvia Benito "cannot be trusted to look after the rights of KS Law." *See Final Award attached as **Exhibit A.***

The Arbitrator's conclusion was clear and unequivocal: "A Receiver Should be Appointed" so that KS Law "collects what it is owed as cases are tried or settled" and to ensure that KS Law's case inventory was not diluted, diverted, or lost. This case originated before this Court and arbitration proceedings were initiated following this Court's January 30th, 2024, Order Staying the Case Pending Result of Arbitration. *See January Order attached as **Exhibit B**.* In that Order the Court specifically retained jurisdiction to manage and appoint a receiver.

## PROCEDURAL POSTURE

On October 14, 2025, the Arbitrator issued a Final Arbitration Award in AAA Case No. 01-23-0005-2721. Plaintiff filed a Motion to Confirm the Award in this Court on October 22nd, 2025. Under Section 682.12, Florida Statutes, the Court shall confirm the Award unless a narrow statutory basis for vacatur applies. This is a summary, mandatory proceeding, and no such basis exists.

However, do the rapidly increasing risk to the actual and potential assets of KS Law along with the Defendants now initiating lawsuits against one another [*see* **DE #93**] along with a receiver being appointed to govern The Lake Law Firm this Emergency Motion is required to safeguard KS Law's operations.

## ARGUMENT

The Final Arbitration Award is not a product of limited briefing or a paper-only review. It followed seven days of evidentiary hearings, another full-day hearing specifically to address issues of truthfulness and candor, extensive document production, post-hearing submissions, and detailed scrutiny of the parties' testimony. The Arbitrator analyzed KS Law's financial structure, the case acquisition model, the movement of funds, and the obligations owed by the partners to KS Law. The result was a clear, unequivocal conclusion: KS Law is currently in a condition that requires judicial protection and the appointment of a receiver.

The Arbitrator found that Melchionni and Benito breached their fiduciary duties to KS Law in multiple respects, including the immediate transfer of nearly the entire $4 million capital contribution to Persist/Lake Law without any binding contract in place, without disclosure to their partner, and without oversight or controls. The Arbitrator found that the justification offered for these actions was not credible, and that the explanations provided during testimony were misleading, evasive, and inconsistent with the documentary evidence.

The Arbitrator expressly found that KS Law's capital was placed at risk through grossly negligent conduct. She specifically held that Melchionni's failure to document the use of the $3,880,000 transfer for more than a year was not a mistake or isolated oversight but instead reflected a pattern of disregard for his fiduciary obligations to KS Law. She concluded that neither

3

Benito nor Melchionni conducted the oversight that any partner responsible for safeguarding millions in partnership assets was required to provide.

These credibility issues were not merely noted they were adjudicated. After the supplemental sanctions hearing held on April 24, 2025, the Arbitrator found that both Respondents Melchionni and Benito gave misleading testimony during the arbitration regarding their ownership interests in other D.C. law firms and the substantial compensation they received from related law firm entities at a time when KS Law itself had generated no revenue. She held that the explanation offered, essentially that opposing counsel should have found it on their own in a late document dump, was not only legally insufficient but ethically unacceptable. The Arbitrator stated plainly: "'You should have caught me' is not an excuse."

As a result of this lack of candor under oath, the Arbitrator imposed monetary sanctions:

- $40,000.00 against Respondent Lee Melchionni, individually; and

- $10,000.00 against Respondent Sylvia Benito, individually; and further ordered that Melchionni and Benito jointly and severally reimburse $8,087.50 in AAA fees.

These sanctions were not symbolic. They represent a determination that both Melchionni and Benito demonstrated a willingness to withhold critical information and to mislead a neutral tribunal in order to obscure the true financial and operational state of KS Law and the related entities through which its funds passed.

The Arbitrator then turned to the current operational risks to KS Law and its recoverable assets. She found that KS Law is entirely dependent on The Lake Law Firm to generate, maintain, qualify, and monetize the mass-tort case inventory that represents KS Law's sole source of future revenue. She further found that Lake Law is now controlled by a manager appointed by Burford

4

Capital, a creditor whose interests do not align with those of KS Law. The Arbitrator concluded that KS Law's revenue stream and asset recovery pathway now flow through a law firm controlled by an outside financial stakeholder with no fiduciary duty to KS Law.

The Arbitrator did not mince words. She held that this situation places KS Law in a "dangerous position", expressly stating that "Benito and Melchionni cannot be trusted to look after the rights of KS Law." *See **Exhibit A**.* The Arbitrator then reached the only possible remedy supported by the record that "[a] Receiver should be appointed." The receiver's role will be to ensure that KS Law "collects what it is owed as cases are tried or settled" and to confirmed that the KS Law "has received its assigned cases appropriately." *See **Exhibit A**.* The Arbitrator ordered that this determination be transmitted to this Court for implementation. This Court is therefore not being asked to evaluate a new request for equitable relief; it is being asked to effectuate the directive of a fully adjudicated Final Award.

Since the Final Award, and even following the Plaintiff's filing of his Motion to Confirm, litigation has been initiated in Suffolk County New York which emphasize the Arbitrator's warnings and the expedited nature of these proceedings. In *Blakemore Investments LLC v. Law Offices of Edward J. Lake, P.C. and Edward J. Lake*, INDEX NO. 629003/2025, the Suffolk County Supreme Court has already appointed a temporary receiver over Lake Law's bank accounts and operations. That appointment was entered with the consent of Benito representing that the instability acknowledged in arbitration is now being litigated in multiple jurisdictions simultaneously.

Additionally, Benito herself has now filed suit in Suffolk County against Lake and Lake Law (INDEX NO. 628021/2025), alleging financial misconduct, case-allocation failures, and non-payment. The partners who were supposed to be aligned in protecting KS Law are now accusing

5

each other of misappropriation. The exact allegations that gave rise to the underlying arbitration and the conclusive findings by the Arbitrator.

Every day without a receiver jeopardizes KS Law's right to case-generated fees; KS Law's stake in settlements; the preservation, transfer, and proper allocation of its case inventory; and the continued ability to trace and recover its receivables. These risks cannot be paused while the confirmation motion proceeds.

Plaintiff proposes the appointment of Stuart I. Grossman, an attorney with decades of experience managing, restructuring, and stabilizing distressed legal and commercial operations. Mr. Grossman is a partner at Levine Kellogg Lehman Schneider + Grossman LLP, a Miami-based firm focused on complex commercial litigation, fiduciary administration, and judicially supervised business management. His practice has, for years, placed him in roles requiring neutral oversight, forensic accounting coordination, partnership governance analysis, and the unwinding or restructuring of professional entities whose internal controls have failed or become compromised.

Mr. Grossman has previously served as a court-appointed receiver, special master, and monitor in matters involving contested control of operating businesses, disputes over income streams, breakdowns of partner fiduciary duties, and the need to preserve asset value while litigation remains ongoing. He has overseen the collection and accounting of receivables, the protection of client and business records, the continuity of professional services during transition, and the fair and orderly distribution of revenue under judicial supervision. He has worked closely with accountants, litigation funders, claims administrators, and trust administrators in matters requiring precise financial tracing and transparent reporting to the court.

This particular receivership requires an individual capable of intervening quickly to determine what revenue is attributable to KS Law, to confirm the status and assignment chain of

6

the mass-tort cases that form KS Law's only meaningful assets, and to ensure that funds generated from those cases are not diverted, diluted, or lost before the Court confirms the Final Award. Mr. Grossman is uniquely suited to that role. His background reflects not only technical ability, but the temperament and credibility necessary to serve as a court-empowered fiduciary in a situation involving competing claims, active parallel litigation, and degraded trust among the partners.

The Arbitrator expressly found that KS Law's interests cannot be protected by Melchionni or Benito, and that the firm is presently in a "dangerous situation." The receiver must therefore be someone independent of all parties, with no financial interest in any of the related entities, and with the demonstrated ability to command professional cooperation, marshal financial data, and exercise control over receivables in a legally disciplined manner. Mr. Grossman satisfies each of those requirements. Appointing him will stabilize KS Law, preserve its revenue rights, and prevent further harm while the Court completes the confirmation process.

**WHEREFORE,** the Plaintiff respectfully requests that the Court:

1. Grant this Emergency Motion and appoint a receiver over KS Law Group, LLP, with authority to take control of KS Law's receivables, case interests, and financial rights;

2. Designate Stuart I. Grossman as the Receiver;

3. Direct immediate turnover of all books, records, case-inventory lists, fee-participation agreements, and accounts relating to KS Law;

4. Prohibit Defendants, Lake Law, or any related entity from transferring, diverting, or dissipating KS Law receivables or case-proceeds during the pendency of this action; and

5. Schedule this matter for the earliest available emergency hearing and retain jurisdiction to grant further relief as necessary.

7

**<u>CERTIFICATE OF SERVICE</u>**

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was delivered to all of the parties on the e-filing service list via the Court's e-portal on this 10th day of November 2025.

**JONES & ADAMS, P.A.**
Coral Gables Centre
999 Ponce de Leon Blvd., Ste 925
Coral Gables, Florida 33134
 Telephone: (305) 270-8858
 Facsimile: (305) 270-6778
Email: matthew@jones-adams.com

By:    _/s/ Matthew L. Jones, Esq._
Matthew L. Jones, Esq.
Florida Bar No. 909335

8

# Exhibit A

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

**Allan Teh**, on a derivative basis as a partner of,
**KS Law Group, LLP**, a District of Columbia
Limited Liability Partnership, Claimant,

-vs-

**Case No.: 01-23-0005-2721**

**KS Law Group, LLP**, a District of Columbia
Limited Liability Partnership,
**Lee Melchionni**, individually, **Sylvia Benito**,
individually,

-vs-

**Persist Communications, Inc**., a Florida Corporation,
**The Lake Law Firm, LLC**, a New York, LLC,
Respondents.

### FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into among Allan Teh, KS Law Group, LLP, Lee Melchionni and Sylvia Benito, and dated August 24, 2021, and having been duly sworn, and having duly heard the proofs and allegations during hearings conducted January 6-10, 13-14, 2025 and April 24, 2025, offered by Claimant, represented by Matthew Jones, Esq. and Cheyenne Moghadam, Esq., Respondents KS Law Group, LLP, Lee Melchionni, Esq. and Sylvia Benito, represented by Michael Stolper, Esq., Lauren Elliot, Esq., Ian Weiss, Esq., and Thomas Mott, Esq., and Respondents Persist Communications, Inc. and The Lake Law Firm, LLC, represented by Matthew Gelber, Esq. and Amiad Kushner, Esq., and having previously rendered a Partial Final Award dated July 11, 2025, hereby AWARD as follows:

For convenience the Partial Final Award rendered on July 11, 2025 is included in this Final Award, as modified by certain of the clarifications requested by the

parties and some wordsmithing the Arbitrator deemed appropriate.  The Arbitrator ruled on the parties' requests for clarification in an Order dated August 29, 2025.

## PROCEDURAL BACKGROUND

Claimant Alan Teh ("Teh") originally brought this derivative action on behalf of KS Law Group, LLP ("KS Law") in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida.  By Order dated October 27, 2023, the Honorable Lisa Walsh ordered the case into arbitration and determined that The Lake Law Firm, LLC ("Lake Law") and Persist Communications, Inc. ("Persist") should be included in the arbitration.  JX 124, Ex. 2 to Teh Demand.[1] Teh shortly thereafter filed his Demand for arbitration with the American Arbitration Association ("AAA").  This matter was heard pursuant to AAA's Commercial Rules.  The substantive law of the District of Columbia applies to Claimant's claims.

The Arbitrator finds that a demand on KS Law to address Teh's complaints would have been futile and is thus excused.

The arbitration agreement allowed for extensive discovery (JX 15@¶39), and after that took place, hearings were held for all or parts of seven days in January 2025. Post-hearing briefing was agreed to and on the same day that Respondents' post-hearing briefs were due, Teh filed a Motion for Sanctions.  The Motion argued that Respondents Lee Melchionni ("Melchionni") and Sylvia Benito ("Benito") had been untruthful in their testimony about their membership in certain District of Columbia law firms.  The Arbitrator was advised that discovery in a related matter subsequent to the hearing in this matter had revealed that these two Respondents had received millions of dollars from DC law firms that they failed to reveal to the Arbitrator during the hearings.  Melchionni and Benito attempted to excuse their failure to disclose these partnerships by pointing to the production by JP Morgan Bank of voluminous documents, a few of which contained the names of these partnerships.  Considering that the JP Morgan production took place a week before Christmas and that the lengthy hearing was to commence January 6, 2025, the Arbitrator cannot fault counsel for Teh for failing to go through these documents with a fine-toothed comb looking for undisclosed partnerships.  Information from a third party does not excuse withholding information.  "You should have caught me" is not an excuse for the failure to disclose the important information that a)

---

[1] Joint exhibits will be referred to as "JX", Claimant's as "CX", Melchionni and Benito's as "M/B Ex." and Persist/Lake Law's exhibits as "P/L Ex."

Case No.: 01-23-0005-2721                                                          2

Melchionni and Benito had interests in other DC law firms not disclosed to the Arbitrator and b) they had been paid millions of dollars as a result of Employee Retention Tax Credit ("ERTC") claims filed by these firms at a time when KS Law had received zero dollars from any of its cases.  More important, the Arbitrator has carefully read and reread the testimony of these two witnesses at the hearing and finds that their answers, particularly Melchionni's, were misleading at best.

The Arbitrator, after considering the parties' submissions and input from counsel, held an additional hearing on April 24, 2025, at which Melchionni and Benito provided additional testimony.  The Arbitrator did not find their explanations and those of their counsel satisfactory.  However, Claimant requested default as a sanction and that is not permitted under the AAA's Commercial Rules.  Nonetheless, the failure to be candid at the hearings speaks to Melchionni and Benito's credibility and warrants a monetary sanction pursuant to the Arbitrator's power to enter an appropriate sanction per Commercial Rule 60(a).

## RELIEF SOUGHT

Teh's Demand seeks the following relief on behalf of KS Law:

1. Appointment of a receiver for KS Law.
2. Awards of damages against Melchionni and Benito for fraud.
3. Awards of damages against Melchionni and Benito for breach of fiduciary duty.
4. Awards of damages against Lake Law and Persist based on a theory of unjust enrichment.
5. An equitable accounting from Lake Law and Persist and damages pursuant to the accounting.
6. Awards of damages against Lake Law and Persist for aiding and abetting the alleged fraudulent actions of Melchionni and Benito.

The Arbitrator finds in favor of Claimant on the first and third claims and further finds that the remaining claims were not proved sufficiently.

## FACTS

The Parties stipulated to the following facts:

1. KS Law is a District of Columbia law firm formed on August 24th, 2021.

2. At all times material hereto, KS Law had three "Managing Partners," each owning a certain ownership interest, as set forth below:

a. Lee Melchionni, Esq.: 25%
b. Sylvia Benito: 25%
c. Allan Teh: 50%

3. On September 3rd, 2021, Teh wired $4 million as a capital contribution into the KS Law Account at Chase Bank (Acct. Ending in ***6138).

4. Teh's $4 million capital contribution is the only capital contribution KS Law has received.

5. Four days following the deposit of $4 million in KS Law's bank account, Melchionni began a series of eight (8) wire transfers, totaling $3,880,000, to Persist's TD Bank Account.

6. Persist Communications, Inc. ("Persist") is a Florida Corporation wholly owned by Edward J. Lake ("Lake").

7. Lake is also the sole equity partner of Respondent, The Lake Law Firm, LLC ("Lake Law"), a New York law firm.

8. KS Law was not identified by name on any retainer agreements when they were originally signed by clients.

9. Melchionni and Benito are partners in at least seven (7) other D.C. law firms which were formed within a year of KS Law's formation.

The Parties subsequently stipulated that all the Joint Exhibits could be admitted in evidence. CX 1, 3, 5 and 6 were admitted. M/B Ex. 1 and 2 were admitted as were 3 versions of P/L Ex. 1 and P/L Ex. 4-6.

It is undisputed that Melchionni, as the sole attorney in the partnership, was and is the legal managing partner of KS Law as well as numerous other DC law firms with a similar structure. Benito worked closely with Melchionni to put together numerous litigation financing deals to fund the pursuit of mass tort settlements (or litigation) with the purpose of generating legal fees. It is undisputed that the partners in KS Law owed fiduciary duties to one another.

Whether KS Law should have had an IOLTA account, as required by the DC Bar Rules of Professional Conduct when client funds are held, is not an issue because, at least to date, KS Law has never held client funds.

### Benito and Melchionni Introduce Teh to Litigation Financing

Teh is a wealthy investor with a Wall Street/hedge fund background who formed a family office which researched and helped him manage investments.  Benito, who worked for a family office herself, was an acquaintance of Teh's and introduced him to the idea of litigation financing and to Melchionni in early 2021.  Prior to speaking with Benito, neither Teh nor his staff had any familiarity with the workings of litigation financing.  In his testimony, Teh complained that Benito and Melchionni led him to believe that they were experts in mass torts, but he discovered later that "they did not know what they were doing."

Teh's initial investment with Benito and Melchionni was with an entity named Justice Partners, LLC, a Delaware limited liability company.  This was not a law firm like KS Law but an investment fund that supported a District of Columbia law firm, Justice Partners Law Group, LLC, through a loan to that firm of all its capital. *See* M/B Exs. 2, 4.  Teh invested $4 million in Justice Partners, LLC.  This investment provided him with the opportunity to make an additional investment of $4 million dollars into a DC law firm solely owned by Teh, Benito and Melchionni.  As noted in the Stipulation, KS Law was formed on August 24, 2021 and Teh wired his $4 million capital contribution on September 3, 2021.  Melchionni immediately forwarded $3.88 million from Teh's contribution to Persist, a marketing firm that worked with Lake Law.  The Arbitrator finds that Teh was never told anything about Persist until much later and was not told that all his money would immediately be transferred to one marketing firm.

Justice Partners, LLC was sold using the types of disclosures that normally accompany the sales of securities.  They contained the usual warnings about the risks accompanying a new venture and specifically stated that the generous return on investment suggested would take 3 to 5 years to develop. *See, e.g.*, M/B Ex. 2.  As noted below, Benito and Melchionni repeatedly suggested to Teh that returns to KS Law in the form of legal fees from mass torts settlements could come much earlier.  It has been almost four years since Teh invested in KS Law and so far, only a trivial amount of attorneys' fees has been collected.  It is expected that at least some additional fees will be collected but the timing and amount are unknown.

Case No.: 01-23-0005-2721                                                                 5

**Benito and Melchionni's Representations to Teh concerning KS Law**

KS Law's structure was different from Justice Partners.  There was a paucity of written material presented to the Arbitrator as to the representations and cautions that accompanied the formation of KS Law, resulting in oral testimony taking on some significance.  Unfortunately, none of the three partners in KS Law was a particularly compelling witness.

Teh testified that he met Benito in January 2021 when he was having drinks with some people that he knew. She told them about her success with a mass torts investment in the Boy Scouts cases.  He recalled that she said she was going to start a fund with Melchionni who had 10 years of mass torts experience.  She described the investment as tax efficient and not correlated with the stock market. He met Melchionni a month or two later and further discussion led to his investment in the Justice Partners fund.  He described his investment in KS Law developing as follows:

> Well, since I invested in Justice Partners in March, they were telling me how well the investments were doing. Basically they were only going to invest in cases that were already qualified and in negotiation settlements. So these are the cases where they pay a significant premium over the marketplace and they were telling me that the cases are going well and in some cases some of them might settle even at the end of 2021. So I said, you know, if that's the case, should we invest more.
>
>  Q. And what did they say?
>
> A. They said sure. We can do it in a law firm structure, in which case you have better control over what you're going to own because it's a 50 percent ownership law firm that you're going to have.

Tr. 32.  He went on to say that Benito and Melchionni told him that "as far as Justice Partners is concerned, they have discretion as to what cases they are going to be acquiring for the fund, whereas with KS Law I had veto power over what cases the law firm can acquire."  Tr. 33.

Just prior to his investment in KS Law, on August 24, 2021, Benito sent Teh a text (JX 21) stating:

Case No.: 01-23-0005-2721                                                                                        7

1- Talc.  We have 714 cases. Continuing to see strong signals from J & J that we will see settlement in next 12 months, we took the move to bankruptcy as non material[.]  2mesh. Seeing fast intake, cost is steady, we have 1000 cases and monitoring work up for drop off ( we have case replacement) 3- roundup. We got a unique window of opportunity to invest in this case which we thought formerly was in accessible but we have a vendor now for the case- our base assumption is 2-3x in 24 months 4- 3M, three trials, two positive results and we are hearing they are ready to [remainder cut off]

Teh testified that Melchionni and Benito told him that they would be purchasing qualified cases for KS Law that were already in settlement negotiations.  Benito and Melchionni denied that they said this.

Teh understood that he was providing all the capital for KS Law.  In October 2021, Melchionni advised that his money had been used to purchase 775 cases.  JX42. While the Arbitrator is not convinced that Teh was told all his cases were already in settlement discussions, he reasonably understood these to be actual "cases" of some sort, *i.e.*, clients in being.  He did not understand that his money would be used to pay for advertising campaigns to attract new clients who not only had not yet filed cases, they had not even been screened to see if they had the potential ever to be clients and thus become "cases."  Once potential clients responded to the advertising, their information needed to be confirmed and their medical records obtained to be sure they met the criteria needed to file suit.  The clients needed to sign a retainer agreement and a package of information would be put together for use by a litigation firm that would actually file suit.  This workup was done by Persist/Lake Law and/or its vendors. For the good cases, Lake Law would take care of hiring counsel to file suit.  Melchionni is not a trial lawyer and had no experience managing a law firm.  He has never spoken to a KS Law client and, of more concern, has never reviewed any medical records even to spot check whether Lake Law's determinations that potential clients were qualified were correct. Benito and Melchionni did monitor the *number* of cases produced by Lake Law and could track their progress via Lake Law's software from the initial lead to either disqualification or being sent to trial counsel for filing.

The Arbitrator concludes, after weighing the testimony and documents, that Teh was told that KS Law would be acquiring actual clients and was not told that his investment in KS Law would only fund an advertising campaign.  He would not have invested $4 million in KS Law had he understood this.  Teh proved by a preponderance of the evidence that Benito and Melchionni made material misrepresentations to him.  However, the evidence did not rise to the level of the

"clear and convincing" evidence required to prove fraud.  Nonetheless, once they became his partners, they had a fiduciary duty to disclose to Teh where and how his money was being spent.  They did not do so.

Benito and Melchionni took the position with Teh and at the hearing that it did not matter which version of their representations was true because Lake Law guaranteed a certain number of cases.  If a potential client did not turn into a viable case because medical records did not support their claim, Lake Law had to find another prospect with good medical records.  When it became apparent that Lake Law had not delivered the promised cases, Benito and Melchionni negotiated a "Case Replacement Agreement" ("CRA") (JX 91) that provided that KS Law would get its money back plus interest if Lake Law were not able to produce the promised cases.  This agreement is of little use to KS Law because Persist is no longer doing business and Lake Law is insolvent as a practical matter.  No more cases are going to be produced than are already on KS Law's docket and its only hope of more cases is if Lake Law can substitute ERTC cases for missing Talcum Powder cases.  Lake Law offered to replace each missing Talcum Powder case with claims for 6 employees who were part of an ERTC claim.

The Arbitrator finds that Benito and Melchionni did adequate due diligence before doing business with Lake and his companies.  They checked his reputation with others in the business and found him to be well-respected and experienced.  They had not actually worked with him, however, and they were not experienced in the roles they undertook for their law firm clients.  It was grossly negligent to put all of their clients' capital into his business all at once.  In particular, it was grossly negligent to pay Persist $6000 each for 200 Talcum Powder cases.  The Talcum Powder cases against Johnson & Johnson had been going on for several years, with the result that many potential clients had already retained counsel, making it unrealistic to expect a large volume of good clients.

Benito and Melchionni formed numerous DC law firms using the same model as KS Law.  They also formed a firm known as Titan Law Group ("Titan") in which they were the only partners.  Titan was used as a "placeholder" for certain of the law firms they formed with individual investors.  When clients were asked to sign retainer agreements after their vetting was complete, only Titan and Lake Law were named as the law firms that the clients were engaging.  Respondents' witnesses testified that there was then an internal process at Lake Law that allocated individual cases to the individual law firms on what was described as a "round robin" basis.  In other words, cases were assigned by a computer program to the individual law firms in a sequential pattern as they came in.  The result of

Case No.: 01-23-0005-2721                                                                 9

this process was that KS Law was never identified to clients as their law firm, and it has no retainer agreements with clients.  This was not disclosed to Teh before or at the time of his investment.  It was also, as discussed below, a violation of the DC Bar Rules of Professional Conduct.  In violation of their fiduciary duties, Benito and Melchionni did not look at the cases assigned to the DC law firms in question to make sure that the assignment resulted in an even distribution of qualified cases.  The Arbitrator was not supplied with sufficient information to determine whether this was the case.

## The Investment in KS Law Sours

Shortly after Teh invested in KS Law, in response to Teh's assistant asking for "an update on how much [of Teh's $8 million] has been invested[2] and what the distribution is per case type", he was provided with a list of "cases" that the Melchionni and Benito had allegedly purchased for KS Law.  JX 42, an email from Melchionni to Teh's assistant dated October 18, 2021, recites that 775 cases had been or were to be acquired:  155 Round Up, 200 Talc[um Powder], 212 Hernia Mesh and 212 3M [ear plugs].  A list of client names and contact information was attached.  Melchionni further stated:  "The attached spreadsheet gives you the case list for KS Law Group. We have only filled 123 of the 155 RoundUp cases. We are taking in new cases daily. Please keep in mind that this list will change as a result of dropoff, but those cases are replaced at no cost."  As to the Hernia Mesh cases, he said:  "We continue to march towards settlement with multiple manufacturers. We are in the process of working up our cases and replacing those that have been disqualified. We are cautiously optimistic that the majority of our docket will be settled by Q2 of 2022."  As to 3M, he reported that plaintiffs had been successful in 3 out of 4 trials and "[t]here are multiple trials scheduled over the next few months, but it is possible that a settlement is reached in the next few months."  He reported old news about Bayer's allocation of funds toward RoundUp cases and indicated that he would report later on Johnson & Johnson's bankruptcy efforts.

In the fall of 2022, Benito and Melchionni revealed to Teh the fact that the 775 cases he thought he had purchased had dwindled down to a smaller number due to "drop off."  Drop off can occur for a variety of reasons, including lack of response from the potential client, difficulty in obtaining medical records (exacerbated

---

[2] Benito and Melchionni repeatedly argued that Teh should have known that all his money would be invested at once and he would have wanted to invest all his money all at once.  If that were the case, he would not have instructed his assistant to ask how much of his money had been invested several weeks after his capital contribution.

Case No.: 01-23-0005-2721

during the Covid pandemic), the potential client not meeting the criteria for a good claim, or having previously engaged counsel.[3]  Teh was furious when he found out how his money had actually been used, that it was all spent and KS Law did not have anywhere near the number of cases he had been told it had.  He was also upset that Benito and Melchionni had not kept him informed of the problems with case development.  Benito testified that Teh kept screaming "I want my cases!", was abusive to her and was not cooperative in trying to find a solution for the problems.  Her proposed solution was to find a buyer who would buy Teh's portfolio for 80% of what he had paid for it.  Benito's fiancé also transferred some 3M cases from his DC law firm to KS Law.  Teh was not satisfied.

KS Law's situation got worse from there.  Benito and Melchionni testified that one reason they invested all their clients' money with Persist/Lake Law is that their contract offered a "medical records guarantee."  This meant that if a lead generated by a Persist advertising campaign turned out not to qualify for medical reasons, they would replace that potential client with a new one.  Although the guarantee sounded good in theory, it did not work in practice as Persist/Lake Law has not been able to find enough qualified clients to fulfill the numbers promised.  After this became apparent, as noted above, Benito and Melchionni negotiated the CRA with Lake.  JX 91.  The CRA, effective December 1, 2022, provided that KS Law's share of attorneys' fees was enhanced.  To the extent Lake Law was unable to fulfill its obligations on talcum powder cases, it could substitute ERTC claims at the rate of 6 employees supporting ERTC claims per talcum powder case.  Failing that, Lake Law would reimburse KS Law for the number of missing cases at the price paid, *i.e.*, $6,000 per Talcum Powder case plus 8% simple interest per year from September 1, 2021.  For the other categories of cases, monetary reimbursement was agreed.  Melchionni signed the CRA on behalf of KS Law on December 28, 2022.  Again, although the CRA sounded good in theory, it did not work in practice as Persist/Lake Law were unable to provide enough good cases and they were insolvent no later than the end of 2023.

There is another contract that was the focus of attention at the hearings, JX 26, a document on the letterhead of Lake Law entitled "Invoice."  Respondents referred to this document as an "insertion order."  It recites that KS Law is ordering the following "cases":  220 Hernia Mesh @$5,600 each for a total of $1,232,000, 200

---

[3] Information produced by Lake Law at the hearing suggests that the primary reasons for drop off in the KS Law docket were that the potential client was unresponsive to further contact or was unqualified for inclusion in the group of clients suing for a particular injury.  *See* P/L Ex. 1.  For example, a talcum powder claimant might have suffered from a cyst rather than cancer.

Talc @$6,000 each for a total of $1,200,000, 155 Round Up cases @$5,048.39 each for a total of $782,500, and 220 3M cases @$3,025 for a total of $665,500. The grand total was $3,880,000.00, all the money that KS Law transferred to Persist in September 2021 except for a bit held back to pay Benito and Melchionni for their services to KS Law.

The Invoice is signed by Melchionni and dated September 1, 2021 although Melchionni testified it was not actually signed until September of 2022. The failure to document what KS Law was to receive for its $3.88 million was an "oversight" on Melchionni's part. Tr. 366-67. He went on to admit that he had not advised his partners of this oversight and when asked why he had not, he said: "I don't recall." (This answer was given with disturbing frequency during Melchionni's testimony.) Lake testified that he was the one who initiated this documentation. Tr. 1270-71. Benito and Melchionni's decision to send all of KS Law's capital to Persist without a firm contract and their failure to correct that oversight for more than a year was grossly negligent.[4]

Melchionni also blamed "oversight" for his failure to obtain the liability insurance he was required to obtain by ¶37 of the Partnership Agreement. He did not advise Teh of his failure to obtain insurance until Teh made a demand for the books and records of the partnership in late 2022. KS Law was able to obtain insurance and no claims have been made against it that would trigger that insurance. Melchionni argues that since no claims have been made, this is a "no harm, no foul" situation. Melchionni's failure to take this basic step was grossly negligent but KS Law has suffered no damage as a result.

Melchionni's "oversights" on important matters while he was the Legal Managing Partner of KS Law lead the Arbitrator to conclude that Melchionni provided little management to KS Law. This is not surprising given the large number of law firms in which he was a partner, the number of times he was named as Legal Managing Partner in those firms, that he had little relevant experience actually practicing law and no experience managing a law firm.

Benito testified that she became concerned about "drop off," particularly in the talc cases, by the summer of 2022. Tr. 1085-87. As late as May 12, 2022, when

---

[4] Benito and Melchionni take the position that the indemnification clause in the KS Law partnership agreement requires that they must be found to have been grossly negligent to have any liability to the partnership. The Arbitrator does not agree with that interpretation but includes findings of gross negligence should a reviewing court disagree.

Case No.: 01-23-0005-2721

12

Melchionni updated Teh on progress, he continued to project confidence about the timing and amount of potential returns to KS Law.  His memo (JX 56) memorializing their conversation states that he told Teh:

> Talc
> ● I spoke to our co-counsel on Talc and he had a positive update. He sat in on settlement negotiations last week in NYC where several "indications" of settlement offers were floated by JJ. The potential numbers proposed by JJ were at the upper end of what we modeled. Now, obviously, things could change, and no agreement was reached, but there is positive momentum towards a resolution. From a timing standpoint, hard to predict, but cautiously optimistic a settlement is reached within 2022, followed by actual cash flow within 6-12 months.
>
> Hernia Mesh
> ● I know I am beating a dead horse, but our co-counsel tells me Bard could settle in 2 weeks or 2 months. This is because a global settlement needs to be reached with MDL before our counsel settles because our values will be higher. Bard will make up a minimum of 60% of our docket. Similar to Talc, we expect funds to flow 6-12 months after settlement is reached.

Melchionni testified at the hearing in January 2025 that KS Law had "100 active 3M cases, it has 70 active hernia mesh cases, it has 60 active Roundup cases, and it has 38 active employee retention tax credit."  Tr. 515.  These numbers do not exactly match the cases listed on P/L Ex. (v.3) but are close enough that the differences are not material.

Benito and Melchionni did not treat Teh as an equal partner in KS Law's business although he owned 50% of it and had provided all its capital.  They failed to provide him with important information in a timely way.  For example, they spent all his money at once with one vendor without consulting him and without telling him until he asked.  They led him to believe everything was fine until they had to admit it was not.  As his partners, Benito and Melchionni owed Teh and KS Law a fiduciary duty.  It is apparent from the facts recited above that they breached their duty of care and duty of loyalty, thus breaching their fiduciary duties.

### Damages

As discussed above, Claimant's fraud claims were not proved but its breach of fiduciary duty claims were.  The next question is: did KS Law suffer any damages

Case No.: 01-23-0005-2721                                                                 13

as a result of the breaches of fiduciary duty, and if so, in what amount?  The Arbitrator does not accept the theory of damages put forward by Claimant's expert which primarily relies on Benito's projections of what KS Law might earn.  These projections are more reasonably construed as estimates rather than promises.  The failure to meet projections for an investment, particularly one as uncertain as mass torts, cannot normally be the basis for damages.

District of Columbia law prohibits the award of speculative damages.  It also requires that a plaintiff who discovers an injury must file suit for that injury, even if future damages are unknown, or risk a statute of limitations bar.  Thus, an injured party cannot simply wait until its damages are certain to make its claim.  The principles as to uncertain damages have often been outlined by the Court of Appeals and are summed up in *NCRIC, Inc. v. Columbia Hospital for Women Medical Center, Inc.*, 957 A.2d 890, 902-03 (D.C. 2008):

> A plaintiff need prove damages only with reasonable certainty. While an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data. Probable and inferential considerations as well as direct and positive proof may provide the basis for an award. "The evidence offered must form an adequate basis for a reasoned judgment;" "mathematical precision" is not required.  Furthermore, "the courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible."  [Citations omitted.]

In other words, difficulty in calculating damages does not allow a tortfeasor to escape the consequences of his or her actions.

The Arbitrator has no doubt that KS Law has suffered and will suffer losses due to the failures of Benito and Melchionni outlined above. A huge volume of leads has already been disqualified and little has been accomplished in the way of finding substitute cases.  The fact is that KS Law's final damages are unknown at this point.  It does have cases assigned to it at Lake Law that have been filed in court or sent to counsel for filing.  *See e.g.*, P/L Ex. 1.  Some 3M cases have been settled (although the fees had not made their way to KS Law at the time of the hearings) and it is reasonable to expect that some additional 3M ear plug cases will settle.

If Melchionni's recitation of the number of cases KS Law had is accurate, the firm is short 120 3M cases, 150 Hernia Mesh cases and 95 Round Up cases.  It is short

Case No.: 01-23-0005-2721

14

the entire 200 Talcum Powder cases for which it paid $1.2 million, $6,000 for each case.[5]

If credit is given for the 38 ERTC employees, then it is short 194 Talcum Powder cases and received $36,000 in value for its $1.2 million. KS Law paid a total of $1,232,000 for the 220 Hernia Mesh ($5,600 each) but received only $560,000 in value. KS Law paid a total of $782,500 for 155 Round Up cases ($5,048.39 each) but received only $479,597 in value. It paid $665,500 for 220 3M ($3,025 each) but received only $302,500. The Arbitrator is using the price paid as the "value" because there is no other basis for determining what the cases Persist was supposed to produce should have cost. Since Melchionni and Benito agreed to pay these amounts with KS Law's money; they should have no complaint about the use of the cost charged as the value.

The shortfall is calculated as follows.

| | | |
|---|---|---|
| Talc | $1,200,000 - $36,000 | = $1,164,000 |
| Hernia Mesh | $1,232,000 - $560,000 | = $ 672,000 |
| Round UP | $ 782,500 - $479,597 | = $ 302,903 |
| 3M | $ 665,500 - $302,500 | = $ 363,000 |
| Total | | $2,501,903 |

To put it another way, for Teh's investment of $3.88 million, KS Law received $1,378,097 worth of leads. These figures are of course not precise. Some of the cases Melchionni mentioned may be disqualified and more ERTC claims may be added. This is not the only way to value KS Law's damages but it is the best there is. Persist/Lake Law had plenty of time to find clients for KS Law and Benito and Melchionni have had plenty of time to find another solution for their reckless actions and omissions.

On May 20, 2025, counsel for Benito and Melchionni represented in an email that KS Law had or would receive about $109,000 in attorneys' fees from 3M and ERTC cases. This information is not in evidence and the timing of this announcement, a week before final argument, is problematic. Nonetheless, the Arbitrator finds that it is likely that KS Law will receive some attorneys' fees from its assigned cases. It is not possible to estimate how much since clients may drop out, offers of settlement may be disappointing or not materialize at all, and cases that are tried may produce great results or nothing. This is an additional reason

---

[5] P/L Ex. 1 (v.3) does reflect a few Talcum Powder cases.

that the Arbitrator has chosen to measure KS Law's damages by looking at what KS Law was supposed to receive but did not.

This Final Award assesses Melchionni and Benito, jointly and severally, with $2.5 million in damages.

In addition, the Arbitrator will impose a monetary sanction of $40,000 on Melchionni and $10,000 on Benito for misleading the Arbitrator and the other parties at the hearings.

### Lake Law and Persist

Given that the fraud claims against Benito and Melchionni have not been proved, the claim for aiding and abetting fraud against Lake Law and Persist must be dismissed.  Mr. Lake and his employees were not involved in the representations made to Teh by Benito and Melchionni.  Lake Law and Persist did not deliver what they promised but Claimant did not assert a breach of contract claim against them. Testimony and exhibits at the hearing showed that Lake Law and Persist performed significant services for KS Law.  Persist paid for advertising campaigns which produced leads that Lake Law or its vendors worked up to see if they could turn them into viable cases.  Both companies had significant internal and external costs.  Lake Law and Persist were therefore not unjustly enriched.  There is, on this record, no reason for the accounting requested although certainly the receiver for KS Law could conduct an audit if he or she should suspect any impropriety in the allocation of cases to KS Law or the work done on those cases.

### A Receiver Should be Appointed

Lake Law is currently in the hands of a manager appointed by Burford Capital, a large litigation financing firm which loaned Lake Law $15 million.  This creditor, and Benito and Melchionni to a lesser extent, have kept Lake Law out of bankruptcy by paying its expenses in the hope that proper management of its docket will produce positive returns.  The current manager is beholden to the creditor that appointed him, and Benito and Melchionni cannot be trusted to look after the rights of KS Law.  This is a dangerous situation for KS Law.  It is therefore necessary to appoint a receiver to be sure that KS Law has received its assigned cases appropriately and collects what it is owed as cases are tried or settled.  Upon receipt of the Final Award in this matter, counsel for Claimant shall transmit a copy to Judge Walsh noting that the Arbitrator has requested the appointment of a receiver.

Case No.: 01-23-0005-2721                                                                              16

**KS Law and the District of Columbia Bar Rules of Professional Conduct**

D.C. Rule 5.4 provides in part:

> (b) A lawyer may practice law in a partnership or other form of organization in which a financial interest is held or managerial authority is exercised by *an individual nonlawyer who performs professional services which assist the organization in providing legal services to clients*, but only if:
>
> (1) The partnership or organization *has as its sole purpose providing legal services to clients;*
>
> (2) All persons having such managerial authority or holding a financial interest undertake to abide by these Rules of Professional Conduct;
>
> (3) The lawyers who have a financial interest or managerial authority in the partnership or organization undertake to be responsible for the nonlawyer participants to the same extent as if nonlawyer participants were lawyers under Rule 5.1;
>
> (4) The foregoing conditions are set forth in writing.

*Emphasis added.*  Comments to Rule 5.4 include the following:

> [7] As the introductory portion of paragraph (b) makes clear, the purpose of liberalizing the Rules regarding the possession of a financial interest or the exercise of management authority by a nonlawyer is to permit nonlawyer professionals to work with lawyers in the delivery of legal services without being relegated to the role of an employee. For example, the rule permits economists to work in a firm with antitrust or public utility practitioners, psychologists or psychiatric social workers to work with family law practitioners to assist in counseling clients, nonlawyer lobbyists to work with lawyers who perform legislative services, certified public accountants to work in conjunction with tax lawyers or others who use accountants' services in performing legal services, and professional managers to serve as office managers, executive directors, or in similar positions. In all of these situations, the professionals may be given financial interests or managerial responsibility, so long as all of the requirements of paragraph (c) are met.

[8] *Paragraph (b) does not permit an individual or entity to acquire all or any part of the ownership of a law partnership or other form of law practice organization for investment or other purposes. It thus does not permit* a corporation, an investment banking firm, *an investor*, or any other person or entity *to entitle itself to all or any portion of the income or profits of a law firm* or other similar organization. *Since such an investor would not be an individual performing professional services within the law firm or other organization, the requirements of paragraph (b) would not be met.*

*Emphasis added.*

KS Law's partnership agreement itself (JX 15) complies with Rule 5.4(b) in meticulous detail, outlining duties for Benito and Teh in ¶13, in accord with the advice received from ethics counsel.  One of the attachments to JX 42 is an opinion of ethics counsel, Jack Marshall, Esq., concerning the interpretation of this rule. He states that "[h]aving a non-lawyer who had no duties in the operation of the firm would be misrepresentation, which constitutes rule 8.4 misconduct."[6]  Mr. Marshall goes on to advise:

> Thus, a non-lawyer partner brought into the firm primarily to provide financial resources must still work to make the partnership valid and prevent the participation from appearing to be an investment.  Such a partner's function could include management, strategic consulting, or any other legitimate non-legal duties that would strengthen the firm and enhance its ability to serve clients. Obviously, they must be real duties, not imaginary ones.

However, it is undisputed that Teh performed no duties for the firm, he was never asked to perform any duties and no one expected that he would do anything other than wire transfer $4 million to KS Law.  His role was to supply capital for the firm and then sit back and wait for the legal fees to roll in from the settlement of mass tort cases filed by other law firms.  Teh's investment was exactly the passive investment that Rule 5.4(b) prohibits.

KS Law's partnership agreement recites that its sole purpose is the practice of law. In fact, it does not engage in the practice of law; its sole purpose was and is to act as a vehicle for Teh to invest in the mass torts industry and hopefully collect attorneys' fees as cases in which it was invested were tried or settled.  KS Law's

---

[6] The Arbitrator is dubious that violation of this Rule would constitute Rule 8.4 misconduct.

sole activity was to provide funding to Persist, a marketing firm that recruited clients for Lake Law through advertising campaigns.  KS Law has only one lawyer, Melchionni, who does not do legal work for it.  Melchionni's touted 10 years of experience with mass torts was primarily on the financing side.

In his testimony, Melchionni cited the above-quoted opinion of counsel in defense of the structure of KS Law and his other DC law firms.  It obviously does not support Melchionni's choices in structuring his DC law firms.  It is plain that KS Law was not a proper law firm within the meaning of Rule 5.4.  It was not in the interest of any party to this arbitration to argue this issue.  The Arbitrator mentions it because Melchionni's consistent denial of the fact that he ignored Mr. Marshall's advice is another factor speaking to Melchionni's credibility and his willingness to misrepresent KS Law's status.

## Retainer Agreements

D.C. Rule 1.5 provides in part:

> (e) A DIVISION OF A FEE BETWEEN LAWYERS WHO ARE NOT IN THE SAME FIRM MAY BE MADE ONLY IF:
>
> (1) THE DIVISION IS IN PROPORTION TO THE SERVICES PERFORMED BY EACH LAWYER OR EACH LAWYER ASSUMES JOINT RESPONSI BILITY FOR THE REPRESENTATION;
>
> (2) THE CLIENT IS ADVISED, IN WRITING, OF THE IDENTITY OF THE LAWYERS WHO WILL PARTICIPATE IN THE REPRESENTATION, OF THE CONTEMPLATED DIVISION OF RESPONSIBILITY, AND OF THE EFFECT OF THE ASSOCIATION OF LAWYERS OUTSIDE THE FIRM ON THE FEE TO BE CHARGED;
>
> (3) THE CLIENT GIVES INFORMED CONSENT TO THE ARRANGEMENT; AND
>
> (4) THE TOTAL FEE IS REASONABLE.

*Caps in original*.  Comment 14 to this Rule explains:

> [14] Paragraph (e) requires that the client be advised, in writing, of the fee division and states that the client must affirmatively give informed consent

Case No.: 01-23-0005-2721                                                                                       19

to the proposed fee arrangement. For the definition of "informed consent," see Rule 1.0(e).[7] The Rule does not require disclosure to the client of the share that each lawyer is to receive but does require that the client be informed of the identity of the lawyers sharing the fee, their respective responsibilities in the representation, and the effect of the association of lawyers outside the firm on the fee charged.

There are no retainer agreements naming KS Law as counsel, let alone Melchionni. This is a fact that KS Law, and indeed its counsel, kept hidden from Teh and the Arbitrator until the Arbitrator ordered production of KS Law's retainer agreements. Then it was disclosed that there were none, but Lake Law was attempting to get client agreement to KS Law's participation through email correspondence. At the time of the hearing, some clients had agreed and others had not responded.

At the hearing, expert witnesses for Benito and Melchionni testified that this is the way things are done in the mass tort industry, and that it is of no consequence that KS Law is not named in any retainer agreements. It may well be that this is the way it is done, but it cannot be done this way by a District of Columbia law firm. Clients are entitled to know who is representing them although here there is arguably "no harm, no foul" because KS Law is not doing any legal work.  Of much more significance, the failure to have retainer agreements for KS Law's clients meant that Teh and his counsel had no way to verify whether there had been any changes to cases assigned to KS Law through the proffered round robin arrangement, another breach of fiduciary duty by Melchionni and Benito.

## ATTORNEYS' FEES AND COSTS

KS Law's Partnership Agreement provides that the prevailing party in an arbitration is to be awarded its costs and fees, including reasonable attorneys' fees. JX 15@¶39.  Claimant KS Law[8] is the prevailing party as to its claims against Respondents Melchionni and Benito.  Persist and Lake Law are the prevailing parties as to the derivative claims against them brought by Teh on behalf KS Law. Counsel were instructed to submit their claims for fees and costs after providing the opposing party the opportunity to review them and raise any objections.  The

---

[7] Rule 1.0(e) defines informed consents as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

[8] The Partial Final Award said that Mr. Teh was the prevailing party but should have said that it was Mr. Teh in his capacity as a partner in KS Law, suing on its behalf.

Case No.: 01-23-0005-2721

Arbitrator appreciates the cooperative manner in which counsel exchanged views. The party claiming fees and costs has the burden of proving that they were incurred (not an issue here) and that they are reasonable. The Arbitrator has considered the claims for these expenses and the objections thereto and awards as follows:

## Lake Law/Persist

Counsel for Mr. Teh sought clarification that KS Law, and not Mr. Teh personally, was obligated to pay the fee and costs award in favor of Lake Law and Persist. The Arbitrator advised that this was not the case. *See* August 29, 2025 Order. Teh brought this derivative action to benefit himself in an effort to recoup his investment in KS Law and much more. There was no benefit to KS Law from this claim and Teh should bear the burden of his errors in bringing and prosecuting it.

Lake Law and Persist requested attorneys' fees of $175,860.00 and costs of $36,794.31 for the period in which Mr. Gelber represented them. Their prior counsel, Andrew Berman, submitted billing records with attorneys' fees of $49,706.23 and costs of $766.83.

Teh objected to certain entries by Mr. Gelber that are part of Lake Law/Persist's claim for fees and costs as "excessive" and lacking "specificity." Mr. Gelber provided additional detail in his responses. The Arbitrator has examined each of these entries and finds them to be within the range of reasonableness for the tasks described. No objection was made to Mr. Berman's claim.

Therefore, Teh shall pay to Mr. Gelber's firm fees of $175,860.00 and costs of $36,794.31 for a total of $212,654.31 and pay to Mr. Berman's firm fees of $49,706.23 and costs of $766.83 for a total of $50,473.06.

## KS Law as Derivative Claimant

Claimant submitted a request for $355,140.00 in attorneys' fees and $237,102.57 in costs to be paid by Respondents Melchionni and Benito. The Arbitrator awards $324,098.00 in attorneys' fees and $183,080.66 in costs. Melchionni and Benito objected to some of the requests, Claimant agreed with some of the objections and the Arbitrator has agreed with some others.

Case No.: 01-23-0005-2721                                                21

### Claimant's Attorneys' Fees

Respondents Melchionni and Benito also argued that because Claimant sought over $12 million in damages and was awarded much less than that, it was not very successful and should receive a fee award reflective of the portion of damages sought actually awarded. The Arbitrator does not agree with this analysis or with their interpretation of the DC cases. Claimant was largely successful in the arbitration, obtaining an award of $2.5 million toward a potential loss of $4 million and the appointment of a receiver. Since Claimant will likely be receiving at least some attorneys' fees for cases yet to be settled, it could possibly be made whole and perhaps even better. That Claimant argued for much more in damages is the usual puffery expected from claimants and not the measuring rod against which success should be measured.

Disallowed fees included the following:

1. Time spent resisting the motion to compel arbitration, the motion to stay and the motion to transfer to Judge Walsh. The arbitration clause in the Partnership Agreement was broad and there was no benefit to KS Law in resisting arbitration as to Respondents Melchionni and Benito. KS Law lost this issue and it was not so intertwined with the case against Respondents Melchionni and Benito that it should be considered part of the "common core" of facts or law. Staying a case referred to arbitration rather than dismissing it is best practice. Efforts to resist this motion and the motion to transfer were both unsuccessful, of no benefit to KS Law and unrelated to the successful claims.

2. Time spent on the case against Lake Law and Persist. Claimant did not prevail on any of the claims against Lake Law and Persist. The claims against these Respondents largely rested on Claimant's argument that they were part of a fraud perpetrated by Respondents Melchionni and Benito. This fraud was not proved.

3. In some cases, Claimant's response to the objection did not meet the substance of the objection. For example, there are numerous entries where the objection was that time recorded should be split with another case and the response was "Objection is unsupported; the work was directly responsive and necessary."

Case No.: 01-23-0005-2721                                                                                           22

4. Time spent communicating with U.S. Attorney's office was not sufficiently explained. While the Arbitrator did find that Respondents Melchionni and Benito had not revealed certain key information until after the hearing in this case, no relationship between this and discussion with the AUSA was established.

## Claimant's Costs

Claimant's primary expert witness, Adam Levitt, is a senior partner in a successful Chicago law firm. He submitted bills for $200,011.00 in fees and costs of $2,334.96. The costs were attributed to his trip to Virginia to participate in the arbitration hearing. His firm did not charge for other costs such as copying, courier service, etc. that many firms do. The out-of-pocket costs charged are not unreasonable for a law firm partner like Mr. Levitt and they will be awarded in full.

Respondents Melchionni and Benito primarily complain about Mr. Levitt's hourly rate of $1,675 per hour and the $1,275 and $1,125 rates charged by his partners. No affidavit was submitted as to the customary rates charged by high end Chicago law firms which, as Mr. Levitt would know, would have been the better practice. However, the Arbitrator is aware that standard hourly rates for successful law firm partners in large cities exceed $1,000 per hour and can be much more than that. The Arbitrator believes the fairest result is to apply a blended rate of $1,200 per hour to the DiCello Levitt partners for a fee of $158,910. It was cost effective for Mr. Levitt to have his partners take care of some of the tasks required of him.

Michael Portuondo was Claimant's accounting expert. He submitted bills for $33,977.50 and costs of $2,974.07. The Arbitrator did not accept his model for calculating damages and has reduced his fee to $20,000 to account for that. As with Mr. Levitt, the only costs he submitted were for travel to Virginia for the arbitration. Respondents question the multiple plane tickets apparently purchased by Mr. Portuondo, $1,138.37 to United Airlines on 01/06/2025, $537.48 to American Airlines on 01/07/2025 and $502.00 to American Airlines on 01/08/2025. Because no explanation was offered, the Arbitrator can only speculate as to why multiple tickets were purchased but that cannot be the basis for an award. The earliest ticket ($1,138.37) is disallowed so costs of $1,835.70 will be awarded.

Case No.: 01-23-0005-2721

23

To sum up, Claimant will be awarded $158,910.00 for Mr. Levitt's fees, $2,334.96 for his costs, $20,000 for Mr. Portuondo's fees and $1,835.70 for his costs for a total of $183,080.66.

## FINAL AWARD

In accord with the reasoning and findings above, it is hereby ORDERED that:

1.  Upon receipt of this Final Award, counsel for Claimant shall transmit a copy to Judge Walsh noting that the Arbitrator has requested the appointment of a receiver.

2.  Respondents Melchionni and Benito are liable, jointly and severally, to KS Law for Two Million Five Hundred Thousand Dollars ($2.5 million) in compensatory damages.

3.  Respondents Melchionni and Benito are liable, jointly and severally, to KS Law for Three Hundred Twenty-Four Thousand Ninety-Eight Dollars ($324,098.00) in attorneys' fees and One Hundred Eighty-Three Thousand Eighty Dollars and Sixty-Six Cents ($183,080.66) in costs.

4.  As a sanction for misleading testimony, Respondent Melchionni is liable to KS Law for Fifty Thousand Dollars ($50,000).

5.  As a sanction for misleading testimony, Respondent Benito is liable to KS Law for Ten Thousand Dollars ($10,000).

6.  Allan Teh is liable for Mr. Gelber's fees of One Hundred Seventy-Five Thousand Eight Hundred Sixty Dollars ($175,860.00) and costs of Thirty-Six Thousand Seven Hundred Ninety-Four Dollars and Thirty-One Cents ($36,794.31) for a total of Two Hundred Twelve Thousand Six Hundred Fifty-Four Dollars and Thirty-One Cents ($212,654.31).  He is further liable for Mr. Berman's fees of Forty-Nine Thousand Seven Hundred Six and Twenty-Three Cents ($49,706.23) and costs of Seven Hundred Sixty-Six Dollars and Eighty-Three Cents ($766.83) for a total of $50,473.06.

7.  The administrative fees of the American Arbitration Association totaling $16,175.00 shall be borne equally by Claimant and Respondents Melchionni and Benito, and the compensation and expenses of the Arbitrator totaling $50,030.00 shall be borne equally by Claimant and Respondents Melchionni

and Benito.  Therefore, Respondents Melchionni and Benito, jointly and severally, shall reimburse Claimant the sum of $8,087.50, representing that portion of said fees in excess of the apportioned costs previously incurred and paid by Claimant, upon demonstration by Claimant that these costs have been paid.

The above sums are to be paid on or before 90 days from the date of this Award.

This Award is in full settlement of all claims submitted to this Arbitration.  All causes of action and claims for relief not expressly ruled on herein are denied with prejudice.

Date:  October 14, 2025

*Sheila J. Carpenter*
Sheila J. Carpenter
Arbitrator

I, Sheila J. Carpenter, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Final Award.

Date:  October 14, 2025

*Sheila J. Carpenter*
Sheila J. Carpenter
Arbitrator

Case No.: 01-23-0005-2721

25

Filing # 190836425 E-Filed 01/30/2024 01:05:24 PM

# Exhibit B

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2023-015702-CA-01
SECTION: CA44
JUDGE: Lisa Walsh

**Allan Teh**

Plaintiff(s)

vs.

**KS Law Group, LLP et al**

Defendant(s)

_____/

## AGREED ORDER STAYING THE CASE PENDING RESULT OF ARBITRATION

**THIS CAUSE** having come before this Court and the Court being fully advised of the agreement of counsel, it is hereupon,

**ORDERED** and **ADJUDGED** that On October 27th, 2023, the Court entered an "Order Granting Motions to Compel Arbitration by Both Signatories and Non-Signatories to the Partnership Agreement Containing the Arbitration Provision" [DE #64], in which this Court compelled arbitration of the above-captioned case. Due to the possibility of post arbitration enforcement of any award, or other disposition, and the possible need for equitable relief/receivership, the Court reserved jurisdiction and kept this case open. But other than the receivership issues and pending motions for sanctions, there are no other substantive issues extant and thus no need for monthly CMC's or close monitoring while the arbitration is proceeding. Accordingly, all CMC's are cancelled.

The parties shall set this case for a status hearing in 180 days. Failure to set the case for status will result in the presumption that the case has been resolved through arbitration, no further judicial action is required and the court will dismiss this case.

Case No: 2023-015702-CA-01

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>30th day of January, 2024</u>.

<u>2023-015702-CA-01 01-30-2024 12:53 PM</u>
Hon. Lisa Walsh

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Scott Berman, aberman@ybkklaw.com
Andrew Scott Berman, eservice@ybkklaw.com
Cheyenne Moghadam, c.moghadam@jones-adams.com
Kenneth L Bressler, ken.bressler@blankrome.com
Matthew L. Jones, matthew@jones-adams.com
Michelle M. Gervais Esq., michelle.gervais@blankrome.com
Michelle M. Gervais Esq., BRFLeservice@blankrome.com
Michelle M. Gervais Esq., Silvia.Membreno@blankrome.com

**Physically Served:**